THEODORE B. STOLMAN (State Bar No. CA 52099)
TStolman@Stutman.com
SCOTT H. YUN (State Bar No. CA 185190)
SYun@Stutman.com
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone:     (310) 228-5600
Facsimile:     (310) 228-5788

ROBERT W. JONES (State Bar No. TX 10951200)
RWJones@pattonboggs.com
J. MAXWELL TUCKER (State Bar No. TX 20270900)
MTucker@pattonboggs.com
PATTON BOGGS LLP
2001 Ross Avenue, Suite 3000
Dallas, TX 75201-8001
Telephone:     (214) 758-1500
Facsimile:     (214) 758-1550

Proposed Bankruptcy Counsel for the
Debtor and Debtor in Possession

Debtor's Mailing Address
2727 East Imperial Highway
Brea, California 92821

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>FREMONT GENERAL CORPORATION, a Nevada corporation,<br><br>        Debtor,<br><br>Tax I.D. 95-2815260 | Case No. 8:08-bk-13421-ES<br><br>Chapter 11<br><br>**DECLARATION OF STEPHEN H. GORDON IN SUPPORT OF MOTION FOR ORDER AUTHORIZING THE DEBTOR TO USE THE SHARES OF A NON-DEBTOR SUBSIDIARY TO CONSUMMATE THE CAPITALSOURCE TRANSACTION**<br><br><u>Hearing</u><br>DATE:  July 17, 2008<br>TIME:  2:00 p.m.<br>PLACE: Courtroom 5A<br>       411 West Fourth Street<br>       Santa Ana, CA 92701 |

-1-

026463.0107\478526
475207v1

## DECLARATION OF STEPHEN H. GORDON

I, Stephen H. Gordon, declare under penalty of perjury as follows:

1. I am over the age of eighteen and mentally competent. I have personal knowledge of the facts in this matter, except where stated upon information and belief, and if called to testify, could and would testify.

2. I am the Chairman and Chief Executive Officer of the Fremont General Corporation ("FGC" or the "Debtor") and Fremont Investment & Loan (the "Bank"). FGC owns 100% of the common stock of Fremont General Credit Corporation ("FGCC"), which in turn owns 100% of the common stock of the Bank.

3. I have more than twenty years of financial services experience. I was a Co-Founder of Commercial Capital Bancorp, Inc. ("CCBI") and of its wholly owned subsidiary, Commercial Capital Bank, a federal savings bank, and served as Chairman and Chief Executive Officer from June 1999 until CCBI was acquired by Washington Mutual, Inc. in October 2006 for a total purchase price of nearly $1 billion. At the time of its acquisition, CCBI was the fifth largest California-based thrift and the twenty-second largest nationwide. I am also a former investment banker, with substantial experience in advising management and directors of underperforming, undercapitalized and troubled financial institutions on such issues as strategic planning, capital and liquidity management, balance

-2-

026463.0107\478526

sheet management and restructuring, asset/liability management, and the enhancement of shareholder value.

4.  I am submitting this declaration in support of a *Motion for Order Authorizing the Debtor to Use the Shares of a Non-Debtor Subsidiary to Consumate the CapitalSource Transaction* (the "Motion[1]") filed by the Debtor.

5.  In November 2007, I was appointed as the Chairman and Chief Executive Officer of FGC by its board of directors. At that time, I assembled a team of highly qualified individuals, many of whom I worked with at CCBI, to assist me as my management team. In addition to serving as management for FGC, our management team was also authorized by the Regulatory Authorities to serve at the Bank in the same capacities in December 2007.

6.  Immediately upon my appointment, my management team and I began work on a series of initiatives designed to resolve many of the legacy issues confronting both FGC and the Bank. In connection with those efforts, the new management team's sole objective was to maximize the value of FGC and the Bank for the benefit of their respective stakeholders.

7.  To that end, our management team has achieved the following:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

- Reduced operating expenses through closure of the Bank's Irving, Texas loan servicing center and the Debtor's Santa Monica, California, headquarters;
- Sold substantially all of the Bank's performing and non-performing loans;
- Negotiated resolutions of many of the Bank's outstanding litigation matters;
- Resolved certain minimum net worth covenant breaches by FGC;
- Negotiated resolutions of a substantial portion of the Bank's residential mortgage loan repurchase demands;
- Sold the Bank's recurring mortgage servicing rights on its $12.2 billion serviced loan portfolio (as of June 2, 2008). Pursuant to that sale, the Bank has monetized its mortgage servicing rights and received reimbursement for delinquency and servicing advances made by the Bank, as well as accrued and unpaid servicing fees;
- Conducted an extensive marketing and diligence effort for the assets of the Bank; and
- Upon completion of such marketing and diligence efforts, negotiated and received approval from the Regulatory Authorities to complete the CapitalSource Transaction.

8. On March 26, 2008, the FDIC, with the concurrence of the DFI, issued a Supervisory Prompt Corrective Action Directive (the

-4-

026463.0107\478526

"Directive") to the Bank, FGC, and FGCC. A true and correct copy of the Directive is attached hereto as Exhibit "A" and incorporated herin by this reference. The Directive required the Bank, FGC and FGCC to take one or more of the following actions to recapitalize the Bank within 60 days of the Directive (i.e., by May 26, 2008): (i) the Bank would have to sell enough voting shares or obligations of the Bank so that the Bank would be "adequately capitalized," as defined under the Federal Deposit Insurance Act and the related FDIC regulations, after the sale; and/or (ii) the Bank would have to accept an offer to be acquired by a depository institution holding company or to combine with another insured depository institution; and in connection with any such acquisition transaction, FGC and FGCC would have to divest themselves of the Bank.

9. After we received the Directive, FGC and the Bank, with the assistance of Credit Suisse Securities (USA) LLC ("Credit Suisse") and Sandler O'Neill & Partners, L.P. ("Sandler O'Neill" and together with Credit Suisse the "Investment Bankers."), continued to devote substantially all of our attention toward exploring a possible sale, recapitalization or merger of FGC and/or the Bank or the sale of the Bank's assets within the time frame imposed by the Directive.

10. Those efforts ultimately led to the successful negotiation and execution of the CapitalSource Transaction. After active arms-length negotiation, resulting in material economic improvements for

-5-

026463.0107\478526

the Bank as compared to CapitalSource's original proposal, FGC, FGCC and the Bank reached agreement with CapitalSource regarding the terms of the Purchase and Assumption Agreement (the "APA"), which was entered into as of April 13, 2008.

11. I am personally familiar with the terms of the APA. The APA provides for the purchase of Bank assets, including the Bank's participation interest in certain previously sold commercial real estate loans and the acquisition of all the Bank's branches, and the assumption of all of the Bank's deposits, by a California industrial bank to be organized and wholly owned by CSE or its designee (the "Purchaser").

12. Pursuant to the APA, the Purchaser will pay a 2% premium on all the Bank's deposits, and will purchase the Bank's participation interest in previously sold commercial real estate loans at a 3% discount to its net book value. The Bank's other assets are to be sold in the transaction at net book value, and include real and personal property, cash and certain other assets.

13. The deposit premium and the purchase price for the participation interest, cash and other assets being sold by the Bank are expected to offset the deposits being assumed by the Purchaser.

14. After giving effect to a deposit premium of approximately $112 million (based on estimated deposits of $5.6 billion at March 31, 2008), an additional cash payment to be received of $58 million, less the discount given on the commercial real estate

-6-

026463.0107\478526

participation interest of approximately $80 million, the parties estimate that the net effect of the proposed transaction will result in a net premium to the Bank of approximately $90 million.

15. I believe that the CapitalSource Transaction represents the best available transaction for the sale of the Bank's remaining assets because those assets have been thoroughly and effectively marketed over the past year. That process began even before I was appointed, when FGC and the Bank retained Credit Suisse, an internationally recognized investment banking firm in March of 2007. After new management was in place, we also engaged Sandler O'Neill, a recognized investment banking firm, to assist Credit Suisse in marketing and selling the assets of FGC and the Bank.

16. As a former investment banker myself, I know and appreciate the work that has been done by both Credit Suisse and Sandler O'Neill. I believe that we have, with the assistance of the Investment Bankers, either contacted directly every party that reasonably could be expected to consummate a transaction to purchase, recapitalize or merge with FGC or the Bank has, or each of those parties has been made aware of the CapitalSource Transaction, and that the best transaction available to FGC is the CapitalSource Transaction. I also believe that the price received under the CapitalSource Transaction is fair and reasonable.

17. On April 13, 2008, the boards of directors of FGC and the Bank met to consider the CaptitalSource Transaction. At that meeting, the directors were each advised by their counsel, the

-7-

Investment Bankers, and management as to the terms of the CapitalSource Transaction, the fairness of the price under the CapitalSource Transaction, the marketing efforts that had occurred which gave rise to the CapitalSource Transaction, the likelihood that superior offers could be obtained and consumated in a timely manner, and the likelihood that the CapitalSource Transaction could be consummated within a reasonable period of time and consistent with the Directive. The boards actively discussed and deliberated the CapitalSource Transaction together with all other information reasonably available to them. The boards considered the advice of mangement and retained professionals, and ultimately, the boards approved the CapitalSource Transaction by unanimous vote. Thereafter, I personally executed the APA on behalf of FGC, FGCC and the Bank. A true and correct copy of the APA is attached hereto as Exhibit "B" and incorporated herein by this reference.

18. As Chairman of the Board and Chief Executive Officer of FGC and the Bank, I believe consumation of the CapitalSource Transaction is a sound business decision in the best interest of FGC and the Bank because:

- The ultimately agreed upon purchase price for the CapitalSource Transaction is fair and reasonable, particularly considering the lengthy sale process conducted by the Investment Bankers and constitutes the best transaction available to capture the Bank's

-8-

026463.0107\478526

- going concern value for the benefit of creditors of the Bank and FGC.
- The APA was negotiated in good faith, intensely, and at arms length between FGC, the Bank and CapitalSource.
- The proposed CapitalSource Transaction preserves employment for many Bank employees.
- The proposed CapitalSource Transaction protects Bank depositors from loss because CSE, through the Purchaser, will assume the deposit liabilities.
- FGC is subject to an FDIC Directive, containing strict time constraints. The value of the Bank stock is eroding substantially with the passage of time. Failure to achieve the CapitalSoruce Transaction exposes the Bank to potential seizure by the FDIC, which would severely damage FGC's creditors and other parties in interest by crippling any chance of realization of the Bank's going concern value.

19. The CapitalSource Transaction has been approved by both the DFI and the FDIC. On May 29, 2008, the DFI provided the Bank with approval of the CapitalSource Transaction, subject to the condition that the Purchaser's application to the Regulatory Authorities was also approved. The approval process with respect to the Purchaser is both involved and stringent, requiring significant review and approval by both the FDIC and the DFI of the Purchaser's financial status, management ability, and business plan. The

-9-

026463.0107\478526

Case 8:08-bk-13421-ES    Doc 31    Filed 06/23/08    Entered 06/23/08 14:48:31    Desc
Main Document    Page 10 of 11

1  Purchaser's application was approved by the DFI on June 12, 2008
2  and the FDIC on June 17, 2008. A copy of the written order of
3  approval from the FDIC is attached hereto as Exhibit "C" and
4  incorporated herein by this reference.
5     20. With respect to the DFI, the completion and effectiveness
6  of the CapitalSource Transaction will occur when the Bank notifies
7  the DFI of the date and time of the closing, which will be endorsed
8  on the APA to be filed with the State of California. The Bank
9  intends to establish such a date promptly following receipt of the
10 Order requested by this Motion.
11    21. The APA provides that FGC can solicit shareholder approval
12 of the CapitalSource Transaction, but that if it is determined by
13 FGC that such solicitation could not reasonably be obtained, then
14 FGC would seek approval through a Chapter 11 bankruptcy filing by
15 FGC. After consulting with counsel, advisors, and after discussions
16 with the Staff of the U.S. Securities and Exchange Commission (the
17 "SEC") concerning the SEC requirements for solicitation of
18 shareholder approvals under the SEC proxy rules, FGC determined
19 that it could not provide, in a realistic time frame, the
20 consolidated financial statements and information that would be
21 required by the SEC proxy rules to permit FGC to solicit its
22 shareholders for approval of the proposed CapitalSource
23 Transaction.
24    22. As a result, because the FGC board of directors
25 nevertheless determined that it is in the best interests of the

-10-
026463.0107\478526

creditors and other constituencies of FGC for FGC to consummate the CapitalSource Transaction, it was determined that FGC would promptly seek protection under Chapter 11 of the Bankruptcy Code following approval of the Regulatory Authorities. Accordingly, FGC filed for Chapter 11 protection and is seeking the relief sought by the Motion.

IN WITNESS WHEREOF, I have executed this declaration under penalty of perjury under the laws of the United States of America this 18th day of June, 2008.

*[signature]*

Stephen H. Gordon

026463.0107\478526

-11-