1  **WEILAND, GOLDEN,**
   **SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
   esmiley@wgllp.com
3  Philip E. Strok, State Bar No. 169296
   pstrok@wgllp.com
4  Kyra E. Andrassy, State Bar No. 207959
   kandrassy@wgllp.com
5  Robert S. Marticello, State Bar No. 244256
   rmarticello@wgllp.com
6  650 Town Center Drive, Suite 950
   Costa Mesa, California 92626
7  Telephone:   (714) 966-1000
   Facsimile:    (714) 966-1002
8
   Attorneys for the Official Committee
9  of Equity Holders

10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                    **SANTA ANA DIVISION**

14  In re                              | Case No. 8:08-bk-13421-ES

15  FREMONT GENERAL CORPORATION, a       | Chapter 11 Case
    Nevada corporation,
16
                                        | **OFFICIAL COMMITTEE OF EQUITY**
17                                       | **HOLDERS' FIRST AMENDED**
                                        | **DISCLOSURE STATEMENT DESCRIBING**
18                Debtor.               | **FIRST AMENDED CHAPTER 11 PLAN OF**
                                        | **REORGANIZATION**
19

20

21

22

23  Taxpayer ID No. 95-2815260

24

25

26

27

28

323260.3                                              AMENDED DISCLOSURE STATEMENT

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................... 1

    A.  Purpose of This Document.......................................................... 1

    B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ................................................................................... 2

        1.  Time and Place of the Confirmation Hearing.................................. 3

        2.  Deadline for Voting for or Against the Plan ..................................... 3

        3.  Deadline for Objecting to the Confirmation of the Plan.................... 3

        4.  Identity of Person to Contact for Further Information Regarding the Plan................................................................... 3

    C.  Disclaimer ................................................................................. 3

II.  OVERVIEW OF THE EQUITY COMMITTEE'S PLAN ........................................... 5

III.  HISTORY OF THE DEBTOR.................................................................... 11

    A.  The Lending Operations ............................................................ 11

    B.  The Insurance and Indemnity Operations .................................... 13

    C.  The Debtor's Management.......................................................... 13

    D.  Selected Financial Information .................................................... 14

IV.  THE CHAPTER 11 CASE...................................................................... 14

    A.  Events Leading to the Bankruptcy Filing...................................... 14

    B.  Significant Events During the Chapter 11 Case ............................. 16

        1.  Retention of Debtor's Professionals and Agents ............................ 16

        2.  Appointment of the Creditors' Committee and Equity Committee......................................................................... 17

        3.  Consummation of the CapitalSource Transaction ......................... 17

        4.  The Order Limiting Transfers of Equity......................................... 18

        5.  Insider Compensation .............................................................. 18

        6.  Establishment of General Bar Date and Filing of Claims................. 19

        7.  Relief from Stay Motions – McIntyre, Faigin, and The Bank of New York Mellon .................................................... 19

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

| | | | |
|---|---|---|---|
| | 8. | Engagement of KPMG Corporate Finance and the Attempts to Negotiate a Consensual Plan | 20 |
| | 9. | Exclusivity | 21 |
| | 10. | Settlement of Claims and Litigation | 21 |
| | | a. California Insurance Commissioner | 21 |
| | | b. Massachusetts Attorney General | 24 |
| | | c. Enron | 25 |
| | | d. The Rampino Litigation and Associated Defendants' Wage, SERP, and Indemnification Claims | 27 |
| | | e. Other Settled and Resolved Claims | 28 |
| V. | LITIGATION AND CAUSES OF ACTION | | 29 |
| | A. | Litigation Commenced Pre-Petition | 29 |
| | B. | Post-Petition and Other Potential Causes of Action | 30 |
| | | 1. In General | 30 |
| | | 2. Adv. Pro. No. 8:08-ap-01256-ES and Adv. Pro No. 8:09-ap-01103-ES | 30 |
| | | 3. Adv. Pro. No. 8:08-ap-01258-ES | 30 |
| | | 4. Adv. Pro. No. 8:08-ap-01418-ES | 31 |
| | | 5. Adv. Pro. No. 8:08-ap-01470-ES | 31 |
| | | 6. Other Actions | 31 |
| | | 7. Other Significant Litigation Claims | 31 |
| | | 8. Causes of Action Are to Be Retained Under Plan; No Waiver Should Be Implied | 31 |
| | | 9. Objections To Claims | 32 |
| VI. | SUMMARY OF THE PLAN OF REORGANIZATION | | 32 |
| | A. | Allowance and Treatment of Unclassified Claims | 33 |
| | | 1. Administrative Claims | 33 |

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# TABLE OF CONTENTS (cont.)

**Page**

      a.    Administrative Claim Reserve ............................................... 34

      b.    Administrative Claims Bar Date ............................................ 34

      c.    Deadline for Objections to Administrative Claims ............... 34

      d.    U.S. Trustee Fees ............................................................... 35

      e.    Professional Fee Claims ...................................................... 35

   2.    Priority Tax Claims .......................................................................... 35

B.    Allowance and Treatment of Classified Claims and Interests ................... 36

   1.    Priority Non-Tax Claims (Class 1) .................................................. 36

   2.    General Unsecured Claims (Class 2) ............................................. 36

   3.    Class of Equity Interests (Class 3A) ............................................... 38

   4.    Class of Claims Subordinated Under 11 U.S.C. § 510(b)
       (Class 3B) ...................................................................................... 39

C.    Executory Contracts and Unexpired Leases ............................................ 39

D.    Means of Effectuating the Plan ................................................................ 40

   1.    The Reorganized Debtor's Management Team .............................. 40

   2.    The Short-Term Strategy ................................................................ 42

   3.    The Long-Term Strategy ................................................................ 43

      a.    Community Bank ................................................................... 44

      b.    Distressed Loans ................................................................. 44

      c.    Hard Money Mortgages ........................................................ 44

      d.    Asset-Based Financing ........................................................ 44

E.    Risk Factors ............................................................................................. 45

   1.    Plan Assumptions .......................................................................... 45

   2.    Additional Risks ............................................................................. 46

      a.    General Risks ...................................................................... 46

      b.    Specific Risks ...................................................................... 46

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

        (i)      Repurchase Obligations........................................... 47

        (ii)     Risks Regarding Unresolved Litigation .................... 47

        (iii)    Risks Regarding Unresolved Claims........................ 47

        (iv)   Dilution of Equity and Public Company Status.................................................................... 49

F.    Tax Consequences of Plan................................................ 50

G.   Retention of Jurisdiction.................................................... 51

H.   Claims.............................................................................. 52

I.    The Committees............................................................... 53

VII.  MISCELLANEOUS PROVISIONS GOVERNING DISBURSEMENTS ............... 53

A.   Dates of Distributions....................................................... 53

B.   Manner of Distribution...................................................... 53

C.   Undeliverable Distributions ............................................... 53

D.   Rounding of Payments ..................................................... 54

E.   Compliance with Tax Requirements .................................. 54

F.    Distribution of Unclaimed Property..................................... 55

G.   Setoff .............................................................................. 55

H.   Exculpation Provision....................................................... 55

VIII. CONFIRMATION REQUIREMENTS AND PROCEDURES ............................ 56

A.   Who May Vote or Object................................................... 56

    1.   Who May Object to Confirmation of the Plan ................. 56

    2.   Who May Vote to Accept/Reject the Plan...................... 56

        a.   What Is an Allowed Claim/Interest....................... 57

        b.   What Is an Impaired Claim/Interest ...................... 57

    3.   Who Is Not Entitled to Vote ......................................... 58

    4.   Votes Necessary to Confirm the Plan........................... 58

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

# TABLE OF CONTENTS (cont.)

Page

5. Votes Necessary for a Class to Accept the Plan ............................ 58

6. Treatment of Non-accepting Classes .............................................. 58

7. Request for Confirmation Despite Nonacceptance by Impaired Class(es) ........................................................................ 59

B. Liquidation Analysis ............................................................................. 59

C. Feasibility ............................................................................................ 61

IX. EFFECT OF CONFIRMATION OF PLAN .......................................................... 63

A. Discharge ............................................................................................. 63

B. Vesting of Property of the Estate ........................................................ 65

C. Modification of Plan ............................................................................. 65

D. Post-Confirmation Status Report ........................................................ 65

E. Post-Confirmation United States Trustee Fees ................................... 65

F. Post-Confirmation Conversion/Dismissal ............................................ 66

G. Final Decree ........................................................................................ 66

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# I. INTRODUCTION

The Official Committee of Equity Holders (the "Equity Committee") of Fremont General Corporation (the "Debtor") submits this First Amended Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of acceptances and rejections of the Equity Committee's first amended plan of reorganization (the "Plan"), a copy of which was sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

This is a reorganizing plan. In other words, the Equity Committee seeks to accomplish payments under the Plan with Cash on hand and other Assets presently available to the Debtor, as well as assets to be generated by the Reorganized Debtor.

**ANY AND ALL STATEMENTS, REPRESENTATIONS, ESTIMATES, ANALYSES, AND FINANCIAL PROJECTIONS CONTAINED IN THE DISCLOSURE STATEMENT AND PLAN ARE SOLELY THOSE OF THE EQUITY COMMITTEE, AND SHOULD NOT BE RELIED UPON AS STATEMENTS OF THE DEBTOR OR ITS MANAGEMENT TEAM. WHILE CERTAIN FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND PLAN RELATING TO THE DEBTOR AND ITS WHOLLY-OWNED INDIRECT SUBSIDIARY FREMONT REORGANIZING CORPORATION ("FRC") MAY BE BASED UPON INFORMATION PROVIDED BY THE DEBTOR TO THE EQUITY COMMITTEE, SUCH INFORMATION WAS PROVIDED PURSUANT TO A CONFIDENTIALITY AGREEMENT EXPRESSLY CONTEMPLATING THAT SUCH MATERIALS WERE NOT GENERALLY AVAILABLE FOR PUBLIC CIRCULATION AND WERE CONSTRUCTED UNDER CIRCUMSTANCES THAT HAVE NOW BEEN MATERIALLY ALTERED. MOREOVER, THE INFORMATION INCLUDES FINANCIAL STATEMENTS THAT HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT REGISTERED ACCOUNTANTS, HAVE NOT BEEN PRESENTED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, AND WERE PREPARED FOR INTERNAL PURPOSES RATHER THAN FOR THE PURPOSES PRESENTED IN THE DISCLOSURE STATEMENT AND PLAN.**

## A. Purpose of This Document

The purpose of this Disclosure Statement is to set forth information (1) about the history of the Debtor, its business, and the chapter 11 case, (2) concerning the Plan and alternatives to the Plan, (3) advising the holders of Claims and Equity Interests of their

Smiley, Weiland, Golden, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  rights under the Plan, (4) assisting the Creditors and Equity Interest Holders who are
2  entitled to vote on the Plan in making an informed judgment regarding whether they
3  should vote to accept this Plan and to reject any plan proposed by the Debtor or the
4  Official Committee of Unsecured Creditors, and (5) assisting the Bankruptcy Court in
5  determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy
6  Code and should be confirmed. This Disclosure Statement cannot tell you everything
7  about your rights. You should consider consulting your own lawyer to obtain more specific
8  advice on how the Plan will affect you and what is the best course of action for you.
9        Be sure to read the Plan as well as the Disclosure Statement. If there are any
10  inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will
11  govern.
12        By order dated _____, the Bankruptcy Court approved this Disclosure
13  Statement as containing "adequate information" concerning the Plan, meaning that it
14  contains sufficient information to enable Creditors and Equity Interest Holders to make an
15  informed judgment in exercising their rights to vote to accept or reject the Plan. Any party
16  may now solicit votes for or against the Plan.
17        The only Creditors or Equity Interest Holders who may vote for or against the Plan
18  are those who have a Claim that is both (1) allowed or allowed for voting purposes and
19  (2) classified in an impaired class. A Class is impaired if the legal, equitable, or
20  contractual rights of the Claims or Equity Interests in the Class are altered. Classes of
21  Claims or Equity Interests that are not impaired are conclusively presumed to have voted
22  to accept the Plan and therefore are not entitled to vote on the Plan.
23        **B.**      **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**
24        The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure
25  Statement. In other words, the terms of the Plan are not yet binding on anyone.
26  However, if the Court later confirms the Plan, then the Plan will be binding on the Debtor
27  and on all Creditors and Equity Interest Holders in this case. The Equity Committee, as
28  proponent of the Plan, recommends that the holders of Claims in Classes 2A, 2C, 2D, and

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1 | 3B vote to accept the Plan and to reject any plan proposed by the Debtor or the Creditors'
2 | Committee.

### 1. Time and Place of the Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2009, at __:__ __.m. in Courtroom 5A of the Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701.

### 2. Deadline for Voting for or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, attn: Philip E. Strok, 650 Town Center Drive, Suite 950, Costa Mesa, California 92626.

Your ballot must be received by _____ or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon counsel for the Equity Committee no later than _____.

### 4. Identity of Person to Contact for Further Information Regarding the Plan

Any interested party desiring further information about the Plan should contact Philip E. Strok of Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, by phone at (714) 966-1000 or by e-mail at pstrok@wgllp.com.

### C. Disclaimer

The Disclosure Statement contains information that will inform your decision of whether to vote to accept or reject the Plan. The purpose of the Disclosure Statement is to provide "adequate information" of a kind and in sufficient detail as far as is reasonably practicable given the nature and history of the Debtor and the condition of its books and records that would enable a reasonable hypothetical investor to make an informed judgment about the Plan. The Equity Committee makes no representations concerning

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

the Debtor, its financial condition, or any aspect of the Plan other than those contained in this Disclosure Statement.

The financial data relied upon in formulating the Plan is based on historical financial information obtained by the Equity Committee from the Debtor and on financial projections prepared by the Equity Committee's financial advisors, CRG Partners Group LLC ("CRG"). Unless otherwise indicated, the financial information is unaudited. The Equity Committee cannot warrant or represent that the information contained in this Disclosure Statement is without inaccuracies, although great effort has been taken to ensure that the information is presented fairly.

In July 2008, Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP ("Weiland Golden") commenced representing the Equity Committee as its counsel and CRG commenced representing the Equity Committee as its financial advisors. Weiland Golden and CRG have relied upon information provided by the Debtor and its management in connection with the preparation of this Disclosure Statement. Although Weiland Golden and CRG have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified all of the information contained herein. The Equity Committee incorporates by reference the boldface capitalized text set forth above on page 1 of this Disclosure Statement.

Although a copy of this Disclosure Statement is being served on the Securities and Exchange Commission (the "SEC") and the SEC has been given an opportunity to object to the adequacy of the Disclosure Statement, the Disclosure Statement has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the Disclosure Statement, its exhibits, or the statements contained therein.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Any tax advice that may be contained in the Disclosure Statement is not intended to be used and cannot be used for the purpose of avoiding any

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  tax penalties that may be imposed on any person.  All Creditors and Equity Interest

2  Holders should consult their own legal counsel and accountants as to legal, tax, and other

3  matters concerning their Claims or Equity Interests.

4

5  **II.**    **OVERVIEW OF THE EQUITY COMMITTEE'S PLAN**

6          The following is a brief summary of the material provisions of the Plan and is

7  provided for convenience only.  A more detailed description of the Plan appears below in

8  Section VI of the Disclosure Statement.

9          The Plan's objective is to vest title to all Assets of the Debtor in the Reorganized

10  Debtor which will then make Distributions to Holders of Allowed Claims and Equity

11  Interests in accordance with the Plan.  The Plan designates a series of Classes of Claims

12  and one Class of Equity Interests and includes all Claims against and Equity Interests in

13  the Debtor.

14          The following table summarizes the treatment of Claims and Equity Interests under

15  the Plan with:  (1) estimates of the amount of Claims in each category or Class that will be

16  finally determined to be Allowed Claims; and (2) a description of the treatment provided

17  for in the Plan for each Class of Claims and Equity Interests.  The dollar amounts are

18  based on the records of the Debtor as of the Petition Date or the date of the Disclosure

19  Statement proposed by the Debtor and do not constitute an admission by the Equity

20  Committee or the Debtor as to the validity or amount of any particular Claim or Equity

21  Interest.  All rights of any party in interest to dispute the validity or amount of any Claim or

22  Equity Interest that have not already been Allowed by the Bankruptcy Court or by

23  agreement of the parties are hereby reserved.

24

25

26

27

28

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|-------|----------------------------------|-----------|----------------------------------------------|--------------------------------------------------------------|-------------------------------|
| N/A | Administrative Claims[1] | Unless any entity entitled to payment of an Allowed Administrative Claim agrees to a less favorable treatment or unless otherwise ordered by the Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Claim, Cash in an amount equal to the amount of the Allowed Administrative Claim on the later of: (1) the Effective Date, or (2) the fifteenth Business Day after such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable. However, Ordinary Course Administrative Claims will be paid in full in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim or as otherwise authorized by the Court. | As of October 31, 2009, the Debtor has estimated that the projected range of unpaid Administrative Claims will be from $1,800,000 to $2,000,000. | 100% | No |
| N/A | Priority taxes | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each | The Debtor has estimated the range from $100,271 to $102,676,574.[2] The Equity Committee has | 100% | No |

---

[1]  The Administrative Claims described in this table do not include Administrative Claims that have already been paid or any intercompany Administrative Claims that may be due to FRC.

[2]  The $102,676,574 figure includes the IRS's proof of claim in the amount of $89,384,470 and the California Franchise Tax Board's proof of claim in the amount of $13,292,104 and does not represent the Debtor's view of the amount that ultimately is likely to be Allowed. The Debtor disputes the proofs of claim filed by the IRS and the California Franchise Tax Board.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
|  |  | Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable. | estimated that the Allowed Priority Taxes will be significantly below the high-end of the range. |  |  |
| 1 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim on the later of (1) the Effective Date or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim, or in either case, as soon thereafter as is practicable | The Debtor has estimated the range from $0 to $68,253 | 100% | No |
| 2A | General Unsecured Claims (excluding the TOPrS Claims (Class 2B), the $176,402,107 of Claims represented by the 7.875% Senior Notes due 2009 (Class 2C), and any Claims included in the Convenience Class (Class 2D)) | Except as provided below with respect to the Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BONY Stipulation or any other settlement, compromise, stipulation or order which provides for treatment that is more or less favorable than the treatment provided for herein, whether in terms of maturity, amortization, interest rate and/or | Approximately $56.5 million

Class 2A includes the proof of claim filed by the Debtor's indirect wholly-owned subsidiary, FRC, in an unspecified amount. | 100% | Yes |

7

AMENDED DISCLOSURE STATEMENT

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|-------|-------------------------------|-----------|--------------------------------------------|-------------------------------------------------------------|-------------------------------|
| | | entitlement to interest (prepetition or postpetition) or otherwise, The Holder of an Allowed General Unsecured Claim shall elect on its ballot, which election may not be changed, one of the following treatments, either of which will be in full satisfaction of the Allowed General Unsecured Claim: <u>Treatment A</u>: The Allowed General Unsecured Claim *plus* any and all accrued pre-petition interest will be paid in full within fifteen Business Days of the Effective Date of the Plan with no postpetition interest; or <u>Treatment B</u>: The Allowed General Unsecured Claim *plus* any and all accrued prepetition interest *plus* postpetition interest at the federal judgment rate in effect during each month (based on the rate in effect on the Petition Date for the first postpetition month and then the first business day of each month thereafter) from the Petition Date to the Effective Date *plus* interest at 6% per annum from the Effective Date through the date of payment will be paid in full no later than two years after the Effective Date. The Holder of any Allowed General Unsecured Claim that does not timely make an election on its ballot between the two | | | |

323260.3

AMENDED DISCLOSURE STATEMENT

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | treatments will default to Treatment B. The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BONY Stipulation or any other settlement, compromise, stipulation or order which provides for treatment that is more or less favorable than the treatment provided for herein, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of (1) the fifteenth Business Day after the Effective Date or (2) the fifteenth Business Day after the Claim becomes an Allowed Claim, or in either case, as soon thereafter as is practicable. | | | |
| 2B | TOPrS Claims | The Holders of Allowed TOPrS Claims shall retain their legal, equitable, and contractual rights provided by the Indenture dated as of March 6, 1996 | $107,422,681 | 100% | No |
| 2C | General Unsecured Claims of the Holders of the 7.875% Senior Notes | The Holders of the Senior Notes shall receive and agree to accept a Cash payment in the aggregate amount of $175,000,000 on the Effective Date as | $176,402,107 | 100% | Yes |

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-965-1000   Fax 714-965-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | and for full and final satisfaction of their Claims, which shall be distributed to each Holder, on a pro rata basis, based on the outstanding principal due to each Holder. The payment of $175,000,000 to the Holders of the Senior Notes shall be a condition to the Plan going effective. | | | |
| 2D | Convenience Class of General Unsecured Claims of $5,000 or less | All Holders of Allowed General Unsecured Claims in the amount of $5,000 or less will be paid in Cash equal to the amount of the Allowed General Unsecured Claim on the later of (1) the Effective Date of the Plan, or (2) the fifteenth Business Day after the General Unsecured Claim becomes an Allowed General Unsecured Claim. In addition, any Holder of an Allowed General Unsecured Claim in excess of $5,000 may elect to be treated in this Class 2D by marking the appropriate box on the ballot. Where the Allowed General Unsecured Claim exceeds $5,000, the payment of $5,000 will be deemed to be in full satisfaction of the Allowed General Unsecured Claim. | The Equity Committee estimates that there are approximately 365 Claims that fall into this category, with the estimated amount of Claims in this category totaling approximately $53,000 | 100% | Yes |
| 3A | Equity Interests | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor, diluted as set forth below, in full and final satisfaction of their Equity Interests. | As of the Petition Date, approximately 82,116,176 shares of the Debtor's common stock had been issued | 100% | No |

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| 3B | Section 510(b) Claims | The Holder of an Allowed Section 510(b) Claim will receive newly-issued interests in the Reorganized Debtor in full and final satisfaction of their Allowed Section 510(b) Claims. The percentage interest of common stock to which such Holders will be entitled shall be based upon the average trading value of the common stock of Reorganized Debtor shares for the thirty days preceding the date on which any Section 510(b) Claims become Allowed Section 510(b) Claims if such allowance occurs after the Effective Date. | Unknown | 100% | Yes |

## III.  HISTORY OF THE DEBTOR

The Debtor is a publicly-held Nevada corporation that has functioned as a financial services holding company. Its prepetition business operations were conducted through two intermediate holding companies--one for banking operations and one for insurance operations.

### A.  The Lending Operations

The Debtor engaged in both commercial and residential real estate lending nationwide through the Debtor's industrial bank subsidiary, Fremont Reorganizing Company, formerly known as Fremont Investment & Loan ("FIL" or "FRC"). FIL focused on the origination of commercial real estate loans and held these loans primarily for investment. Its consumer lending operations focused on the origination of non-prime and

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  sub-prime residential real estate loans, most of which were sold to third party investors or

2  securitized. FIL was one of the nation's largest originators of sub-prime loans.

3      FIL's business grew rapidly in the years before the Debtor's bankruptcy filing. FIL's

4  total amount of residential loan originations increased from approximately $14 billion in

5  2003 to approximately $36 billion in 2006. Its commercial real estate loan originations

6  also increased from approximately $1.1 billion in annual mortgage originations in 2003 to

7  approximately $8.3 billion in 2005. However, the sub-prime lending market deteriorated

8  significantly in 2007. A periodic review by the Federal Deposit Insurance Corporation

9  ("FDIC") of FIL's sub-prime lending operations led to the issuance of a cease-and-desist

10  order with respect to some of FIL's past sub-prime lending practices. The cease and

11  desist order required much higher capital levels, making it more difficult for FIL to operate

12  in the sub-prime business. As a result, FIL decided to discontinue its sub-prime lending

13  activities. As of March 7, 2007, FIL ceased entering into new funding commitments for

14  sub-prime mortgage loans, although it continued to honor remaining outstanding

15  commitments. FIL also sold substantially all of its commercial real estate loan portfolio to

16  another entity during 2007, terminating FIL's interest in its commercial real estate lending

17  business.

18      The vast majority of FIL's originated residential loans were transferred to third

19  parties via a whole loan sale or securitizations. Most of FIL's loans transferred were

20  transferred via a whole loan sale. In a whole loan sale, FIL entered into an agreement to

21  sell loans for cash, generally on a servicing released basis, but occasionally on a servicing

22  retained basis. As part of the sale process, FIL gave customary representations and

23  warranties regarding the characteristics and origination process of the loans. FIL also

24  generally committed to repurchase loans if a payment default occurred within a certain

25  period after the loan was sold.

26      In a securitization, FIL transferred residential loans to a qualifying special-purpose

27  entity, established for the limited purpose of purchasing the loans and issuing interest

28  bearing securities that represented interests in the loans. The transfer of the loans in a

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-965-1000  Fax 714-966-1002

1 securitization was treated as a sale, with the loans being removed from FIL's balance
2 sheet, although FIL continued to perform loan servicing functions for the securitizations.

3      For various reasons, some of the loans that FIL originated were not sold to other
4 parties.  In March and April of 2007, FIL entered into whole loan sale agreements that
5 transferred the majority of FIL's unsold sub-prime residential real estate loans, valued at
6 approximately $6.9 billion.

### B.    The Insurance and Indemnity Operations

8      On the insurance side, the Debtor owns all of the common stock of Fremont
9 Compensation Insurance Group, Inc. ("FCIG").  FCIG in turn owns 100% of bare legal title
10 to the common stock of Fremont Indemnity Company in Liquidation ("Indemnity") and
11 100% of bare legal title to the common stock of Fremont Life Insurance Company ("Life").
12 In June 2003, Indemnity was placed into a state "conservation" proceeding under section
13 1101 of the California Insurance Code, and the following month, that proceeding was
14 subsequently converted into a liquidation proceeding under section 1016 of the California
15 Insurance Code.  In connection with those proceedings, the California Insurance
16 Commissioner obtained all of the powers of the directors, officers, and manager of
17 Indemnity, as well as sole control over Indemnity's property.  Life was placed into a state
18 "conservation" proceeding in June 2008.

### C.    The Debtor's Management

20      Until November 2007, the Debtor was managed by a management team that
21 included Chairman of the Board James A. McIntyre, President and Chief Executive Officer
22 Louis J. Rampino.  Mr. McIntyre and Mr. Rampino were each employed by the Debtor for
23 more than thirty years.  Mr. McIntyre served as the Debtor's Chief Executive Officer from
24 1976 until 2004, when Mr. Rampino was appointed as Chief Executive Officer.

25      In November 2007, Mr. McIntyre, Mr. Rampino, and several of the Debtor's other
26 officers and directors resigned after the Debtor continued to experience significant
27 financial difficulties.  The Debtor's previous management team was replaced with a new
28 management team, including Chairman of the Board of Directors and Chief Executive

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Officer Stephen H. Gordon and Vice-Chairman and President David S. DePillo. This
management team managed the Debtor from November 2007 through October 2008.
Gordon and DePillo resigned from day-to-day management on September 30, 2008, but
remained on the board as chairman and vice-chairman, respectively. On October 1,
2008, Richard A. Sanchez replaced Mr. DePillo and Mr. Gordon and became the Debtor's
Interim President and Interim Chief Executive Officer. Mr. Sanchez has served as Interim
President and Interim CEO through the present date. Other members of the new
management team, namely Thea K. Stuedli as the chief financial officer and Donald E.
Royer as the general counsel, have remained in their positions since November 2007.

     **D.**   **Selected Financial Information**

     Attached as Exhibit "1," for general informational purposes, is the Debtor's
operating report filed with the Office of the United States Trustee for the month ended
June 30, 2009. The Debtor's Bankruptcy Schedules are attached for general
informational purposes as Exhibit "2."

## IV.   **THE CHAPTER 11 CASE**

     **A.**   **Events Leading to the Bankruptcy Filing**

     FIL was one of the nation's largest sub-prime lenders. Although FIL resold the vast
majority of all loans that it originated via "whole loan" sales, FIL remained obligated to
repurchase loans that it had sold if they experienced a payment default within a certain
period of time after being sold. FIL's loan repurchase obligations increased significantly in
2006.

     A combination of loan repurchase losses and deterioration in the sub-prime loan
market caused FIL to experience significant erosion in its statutorily mandated capital
ratios. Consequently, on February 27, 2007, the FDIC provided Debtor and FIL with a
Cease and Desist Order, which required the Debtor to take steps to improve FIL's Tier 1
capital ratio and significantly adjust and improve its sub-prime lending practices. As a
result of the Cease and Desist Order, FIL decided to completely terminate all new sub-

Smiley, Weiland, Golden,
Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

prime funding commitments on March 7, 2007, although it continued to honor existing

funding commitments made before March 7, 2007. FIL reached agreements to sell its

remaining residential and commercial real estate loan portfolios to third parties during the

first half of 2007.

Even after ceasing residential lending, disposing of residential and commercial loan

portfolios, completing the sale of significant portions of FIL's assets, and taking other

steps to comply with the Cease and Desist Order, the Debtor was not able to sufficiently

repair the damage to FIL's capital position caused by the sub-prime lending crisis. The

FDIC issued a Supervisory Prompt Corrective Action Directive (the "Directive") on March

26, 2008, which that gave the Debtor sixty days to either recapitalize FIL or accept an

offer for FIL to be acquired by another depository institution. In order to comply with the

Directive, the Debtor reached an agreement with CapitalSource, Inc. ("CapitalSource"),

where CapitalSource would agree to purchase substantially all of FIL's principal assets

and assume its deposits. Because the Debtor was a publicly traded entity, it would have

to comply with SEC proxy rules in order to complete the sale to CapitalSource. However,

given its dire financial condition, the Debtor determined that it would be unable to

complete an audit of its 2007 consolidated financial statements and required subsequent

quarterly financial statement reviews. Under SEC proxy rules, both of these items would

have to be completed before the Debtor could solicit shareholder approval of the

CapitalSource Transaction. Given the difficulties associated with completing a sale

outside of bankruptcy, the Debtor determined that its best option for completing the sale

would be to seek protection under Chapter 11 of the Bankruptcy Code and complete the

sale. Accordingly, on June 18, 2008 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has continued to

manage its Assets and properties as a debtor-in-possession pursuant to Bankruptcy Code

sections 1107 and 1108.

As of the Petition Date, the Debtor's books and records reflected that the Debtor's

common stock was held by approximately 120 holders of record, with no person or entity

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  holding more than 20% of the Debtor's common stock.  The Debtor's common stock was

2  listed on the New York Stock Exchange ("NYSE") under the "FMT" symbol, although the

3  NYSE suspended trading of the Debtor's stock prior to the opening of trading on April 17,

4  2008.  Also as of the Petition Date, the Debtor had two issues of debt securities

5  outstanding.  On March 1, 1999, the Debtor issued its "Senior Notes," of which

6  approximately $166 million in principal remained outstanding on the Petition Date.

7  Tennenbaum Capital Partners, LLC, appears to hold over 95% of the Senior Notes.  On

8  March 6, 1996, the Debtor issued its 9% Junior Subordinated Debentures to the Debtor's

9  wholly-owned subsidiary, Fremont General Financing I, a Delaware business trust.

10  Fremont General Financing I in turn issued preferred securities that had been traded on

11  the NYSE under the symbol "FMTPR."  As of the Petition Date, the Debtor's books and

12  records reflected that the Trust Preferred Securities stock was held by approximately

13  1,750 holders of records and that approximately $103 million in principal remained

14  outstanding.

15      **B.**      **Significant Events During the Chapter 11 Case**

16          **1.**      **Retention of Debtor's Professionals and Agents**

17          After filing its petition for reorganization, the Debtor retained the law firm of Patton

18  Boggs LLP, as reorganization counsel, effective as of June 18, 2008.  The Debtor also

19  retained the law firm of Stutman, Treister & Glatt, PC, to assist Patton Boggs in rendering

20  bankruptcy-related services to the Debtor.  The Bankruptcy Court approved the Debtor's

21  employment of these professionals, effective as of the Petition Date, pursuant to orders

22  entered on September 29, 2008.

23          The Debtor has also retained (i) FTI Consulting, Inc. ("FTI") to provide interim

24  management and management assistance to the Debtor, (ii) the law firms of Willenken,

25  Wilson, Loh & Lieb, LLP, Epstein Becker & Green, PC and The Caldwell Law Firm as

26  special litigation counsel, and (iii) KPMG Corporate Finance LLC ("KPMGCF") as the

27  Debtor's exclusive financial advisor in conjunction with a contemplated transaction that

28  could form the basis for a plan of reorganization.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1     The Debtor has also retained Squar, Milner, Peterson, Miranda & Williamson, LLP

2 and Ernst & Young, LLP as the Debtor's independent accountant and auditor.

3     **2.    Appointment of the Creditors' Committee and Equity Committee**

4     On July 1, 2008, the U.S. Trustee appointed an official committee of creditors

5 holding unsecured claims against the Debtor (the "Creditors' Committee") to represent the

6 interests of the general unsecured creditors of the Estate.  The members of the Creditors'

7 Committee are:  (1) Tennenbaum Multi-Strategy Master Fund, which serves as the chair;

8 (2) HSBC Bank USA, N.A., the Indenture Trustee for holders of the Debtor's 7.875%

9 Senior Notes; (3) Wells Fargo Bank, N.A., as successor trustee to the Bank of New York

10 Trust Company, N.A., the Indenture Trustee for holders of the Debtor's 9% Junior

11 Subordinated Debentures; (4) Dennis & Loretta Danko Family Trust; and (5) Rita Angel.

12 In addition, Howard Amster and Roark, Rearden & Hamot Capital Management serve as

13 "ex officio" members of the Creditors Committee.

14     The Creditors Committee has employed Klee, Tuchin, Bogdanoff & Stern LLP

15 ("Klee Tuchin") as its counsel, the Solon Group, Inc. ("Solon") as its financial advisor on a

16 limited basis in the Case, and Bocarsly Emden Cowan Esmail & Arndt LLP as its tax

17 advisor.

18     On July 8, 2008, the U.S. Trustee appointed the Equity Committee to represent the

19 interests of the equity holders.  The initial members of the Equity Committee were:

20 (1) John M. Koral; (2) William M. Stern; (3) Paul Dagostino; (4) William Holmes; (5) Frank

21 E. Williams, Jr.; (6) Jeffrey M. Pies; (7) Lynn Ehlers; (8) John M. Mlynick; and (9) Jonathan

22 Siegal.  The latter two later resigned from the Equity Committee.  The Equity Committee

23 has employed, with the Bankruptcy Court's approval, Weiland Golden as its counsel and

24 CRG as its financial advisor.

25     **3.    Consummation of the CapitalSource Transaction**

26     Within a week of the Petition Date, the Debtor filed its Motion for Order Authorizing

27 the Debtor to Use the Shares of Non-Debtor Subsidiary to Consummate the

28 CapitalSource Transaction (the "CapitalSource Motion"), which sought entry of an order

authorizing the Debtor, as sole shareholder, to use its shares of a non-debtor subsidiary to consummate the CapitalSource Transaction. Following a hearing on July 17, 2008, the Court entered an order approving the CapitalSource Motion, which order was supported by accompanying Findings of Fact and Conclusions of Law.

The CapitalSource Transaction closed on or about July 25, 2008, and FRC subsequently surrendered its banking charter to the state of California and changed its name from Fremont Investment & Loan to Fremont Reorganizing Corporation. As a result of the CapitalSource Transaction – which both the Creditors' Committee and the Equity Committee supported – seizure of FRC by the FDIC was avoided and significant value was preserved for all stakeholders.

### 4. The Order Limiting Transfers of Equity

On the Petition Date, the Debtor filed an emergency motion for an order limiting certain transfers of Equity Interests in the Debtor. The motion was filed because the Debtor's consolidated federal corporate income tax return for 2007 reflect NOLs of $695,469,659 that, if preserved, could yield a tax benefit of more than $200 million. However, the Debtor was concerned that unregulated postpetition trading of the Debtor's equity interests could reduce or eliminate the value of the NOLs that it thought might be critical to its reorganization. Accordingly, the Debtor sought an order limiting and tailoring restrictions on trading and requiring the Debtor to receive advance notice of any transfers that could have the effect of jeopardizing the NOLs. The Court granted the requested relief with an order that was entered on June 19, 2008.

### 5. Insider Compensation

During the Case, the Debtor sought Court approval of the post-petition compensation of its current and past officers and directors, including Stephen H. Gordon, David S. DePillo, Donald E. Royer, Richard A. Sanchez, and Thea K. Stuedli. The Court approved a stipulation on September 15, 2008, that set the post-petition compensation for each of these officers or directors and established a mechanism for apportioning the executive compensation cost among the Debtor and FRC.

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   **6.    Establishment of General Bar Date and Filing of Claims**

2        On September 4, 2008, pursuant to a Stipulated Order Regarding the Claims Bar

3   Date, the Court established November 10, 2008 as the general claims bar date for all

4   Persons other than governmental units to file proofs of Claim or Equity Interests arising

5   prior to the Petition Date, pursuant to section 501 of the Bankruptcy Code, and

6   (2) December 15, 2008 as the claims bar date for governmental units to file pre-petition

7   Claims.

8        Over 900 Proofs of Claim have been filed against the Debtor, including a limited

9   number after the Claims Bar Date.  Based on its preliminary review, it appears that many

10  of these asserted Claims are invalid and/or inflated and, ultimately after Claims objection

11  litigation, the aggregate Claims amounts should be significantly reduced.

12       **7.    Relief from Stay Motions – McIntyre, Faigin, and The Bank of**

13           **New York Mellon**

14       During the Case, two of the Debtor's former Officers, James A. McIntyre and Alan

15  C. Faigin have filed motions seeking relief from the automatic stay under Bankruptcy

16  Code section 362.  Former CEO McIntyre sought relief from the automatic stay to allow

17  him to pursue litigation requiring the Debtor to hold a shareholder's meeting.  After

18  conducting a hearing on the matter, the Bankruptcy Court entered an order on October

19  24, 2008, denying, without prejudice, McIntyre's motion to lift the stay.

20       Former General Counsel Faigin filed a motion to lift the automatic stay in order to

21  pursue state court litigation against the Debtor and FRC under a theory that both entities

22  were jointly liable for amounts that were still allegedly owed to Faigin under his pre-

23  petition employment contract with the Debtor.  Although the Debtor, but not FRC, was a

24  party to Faigin's employment contract, Faigin had attempted to pursue arbitration against

25  FRC, which is not a debtor in bankruptcy, under a theory that both Debtor and FRC were

26  joint employers of Faigin.  The Bankruptcy Court entered an order on December 24, 2008

27  allowing Faigin's litigation against FRC to proceed on the condition that Faigin amend his

28

1 complaint to remove all allegations against the Debtor and refrain from seeking discovery

2 from the Debtor in connection with the state court litigation.

3     More recently, The Bank of New York Mellon ("BONY") filed a motion to lift the

4 automatic stay so that prepetition litigation that BONY commenced against the Debtor for

5 alleged interference with a contractual relationship between BONY, the New York

6 Insurance Department, and FIC, which was pending in the United States District Court,

7 Central District of California, on the Petition Date, could resume. The hearing on the

8 motion has been continued several times and is presently scheduled for August 18, 2009.

9 BONY's prepetition litigation claims have been asserted in the Case through a proof of

10 claim BONY filed in excess of $20,000,000. The Debtor disputes any liability to BONY

11 and whether the Debtor had the requisite intent.

12         **8.**     **Engagement of KPMG Corporate Finance and the Attempts to**

13                **Negotiate a Consensual Plan**

14     On January 6, 2009, the Bankruptcy Court approved the engagement of KPMG

15 Corporate Finance LLC ("KPMGCF"), a subsidiary of KPMG LLP (UK), as the Debtor's

16 financial advisor to locate potential acquirers of the Debtor who might act as a sponsor in

17 a potential plan of reorganization. In connection with this engagement, the Equity

18 Committee is informed that KPMGCF distributed marketing materials informing potential

19 investors of the opportunity to act as the sponsor of the Debtor's plan of reorganization.

20     As a result of KPMGCF's marketing efforts, 26 parties entered into non-disclosure

21 agreements and were provided access to information about the Debtor and its

22 management. Ultimately, the Debtor received six non-binding letters of intent from

23 interested third parties.

24     In Spring 2009, the Debtor evaluated each of these proposals to determine whether

25 the implementation of any of such proposals through a plan of reorganization was viable

26 and consulted with the committees to determine their positions. Although the Equity

27 Committee was supportive of the Debtor's efforts and even contemplated being a co-

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

1 sponsor of a plan with the Debtor, the Creditor's Committee was not supportive.

2 Ultimately, the Debtor proposed its own plan.

### 9. Exclusivity

4 Pursuant to the United States Bankruptcy Code, a debtor-in-possession, such as

5 the Debtor, has 120 days from the date of the filing of its Chapter 11 petition with the

6 Bankruptcy Court in which to file a plan of reorganization, subject to Bankruptcy Court's

7 discretion to grant extensions of this exclusive period. During this exclusive period no

8 other person or entity is permitted to file a plan of reorganization. The Debtor obtained an

9 extension of time to June 1, 2009, to propose its plan and September 1, 2009, to solicit

10 votes on the plan. The Debtor filed its plan and the Creditors' Committee filed a motion to

11 terminate exclusivity that was set for a hearing on July 14, 2009. The Equity Committee

12 joined in that motion and the Court granted it and terminated exclusivity effective July 17,

13 2009.

### 10. Settlement of Claims and Litigation

15 During the course of the bankruptcy case, the Debtor has achieved settlements of

16 various matters. In some instances, the Debtor has negotiated final terms of settlement,

17 subject only to obtaining Bankruptcy Court approval. The following narrative describes

18 the more significant settlements.

19         a. <u>California Insurance Commissioner</u>

20 In June 2004, the California Insurance Commissioner (the "CIC"), as Indemnity's

21 statutory liquidator, sued the Debtor and FCIG in state court, alleging that they improperly

22 utilized net operating loss deductions ("NOLs") allegedly belonging to Indemnity (the "NOL

23 Case"). In 2005, the CIC filed another complaint against the Debtor and others on behalf

24 of Indemnity as successor in interest to Comstock Insurance Company ("Comstock"), a

25 former affiliate of Indemnity that was subsequently merged into Indemnity. That case

26 alleged similar causes of action regarding the utilization of NOLs as well as assertions of

27 improper transactions with other insurance subsidiaries and affiliates of Indemnity (the

28

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  "Comstock Action"). In 2008, FRC was added as a defendant in both the NOL Case and

2  the Comstock Action.

3       As a result of disputes as to whether Indemnity, which is in liquidation, and its

4  subsidiaries could be considered part of the Debtor's consolidated taxpayer group for

5  federal income tax purposes, the CIC requested that the IRS issue a private letter ruling to

6  resolve the dispute. The IRS issued it on July 26, 2006, and based on that ruling, the CIC

7  has taken the position that Indemnity and its subsidiaries should be included in the

8  Debtor's consolidated taxpayer group, and the Debtor has maintained its objection to such

9  tax treatment (the "Tax Deconsolidation Dispute").

10      The CIC also filed a lawsuit in California state court asserting on behalf of

11  Indemnity claims of ownership to substantial portions of artwork, including any related

12  proceeds from the sale of that artwork, that were at any time in the possession or control

13  of the Debtor or its affiliates. The Debtor removed that action to the Bankruptcy Court on

14  July 11, 2008, and it remains pending as case number 08:08-ap-01258-ES (the "Art

15  Adversary Dispute"). The claims are being asserted against the Debtor, FRC, and four

16  current or former employees of the Debtor.

17      In connection with these various adversary proceedings, the CIC filed four claims

18  with the Bankruptcy Court, asserting the claims set forth in the NOL Case, the Comstock

19  Action, the Art Adversary Dispute, and the Tax Consolidation Dispute. Collectively, the

20  liquidated amounts of these asserted claims exceed $489 million, and also included

21  unliquidated amounts.

22      In April 2009, the Debtor, FRC, and FCIG (together, the "Fremont Entities") and the

23  CIC, in its capacity as the statutory liquidator or Indemnity and the statutory conservator of

24  Life, entered into a stipulation agreement that settled their disputes (the "CIC Stipulation").

25  In the CIC Stipulation, the Fremont Entities and the CIC agreed to the following:

26      (1)    Tax Issues: Within 20 days of the CIC Stipulation's effective date, the

27  Fremont Entities will take the appropriate action to document that Indemnity has been

28  deconsolidated from the group of affiliates of the Debtor that elect to participate in a

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

consolidated federal taxpayer group so that Indemnity can use any NOLs generated by Indemnity on or after January 1, 2003, on its own tax returns. In addition, the Debtor has agreed to cooperate with the CIC in the preparation, filing, approval, and consummation of the statutory liquidation case involving Indemnity.

(2) <u>Life Stock</u>. On the effective date of the CIC Stipulation, FCIG, as the holder of all of Life's issued and outstanding stock, will transfer all of its right, title, and interest in the stock of Life to the Commissioner.

(3) <u>Proofs of Claim</u>. On the effective date of the CIC Stipulation, each of the proof of claim filed by the CIC in the Debtor's case will be withdrawn, disallowed, and expunged with prejudice. The CIC will be allowed a $5 million general unsecured claim in the Debtor's Case, and this claim will be the sole and exclusive right to payment by CIC, Indemnity, and Life from the Debtor's bankruptcy estate, except with respect to the D&O Case described below.

(4) <u>Art Adversary Dispute</u>. On the effective date of the CIC Stipulation, the CIC will receive $4.1 million of the funds presently held in escrow that are attributable to the sale of certain of the Debtor's artwork. The Debtor will receive the remaining proceeds held in the escrow account (approximately $300,000) and ownership rights to all of the remaining artwork, including any future proceeds from the sale or disposition of such artwork.

(5) <u>Cash Payment</u>. On the effective date of the CIC Stipulation, FRC will pay to Indemnity $5.0 million.

(6) <u>Dismissal of Pending Litigation</u>. As soon as possible after the effective date of the CIC Stipulation, the CIC will dismiss with prejudice all of the actions mentioned above, including any counterclaim or cross complaint filed therein, and the Fremont Entities will dismiss with prejudice any claims filed in connection with Indemnity's statutory liquidation case.

1    (7)    Releases. Except for the agreements and obligations set forth in the CIC

2 Stipulation, CIC, Indemnity, Life, and the Fremont Entities will give each other mutual

3 releases of the claims set forth in the actions described above.

4        The Debtor filed a motion to approve the CIC Stipulation pursuant to FRBP 9019

5 (a) in April 2009, and the motion was approved at a hearing held on May 14, 2009. The

6 CIC Stipulation has also been approved by the two necessary state court and the Debtor

7 and CIC are presently in the process of closing and implementing the settlement.

8                b.    Massachusetts Attorney General

9        The Debtor and FRC were also subject to ongoing litigation in the Massachusetts

10 Superior Court in Suffolk County ("MA Superior Court") brought by the Attorney General

11 for the Commonwealth of Massachusetts (the "Commonwealth") based upon alleged

12 consumer protection violations stemming from FRC's lending practices in connection with

13 the origination and servicing of residential mortgage loans made to Massachusetts

14 residents. The complaint sought injunctive and equitable relief and civil penalties. Since

15 February 2009, the Debtor and FRC have been operating under a preliminary injunction

16 issued by the MA Superior Court, as modified in March 2008, that enjoined the Debtor and

17 FRC from foreclosing on certain of the loans made to Massachusetts residents absent the

18 approval of the MA Superior Court. The preliminary injunction also prevented the Debtor

19 and FRC from selling, transferring, or assigning any of these Massachusetts residential

20 loans unless certain conditions were met. This litigation appeared to be outside the scope

21 of the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

22       In April 2009, after comprehensive settlement discussions, the Commonwealth, the

23 Debtor, and FRC entered into a Final Judgment by Consent (the "Final Judgment").

24 Pursuant to the Final Judgment, FRC will pay $10 million to the Commonwealth on the

25 effective date of the Final Judgment. If neither FRC nor FGCC is the subject of a

26 bankruptcy proceeding as of a date that is about 95 days after the effective date of the

27 Final Judgment and no court has determined that either the Debtor or FRC has violated

28 any of the terms of the Final Judgment, then the Commonwealth will withdraw with

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  prejudice the $20 million proof of claim that it filed in the Debtor's Case.  If either FRC or

2  FGCC is in a bankruptcy proceeding on such date, then the Commonwealth may void the

3  Final Judgment and refund the $10 million.  That deadline has not yet passed as of the

4  filing of the Disclosure Statement.

5      If the Final Judgment becomes effective, then the preliminary injunction will be

6  modified and will become a permanent injunction that will apply to loans to Massachusetts

7  residents or to loans secured by property in Massachusetts.  The permanent injunction

8  requires the Debtor or FRC to provide the Massachusetts Attorney General with prior

9  notice before initiating or advancing a foreclosure on any such mortgage loan originated

10  by FRC.  If the Attorney General does not provide a written objection, then the Debtor or

11  FRC may proceed with the foreclosure.  If there is a written objection, then the parties will

12  follow the resolution procedures set forth in the Final Judgment.  In addition, before the

13  Debtor or the FRC can sell, transfer, or assign any mortgage loan originated by FRC that

14  is secured by any residential property in Massachusetts, they must (1) provide the

15  Attorney General with prior notice; (2) a purchaser or assignee from the FRC must agree

16  to be bound by the foreclosure and sale restrictions in the permanent injunction, and (3) a

17  copy of the written assignment must be provided to the Attorney General.  In exchange for

18  this agreement, upon entry of the Final Judgment by the MA Superior Court, the

19  Commonwealth will release the Debtor and FRC from the claims set forth in the

20  Massachusetts Action.

21      The Debtor sought Court approval of the Final Judgment pursuant to FRBP

22  9019(a) in April 2009, and that was approved at a hearing on May 14, 2009.  The Debtor,

23  FRC, and the Commonwealth have stated that they are in the process of implementing

24  the Final Judgment.

25                  c.      Enron

26      In April 2009, the Debtor entered into a stipulation and agreement (the "Enron

27  Stipulation') with Enron Creditors Recovery Corporation ("Enron") to settle the litigation

28

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1 described below and to resolve a proof of claim in the approximate amount of $25.5

2 million that Enron filed against the Debtor in the Case.

3     On December 2, 2001, Enron and certain affiliates filed voluntary petitions for relief

4 under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern

5 District of New York (the "Enron Court"). Before that date, Enron issued unsecured

6 commercial paper to various entities, including the Debtor. The commercial paper had

7 maturities of up to 270 days. In a series of transfers, Enron allegedly paid over $1 billion

8 to various entities, including $25,426,521.66 to the Debtor, on account of the commercial

9 paper prior to their stated maturity. In November 2003, representatives of Enron's

10 bankruptcy estate filed avoidance actions in the Enron Court against the Debtor and

11 various defendants, contending that the payments were avoidable and recoverable under

12 the Bankruptcy Code. In settlement of that dispute, Enron and the Debtor agreed to the

13 following:

14     (1)    Allowed General Unsecured Claim. Enron will be allowed for purposes of

15 voting on any plan proposed in the Case and receiving Distributions a general unsecured

16 claim against the Debtor in the amount of $4.0 million (the "Allowed Enron Claim").

17 However, upon Enron's actual receipt of Distributions from the Debtor's bankruptcy estate

18 of $2.0 million, the Allowed Enron Claim will be deemed satisfied in full and Enron will

19 have no further right to any Distributions from the Debtor's bankruptcy estate. The

20 Allowed Enron Claim is the only right to payment that Enron will have against the Debtor's

21 bankruptcy estate.

22     (2)    Dismissal of the Avoidance Action. After the effective date of the

23 agreement, Enron has agreed to dismiss the avoidance action with prejudice as to the

24 Debtor, with each party bearing its own attorney's fees and costs.

25     (3)    Releases. On the effective date and except for the agreements and

26 obligations arising from the settlement, Enron and the Debtor will exchange mutual

27 general releases of all claims they may hold against one another.

28     Both this Court and the Enron Court have approved the settlement agreement.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1           d.     The Rampino Litigation and Associated Defendants' Wage,

2                SERP, and Indemnification Claims

3         In October 2006, the CIC, as the statutory liquidator of Indemnity, filed a first

4    amended complaint in Los Angeles Superior Court against seven former officers and

5    directors of the Debtor or Indemnity (together, the "Rampino Defendants"), alleging that

6    they breached their fiduciary duties by allowing Indemnity to engage in an inappropriate

7    underwriting scheme that caused injury to Indemnity's reinsurers, which in turn injured

8    Indemnity by settlements it made with those reinsurers (the "D&O Case").  Although

9    neither the Debtor nor any affiliates are defendants in the D&O Case, it is possible that the

10   Debtor could have indemnification obligations to some or all of the Rampino Defendants.

11   After the Debtor filed its bankruptcy petition, each of the Rampino Defendants filed at least

12   one claim based on, among other things, the contention that the Debtor is obligated to

13   indemnify each of them for any settlement amounts or judgment that might be entered

14   against them in the D&O Case.'

15        In May 2009, the Debtor entered into a stipulation (the "Rampino Stipulation") with

16   the Rampino Defendants and the CIC to settle the outstanding litigation and to resolve

17   fifteen proof of claims that together asserted liquidated amounts in excess of $27 million

18   and that also contained substantial contingent and unliquidated components.  A summary

19   of the Rampino Stipulation is as follows:

20        (1)    Allowed General Unsecured Claim of CIC.  The CIC will be allowed, for

21   voting and Distribution purposes, a general unsecured claim in the amount of $35 million.

22   However, after the CIC's actual receipt of Distributions from the Debtor's bankruptcy

23   estate totaling $22 million, the claim will be deemed to be satisfied in full and the CIC will

24   have no further right to any Distributions from the Debtor's bankruptcy estate on account

25   of the D&O Case.  This claim is in addition to the $5 million general unsecured claim

26   allowed the CIC for the unrelated settlement discussed above.

27        (2)    Final Disallowance of Proof of Claims.  Each of the Rampino Defendants'

28   proofs of claim will be deemed to have been withdrawn or disallowed with prejudice.

323260.3

AMENDED DISCLOSURE STATEMENT

(3) <u>Allowed General Unsecured SERP Claims</u>. Four of the seven defendants will each be allowed for purposes of voting and Distribution purposes a general unsecured claim against the Debtor in amounts ranging from $2.3 million to $5.6 million. However, once they actually receive Distributions in specific, lesser amounts ranging from $1.42 million to $3.47 million, their claims will be deemed to have been satisfied in full and they will have no further rights to Distributions or payments from the Debtor's bankruptcy estate. They will also have no right to Distributions or payments from the Fremont General Corporation Supplemental Executive Retirement Plan or the Fremont General Corporation Supplemental Executive Retirement Plan II.

(4) <u>Dismissal of Litigation</u>. After the effective date of the Rampino Stipulation, CIC and Indemnity will dismiss the D&O Case with prejudice, and Mr. Bailey, Mr. Rampino, and Mr. McIntyre will dismiss their respective adversary proceedings that are pending in the Bankruptcy Court to be dismissed with prejudice against all defendants other than the Debtor. With respect to the Debtor, the dismissal is conditioned upon their receiving payment on account of their allowed general unsecured claims.

(5) <u>Releases</u>. Except for the agreements and obligation arising under the Rampino Stipulation, the parties will execute mutual general releases, except that the Rampino Defendants are not releasing any claims that they may have against the Debtor as a result of ownership of the Debtor's common stock or other securities of the Debtor or its affiliates. In addition, no one is releasing any claims that they may hold against any insurance policy issued by any insurer of any of the parties.

The hearing on approval of the Rampino Stipulation was held on June 11, 2009, and the order approving the Rampino Stipulation was entered on June 18, 2009.

e. <u>Other Settled and Resolved Claims</u>

The Debtor and FRC entered into an agreement with Credit Suisse to provide for the payment and resolution of a proof of claim in excess of $2 million filed by Credit Suisse, which agreement was approved by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019(a).

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002