LEE R. BOGDANOFF (State Bar No. 119542)
JONATHAN S. SHENSON (State Bar No. 184250)
BRIAN M. METCALF (State Bar No. 205809)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4085
Facsimile: (310) 407-9090

Counsel for the Official Committee of
Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>FREMONT GENERAL CORPORATION, a Nevada Corporation<br><br>Debtor. | Case No. 8:08-bk-13421-ES<br><br>Chapter 11<br><br>**DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF FREMONT GENERAL CORPORATION PRESENTED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (DATED SEPTEMBER 17, 2009)**<br><br><u>Hearing</u><br><br>Date: September 17, 2009<br>Time: 2:00 p.m.<br>Place: Courtroom 5A<br>       411 West Fourth St.<br>       Santa Ana, California |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

    A.    Proposed Plan and its Structure. ........................................................ 2

    B.    Purpose of the Disclosure Statement. ................................................ 5

II. GENERAL DISCLAIMERS AND INFORMATION ................................... 7

III. WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN ..................... 9

    A.    Allowed Claims and Interests. .......................................................... 10

    B.    Impaired Claims and Interests. ......................................................... 11

    C.    Class 3(A) (Non-Note General Unsecured Claims), Class 3(B) (Senior Note Claims) and Class 3(C) (Junior Note Claims) Elections. ...................... 12

    D.    Reservation of Rights Regarding Classification of Claims in Class 3(A) (Non-Note General Unsecured Claims), Class 3(B) (Senior Note Claims) and Class 3(C) (Junior Note Claims). ................................. 12

    E.    Class 4 (Convenience Claims) Election. .......................................... 13

IV. VOTES NECESSARY TO CONFIRM THE PLAN ................................... 13

V. CRAMDOWN TREATMENT OF NON-CONSENTING CLASSES ........... 14

VI. INFORMATION REGARDING VOTING IN THIS CASE ....................... 15

    A.    Voting Instructions. ........................................................................... 15

VII. WHO MAY OBJECT TO PLAN CONFIRMATION ............................... 17

VIII.    DESCRIPTION OF THE DEBTOR'S BUSINESS, EVENTS PRECIPITATING THIS BANKRUPTCY CASE, AND SIGNIFICANT EVENTS IN THE CASE ..................................................................... 18

    A.    Business Background ......................................................................... 18

        1.    Financial Services Operations. ............................................. 18

        2.    Insurance Services Operations. ............................................. 20

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

i

B.   The Debtor's Management. ................................................................ 21

    1.   Previous Management Team. ...................................................... 21

    2.   Current Management Team. ......................................................... 21

C.   Brief Summary of the Circumstances that Led the Debtor File its Case.......... 24

D.   Significant Events in the Case. ............................................................. 25

    1.   Emergency Relief Sought by the Debtor. ............................................. 25

    2.   Appointment of the Committees. ................................................... 26

    3.   The CapitalSource Transaction. ..................................................... 27

    4.   Professionals Retained at the Expense of the Estate. ............................. 27

    5.   Insider Compensation. ................................................................ 30

    6.   Settlements of Claims and Pre-Petition Litigation. .............................. 31

    7.   Post-Petition Litigation. ............................................................. 39

    8.   Preservation/Revesting of Rights of Action. ..................................... 40

    9.   Plan Proponent Search Process and Marketing Efforts. ....................... 41

    10.  Plan Exclusivity. ..................................................................... 42

IX. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR ...................... 43

A.   Assets. .................................................................................... 43

B.   Liabilities. ............................................................................... 45

    1.   Schedules. ............................................................................. 45

    2.   Claims Bar Date and Proofs of Claim. ............................................ 46

    3.   Senior and Junior Notes. ............................................................ 47

    4.   Intercompany Claims. ................................................................ 48

    5.   Settled and Allowed General Unsecured Claims. .............................. 48

    6.   Disputed and Other Tax Liabilities. ............................................... 48

    7.   Remaining Asserted Claims and Claim Objections. ........................... 50

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

8.      Estimated Allowed Claim Amounts; Express Reservation of Rights. ........................................................................ 52

C.      Interests in the Debtor. .................................................................. 53

D.      Status of Compliance with SEC Reporting Requirements and Anticipated Revocation of Registration. ............................................. 53

X. SUMMARY OF THE PLAN ........................................................................ 54

A.      The Merger. .................................................................................. 54

B.      The Assets and Liabilities of the Lower Tier Entities Subject to the Merger; the Reorganized Debtor. .................................................. 57

        1.      Assets and Liabilities of FGCC and FRC. ......................... 57

        2.      Assets and Liabilities of the Reorganized Debtor. .............. 60

C.      Classification and Treatment of Claims and Interests under the Plan. ............. 62

        1.      Unclassified Claims. ........................................................ 63

        2.      Classification and Treatment of Secured Claims, Priority Claims, General Unsecured Claims and Convenience Claims. ........................... 67

        3.      Classification and Treatment of Subordinated Claims and Interests. ........................................................................ 77

XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 83

A.      Rejection of Executory Contracts and Unexpired Leases. ............................... 83

        1.      Rejected Agreements and Bar Date for Rejection Damage Claims. ........................................................................... 83

B.      Ratification and Assumption of Agreements. ................................................... 83

        1.      Cure Payments. ............................................................... 84

        2.      Objections to Assumption. ................................................ 85

        3.      Resolution of Claims Relating to Assumed Agreements. ...................... 86

XII. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN. ................. 86

A.      Vesting of Assets. .......................................................................... 86

B.     Authority to Effectuate Plan. ...................................................... 86

C.     Subordination Provisions / Ongoing Effectiveness. ........................ 87

D.     Board of Directors of the Reorganized Debtor. .............................. 87

     1.     Responsibility of the Board of Directors. .............................. 89

     2.     Compensation of the Board of Directors. .............................. 89

     3.     Limitation on Liability of Board of Directors; Indemnification; Insurance. ........................................................................... 89

E.     Articles of Incorporation and Bylaws. ............................................ 90

F.     Periodic Reporting. ....................................................................... 90

G.     Employee Benefit Plans. ............................................................... 91

H.     The Plan Administrator. ................................................................ 91

     1.     Appointment of the Plan Administrator. ............................... 91

     2.     Powers of the Plan Administrator. ....................................... 92

     3.     Plan Administrator as Representative of the Estate. ............. 93

     4.     Compensation of the Plan Administrator. .............................. 94

     5.     Limitation on Liability of Plan Administrator. ...................... 94

I.     The Equity Trust. .......................................................................... 95

     1.     Establishment and Effectiveness of the Equity Trust. ........... 95

     2.     Term and Purpose of the Equity Trust. ................................. 95

     3.     Transfer of Exchanged Common Stock. ................................. 95

     4.     Expenses of the Equity Trust. ............................................... 96

     5.     Investment Powers. .............................................................. 96

     6.     Reporting Duties. ................................................................. 97

     7.     Other. .................................................................................. 98

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

J.    Distribution of Property Under the Plan. ........................................ 98

     1.    Manner of Cash Payments Under the Plan. ......................... 98

     2.    No *De Minimis* Distributions. ............................................ 99

     3.    Provisions Regarding Disputed Claims. ............................. 99

     4.    Allowance of Claims and Interests. .................................. 100

     5.    Distributions to Holders as of the Distribution Record Date. ............. 101

     6.    Withholding. ..................................................................... 101

     7.    Delivery of Distributions and Undeliverable/Unclaimed Distributions. .................................................................... 102

K.    Post-Effective Date Reporting. ..................................................... 103

L.    Dissolution of the Creditors' Committee. ..................................... 103

M.    Dissolution of the Equity Committee. .......................................... 104

N.    Preservation of Litigation. ............................................................ 104

O.    Additional Provisions Governing Indenture Trustee and Notes Indenture. ..................................................................................... 105

     1.    Payments to or for the Benefit of Noteholders to be Made to Indenture Trustee. .............................................................. 105

     2.    Post-Confirmation Effect of Indentures. .......................... 106

     3.    Indenture Trustees' Liens. ................................................. 108

P.    Restrictions on Transfer of Junior Repayment Rights. ................. 108

XIII. DISCHARGE OF THE REORGANIZED DEBTOR AND INJUNCTION .............. 109

XIV. EXCULPATION AND LIMITATION OF LIABILITY ........................................ 112

XV. OTHER PLAN PROVISIONS ......................................................................... 113

A.    Conditions Precedent To Effectiveness. ....................................... 113

B.    Revocation of Plan/No Admissions. ............................................. 113

C.    Exemption from Certain Transfer Taxes. ...................................... 113

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

D.      Modifications of Plan.................................................................. 114

E.      Reservation of Rights Regarding Classification of Claims. .......................... 114

F.      Cram-Down. ........................................................................ 114

G.      Successors and Assigns. ............................................................. 114

H.      Severability of Plan Provisions. ...................................................... 114

I.      Governing Law. ..................................................................... 115

J.      Good Faith. ......................................................................... 115

K.      Retention of Jurisdiction. ............................................................ 115

L.      Term of Bankruptcy Injunctions or Stays. ............................................. 117

M.      Objections to Confirmation. ......................................................... 117

N.      Notices. ............................................................................ 117

XVI. BEST INTERESTS TEST AND FEASIBILITY ................................................ 118

A.      The "Best Interests Test." ........................................................... 118

B.      Feasibility and Projected Performance of the Reorganized Debtor. .............. 119

XVII. RISK FACTORS ......................................................................... 121

A.      Non-Occurrence of the Effective Date. ............................................... 121

B.      Restrictions on Transfer of Class 3(C) the Junior Note Claims and
        Equity Trust Interests. ............................................................... 121

C.      Post-Effective Date Merger Claims and Distributions. ................................ 124

D.      Impact of Tax Issues on Distributions On and After the Effective Date. ........ 126

XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        PLAN ............................................................................... 129

A.      Liquidation under Chapter 7. ........................................................ 129

B.      Alternative Plan of Liquidation. ..................................................... 129

XIX. TAX CONSEQUENCES OF THE PLAN ..................................................... 130

| | A. | Tax Consequences to the Debtor. | 132 |

| | B. | Tax Consequences to Holders of Certain Claims in Classes 3(A), 3(B) and 3(C). | 132 |

| | | 1. | Recognition of Gain or Loss. | 132 |

| | | 2. | Distributions in Payment of Accrued But Unpaid Interest. | 134 |

| | C. | Tax Consequences to Beneficiaries of the Equity Trust. | 134 |

| | D. | Withholding/Reporting Requirements. | 136 |

XX. SECURITIES LAW MATTERS ................................................................. 137

    A. In General. ........................................................................................... 137

        1. Initial Issuance. ........................................................................ 138

        2. Resales. .................................................................................... 139

        3. Exchange Act Compliance. ...................................................... 140

        4. Investment Company Act. ........................................................ 140

    B. Compliance if Required. ...................................................................... 141

XXI. RECOMMENDATION AND CONCLUSION ....................................... 141

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**DISCLOSURE STATEMENT DESCRIBING**
**CHAPTER 11 PLAN**
**PRESENTED BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A BANKRUPTCY COURT DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.**

## SUMMARY INFORMATION

| | |
|---|---|
| **Debtor:** | Fremont General Corporation, a Nevada corporation |
| **Recommendation:** | **The Official Committee of Unsecured Creditors recommends that you vote in favor of the Plan.** |
| **Vote Required to Accept the Plan:** | Acceptance of the Plan requires the affirmative vote of: (1) two-thirds in amount and a majority in number of the Allowed Claims actually voted in each Class of Impaired Claims entitled to vote and, if applicable, (2) two-thirds in amount of the Allowed Interests actually voted in each Class of Impaired Interests entitled to vote. Only Entities holding Claims or Interests in Classes 3(A), 3(B), 3(C), 4, 5 and 6 are impaired and therefore entitled to vote. If any of these Classes rejects the Plan, however, the Bankruptcy Court nevertheless may confirm the Plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied with respect to any such Class. |
| **Voting Information:** | If you are entitled to vote, you should have received a ballot with this Disclosure Statement. After completing and signing your ballot, you should return it to: |

> Klee, Tuchin, Bogdanoff & Stern LLP
> Attn: Shanda D. Pearson, Paralegal
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, CA  90067
> Facsimile: (310) 407-9090

| | |
|---|---|
| | For your ballot to be counted, Klee, Tuchin, Bogdanoff & Stern LLP must receive it no later than 12:00 p.m. Pacific Time on _____ __, 2009. |
| **Confirmation Hearing:** | The Confirmation Hearing will be held on _____ __, 2009 at __:__ _.m. Pacific Time. The Confirmation Hearing may be continued from time to time without further notice. |
| **Treatment of Claims and Interests:** | The treatment that creditors and shareholders will receive if the Bankruptcy Court confirms the Plan is set forth in the Plan and summarized in Section X.C of this Disclosure Statement.  The terms of the Plan are controlling, and all creditors, shareholders and interested parties are urged to read the Plan in its entirety. |
| **The Effective Date:** | The Effective Date of the Plan will be the first Business Day on which all of the conditions set forth in Section VII.A. of the Plan have been satisfied or waived in accordance with the Plan. |
| **Questions:** | All inquiries about the Plan and Disclosure Statement should be in writing and must be sent to: |

> Klee, Tuchin, Bogdanoff & Stern LLP
> Attn: Shanda Pearson
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, CA  90067
> Facsimile: (310) 407-9090

| | |
|---|---|
| **IMPORTANT NOTICE:** | **THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS.  YOU SHOULD THEREFORE READ THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS IN THEIR ENTIRETY.  YOU ALSO SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN.** |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| CLASS AND/OR CLAIM TYPE | SUMMARY OF TREATMENT | IMPAIRED STATUS/ VOTING STATUS |
|---|---|---|
| **Unclassified Claims** | | |
| Administrative Claims | <u>U.S. Trustee Fees</u><br><br>U.S. Trustee Fees will be allowed in accordance with 28 U.S.C. § 1930 and any U.S. Trustee Fees due and owing will be paid by the Reorganized Debtor on the Effective Date. The Reorganized Debtor will further set aside and reserve amount necessary to pay fees due and owing under 28 U.S.C. § 1930 after the Confirmation Date.<br><br> Professional Fee Claims <br>Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before thirty (30) days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting Allowance of the fees and serves the application or motion on the Reorganized Debtor and the U.S. Trustee; and (ii) the Court allows the Claim by an order of the Bankruptcy Court (as to which eleven (11) days have passed without a stay of the enforcement of such order or, if a stay has been granted, such stay has lapsed or been dissolved).<br><br>The Disbursing Agent will pay or cause to be paid an Allowed Professional Fee Claim, in Cash, within five (5) days after the date on which the Bankruptcy Court order allowing such Claim becomes a final order.<br><br> Ordinary Course Administrative Claims <br>An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim. Unless a party in interest objects to an Ordinary Course Administrative Claim, such Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.<br><br> Non-Ordinary Course Administrative Claims <br>Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims will be Allowed only if: (a) on or before thirty (30) days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Fee Claim both Files with the Court a motion requesting Allowance of the Non-Ordinary Course Administrative Claim and serves the motion on the Reorganized Debtor and the U.S. Trustee and (b) the Court determines it is an Allowed Claim.<br><br>Unless the entity holding an Allowed Administrative Claim (other than U.S. Trustee Fees and Professional Fee Claims) agrees to different treatment, the Disbursing Agent will pay to the entity | Unimpaired<br>Not Entitled to Vote<br>Deemed to Accept |

holding such Allowed Administrative Claim Cash in the full amount of such Allowed Administrative Claim, on or before the latest of: (a) the Distribution Date; (b) fifteen (15) days after the date on which the Allowed Administrative Claim becomes an Allowed Administrative Claim; and (c) the date on which the Allowed Administrative Claim first becomes due and payable in accordance with its terms.

<u>Indenture Trustee Fees and Expenses</u>

The Disbursing Agent will pay or cause to be paid in full and in Cash, without reduction to the recovery of applicable holders of allowed claims, any and all Indenture Trustee Fees and other amounts that are due to each of the Indenture Trustees and its counsel as of the Effective Date on or before the later of: (i) the Effective Date; or (ii) 5 days after the date on which the Plan Administrator receives from such Indenture Trustee a reasonably and customary detailed itemized statement of such amounts so long as the Plan Administrator does not, within such 5 day period, give written notice to such Indenture Trustee that it disputes the amount requested or any part thereof and all such amounts shall be deemed Allowed without further application to or order from the Court. The Plan Administrator's objection shall be limited to a "reasonableness standard" and whether the amounts sought are actually due and payable under the particular Indenture. If the Plan Administrator gives such Indenture Trustee timely written notice that it disputes the amount requested or any part thereof, the Plan Administrator will promptly pay or cause to be paid any undisputed amounts and any pending disputed items shall be promptly presented to and determined by the Court, the sole questions being whether the amounts in dispute are due and payable under the particular Indenture and satisfy the "reasonableness standard"; any unpaid amounts shall be promptly paid upon determination by the Court that such amounts are due and owing under the respective Indenture Trustee Fees. The Disbursing Agent shall also promptly pay or cause to be paid in full any all fees and expenses that will be incurred in connection with the distributions to be made by the Indenture Trustees under the Plan to the extent such fees and costs are provided for by the Indentures.

In the event the payment of any Indenture Trustee Fees due and owing to the Junior Note Indenture Trustee and Guaranty Trustee is to be made as of the Effective Date (pursuant to the provisions in the preceding paragraph), the payment of such fees (or reservation thereof) shall be a condition to the dissolution of the Fremont General Financial Declaration of Trust (provided, however, such condition can be satisfied contemporaneously with the dissolution of the trust).

Any claim for Indenture Trustee Fees arising after the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtor.

Distributions by the Reorganized Debtor to holders of Junior Note Claims or Senior Note Claims pursuant to the Plan will not be reduced on account of payment of the Indenture Trustee Fees,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

| | | |
|---|---|---|
| | provided, however, that nothing in the Plan shall be deemed to impair, waive, extinguish or negatively impact the Indenture Trustee Charging Lien. | |
| Priority Tax Claims | Unless the entity holding a Priority Tax Claim Allowed by the Court agrees to different treatment, the Disbursing Agent will pay to the entity holding an Allowed Priority Tax Claim Cash in the full amount thereof on or before the latest of: (a) the Distribution Date; (b) fifteen (15) days after the date on which the Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date on which the Allowed Priority Tax Claim first becomes due and payable in accordance with its terms. | Unimpaired<br>Not Entitled to Vote<br>Deemed to Accept |
| **Classified Claims and Interests** | | |
| Class 1<br>Secured Claims | In full satisfaction of any Allowed Class 1 Claims that have not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will, at its option: (1) pay the holder of such Allowed Class 1 Claims the full amount thereof in Cash on or before the latest of: (a) the Distribution Date and (b) fifteen (15) days after the date on which such Claim becomes an Allowed Secured Claim, or (2) surrender the Collateral securing the Allowed Secured Claim to the holder thereof, in full satisfaction thereof. | Unimpaired<br>Not Entitled To Vote<br>Deemed to Accept |
| Class 2<br>Priority Claims other than Priority Tax Claims | In full satisfaction of any Allowed Class 2 Claims that have not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 2 Claims the full amount thereof in Cash on or before the latest of: (a) the Distribution Date and (b) fifteen (15) days after the date on which such Claim becomes an Allowed Priority Claim. | Unimpaired<br>Not Entitled To Vote<br>Deemed to Accept |
| Class 3(A)<br>Non-Note General Unsecured Claims | In full satisfaction of the Allowed Class 3(A) Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder shall be entitled to receive Post-Petition Interest, and shall receive the following on account of its Allowed Claim:<br><br>(a) on the Distribution Date, its Pro Rata share of the Effective Date Cash Distribution until such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest);<br><br>(b) within fifteen (15) Business Days after the end of each Calendar Quarter (commencing with the Calendar Quarter ending on December 2009), its Pro Rata share of the Post-Effective Date Distributable Cash for each such Calendar Quarter until such time as such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest); and<br><br>(c) in the event the Holders of Allowed Claims in Class 3(A) have not been paid in full on account of their Allowed Claims (inclusive of their Post-Petition Interest Claims) as of the Maturity Date; then, on the first Business Day following the Maturity Date, such Holder shall receive its Pro Rata allocation of the Equity Trust | Impaired<br>Entitled to Vote |

| | | |
|---|---|---|
| | Interests.<br><br>In the alternative, each such Holder of an Allowed Class 3(A) Claim may agree, on or before the Ballot Deadline and in conjunction with such Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of Cash in an amount equal to the sum of the principal amount of such Holder's Allowed Class 3(A) Claim plus fifty percent (50%) of the Post-Petition Interest that accrued on such Claim (as of the date such payment is made), such Holder shall be deemed to waive any right or claim to any further Post-Petition Interest on account of its Allowed Class 3(A) Claim. Nothing in the Plan, however, shall be deemed or construed to guarantee such Holder that such Holder shall receive such payment on or before November 30, 2009. | |
| Class 3(B)<br><br>Senior Note Claims | On the Effective Date, each Holder of a Class 3(B) Claim shall be deemed to have an Allowed Class 3(B) Claim in an amount equal to the sum of (x) the principal amount of the Claim of such holder as of the Petition Date plus (y) any and all interest which accrued on such holder's Claim any time on or before the Petition Date. In full satisfaction of the Allowed Class 3(B) Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder shall be entitled to receive Post-Petition Interest, and shall receive the following on account its Allowed Claim:<br><br>    (a) on the Distribution Date, its Pro Rata share of the Effective Date Cash Distribution until such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest);<br><br>    (b) within fifteen (15) Business Days after the end of each Calendar Quarter (commencing with the Calendar Quarter ending on December 2009), its Pro Rata share of the Post-Effective Date Distributable Cash for each such Calendar Quarter until such time as such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest); and<br><br>    (c) in the event the Holders of Allowed Claims in Class 3(B) have not been paid in full on account of their Allowed Claims (inclusive of their Post-Petition Interest Claims) as of the Maturity Date; then, on the first Business Day following the Maturity Date, such Holder shall receive its Pro Rata allocation of the Equity Trust Interests.<br><br>In the alternative, each such Holder of an Allowed Class 3(B) Claim may agree, on or before the Ballot Deadline and in conjunction with such Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of Cash in an amount equal to the sum of (x) the principal amount of such Holder's Allowed Class 3(B) Claim plus (y) any and all interest which accrued on such Holder's Claim any time on or before the Petition Date plus (z) fifty percent (50%) of the Post-Petition Interest that accrued on such Claim (as of the date such payment is made), such Holder shall be deemed to waive any right or claim to any further Post-Petition Interest on account of its Allowed Class 3(B) Claim. Nothing in the Plan, however, shall be deemed or construed to guarantee such Holder that such Holder shall receive | Impaired<br>Entitled to Vote |

| | | |
|---|---|---|
| | such payment on or before November 30, 2009. | |
| Class 3(C)<br><br>Junior Note Claims | On the Effective Date, the Fremont General Financing Declaration of Trust shall be deemed dissolved and each Holder of a Junior Note Claim shall be deemed to have an Allowed Class 3(C) Claim in an amount equal to the sum of (x) the principal amount of the Claim of such Holder as of the Petition Date plus (y) any and all interest which accrued on such Holder's Claim any time on or before the Petition Date.  In full satisfaction of the Allowed Class 3(C) Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder shall be entitled to receive Post-Petition Interest, and shall receive the following Junior Repayment Rights on account of and in exchange for its Allowed Claim:<br><br>        (a)   on the Distribution Date, its Pro Rata share of the Effective Date Cash Distribution until such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest);<br><br>        (b)  within fifteen (15) Business Days after the end of each Calendar Quarter (commencing with the Calendar Quarter ending on December 2009), its Pro Rata share of the Post-Effective Date Distributable Cash for each such Calendar Quarter until such time as such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest); and<br><br>        (c)   in the event the Holders of Allowed Claims in Class 3(C) have not been paid in full on account of their Allowed Claims (inclusive of their Post-Petition Interest Claims) as of the Maturity Date; then, on the first Business Day following the Maturity Date, such Holder shall receive its Pro Rata allocation of the Equity Trust Interests.<br><br>In the alternative, each such Holder of an Allowed Class 3(C) Claim may agree, on or before the Ballot Deadline and in conjunction with such Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of Cash in an amount equal to the sum of (x) the principal amount of such Holder's Allowed Class 3(B) Claim plus (y) any and all interest which accrued on such Holder's Claim any time on or before the Petition Date plus (z) fifty percent (50%) of the Post-Petition Interest that accrued on such Claim (as of the date such payment is made), such Holder shall be deemed to waive any right or claim to any further Post-Petition Interest on account of its Allowed Class 3(C) Claim.  Nothing in the Plan, however, shall be deemed or construed to guarantee such Holder that such Holder shall receive such payment on or before November 30, 2009. | Impaired<br>Entitled to Vote |
| Class 4<br><br>Convenience Claims | In full satisfaction of any Allowed Class 4 Claims that have not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 4 Claims the full amount thereof in Cash on or before the latest of: (a) the Distribution Date and (b) fifteen (15) days after the date on which such Claim becomes an Allowed Convenience Claim. | Impaired<br>Entitled to Vote |

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

| Class 5<br>Subordinated Claims | In full satisfaction of any Allowed Class 5 Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder of Allowed Claims shall be deemed to have received Series B Equity Trust Interests under the Plan in an amount equal to the Allowed Amount of such Subordinated Claims. | Impaired<br>Entitled to Vote |
|---|---|---|
| Class 6<br>Exchanged Common Stock | On the Effective Date, holders of all the then issued and outstanding shares of Exchanged Common Stock, in exchange for such Interests, shall be deemed to have received Series A Equity Trust Interests under the Plan in an amount equal to the number of shares of the Debtor's common stock owned by such Holder.<br><br>On the Effective Date, the stock certificates representing shares of common stock issued by the Debtor prior to the Effective Date shall be deemed to be of no force and effect against the Reorganized Debtor, and the Exchanged Common Stock shall be issued to the Equity Trust in lieu thereof. | Impaired<br>Entitled to Vote |

## INTRODUCTION[1]

Fremont General Corporation, a Nevada corporation (the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on June 18, 2008 (the "Petition Date"), thereby commencing the above-captioned bankruptcy case. The Case is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court") under case number 8:08-13421-ES (the "Case"). Pursuant to Bankruptcy Code sections 1107 and 1108, the Debtor has been operating its business and managing its affairs as a debtor and debtor in possession.

The Official Committee of Unsecured Creditors (the "Creditors' Committee") is the proponent of the "Chapter 11 Plan of Fremont General Corporation Presented by the Official Committee of Unsecured Creditors (Dated September 17, 2009)" (the "Plan") that is attached to this Disclosure Statement as Exhibit 1. **THE DOCUMENT THAT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ACCOMPANYING PLAN. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THESE DOCUMENTS IN THEIR ENTIRETY.**

The Plan sets forth the manner in which the Claims against and Interests in the Debtor will be treated following the Debtor's emergence from chapter 11. This Disclosure Statement describes the Debtor's prior business operations, the events precipitating the Case, certain events during the Case and the principal aspects of the Plan including, without limitation, the treatment of Claims against and Interests in the Debtor.

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. The Plan, once confirmed, is the legally binding document regarding the treatment of Claims and Interests and the terms and conditions of the Debtor's reorganization. Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the Plan, the terms of the Plan will govern.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

## A. Proposed Plan and its Structure.

This Section of the Disclosure Statement sets forth the views and perspectives of the Creditors' Committee on the structure and purpose of the Plan.

As discussed more fully in Section X[2], the Plan provides for a reorganization of the Debtor that distributes value to the Holders of Allowed Claims and Interests in accordance with their respective order of priority under the Bankruptcy Code as such value becomes available. Holders of Class 3 General Unsecured Claims are afforded the option of waiving fifty percent (50%) of the Post-Petition Interest to which they are otherwise entitled in exchange for payment in full of the amount owing to such Holders on or before November 30, 2009, so long as sufficient Cash is then available to make such payment. The rate of Post-Petition Interest to which such Holders would be entitled for the period from the Petition Date through the Effective Date is the federal judgment rate as set forth in 28 U.S.C. § 1961(a), in effect on the Petition Date which was 2.51% (compounded annually). Waiver of one-half of that interest would result in a rate of 1.26% from the Petition Date through the Effective Date. If (i) agreed to by the Holders of Class 3 (A) Claims (Non-Note General Unsecured Claims) and Class 3 (B) Claims (Senior Note Claims), (ii) the Effective Date of the Plan occurs on or before November 30, 2009 and (iii) sufficient Cash is available to make the required payments, the partial waiver of Post-Petition Interest in exchange for early payment in turn will leave more value available for remaining junior Classes of Claims and Interests. Otherwise, the Plan provides that all such Holders will receive payment on account of Allowed Claims (and all Post-Petition Interest) from the initial Cash distribution on the Effective Date (the Effective Date Cash Distribution) and available Cash generated by the Reorganized Debtor over time. Holders of Interests in the Debtor will retain those Interests in the form of Equity Trust Interests in an Equity Trust established under the Plan.

Because of the operation of the subordination provisions contained in the Junior Note Indenture (pursuant to which amounts otherwise payable on account of Class 3(C) Junior

---

[2] Unless otherwise indicated, Section references are to sections of this Disclosure Statement.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Note Claims will be remitted to satisfy Class 3(B) Senior Note Claims until the latter such Claims are paid in full), it is anticipated that sufficient Cash will be available to pay Allowed Senior Note Claims (without Post-Petition Interest) on the Effective Date. Depending on the magnitude of Class 3(A) Non-Note General Unsecured Claims ultimately Allowed and the amount of Cash available for distribution on the Effective Date, there may not be sufficient Cash to pay those Claims in full, but the Holders of such Claims should receive a significant payment on the Effective Date nonetheless. Although the Plan offers Holders of Class 3(C) Claims (Junior Note Claims) the option of waiving a portion of Post-Petition Interest in exchange for early payment, barring an unforeseen change it is not expected that sufficient Cash will be available on the Effective Date to pay those Claims in full even if those Holders agree to partially waive Post-Petition Interest in exchange for an early payment.

Accordingly, although the Plan proposes to make a substantial payment of Cash on account of General Unsecured Claims on the Effective Date, it is not expected that this payment will be sufficient to pay in full all of those Claims. At a minimum, a substantial portion of the Junior Note Claims will remain outstanding after the Effective Date distributions are made, and it likely that a small portion of the Non-Note General Unsecured Claims will also remain outstanding. Whether those Holders thereafter receive payment in full over time depends on the amount of Cash that ultimately becomes available to satisfy their Allowed Claims.

The Plan provides that as the Reorganized Debtor generates income that becomes available Cash, the Reorganized Debtor will distribute such Cash to creditors until their remaining Allowed Claims are satisfied, and thereafter value will be distributed to equity holders, in each case subject to appropriately providing for Post-Effective Date Merger Claims and other liabilities. The Plan further provides that until Senior Note Claims are paid in full, Holders of General Unsecured Claims comprised of Senior Note Claims and Non-Note General Unsecured Claims initially will be vested with the right to designate a majority of the members of the Board of Directors of the Reorganized Debtor. Once those Claims are paid in full, the right to designate a majority of the members of the Board of Directors shifts

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

to junior Classes of General Unsecured Claims comprised of Junior Note Claims and, once those Claims are repaid in full, the right to designate the members vests in Holders of Interests. Once a Class of Holders is repaid, that Class cedes the right to designate such members to junior Classes. In this fashion, the Holders with the most immediate stake in the successful administration of the Reorganized Debtor are vested with the right to designate a majority of the members of the Board of Directors.

In addition to being consistent with the mandates of the Bankruptcy Code, the mechanism for selection of the Board of Directors is designed to ensure that junior Classes are not placed in a position, through the control of the Board of Directors, to cause the Reorganized Debtor to use Cash and its other resources to speculate for the benefit of such Holders to the substantial detriment of senior Classes. As noted, although the Reorganized Debtor will maintain its business after the Effective Date, as shown in the Projections (Exhibit 3) accompanying this Disclosure Statement, the projected income generated from this business alone will not be sufficient to pay Allowed Claims in full. The vast majority of the Reorganized Debtor's remaining property is in the form of Cash (or the disposition of assets in exchange for Cash). It would be improper for the Reorganized Debtor to divert Cash that would otherwise be available to satisfy Allowed Claims for use in potential investments that might or might not succeed (and in which the principal amount might be lost), particularly where the remaining assets of the Reorganized Debtor are insufficient to pay Allowed Claims in full. Under the Plan, the Reorganized Debtor will safely invest the remaining Cash and make provision for the distribution of the available Cash to those Holders so entitled under the Plan, rather than attempt to effectuate risky transactions that might or might not succeed and thereby would jeopardize the repayment of Allowed Claims. The sooner creditors are repaid, the sooner the right to designate the Board of Directors shifts to equity holders. The mechanism for selection of the Board also enables the Plan to propose to creditors a far lower rate of interest on Allowed Claims that remain unpaid following the Effective Date than would be the case if the power to control the Board of Directors were vested in representatives of Holders other than those most immediately affected by the

4

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

decisions made by the Board of Directors.

The Debtor is a holding company that owns 100% of the common stock of Fremont General Credit Corporation ("FGCC"), which in turn owns 100% of the common stock of Fremont Reorganizing Corporation, f/k/a Fremont Investment & Loan ("FRC").  In contrast to the Debtor, the existing Cash and other assets held by the Debtor's indirect subsidiary, FRC, greatly exceed FRC's own liabilities even in a liquidation.  See Liquidation Analysis (Exhibit 2).  As a result, substantial Cash is available from FRC to satisfy the Debtor's liabilities.  In order to accomplish the reorganization described in the Plan, the Plan proposes to streamline the structure of the Debtor's corporate enterprise, maintain existing business operations and preserve asset values.  The Plan provides for the Debtor, FGCC, and FRC to effectuate a series of mergers (defined in the Plan as the "Merger") in conjunction with the Effective Date pursuant to which the Reorganized Debtor will become the sole remaining corporation.  Following the Merger, the Reorganized Debtor will continue to operate its business and satisfy in full any liabilities of FGCC and FRC that existed prior to the Merger and that are thereafter asserted in accordance with applicable non-bankruptcy law.

## B.    Purpose of the Disclosure Statement.

The purpose of this Disclosure Statement is to provide information to enable Holders of impaired Claims and Interests to make an informed decision whether to accept or reject the Plan.  This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Bankruptcy Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Bankruptcy Court.  Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization.  See 11 U.S.C. § 1125(a).  The Bankruptcy Court's approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Bankruptcy Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement.  **THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE**

5

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  **STATEMENT. THEREFORE, THE PLAN'S TERMS ARE NOT YET BINDING ON**

2  **ANYONE. IF THE COURT LATER CONFIRMS THE PLAN, HOWEVER, AND**

3  **THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON**

4  **THE DEBTOR AND ON ALL PARTIES IN INTEREST IN THIS CASE,**

5  **INCLUDING CREDITORS AND INTEREST HOLDERS OF THE DEBTOR.**

6        Various potential claims may be pursued for the Estate's benefit and are being

7  preserved under the Plan. You should not vote to accept or reject the Plan in the expectation

8  that the Debtor, the Reorganized Debtor or the Plan Administrator may or may not pursue

9  any action, regardless of whether that action was commenced prepetition or whether that

10  action pertains to preferences, fraudulent transfers, or other claims. Unless explicitly set

11  forth in the Plan, the Plan releases none of the Debtor's or the Estate's rights to commence

12  any action. Furthermore, the Creditors' Committee, the Reorganized Debtor and the Plan

13  Administrator reserve all rights to object to any Claim or defend itself against any

14  counterclaim asserted by any entity in connection with a claim or cause of action.

15        The Creditors' Committee believes that the Plan provides, under the circumstances,

16  the best possible recoveries to creditors and equity holders, that acceptance of the Plan is in

17  the best interests of all parties in interest, and that any alternative would result in unnecessary

18  delay, uncertainty, and expense to the Estate. The Creditors' Committee therefore

19  recommends that all eligible creditors and other parties entitled to vote on the Plan cast their

20  ballots to accept the Plan.

21

22

23

24

25

26

27

28

## GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the Exhibits to this document. These documents explain who may object to confirmation of the Plan, who is entitled to vote to accept or reject the Plan, and the treatment that creditors and shareholders can expect to receive if the Court confirms the Plan. The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial or legal advice. You should therefore consult your own advisors if you have questions about the impact of the Plan on your Claims or Interests.

**CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATING TO THE DEBTOR AND ITS DIRECT AND INDIRECT SUBSIDIARIES IS BASED UPON INFORMATION PROVIDED TO THE CREDITORS' COMMITTEE PURSUANT TO A CONFIDENTIALITY AGREEMENT BETWEEN THE CREDITORS' COMMITTEE AND THE DEBTOR THAT WAS ENTERED INTO DURING THE CASE AND THAT CONTAINED PROVISIONS GOVERNING THE PROVISION OF POTENTIALLY CONFIDENTIAL INFORMATION. PURSUANT TO THAT CONFIDENTIALITY AGREEMENT, THE CREDITORS' COMMITTEE SUBMITTED A DRAFT OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING EXHIBITS TO THE DEBTOR AND AFFORDED THE DEBTOR WITH AN OPPORTUNITY TO SEEK TO REQUIRE THE FILING UNDER SEAL OF ANY INFORMATION IT IDENTIFIED AS CONFIDENTIAL. THE DEBTOR DECLINED TO TAKE SUCH ACTION.**

**EXCEPT TO THE EXTENT THAT THIS DISCLOSURE STATEMENT EXPRESSLY STATES THAT ANY STATEMENT, REPRESENTATION, ESTIMATE, ANALYSIS OR FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WAS FURNISHED BY THE DEBTOR TO THE CREDITORS' COMMITTEE OR OTHERWISE MADE AVAILABLE BY THE**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**DEBTOR GENERALLY PURSUANT TO PUBLIC STATEMENTS FILINGS, ALL STATEMENTS, REPRESENTATIONS, ESTIMATES, ANALYSES OR FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE SOLELY THOSE OF THE CREDITORS' COMMITTEE AND SHOULD NOT BE RELIED UPON AS STATEMENTS OF THE DEBTOR OR ITS MANAGEMENT. THE DEBTOR HAS ADVISED THAT INFORMATION IT HAS FURNISHED TO THE CREDITORS' COMMITTEE AND THAT APPEARS IN THIS DISCLOSURE STATEMENT INCLUDES INFORMATION THAT HAS NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT REGISTERED ACCOUNTANTS, HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND WAS NOT PREPARED FOR PURPOSES OF INCLUSION IN A DISCLOSURE STATEMENT. THE CREDITORS' COMMITTEE, HOWEVER, IS NOT AWARE OF ANY INACCURACY IN ANY INFORMATION FURNISHED BY THE DEBTOR AND ITS MANAGEMENT TO THE CREDITORS' COMMITTEE THAT IS REFERRED TO IN THIS DISCLOSURE STATEMENT. AS OF THE DATE HEREOF, THE DEBTOR HAS NOT ENDORSED OR OTHERWISE AGREED TO SUPPORT THE PLAN.**

**TO THE BEST OF THE CREDITORS' COMMITTEE'S KNOWLEDGE AND BELIEF, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE. THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.**

The statements and information that concern the Debtor that are set forth in this document constitute the only statements and information that the Bankruptcy Court has approved for the purpose of soliciting votes to accept or reject the Plan. Therefore, no information or statements that are inconsistent with anything contained in this Disclosure Statement are authorized unless otherwise ordered by the Bankruptcy Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan. Nothing contained in the Plan or

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Disclosure Statement constitutes an admission of any fact or liability by any party or may be deemed to constitute evidence of the tax or other legal effects that the reorganization set forth in the Plan may have on entities holding Claims or Interests.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of September 17, 2009. Under no circumstances will the delivery of this Disclosure Statement or the exchange of any rights made in connection with the Plan create an implication or representation that there has been no subsequent change in the information included in this document. The Creditors' Committee assumes no duty to update or supplement any of the information contained in this document, and it presently does not intend to undertake any such update or supplement.

**CAUTIONARY STATEMENT:** Some statements in this document may constitute forward-looking statements within the meaning of the of 1933 and the Securities Exchange Act of 1934 and any amendments to those acts (the "Exchange Act"). Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements. Neither the Securities and Exchange Commission ("SEC") nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any Exhibits to either document.

The Exhibits listed in the following table are attached to the Disclosure Statement.

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Chapter 11 Plan |
| 2 | Liquidation Analysis |
| 3 | Projections |
| 4 | Litigation Schedule |

### III.

### WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

What follows in this Section III is a general discussion of the rules governing the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

treatment and satisfaction of claims and equity interests under a plan of reorganization proposed under the Bankruptcy Code. Where a particular word (such as "Debtor") or term (such as "Allowed Claim" or "Allowed Interest") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or phrase has the meaning provided in Section I (Definitions and Rules of Construction) of the Plan. Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim" or "allowed interest") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section I of the Plan, but rather, the word or phrase is intended to have the general meaning ascribed to it.

To vote to accept or reject the Plan, your Claim or Interest must be: (a) an impaired Claim or Interest; (b) neither a Disputed Claim or Disputed Interest, nor a Disallowed Claim or Disallowed Interest; and (c) entitled to receive or retain some value under the Plan. Holders of unimpaired Claims are deemed to have accepted the Plan and do not vote, though they may object to Plan confirmation to the extent they otherwise have standing to do so. Holders of Claims and/or Interests that do not receive or retain any value under the Plan are deemed to reject the Plan. As defined by the Bankruptcy Code, a claim generally includes all rights to payment from the Debtor, while an interest generally represents an ownership stake in the Debtor.

### A. Allowed Claims and Interests.

With the exceptions explained below, under the Bankruptcy Code, a claim or interest generally is allowed only if a proof of claim or interest is properly filed before any applicable bar date, and either no party in interest has objected or the Court has entered an order allowing the claim or interest.[3] Under certain circumstances, as provided in the Bankruptcy Code, a creditor may have an allowed claim even if a proof of claim was not filed and the applicable bar date for filing a proof of claim has passed. For example, a claim may be

---

[3] Section IX.B.2 contains specific information regarding the deadlines established in this Case by which proofs of claim were to be filed.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

deemed allowed if the claim is listed on a debtor's schedules and is not scheduled as disputed, contingent, or unliquidated. Similarly, an interest may be deemed allowed if it is included on the list of equity security holders filed by a debtor with the court and is not scheduled as disputed, contingent or unliquidated.

A holder's Claim or Interest must be an Allowed Claim or Allowed Interest for purposes of voting for the holder of such Claim to have the right to vote on the Plan. Generally, for voting purposes, a Claim or Interest is deemed Allowed to the extent that: (a) either (1) a proof of Claim or proof of Interest was timely Filed; or (2) a proof of Claim or proof of Interest is deemed timely Filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a Final Order; and (b) either (1) the Claim or Interest is not a Disputed Claim or Disputed Interest, or (2) the Claim or Interest is allowed either by a Final Order or under the Plan.

Under the Plan, a creditor or interest holder whose Claim or Interest is not allowed may still be entitled to vote to accept or reject the Plan if the creditor or interest holder has timely Filed a proof of Claim or proof of Interest that is not the subject of an objection Filed before the Confirmation Hearing or a Court order disallowing the Claim entered before the Confirmation Hearing. An entity whose Claim or Interest is subject to an objection is not eligible to vote on the Plan unless and until that objection is resolved in the entity's favor or, after notice and a hearing under Bankruptcy Rule 3018(a), the Court temporarily allows the entity's Claim or Interest for the purpose of voting to accept or reject the Plan. Any entity that seeks temporary allowance of its Claim or Interest for voting purposes must promptly file an appropriate motion and take the steps necessary to arrange an appropriate and timely hearing with the Court.

## B. Impaired Claims and Interests.

Generally speaking, under the Bankruptcy Code, a class of claims or interests is impaired if the plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or interest holders. Section X of this Disclosure Statement and Section II of the Plan identify and describe, among other things, the Classes of Claims and Interests that the Creditors' Committee believes to be impaired (or

unimpaired) under the Plan.

### C. Class 3(A) (Non-Note General Unsecured Claims), Class 3(B) (Senior Note Claims) and Class 3(C) (Junior Note Claims) Elections.

If you hold an Allowed Class 3 (A) Claim, Allowed Class 3(B) Claim or Allowed Class 3(C) Claim against the Estate, you will be entitled to receive distributions of Post-Petition Interest on account of your Allowed Claim. However, you will have the option on your Ballot to elect to receive Cash payments by November 30, 2009 equal to (i) the principal amount of your Allowed Class 3(A) Claim plus fifty percent (50%) of the Post-Petition Interest that accrued on such Claim, (ii) the principal amount of your Allowed Class 3(B) Claim plus any interest that accrued on such Claim prior to the Petition Date plus fifty percent (50%) of the Post-Petition Interest that accrued on such Claim or (iii) the principal amount of your Allowed Class 3(C) Claim plus any interest that accrued on such Claim prior to the Petition Date plus fifty percent (50%) of the Post-Petition Interest that accrued on such Claim, as applicable, in exchange for a waiver of any right or claim you may have to the payment of the other fifty percent (50%) of Post-Petition Interest that has accrued on your Allowed Claim (the "Early Payment Election"). If you make the Early Payment Election, and receive Cash payments totaling such amounts on account of your Allowed Claim by November 30, 2009, your Allowed Claim will be deemed satisfied in full and you will waive any right or claim to the payment of fifty percent (50%) of the Post-Petition Interest to which you may otherwise be entitled. The Plan does not guarantee that Holders of Allowed Claims making the Early Payment Election will receive their Cash payments by November 30, 2009. Consequently, to the extent you make the Early Payment Election, but do not receive the required Cash payments by November 30, you will still be entitled to receive payment of Post-Petition Interest in full.

### D. Reservation of Rights Regarding Classification of Claims in Class 3(A) (Non-Note General Unsecured Claims), Class 3(B) (Senior Note Claims) and Class 3(C) (Junior Note Claims).

Although Classes 3(A), 3(B) and 3(C) are separately classified under the Plan, the Creditors' Committee reserves the right to request that the Bankruptcy Court treat Classes

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

3(A), 3(B) and 3(C) as a single Class (e.g., Class 3) for voting purposes pursuant to Bankruptcy Code section 1126 in the event any of these Classes do not vote to accept the Plan.

### E.    Class 4 (Convenience Claims) Election.

If you hold an Allowed Claim against the Estate equal to or less than $10,000, that Claim will be classified and treated as an Allowed Class 4 Claim (i.e., an Allowed Convenience Claims) under the Plan.  If you hold an Allowed Non-Note General Unsecured Claim that exceeds $10,000, that Claim will be classified and treated as an Allowed Class 3(A) Claim; provided, however, that as the Holder of an Allowed Class 3(A) Claim, you will have the option to timely elect on your Ballot to have your Allowed Class 3(A) Claim treated as an Allowed Class 4 Claim as described herein.  If you make this election, your Allowed Class 3(A) Claim against the Estate will be reduced to a $10,000 claim and treated as an Allowed Class 4 Claim.  Holders of Class 4 Claims will not receive Post-Petition Interest. For example, if you hold an Allowed Non-Note General Unsecured Claim totaling $25,000, you may indicate on your Ballot that you wish to elect to have your Allowed Non-Note General Unsecured Claim treated as an Allowed Convenience Claim in which case your Claim will be reduced to $10,000 and treated as an Allowed Class 4 Claim.  On account of such Claim, you will be eligible to receive Cash distributions equal to the Allowed amount of such Claim (i.e., up to $10,000), without Post-Petition Interest.  If, on the other hand, you hold an Allowed Claim against the Estate totaling $3,000, your Claim automatically will be classified and treated as a Class 4 Claim and be eligible to receive Cash distributions equal to that amount (i.e., up to $3,000), without Post-Petition Interest.  If you make this election, your Ballot will be counted as a Class 4 Ballot.  Otherwise, if your Claim exceeds $10,000, your Ballot will be treated as a Class 3(A) Ballot.

### IV.

### VOTES NECESSARY TO CONFIRM THE PLAN

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and it is each class that must accept (or reject) that plan.  Section X of this Disclosure

Statement and Section II of the Plan set forth a summary of the classification of all Claims and Interests under the Plan. There also are some types of claims that are unclassified because the Bankruptcy Code requires that they be treated a specific way. These claims are considered unimpaired, and their holders cannot vote.

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims has voted to accept that plan (without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements are met both as to non-consenting members within a consenting class and as to dissenting classes. A class of claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the allowed claims actually voting in that class vote to accept the plan. A class of interests has accepted the plan only when at least two-thirds in amount of the allowed interests actually voting in that class vote to accept the plan.

Even if the Creditors' Committee receives the requisite number of votes to confirm the proposed Plan, the Plan will not become binding unless and until, among other things, the Court makes an independent determination that Confirmation is appropriate.[4] This determination will be the subject of the Confirmation Hearing. In addition, even if all Classes do not vote in favor of the Plan, the Plan nonetheless may be confirmed if the dissenting Classes are treated in a manner prescribed by the Bankruptcy Code.

## V.

## CRAMDOWN TREATMENT OF NON-CONSENTING CLASSES

Even if all classes do not consent to the proposed treatment of their claims and interests under a plan, the plan nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which dissenting classes are forced to abide by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting classes to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define

---

[4] Section VII.A of the Plan sets forth the various conditions to effectiveness of the Plan.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment. For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of their interests in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claim or interest that is junior to such claims receives or retains anything under the plan. Accordingly, if a class of unsecured claims rejects a plan under which a junior class (e.g., a class of interest holders) will receive or retain any property under the plan, the plan generally cannot be confirmed, subject to certain established exceptions, unless the plan provides that the class of unsecured creditors receives value equal to the allowed amount of the claims in that class.[5]

## VI.

## INFORMATION REGARDING VOTING IN THIS CASE

### A. Voting Instructions.

The Creditors' Committee believes that Classes 3(A), 3(B), 3(C), 4, 5 and 6 are impaired and therefore entitled to vote on the Plan except to the extent such holders hold Disputed Claims or Disputed Interests. The Creditors' Committee believes that Classes 1 and 2 are unimpaired and therefore are not entitled to vote on the Plan. Entities holding Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

Any party that disputes the characterization of its Claim as unimpaired may request a finding of impairment from the Court to obtain the right to vote, but such party must promptly take action to request such a finding and arrange for the Court to hold a hearing and adjudicate such request prior to the hearing on confirmation of the Plan. In addition, if your Claim is a Disputed Claim or your Interest is a Disputed Interest and you wish to vote on

---

[5] These are complex statutory provisions. The preceding paragraph does not purport to state or explain fully the applicable statutes or case law.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the Plan, you will be required to move the Court to temporarily Allow your Claim or Interest for voting purposes.

In voting to accept or reject the Plan, please use only the ballot sent to you with this Disclosure Statement, and please carefully read the voting instructions on the ballot for an explanation of the applicable voting procedures and deadlines. If you have received this Disclosure Statement without a ballot, the Creditors' Committee believes that you are: (i) a creditor whose claim is unimpaired by the Plan and that you, therefore, are not entitled to vote on the Plan; (ii) a holder of a Claim that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan; (iii) a holder of an Interest that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan or (iv) otherwise not the holder of a Claim or Interest that is entitled to vote to accept or reject the Plan.

If, after reviewing this Disclosure Statement, you believe that you hold an impaired Claim or Interest and that you are entitled to vote on the Plan but you did not receive a ballot, or if your ballot is damaged or lost, please send a written request for a ballot to the Ballot Tabulator at the following address:

> Klee, Tuchin, Bogdanoff & Stern LLP
> Attn: Shanda D. Pearson, Paralegal
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, CA 90067
> Facsimile: (310) 407-9090

If you wish to vote to accept or reject the Plan, your ballot must be received by the Ballot Tabulator, at the address or facsimile number listed above, no later than __:__ Pacific Time, on _____ __, 2009. If your ballot is not timely received by the Ballot Tabulator, it will not be counted. Ballots must be provided to the Ballot Tabulator by mail, overnight delivery, messenger, or facsimile. Ballots sent by e-mail will not be accepted by the Ballot Tabulator and will not be counted in tabulating votes accepting or rejecting the Plan.

Any interested party desiring further information with respect to the Plan, or seeking additional copies of this document, should contact in writing, Creditors' Committee counsel, Klee, Tuchin, Bogdanoff & Stern LLP, Attn: Shanda D. Pearson, at the address noted in this

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Section. The cost of additional copies must be paid by the person ordering them. All pleadings and other papers Filed in this Case, however, may be inspected free of charge during regular court hours at the Office of the Clerk, United States Bankruptcy Court, 411 West Fourth Street, Santa Ana, California 92701. Documents also may be accessed free of charge through the website of the Debtor's claims agent at www.kccllc.net/fremontgeneral or for a fee through Court's electronic records system at http://ecf.cacb.uscourts.gov.

## VII.

### WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for _____ __, 2009 at __:__ Pacific Time at the United States Bankruptcy Court, Courtroom 5A, 411 West Fourth Street, Santa Ana, California 92701, to determine whether the Court will confirm the Plan. On September 28, 2009, the Creditors' Committee will file a memorandum of points and authorities supporting the entry of the Confirmation Order. This memorandum will be served on, at minimum, the Office of the United States Trustee for the Central District of California (the "U.S. Trustee"), counsel for the Debtor, counsel for the Official Committee of Equity Holders (the "Equity Committee") and all entities that have requested special notice in the Case.

Any party in interest in the Case, including any creditor or shareholder that voted (or was deemed to have voted) to accept or reject the Plan, may file an objection to confirmation of the Plan. Any such objection must be filed and served on the Creditors' Committee and its counsel, the U.S. Trustee, counsel for the Debtor and counsel for the Equity Committee by _____ __, 2009 at __:__ Pacific Time. **Failure to properly and timely File an opposition to Plan confirmation may be deemed to be consent to the Plan's confirmation.** If you wish to obtain more information, you should contact: Klee, Tuchin, Bogdanoff & Stern LLP Attn: Shanda D. Pearson, 1999 Avenue of the Stars, 39th Floor Los Angeles, CA 90067, Facsimile: (310) 407-9090.

17

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

## VIII.[6]

## DESCRIPTION OF THE DEBTOR'S BUSINESS, EVENTS PRECIPITATING THIS BANKRUPTCY CASE, AND SIGNIFICANT EVENTS IN THE CASE

### A.    Business Background.

The Debtor is a publicly held Nevada company incorporated in 1972 that has functioned as a financial services holding company.  Prior to the Petition Date, the Debtor's common stock was traded on the New York Stock Exchange under the symbol "FMT."  As a holding company, the Debtor's main assets consist of direct and indirect ownership interests in a number of subsidiaries.  As described below, the Debtor's business operations were generally conducted through two intermediate holding companies, one of which operated in the financial services industry and the other of which operated in the insurance industry.

### 1.    Financial Services Operations.

The Debtor conducted its financial services business primarily through FRC.  Prior to the Petition Date, FRC offered certificates of deposit and savings and money market deposit accounts through its 22 retail banking branches in California and was engaged in the commercial and residential (consumer) real estate lending businesses on a nationwide basis, including lending in the sub-prime residential real estate market.  While FRC was still a California-charted industrial bank, FRC engaged in both commercial and residential (consumer) real estate lending.  FRC's commercial lending operations focused on the origination of commercial real estate loans, which FRC primarily held for investment.  FRC's consumer lending operations focused on the origination of non-prime and subprime residential real estate loans, most of which were sold to third party investors through whole loan sales or securitizations.

FRC's business grew rapidly in the years just before the Petition Date.  The total amount of residential loans originated by FRC increased from approximately $14 billion in 2003 to approximately $33 billion in 2006.  FRC's commercial real estate loan portfolio also increased from approximately $1.1 billion in 2003 to approximately $6.3 billion in 2006.

---

[6]    Information set forth in Sections VIII.A, B and C is based upon information provided by the Debtor.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

However, the subprime lending market deteriorated significantly in 2007, and a periodic review by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") of FRC's subprime lending operations lead to the issuance of a Cease and Desist Order, which was consented to by FRC and the Debtor on March 7, 2007 (the "<u>Cease and Desist Order</u>").

The Cease and Desist Order required FRC to (among other requirements) make a variety of changes designed to restrict the level of lending in its subprime residential mortgage and commercial real estate business, to adopt a Capital Adequacy Plan to improve FRC's Tier-1 leverage capital in relation to its risk profile, to provide for enhanced regulatory oversight and to mandate the retention of qualified management acceptable to the FDIC and the Department of Financial Institutions of the State of California ("<u>DFI</u>"). The requirement for FRC to maintain higher capital levels made it more difficult for FRC to operate its lending business. In response, FRC decided to discontinue its subprime lending activities and, as of March 2007, ceased entering into new funding commitments for subprime mortgage loans, although FRC continued to honor remaining outstanding commitments.

FRC also sold its entire commercial real estate loan portfolio and its commercial lending platform to an unaffiliated third party in July 2007, terminating FRC's commercial real estate lending operations. In addition to the Cease and Desist Order, FRC and the Debtor entered into a Final Order with the DFI on April 13, 2007 (the "<u>Final Order</u>"), which was substantially similar in content to the Cease and Desist Order.

The vast majority of FRC's originated residential loans were transferred to third parties through whole loan sales or securitizations. In a whole loan sale, FRC entered into an agreement to sell loans for cash, generally on a servicing released basis, but occasionally on a servicing retained basis. As part of the sale process, FRC gave customary representations and warranties regarding the characteristics and origination process of the loans. FRC also generally committed to repurchase loans if payment defaults occurred within a certain period after the loans were sold. In a securitization, FRC transferred residential loans to a qualifying special-purpose entity, established for the limited purpose of purchasing the loans

and issuing interest bearing securities that represented interests in the loans. The transfer of the loans in a securitization is treated as a sale, with the loans being removed from FRC's balance sheet, although FRC continued to perform loan servicing functions for the securitizations.

### 2. Insurance Services Operations.

As of the Petition Date, the Debtor also owned 100% of the common stock of Fremont Compensation Insurance Group, Inc. ("FCIG"). FCIG, in turn, owned 100% of the common stock of Fremont Indemnity Company in Liquidation ("FIC"), and 100% of the common stock of Fremont Life Insurance Company ("Fremont Life"). The Debtor conducted its insurance business primarily through FIC and Fremont Life, although the operations and activities of these entities had effectively been discontinued prior to the Petition Date.

FIC historically operated in the property and casualty insurance industry and engaged in the underwriting of workers' compensation insurance business. In June 2003, FIC was placed into a state "conservation" proceeding under section 1011 of the California Insurance Code, which was subsequently converted into a state "liquidation" proceeding under section 1016 of the California Insurance Code in July 2003. In connection with those proceedings, the California Insurance Commissioner (the "CIC") obtained the powers of the directors, officers, and managers of FIC, as well as control over FIC's property.

Fremont Life operated as a licensed life, annuity and accident and health insurance company, but had discontinued writing new business in 1995, and in 1996 entered into a coinsurance agreement to reinsure all its existing annuity, life and credit in-force business. By 2004, Fremont Life had terminated its life, disability, liability, workers' compensation and common carrier liability lines. In June 2008, Fremont Life was itself placed into a state "conservation" proceeding by the CIC.

The Debtor has previously indicated that, in light of the foregoing, it did not expect to recover any of its investment the discontinued insurance operations. Further, as discussed in Section VIII.D.6.a, pursuant to a settlement between the Debtor, FRC, FCIG and the CIC, as

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the statutory liquidator of FIC and the statutory conservator of Fremont Life, FCIG surrendered or transferred all of its right, title and interest in the stock of FIC and Fremont Life.

### B. The Debtor's Management.

#### 1. Previous Management Team.

Until November 2007, the Debtor's management team included Chairman of the Board James A. McIntyre ("McIntyre"), and President and Chief Executive Officer Louis J. Rampino ("Rampino"). McIntyre and Rampino had each been employed by the Debtor for more than thirty years. McIntyre had served as the Debtor's Chief Executive Officer from 1976 until 2004, when Rampino was appointed as Chief Executive Officer. In November of 2007, McIntyre, Rampino, and several of the Debtor's other officers and directors resigned after the Debtor and FRC continued to experience significant financial difficulties.

#### 2. Current Management Team.

The Debtor's previous management team was replaced in November 2007 with a new management team, including Chairman of the Board of Directors and Chief Executive Officer Stephen H. Gordon ("Gordon") and Vice-Chairman and President David S. DePillo ("DePillo").

As discussed in Section VIII.D.5, Gordon and DePillo resigned from day-to-day management on September 30, 2008, but remain on the board as Chairman and Vice-Chairman, respectively. On October 1, 2008, Richard A. Sanchez ("Sanchez") replaced DePillo and Gordon and became the Debtor's Interim President and Interim Chief Executive Officer and he remains in such positions. Prior to the appointment as Interim President and Interim Chief Executive Officer, Sanchez served as the Debtor's Executive Vice President and Chief Administrative Officer from November 2007 through September 30, 2008. The Debtor's Executive Vice President and Chief Financial Officer, Thea K. Stuedli ("Stuedli"), and the Executive Vice President and General Counsel Donald E. Royer ("Royer"), have held their respective positions since November 2007.

In November 2007, in connection with the hiring of the new management team, the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Debtor and FRC entered into Employment Agreements (collectively, the "<u>Employment Agreements</u>") with each of Gordon, DePillo, Sanchez, Royer and Stuedli (each an "<u>Executive</u>," and collective, the "<u>Executives</u>"). The term of each of the Employment Agreements is three years. (It is expected that notices of non-renewal of the Employment Agreements will be provided in November 2009). Among other things, the Employment Agreements provide that the Debtor and FRC are jointly and severally obligated to pay the salaries of the Executives. The Employment Agreements also provide that, if an Executive is terminated for other than "cause" or voluntarily resigns from their employment for "good reason," the Debtor and FRC may be obligated to pay such Executive severance compensation equaling 300% of the Executive's annual base salary and average annual bonus. FRC may be further obligated to pay the Executive severance compensation equal to 300% of such Executive's average annual bonus and provide continued health benefits for three years. Moreover, upon a "change in control event," which includes (i) where any person becomes the beneficial owner of 20% of the voting securities of the Debtor or FRC or (ii) a plan of reorganization, merger or sale of assets occurs and the resulting entity is not the Debtor or FRC, any outstanding and unvested equity awards the Executive is eligible to receive will immediately vest in full.

As described in Section XI.B, the Employment Agreements of Sanchez, Royer and Stuedli (collectively, the "<u>Executive Employment Agreements</u>") will be assumed in connection with the Plan, thereby retaining their executive positions and existing job duties and responsibilities with the Reorganized Debtor following the Effective Date, including the continued reporting of Sanchez directly to the Board of Directors, should they determine to continue to serve. Sanchez, Royer and Stuedli have not agreed, at this point, to continue their employment with the Reorganized Debtor under their Employment Agreements. In addition, the Debtor has advised the Creditors' Committee that Sanchez, Royer and/or Stuedli may take the position, regardless of the assumption of the Executive Employment Agreements, that "good reason" exists for one or more of them to resign under the terms of their Executive Employment Agreements, and that they are entitled to certain payments by

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the Debtor and/or FRC as a result thereof. The Creditors' Committee disagrees with any such contention. Set forth below is information concerning the backgrounds of Sanchez, Royer and Stuedli:

### a. Richard A. Sanchez, Interim President and Interim Chief Executive Officer.

Mr. Sanchez has served as both a bank executive and banking regulator. From 2002 through 2006, he was a director of Commercial Capital Bancorp, Inc. ("CCBI") and served as Executive Vice President, Chief Administrative Officer and Corporate Secretary for CCBI and Commercial Capital Bank. From 1993 to 2002, Mr. Sanchez was Deputy Regional Director for the Office of Thrift Supervision, where he supervised examiners responsible for and planned and directed the examination of and supervision of 85 insured financial institutions with total assets over $300 billion.

### b. Thea K. Stuedli, Executive Vice President and Chief Financial Officer.

Ms. Stuedli, a certified public accountant, has more than 11 years of financial services experience. From 2004 to 2006, Ms. Stuedli served as Senior Vice President and Chief Accounting Officer at CCB, where she was primarily responsible for all internal and external financial reporting, including all SEC filings, board of directors' reports and regulatory reports. From 2002 through 2004, Ms. Stuedli served as the Corporate Controller at Jackson Federal Bank and, prior to 2002, served as a manager in the financial services practice at KPMG, LLP.

### c. Donald E. Royer, Executive Vice President and General Counsel.

Mr. Royer has served in various capacities in the California financial services industries. During 2007, Mr. Royer acted as a consultant in representing various mortgage lender institutions. In 2006, Mr. Royer joined CCB and CCBI as Executive Vice President and General Counsel. From 2002 through 2006, Mr. Royer was in private practice as an attorney. From 1991 to 2002, Mr. Royer was employed by Downey Savings as Executive President, General Counsel and Corporate Secretary. From 1988 to 1991, Mr. Royer served

as Executive Vice President and General Counsel of American Savings Bank, and from 1984 to 1988 served as Executive Vice President and General Counsel of Financial Corporation of American and American Savings and Loan Association. Prior to that time, Mr. Royer held positions as General Counsel for American Savings and Loan Association from 1979 to 1983 and began his legal career at First Federal Savings from 1977 to 1979.

### C. Brief Summary of the Circumstances that Led the Debtor File its Case.

The Debtor commenced this Case to facilitate the sale of certain assets of its indirect subsidiary FRC, which was one of the nation's largest subprime lenders. Although FRC sold the vast majority of loans that it originated by way of "whole loan" sales, it did remain obligated to repurchase loans sold if such loans experienced a payment default within a certain period of time after being sold or in the event of a breach of customary representation and warranties included in the whole loan sale agreements.

FRC's loan repurchase obligations began increasing by the end of 2006, and a combination of loan repurchase losses and deterioration in the subprime loan price caused FRC to experience significant erosion in its earnings and statutorily mandated capital ratios. The Debtor has indicated that this led to the Debtor and FRC consenting to the Cease and Desist Order and the Final Order. As a result of the Cease and Desist Order and the Final Order, FRC decided to completely terminate all new subprime funding commitments on March 7, 2007, although it continued to honor existing funding commitments made before March 7, 2007. FRC reached agreements to sell the majority of its remaining residential loan portfolio, its entire commercial real estate loan portfolios and its commercial lending platform to third parties during the first half of 2007.

Even after ceasing residential lending and taking other actions to comply with the Cease and Desist Order and the Final Order, the Debtor was unable to sufficiently remedy FRC's capital position that was caused primarily by the subprime lending crisis. The FDIC issued a Supervisory Prompt Corrective Action Directive (the "Directive") on March 26, 2008, which required the Debtor to within sixty days either recapitalize FRC or accept an offer for FRC to be acquired by another depository institution. In order to comply with the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Directive, the Debtor reached an agreement with CapitalSource, Inc. ("CapitalSource") pursuant to which CapitalSource or its designee would purchase a substantial portion of FRC's principal assets and assume its deposits (the "CapitalSource Transaction").

Because the Debtor was a publicly traded entity, the Debtor ordinarily would have had to comply with SEC proxy rules in order to complete the sale to CapitalSource. However, due in part to its illiquid financial condition and the possible recording of additional asset write-downs and reserves, the Debtor determined that it would be unable, on a timely basis, to complete an audit of its consolidated financial statements for the year ended December 31, 2007 and its consolidated unaudited quarterly financial statements for the quarter ended March 31, 2008 or to file the related periodic reports with the SEC. Under SEC proxy rules, availability of this financial information would be necessary before the Debtor could have solicited shareholder approval of the CapitalSource Transaction.

The Debtor has stated that, given the difficulties associated with completing a sale outside of bankruptcy, for purposes of completing the CapitalSource Transaction it was appropriate for the Debtor to seek protection under chapter 11 of the Bankruptcy Code and seek to complete the transaction with Bankruptcy Court approval. Consequently, on June 18, 2008 the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and continued to manage its assets and properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

**D. Significant Events in the Case.**

**1. Emergency Relief Sought by the Debtor.**

On the Petition Date, the Debtor filed the following emergency motions to facilitate its transition into operating as a debtor in possession under chapter 11 of the Bankruptcy Code and preserve federal income tax net operating loss carryovers:

- *Emergency Motion of Debtor and Debtor in Possession for Order Limiting Notice and Permitting Service on Insured Depository Institutions by First-Class Mail; Memorandum of Points and Authorities* [Docket No. 5];

25

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

- *Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105, 345, and 363 Authorizing (A) Continued Maintenance of Existing Bank Accounts; (B) Continued Use of Existing Cash Management System; and (C) Waiver of Requirements of Bankruptcy Code Section 345(b); Memorandum of Points and Authorities* [Docket No. 6];

- *Emergency Motion of Debtor and Debtor in Possession Fixing Procedures for Providing Certain Notices and Authorizing Debtor to Retain and Compensate Kurtzman Carson Consultants LLC as Noticing Agent/Claims Processor* [Docket No. 7]; and

- *Emergency Motion of Debtor and Debtor in Possession for Order (A) Limiting Certain Transfers of Equity Interests in the Debtor and (B) Approving Related Notice Procedures; Memorandum of Points and Authorities; and Declaration of Gregory Soukup in Support Thereof* [Docket No. 8].

On June 19, 2008, the Court conducted a hearing on the foregoing emergency motions and approved the relief sought therein. Information regarding each of the other above-listed motions and the relief requested therein is not contained in this Disclosure Statement. Anyone wishing to review a copy of one or more of these motions, or otherwise, may do so by accessing the website of the Debtor's claims agent at www.kccllc.net/fremontgeneral or the Bankruptcy Court's electronic records system at http://ecf.cacb.uscourts.gov or contact: Klee, Tuchin, Bogdanoff & Stern LLP, Attn: Shanda D. Pearson, 1999 Avenue of the Stars, 39th Floor, Los Angeles, CA 90067, Facsimile: (310) 407-9090.

## 2.    Appointment of the Committees.

Shortly after the Debtor commenced its Case, the U.S. Trustee appointed two official committees, the Creditors' Committee and the Equity Committee. The members of the Creditors' Committee are: (i) Tennenbaum Multi-Strategy Master Fund (which serves as the chair); (ii) HSBC Bank USA, N.A., the Indenture Trustee for holders of the Debtor's 7.875% Senior Notes; (iii) Wells Fargo Bank, N.A., as successor trustee to the Bank of New York Trust Company, N.A., the Indenture Trustee for holders of the Debtor's 9% Junior

26

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Subordinated Debentures; (iv) Dennis & Loretta Danko Family Trust and (v) Rita Angel. In addition, Howard Amster and Roark, Rearden, & Hamot Capital Management serve as "ex officio" members of the Creditors Committee. The initial members of the Equity Committee were: (i) John M. Koral; (ii) William M. Stern; (iii) Paul Dagostino; (iv) William Holmes; (v) Frank E. Williams, Jr.; (vi) Jeffrey M. Pies; (vii) Lynn Ehlers; (vii) John M. Mlynick; and (ix) Jonathan Siegal. Messrs. Mlynick and Siegal subsequently resigned from the Equity Committee.

### 3. The CapitalSource Transaction.

On June 23, 2008, the Debtor filed its *Motion for Order Authorizing the Debtor to Use the Shares of a Non-Debtor Subsidiary to Consummate the CapitalSource Transaction* [Docket No. 29] (the "CapitalSource Motion"), which sought entry of an order authorizing the Debtor, as sole shareholder, to vote its shares in FGCC to cause FRC to consummate the CapitalSource Transaction. Following a hearing on July 17, 2008, the Court entered an order approving the CapitalSource Motion. The CapitalSource Transaction closed on or about July 25, 2008, and FRC subsequently changed its name from Fremont Investment & Loan to Fremont Reorganizing Corporation.

### 4. Professionals Retained at the Expense of the Estate.

During the Case, the Debtor, the Creditors' Committee and the Equity Committee retained numerous professionals to assist with the administration of the Estate and their respective obligations. The Court has approved the employment of the following professionals:

- Kurtzman Carson Consultants LLC as Noticing Agent and Claims Processor of the Court
- Patton Boggs LLP as the Debtor's co-reorganization counsel
- Stutman, Treister & Glatt, PC as the Debtor's co-reorganization counsel
- FTI Consulting, Inc. as the Debtor's provider of interim management and management assistance
- Willenken, Wilson, Loh & Lieb LLP as the Debtor's special litigation counsel

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

- • Epstein Becker & Green, PC as the Debtor's special litigation counsel
- • The Caldwell Law Firm as the Debtor's special insurance counsel
- • KPMG Corporate Finance LLC as the Debtor's investment banker
- • Squar, Milner, Peterson, Miranda & Williamson, LLP as the Debtor's special auditor and accountant
- • Ernst & Young, LLP, as the Debtor's tax services provider
- • Klee, Tuchin, Bogdanoff & Stern LLP as the Creditors' Committee's counsel
- • Solon Group, Inc. as the Creditors' Committee's financial advisor
- • Bocarsly Emden Cowan Esmail & Arndt LLP as the Creditors' Committee's tax counsel
- • Weiland, Golden, Smiley, Wang Ekvall & Strok LLP as the Equity Committee's counsel
- • CRG Group Partners, LLC as the Equity Committee's financial advisor

The Court approved interim fee procedures for professionals seeking compensation from the Estate. With the exception of certain professionals whose compensation is subject to different procedures, professionals are eligible to receive payment of 80% of their monthly fees and 100% of their monthly expenses provided that no objection is timely filed and served with respect to such professionals' monthly fee statements. Such professionals have the opportunity to request and obtain payment of the "hold back" amounts at interim or final fee application hearings.

Kurtzman Carson Consultants LLC is paid in full on a monthly basis by the Debtor pursuant to a separate procedure. KPMG Corporate Finance LLC has also been compensated pursuant to a separate procedure under which it is paid a monthly retainer of $25,000, until its retention with the Debtor is terminated, and is eligible to receive an additional transaction fee in the event a plan of reorganization sponsored by a third party plan proponent becomes effective, which will not occur if the Plan is confirmed.

Set forth below is a chart which summarizes the fees and expenses incurred and requested by professionals during the first interim fee application period (covering June 18,

2008 through and including November 30, 2008) (the "<u>First Interim Period</u>") and second interim fee application period (covering December 1, 2008 through and including March 31, 2009) (the "<u>Second Interim Period</u>") pursuant to interim fee applications submitted by such professionals, and the outstanding unpaid amounts, if any, associated with such applications:

| Professional | Retainer | First Interim Period<br>Total Request | | | Second Interim Period<br>Total Request | | |
|---|---|---|---|---|---|---|---|
| | | Fees | Expenses | Unpaid Portion | Fees | Expenses | Unpaid Portion |
| Klee Tuchin | - | $ 652,229 | $ 32,129 | $0 | $ 571,868 | $ 11,265 | $ 113,829 |
| Stutman Treister | $ 116,314 | $ 978,456 | $ 46,882 | $0 | $ 746,501 | $ 20,267 | $ 149,300 |
| Patton Boggs | $ 250,000 | $ 1,459,565 | $ 37,427 | $0 | $ 608,329 | $ 29,686 | $ 121,665 |
| FTI | $ 500,000 | $906,964 | $ 132,132 | $0 | $ 429,651 | $ 39,461 | $ 85,930 |
| Weiland Golden | - | $ 391,820 | $ 10,046 | $0 | $ 213,573 | $ 467 | $ 43,118 |
| Solon Group | - | $25,285 | - | $0 | $ 10,452 | - | $0 |
| CRG Partners | - | $ 87,100 | $ 105 | $0 | $ 20,362 | - | $0 |
| Epstein Becker | - | $ 238,524 | $ 12,720 | $0 | $ 619,720 | $ 18,070 | $0 |
| Willenken Wilson | - | - | - | - | $ 5,351 | $ 8 | $0 |
| Caldwell Law Firm | - | - | - | - | $ 17,508 | - | $0 |
| Totals | $ 866,314 | $ 4,739,943 | $ 271,441 | - | $ 3,243,315 | $ 119,224 | $ 513,842 |

Set forth below is a chart which summarizes the fees and expenses incurred and requested by professionals during the third interim fee application period (covering April 1, 2009 through and including July 31, 2009) (the "<u>Third Interim Period</u>") pursuant to interim fee applications submitted by such professionals, and the outstanding unpaid amounts, if any, associated with such applications:

| Professional | Retainer | Third Interim Period<br>Total Request | | |
|---|---|---|---|---|
| | | Fees | Expenses | Unpaid Portion |
| Klee Tuchin | | $ 795,297 | $ 14,392 | $ 159,059 |
| Stutman Treister | | $ 848,468 | $ 41,878 | $ 169,727 |
| Patton Boggs | | $ 663,712 | $ 18,274 | $ 137,742 |
| FTI | | $ 428,263 | $ 25,780 | $ 156,710 |

29

| | | | | |
|---|---|---|---|---|
| Weiland Golden | | $ 328,808 | $ 1,217 | $ 65,762 |
| Solon Group | | $ 36,465 | - | $ 29,947 |
| CRG Partners | | $ 108,361 | $ 1,086 | $ 50,225 |
| Epstein Becker | | $ 57,787 | $ 4,519 | $ 11,557 |
| Willenken Wilson | | $ 11,963 | $ 91 | $ 12,054 |
| Caldwell Law Firm | | $ 104,227 | $ 6,291 | $ 20,855 |
| Squar Milner | $ 100,000 | $ 57,546 | | $ 57,546 |
| Bocarlsy Emden | | $ 28,375 | $ 158 | $ 5,675 |
| Ernst & Young | | $ 48,600 | | $ 9,270 |
| Totals | $ 100,00 | $ 3,517,872 | $ 113,686 | $ 886,129 |

Additional fees and expenses will be incurred by professionals through the Effective Date. An estimate of these additional professional fees and expenses is set forth in Section X.C.1.a(2) of this Disclosure Statement.

### 5. Insider Compensation.

In July 2008, the Debtor served Notices of Setting Insider Compensation (the "Insider Compensation Notices") for the Executives and Mark E. Schaffer, Robert J. Shackleton, Barney R. Northcote and John C. Loring as non-executive members of the Debtor's board of directors. After the Creditors' Committee notified the Debtor that it intended to object to the Insider Compensation Notices, the Debtor and the Creditors' Committee negotiated a resolution of the potential objection pursuant to that certain *Stipulation of the Debtor; Fremont Reorganizing Corporation f/k/a Fremont Investment & Loan; the Executives, the Non-Executive Directors, and the Official Committee of Creditors Holding Unsecured Claims Concerning Notices of Insider Compensation* [Docket No. 241] (the "Insider Compensation Stipulation").

Pursuant to the Insider Compensation Stipulation, among other things, (i) Gordon and DePillo resigned from their executive positions with the Debtor effective as of September 30, 2008, (ii) Sanchez replaced Gordon as the Debtor's Chief Executive Officer (and received a $100,000 increase in his base salary), (iii) FRC continued to pay the salaries of the Executives and reserved the right to seek reimbursement from the Debtor for such payments,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

(iv) the then remaining Executive were required to provide notice of monthly allocations for work performed on behalf of either the Debtor or FRC in order to facilitate the determination of whether and to what extent the Debtor should be responsible for reimbursing FRC for having paid the salaries of the Executives and (v) the Debtor was permitted to pay compensation to its board of directors, subject to objection to further payments. The Bankruptcy Court entered an order approving the Insider Compensation Stipulation on September 29, 2008, resulting in a net savings to the Estate of $1.8 million from the resignations of Messrs. Gordon and DePillo.

As noted in Section IX.B.4, in the event the Plan is confirmed and the Effective Date and Merger occur, any right of reimbursement that FRC may have against the Debtor for the salaries of the Executives will be eliminated.

### 6. Settlements of Claims and Pre-Petition Litigation.

During the course of the Case, the Debtor has settled and resolved various Claims and litigation matters or has entered into discussions and negotiations that are intended to resolve contingent Claims asserted against the Estate. The following narrative describes the more significant of the settlements reached to date and the related litigation matters. Additional information concerning other litigation matters involving or pending against the Debtor as of the Petition Date is included in Exhibit A-4 of the Statement of Financial Affairs [Docket No. 65] filed by the Debtor.

### a. Settlement With California Insurance Commissioner.

In 2004, the CIC, as FIC's statutory liquidator, filed suit in Los Angeles Superior Court against the Debtor and FCIG alleging that they improperly utilized certain net operating loss deductions ("NOLs") purportedly belonging to FIC (the "NOL Case"). In 2005, the CIC filed an additional and separate complaint against the Debtor and others on behalf of FIC as successor in interest to Comstock Insurance Company ("Comstock"), a former affiliate of FIC that was subsequently merged into FIC. This case alleged similar causes of action regarding the utilization of the NOLs as in the NOL Case as well as assertions of improper transactions with other insurance subsidiaries and affiliates of FIC

(the "Comstock Action"). In 2008, FRC was added as a defendant in both the NOL Case and the Comstock Action.

As a result of disagreements as to whether FIC, which is in liquidation, and/or its subsidiaries could be considered part of the Debtor's consolidated taxpayer group for federal income tax purposes, the CIC requested that the Internal Revenue Service ("IRS") issue a private letter ruling to resolve the dispute, which the IRS issued on July 26, 2006. Based upon this IRS private letter ruling, the CIC took the position that FIC and its subsidiaries should be included in the Debtor's consolidated taxpayer group, and the Debtor maintained its objection to such tax treatment (the "Tax Deconsolidation Dispute").

In March 2008, the CIC filed a third lawsuit in California state court asserting, on behalf of FIC, claims of ownership to substantial portions of certain artwork, including any related proceeds from the sale of such artwork, that at any time were in the possession or control of the Debtor or any of its affiliates. On July 11, 2008, the Debtor removed that state court lawsuit to the Bankruptcy Court, which is now pending as adversary proceeding number 8:08-ap-01258-ES (the "Art Adversary Dispute"). In the Art Adversary Dispute, the CIC asserted ownership rights to such artwork and related proceeds and asserted claims against the Debtor, FRC and four individuals that are current or former employees of the Debtor.

The CIC filed eight proofs of claim against the Debtor asserting all of the claims set forth in the NOL Case, the Comstock Action, the Art Adversary Dispute and the Tax Consolidation Dispute. Collectively, the liquidated amount of the claims asserted by the CIC exceeded $490 million, and further included claims based upon various alleged unliquidated components. On April 17, 2009, the Debtor, FRC, and FCIG (collectively, the "Fremont Settling Entities"), and the CIC, as the statutory liquidator of FIC and the statutory conservator of Fremont Life, entered into a stipulation and agreement (the "CIC Stipulation") providing for a global and integrated settlement and release of all claims and disputes arising out of or in connection with the NOL Case, the Comstock Action, the Art Adversary Dispute and the Tax Consolidation Dispute. The material terms of CIC

32

Stipulation include (i) an agreement by the Fremont Settling Entities to make any necessary requests, enter into any agreements and/or make any necessary filings with the IRS to document that FIC was deconsolidated from the group of the Debtor's affiliates participating in a consolidated federal taxpayer group, (ii) the transfer of FCIG's holdings of issued and outstanding stock in Fremont Life to the CIC for the benefit of FIC, (iii) disallowance of the CIC's proofs of claim and allowance of a $5 million general unsecured priority claim for the CIC against the Debtor, (iv) the transfer of $4.1 million to the CIC from the funds presently held in escrow resulting from the sale of certain of the Debtor's artwork, (v) the payment of $5 million by FRC to FIC, (vi) dismissal of the NOL Case, the Comstock Action and the Art Adversary Dispute and any claims filed by the Fremont Settling Entities in the statutory liquidation case of FIC and (vii) an exchange of general mutual releases by and among the CIC, FIC, Fremont Life and the Fremont Settling Entities.

On April 23, 2009, the Debtor filed a motion for approval of the CIC Stipulation, which was approved by the Bankruptcy Court on May 14, 2009. The CIC Stipulation has further been approved by the necessary state courts. The settlement is essentially final, and the only action that remains pending is the ministerial act of courts entering various orders of dismissal. The Claim of $5 million that was granted to the CIC under the CIC Stipulation is treated as an Allowed Non-Note General Unsecured Claim under the Plan.

### b. Settlement with Attorney General for the Commonwealth of Massachusetts.

In October 2007, the Attorney General (the "<u>Attorney General</u>") for the Commonwealth of Massachusetts (the "<u>Commonwealth</u>") filed a lawsuit in Massachusetts Superior Court in Suffolk County ("<u>MA Superior Court</u>") alleging that the Debtor and FRC engaged in unfair or deceptive practices in connection with the origination and servicing of residential mortgage loans made to residents of Massachusetts (the "<u>Massachusetts Action</u>").

The Massachusetts Action was brought on behalf of the Commonwealth and the allegedly impacted borrowers, and sought injunctive and equitable relief for such borrowers as well as civil penalties. On February 25, 2008, the MA Superior Court issued a

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

preliminary injunction against the Debtor and FRC (as modified on March 31, 2008, the "Preliminary Injunction"). The Preliminary Injunction enjoined the Debtor and FRC from foreclosing on certain of such loans made to Massachusetts residents without the approval of the MA Superior Court, and prevented the Debtor and FRC from selling, transferring, or assigning any such Massachusetts residential mortgage loan unless certain conditions were satisfied.

On December 12, 2008, the Commonwealth filed a proof of claim against the Debtor in the aggregate amount of $20 million with respect to the claims it had alleged in the Massachusetts Action. On April 17, 2009, the Commonwealth, the Debtor and FRC entered into a Final Judgment By Consent (the "Final Judgment") pursuant to which FRC agreed to pay $10 million to the Commonwealth and the Commonwealth agreed to generally release the Debtor and FRC from the claims alleged in connection with the Massachusetts Action and withdraw with prejudice its proof of claim against the Debtor. The Final Judgment is subject to certain contingencies. If neither FRC nor FGCC are the subject of bankruptcy proceedings as of a date which is approximately 95 days after the Final Judgment's effective date, and no court has determined that either the Debtor or FRC has violated any of the terms of the Final Judgment, the Commonwealth will withdraw with prejudice its proof of claim. However, if either FRC or FGCC are in bankruptcy proceedings on such date, then the Commonwealth may void the Final Judgment, refund the $10 million payment it has received, void any releases and assert its proof of claim against the Debtor.

To the extent the Final Judgment becomes effective, the Preliminary Injunction will be modified and become a permanent injunction applicable only to loans to Massachusetts residents or to loans secured by property in Massachusetts (the "Permanent Injunction"), and will require the Debtor and FRC to provide notice to the Attorney General before initiating or advancing a foreclosure on any such mortgage loan originated by FRC. The Permanent Injunction will also include additional requirements if the Attorney General objects to a foreclosure or the Debtor or FRC seek to sell, transfer or assign mortgage loans originated by FRC that are secured by residential property in Massachusetts.

On April 23, 2009, the Debtor filed a motion for approval of the Debtor's participation in the Final Judgment and the settlement with the Commonwealth. On May 29, 2009, the Bankruptcy Court entered an order approving the Final Judgment and the Debtor's settlement with the Commonwealth. The Debtor, FRC and the Commonwealth are currently in the process of consummating and implementing the Final Judgment.

### c. Settlement With Enron Creditors Recovery Corporation.

In December 2, 2001, Enron Corporation ("Enron") and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States District Court for the Southern District of New York (the "Enron Court"). Prior to that date, Enron had issued unsecured commercial paper to various entities, including the Debtor, which had maturities of up to 270 days. In a series of transfers involving this commercial paper, Enron allegedly paid over $1 billion to various entities prior to the stated maturity of such commercial paper, including approximately $25.4 million which was purportedly paid to the Debtor (the "Enron Payments"). In November 2003, Enron Creditors Recovery Corporation ("ECRC"), as representatives of Enron's bankruptcy estate, commenced adversary proceedings in the Enron Court against the Debtor and various defendants, asserting that the payments made in respect of the commercial paper were avoidable and recoverable under the Bankruptcy Code (the "CP Adversary Proceeding"). In the CP Adversary Proceeding, the ECRC sought to recover the Enron Payments from the Debtor.

On October 14, 2008, ECRC filed a proof of claim against the Debtor in the aggregate amount of approximately $25.4 million on account of claims related to the Enron Payments. On April 24, 2009, the Debtor entered into a stipulation and agreement (the "Enron Stipulation") with the ECRC which provides for the settlement of the CP Adversary Proceeding resolution of the proof of claim filed by the ECRC. The material terms of the Enron Stipulation include (i) the allowance of a $4 million general unsecured Claim in favor of the ECRC, which will be deemed satisfied in full upon the receipt of $2 million in payments, (ii) dismissal of the CP Adversary Proceeding and (iii) the exchange of general mutual releases by and among ECRC and the Debtor.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

On April 27, 2009, the Debtor filed a motion for approval of the Enron Stipulation and settlement. On June 17, 2009, the Bankruptcy Court entered an order approving the Enron Stipulation, and it has been further approved by the Enron Court. The Claim of $4 million that was granted to the ECRC under the Enron Stipulation is treated as an Allowed Non-Note General Unsecured Claim under the Plan that will be deemed satisfied in full upon the ECRC's receipt of payments totaling $2 million.

### d. Settlement of the Rampino Litigation.

On October 12, 2006, the CIC, as statutory liquidator of FIC, filed an amended complaint in the Los Angeles Superior Court against Rampino, McIntyre, Wayne R. Bailey ("Bailey"), John A. Donaldson ("Donaldson"), Ronald A. Groden ("Groden"), W. Brian O'Hara ("O'Hara"), and Raymond G. Meyers ("Meyers") (collectively, the "Rampino Defendants"), as former directors and officers of FIC. In the action, the CIC alleged that the Rampino Defendants breached their fiduciary duties to FIC by allowing FIC to engage in inappropriate underwriting schemes causing injury to FIC's reinsurers, in turn harming FIC when it entered into settlements with such reinsurers (the "D&O Case").

Although the Debtor and its affiliates were not named as defendants in the D&O Case, under the terms of the Debtor's governing documents and applicable law, the Debtor was potentially obligated to indemnify some or all of the Rampino Defendants in the event an adverse judgment was entered against them in the D&O Case. Each of the Rampino Defendants filed one or more proofs of claim against the Debtor based upon, among other things, the Debtor's purported obligation to indemnify the Rampino Defendants for any judgment that was entered against the Rampino Defendants in the D&O Case. These proofs of claim asserted liquidated amounts against the Debtor that, in the aggregate, exceeded $27 million, and asserted unliquidated claims in respect of the Debtor's alleged indemnification obligations.

On May 15, 2009, the Debtor entered into a trilateral stipulation and agreement (the "Rampino Stipulation") with the CIC, as statutory liquidator of FIC, and the Rampino Defendants which provided for the settlement of the D&O Case and resolution of the proofs

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

of claim filed by the Rampino Defendants against the Debtor. The material terms of the settlement embodied in the Rampino Stipulation include (i) allowance of a $35 million general unsecured Claim in favor of the CIC against the Debtor that will be deemed satisfied by receipt of payments totaling $22 million, (ii) disallowance of the proofs of claim filed by the Rampino Defendants, (iii) allowance of general unsecured Claims in favor of Bailey, Rampino, McIntyre and Meyers in the amounts of $4.6 million, $5.6 million, $5.2 million and $2.3 million, respectively, against the Debtor that will be deemed satisfied by the receipt by Bailey, Rampino, McIntyre, and Meyers of distributions from the Estate totaling approximately $2.874 million, $3.470 million, $3.227 million and $1.420 million, respectively, (iv) dismissal of the D&O Case and other adversary proceedings commenced by Messrs. Bailey, Rampino, and McIntyre, (v) the exchange of general mutual releases by and among the CIC, FIC, the Debtor and the Rampino Defendants, subject to certain limited exceptions and (vi) the preservation of any rights of the parties with respect to any insurance coverage or policies.

On May 21, 2009, the Debtor filed a motion for approval of the Rampino Stipulation and settlement. On June 18, 2009, the Bankruptcy Court entered an order approving the Rampino Stipulation. The Rampino Stipulation has also been approved by the court overseeing FIC's liquidation proceeding. The effective date of the settlement occurred on July 20, 2009, and certain post-effective date events remain outstanding (which essentially consist of waiting for orders to be entered by such courts). It is expected that this settlement will be fully completed by the hearing on approval of the Disclosure Statement.

In the event the settlement is fully completed, each of the Claims granted under the Rampino Stipulation will be treated as Allowed Non-Note General Unsecured Claims subject to the provisions governing the satisfaction of such Claims under the Rampino Stipulation.

### e. Settlement With Credit Suisse Securities (USA) LLC.

On January 13, 2009, the Debtor filed its *Motion for Order Approving Stipulation Between the Debtor, Fremont Reorganizing Corporation, and Credit Suisse Securities (USA)*

37

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

*LLC* [Docket No. 430], pursuant to which it sought approval of a settlement with Credit Suisse Securities (USA) LLC ("Credit Suisse") with respect to a proof of claim that Credit Suisse had filed against the Debtor. Prior to the Petition Date, Credit Suisse had acted as the Debtor's investment banker with respect to certain transactions, including the CapitalSource Transaction, which entitled it to payment of fees and expenses upon the consummation of such transactions. In its proof of claim, Credit Suisse alleged that the Debtor owed Credit Suisse in excess of $2 million in fees and expenses in connection with the CapitalSource Transaction. Pursuant to the proposed settlement, FRC agreed to pay Credit Suisse approximately $2 million, Credit Suisse agreed to the disallowance of its proof of claim against the Debtor and the parties exchanged general mutual releases. On February 20, 2009, the Bankruptcy Court approved the settlement with Credit Suisse.

#### f.      Settlement With Ronald Nicolas.

On July 16, 2009, the Debtor filed its *Stipulation Regarding the Withdrawal and Disallowance of Proof of Claim Numbers 738 and 742* [Docket No. 817], pursuant to which two proofs of claim filed by Ronald Nicolas ("Nicolas") against the Estate asserting aggregate liquidated Claims of approximately $1.47 million will be withdrawn and disallowed.

#### g.      Settlement With Bank of New York Mellon.

The Debtor has also resolved a proof of claim the Bank of New York Mellon filed against the Estate which asserts a Claim of approximately $20.1 million arising out of a prepetition lawsuit against the Debtor styled as Bank of New York v. Fremont General Corporation, Case No. CV-03-09238-CAS, United States District Court for the Central District of California. The litigation generally involved a dispute over a custodial account of Fremont Indemnity established for the benefit of workers compensation claimants from which the Bank of New York Mellon alleged the Debtor wrongfully withdrew funds. The Debtor and the Bank of New York Mellon executed a settlement stipulation pursuant to which the Bank of New York Mellon will be granted an Allowed Claim of $10 million that may be deemed satisfied by receipt of payments (i) totaling $6.5 million if such amount is

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

received by the Bank of New York Mellon by October 31, 2009 or (ii) totaling $7 million if such amount is received by the Bank of New York Mellon by June 30, 2010, the Bank of New York Mellon's pending action against the Debtor will be dismissed and the parties will exchange general mutual releases, subject to certain exceptions.  On August 4, 2009, the Debtor filed its *Motion for Order Approving Stipulation Between the Debtor and the Bank Of New York Mellon* [Docket No. 853] seeking approval of the settlement with Bank of New York Mellon.  In the event the settlement is approved by the Bankruptcy Court and becomes effective, the Allowed Claim granted to the Bank of New York Mellon will be treated as an Allowed Non-Note General Unsecured Claim, subject to the terms of the settlement governing the satisfaction of such Claim.

### 7.     Post-Petition Litigation.

After the Petition Date, the Debtor prosecuted or defended multiple adversary proceedings commenced in connection with the Case, and in some instances removed civil actions to the Bankruptcy Court that were pending in other forums on the Petition Date.  Set forth below is a general summary of certain pending litigation involving the Debtor for informational purposes.  Nothing herein is intended nor should be construed to be any admission or acknowledgement by the Estate of any matter, and all rights with respect to any potential and/or actual claims against any persons in connection therewith are hereby reserved.

a.     **McIntyre, et al. v. Fremont General Corporation, et al., Adv. Pro. No. 8:08-ap-01256-ES and Bailey, et. al v. Fremont General Corporation, et al., Adv. Pro. No. 8:09-ap-01103-ES.**

Adversary proceeding number 8:08-ap-01256-ES was commenced by McIntyre and Alan W. Faigin ("Faigin") and alleges claims against the Debtor arising from two supplemental executive retirement plans ("SERPs").  The action was initially commenced by the plaintiffs in California state court, but was removed by the Debtor to the Bankruptcy Court on July 7, 2008.  Adversary proceeding number 8:09-ap-01103-ES was commenced by Bailey and Rampino, and involves certain ERISA claims against the Debtor related to the SERPs.  As explained in Section VIII.D.6.d, the Rampino Stipulation resolves, subject to

39

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

final distributions on the Allowed Claims granted thereunder, these two cases with respect to all plaintiffs other than Faigin, which have been disputed by the Debtor. The Debtor has subsequently reached an agreement with Faigin pursuant to which any remaining causes of action will be dismissed with prejudice as to all defendants other than the Debtor, and any remaining causes of action against the Debtor will be dismissed without prejudice.

### b. Fremont General Corporation, et al. v. Federal Insurance Company, Adv. Pro. No. 8:08-ap-01418-ES.

Adversary proceeding number 8:08-ap-01418-ES was commenced by the Debtor and FRC against Federal Insurance Company on October 20, 2008. In this action, the Debtor and FRC seek a determination as to their rights to coverage under certain insurance policies issued by Federal Insurance Company, including with respect to amounts paid by FRC in connection with settlement of the Massachusetts Action, and an affirmative recovery from Federal Insurance Company with respect to such amounts. The action remains pending.

### c. Fremont General Corporation v. National Relocation Services, Inc., et al., Adv. Pro. No. 8:08-ap-01470-ES.

Adversary proceeding number 8:08-ap-01470-ES was commenced by the Debtor against National Relocation Services, Inc., Mike Garrett and certain other parties on November 20, 2008. In this action, the Debtor alleges that the defendants misappropriated furniture, fixtures and equipment owned by the Debtor, and seeks an affirmative recovery from such individuals for their actions. This action remains pending.

### 8. Preservation/Revesting of Rights of Action.

Except as expressly released or otherwise expressly provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Reorganized Debtor will be vested with and will retain and may enforce any claims, rights and causes of action that the Debtor or the Estate may hold or have against any party, and such claims, rights and causes of action will be reserved, including any rights of disallowance, offset, recharacterization and/or equitable subordination with respect to Claims and Interests, and derivative causes of action that may be brought on behalf of the Debtor or the Estate. The Reorganized Debtor and Plan Administrator will be entitled to pursue the claims, rights and causes of action vested under

40

the Plan.

**9.      Plan Proponent Search Process and Marketing Efforts.**

During the Case, the Debtor sought to locate a party that would provide funding for alternative plans of reorganization.  The principal focus of the Debtor's contemplated search process was to identify a third party that could take advantage of FRC's cash position, capitalization and remaining business activities and use these attributes (including the Debtor's substantial NOLs) as the foundation of a plan of reorganization for the Debtor.  In order to explore the opportunity and locate such a third party plan proponent, the Debtor retained KPMG Corporate Finance LLC ("KPMGCF") with the Bankruptcy Court's approval pursuant to an engagement letter dated November 26, 2008.

Following approval of its retention, KPMGCF undertook a marketing process intended to locate third parties expressing an interest in acting as a stalking horse plan proponent for, or otherwise sponsoring, a chapter 11 plan for the Debtor.  KPMGCF's efforts to locate a plan proponent commenced in January 2009, initially involving the wide dispersion of marketing materials to inform potential investors of the opportunity to act as a plan proponent for the Debtor.  This resulted in twenty-six parties executing non-disclosure agreements and receiving confidential information regarding the Debtor and FRC, and six of those parties submitting non-binding term sheets or letters of intent by mid-February 2009 deadline established by KPMGCF.

During the next several months, lengthy discussions and negotiations took place between the potential plan proponents, the Debtor, the Creditors' Committee, the Equity Committee and their respective professionals.  The Creditors' Committee, and a two person subcommittee (the "Subcommittee") composed of representatives of the Holders of Senior Notes and Junior Notes that was appointed specifically for the purpose of negotiating the terms of a plan, engaged in discussions with such parties.  During February 2009, the efforts of the Creditors' Committee and Subcommittee included providing extensive detailed comments to the plan proposals and term sheets that had been submitted, and conducting in-person meetings with two of the bidders.  These efforts continued in March and April 2009,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

during which period the Subcommittee continued to communicate and negotiate with the bidders regarding their respective proposals and the revisions that had been made to their offers.

By mid-April 2009, in response to a deadline established by the Debtor and KPMGCF for bidders to submit proposals in response to a term sheet developed by the Subcommittee, a total of three revised bids were submitted by prospective plan proponents. Because each of the revised proposals provided for only a small cash contribution that could satisfy at most a very small percentage of the liquidated and undisputed Claims asserted against the Debtor, with the vast majority of payments to be derived from the existing Cash in the Estate and held by FRC, the proposals were not acceptable to the Creditors' Committee and failed to provide adequate terms for an appropriate plan of reorganization for creditors. Discussions and negotiations with certain bidders continued to take place during May and June 2009, but they also failed to result in a proposal that was acceptable to the Creditors' Committee.

The Creditors' Committee does not believe that the Debtor has generated a viable and attractive transaction involving a third party proponent and believes that the Plan represents the best mechanism to deliver value promptly. Notably, it is possible that a transaction may be pursued after the Effective Date. The Plan proposes to preserve the assets and business operations that were offered to potential plan proponents during the Debtor's effort to attract a third party investor. Moreover, with the benefit of the discharge (if granted) and the streamlined corporate structure effectuated pursuant to the Merger, the Reorganized Debtor may turn out to be a more attractive candidate for a transaction with a third party than it was during the Case, although there can be no assurance that a transaction will be proposed or will occur.

### 10. Plan Exclusivity.

Pursuant to section 1121 of the Bankruptcy Code, a debtor in possession, such as the Debtor, typically has at least 120 days from the date of the filing of its chapter 11 petition in which to file a plan of reorganization, subject to the discretion of the bankruptcy court to grant extensions of this exclusive period for "cause." Following the filing of a plan, a debtor

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

has an additional 60 days in which it has the exclusive right to solicit and obtain acceptances of a plan. During the exclusive period, no other person or entity is permitted to file a competing plan of reorganization. During the Case, the Debtor received three extensions of its exclusivity periods, ultimately resulting in a final deadline of June 1, 2009 for filing a plan and a final deadline of September 1, 2009 for soliciting votes on any such plan, which could not have been further extended without the consent of the Creditors' Committee.

On June 1, 2009, the Debtor elected to file a "standalone" plan (the "<u>Fremont Plan</u>") and an accompanying disclosure statement, which automatically extended the Debtor's exclusive ability to pursue confirmation of a plan through and including September 1, 2009. The Fremont Plan did not reflect any input from the Creditors' Committee or Equity Committee and was viewed by both committees as incomplete and inadequate for their respective constituents. As a result, on June 8, 2009, the Creditors' Committee filed its *Motion for Order Terminating the Exclusive Periods in Which Only Fremont May File a Plan and Solicit Acceptances Thereto* [Docket No. 728] (the "<u>Motion to Terminate Exclusivity</u>"). In the Motion to Terminate Exclusivity, the Creditors' Committee sought entry of an order terminating Fremont's exclusive right to seek approval of a plan and to permit the Creditors' Committee with an opportunity to file of an alternative plan of reorganization. The Equity Committee joined in the Motion to Terminate Exclusivity and made the same request. At a hearing held on July 14, 2009, the Court approved the Motion to Terminate Exclusivity and exclusivity was terminated effective as of July 17, 2009, providing the Creditors' Committee with an opportunity to submit the Plan.

## IX.

## DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTOR

### A.    Assets.

Based on the Debtor's unaudited balance sheet as of July 31, 2009, the Debtor holds "unrestricted cash" of approximately $28.3 million, in other words, cash that is not subject to an asserted competing ownership claim or other legal or benefit interests. An additional $11.5 million in cash currently is held in accounts at Merrill Lynch Trust Company

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

established in connection with the SERPs that are currently the subject of a pending ownership dispute. The Creditors' Committee believes that this cash will be available to satisfy Allowed Claims under the Plan. The Debtor also holds interests in certain insurance policies. These policies include 2007 and 2008 Directors' and Officers' Liability Policies issued by XL Specialty Insurance Company with coverage totals of up to $100 million and $225 million, respectively, and policies issued by Federal Insurance Company under which the Debtor and FRC are currently attempting to recover more than $10 million in defense and settlement costs that were incurred in connection with the Massachusetts Action.

Westchester Surplus Lines Insurance Company ("WSLIC") issued pre-petition to the Debtor a claims made directors and officers excess liability insurance policy and a six year run off endorsement thereto for claims made against the insured for wrongful acts before December 31, 2014 (the "Westchester Policy"). Pursuant to the Westchester Policy, under certain circumstances, the Debtor would be required to reimburse the insurer for advanced defense costs. Pacific Employers Insurance Company ("PEIC") issued pre-petition to the Debtor high deductible workers compensation occurrence policies for the calendar years 2001, 2002 and 2003 (the "Pacific Policies"). WSLIC and PEIC have filed contingent and unliquidated proofs of claim. Matters relating to the Westchester Policy and Pacific Policies are addressed in the Plan.

Aside from cash and interests in insurance policies, the Debtor's primary assets include direct and indirect ownership of 100% of the stock in FGCC, FCIG, Fremont Aviation Services Corp. and Fremont General Financing I. The Creditors' Committee does not believe that material value will be realized from the Debtor's interests in FCIG, Fremont Aviation Services Corp. or Fremont General Financing I. The Reorganized Debtor will continue to own and control these entities, and it is expected that the Plan Administrator will serve on their boards of directors. The Debtor has recorded a book value of approximately $415.9 million for its equity interest in FGCC, which is principally attributable to FGCC's equity interest in FRC. Information concerning the respective assets and material liabilities of FGCC and FRC is set forth in Section X.B.1 of this Disclosure Statement.

44

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

On the Petition Date, the consolidated federal income taxpayer group of which the Debtor is the common parent had reported NOLs for the 2007 tax year amounting to over $1 billion. Based upon information provided by the Debtor, approximately $418 million of those NOLs were carried back to earlier tax years to obtain a tax refund, leaving, as of the Petition Date, estimated NOLs for application to 2007 and future tax years of approximately $695 million. In connection with the relief sought during the early stages of the Case, the Debtor obtained an order from the Bankruptcy Court that established certain procedures regarding trading in the Debtor's common stock that were designed to avoid a "change of control" and preserve these NOLs. The Debtor has indicated that, to the best of its knowledge but without offering any assurances, these procedures have been effective and the NOLs have otherwise been preserved.

**B.    Liabilities.**

**1.    Schedules.**

On July 3, 2008, the Debtor filed its Statement of Financial Affairs [Docket No. 65] and Schedules of Assets and Liabilities [Docket No. 66], and filed an amended version of the Schedules of Assets and Liabilities on October 30, 2008 [Docket No. 327] (as amended, the "Schedules"). The Schedules indicate that, as of the Petition Date, the Debtor was subject more than $326.5 million in unsecured Claims, of which more than $314 million were scheduled as undisputed. As set forth in the Schedules, the majority of the Debtor's undisputed and liquidated liabilities are attributable to two prepetition debt issuances (which are listed at approximately $282.5 million in aggregate amount) and an intercompany debt owed by the Debtor to FRC (listed at approximately $32.2 million). The balance of the Debtor's undisputed and liquidated liabilities described in the Schedules is related to a small amount of prepetition trade debt and employee benefit obligations. In addition to these undisputed and liquidated liabilities, the Schedules identified disputed, contingent and unliquidated priority Claims consisting primarily of potential tax liabilities and other disputed, contingent and unliquidated general unsecured Claims related to litigation against the Debtor and the SERP plans.

45

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

## 2.     Claims Bar Date and Proofs of Claim.

The Bankruptcy Court established November 10, 2008 as the general bar date for creditors other than governmental units to file proofs of claim against the Debtor and December 15, 2008 as the bar date for governmental units could to file such proofs of claim. On September 11, 2008, notice of the claims bar dates and related procedures for filing proofs of claims was sent by first-class mail to all creditors and parties in interest in this Case, and notice of the claims bar dates and related procedures for filing proofs of claims was published on September 12, 2008 in the *Wall Street Journal*.  Over 900 proofs of Claim in an aggregate amount in excess of $1.14 billion have been Filed in the Case, which are summarized below as they have been classified by the parties Filing such Claims:

Fremont General Corporation Proofs of Claim

|  | COUNT | | AMOUNT |
|---|---|---|---|
| Secured Claims |  | $ | 8,466,301 |
| Priority Claims |  | $ | 107,056,301 |
| Unsecured Claims |  | $ | 1,023,180,072 |
| Total | 903 | $ | 1,143,702,725 |

Sources:  Bankruptcy Court Claims Register as 6/23/09; Kurtzman Carson Consultants Claim Database as of 6/23/09

Notes:

(1) Total count and amount includes late filed claims, duplicate claims, claims filed under multiple class categories and claims settled or resolved at lower amounts.
(2) No Administrative Claims appear to have been asserted under a proof of claim

Although the aggregate amount of Filed and asserted Claims greatly exceeds the liabilities identified by the Debtor in the Schedules, the Debtor has indicated that it has performed an initial analysis of the Claims Filed in this Case and has concluded, based on this analysis, that substantial number of the proofs of claim Filed in the Case are without merit, duplicative, inflated and/or improperly classified.  For example, there is no reason to believe that any valid secured Claims exist against the Debtor.  In addition, as described

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

elsewhere in this Disclosure Statement, the Debtor has resolved a number of Claims at amounts that are significantly less than asserted in the proof of claim, and several Claims have already been withdrawn and disallowed. Consequently, with the exception of certain undisputed and liquidated general unsecured Claims and settlements of previously disputed and contingent litigation Claims that have resulted in Allowed Claims, the Creditors' Committee does not believe that the proofs of claim Filed in the Case are reflective of its actual liabilities and expects that the Filed and asserted Claims against the Estate should be substantially reduced pursuant to a claims objection and reconciliation process.

### 3. Senior and Junior Notes.

The vast majority of the Debtor's undisputed liabilities arise from prepetition debt issuances of 7.875% Senior Notes due 2009 in the original aggregate principal amount of $200,000,000 (the "Senior Notes") and 9% Junior Subordinated Debentures due March 31, 2026 in the original aggregate principal amount of $103,092,784 (the "Junior Notes"). As of the Petition Date, approximately $176.4 million in principal and accrued interest was outstanding under the Senior Notes, and approximately $107.4 million in principal and accrued interest was outstanding under the Junior Notes. As discussed in Sections X.C.2.c(2) and X.C.2.c(3), the Plan proposes to allow the principal and accrued prepetition interest due under the Senior Notes and Junior Notes and treat such amounts as Allowed Senior Note Claims and Allowed Junior Note Claims.

The Junior Notes are currently held by Fremont General Financing I ("Fremont General Financing"), a statutory business trust that was formed pursuant to the Delaware Business Trust Act and an Amended and Restated Declaration of Trust of Fremont General Financing I dated March 6, 1996 (the "Fremont General Financing Declaration of Trust"). Fremont General Financing is a wholly owned subsidiary of the Debtor that was created as a special purpose financing entity to hold the Junior Notes as its sole asset. In 1996, Fremont General Financing issued and sold approximately $100 million of 9% Trust Originated Preferred Securities ("TOPrS") in a public offering, which represent preferred undivided beneficial interests in the assets of Fremont General Financing (i.e., the Junior Notes).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Generally, the Debtor would make payments on account of the Junior Notes to Fremont General Financing, and Fremont General Financing would in turn distribute those payments to holders of TOPrS. Pursuant to the terms of the Fremont General Financing Declaration of Trust, Fremont General Financing I is to terminate in the event the Debtor files for bankruptcy. As noted in Section X.C.2.c(3), the Plan proposes to dissolve the Fremont General Financing Declaration of Trust.

### 4. Intercompany Claims.

The Schedules and a proof of claim Filed by FGC reflect an intercompany payable owed by the Debtor to FGC of approximately $32.2 million, most of which is attributable to amounts purportedly owed in connection with a Tax Allocation Agreement dated May 1, 2006 by and among the Debtor, FGCC and FGC (the "Tax Allocation Agreement"). The Merger that will be consummated pursuant to the Plan will result in the elimination of all Intercompany Claims between the Debtor, FGCC and FRC, including any Intercompany Claims owed by the Debtor to FRC pursuant to the Tax Allocation Agreement or otherwise.

### 5. Settled and Allowed General Unsecured Claims.

As described in Section VIII.D.6, the Debtor has settled and resolved, or is in the process of settling and resolving, a number of contingent, disputed and unliquidated Claims that were originally asserted in an aggregate face amount of approximately $588 million. These resolutions have resulted or will result in approximately $71.7 million in Allowed General Unsecured Claims for voting and distribution purposes. Pursuant to the terms of the various settlements described in this Disclosure Statement, however, these Allowed Claim will be deemed satisfied in full upon the receipt of payments totaling approximately $46.5 million. The Allowed Claims arising from the settlements are treated as Allowed Non-Note General Unsecured Claims under the Plan until the requisite payment is made in accordance with the terms of the settlements.

### 6. Disputed and Other Tax Liabilities.

For federal income tax purposes, the Debtor, FGCC and FRC have participated in the filing of consolidated income tax returns in accordance with section 1501 of the Internal

Revenue Code of 1986, as amended (the "Tax Code"), as members of "affiliated group" of corporations as defined in section 1504 of the Tax Code, with the Debtor filing the income tax returns on behalf of the affiliated group. The priority claims asserted against the Debtor arise primarily from a priority tax claim Filed by the IRS of approximately $89.4 million (the "IRS Claim"), which relates to additional tax assessments associated with adjustments sought by the IRS to the Debtor's 2004, 2005, 2006 and 2007 tax returns, and a similar priority tax claim of approximately $13.2 million Filed by the California Franchise Tax Board (the "FTB Claim"). These Claims are contingent and disputed.

As of the Petition Date, the Debtor's 2004 and 2005 tax returns were the subject of a pending audit and examination process with the IRS. The IRS proposed certain adjustments to those tax years, the net result of which would have increased the Debtor's taxable income. The additional tax assessments associated with the adjustments to the Debtor's 2004 and 2005 tax returns are included in the IRS Claim in the asserted amounts of $14,713410, and $51,304,894, respectively.

With regard to the audit of the 2004 and 2005 tax returns, the Debtor disputed the additional tax assessments and engaged in an administrative appeals process seeking a determination that the proposed adjustments by the IRS were improper. In April 2009, the appeals process concluded and the Debtor generally prevailed in its appeal. The Debtor has recently advised that the audits of the 2004 and 2005 tax returns have been successfully resolved with no tax exposure.

In December 2008, the Debtor received notice that the IRS intended to examine and audit the Debtor's 2006 tax return, and received a similar notice in January 2009 that the IRS intended to examine and audit the Debtor's 2007 tax return. Based upon information furnished by the Debtor, the principal remaining issue relates to bad debt deductions taken in tax year 2006 (which resulted in NOLs that were carried back in 2004 to generate a refund) which if resolved adversely could result in a tax liability of approximately $25.7 million. The Debtor disputes a substantial portion of this potential liability. If all or a portion the IRS Claim is Allowed, it may be classified as, and receive the treatment of, a Priority Tax Claim

as described in the Plan which must be paid in full before Holders of Claims in Classes 3(A), 3(B) and 3(C) are entitled to receive any distribution. A similar risk is presented by the FTB Claim because it is based upon similar tax law concepts as those asserted by the IRS. Because the FTB Claim is based on the same proposed adjustments and assessments that has been asserted by the IRS, it is likely that resolution of the IRS Claim will have a corresponding impact on the FTB Claim.

The Creditors' Committee believes that the Reorganized Debtor will have sufficient Cash to satisfy any likely liability resulting from the preceding matters.

### 7. Remaining Asserted Claims and Claim Objections.

As noted above, the Debtor has indicated that a large number of the proofs of claim that have been Filed are without merit, duplicative, inflated and/or improperly classified, and intends to pursue a claims objection and reconciliation process which is expected to result in a substantial reduction in the overall number and amount of asserted Claims. For example, in February 2009 the Debtor and plaintiffs in a putative class action (the "Scheid Action") stipulated to the disallowance of 86 proofs of claim. In May 2009, the Debtor filed an objection to the proof of claim of SG Mortgage Finance Corp. ("SG Mortgage"), which resulted in a stipulation disallowing SG Mortgage's proof of claim of approximately $4.9 million. In June 2009, the Debtor Filed its first "omnibus" objection to approximately 25 Claims. Substantially all of the entities whose Claims were subject to the motion declined to request hearings with respect to the objections, and on July 10, 2009 the Bankruptcy Court entered an order disallowing and recharacterizing those Claims as Interests. In July 2009, the Debtor also entered into a stipulation with Nicolas pursuant to which his two proofs of claim totaling approximately $1.47 million will be withdrawn and disallowed.

The numerous settlements negotiated by the Debtor to date have also reduced the overall number and amount of Claims. For example, the CIC Filed 8 proofs of claim which collectively exceed $490 million, and the Debtor and the CIC entered into a settlement under which the CIC will be granted an allowed general unsecured Claim of $5 million and the balance of its Claims will be disallowed. The Debtor's settlement with the Commonwealth,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

which had Filed a $20 million proof of claim, will result in the total disallowance of the Commonwealth's Claim. The Debtor's settlement with the ECRC, which had Filed a $25.4 million proof of claim, will result in the ECRC holding an Allowed Non-Note General Unsecured Claim of $2 million that will be deemed satisfied upon the receipt of $2 million in payments, and the balance of the ECRC's Claim will be disallowed. Similarly, the Debtor's settlement with the Bank of New York Mellon will result in the Bank of New York Mellon holding an Allowed Non-Note General Unsecured Claim of $10 million that may be deemed satisfied upon the receipt of $6.5 million if such payment is received by October 31, 2009 or upon the receipt of $7 million if such payment is received by June 30, 2009.

The objections and settlements to date have reduced the total net Claims against the Estate by approximately $541.2 million. The Creditors' Committee anticipates that the amount of general unsecured Claims against the Estate will be further reduced as other objections are Filed and resolved. The Debtor has preliminarily identified more than 600 invalid, duplicate, inflated and/or improperly classified Claims. In order to facilitate the resolution of these Claims, the Debtor filed a *Motion to Approve Omnibus Claim Objection Protocol Pursuant to Federal Rule of Bankruptcy Procedure Rule 3007; Memorandum of Points and Authorities* [Docket No. 667] seeking authority to implement a protocol for objecting to certain classes of Claims (the "Omnibus Claim Objection Protocol"). The Bankruptcy Court has approved the Omnibus Claim Objection Protocol, and established three hearing dates in August and September 2009 for omnibus objections to (i) proofs of claim based of the Debtor's common stock, (ii) duplicate proofs of claim Filed by individual Holders of Senior Note Claims, (iii) duplicate proofs of claim Filed by individual Holders of Junior Note Claims and (iv) proofs of claim asserting claims solely against FRC.

The Debtor has Filed omnibus claim objections to over 600 Claims pursuant to the procedures established by the Omnibus Claim Objection Protocol. On July 13, 2009, the Debtor filed its second and third omnibus objections to Claims and, on August 10, 2009, filed its fourth and fifth omnibus objections to Claims. The Court has already considered and sustained these omnibus objections to Claims, and has entered orders disallowing and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

recharacterizing the Claims that were the subject of such objections.  On August 25, 2009, the Debtor filed its sixth, seventh, eight and ninth omnibus objections to Claims, each of which are currently pending before the Court.  In the event each of the Debtor's remaining objections pursuant to the Omnibus Claim Objection Protocol are sustained, it is estimated that more than $26 million in total Claims against the Estate will be disallowed or recharacterized pursuant to the Omnibus Claim Objection Protocol.  It is expected that additional objections will further substantially reduce the amount of Claims that have been asserted against the Estate.

> **8.**    **Estimated Allowed Claim Amounts; Express Reservation of Rights.**

In light of the settlements and objections that have been resolved thus far, and the anticipated results of the claim reconciliation process, the Creditors' Committee estimates that the Allowed Claims against the Estate should be as follows:  Allowed Priority Tax Claims will not exceed $15 million; Allowed Non-Note General Unsecured Claims should total approximately $77.2 million (consisting primarily of the $66.7 million in Claims that have been Allowed pursuant to settlements and that may be deemed satisfied upon receipt of payments totaling $42 million pursuant to the terms of those settlements); Allowed Senior Note Claims should total approximately $176.4 million (exclusive of Postpetition Interest); Allowed Junior Note Claims should total approximately $107.4 million (exclusive of Postpetition Interest) and Allowed Convenience Claims should total up to approximately $100,000.  The Creditors' Committee does not believe that the Estate currently faces any significant liabilities in respect of Ordinary Course Administrative Claims, Non-Ordinary Course Administrative Claims, Secured Claims or Priority Claims.  Information concerning estimated Professional Fee Claims through the Effective Date is set forth in Section X.C.1.a(2) of this Disclosure Statement.  The preceding, however, is only an estimate.  The actual Allowed amounts of such Claims may greatly exceed the estimates set forth herein.

**The Creditors' Committee and the Plan Administrator reserve any and all rights with respect to the allowance or disallowance of any and all Claims, including Claims not referenced in the Disclosure Statement.  In voting on the Plan, Holders of Claims**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**and Interests may not rely on the absence of an objection to their proofs of Claim or Interest as any indication that the Creditors' Committee, the Reorganized Debtor, the Plan Administrator or other parties in interest ultimately will not object to the amount, priority, security, or allowance of their Claims or Interests. Moreover, the Creditors' Committee, the Reorganized Debtor, and the Plan Administrator reserve, and intend to prosecute, all objections and counterclaims they may have with respect to Claims and Interests, and except as specifically set forth in the Plan, they further reserve and intend to prosecute all claims and rights of action of the Debtor and the Estate (including rights to affirmative recovery, rights to subordinate claims, and rights to avoid transfers).**

    **C.      Interests in the Debtor.**

As of the Petition Date, the Debtor had issued and outstanding approximately 82,116,179 shares of common stock. The Plan provides that holders of Interests will receive Equity Trust Interests, and receive no distributions on account of such Equity Trust Interests unless and until Holders of Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note are paid in full on account of their Allowed Claims (including Post-Petition Interest Claims if applicable).

    **D.      Status of Compliance with SEC Reporting Requirements and Anticipated Revocation of Registration.**

The Debtor presently has two classes of securities registered under Section 12(b) of the Exchange Act and is a "reporting company." However, before the Petition Date, the Debtor did not complete an audit of its consolidated financial statements for the year ended December 31, 2007 and its consolidated unaudited quarterly financial statements for the quarter ended March 31, 2008 or file quarterly and annual reports with the SEC. During the Case, the Debtor likewise has not filed quarterly and annual reports with the SEC. The costs of returning to compliance would be significant (in May of 2009 the Debtor estimated that this could cost approximately $2 million and would take a considerable number of months to complete).

53

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Accordingly, the Creditors' Committee expects that the Reorganized Debtor promptly will consent to the revocation of the registration of its publicly held securities in accordance with Section 12(j) of the Exchange Act. (Although the Reorganized Debtor will reserve the right to apply for rescission of revocation, there are no assurances that any such rescission will be permitted.). Revocation will apply to the Debtor's two previously registered classes of securities, namely, the Junior Note Claims and the Debtor's common stock. Based upon a communication from the SEC staff to counsel for the Creditors' Committee, revocation of registration will terminate the Debtor's status as a reporting company. Further, upon such revocation, no member of a national securities exchange, broker, or dealer shall be entitled to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security of the Debtor, the registration of which has been revoked. Holders of any such securities will only be able to sell or transfer those securities through private transactions not effectuated through a broker-dealer, by consulting with their legal counsel. As discussed in Section XVII.B, there is a question whether this limitation on resales will apply to rights to repayment issued under the Plan.

## X.

## SUMMARY OF THE PLAN

The following is a narrative description of certain provisions of the Plan. The Plan is attached hereto as Exhibit 1. The following summary of the Plan is qualified in its entirety by the actual terms of the Plan. In the event of any conflict, the terms of the Plan will control over any summary set forth in this Disclosure Statement.

### A.     The Merger.

Bankruptcy Code section 1123(a)(5)(C) provides that a plan of reorganization may provide for a merger of the debtor with one or more persons as a means of implementation of such plan. As a matter of non-bankruptcy law, both Nevada Revised Statute Section 92A.180 and California General Corporate Law Section 1110 both enable parent corporations to effectuate "short form" mergers with subsidiaries as a matter of right. The

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

Plan provides for the Merger of the Debtor, FGCC and FRC on the Effective Date as a means of implementation of the Plan. Specifically, on the Effective Date, and effective contemporaneously with the occurrence of the Effective Date, FGCC will first be merged into the Debtor or the Reorganized Debtor (as applicable), and then FRC will be merged into the Debtor or the Reorganized Debtor (as applicable), with the resulting merged entity surviving as the Reorganized Debtor. The Reorganized Debtor will thereafter continue to operate its business in the ordinary course without the supervision or oversight of the Bankruptcy Court.

As a result of the Merger, the assets of the Debtor, FGCC and FRC will become assets of the Reorganized Debtor. Similarly, any existing liabilities of FGCC and FRC that are unsatisfied as of the date of the Merger, any guarantees by FGCC or FRC of any obligations of the Debtor and any joint and several liabilities of the Debtor, FGCC and/or FRC will become obligations of the Reorganized Debtor. The liabilities of FGCC and FRC constitute Post-Effective Date Merger Claims that will satisfied by the Reorganized Debtor in the ordinary course of business in accordance with applicable non-bankruptcy law; those liabilities are not classified or treated as Claims under the Plan. The equity securities of FGCC and FRC will also be cancelled and all Intercompany Claims between the Debtor, FGCC and FRC will be eliminated.

It is important to note that, on the Effective Date, and after giving effect to the Effective Date Cash Distribution, the Reorganized Debtor will have substantial Cash (which the Creditors' Committee believes will total about $72.5 million net of accrued administrative liabilities), as well as other assets that may be liquidated for Cash. See Exhibit 2 (Liquidation Analysis) and Exhibit 3 (Projections). Significantly, under the Plan, the remaining Cash and assets of the Reorganized Debtor may only be distributed to satisfy remaining Allowed Unsecured Claims to the extent there is available Cash, in other words, *after* providing for the liabilities of FGCC and FRC (i.e., the Post-Effective Date Merger Claims) that will be assumed pursuant to the Merger and the costs and expenses of operating and administering the Reorganized Debtor.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**AS A RESULT OF THE PRECEDING, UNDER THE MERGER, CLAIMS AGAINST FRC AND FGCC WILL BE ASSUMED AND SATISFIED BY THE REORGANIZED DEBTOR, AS FRC AND FGCC WILL CEASE TO EXIST AS SEPARATE ENTITIES. THUS, TO THE EXTENT AN ENTITY IS A CREDITOR OF, OR BELIEVES IT HAS A CLAIM AGAINST, FRC AND/OR FGCC, SUCH ENTITY'S CLAIM WILL BE SATISFIED BY THE REORGANIZED DEBTOR. AT THE CONFIRMATION HEARING, THE BANKRUPTCY COURT WILL BE REQUESTED TO APPROVE THE MERGER PURSUANT TO THE PLAN. ALL CREDITORS AND INTERESTED PARTIES SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT AND PLAN.**

The Creditors' Committee is informed that during the period in which FRC operated as a bank, held a banking charter and engaged in the business of originating loans, FRC may have entered into certain mortgage loan purchase and securitizations agreements containing provisions addressing FRC's possible merger or consolidation. Certain of these agreements contain provisions specifying that the successor corporation have a minimum net worth of at least $25 million or be an institution whose deposits are insured by the FDIC or a company whose business is the origination and servicing of mortgage loans, or that the merger not adversely affect the then current rating or ratings on the certificates originally generated. It is highly questionable whether any of the provisions are relevant (and if relevant, could give rise to any cognizable claim for damages based upon the Merger) inasmuch as FRC long ago ceased operating as a bank and returned its banking charter and is not originating loans. However, the Merger itself will not in any way alter or modify FRC's business operations as they exist immediately before the Merger and, as set forth in this Disclosure Statement, the Creditors' Committee believes that the Reorganized Debtor will have a net worth in excess of $25 million.

The Creditors' Committee believes that the Merger is appropriate under the circumstances. The present parent and intermediate holding company structure of the Debtor and FGCC was established when FRC was operating as a California-charted industrial bank

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

subject to federal and state regulations, and at a time when the Debtor, as a holding company of a California-charted industrial bank, was subject to laws and regulations governing its ownership of FRC. FRC no longer is a bank, and neither entity is subject to such laws. Nevertheless, during the Case the Debtor and FRC have maintained their separate legal existence, operating under the supervision of separate boards of directors and officers with separate legal counsel, all of which has generated unnecessary incremental expenses. Significant time and expense has been devoted to issues involving intercompany allocations. The Merger will rationalize and streamline this corporate structure, thereby facilitating the Reorganized Debtor's emergence from chapter 11.

The Merger also will streamline the decision making process for the Reorganized Debtor. The decisions of the Reorganized Debtor, including the timing and amounts of distributions to creditors, will now be made by a single Board of Directors (acting through the Plan Administrator) that is well positioned to evaluate such matters in light of the performance of the business and the status of any outstanding liabilities.

The streamlined corporate structure also may also make the Reorganized Debtor a more attractive candidate for a third party investor (although, again, no assurances can be given that any such transaction will occur).

Although the Creditors' Committee as the proponent of the Plan strongly supports the Merger, the Debtor, FGCC and FRC, and each of their respective current management teams and boards of directors, have not approved or endorsed the Merger.

**B. The Assets and Liabilities of the Lower Tier Entities Subject to the Merger; the Reorganized Debtor.**

**1. Assets and Liabilities of FGCC and FRC.**

**a. FGCC's Assets and Business Operations.**

FGCC operates primarily as the holding company of its wholly owned subsidiary FRC. Based on FGCC's unaudited balance sheet as of July 31, 2009, FGCC's assets consist of the equity interest in FRC and approximately $986,000 in cash. In light FGCC's status as a holding company, and its level of business activities, FGCC's balance sheet does not

reflect any material outstanding liabilities.

### b. FRC's Assets and Business Operations.

Since the CapitalSource Transaction, FRC has conducted its remaining business and administered its remaining assets, including real estate loan portfolios (referred to in the Plan as the "Loans"), real estate holdings and other investments, and continued to generate operating cash flow and income, predominantly through the collection of mortgage principal and interest payments. In the summer of 2009, FRC outsourced the servicing of the Loans to a third party sub-servicer, Specialized Loan Servicing LLC ("SLS").

Based on FRC's unaudited balance sheet as of July 31, 2009, FRC's primary assets consist of (i) approximately $330.3 million in cash and cash equivalents, (ii) residential real property held for sale with an aggregate book value of approximately $5.7 million, (iii) real property constituting its corporate headquarters and related personal property, furniture and equipment with an aggregate book value of approximately $4.4 million (after depreciation), (iv) real estate loan portfolios with an aggregate book value of approximately $164.1 million, (v) common stock investments with a book value of approximately $2.1 million and (vi) Community Reinvestment Act loans and investments with a book value of approximately $18.1 million. Book value does not necessarily reflect fair market value. Information concerning the estimated realizable asset values in connection with a chapter 7 case of the Debtor is set forth in the Liquidation Analysis attached as Exhibit 2 to this Disclosure Statement.

FRC also may be entitled to recoveries under certain fidelity bonds and insurance policies. These potential recoveries include FRC's continuing pursuit of fidelity bond claims for loan fraud losses incurred by FRC in California and Michigan, and insurance coverage for defense and settlement costs paid by FRC in connection with the Massachusetts Action.

### c. FRC's Liabilities.

FRC's material liabilities consist primarily of the remaining contingent, disputed and unliquidated claims associated with its lending activities. Before and during the Case, FRC has resolved substantial liabilities that were asserted against it. With respect to the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

remaining disputed liabilities, as noted in Section VIII.AA.1, many of the residential loans originated by FRC were sold to third parties in either whole loan sales or securitized transactions. In a whole loan sale, FRC agreed to sell the loans for cash, and gave customary representations and warranties regarding the loan characteristics and origination process that obligated FRC to repurchase those loans if certain defaults occurred within a designated period following the sale (the "<u>Repurchase Claims</u>").

FRC long ago established a "reserve" for then outstanding Repurchase Claims, which has been adjusted from time to time as claims have been resolved and new Repurchase Claims, if any, have been asserted. FRC has contested, and in some instances settled, these Repurchase Claims, but, as discussed below, certain Repurchase Claims remain outstanding and others may be asserted in the future (although this will become less likely over time). The Debtor has advised that FRC has reserved approximately $10.5 million on account of known Repurchase Claims and has indicated that it anticipates this sum will be used to satisfy existing Repurchase Claims. The Debtor has also advised that FRC has further estimated that additional Repurchase Claims in the range of $14.4 million and $29.4 million will require payment and resolution. Based upon FRC's books and records, historical results in resolving Repurchase Claims at a small fraction of their asserted face amounts, the progress made to date in resolving Repurchase Claims, and information furnished by the Debtor, the Creditors' Committee believes the remaining Cash in the Reorganized Debtor will be amply sufficient to satisfy the remaining Repurchase Claims. The Liquidation Analysis and the Projections assume that the remaining Repurchase Claims will be resolved at the upper end of the range established by the Debtor.

The Creditors' Committee is informed that, of the Repurchase Claims asserted to date, U.S. Bank National Association, as Trustee ("<u>U.S. Bank</u>") has asserted that the various securitization trusts that own more than 700 residential loans originated by FRC, and as to which U.S. Bank acts as trustee, have an aggregate outstanding principal balance and/or liquidated loss in excess of $64,000,000. The Creditors' Committee understands that FRC has requested information from U.S. Bank concerning its claims. U.S. Bank has reserved its

59

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

right to contest confirmation of the Plan and/or the provisions of the Plan concerning the Merger, the Effective Date Cash Distribution and/or the provisions governing post-Effective Date distributions on account of holders of Allowed Claims. The Creditors' Committee does not believe that any such objection has merit, but emphasizes that the amount of the Effective Date Cash Distribution is subject to determination by the Court at the Confirmation Hearing. <u>See</u> Section IV.C (Post-Effective Date Merger Claims and Distributions).

FRC is also currently a party to more than 150 miscellaneous pending litigation actions in numerous forums at various stages of progress, and additional lawsuits continue to be filed and commenced against FRC. Because the resolution of these actions involves an ongoing process, and newly commenced lawsuits may replace resolved lawsuits, the number of outstanding litigation matters is not static. These litigation matters relate to FRC's lending operations and primarily involve title actions, foreclosure proceedings or claims asserted by individual borrowers against FRC. The title cases are generally covered by applicable title insurance and defended by the insurer, and FRC may be able to access bankers professional liability insurance and other insurance coverage for other types of actions such as individual borrower claims. To the extent not covered by insurance, FRC has historically resolved these matters for small sums. The Liquidation Analysis and the Projections assume that the pending and anticipated future actions will be resolved at an average cost of approximately $10,000 per case, which the Creditors' Committee likewise believes is a conservative estimate. It must be emphasized again that distributions of Cash on account of remaining Allowed Unsecured Claims is permitted only to the extent Cash is available to make such distributions after adequately providing for the satisfaction of Post-Effective Date Merger Claims and other liabilities.

### 2. Assets and Liabilities of the Reorganized Debtor.

The Reorganized Debtor's assets will be comprised of the remaining property of the Estate and the assets of FGCC and FRC. Following the Merger, the Reorganized Debtor will continue to operate its business and generate income from the administration of the loan portfolio, real estate holdings and other assets. The Creditors' Committee expects that the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Reorganized Debtor will continue to operate and manage its and FRC's business (which will include the retention of a significant portfolio of the Loans, currently being administered by SLS, and related "REO" properties) under the auspices of a staff of employees. As set forth in the Projections, the Reorganized Debtor is expected to retain and not dispose of the Loans, which comprise the single most significant asset of the Reorganized Debtor. It is worth pointing out that the operations of the Reorganized Debtor will be virtually identical to the operations of FRC which existed immediately prior to the Effective Date (described above).

As of the Effective Date, and following the Merger, the Reorganized Debtor's assets are expected to include, without limitation, approximately $350 million in available Cash on hand net of certain estimated accrued administrative liabilities and the non-cash assets described in Sections IX.A, X.B.1.a and X.B.1.b of this Disclosure Statement. The Plan provides for distribution on the Effective Date of the Effective Date Cash Distribution, which is defined under the Plan to be no less than $275 million unless the Court determines otherwise in conjunction with the Confirmation Hearing. Additional distributions will be made from Post-Effective Date Distributable Cash, in other words, Cash available for distribution following satisfaction or reserves for then pending liabilities of the Reorganized Debtor.

The Creditors' Committee believes that the remaining Cash and income-producing assets of the Reorganized Debtor (after giving effect to the Effective Date Cash Distribution) are amply sufficient to satisfy the liabilities of FGCC and FRC (i.e., the Post-Effective Date Merger Claims) that will be assumed pursuant to the Merger. After making the Effective Date Cash Distribution, the Reorganized Debtor should have about $72.5 million in available Cash on hand. In light of this substantial amount of Cash, and the Reorganized Debtor's other assets of significant value (as shown in the Liquidation Analysis attached hereto as Exhibit 2), the Creditors' Committee believes that the Reorganized Debtor should be able to satisfy in full all Post-Effective Date Merger Claims and all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Claims, Allowed Non-Note General Unsecured Claim, Allowed Senior Note Claims, Allowed Junior Note

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Claims and Allowed Convenience Claims. This does not include consideration of any income produced by the Reorganized Debtor's remaining business, which may not generate sufficient Cash to satisfy in full, but should contribute to the satisfaction of, Allowed Claims.

**C.** **Classification and Treatment of Claims and Interests under the Plan.**

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

The Creditors' Committee believes that the classification of Classes specified in the Plan is appropriate and consistent with the requirements of the Bankruptcy Code. The Court will determine the appropriateness of the classification of Classes under the Plan in conjunction with the hearing on confirmation of the Plan.

Under Bankruptcy Code section 1124, a class of claims is "impaired" unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of the holders of claims in the class; or (ii) cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or nonperformance of a nonmonetary obligation) that occurred before or after the commencement of the case, reinstates the maturity of the claims in the class, compensates the holders for their actual damages incurred as a result of their reasonable reliance on any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Except for any right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position in which it would have been if the debtor's case had not been commenced.

A chapter 11 plan must designate each separate class of claims and equity interests either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," under the Bankruptcy Code, the holders of claims in that class are entitled to vote on the plan (unless the plan provides for no distribution to the class, in

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

which case, the class is deemed to reject the plan), and to receive, under the plan, property with a value at least equal to the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. If a class of claims is unimpaired, the holders of claims in that class are deemed to accept the plan.

The following describes specifically how Claims and Interests are classified under the Plan, whether the holders thereof are entitled to vote, and the treatment accorded such claims and interests under the Plan.

### 1. Unclassified Claims.

Certain types of Claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired, and they do not vote on a plan of reorganization because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. Therefore, the following Claims have not been placed into a Class.

### a. Administrative Claims.

Administrative Claims are Claims under Bankruptcy Code section 503(b) for costs or expenses and that are allowed under Bankruptcy Code section 507(a)(1). The Bankruptcy Code requires that all administrative claims be paid on the date that a plan of reorganization becomes effective, unless a particular claimant agrees to a different treatment.

### (1) U.S. Trustee Fees.

The Plan proposes to allow U.S. Trustee Fees in accordance with 28 U.S.C. § 1930 and to pay all U.S. Trustee Fees due and owing to the U.S. Trustee in Cash on the Effective Date. Going forward, the Reorganized Debtor will be responsible for (and will set aside and reserve amounts necessary to pay) U.S. Trustee Fees if and when they become due after the Confirmation Date.

### (2) Professional Fee Claims.

Unless otherwise expressly provided in the Plan, Professional Fee Claims will be Allowed only if the Holders of such Professional Fee Claims, within thirty (30) days of the Effective Date, files with the Bankruptcy Court and serves on the Reorganized Debtor and the U.S. Trustee final fee applications or motions requesting Allowance of their fees, and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

such Claims are allowed by a final order of the Bankruptcy Court. If the Holder of a Professional Fee Claim fails to timely file and serve a fee application or motion for payment, it will be barred from asserting its Professional Fee Claim against the Debtor, the Estate or the Reorganized Debtor. Allowed Professional Fee Claims will be paid in Cash within five (5) days after the order allowing such Claims become final.

*The Creditors' Committee estimates that up to approximately $2.5 million in unpaid and outstanding Professional Fee Claims may be asserted through the Effective Date of the Plan. The preceding represents the Creditors' Committee's estimate as of the date of this Disclosure Statement and is based on "hold-backs" and anticipated further fee accruals. The actual amounts of asserted or allowed Professional Fee Claims may be higher or lower than such estimates. Litigation relating to Plan confirmation or delays in the Plan confirmation process may materially affect the amount of Professional Fee Claims. In addition, parties in interest may object to some or all of such Claims, and some of the claimants who file Professional Fee Claims may also request the payment of a bonus or enhancement for their services with respect to the Case, which is not reflected in the estimate set forth above.*

### (3) Ordinary Course Administrative Claims.

An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim. Unless a party in interest objects to an Ordinary Course Administrative Claim, such Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.

*The Creditors' Committee is not aware of any material Ordinary-Course Administrative Claims.*

### (4) Non-Ordinary Course Administrative Claims.

Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims will be Allowed only if the Holders of such Non-Ordinary Course Administrative Claims, within thirty (30) days of the Effective Date, files with the Bankruptcy Court and serves on the Reorganized Debtor and the U.S. Trustee a motion requesting Allowance of the

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

Non-Ordinary Course Administrative Claims, and such Claims are allowed by a final order of the Bankruptcy Court. Holders of Non-Ordinary Course Administrative Claims that fail to timely File and serve a request for payment will be barred from asserting those Claims against the Debtor, the Estate or the Reorganized Debtor.

Unless the Holder of an Allowed Non-Ordinary Course Administrative Claim agrees to different treatment, the full amount of such Allowed Non-Ordinary Course Administrative Claim will be paid in Cash on or before the latest of (i) the Distribution Date; (ii) fifteen (15) days after the Non-Ordinary Course Administrative Claim becomes an Allowed Non-Ordinary Course Administrative Claim or (iii) the date on which the Allowed Non-Ordinary Course Administrative Claim first becomes due and payable in accordance with its terms.

*The Creditors' Committee is not aware of any material Non-Ordinary-Course Administrative Claims.*

### (5) Indenture Trustee Fees and Expenses.

The Plan provides that any and all Indenture Trustee Fees and other amounts that are due to each of the Indenture Trustees and its counsel as of the Effective Date will be paid in full in Cash, without reduction to the recovery of applicable Holders of Allowed Claims, on or before the later of: (i) the Effective Date; or (ii) five (5) days after the date on which the Plan Administrator receives from such Indenture Trustee a reasonably and customary detailed itemized statement of such amounts so long as the Plan Administrator does not, within such five (5) day period, give written notice to such Indenture Trustee that it disputes the amount requested or any part thereof and all such amounts shall be deemed Allowed without further application to or order from the Court. The Plan Administrator's objection shall be limited to a "reasonableness standard" and whether the amounts sought are actually due and payable under the particular Indenture. If the Plan Administrator gives such Indenture Trustee timely written notice that it disputes the amount requested or any part thereof, the Plan Administrator will promptly pay or cause to be paid any undisputed amounts and any pending disputed items shall be promptly presented to and determined by the Court, the sole questions being whether the amounts in dispute are due and payable under

the particular Indenture and satisfy the "reasonableness standard"; any unpaid amounts shall be promptly paid upon determination by the Court that such amounts are due and owing under the respective Indenture Trustee Fees. The Plan further provides that any and all fees and expenses that will be incurred in connection with the distributions to be made by the Indenture Trustees under the Plan will be promptly paid to the extent such fees and costs are provided for by the Indentures.

In the event the payment of any Indenture Trustee Fees due and owing to the Junior Note Indenture Trustee and Guaranty Trustee is to be made as of the Effective Date, the payment of such fees (or reservation thereof) shall be a condition to the dissolution of the Fremont General Financial Declaration of Trust (provided, however, such condition can be satisfied contemporaneously with the dissolution of the trust). Distributions by the Reorganized Debtor to holders of Junior Note Claims or Senior Note Claims pursuant to the Plan will not be reduced on account of payment of the Indenture Trustee Fees; provided, however, that nothing in the Plan shall be deemed to impair, waive, extinguish or negatively impact the Indenture Trustee Charging Lien.

Any claim for Indenture Trustee Fees arising after the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtor.

*The Creditors' Committee estimates that Indenture Trustee fees and expenses will not exceed $750,000 in aggregate amount on the Effective Date.*

### b. Priority Tax Claims.

Priority Tax Claims are Claims entitled to priority against the Estate under Bankruptcy Code section 507(a)(8). Priority Tax Claims do not include any tax Claims incurred after the Petition Date. Unless the Holder of a Priority Tax Claim that is Allowed by the Bankruptcy Court agrees to different treatment, the full amount of such Allowed Priority Tax Claim will be paid in Cash on or before the latest of (i) the Distribution Date; (ii) fifteen (15) days after the Priority Tax Claim becomes an Allowed Priority Tax Claim or (iii) the date on which the Allowed Priority Tax Claim first becomes due and payable in accordance with its terms.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

*The Priority Tax Claims asserted against the Estate total approximately $102.6 million plus any additional amounts that may become liquidated as a result of pending audits. Based on the current posture of the appeals process and audits involving the IRS, recent discussions with the IRS and the derivative nature of the FTB's Claim, the Creditors' Committee does not anticipate that the aggregate liability will represent more than a small percentage of the preceding amount, and in any event is not likely to exceed $15 million.*

### 2. Classification and Treatment of Secured Claims, Priority Claims, General Unsecured Claims and Convenience Claims.

Claims, other than Administrative Claims and Priority Tax Claims, are classified under the Plan. Secured Claims are Claims secured by liens on Estate property, to the extent that such Claim is secured by a valid and unavoidable lien against property in which an Estate has an interest or that is subject to setoff under Bankruptcy Code section 553. A Claim is a Secured Claim only to the extent of the value of the claimholder's interest in the collateral securing the Claim. Priority Claims are Claims arising under Bankruptcy Code sections 507(a)(4), 507(a)(5), 507(a)(7) or 507(a)(9). These Priority Claims are not secured by Estate property, but have statutory priority over other Claims. General Unsecured Claims are Claims that are not secured by liens on Estate property. Under the Plan, General Unsecured Claims include Non-Note General Unsecured Claims, Senior Note Claims and Junior Note Claims. Convenience Claims are Claims that are either (i) Allowed in an amount that is less than $10,000 or (ii) the Holder of such Claim has voluntarily agreed to reduce the Allowed Amount of such Claim to $10,000.

Set forth below is a summary of the Plan's treatment of Secured Claims, Priority Claims, General Unsecured Claims and Convenience Claims.

### a. Class 1 (Secured Claims against the Debtor).

Class 1 comprises all the Secured Claims, if any, against the Debtor. Class 1 is unimpaired under the Plan. In full satisfaction of any Allowed Secured Claims that have not been satisfied or extinguished as of the Effective Date, the Holder of such Allowed Secured Claim will receive, at the option of the Disbursing Agent, (i) the full amount of the Allowed

Secured Claim in Cash on or before the latest of (a) the Distribution Date and (b) fifteen (15) days after the date on which such Claim becomes an Allowed Secured Claim, or (ii) the Collateral securing the Allowed Secured Claim.

*The Creditors' Committee is not aware of any material Secured Claims.*

### b. Class 2 (Priority Claims other than Priority Tax Claims).

Class 2 comprises all of the Priority Claims, other than Priority Tax Claims, against the Debtor. Class 2 is unimpaired under the Plan. In full satisfaction of any Allowed Class 2 Claims that have not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 2 Claims the full amount thereof in Cash on or before the latest of: (a) the Distribution Date and (b) fifteen (15) days after the date on which such Claim becomes an Allowed Priority Claim.

*The Creditors' Committee is not aware of any material Priority Claims.*

### c. General Unsecured Claims.

The Plan classifies General Unsecured Claims against the Debtor in three Classes comprised of Non-Note General Unsecured Claims (Class 3(A)), Senior Note Claims (Class 3(B)) and Junior Note Claims (Class 3(C)) which share certain common elements in their proposed treatment.[7] The following is a general summary of the treatment of General Unsecured Claims under the Plan.

The Plan gives each of the Holders of Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note Claims an option to agree to accept payments of Cash in an amount equal to the principal amount of the Holder's Allowed Claim (plus, in the case of Holders of Allowed Senior Notes Claims and Allowed Junior Note Claims, any interest that accrued on such Allowed Claim prior to the Petition Date) and waive payment of fifty percent (50%) of the Post-Petition Interest that has accrued on such

---

[7] As noted in Section III.D, the Creditors' Committee reserves the right to right to request that the Bankruptcy Court treat Classes 3(A), 3(B) and 3(C) as a single Class (e.g., Class 3) for voting purposes pursuant to Bankruptcy Code section 1126 in the event any of these Classes do not vote to accept the Plan.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Claims, provided that the payment of the principal amount owing is made by November 30, 2009. **The Plan does not guarantee that the Holders of Claims making this election will receive the required payments by November 30, 2009 and, to the extent the payments are not delivered by such date, they will be entitled to receive Post-Petition Interest notwithstanding the election.**

The Plan provides that the initial cash distributions on account of Allowed Claims in Classes 3(A), 3(B) and 3(C) (again, subject to the subordination provisions in the Junior Note Indenture) will be funded by way of an Effective Date Cash Distribution of not less than $275 million (unless the Bankruptcy Court determines otherwise in conjunction with the Confirmation Hearing). The Creditors' Committee estimates that the Non-Note General Unsecured Claims, Senior Note Claims and Junior Note Claims that should be Allowed as of the Effective Date and amount of the Effective Date Cash Distribution that will be available to be paid on a pro rata basis on account of such Allowed Claims (after taking into account the subordination provisions of the Junior Note Indenture and settlements under which the amounts of certain Allowed Non-Note General Unsecured Claims will be deemed satisfied by the receipt of total payments in an amount less than the face amount of such Allowed Claims) would be approximately as follows:

| Claim Class | Effective Date Allowed Claim Amount | Pro Rata Amount | Pro Rata Effective Date Cash Distribution | Adjusted Effective Date Cash Distribution |
|---|---|---|---|---|
| 3(A) (Non-Note General Unsecured Claims) (Settlements) | $ 66.7 million | 18.1% | $ 49.8 million | $ 42 million |
| 3(A) (Non-Note General Unsecured Claims) (Others) | $ 10.9 million | 3.0% | $ 8.3 million | $ 8.6 million |
| 3(B) (Senior Note Claims) | $ 179.6 million | 48.7% | $ 133.9 million | $ 179.6 million |
| 3(C) (Junior Note Claims) | $ 111.3 million | 30.2% | $ 83 million | $ 44.8 million |
| Total | $ 368.5 million | 100% | $ 275 million | $ 275 million |

Notes:

(1) For purposes of this estimate, the Effective Date Cash Distribution is assumed to be in the amount of $275 million and is

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

assumed to be paid on November 30, 2009.

(2) Terms of settlements involving certain Allowed Non-Note General Unsecured Claims permit such Claims to be satisfied in full when payments totaling $42 million are received by the Holders of such Claims. This estimate takes into account the effect of those settlements.

(3) Post-Petition Interest has been excluded in the calculation of Allowed Non-Note General Unsecured Claims that are limited in payment amount by settlements and in the calculation of Allowed Senior Note Claims. It is assumed for the purposes of this estimate that Holders of Allowed Senior Note Claims will make the Early Payment Election and waive payment of fifty percent (50%) of the Post-Petition Interest to which such Holders are entitled. Post-Petition Interest has been included in the calculation of Allowed Non-Note General Unsecured Claims that are not limited in payment amount by settlements and Allowed Junior Note Claims.

(4) Pursuant to the Junior Note Indenture subordination provisions, approximately $45.7 million of the Effective Date Cash Distribution that is otherwise attributable to Allowed Junior Note Claims will be paid to the Holders of Allowed Senior Note Claims. Holders of Allowed Junior Note Claims may have rights of subrogation arising from the diversion of Cash from such Holders to satisfy Allowed Senior Note Claims. These rights of subrogation may permit Holders of Allowed Junior Note Claims to obtain greater pro rata amounts of distributions to the extent of such payments under the Junior Note Indenture subordination provisions. This estimate does not take into account any subrogation rights of the Holders of Allowed Junior Note Claims in calculating the amount of the Effective Date Cash Distribution that would be payable to such Holders. Given the proportion of remaining Allowed Junior Note Claims relative to the amount of remaining Allowed Non-Note General Unsecured Claims, the effect of any such subrogation rights is not expected to be material with respect to the Effective Date Cash Distribution.

To the extent that the Disputed Claims pending as of the Effective Date exceed the preceding estimates, the Cash that will be paid on account of Allowed Claims in Classes 3(A), 3(B) and 3(C) will be less because it will be necessary to reserve Cash for distribution to satisfy such Disputed Claims to the extent they become Allowed Claims.

To the extent Allowed Claims in Classes 3(A), 3(B) and 3(C) are not satisfied in full by the Effective Date Cash Distribution (including Post-Petition Interest, as applicable), the Holders thereof will receive quarterly pro rata distributions of Post-Effective Date Distributable Cash until their Allowed Claims are paid in full (including Post-Petition Interest as described below). The availability of distributions of Post-Effective Date Distributable Cash will depend, in part, on the performance of the Reorganized Debtor and the amount of Cash that is necessary to satisfy Post-Effective Date Merger Claims, Post-Effective Date Plan Expenses, Allowed Administrative Claims, Priority Tax Claims and Priority Claims.

The Plan further provides that the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) will be entitled to receive Post-Petition Interest in full unless they partially waive that right (or, if they elect to partially waive that right, they do not receive certain required payments by November 30, 2009). The Post-Petition Interest such Holders are entitled to

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

receive on account of their Allowed Claims will accrue pursuant to the formula and graduated rates described in the Plan until such Claims are paid in full.

Post-Petition Interest includes interest from the Petition Date to the Effective Date at the federal judgment rate as set forth in 28 U.S.C. § 1961(a) in effect as of the Petition Date (in this case, 2.51%). Higher rates of interest will apply during the post-Effective Date period, but the rate of interest will be reduced as specified Allowed Claims are paid in full or substantially reduced. The Creditors' Committee believes that the Reorganized Debtor should be able to make Effective Date Cash Distribution of not less than $275 million, an amount which should be adequate to satisfy a sufficient amount of Allowed Claims in Classes 3(A), 3(B) and 3(C) on the Effective Date and result in a reduction of the Post-Petition Interest Rate after the Effective Date as provided in the Plan.

Under the Plan, unless the Holder of an Allowed Claim in Class 3(A), 3(B) or 3(C) waives the right to receive Post-Petition Interest, the Holders of such Claims will receive distributions on account of their Claims at the same time (subject to the subordination provisions in the Junior Note Indenture). If it turns out that insufficient funds are available to pay the principal amount of Allowed Claims in Classes 3(A), 3(B) and 3(C) in full (i.e., the amount due on account of such Claims exclusive of Post-Petition Interest), the sole effect of having previously accrued and paid any Post-Petition Interest is to correspondingly reduce the amount of the remaining principal repayment on account of such Claims. The Holders of Interests, who would not be entitled to retain any value in such a circumstance, would remain unaffected by this accrual of Post-Petition Interest.

Finally, the Plan provides that, to the extent all Allowed Claims in Classes 3(A), 3(B) and 3(C) are not paid in full (including Post-Petition Interest, if applicable) within four years following the Effective Date, the Equity Trust Interests distributed under the Plan initially to Holders of Interests will be assigned to the Holders of the remaining unpaid Allowed Claims in those Classes. This is included in the Plan solely as an administrative matter. If the Reorganized Debtor is unable to satisfy Allowed Claims in Classes 3(A), 3(B) and 3(C) within four years after the Effective Date, there is no reason to believe that any value will

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

ever be available for the Holders of Interests. The four-year period establishes an end date so that Holders of Interests may take appropriate measures to close the books on their holdings after an extended and unsuccessful effort to recover value.

The following provides a more specific description of the Plan provisions governing the treatment of General Unsecured Claims.

### (1)  Class 3(A) (Non-Note General Unsecured Claims).

Class 3(A) comprises all of the Non-Note General Unsecured Claims against the Debtor and is impaired under the Plan. In full satisfaction of the Non-Note General Unsecured Claims that have not been satisfied or extinguished as of the Effective Date, each Holder of an Non-Note General Unsecured Claims will be entitled to receive Post-Petition Interest and the following on account of its Allowed Claim:

(a)  on the Distribution Date, its Pro Rata share of the Effective Date Cash Distribution until such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest);

(b)  within fifteen (15) Business Days after the end of each Calendar Quarter (commencing with the Calendar Quarter ending on December 2009), its Pro Rata share of the Post-Effective Date Distributable Cash for each such Calendar Quarter until such time as such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest); and

(c)  in the event the Holders of Allowed Claims in Class 3(A) have not been paid in full on account of their Allowed Claims (inclusive of their Post-Petition Interest Claims) as of the Maturity Date; then, on the first Business Day following the Maturity Date, such Holder shall receive its Pro Rata allocation of the Equity Trust Interests.

With regard to each holder of an Allowed Class 3(A) Claim, to the extent any portion of such holder's Claim is Disputed, pending determination of the Disputed portion of such holder's Claim, such holder shall receive distributions in the amount of the portion of its Claim

that is Allowed.

Notwithstanding the treatment set forth herein, each such Holder of an Allowed Class 3(A) Claim may agree, on or before the Ballot Deadline and in conjunction with such Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of Cash in an amount equal to the sum of the principal amount of such Holder's Allowed Class 3(A) Claim plus fifty percent (50%) of the Post-Petition Interest that accrued on such Claim (as of the date such payment is made), such Holder shall be deemed to waive any right or claim to any further Post-Petition Interest on account of its Allowed Class 3(A) Claim. Nothing in the Plan, however, shall be deemed or construed to guarantee such Holder that such Holder shall receive such payment on or before November 30, 2009.

*The Creditors' Committee estimates that Allowed Non-Note General Unsecured Claims for voting and distribution purposes on the Effective Date should total approximately $77.2 million. However, as noted above, settlements involving approximately $66.7 million of these Allowed Non-Note General Unsecured Claims will permit such Claims to be satisfied in full when payments totaling approximately $42 million are received on account of such Claims. The Allowed Non-Note General Unsecured could be altered if presently contingent or Disputed Non-Note General Unsecured Claims against the Estate become Allowed Claims.*

### (2) Class 3(B) (Senior Note Claims).

Class 3(B) comprises all of the Senior Note Claims against the Debtor. Class 3(B) is impaired under the Plan. The Senior Note Claims shall be Allowed in the aggregate amount of $176,402,106.56. On the Effective Date, each such holder shall be deemed to have an Allowed Class 3(B) Claim in an amount equal to the sum of (i) the principal amount of the Claim of such holder as of the Petition Date plus (ii) any and all interest which accrued on such holder's Claim any time on or before the Petition Date. In full satisfaction of the Allowed Class 3(B) Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder shall be entitled to receive Post-Petition Interest, and shall receive the following on account of its Allowed Claim:

(a) on the Distribution Date, its Pro Rata share of the Effective Date Cash

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  Distribution until such Holder has been paid in full on account of its

2  Allowed Claim (inclusive of any Post-Petition Interest);

3  (b)  within fifteen (15) Business Days after the end of each Calendar Quarter

4  (commencing with the Calendar Quarter ending on December 2009), its

5  Pro Rata share of the Post-Effective Date Distributable Cash for each

6  such Calendar Quarter until such time as such Holder has been paid in

7  full on account of its Allowed Claim (inclusive of any Post-Petition

8  Interest); and

9  (c)  in the event the Holders of Allowed Claims in Class 3(B) have not been

10  paid in full on account of their Allowed Claims (inclusive of their Post-

11  Petition Interest Claims) as of the Maturity Date; then, on the first

12  Business Day following the Maturity Date, such Holder shall receive its

13  Pro Rata allocation of the Equity Trust Interests.

14  Notwithstanding the treatment set forth herein, each such Holder of an Allowed Class

15  3(B) Claim may agree, on or before the Ballot Deadline and in conjunction with such

16  Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of

17  Cash in an amount equal to the sum of (x) the principal amount of such Holder's Allowed

18  Class 3(B) Claim *plus* (y) any and all interest which accrued on such Holder's Claim any

19  time on or before the Petition Date *plus* (z) fifty percent (50%) of the Post-Petition Interest

20  that accrued on such Claim (as of the date such payment is made), such Holder shall be

21  deemed to waive any right or claim to any further Post-Petition Interest on account of its

22  Allowed Class 3(B) Claim.  Nothing in the Plan, however, shall be deemed or construed to

23  guarantee such Holder that such Holder shall receive such payment on or before November

24  30, 2009.

25  *The Creditors' Committee has been informed by the Senior Note Indenture Trustee*

26  *that Allowed Senior Note Claims total $176,402,106.56.*

27  **(3)  Class 3(C) (Junior Note Claims).**

28  Class 3(C) comprises all of the Junior Note Claims and is impaired under the Plan.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

The Junior Note Claims shall be Allowed in the aggregate amount of $107,422,680.93. On the Effective Date and after payment of the Indenture Trustee Fees, the Fremont General Financing Declaration of Trust shall be deemed terminated and dissolved and, if necessary or desirable, the Debtor or Junior Note Indenture Trustee may file a certificate of cancellation with the Secretary of State of Delaware, and upon such termination and dissolution, the Preferred Securities Guarantee shall be deemed terminated, the Junior Notes shall be deemed distributed pro rata to the holders of Junior Note Claims and each Holder of a Junior Note Claim shall be deemed to have an Allowed Class 3(C) Claim in an amount equal to the sum of (i) the principal amount of the Claim of such Holder as of the Petition Date plus (ii) any and all interest which accrued on such Holder's Claim any time on or before the Petition Date, and to the extent necessary all Junior Notes shall be distributed on a pro rata basis on the Effective Date.

In full satisfaction of the Allowed Class 3(C) Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder shall be entitled to receive Post-Petition Interest, and shall receive the following Junior Repayment Rights on account of and in exchange for its Allowed Claim:

    (a)    on the Distribution Date, its Pro Rata share of the Effective Date Cash Distribution until such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest);

    (b)    within fifteen (15) Business Days after the end of each Calendar Quarter (commencing with the Calendar Quarter ending on December 2009), its Pro Rata share of the Post-Effective Date Distributable Cash for each such Calendar Quarter until such time as such Holder has been paid in full on account of its Allowed Claim (inclusive of any Post-Petition Interest); and

    (c)    in the event the Holders of Allowed Claims in Class 3(C) have not been paid in full on account of their Allowed Claims (inclusive of their Post-Petition Interest Claims) as of the Maturity Date; then, on the first

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Business Day following the Maturity Date, such Holder shall receive its Pro Rata allocation of the Equity Trust Interests.

Notwithstanding the treatment set forth herein, each such Holder of an Allowed Class 3(C) Claim may agree, on or before the Ballot Deadline and in conjunction with such Holder's Ballot, that if on or before November 30, 2009, such Holder receives payment of Cash in an amount equal to the sum of (x) the principal amount of such Holder's Allowed Class 3(C) Claim *plus* (y) any and all interest which accrued on such Holder's Claim any time on or before the Petition Date *plus* (z) fifty percent (50%) of the Post-Petition Interest that accrued on such Claim (as of the date such payment is made), such Holder shall be deemed to waive any right or claim to any further Post-Petition Interest on account of its Allowed Class 3(C) Claim. Nothing in the Plan, however, shall be deemed or construed to guarantee such Holder that such Holder shall receive such payment on or before November 30, 2009.

Pursuant to the subordination provisions in the Junior Note Indenture, any Distribution on account of any Class 3(C) Claim shall first be payable by the Reorganized Debtor to the Holders of the Class 3(B) Claims until their Allowed Claims have been paid in full in accordance with the Plan.

*The Creditors' Committee has been informed by the Junior Note Indenture Trustee that Allowed Junior Note Claims total $107,422,680.93. As a result of the Debtor's retention of certain securities related to the Junior Notes, approximately $3.2 million of the Allowed Junior Note Claims may be held by the Debtor.*

### d.   Class 4 (Convenience Claims).

Class 4 comprises all of the Convenience Claims against the Debtor. Class 4 is impaired under the Plan and entitled to vote. In full satisfaction of any Allowed Class 4 Claims that have not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 4 Claims the full amount thereof in Cash on or before the latest of: (i) the Distribution Date and (ii) fifteen (15) days after the date on which such Claim becomes an Allowed Convenience Claim.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

*The Creditors' Committee estimates that Allowed Convenience Claims total up to approximately $100,000. While the Creditors' Committee does not believe there are any Holders of Allowed Convenience Claims in the amount of $50 or less, any such Holders should be aware that they will not receive any consideration on account of their Allowed Claims. (See Section XII.J.2 hereof).*

### 3. Classification and Treatment of Subordinated Claims and Interests.

The Plan classifies Subordinated Claims in Class 5 (Subordinated Claims) and Interests in Class 6 (Exchanged Common Stock). Although separately classified, the treatment provided to Subordinated Claims and Interests under the Plan share common elements. Under the Plan, an Equity Trust will be organized and established as a trust for the benefit of Holders of Allowed Subordinated Claims and Allowed Interests who shall be deemed the beneficiaries of the Equity Trust (collectively, the "Beneficiaries") in accordance with Treasury Regulation Section 301.7701-4(d). The Equity Trust will be the sole remaining stockholder of the Reorganized Debtor.

After the Equity Trust is organized and established, the Equity Trust will issue beneficial trust interests that are divided into Series A Equity Trust Interests and Series B Equity Trust Interests. As explained below, the existing Holders of common stock in the Debtor, which will be issued to the Equity Trust in exchange for such Interests, will be deemed to have received Series A Equity Trust Interests in an amount equal to the number of shares of common stock owned by such Holder. The Series B Equity Trust Interests will be allocated to the Holders of Allowed Subordinated Claims, in each case according to formulas set forth in the Plan (and described below in Section X.C.3.a).

The right of Holders of Equity Trust Interests to receive any distributions on account of such Equity Trust Interests, or realize any value thereof, will be subject to various limitations and restrictions that are set forth in the Plan and the Equity Trust Agreement. For example, as noted in Section X.C.3.b(1), the Plan generally provides that distributions on account of Equity Trust Interests may not be made until Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) have been paid in full on account of their Allowed Claims,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

including Post-Petition Interest (if applicable), which reflects the priority scheme of the Bankruptcy Code. In addition, to the extent Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note Claims are not paid in full (including Post-Petition Interest Claims, if applicable) within four years of the Effective Date, the Plan provides that the Equity Trust Interests will be assigned to the Holders of Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note Claims on a pro rata basis, consistent with the allocations with respect to such Allowed Claims established in the Plan. As explained in Section X.C.2.c, the Creditors' Committee believes the four year repayment requirement, and the assignment of the Equity Trust Interests to Holders of Claims that are not paid in full within this four year period, is appropriate as an administrative matter under the circumstances of this Case.

The following provides a more specific description of certain Plan provisions governing the treatment of Subordinated Claims and Interests.

> **a.      Description of Treatment of Subordinated Claims and Interests.**

> **(1)      Class 5 (Subordinated Claims).**

Class 5 comprises all of the Subordinated Claims against the Debtor. Class 5 is impaired under the Plan and entitled to vote. In full satisfaction of any Allowed Class 5 Claims that have not been satisfied or extinguished as of the Effective Date, each such Holder of Allowed Claims shall be deemed to have received Series B Equity Trust Interests under the Plan in an amount equal to the Allowed Amount of such Subordinated Claims.

*The Creditors' Committee is aware of a securities class action lawsuit styled as New York State Teachers' Retirement System v. Fremont General Corporation et al., Case No. 2:07-cv-05756-FMC-FFM, United States District Court for the Central District of California* (the "Securities Class Action")*, and a putative ERISA class action lawsuit styled as In re Fremont General Corp. Litig., Case No. CV07-02693 FMC (FMMx), United States District Court for the Central District of California* (the "ERISA Action")*, that were pending against the Debtor on the Petition Date and has been stayed as to the Debtor as a*

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

result of its bankruptcy filing. *The plaintiffs in the Securities Class Action and ERISA Action have filed proofs of claim against the Debtor in an unliquidated amount. Any Allowed Claims against the Debtor arising from any Claim filed by the plaintiffs in the Securities Class Action or ERISA Action will be classified and treated as Allowed Subordinated Claims.*

*The Creditors' Committee has been informed that the plaintiffs in the ERISA Action contend that the Claims they assert are not subject to subordination and further contend that, to the extent they exceed available insurance coverage, such Claims should be classified and treated as Class 3(A) Claims. The Creditors' Committee disputes these contentions. The Creditors' Committee has also been informed that the plaintiffs in the ERISA Action contend that the Claims they assert are covered under available insurance policies up to $100 million. Plaintiffs in the ERISA Action have indicated to the Creditors' Committee that they intend to file motions for relief from stay and for withdrawal of the reference so that the ERISA Action may proceed in the United States District Court for the Central District of California and the Claims they assert may be prosecuted against the Debtor in such forum.*

### (2) Class 6 (Exchanged Common Stock).

Class 6 comprises all issued and outstanding shares of Exchanged Common Stock. Class 6 is impaired under the Plan and entitled to vote. On the Effective Date, Holders of all the then issued and outstanding shares of Exchanged Common Stock, in exchange for such Interests, shall be deemed to have received Series A Equity Trust Interests under the Plan in an amount equal to the number of shares of the Debtor's common stock owned by such Holder. On the Effective Date, the stock certificates representing shares of common stock issued by the Debtor prior to the Effective Date shall be deemed to be of no force and effect against the Reorganized Debtor, and the Exchanged Common Stock shall be issued to the Equity Trust in lieu thereof.

### b. Description of Plan Provisions Governing Distributions and Transfers of Equity Trust Interests.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**(1)      Equity Trust Distributions and Withholding.**

Consistent with the priority scheme of the Bankruptcy Code, the Plan provides that there will be no distributions on account of any Equity Trust Interests until the earlier of (i) the first Business Day after the date upon which the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) have been paid in full on account of their Allowed Claims inclusive of their Post-Petition Interest Claims and (ii) the first Business Day after the Maturity Date; provided, however, that the Equity Trust may retain such amounts (x) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Equity Trust during liquidation, (y) to pay reasonable administrative expenses (including, without limitation, to pay any taxes imposed on the Equity Trust or in respect of the assets of the Equity Trust), and (z) to satisfy other liabilities incurred or assumed by the Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Equity Trust Agreement.  The Equity Trustee may withhold from amounts distributable to any person any and all amounts, determined in the Equity Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

**(2)      Equity Trust Reconciliation.**

Distributions of Equity Trust Interests are also subject to a reconciliation process which may impact and dilute the amounts paid to Holders of Series A Equity Trust Interests and Series B Equity Trust Interests.  In accordance with the Equity Trust Agreement, prior to any distribution on account of Equity Trust Interests (which is subject to further limitations in the Plan including, without limitation, Section IV.L.8 of the Plan), the Equity Trustee shall determine the value of the Series B Equity Trust Interests, relative to the total Equity Trust Interests.  In connection therewith, the Equity Trustee shall (i) calculate the total amount of Allowed Subordinated Claims, after deducting payments made on account of such Claims by applicable insurance; (ii) reasonably estimate the value of each such Allowed Subordinated Claims compared to the total value of all Interests, as of the date of incurrence of the Allowed Subordinated Claims; and (iii) if the calculation in section (i) above is less than the Estimated Subordinated Claims, redistribute all Excess Series B Equity Trust Interests to all

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

Beneficiaries on a pro rata basis (the "Equity Reconciliation").

The Equity Trustee shall file a copy of the Equity Reconciliation with the Court, with service to each of the Beneficiaries, at least sixty (60) days prior to the first distribution to the Beneficiaries from the Equity Trust. Each Beneficiary shall have the right to file an objection with the Court to the Equity Reconciliation, and any such objections will be resolved by the Court prior to any distributions being made to the Beneficiaries; provided, however, the Court may allow interim distributions while objections to the Equity Reconciliation are pending. After the Equity Reconciliation is complete, the Beneficiaries shall receive distributions from the Equity Trust as provided for in the Plan and the Equity Trust Agreement.

Notwithstanding anything to the contrary in the Plan, in the event there is a Maturity Date Payment Default, the Equity Trust Interests of the Holders of Allowed Interests and Holders of Allowed Subordinated Claims shall be deemed assigned to the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) pro rata to extent unpaid pursuant to and consistent with the allocations set forth in Sections II.C.3, II.C.4 and II.C.5 of the Plan, at which point the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) shall become the Holders of the Equity Trust Interests and the Beneficiaries, as of such date.

(3)     **Restrictions on Transfer of Equity Trust Interests.**

The Plan also provides that the Equity Trust Interests shall be non-transferable from and after the Effective Date to and through the 30th Business Day after the Maturity Date and, thereafter, the Equity Trust Interests shall only be transferable if (i) the transferee agrees to become a party to the Equity Trust Agreement and (ii) such transfer is exempt from the registration provisions of the Exchange Act, if applicable or from the qualification provisions of any state securities law, if applicable. The Equity Trustee need not reflect any transfer (or make any distribution to any transferee) and will give notice to such Beneficiary that no transfer has been recognized in the event the Equity Trustee reasonably believes that such transfers (or the distribution to such transferee) may constitute a violation of applicable laws or might cause the Equity Trust to be required to register interests in the Trust under the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Exchange Act. Prior to any transfer an Equity Trust Interest, the transferring Beneficiary shall submit to the Equity Trustee a duly endorsed assignment of the Equity Trust Interests to be transferred (in a form reasonably acceptable to the Equity Trustee) together with the service charge, if any, to be specified by the Equity Trustee pursuant to the Equity Trust Agreement.

No such transfer of an Equity Trust Interest shall be effected until, and the transferee shall succeed to the rights of a Beneficiary only upon, final acceptance and registration of the transfer by the Equity Trustee in the Equity Trust register. No transfer, assignment, pledge, hypothecation or other disposition of an Equity Trust Interest may be effected until either (i) the Equity Trustee has received such legal advice or other information that it, in its sole discretion, deems necessary or appropriate to assure that any such disposition shall not require the Equity Trust to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act or (ii) the Equity Trustee has determined to register and/or make periodic reports in order to enable such disposition to be made. In the event that any such disposition is allowed, the Equity Trustee may add such restrictions upon transfer and other terms to the Equity Trust Agreement as are deemed necessary or appropriate by the Equity Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

Prior to the registration of any transfer by a Beneficiary, the Equity Trustee shall (i) treat the person in whose name is in the register as the owner for all purposes, and the Equity Trustee shall not be affected by notice to the contrary and (ii) not be liable for making any distribution to the transferring Beneficiary. When a request to register the transfer of an Equity Trust Interest is presented to the Equity Trustee, the Equity Trustee shall register the transfer as requested if the requirements for transfers set forth in the Plan and Equity Trust Agreement are satisfied. The Equity Trustee shall charge a service charge in an amount sufficient to cover the expenses of the Equity Trustee and its agents and any tax or governmental charge that may be imposed on any transfer of an Equity Trust Interests. Failure of any Beneficiary to comply with these provisions shall void any transfer of the

82

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

related Equity Trust Interest, and the proposed transferee shall have no rights under the Plan or the Equity Trust Agreement. Upon the transfer of a transferring Beneficiary's entire Equity Trust Interest as evidenced by the register, such transferring Beneficiary shall have no further right, title or Equity Trust Interests.

**XI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.     Rejection of Executory Contracts and Unexpired Leases.**

**1.     Rejected Agreements and Bar Date for Rejection Damage Claims.**

On the Effective Date, all executory contracts and unexpired leases of the Debtor will be rejected, except (i) any executory contracts and unexpired leases already rejected by prior order of the Court, (ii) the D&O Insurance Policies that will be assumed in accordance with the Plan, (iii) the Executive Employment Agreements assumed in accordance with the Plan and (iii) as otherwise provided in the Plan. The Confirmation Order will constitute a Bankruptcy Court order approving these rejections.

The Plan will require that any Rejection Damage Claim or other Claim for damages arising from the rejection of an executory contract or unexpired lease be Filed and served on the Reorganized Debtor within thirty (30) days after the mailing of notice of the occurrence of the Effective Date. Any party that fails to timely File and serve such a Claim will be prevented from receiving any distribution under the Plan on account of such Claim, and the Claim will be unenforceable against the Debtor, the Estate and the Reorganized Debtor.

**B.     Ratification and Assumption of Agreements.**

In connection with the Plan, a schedule of executory contracts and unexpired leases that the Reorganized Debtor will assume on the Effective Date (the "Schedule of Assumed Agreements") will be prepared and Filed by the Creditors' Committee. The Creditors' Committee will reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date in order to (i) delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) add any executory contract or unexpired lease and provide for its assumption under the Plan. The Creditors' Committee

will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to the agreement affected by the amendment.

The D&O Insurance Policies shall remain in force and shall be enforceable on and after the Effective Date, and to the extent the D&O Insurance Policies constitute executory contracts under the Bankruptcy Code, they will be assumed on the Effective Date. On the Effective Date, the Reorganized Debtor will also assume all executory contracts and unexpired leases of the Debtor listed on the Schedule of Assumed Agreements including, without limitation, each of the Executive Employment Agreements and, for the avoidance of doubt, each of the D&O Policies. The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

After the assumption to the Executive Employment Agreements, each of Sanchez, Stuedli and Royer will retain their executive positions and existing job duties and responsibilities with the Reorganized Debtor following the Effective Date, including the continued reporting of Sanchez directly to the Board of Directors, should they continue to serve. During the remaining term of the Assumed Employment Agreements, which will expire in November 2010, the annual compensation payable to these senior executive employees will be as follows:

| Executive | Position | Base Salary |
|---|---|---|
| Richard A. Sanchez | President and Chief Executive Officer | $600,000 |
| Thea K. Stuedli | Executive Vice President and Chief Financial Officer | $450,000 |
| Donald E. Royer | Executive Vice President and General Counsel | $500,000 |

### 1. Cure Payments.

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the amount identified in the Schedule of Assumed Agreements, in Cash

84

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

on or before the Distribution Date, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the Reorganized Debtor unless otherwise ordered by the Bankruptcy Court.

*The Creditors' Committee is not aware of any cure payments that will be owed in connection with the assumption of any executory contracts or unexpired leases under the Plan.*

## 2. Objections to Assumption.

Any entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan, and that objects to such assumption or the amount of the proposed cure payment, will be required to File with the Court and serve upon interested parties a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be Filed and served by no later than ten (10) days prior to the Confirmation Hearing. Any entity that fails to timely File and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption of its contract or lease and the amount of the proposed cure payment. In the absence of a timely objection by an entity who is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination as to the amount of any cure and compensation due under the executory contract or unexpired lease, and that the Reorganized Debtor has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

### 3. Resolution of Claims Relating to Assumed Agreements.

In accordance with the procedures set forth in the Plan with respect to cure payments, payment of the cure payments will be deemed to satisfy, in full, any associated pre-petition or post-petition arrearage or other Claim asserted in a Filed proof of Claim or listed in the Schedules, irrespective of whether the cure payment is less than the amount set forth in such proof of Claim or the Schedules. Upon the tendering of the cure payment, such Claim shall be disallowed, without further order of the Court or action by any party.

## XII.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN.

### A. Vesting of Assets.

Except as otherwise provided by the Plan, on the Effective Date, title to all assets and properties encompassed by the Plan shall vest in the Reorganized Debtor free and clear of all liens and in accordance with section 1141 of the Bankruptcy Code, and the Confirmation Order shall be a judicial determination of any discharge of the liabilities of the Debtor except as provided in the Plan.

### B. Authority to Effectuate Plan.

Upon the entry of the Confirmation Order by the Bankruptcy Court, all transactions and applicable matters provided under the Plan (including, without limitation, the Merger) will be deemed to be authorized and approved without any requirement of further action by the Debtor or the Reorganized Debtor, their respective shareholders, or board of directors, and without further approval from the Bankruptcy Court. The Confirmation Order will also act as an order modifying the Debtor's by-laws, if necessary, such that the provisions of the Plan can be effectuated. The Reorganized Debtor will further be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan and to effectuate the distributions provided in the Plan. If and to the extent the Board of Directors is required to take any affirmative act or action in order to give further effect to the Merger, the Board of Directors will also be authorized and directed to take any such act or actions and will take such act or actions as

86

may be required to further effect the Merger in accordance with Nevada Revised Statute Annotated Section 92A.180 and California General Corporate Law Section 1110 (as applicable), and the Confirmation Order will expressly authorize and direct the Board of Directors to take any such affirmative act or actions.

### C.     Subordination Provisions / Ongoing Effectiveness.

Nothing in the Plan is intended to affect the terms or enforceability of any subordination agreement entered into prior to the Effective Date by any creditor or group of creditors in favor of any other creditors of the Debtor in respect of any obligations owing by the Debtor. Without limiting the generality of the foregoing, pursuant to Section 510 of the Bankruptcy Code, the subordination of the Junior Notes to the Senior Notes pursuant to the terms of the Junior Note Indenture will be unaffected by the Plan, and, by reason of such subordination, any distribution on account of any Class 3(C) Claim shall first be payable by the Reorganized Debtor to the Holders of the Class 3(B) Claims until their Allowed Claims have been paid in full in accordance with the Plan.

### D.     Board of Directors of the Reorganized Debtor.

With respect to corporate governance, the Plan generally provides that, upon the Effective Date, the Board of Directors of the Reorganized Debtor will be composed of five persons initially selected by the members and ex officio members of the Creditors' Committee. The members of the Creditors' Committee holding Senior Notes will be entitled to select four of the directors and the ex officio members of the Creditors' Committee will be entitled to select one director (the "Junior Board Member"). If the Equity Committee does not object to the Plan and Holders of Interests vote in favor of the Plan (the "Equity Support Conditions"), the Equity Committee will be entitled to select one board member (the "Equity Board Member") that would otherwise be designated by the members of the Creditors' Committee holding Senior Notes (reducing the number of board members selected by such parties to three).

After the initial selection of the directors, the removal and replacement of the Senior Board Members, Junior Board Member and Equity Board Member (if any) will be

87

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

effectively controlled by a simple majority (in dollar amount) of their respective constituents. For example, a simple majority (in dollar amount) of Holders of Allowed Non-Non General Unsecured Claims and Allowed Senior Note Claims will be entitled to remove and replace the Senior Board Members, and a simple majority (in dollar amount) of Holders of Allowed Junior Note Claims will be entitled to remove and replace the Junior Board Member.

As Allowed Claims are paid in the order of priority under the Plan, control over the positions on the Board of Directors held by senior classes of general unsecured creditors will shift to junior classes of general unsecured creditors and, after creditors are paid in full, equity holders. For example, after Allowed Non-Note General Unsecured Claims and Allowed Senior Note Claims are paid in full (including Post-Petition Interest, if applicable), control over the designation of the Senior Board Members will shift to the Junior Board Member, who will then be entitled to replace the Senior Board Members. Likewise, after Allowed Junior Note Claims are paid in full (including Post-Petition Interest, if applicable), the entire Board of Directors will be replaced by new members appointed by the Equity Trustee.

The vesting of the right to designate the members of the Board of Directors is consistent with the distribution priorities established under the Plan and Bankruptcy Code and, the Creditors' Committee believes, is entirely appropriate under the circumstances of this Case. The Creditors' Committee is hopeful that, as Disputed Claims are resolved and the remaining assets of FRC that will be contributed pursuant to the Reorganized Debtor by way of the Merger generate Cash, sufficient funds will be made available to pay all Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note Claims in full. However, because the asserted Claims against the Debtor presently exceed the value available to satisfy such Claims on the Effective Date, the Plan appropriately vests control over the appointment of members of the Board of Directors in the representatives of the creditors that will be most immediately affected by the success or failure of the Reorganized Debtor to resolve Disputed Claims and generate Cash to satisfy Allowed Claims.

88

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

The identity of the membership of the initial Board of Directors shall be disclosed at the Confirmation Hearing, if not prior thereto. It is not anticipated that the members of the Board of Directors will receive any compensation for their services, although it is possible that in the future the Board of Directors may determine to award a relatively small amount of compensation members totaling no more than $10,000 per member annually; members will be entitled to reimbursement of out-of-pocket expenses. If the Equity Support Conditions are not satisfied, then on the Effective Date the Equity Committee nevertheless shall be entitled to select one (1) individual to participate in meetings of the Board of Directors as an observer and to receive all correspondence and documents presented to the Board of Directors, with no voting rights, with any successor to be selected in accordance with the applicable provisions of the Equity Trust Agreement. From and after the Effective Date, the Debtor's officers and directors will be relieved of any responsibilities to the Debtor.

### 1. Responsibility of the Board of Directors.

The Board of Directors will have plenary responsibility for overseeing and directing the properties and operations of the business Reorganized Debtor, including, without limitation, the implementation of the provisions of the Plan.

### 2. Compensation of the Board of Directors.

Other than reimbursement for actual out-of-pocket expenses incurred by the members of the Board of Directors, the members of the Board of Directors shall not be entitled to receive any compensation for services rendered on behalf of the Reorganized Debtor.

### 3. Limitation on Liability of Board of Directors; Indemnification; Insurance.

**The Board of Directors and its members, agents, and professionals employed or retained by the Board of Directors (the "<u>Board of Directors' Agents</u>") (i) shall not have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the Plan and the distributions made thereunder or distributions made under the Equity Trust by the Equity Trustee; and, in connection therewith, the Reorganized Debtor shall indemnify and hold the Board of Directors and**

89

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**the Board of Directors' Agents harmless from and against any and all claims for any such losses, damages, claims or causes of action arising therefrom and (ii) shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan. Entry of the Confirmation Order will constitute a judicial determination that the exculpation provision contained in Section IV.G.4 of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or its respective property.** Notwithstanding the foregoing, at the expense of the Reorganized Debtor, the Board of Directors shall be entitled to procure directors' and officers' liability policies.

The Creditors' Committee believes that the preceding provision is appropriate and consistent with applicable law, as these provisions specify a standard for liability for the Board of Directors' Agents that is fully consistent with applicable law and clarifies that this standard will apply to acts implementing the Plan. To the extent the Court disagrees with the Creditors' Committee's position, the Court may modify the scope of the foregoing provision.

## E. Articles of Incorporation and Bylaws.

The Articles of Incorporation and Bylaws of the Reorganized Debtor will prohibit the issuance of non-voting equity securities as required by Bankruptcy Code section 1123(a)(6), subject to amendment of such Articles of Incorporation and Bylaws as permitted by applicable law. The Articles of Incorporation will further provide that, until all Allowed Non-Note General Unsecured Claims, Allowed Senior Note Claims and Allowed Junior Note Claims are paid in full (inclusive of Post-Petition Interest Claims to the extent applicable) or the first Business Day after a Maturity Date Payment Default, there will be no Cash payments or other distributions made on account of any Equity Trust Interests.

## F. Periodic Reporting.

As discussed in Section IX.D, as of the Effective Date, the Reorganized Debtor will not be required to file reports under Section 13 of the Exchange Act. To the extent permitted, the Reorganized Debtor may undertake other actions to suspend its obligation to

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

file reports under Section 15(d) of the Exchange Act by filing a Form 15 with the SEC certifying that there are fewer than 300 holders of record of the securities to be deregistered. The Board of Directors may, in its sole discretion, periodically disseminate information concerning the financial affairs and condition of the Reorganized Debtor.

### G. Employee Benefit Plans.

It is anticipated that as of the Effective Date, all of the Debtor's employee benefit plans, programs and benefits existing immediately prior to the Effective Date as to persons employed on the Effective Date shall be retained and constitute obligations of the Reorganized Debtor, provided, that nothing herein shall preclude the Reorganized Debtor from amending, modifying or otherwise canceling such benefit plans, programs and benefits in its discretion to the extent permitted by law.

### H. The Plan Administrator.

#### 1. Appointment of the Plan Administrator.

On the Effective Date, the provisions of the Plan shall be executed and carried out by the Plan Administrator (subject to the supervision of the Board of Directors) pursuant to and in accordance with the provisions of the Plan and the Plan Administration Agreement. The Creditors' Committee shall select the individual to serve as the Plan Administrator, which will be disclosed in the Plan Administrator Disclosure. The Creditors' Committee currently is investigating potential parties to serve as Plan Administrator and is conducting discussions concerning this matter with members of the Debtor's management and third parties, including persons that serve as trustees for post-confirmation debtors. The Projections set forth the anticipated costs (compensation and other related expenses) associated with the Plan Administrator. The Projections also assume that a current senior member of the Debtor's management continues his or her employment for a period of two years following the Effective Date. Such person may or may not serve as the Plan Administrator; if such person does undertake that position, the Plan Administrator compensation assumed in the Projections would be in addition to such salary. The Plan Administrator will serve at the pleasure of the Board of Directors and shall report directly to the Board of Directors, and the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Board of Directors shall have the right to remove (with or without cause) and replace the person serving as the Plan Administrator.

In accordance with the Plan Administration Agreement, the responsibilities of the Plan Administrator shall include (a) in consultation with the Board of Directors, determining the amount of (i) reserves for Disputed Claims, Post-Effective Date Plan Expenses and Post-Effective Date Merger Claims, in each case, in a manner consistent with the provisions of the Plan, (ii) Post-Effective Date Distributable Cash for each Calendar Quarter, as applicable and (iii) the calculation of the Post-Petition Interest to which a Holder is entitled under the Plan; (b) facilitating the Reorganized Debtor's prosecution or settlement of objections to and estimations of Claims and Post-Effective Date Merger Claims; (c) prosecution or settlement of claims and causes of action held by the Debtor; (d) calculating and assisting the Disbursing Agent in implementing all distributions in accordance with the Plan; (e) filing all required tax returns and paying taxes and all other obligations on behalf of the Reorganized Debtor from funds held by the Reorganized Debtor or other available funds; (f) periodic reporting if required by the Bankruptcy Court regarding the status of the claims resolution process, distributions on Allowed Claims and prosecution of causes of action; (g) disposing of assets of the Reorganized Debtor and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan; (h) responding to any requests for the election of the replacement of members of the Board of Directors and conducting any elections in connection therewith, and (i) such other responsibilities as may be vested in the Plan Administrator by the Board of Directors or pursuant to the Plan, the Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

## 2. Powers of the Plan Administrator.

The powers of the Plan Administrator will, without any further Bankruptcy Court approval, include (i) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by the Reorganized Debtor from funds held by the Plan Administrator and/or the Reorganized Debtor in accordance with the Plan; (ii) the power to

compromise and settle claims and causes of action on behalf of or against the Reorganized Debtor and (iii) such other powers as may be vested in or assumed by the Plan Administrator at the discretion of the Board of Directors or pursuant to the Plan, the Plan Administration Agreement or as may be deemed necessary and proper to carry out the provisions of the Plan.

**3.    Plan Administrator as Representative of the Estate.**

The Plan Administrator will be appointed as the representative of the Estate and the Reorganized Debtor pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such shall be vested with the authority and power (subject to the Plan Administration Agreement and the Board of Directors) to: (i) administer, hold and liquidate the assets of the Estate and the Reorganized Debtor; (ii) administer, investigate, prosecute, settle and abandon all Litigation in the name of, and for the benefit of, the Estate and the Reorganized Debtor; (iii) make distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims and Post-Petition Interest Claims, and (iv) take such action as required to administer, wind-down, and close the Case. As the representative of the Estate and the Reorganized Debtor, the Plan Administrator shall succeed to all of the rights and powers of the Debtor and the Estate with respect to all causes of action and the rights and powers of FRC and FGCC with respect to any rights, and the Plan Administrator shall be substituted and shall replace the Debtor, the Estate, FRC, FGCC, the Creditors' Committee, and/or the Equity Committee, as applicable, as the party in interest in all such litigation pending as of the Effective Date. Further, for all purposes, including, without limitation, any insurance policy of the Debtor, the Plan Administrator shall be considered the equivalent of a "Bankruptcy Trustee," "Examiner," "Receiver," "Conservator," "Rehabilitator," or "Liquidator" of the Debtor. In connection with the discharge of its duties and obligations as the representative of the Estate, the Plan Administrator shall be entitled to retain a third party, including, without limitation, Kurtzman Carson Consultants LLC, to maintain the claims register for this Case.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

### 4.      Compensation of the Plan Administrator.

In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Reorganized Debtor in an amount and on such terms as may be reflected in the Plan Administration Agreement.

### 5.      Limitation on Liability of Plan Administrator.

The Plan Administrator and its employees, officers, directors, agents, members, representatives, or professionals employed or retained by the Plan Administrator (the "Plan Administrator's Agents"), whether acting as Plan Administrator or otherwise (i) shall not have or incur liability to any person for an act taken or omission made in good faith in connection with or related to the Plan and the distributions made thereunder or distributions made under the Equity Trust by the Equity Trustee; and, in connection therewith, the Reorganized Debtor shall indemnify and hold the Plan Administrator and the Plan Administrator's Agents harmless from and against any and all claims for any such losses, damages, claims or causes of action arising therefrom and (ii) shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan and the Plan Administration Agreement.  Entry of the Confirmation Order constitutes a judicial determination that the exculpation provision contained in Section IV.K.5 of the Plan is necessary to, inter alia, facilitate Confirmation and feasibility and to minimize potential claims arising after the Effective Date for indemnity, reimbursement or contribution from the Estate, or its respective property.

The Creditors' Committee believes that the preceding provision is appropriate and consistent with applicable law, as these provisions specify a standard for liability for the Plan Administrator's Agents that is fully consistent with applicable law and clarifies that this standard will apply to acts implementing the Plan.  To the extent the Court disagrees with the Creditors' Committee's position, the Court may modify the scope of the foregoing provision.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

I.      **The Equity Trust.**

      1.      **Establishment and Effectiveness of the Equity Trust.**

On the Effective Date, the Equity Trust Agreement shall become effective, and, if not previously signed, the Debtor and the Equity Trustee shall execute the Equity Trust Agreement. The Equity Trust will be organized and established as a trust for the benefit of the Beneficiaries, and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). On such date of execution, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency or other consents, the Debtor shall issue to the Equity Trust the Exchanged Common Stock subject to the Equity Trust Agreement.

      2.      **Term and Purpose of the Equity Trust.**

The Equity Trust shall be limited to a five (5) year term, shall refrain from engaging in the conduct of any trade or business, and shall provide annual unaudited reports and other information to the Beneficiaries. The Equity Trust shall be established for the (i) purpose of holding the Exchanged Common Stock in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and provisions of the Plan and the Equity Trust Agreement; and (ii) redistributing any distributions received by the Equity Trustee under the Plan to the Holders of Equity Trust Interests; but in no event will any such Holders receive a distribution of Exchanged Common Stock. At the end of its five (5) year term, the Equity Trust shall be liquidated in accordance with Treasury Regulation Section 301.7701-4(d); provided, however, if there has not been a Maturity Date Payment Default, the Equity Trustee (with the advise of counsel) shall be entitled to take affirmative steps, to the extent permitted by applicable law, to unwind the liquidating trust and/or otherwise relieve itself and the Equity Trust of the requirement(s) that the Equity Trust be liquidated. The voting rights of the Holders of Equity Trust Interests shall be set forth in the Equity Trust Agreement, but shall include the power to remove and replace the Equity Trustee.

      3.      **Transfer of Exchanged Common Stock.**

The Exchanged Common Stock issued to the Equity Trust will be made for the benefit

95

of the Beneficiaries. For all federal income tax purposes, all parties will be required to treat the Exchanged Common Stock issued to the Equity Trust as an issuance to the Holders of Allowed Subordinated Claims and Allowed Interests which is immediately followed by a transfer by such Holders to the Equity Trust and the Beneficiaries shall be treated as the grantors and owners thereof.

### 4. Expenses of the Equity Trust.

In accordance with the Equity Trust Agreement and any agreements entered into in connection therewith, the Equity Trustee shall be entitled to seek reimbursement for reasonable expenses from the Reorganized Debtor in an amount not to exceed the Equity Trust Expense Amount; provided, however, that the Reorganized Debtor shall have no liability or obligation to provide reimbursement in an amount greater than the Equity Trust Expense Amount.

### 5. Investment Powers.

The right and power of the Equity Trustee to invest assets transferred to the Equity Trust, the proceeds thereof, or any income earned by the Equity Trust, shall be limited to the right and power to invest such assets in deposits in banks or savings institutions and temporary, liquid investments such as short-term certificates of deposit or Treasury bills, provided, however, that (i) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise and (ii) the Equity Trustee may expend the assets of the Equity Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Equity Trust during liquidation, (b) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Equity Trust or fees and expenses in connection with litigation), and (c) to satisfy other liabilities incurred or assumed by the Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

or the Equity Trust Agreement; and, provided, further, that, under no circumstances, shall the Equity Trust segregate the assets of the Equity Trust on the basis of classification of the Holders of Equity Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Interests in accordance with the provisions of the Plan.

### 6. Reporting Duties.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including, without limitation, the receipt by the Equity Trustee of a private letter ruling if the Equity Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Equity Trustee), the Equity Trustee shall file returns for the Equity Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Equity Trustee shall also annually send to each Holder of an Equity Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and shall instruct all such Holders to report such items on their federal income tax returns.

Allocations of Equity Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Equity Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the Equity Trust Interests (treating any Holder of a Disputed Claim, for this purpose, as a current Holder of a Equity Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Equity Trust (including, without limitation, all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Equity Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Equity Trust. The tax book value of the assets of the Equity Trust for this purpose shall equal their fair market value on the date the Equity Trust was created or, if later, the date such assets were acquired by the Equity

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, associated regulations, and other applicable administrative and judicial authorities and pronouncements.

### 7. Other.

The Equity Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Equity Trust that are required by any governmental unit.

### J. Distribution of Property Under the Plan.

The following procedures apply to distributions made pursuant to the Plan by the Plan Administrator and the Disbursing Agent. The Disbursing Agent shall be appointed by the Plan Administrator and will serve without bond under the direction of the Plan Administrator. The Disbursing Agent shall make all distributions under the Plan, except where otherwise provided. To the extent required by applicable law, the Disbursing Agent in making Cash distributions under the Plan shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold the entire Cash distribution due to any holder of an Allowed Claim or Allowed Interest until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.

### 1. Manner of Cash Payments Under the Plan.

Cash payments to domestic persons holding Allowed Claims or Allowed Interests will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank. Any domestic person holding a Claim or Interest that wishes to receive a Cash payment by wire transfer shall provide wire instructions to the Disbursing Agent. In any such case, the Disbursing Agent shall make the Cash payment(s) by wire transfer in accordance with the wire instructions, provided that the costs of such wire transfer shall be deducted from such entity's distribution. Payments made to foreign creditors holding Allowed Claims or Allowed Interests may be paid or caused to be paid, at the option of the Plan Administrator, in such funds and by such

98

means as are necessary or customary in a particular foreign jurisdiction.

## 2. No *De Minimis* Distributions.

Notwithstanding anything to the contrary in the Plan, no Cash payment of less than $50 will be made to any person. No consideration will be provided in lieu of the *de minimis* distributions that are not made under Section IV.M.2 of the Plan, and the Plan Administrator shall be authorized to remit such amounts to a charitable organization, which is a tax exempt organization under section 501(c)(3) of the Internal Revenue Code.

## 3. Provisions Regarding Disputed Claims.

The Plan Administrator shall implement the following additional procedures with respect to the allocation and distribution of Cash in accordance with the Plan, after payment of all senior Claims, to the holders of Disputed Claims that become Allowed Claims:

a. Cash respecting Disputed Claims shall not be distributed, but shall be withheld by the Plan Administrator in an amount equal to the amount of the distributions that would otherwise be made to the holders of such Claims if such Claims had been Allowed Claims, based on the face amount of such Disputed Claims, and any such Cash (which is to be reserved) shall be held in one or more trust accounts for the benefit of the Holders of such Disputed Claims, which can be drawn upon solely to pay such Claims if and when they become Allowed (the sole entitlement, as beneficiary, of the Holder of a Disputed Claim in respect of such account or accounts is to receive payment from such account at such time as such Claim is Allowed).

b. The Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan.

c. When a Disputed Claim or a Disputed Interest becomes an Allowed Claim or Allowed Interest, there shall be distributed to the holder of such Allowed Claim or Allowed Interest, in accordance with the provisions of the Plan,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Cash equal to a Pro Rata share of the Cash set aside for Disputed Claims or Disputed Interests, but in no event shall such holder be paid more than the amount that would otherwise have been paid to such holder if the Claim or Interest (or the Allowed portion of the Claim or Interest) had not been a Disputed Claim or Disputed Interest.

**d.** Interim distributions may be made from time to time to the Holders of Allowed Claims and Allowed Interests prior to the resolution of all Disputed Claims or Allowed Interests in the discretion of the Plan Administrator. Notwithstanding the foregoing, no interim distribution shall be made which would be less than $50.

**e.** In no event shall any holder of any Disputed Claim or Disputed Interest be entitled to receive (under the Plan or otherwise) from the Debtor or Reorganized Debtor any payment (x) which is greater than the amount reserved for such Claim or Interest by the Bankruptcy Court pursuant to Section IV.R.3 of the Plan, or (y) except as otherwise permitted under the Plan, of interest or other compensation for delays in distribution. In no event shall the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under the Plan.

**f.** To the extent a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest in an amount less than the Disputed Amount or Disputed Reserve Amount reserved for such Disputed Claim or Disputed Interest (as applicable), then the resulting surplus of Cash shall be distributed among the holders of Allowed Claims or Allowed Interests until such time as each holder of an Allowed Claim or an Allowed Interest has been paid the Allowed Amount of its Claim or Interest.

**4.** **Allowance of Claims and Interests.**

**a.** **Disallowance of Claims.**

All Claims held by persons against whom the Debtor (including, without limitation, its successors and assigns) has asserted an Avoidance Action shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not vote to

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due to the Debtor by that Entity are turned over to the Plan Administrator.

**b.** **Allowance of Claims and Interests.**

Except as expressly provided in the Plan, no Claim or Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or entry of the Confirmation Order, unless and until such Claim or Interest is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Case allowing such Claim or Interest.

**5.** **Distributions to Holders as of the Distribution Record Date.**

At the close of business on the Distribution Record Date, the claims register and stock transfer books shall be closed, and there shall be no further changes in the record holder of any Claim or Interest. The Plan Administrator and the Disbursing Agent or any other party responsible for making distributions under the Plan shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date, and shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register and stock transfer books as of the close of business on the Distribution Record Date.

**6.** **Withholding.**

The Plan Administrator, in making distributions under the Plan, shall comply with applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator or any other person responsible for making distributions under the Plan may withhold the entire distribution due to any holder of an Allowed Claim or Allowed Interest until such time as such holder provides the Plan Administrator with the necessary information to comply with any reporting and withholding requirements of any governmental unit. Any funds so withheld will then be paid by the Plan Administrator (or other person, if applicable) to the appropriate authority. If the Holder of an Allowed Claim or Allowed Interest fails to provide to the Plan Administrator the

information necessary to comply with any reporting and withholding requirements of any governmental unit within thirty (30) days from the date of first notification by the Plan Administrator to the holder of such Allowed Claim or Allowed Interest about the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the holder's distribution shall be treated as an undeliverable distribution in accordance with the Plan.

**7.**      **Delivery of Distributions and Undeliverable/Unclaimed Distributions.**

**a.**      **Delivery of Distributions in General.**

The Plan Administrator shall make distributions to each holder of an Allowed Claim by mail as follows: (i) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (ii) at the address set forth in any written notice of address change delivered to the Plan Administrator after the date of any related proof of Claim; and (iii) at the address reflected in the Schedules if no proof of Claim is filed and the Plan Administrator has not received a written notice of a change of address.

The Plan Administrator shall make distributions in respect of the Allowed Interests as follows: the Plan Administrator shall make the distributions to the Equity Trustee, who shall distribute or cause to be distributed to each Holder in accordance with the Plan, with such amount distributed to be mailed by the Equity Trustee to such holders in accordance with the procedures set forth in the Equity Trust Agreement.

The Plan Administrator may withhold the entire distribution due to any holder of an Allowed Claim or Allowed Interest until such time as the holder provides the Plan Administrator with the information necessary to make a distribution to such holder in accordance with the Plan and applicable law, and Holders of Allowed Claims or Allowed Interests who do not provide such information may be barred from participating in distributions under the Plan.

**b.**      **Undeliverable and Unclaimed Distributions.**

If the distribution to the Holder of any Allowed Claim or Allowed Interest is returned

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

as undeliverable, no further distribution shall be made to such Holder unless and until the Plan Administrator (or Equity Trustee, as the case may be) is notified in writing of such Holder's then current address. Insofar as a distribution is returned to the Equity Trustee as undeliverable, the Equity Trustee shall remit the undeliverable distribution back to the Plan Administrator as soon as is practicable. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Plan Administrator pursuant to Section IV.M.7 of the Plan until such time as a distribution becomes deliverable. All undeliverable Cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions. The bank account will be maintained in the name of the Plan Administrator but it will be accounted for separately.

Any holder of an Allowed Claim or Allowed Interest who does not assert a claim in writing for any undeliverable distribution within one (1) year after such distribution was first made shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against or Interest in the Debtor, the Estate, the Reorganized Debtor or their respective property, and the Claim or Interest giving rise to the undeliverable distribution will be barred.

Any undeliverable distributions that are not claimed will be transferred to the Plan Administrator to be paid or caused to be paid to the other holders of Allowed Claims or Allowed Interests.

### K. Post-Effective Date Reporting.

Within 90 Business Days after the end of each calendar year to and through 2013, the Plan Administrator shall file and serve an annual report concerning the status of the implementation of the Plan as of December 31st of the immediately preceding calendar year.

### L. Dissolution of the Creditors' Committee.

On the Effective Date, the Creditors' Committee shall be released and discharged

103

from the rights and duties arising from or related to the Case, except with respect to final applications for professionals' compensation, provided that the Creditors' Committee shall continue for the sole purpose of reviewing and taking any appropriate action (including filing objections thereto) in connection with Professional Fee Claims. The professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for (i) services rendered and expenses incurred in connection with any applications by such professionals or Creditors' Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date as provided in the Plan, as approved by the Court and (ii) services rendered and expenses incurred as requested by the Creditors' Committee in connection with Professional Fee Claims, as approved by the Court.

**M. Dissolution of the Equity Committee.**

On the Effective Date, the Equity Committee shall be released and discharged from the rights and duties arising from or related to the Case, except with respect to final applications for professionals' compensation, provided that the Equity Committee shall continue for the sole purpose of reviewing and taking any appropriate action (including filing objections thereto) in connection with Professional Fee Claims. The professionals retained by the Equity Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for (i) services rendered and expenses incurred in connection with any applications by such professionals or Equity Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date as provided in the Plan, as approved by the Court and (ii) services rendered and expenses incurred as requested by the Creditors' Committee in connection with Professional Fee Claims, as approved by the Court.

**N. Preservation of Litigation.**

Except as otherwise provided in the Plan, all Litigation will be retained and preserved

pursuant to section 1123(b) of the Bankruptcy Code including, without limitation, the pending or contemplated Litigation that will be identified on an <u>Exhibit 4</u> to the Disclosure Statement that will be filed and served with the approved version of the Disclosure Statement. From and after the Effective Date, all Litigation will be prosecuted or settled by the Plan Administrator. To the extent any Litigation is already pending on the Effective Date, the Reorganized Debtor as successor to the Debtor will continue the prosecution of such Litigation. From and after the Effective Date (as a result of the Merger), the Reorganized Debtor will be the successor-in-interest to any and all interests of FGCC or FRC in any and all claims, rights, and causes of action which have been or could have been commenced by FGCC or FRC immediately prior to the Effective Date.

## O. Additional Provisions Governing Indenture Trustee and Notes Indenture.

### 1. Payments to or for the Benefit of Noteholders to be Made to Indenture Trustee.

All payments and distributions to be made to or for the benefit of holders of the Senior Note Claims, Junior Note Claims and Guaranty Claims under the Plan shall be delivered to the applicable Indenture Trustees or with the prior written consent of the applicable Indenture Trustee (or its counsel of record), through the facilities of DTC, or, if applicable the Plan Administrator, who, after paying or reserving for any unpaid fees, expenses, indemnities and other amounts that are or may become due to the Indenture Trustees and their counsel to the extent provided for by the Indentures and in accordance with applicable law, will then distribute such payments pursuant to the provisions of the Indentures and Guaranty Agreement (as applicable). The Reorganized Debtor will provide periodic reporting to the Junior Note Indenture Trustee with respect to distributions made.

Except as otherwise expressly provided for in the Plan, and subject to the requirements set forth above, distributions to holders of Allowed Senior Note Claims and Allowed Junior Note Claims will be made to the record holders of the Senior Note Claims and Junior Note Claims, respectively, as of the Distribution Record Date, as identified on a record holder register to be provided to the Disbursing Agent by the Indenture Trustees (as

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

applicable) within five (5) business days after the Distribution Record Date. This record holder register (i) will provide the name, address and holdings of each of respective registered holder as of the Distribution Record Date and (ii) must be consistent with the applicable holder's Claim, if filed, or as otherwise determined by the Bankruptcy Court.

With respect to the Allowed Junior Note Claims, on the Effective Date (or as soon as practicable thereafter in accordance with the Plan and such other times as provided under the Plan); the Disbursing Agent shall distribute to the Junior Note Indenture Trustee all distributions under the Plan on account of the Allowed Junior Note Claims and the Junior Note Indenture Trustee shall remit such distributions that are allocable to Holders of Class 3(B) Claims pursuant and subject to the terms of the Plan including, without limitation, to Section IV.F and the last paragraph of Section II.C.5 of the Plan. The Junior Note Indenture Trustee will then make any such distributions to holders of the Allowed Junior Note Claims in accordance with the Plan (again subject to the provisions of Section IV.F of the Plan), the Junior Note Indenture and related documents.

The Indenture Trustees providing services related to distributions under the Plan will receive from the Reorganized Debtor, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made by the Reorganized Debtor and will not be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims receiving distributions.

### 2. Post-Confirmation Effect of Indentures.

#### a. Cancellations.

Anything in the Plan, the Confirmation Order, or any other document to the contrary notwithstanding, and notwithstanding the confirmation and effectiveness of and distributions under the Plan, all Notes and the Indentures shall be deemed automatically canceled and discharged on the Effective Date; provided, however, that the Notes and the Indentures shall continue in effect solely for the purposes of (i) allowing the holders of the Senior Note Claims and Junior Note Claims to receive their distributions under the Plan, (ii) allowing the

106

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Indenture Trustees or their nominees to make the distributions, if any, to be made on account of the Notes, the Senior Note Claims and Junior Note Claims and to perform such other necessary functions with respect thereto and to have the benefit of all the protections and other provisions of the applicable Indentures in doing so, (iii) permitting the Indenture Trustees to assert their respective Indenture Trustee Charging Liens against distributions to holders of Senior Note Claims and Junior Note Claims (as applicable) for payment of the Indenture Trustee Fees, (iv) permitting the Indenture Trustees to maintain and enforce any right to indemnification, contribution or other Claim it may have under the applicable Indenture and related documents, (v) permitting the Indenture Trustees to exercise their rights and obligations relating to the interests of holders of the Senior Note Claims Junior Note Claims (as applicable) and their relationship with holders of the Senior Note Claims and Junior Note Claims (as applicable) pursuant to the applicable Indentures and related documents, (vi) appearing in the Case including, but not limited to, its membership on any post-confirmation oversight committee (if any) or board of directors, and (vii) allowing the Indenture Trustees to enforce the subordination and indemnification provisions contained in the Indentures.

### b.     Delivery and Surrender of Actual Notes.

Each holder of any Note shall surrender such Note to the applicable Indenture Trustee.  No distribution under the Plan will be made to or on behalf of any such holder unless and until such Note is received by the Indenture Trustee or its nominee, or the loss, theft or destruction of such Note is established to the satisfaction of the Indenture Trustee, including requiring such holder (i) to submit a lost instrument affidavit and an indemnity bond, and (ii) to hold the Reorganized Debtor and the Indenture Trustee harmless in respect of such Note and any distributions made in respect thereof.  Upon compliance with the foregoing by a holder of any Note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such Note.  Any such holder that fails to surrender such Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within eighteen months of the Effective Date shall be deemed to have no Claim or further Claim against the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Reorganized Debtor or its property or the Indenture Trustee in respect of such Note and will not participate in any distribution under the Plan, and the distribution that would otherwise have been made to such holder shall be distributed by the Indenture Trustee to all holders who have surrendered their Notes or satisfactorily explained their non-availability to the Indenture Trustee within eighteen months of the Effective Date.

### 3. Indenture Trustees' Liens.

Anything in the Plan to the contrary notwithstanding, but subject to the terms of the Indentures and to applicable law, the Plan shall not affect or impair the Indenture Trustee Charging Liens arising pursuant to the terms of the Indentures, which liens shall continue notwithstanding the occurrence of the Confirmation Date and the Effective Date and notwithstanding any discharge of the Debtor pursuant to the Plan and Bankruptcy Code section 1141. Anything in the Plan to the contrary notwithstanding, but subject to the terms of the Indentures and applicable law, the Indenture Trustees may at any time, and from time to time, pay or reserve for such fees, expenses, indemnity and other obligations from any such money or property now or in the future held by the Indenture Trustees.

### P. Restrictions on Transfer of Junior Repayment Rights.

The Plan provides that, unless the Plan Administrator agrees otherwise in writing in its sole discretion, the Reorganized Debtor shall not recognize as valid for any purpose any proposed transfer of any Junior Repayment Rights unless both the transferor and transferee submit a duly notarized affidavit under penalty of perjury certifying that no member of a national securities exchange, broker, or dealer has made use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, such Junior Repurchase Rights. The Plan Administrator may establish additional terms and conditions to recognize as valid such proposed transfer as determined in good faith by the Plan Administrator.

It is anticipated that the Plan Administrator would not agree otherwise absent the obtaining of appropriate legal advice that the transfer of Junior Repayment Rights is not subject to the above noted limitations and that transfers of Junior Repayment Rights by other

108

means do not impose any additional reporting and securities compliance requirements on the Reorganized Debtor.

**XIII.**

**DISCHARGE OF THE REORGANIZED DEBTOR AND INJUNCTION**

**The rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever arising prior to the Effective Date, including any interest accrued on such Claims from and after the Petition Date (except as otherwise ordered by the Court), against the Debtor, the Estate and their property.**

The Plan proposes that the Plan and the Confirmation Order will grant the Debtor a discharge as provided in the Bankruptcy Code. Bankruptcy Code section 1141(d)(3) contains an exception to discharge where the plan provides for the liquidation of all or substantially all of the property of the estate, the debtor does not engage in a business after consummation of the plan and the debtor would be denied a discharge under Bankruptcy Code section 727(a) if the case were a case under chapter 7 of the Bankruptcy Code. The Creditors' Committee does not believe that this exception applies to the Plan because (i) the Plan does not provide for the liquidation of all or substantially all of the property of the Estate and (ii) the Reorganized Debtor will be engaging in a business after consummation of the Plan. As discussed above in Section X.B.2 and in the Projections, the Creditors' Committee expects that the Reorganized Debtor will continue to operate and manage its business (which includes the retention of a significant portfolio of Loans and related "REO" properties) under the auspices of a staff of employees; the Reorganized Debtor is expected to retain and not dispose of the Loans (which comprise the single most significant asset of the Reorganized Debtor). Indeed, nothing in the Plan compels the liquidation of any properties as the sole means of repaying creditors and, as discussed elsewhere, the Reorganized Debtor would be a candidate for investment after the Effective Date. In contrast, the Liquidation Analysis sets forth a series of material differences that would occur if, as an alternative to the Plan, the Debtor were to liquidate all or substantially all of its assets, including the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

termination of management personnel and the winding down of the Debtor's operations over a brief period of time.

Notwithstanding preceding, if the Court does not agree with the Creditors' Committee's position concerning the discharge, the Debtor will not receive a discharge. As more fully set forth below, however, the Plan provides that whether confirmation of the Plan discharges the Debtor, Bankruptcy Code section 1141 nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests of creditors and equity holders of the Debtor. The principal effect of denial of a discharge would be to render the Reorganized Debtor a less attractive candidate for investment, as the additional protections afforded under the discharge would not be available.

The following summarizes the provisions of the Plan governing discharge:

**Except as otherwise provided in the Plan or the Confirmation Order, the Plan and Confirmation Order shall: (i) on the Effective Date, discharge and release the Debtor, the Estate, the Reorganized Debtor, and their property to the fullest extent permitted by Bankruptcy Code sections 524 and 1141 from all Claims and Interests, including all debts, obligations, demands, liabilities, Claims, and Interests that arose before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), regardless of whether or not (a) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed, (b) a Claim or Interest based on such debt or Interest is allowed pursuant to Bankruptcy Code section 502, or (c) the holder of a Claim or Interest based on such debt or Interest has or has not accepted the Plan; (ii) void any judgment underlying a Claim or Interest discharged hereunder and (iii) preclude all entities from asserting against the Debtor, the Estate, the Reorganized Debtor, or their respective property any Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. (For the avoidance of doubt, nothing in Section V of the Plan shall be construed as a discharge of, or imposition of injunction concerning, any of the Post-Effective Date Merger Claims.)**

110

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1    **Except as otherwise provided in the Plan or the Confirmation Order, on and**

2    **after the Effective Date, all entities that have held, currently hold, or may hold a debt,**

3    **Claim, or Interest against the Debtor, the Estate, the Reorganized Debtor or their**

4    **respective property that is based upon any act or omission, transaction, or other**

5    **activity of any kind or nature that occurred prior to the Effective Date, that otherwise**

6    **arose or accrued prior to the Effective Date, or that is otherwise discharged pursuant to**

7    **the Plan, shall be permanently enjoined from taking any of the following actions on**

8    **account of any such discharged debt, Claim, or Interest (the "Permanent Injunction"):**

9    **(i) commencing or continuing in any manner any action or other proceeding against the**

10   **Debtor, the Estate, the Reorganized Debtor, or their respective property that is**

11   **inconsistent with the Plan or the Confirmation Order; (ii) enforcing, attaching,**

12   **collecting, or recovering in any manner any judgment, award, decree, or order against**

13   **the Debtor, the Estate, the Reorganized Debtor, or their respective property other than**

14   **as specifically permitted under the Plan; (iii) creating, perfecting, or enforcing any lien**

15   **or encumbrance against the Debtor, the Estate, the Reorganized Debtor, or their**

16   **respective property and (iv) commencing or continuing any action, in any manner, in**

17   **any place that does not comply with or is inconsistent with the provisions of the Plan,**

18   **the Confirmation Order, or the discharge provisions of Bankruptcy Code section 1141.**

19   **Any entity injured by any willful violation of such Permanent Injunction shall recover**

20   **actual damages, including costs and attorneys' fees, and, in appropriate circumstances,**

21   **may recover punitive damages, from the willful violator.**

22   **Whether or not the confirmation of the Plan discharges the Debtor, Bankruptcy**

23   **Code section 1141 nevertheless provides, among other things, that the property dealt**

24   **with by the Plan is free and clear of all Claims and Interests of creditors, equity**

25   **security holders, of the Debtor.  Accordingly, no entity holding a Claim against the**

26   **Debtor may receive any payment from, or seek recourse against, any assets that are to**

27   **be distributed under the Plan other than assets required to be distributed to that entity**

28   **under the Plan.  As of the Confirmation Date, all parties will be precluded from**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

asserting against any property that is to be distributed under the Plan any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

## XIV.

## EXCULPATION AND LIMITATION OF LIABILITY

The Plan provides that, as of the Effective Date, neither the Debtor, FGCC or FRC (including, without limitation, their successors or assigns, including, without limitation, the Reorganized Debtor, the Plan Administrator and the Plan Administrator's Agents, the Disbursing Agent, the Board of Directors and Board of Directors' Agents) or the Creditors' Committee or the Equity Committee or the Indenture Trustees and, in each case, none of their respective present or former officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and professionals and agents for the foregoing shall have or incur any liability for, and are expressly exculpated and released from, any Claims (including, without limitation, any Claims whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise) for any past or present or future actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the Case including, without limitation, the formulation, negotiation, documentation, preparation, dissemination, implementation, administration, confirmation, or consummation of the Plan and the Disclosure Statement; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. Any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud

112

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation.**

The Creditors' Committee believes that the preceding provision is appropriate and consistent with applicable law, as these provisions set forth the standard for the imposition of liability in connection with the Case and the formulation and implementation of the Plan. To the extent the Court disagrees with the Creditors' Committee's position, the Court may modify the scope of this provisions.

**XV.**

**OTHER PLAN PROVISIONS**

### A. Conditions Precedent To Effectiveness.

The Plan will not become effective unless and until the (i) Bankruptcy Court enters an order approving this Disclosure Statement, (ii) the Bankruptcy Court enters the Confirmation Order and no stay or injunction shall be in effect with respect to the Confirmation Order and (iii) all documents, instruments and agreements, including any approvals, consents or resolutions necessary or desirable to implement or otherwise give effect to the Merger, that are necessary to implement the Plan have been executed and delivered by the parties thereto. The Creditors' Committee will have the option, in its discretion, to waive any of these conditions without notice and a hearing.

### B. Revocation of Plan/No Admissions.

The Creditors' Committee reserves the right to revoke or withdraw the Plan anytime prior to the Confirmation Date. If the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will be deemed to be an admission with respect to any matter set forth in the Plan or otherwise.

### C. Exemption from Certain Transfer Taxes.

Pursuant to Bankruptcy Code section 1146(c), the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan will not be taxable under any law imposing a stamp tax or similar tax. All transfers to and by the Equity

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Trust will be exempt from taxes under section 1146(c) of the Bankruptcy Code, including stamp taxes, recording taxes, sales and use taxes, transfer taxes and other similar taxes.

### D. Modifications of Plan.

Subject to the restrictions set forth in Bankruptcy Code section 1127, the Creditors' Committee will reserve the right, to alter, amend, or modify the Plan before its substantial consummation.

### E. Reservation of Rights Regarding Classification of Claims.

Notwithstanding anything to the contrary in the Plan, the Creditors' Committee will reserve the right to request that the Bankruptcy Court treat Classes 3(A), 3(B) and 3(C) as one class (e.g., Class 3) for voting purposes pursuant to Bankruptcy Code section 1126 if Class 3(A), Class 3(B) or Class 3(C) does not vote to accept the Plan.

### F. Cram-Down.

The Creditors' Committee reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) if one or more impaired Classes votes to reject the Plan (provided the other requirements of Bankruptcy Code section 1129 are satisfied).

### G. Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity, whether or not such entity is impaired under the Plan and whether or not such entity has accepted the Plan.

### H. Severability of Plan Provisions.

If before confirmation the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of the Plan will remain in full force and effect and will in no

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section VII.L of the Plan, is valid, enforceable, and, as of the Effective Date, binding under its terms.

## I. Governing Law.

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof.

## J. Good Faith.

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## K. Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including, without limitation the jurisdiction to:

1. Allow, disallow, determine, liquidate, estimate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim;

2. Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3. Ensure that distributions are accomplished pursuant to the provisions of the Plan;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

4.      Determine the appropriate amount of any reserve authorized or required under the Plan;

5.      Resolve any and all applications, motions, adversary proceedings, and other matters involving the Estate that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan, provided that the Trustee and the Trust shall reserve the right to prosecute claims and causes of action in any proper jurisdiction;

6.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

7.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

8.      Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or this Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, this Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan or this Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

10.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

11.     Determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release,

116

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

or other agreement or document created in connection with the Plan or this Disclosure Statement; and

12.     Enter an order closing the Case.

If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, Section VII.O of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## L.     Term of Bankruptcy Injunctions or Stays.

All injunctions or stays provided for in the Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## M.     Objections to Confirmation.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE COURT.

## N.     Notices.

Any notice required or permitted to be provided under the Plan or in connection with the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) overnight delivery service, freight prepaid, and addressed as follows:

For the Creditors' Committee:

KLEE TUCHIN BOGDANOFF & STERN LLP
Attn: Lee R. Bogdanoff, Esq.
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067

**BEST INTERESTS TEST AND FEASIBILITY**

**A.      The "Best Interests Test."**

In addition to the other requirements described in this Disclosure Statement, Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an Impaired Class either (i) vote to accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This is commonly referred to as the "Best Interests Test."

In a chapter 7 case, a trustee would be elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code.  Under the priority scheme set forth in the Bankruptcy Code, secured creditors are generally paid from the proceeds of sale of the properties securing their liens.  If any assets are remaining after the satisfaction of secured claims, the holders of administrative claims are generally next to receive payments.  Unsecured claims are thereafter paid from any remaining sales proceeds, according to their legal rights of priority.  Unsecured claims with the same priority share in proportion to the amount of their allowed claim in relation to the amount of total allowed unsecured claims with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.  Thus, for the Court to confirm the Plan, the Court must find that all creditors and shareholders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation.

Generally, the Plan requires the Reorganized Debtor to distribute value and proceeds, to the extent available, to holders of Claims and Interests in accordance with the priority scheme established by the Bankruptcy Code.  The financial advisor to Creditors' Committee has estimated the liquidation value of the Debtor's assets based upon the most accurate information that is currently available and produced a liquidation analysis  (the "Liquidation Analysis") which is attached hereto as Exhibit 2.   The Liquidation Analysis is not a

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

guarantee as to the amounts and sources of recovery that could be realized in a hypothetical liquidation. Rather, the Liquidation Analysis is only an estimate. The Liquidation Analysis was prepared based on a number of sources, including unaudited financial statements prepared by the Debtor and its affiliates and information furnished by the Debtor and certain of its advisors and professionals concerning the assets, liabilities and operations of the Debtor and its affiliates. The Liquidation Analysis, however, was prepared by the Creditors' Committee with the assistance of its legal and financial advisors. As demonstrated by the Liquidation Analysis, the prospects for recovery that may be realized by creditors on account of their Claims and equity holders on account of their Interests are greater under the terms embodied in the Plan than they would be in a chapter 7 liquidation of the Debtor. In fact, it is likely that, in a chapter 7 case, certain creditors will receive substantially less, and equity holders will receive no distributions.

In contrast, under the Plan, general unsecured creditors will immediately receive an Effective Date Cash Distribution, plus the opportunity for a full recovery on their claims in the event sufficient Post-Effective Date Distributable Cash is generated by the Reorganized Debtor, and equity holders will retain Equity Trust Interests. In light of the foregoing, the Creditors' Committee does not believe that Holders of Claims and Interests would receive more in a chapter 7 liquidation of the Debtor than they would receive under the Plan and, in fact, believes that most would recover less.

**B.      Feasibility and Projected Performance of the Reorganized Debtor.**

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan (i.e., the Reorganized Debtor), unless such liquidation or reorganization is proposed in the Plan. See 11 U.S.C. § 1129(a)(11). Attached as Exhibit 3 to this Disclosure Statement for informational purposes are Projections for the Reorganized Debtor (the "Projections") that show estimated receipts from the income generating assets that will be retained by the Reorganized Debtor and associated expenses.

119

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Additional assets of the Reorganized Debtor will include Cash as well as the other assets described in Sections IX.A, X.B.1.a and X.B.1.b and as set forth in the Liquidation Analysis attached as <u>Exhibit 2</u> to this Disclosure Statement. The Projections are not a guarantee as to how the Reorganized Debtor will perform or how quickly, or how much, creditors may be paid. Rather, the Projections are only an estimate. The timetable for satisfaction of remaining Allowed Claims reflected in the Projections may or may not turn out to be correct. Depending on the amount of Cash available for distribution, creditors may be repaid earlier or later, and it is possible that insufficient Cash will be available to pay remaining Allowed Claims in full. The Projections were prepared from information contained in a number of sources, including unaudited financial statements prepared by the Debtor and its affiliates and information furnished by the Debtor and certain of its advisors and professionals concerning the assets, liabilities and operations of the Debtor and its affiliates. The Projections, however, were prepared by the Creditors' Committee with the assistance of its legal and financial advisors.

Because the Creditors' Committee believes that the Reorganized Debtor will have sufficient Cash on the Effective Date to satisfy estimated Post-Effective Merger Date Claims, Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Claims in Classes 1, 2 and 4, and any future distributions on account of Allowed Claims in Classes 3(A), 3(B) and 3(C) that are not satisfied on the Effective Date will be made pursuant to payments of Post-Effective Date Distributable Cash as and when (but only if) it becomes available, the Plan is not likely to followed by the liquidation or the need for further financial reorganization of the Debtor or the Reorganized Debtor. Moreover, if the Reorganized Debtor is ultimately unable to pay in full Junior Note Claims, including Post-Petition Interest, this circumstance will not result in the Reorganized Debtor's liquidation or need for further financial rehabilitation; rather, the Reorganized Debtor will remit Cash to satisfy Junior Note Claims only to the extent of any available Cash. As a result, the Plan satisfies the feasibility requirement of Bankruptcy Code section 1129(a)(11).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# XVII.

## RISK FACTORS

The Reorganized Debtor's ability to perform its obligations under the Plan is subject to various factors and contingencies, some of which are described in this Section. The following discussion summarizes only some material risks associated with the Plan and the Reorganized Debtor and is not exhaustive. Moreover, this Section should be read in connection with the other disclosures contained in the Plan and this Disclosure Statement. Each Holder of a Claim or Interest, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a whole. **THE RISKS ASSOCIATED WITH THE PLAN AND THE REORGANIZED DEBTOR MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN.**

### A. Non-Occurrence of the Effective Date.

The Plan shall not become binding until the Effective Date occurs. The Effective Date is the first Business Day, as determined by the Creditors' Committee, in its reasonable discretion, on which (i) the Confirmation Order has been entered and is not stayed and at least ten days have passed since the Confirmation Date and (ii) on which the conditions set forth in Section VII.A of the Plan have been satisfied or waived. If the conditions set forth on section VII.A of the Plan do not occur (or are not waived), the Effective Date may never occur. For example, the Bankruptcy Court may deny confirmation of the Plan. While there can be no assurances as to when exactly the Effective Date will occur, based on the current circumstances of the Case, the Creditors' Committee presently believes that the Effective Date should occur promptly following the Confirmation Date.

### B. Restrictions on Transfer of Class 3(C) the Junior Note Claims and Equity Trust Interests.

As discussed in IX.D. it is expected that the Reorganized Debtor will promptly consent to revocation of the registration of its publicly held securities in accordance with Section 12(j) of the Exchange Act. The Debtor presently has two registered classes of

121

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

securities: the Junior Notes and existing Interests. Upon revocation of registration, no member of a national securities exchange, broker, or dealer shall be entitled to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security of the Debtor the registration of which has been revoked. Holders of such securities may only sell or transfer those securities through private transactions by consulting with their legal counsel and complying with certain regulations of the Exchange Act

Revocation of registration should not materially affect the ability of Holders of Equity Trust Interests to transfer those holdings, since, as described below, the Plan already provides that (i) Equity Trust Interests are nontransferable in any event after the Effective Date to and through the 30th Business Day after the Maturity Date and (ii) thereafter, any proposed transfer of an Equity Trust Interest must meet certain additional requirements.

The prohibition against any member of a national securities exchange, broker, or dealer from using the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of a deregistered security, may make it more difficult for Holders of Junior Note Claims to effectuate transfers of such Claims, which are currently traded on the "pink sheets" (presumably with the assistance of a national securities exchange, broker, or dealer). This prohibition plainly would apply if the Plan proposed to reinstate the Junior Note Claims, such that the same security that would be the subject of revocation would continue in effect after the Effective Date. Under the Plan, however, the Junior Note Claims are not reinstated, but rather Holders of the Junior Note Claims receive the Junior Repayment Rights, which is the right to receive payment in order of priority as and when Cash becomes available in accordance with the Plan. The Creditors' Committee believes that the Junior Repayment Rights may constitute a security issued in exchange for such Claim within the meaning of Bankruptcy Code section 1145 and thereby may be eligible for the exemption from registration provided under Bankruptcy Code section 1145 (and eligible for resale by the holders thereof except for any such holder that is deemed to be an "underwriter" as defined in Bankruptcy Code section 1145(b)(1)). The same issue

122

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

applies to the Equity Trust Interests, although as noted the Equity Trust Interests are subject to other limitations on transfers contained in the Plan. The Creditors' Committee intends to work with SEC staff to obtain clarification of these matters (and the terms upon which the Junior Repayment Rights might be entitled to be traded without being subject to the above-described prohibition), but cannot give assurances that adequate clarification will be forthcoming. **Thus, absent satisfactory clarification, the above-described prohibition against any member of a national securities exchange, broker, or dealer from using the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of a deregistered security will apply to any proposed transfer of the Junior Repayment Rights and the Equity Trust Interests.**

The Equity Trust Interests that will be issued under the Plan will be non-transferable from and after the Effective Date to and through the 30th Business Day after the Maturity Date. Thereafter, the Equity Trust Interests will be transferable only if (i) the transferee agrees to become a party to the Equity Trust Agreement and (ii) such transfer is exempt from the registration provisions of the Exchange Act, if applicable, or from the qualification provisions of any state securities law, if applicable. In addition, no transfer of the Equity Trust Interests shall be effected until either (i) the Equity Trustee has received such legal advice or other information that it, in its sole discretion, deem necessary or appropriate to assure that any such disposition shall not require the Equity Trust to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act or (ii) the Trustee has determined to register and/or make periodic reports in order to enable such disposition to be made.

In addition, the Plan and instruments issued with respect to the Equity Trust Interests will provide certain restrictions on transferring such Equity Trust Interests, including, but not limited to, an absolute prohibition on transfers that may cause a "change in control" under Section 382 of the Tax Code.

Further, in the event there is a Maturity Date Payment Default, the Equity Trust Interests of the Holders of Allowed Interests and Holders of Allowed Subordinated Claims

123

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

shall be assigned to the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) pursuant to and consistent with the allocations set forth in Sections II.C.3, II.C.4 and II.C.5 of the Plan, at which point the Holders of Allowed Claims in Classes 3(A), 3(B) and 3(C) shall be the Holders of the Equity Trust Interests and the Beneficiaries, as of such date.

There is no public market for the Equity Trust Interests, and none is expected to develop in the foreseeable future.  Recipients of the Equity Trust Interests should be prepared to hold the Equity Trust Interests for an indefinite period of time.  In principle, in the event there is a public market for the Equity Trust Interests, the Equity Trust Interests distributed under the Plan pursuant to the exemption provided under Bankruptcy Code section 1145 may be eligible for resale by the holders thereof, except for any such holder that is deemed to be an "underwriter" as defined in Bankruptcy Code section 1145(b)(1).

**Because of the restrictions on transfer that will be placed on the Equity Trust Interests and the fact that no public market exists for such Equity Trust Interests, the Creditors' Committee makes no representation concerning the ability of any person to dispose of the Equity Trust Interests to be distributed in connection with the Plan.  The Creditors' Committee recommends that recipients of Equity Trust Interests consult with their own legal counsel concerning the limitations on their ability to dispose of such Equity Trust Interests.**

### C.    Post-Effective Date Merger Claims and Distributions.

The Plan provides that the distributions to Holders of Claims in Classes 3(A), 3(B) and 3(C) will be accomplished pursuant to payment of the Effective Date Cash Distribution and Post-Effective Date Cash Distributions.  As noted above, the Plan proposes that the Effective Date Cash Distribution to be paid to Holders of Claims in Classes 3(A), 3(B) and 3(C) will be not less than $275 million, unless the Bankruptcy Court determines otherwise in conjunction with the Confirmation Hearing.  This amount should be sufficient to satisfy the Allowed Claims in Class (B) on the Effective Date (provided that large amounts need not be reserved for Disputed Claims, as discussed below), but is not expected to be sufficient to satisfy all Allowed Class 3(A) and 3(C) Claims.  To the extent any Allowed Class 3(A), 3(B)

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

or 3(C) Claims are not satisfied on the Effective Date, the Holders of such Claims will be eligible to receive quarterly pro rata distributions of Post-Effective Date Distributable Cash until their Allowed Claims are paid in full (including Post-Petition Interest, if applicable). In addition, to the extent (i) the Bankruptcy Court determines that the Effective Date Cash Distribution should be an amount less than $275 million (or if, for any other reason, less than $275 million is available for distribution on account of Allowed Claims on the Effective Date) or (ii) the Effective Date Cash Distribution is $275 million but a reserve from such amount must be set aside to satisfy Disputed Claims, then (a) the repayment of many Allowed Claims correspondingly will be deferred, (b) unpaid Allowed Claims will accrue more Post-Petition Interest and (c) there will be an increased risk that all Allowed Claims will not be repaid in full.

The timing and amount of any payments of Post-Effective Date Cash Distribution will depend on the amount of Cash that is required to pay or establish adequate reserves for Post-Effective Date Merger Claims, Post-Effective Date Plan Expenses, Allowed Administrative Claims, Priority Tax Claims and Priority Claims, as well as the income generated by the Reorganized Debtor's business. To the extent that Post-Effective Date Merger Claims, for example, are greater than anticipated by the Creditors' Committee, distributions to Holders of remaining Allowed Unsecured Claims will be deferred and may be lower than as set forth in the Projections, which present the Creditors' Committee's estimate of the likely timing of distributions of available Cash. However, it bears emphasizing that all or a portion of these payments may not be made, or if made may be distributed much later than reflected in the Projections, depending on the magnitude of the Post-Effective Date Claims and anticipated Post-Effective Date Plan Expenses. The Plan Administrator, in consultation with the Board of Directors, will continue to assess the Reorganized Debtor's exposure to known and estimated Post-Effective Date Claims and the anticipated Post-Effective Date Plan Expenses, adjust the reserves for such liabilities and make distributions of Post-Effective Date Distributable Cash as appropriate.

The Projections further assume that Sanchez, Royer and Stuedli are not entitled to any

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

severance payment under their Executive Employment Agreements.  If this is incorrect, then Sanchez, Royer and Stuedli may be entitled to severance compensation in an amount equal to 300% of such Executive's average annual bonus and continued health benefits for three years.  Any such payment would correspondingly reduce the amount of  Cash available for distribution to creditors on account of Allowed Claims.  Finally, the Projections assume that Sanchez, Royer and Stuedli will continue to work with the Reorganized Debtor until the fall of 2010.   If this is incorrect, the Reorganized Debtor may have to find replacement employees, and there likely would be a loss of "institutional knowledge," delays or adverse results as a result of any or all of those departures.  The impact of such events is speculative and difficult to quantify, but could be adverse.

### D. Impact of Tax Issues on Distributions On and After the Effective Date.

The amount of Post-Effective Date Distributable Cash distributed to Holders of Claims in Classes 3(A), 3(B) and 3(C) may also be affected by, among other things, the outcome of objections to the allowance of Disputed Claims and the resolution of contingent Claims.

As noted in Section IX.B.6, the IRS is auditing the Debtor's 2004, 2005, 2006 and 2007 tax returns and has filed a priority tax claim of approximately $89.4 million.  With respect to the audits of the 2004 and 2005 tax returns, the Debtor has advised that those audits have been successfully resolved with no tax exposure.  The audits of the Debtor's 2006 and 2007 tax returns remain pending.  As noted above, in 2006 the Debtor recorded a NOL of approximately $459 million which was carried back in full and applied to the Debtor's 2004 tax return period, resulting in the generation of a carryback refund of approximately $160 million that the Debtor received in January 2008.  In 2007, the Debtor recorded a NOL in excess of $1 billion, which was partially carried back by the Debtor to recapture taxes paid in 2005 and resulted in the Debtor receiving a carryback refund of approximately $105 million in June 2008.

As of August 2009, the Debtor was in discussions with the IRS regarding the potential resolution of those audits and closing of the 2006 and 2007 tax years.  In the event the IRS

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

proposes adjustments reducing the NOLs recorded by the Debtor on its 2006 or 2007 tax returns, and if the IRS prevails in any appeal pursued by the Debtor, the carryback refunds received by the Debtor may be impacted and could result in the Debtor becoming obligated to repay some or all of those refunds, subject to the Debtor's ability to potentially offset a portion of any 2007 tax year liability with remaining NOLs. Based upon information furnished by the Debtor, the principal remaining issue relates to bad debt deductions taken in tax year 2006 (which resulted in NOLs that were carried back in 2004 to generate a refund) which if resolved adversely could result in a tax liability of approximately $25.7 million. The Debtor disputes a substantial portion of this potential liability. Although the Debtor has also advised that it believes it has a reasonable basis for disputing the position of the IRS, the IRS Claim remains unresolved. If all or a portion the IRS Claim is Allowed, it may be classified as, and receive the treatment of, a Priority Tax Claim as described in the Plan which is entitled to payment before Holders of Claims in Classes 3(A), 3(B) and 3(C) receive any distribution. A similar risk is presented by the FTB Claim because it is based upon similar tax law concepts as those asserted by the IRS.

In addition to the IRS Claim and FTB Claim, there are other tax related matters which could impact the availability of Post-Effective Date Distributable Cash under the Plan. In November 2008, FRC entered into a Consent Agreement with the IRS (the "Consent Agreement"), pursuant to which the IRS permitted FRC to change its method of accounting for loan repurchase obligations and requiring FRC to recognize an increase in computing taxable income of $100,358,879 (the "Adjustment"). Under the Consent Agreement FRC is required to recognize one-fourth of the Adjustment in computing taxable income beginning with the tax year ended December 31, 2008, and is required to recognize one-fourth of the Adjustment in each the subsequent three years.

If the Reorganized Debtor ceases to engage in the trade or business associated with the loan repurchase obligations, or terminates its existence, it must take the remaining balance of the Adjustment into account in computing taxable income in the year it ceases conducting business or terminates its existence. Thus, if the Reorganized Debtor fails to

127

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

sufficiently offset against the taxable income recognized pursuant to the Consent Agreement, such as by application of existing NOLs against such taxable income, the Reorganized Debtor may incur additional federal and state tax liabilities that will be paid from cash otherwise payable to creditors as Post-Effective Date Distributable Cash under the Plan. In the absence of a "change of control," which may occur if during a three year period the percentage of a corporation's stock held by shareholders owning 5% or more of the stock in corporation increases by 50 percentage points, the Reorganized Debtor may be able to utilize at least some portion of any remaining NOLs to offset any accelerated taxable income recognized under the Consent Agreement, even in the event of a cessation of business.

The Creditors' Committee believes that the merger of FGCC into the Debtor (or the Reorganized Debtor) and the subsequent merger of FRC into the Debtor (or the Reorganized Debtor) should not result in a cessation of business triggering an acceleration of the obligations under the Consent Agreement as both mergers should qualify as complete liquidations under Section 332 of the Tax Code. In addition, as noted in Section VIII.D.1, the Debtor obtained an order from the Bankruptcy Court establishing procedures with respect to trading in the Debtor's common stock that were designed to avoid a "change of control" and preserve the NOLs. The Plan includes certain provisions that are equally intended to avoid a "change of control" and preserve any such NOLs. For example, the Plan proposes that the Debtor's existing common shareholders remain the Debtor's residual owners through their ownership of Equity Trust Interests. Similarly, the Plan proposes limitations on the Reorganized Debtor's ability to dispose of the Loans and cease engaging in a major business activity to avoid a cessation of business, which could trigger acceleration of the obligations under the Consent Agreement, unless certain conditions designed to preserve the NOLs are satisfied. While the Debtor has previously advised that it believes the NOLs have been preserved, and the Plan includes these provisions and others that are intended to preserve any NOLs, there can be no assurance that events impacting the NOLs, including a "change of control," have not already occurred or that there are any preserved or remaining NOLs.

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

# XVIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the legal alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan.

### A.     Liquidation under Chapter 7.

If no plan of reorganization can be confirmed, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of the holders of Claims and Interests is set forth in Section XVI.A of this Disclosure Statement.

The Creditors' Committee believes that liquidation under chapter 7 would result in smaller distributions being made to Holders of Claims than those provided by the Plan and that Holders of Interests would receive no distributions. The Plan generally provides for value and proceeds to be distributed, to the extent available, in accordance with the priority scheme established by the Bankruptcy Code. A conversion to chapter 7 would necessarily result in diminished recoveries to creditors and other parties in interest because of (i) the likelihood that assets would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (ii) the potential inability to take advantage of NOLs and other tax related consequences of liquidation; (iii) additional administrative expenses involved in the appointment of a chapter 7 trustee and (iv) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation.

### B.     Alternative Plan of Liquidation.

If the Plan is not confirmed, the Debtor, the Creditors' Committee, the Equity Committee or any other party in this Case could theoretically attempt to formulate a different plan. However, prosecution of an alternative plan of liquidation would necessarily involve

129

delay, uncertainty, and additional expense. During the Case, the Creditors' Committee explored various alternatives in connection with the formulation and development of the Plan described herein. The Creditors' Committee believes that the Plan enables creditors and equity holders to realize the most value under the circumstances.

# XIX.

## TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims and Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims and Interests, the holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences of the Plan are complex and are subject to significant uncertainties. The Creditors' Committee has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt concerning any issue discussed herein. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the holders of Claims and Interests.

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

business investment companies, regulated investment companies and foreign taxpayers). This discussion assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form, and does not address the tax consequences to holders of Claims who did not acquire such Claims at the issue price on original issue. There is no assurance that the IRS will not take contrary positions to those described herein or upon which this summary is based. No aspect of foreign, state, local or estate and gift taxation is addressed.

**DISCLAIMER: The following summary is included for general information only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Interest. The Creditors' Committee and its counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan with respect to the Debtor, the Estate, the Reorganized Debtor or holders Claims or Interests, nor are they rendering any form of legal opinion or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary does not address all aspects of federal income taxation that may be relevant to the Debtor, the Estate, the Reorganized Debtor or holders Claims or Interests. Entities holding Claims or Interests are strongly urged to consult their tax advisors regarding the tax consequences of the Plan, including federal, foreign, state, and local tax consequences.**

**IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) (to the extent, notwithstanding the preceding disclaimer, any communication contained in this Disclosure Statement is deemed or construed to constitute tax advice) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Tax Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) addressed herein.**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

### A.     Tax Consequences to the Debtor.

The Creditors' Committee believes that the Plan and the Merger should not impair the Debtor's NOLs (to the extent they have been preserved) because (i) the Debtor's existing common shareholders remain the Debtor's residual owners and stakeholders by virtue of the Equity Trust as the estimated asset values and Projections demonstrate it is reasonable to believe that all Post-Effective Date Merger Claims and Allowed Claims will be paid in full over time and (ii) the structure of the Equity Trust should preclude a further "ownership change" with adverse effects on the NOLs.  Thus, the Creditors' Committee believes that the Plan includes appropriate mechanisms to facilitate the preservation of any existing NOLs for use by the Reorganized Debtor and that the Merger will not impair any such NOLs, although it cannot guarantee that this will be the case.

The Reorganized Debtor's ability to realize any value from any NOLs, above the amount of NOLs that may be available to offset taxable income arising under the provisions of the Consent Agreement, will be contingent upon the Reorganized Debtor's ability to generate positive income from the operation of its business which can be offset by the NOLs, and decisions relating to these matters will be made by the Board of Directors, subject to any limitations imposed in the Plan.

Section 1032 of the Tax Code provides that no gain or loss is recognized by a corporation upon the receipt of money or other property in exchange for the corporation's stock.  Thus, the Debtor will not recognize gain or loss on the issuance of the Series A Equity Trust Interests or Series B Equity Trust Interests to holders of Interests or Subordinated Claims.

### B.     Tax Consequences to Holders of Certain Claims in Classes 3(A), 3(B) and 3(C).

#### 1.     Recognition of Gain or Loss.

In general, each Holder of an Allowed Claim in Classes 3(A), 3(B) and 3(C) will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property that such Holder receives

132

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest and excluding any portion required to be treated as imputed interest) and (ii) such Holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Due to the possibility that a Holder of an Allowed Claim may receive more than one distribution subsequent to the Effective Date, the imputed interest or original issue discount provisions of the Tax Code may apply to treat a portion of such later distributions to such holders as imputed interest. In addition, it is possible that any loss realized by a Holder in satisfaction of an Allowed Claim in Classes 3(A), 3(B) and 3(C) may be deferred until subsequent distributions relating to Disputed Claims are determinable or payments of Post-Effective Date Distributable Cash are received, and that a portion of any gain realized may be deferred under the "installment method" of reporting. Holders are urged to consult their tax advisors regarding the possibility for deferral, and the potential ability to elect out of the installment method of reporting any gain realized in respect of their Claims.

Where a Holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been so held, whether the Holder had acquired the Claim at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

In general, a Holder's tax basis in any property received will equal the fair market value of the property on the date of distribution. The holding period for such assets generally will begin the day following the date of distribution.

133

## 2. Distributions in Payment of Accrued But Unpaid Interest.

Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. It is also possible that a Holder of an Allowed Claim may recognize taxable interest income in the amount of any Post-Petition Interest that accrues on such Allowed Claim whether or not such Holder receives a distribution of such Post-Petition Interest at or around the time that such interest accrued. To the extent a Holder receives an amount of Cash or property in satisfaction of interest accrued during its holding period, such Holder generally recognizes taxable interest income in such amount (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

## C. Tax Consequences to Beneficiaries of the Equity Trust.

On the Effective Date, the Equity Trust will be established for the benefit of Holders of Allowed Subordinated Claims (Class 5) and Exchanged Common Stock (Class 6). The Equity Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Equity Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtor, the Equity

134

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

Trustee and the Beneficiaries of the Equity Trust) are required for federal income tax purposes to treat the Equity Trust as a grantor trust of which the persons receiving interests therein are the owners and grantors.

The following discussion assumes that the Equity Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Equity Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Equity Trust and the Beneficiaries could vary from those discussed herein.

For U.S. federal income tax purposes, all parties (including the Debtor, the Equity Trustee and the Beneficiaries) must treat the transfer of the Exchanged Common Stock to the Equity Trust, in accordance with the terms of the Plan and the Equity Trust Agreement, as a transfer of such assets directly to the Beneficiaries, followed by such Beneficiaries transfer of the assets to the Equity Trust. Consistent therewith, all parties must treat the Equity Trust as a grantor trust of which the Beneficiaries are the owners and grantors. Thus, such Beneficiaries will be treated as the direct owners of their respective undivided interests in the Equity Trust assets for all U.S. federal income tax purposes. Each such Beneficiary will have a tax basis in its proportionate share of the Equity Trust assets deemed owned equal to the Beneficiary's basis in their shares of Debtor common stock issued by the Debtor prior to the Effective Date or their basis in their Subordinated Claims as applicable.

The U.S. federal income tax reporting obligations of a Beneficiary are not dependent upon the Equity Trust distributing any Cash or other proceeds. Therefore, a Beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Equity Trust regardless of the fact that Beneficiary has not received any prior or concurrent Distribution. The distribution of assets by the Equity Trust to Beneficiaries generally will not be taxable to said Beneficiaries because they already are regarded for federal income tax purposes as owning the underlying assets of the Equity Trust.

135

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Equity Trustee of a private letter ruling if the Equity Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Equity Trustee), the Equity Trustee shall file returns for the Equity Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Equity Trustee shall also annually send to each Holder of a Equity Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and shall instruct all such Holders to report such items on their federal income tax returns.

Allocations of Equity Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Equity Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the Equity Trust Interests (treating any Holder of a Disputed Claim, for this purpose, as a current Holder of a Equity Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Equity Trust (including all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Equity Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Equity Trust.

Accordingly, each Holder of an Equity Trust Interest will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Equity Trust, in accordance with its relative beneficial interest. The character of items of income, deduction, and credit to any Holder of an Equity Trust Interest and the ability of such Holder to benefit from any deduction or losses may depend on the particular situation of such Holder.

**D. Withholding/Reporting Requirements.**

All distributions to Holders of Allowed Claims in Classes 3(A), 3(B), 3(C) and 4 will be subject to any applicable tax withholding, including employment tax withholding. Under

136

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the Holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING IS ONLY A BRIEF SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND HAS BEEN PROVIDED ONLY FOR INFORMATIONAL PURPOSES. THE HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE SPECIFIC CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.**

## XX.

## SECURITIES LAW MATTERS

### A.  In General.

The Plan provides for the establishment of the Equity Trust and for the issuance of beneficial interests therein. Beneficial interests in trusts may be deemed to be "securities" under applicable federal and state securities laws. While the Creditors' Committee does not believe that the Equity Trust Interests constitute "securities" for purposes of applicable nonbankruptcy law, even if they do the Creditors' Committee believes that the Equity Trust Interests would be exempt from registration pursuant to Bankruptcy Code section 1145(a)(l). Finally, the Creditors' Committee does not believe that the Investment Company Act is applicable in that the Equity Trust will not be, and not controlled by, an "investment

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

company" for purposes of the Investment Company Act. The Plan also provides for Holders of Junior Note Claims to receive the Junior Repayment Rights. The Creditors' Committee believes that these rights may be exempt from registration pursuant to Bankruptcy Code section 1145(a)(l) to the extent they are deemed to constitute "securities" within the meaning of the Bankruptcy Code and will seek to work with the SEC staff to obtain clarification concerning this matter.

### 1. Initial Issuance.

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under section 5 the Exchange Act. The Creditors' Committee does not believe that the Equity Trust Interests constitute "securities" within the definition of section 2(11) of the Exchange Act and corresponding definitions under state securities laws and regulations ("Blue Sky Laws") because they are generally non-transferable. Accordingly, the Equity Trust Interests should be issuable in accordance with the Plan without registration under the Exchange Act or any Blue Sky Law. In the event that the Trust Interests are deemed to constitute securities, section 1145(a)(l) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Exchange Act and Blue Sky Laws if three principal requirements are satisfied:

1. The securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

2. The recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

3. The securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Equity Trust Interests may constitute securities, the Creditors' Committee believes that will qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(l). In addition, the Equity Trust

138

Interests will be issued entirely in exchange for Subordinated Claims and Exchanged Common Stock. As a result, the Creditors' Committee believes that the issuance of the Equity Trust Interests pursuant to the Plan will satisfy the applicable requirements of section 1145(a)(l) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Exchange Act and any applicable Blue Sky Law.

Although the Creditors' Committee believes that the foregoing exemptions in respect of the issuance of the Equity Trust Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements in other chapter 11 cases, the Creditors' Committee has not sought and will not seek any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

### 2. Resales.

As described in Section X.C.3.b(3), the Equity Trust Interests are subject to transfer restrictions. The Equity Trust Interests will be non-transferable from and after the Effective Date to and through the first Business Day after the Maturity Date. Thereafter, the Equity Trust Interests will be transferable only if (i) the transferee agrees to become a party to the Equity Trust Agreement and (ii) such transfer is exempt from the registration provisions of the Exchange Act, if applicable, or from the qualification provisions of any state securities law, if applicable. In addition, the Plan and instruments issued with respect to the Equity Trust Interests will provide certain restrictions on transferring such Equity Trust Interests, including, but not limited to, an absolute prohibition on transfers that may cause a "change in control" under Section 382 of the Internal Revenue Code. Finally, no transfer of the Equity Trust Interests shall be effected until either (i) the Equity Trustee has received such legal advice or other information that it, in its sole discretion, deem necessary or appropriate to assure that any such disposition shall not require the Equity Trust to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act or (ii) the Trustee has determined to register and/or make periodic reports in order to enable

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

such disposition to be made.

As discussed in XVII.B, as a result of the revocation of the registration of the Debtor's registered securities, absent contrary clarification, significant limitations may apply with respect to how transfers of Junior Repayment Rights are effectuated. The Creditors' Committee intends to attempt to work with the SEC staff to obtain clarification concerning this matter, but cannot offer assurances that those efforts will be successful.

### 3. Exchange Act Compliance.

Section 12(g) of the Exchange Act applies only to a company that has both (i) total assets in excess of $10 million and (ii) a class of equity securities held by more than 500 persons as of the end of its fiscal year. The Creditors' Committee believes that, although the Equity Trust may be deemed to have both total assets in excess of $10 million and a class of equity securities held by more than 500 persons, the Equity Trust may not be required to register under section 12(g) of the Exchange Act. The Creditors' Committee believes that the SEC has issued no-action letters with respect to the non necessity of Exchange Act registration of trust interests issued in connection with a plan of reorganization when the following criteria are satisfied:

1. the beneficial interests in the trust are not represented by certificates or, if they are, the certificates bear a legend stating that the certificates are transferable only upon death or by operation of law;

2. the trust exists only to effect a liquidation and will terminate within a reasonable period of time; and

3. the trust will issue annual unaudited financial information to all beneficiaries.

Based on the foregoing, the Creditors' Committee believes that the Equity Trust Interests will not be subject to registration under the Exchange Act. However, the views of the SEC on the matter have not and will not be sought by the Creditors' Committee and, therefore, no assurances are given regarding this matter.

### 4. Investment Company Act.

As the assets of the Equity Trust do not consist of securities issued by the Debtor or

140

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

any other person, and the Equity Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), the Creditors' Committee does not believe that the Equity Trust falls within the definition of "investment company" in any manner requiring such entity to register under the Investment Company Act.

## B.   Compliance if Required.

If the Plan Administrator determines that, with the advice of counsel, the Equity Trust is required to comply with the registration and reporting requirements of the Exchange Act or the Investment Company Act, then prior to the registration of the Equity Trust under the Exchange Act or the Investment Company Act, the Plan Administrator or the Equity Trustee shall seek to amend the Equity Trust Agreement to make such changes as are deemed necessary or appropriate to ensure that the Equity Trust is not subject to registration or reporting requirements of the Exchange Act or the Investment Company Act.

**XXI.**

**RECOMMENDATION AND CONCLUSION**

The Creditors' Committee believes that Plan confirmation and implementation are preferable to any feasible alternative. **Accordingly, the Creditors' Committee urges entities that hold impaired Claims and Interests to vote to accept the Plan by checking the box marked "Accept" on their Ballots and then returning the Ballots as directed in the Plan and Disclosure Statement.**

DATED:  September 17, 2009          Official Committee of Unsecured Creditors of
                                    Fremont General Corporation


                                    HUGH STEVEN WILSON
                                    Tennenbaum Capital Partners, LLC
                                    Title:  Managing Partner
                                    Tennenbaum Multi-Strategy Master Fund,

                                    Chairperson of the Official Committee of
                                    Unsecured Creditors of Fremont General
                                    Corporation

SUBMITTED BY:

DATED:  September 17, 2009

/s/  Jonathan S. Shenson
Jonathan S. Shenson, an Attorney with
KLEE, TUCHIN, BOGDANOFF & STERN LLP
Counsel for the Official Committee of
Unsecured Creditors

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000