1  **WEILAND, GOLDEN,**
   **SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
   esmiley@wgllp.com
3  Philip E. Strok, State Bar No. 169296
   pstrok@wgllp.com
4  Reem J. Bello, State Bar No. 198840
   rbello@wgllp.com
5  Kyra E. Andrassy, State Bar No. 207959
   kandrassy@wgllp.com
6  650 Town Center Drive, Suite 950
   Costa Mesa, California 92626
7  Telephone:   (714) 966-1000
   Facsimile:    (714) 966-1002
8
   Attorneys for the Official Committee
9  of Equity Holders

10

11                 **UNITED STATES BANKRUPTCY COURT**

12                 **CENTRAL DISTRICT OF CALIFORNIA**

13                       **SANTA ANA DIVISION**

14  In re                             | Case No. 8:08-bk-13421-ES

15  FREMONT GENERAL CORPORATION, a    | Chapter 11 Case
    Nevada corporation,
16
                                      | **OFFICIAL COMMITTEE OF EQUITY**
17                                     **HOLDERS' THIRD AMENDED**
                                       **DISCLOSURE STATEMENT DESCRIBING**
18                        Debtor.      **THIRD AMENDED CHAPTER 11 PLAN OF**
                                       **REORGANIZATION**
19

20

21

22

23  Taxpayer ID No. 95-2815260

24

25

26

27

28

347881.2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

    A.    Purpose of This Document ....................................................................... 1

    B.    Deadlines for Objecting; Date of Plan Confirmation Hearing ..................... 3

        1.    Time and Place of the Confirmation Hearing ................................... 3

        2.    Deadline for Objecting to the Confirmation of the Plan ................... 3

        3.    Identity of Person to Contact for Further Information
           Regarding the Plan ....................................................................... 3

    C.    Disclaimer ............................................................................................... 4

II.   OVERVIEW OF THE EQUITY COMMITTEE'S PLAN AND NOTICE
    TO CREDITORS OF FREMONT GENERAL CREDIT
    CORPORATION AND FREMONT REORGANIZING CORPORATION ............... 5

    A.    The Merger of Fremont General Credit Corporation and
        Fremont Reorganizing Corporation Into the Debtor ................................... 5

    B.    Treatment of Claims Against the Debtor and Equity Interests in
        the Debtor ................................................................................................ 6

III.  HISTORY OF THE DEBTOR ............................................................................ 12

    A.    The Banking Operations ......................................................................... 13

    B.    The Insurance and Indemnity Operations ............................................... 14

    C.    The Debtor's Management ...................................................................... 15

        1.    Richard A. Sanchez, Interim President and Interim Chief
           Executive Officer .......................................................................... 16

        2.    Thea Stuedli, Executive Vice President and Chief
           Financial Officer ........................................................................... 17

        3.    Donald E. Royer, Executive Vice President and General
           Counsel ....................................................................................... 17

    D.    Selected Financial Information ................................................................ 17

IV.   THE CHAPTER 11 CASE ................................................................................ 18

    A.    Events Leading to the Bankruptcy Filing ................................................. 18

    B.    Significant Events During the Chapter 11 Case ....................................... 20

        1.    Retention of Debtor's Professionals and Agents ............................ 20

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

2. Appointment of the Creditors' Committee and Equity Committee................................................................. 20

3. Consummation of the CapitalSource Transaction.......................... 21

4. The Order Limiting Transfers of Equity ........................................ 21

5. Insider Compensation ................................................................ 22

6. Establishment of General Bar Date and Filing of Claims .............. 22

7. Relief from Stay Motions – McIntyre, Faigin, and The Bank of New York Mellon ......................................................... 23

8. Engagement of KPMG Corporate Finance and the Attempts to Negotiate a Consensual Plan................................... 24

9. Exclusivity ................................................................................ 24

10. Settlement of Claims and Litigation.............................................. 25

    a. California Insurance Commissioner.................................... 25

    b. Massachusetts Attorney General ....................................... 27

    c. Enron.............................................................................. 29

    d. The Rampino Litigation and Associated Defendants' Wage, SERP, and Indemnification Claims ............................................................................. 30

    e. Other Settled and Resolved Claims ................................... 32

11. Allowance of Fees and Costs of Professionals Employed by the Debtor, the Creditors' Committee, and the Equity Committee.................................................................. 33

V. LITIGATION AND CAUSES OF ACTION.......................................................... 35

  A. Litigation Commenced Pre-Petition ......................................... 35

  B. Post-Petition and Other Potential Causes of Action................................... 35

    1. In General ............................................................................... 35

    2. Adv. Pro. No. 8:08-ap-01256-ES and Adv. Pro No. 8:09-ap-01103-ES................................................................. 35

    3. Adv. Pro. No. 8:08-ap-01258-ES .................................................. 36

    4. Adv. Pro. No. 8:08-ap-01418-ES .................................................. 36

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

347881.2

5.  Adv. Pro. No. 8:08-ap-01470-ES ................................................. 36

6.  ERISA Class Action ................................................................ 37

7.  The Securities Class Action (Al-Beitawi v. Fremont General Corp., Consolidated Securities Complaint, Case No. CV07-05756) .................................................. 37

8.  Other Actions ........................................................................ 38

9.  Other Significant Litigation Claims ............................................ 38

10. Causes of Action Are to Be Retained Under Plan; No Waiver Should Be Implied .............................................. 38

11. Objections To Claims ............................................................. 39

12. Insurance Policies with Westchester Surplus Lines Insurance Company and Pacific Employers Insurance Company ........................................................................... 39

VI.  GENERAL DISCUSSION OF ASSETS AND LIABILITIES ................................. 40

A.  Assets ....................................................................................... 40

B.  Liabilities .................................................................................. 41

1.  Liabilities Identified in the Schedules ........................................ 41

2.  Proofs of Claim ..................................................................... 41

3.  Senior and Junior Notes ......................................................... 42

4.  Intercompany Claims ............................................................. 43

VII. SUMMARY OF THE PLAN OF REORGANIZATION ........................................... 44

A.  Allowance and Treatment of Unclassified Claims ..................................... 44

1.  Administrative Claims ............................................................ 44

a.  Administrative Claim Reserve .......................................... 45

b.  Administrative Claims Bar Date ........................................ 45

c.  Deadline for Objections to Administrative Claims ................. 46

d.  U.S. Trustee Fees ....................................................... 46

e.  Professional Fee Claims ................................................ 46

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

2.  Priority Tax Claims ......................................................................... 47

B.  Allowance and Treatment of Classified Claims and Interests ................... 47

   1.  Secured Claims (Class 1) ............................................................. 47

   2.  Priority Non-Tax Claims (Class 2) ................................................ 48

   3.  General Unsecured Claims (Class 3) ............................................ 48

   4.  Class of Equity Interests (Class 4) ............................................... 50

   5.  Class of Claims Subordinated Under 11 U.S.C. § 510(b) (Class 5) ..................................................................................... 50

C.  Executory Contracts and Unexpired Leases ......................................... 52

D.  Means of Effectuating the Plan ........................................................... 53

   1.  Merger ...................................................................................... 53

      a.  The Assets and Liabilities of FGCC ....................................... 54

      b.  The Assets and Liabilities of FRC ......................................... 54

   2.  Postconfirmation Business Operations of the Reorganized Debtor ...................................................................... 57

   3.  The Reorganized Debtor's Management Team ............................. 58

   4.  The Short-Term Strategy ............................................................ 59

   5.  The Long-Term Strategy ............................................................ 60

      a.  Community Bank ................................................................ 60

      b.  Distressed Loans ............................................................... 61

      c.  Hard Money Mortgages ....................................................... 61

      d.  Asset-Based Financing ........................................................ 61

E.  Risk Factors ..................................................................................... 61

   1.  Plan Assumptions ...................................................................... 62

   2.  Additional Risks ........................................................................ 63

      a.  General Risks .................................................................... 63

      b.  Specific Risks .................................................................... 63

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

(i) Repurchase Claims ................................................. 63

(ii) Risks Regarding Unresolved Litigation ..................... 64

(iii) Risks Regarding Unresolved Claims ........................ 64

F. Tax Consequences of Plan.......................................................... 66

G. Retention of Jurisdiction .......................................................... 68

H. Claims.......................................................................................... 69

 1. Maintenance of Post-Confirmation Claims Register....................... 69

 2. Claim Objections ........................................................... 69

I. The Committees ................................................................. 70

VIII. MISCELLANEOUS PROVISIONS GOVERNING DISBURSEMENTS ............... 70

A. Dates of Distributions.......................................................... 70

B. Manner of Distribution.......................................................... 70

C. Undeliverable Distributions ........................................................ 71

D. Rounding of Payments ............................................................... 71

E. Compliance with Tax Requirements .......................................... 71

F. Distribution of Unclaimed Property ............................................ 72

G. No De Minimis Distributions.......................................................... 72

H. Setoff ........................................................................................... 72

IX. CONFIRMATION REQUIREMENTS AND PROCEDURES ................................. 73

A. Who May Vote or Object................................................................. 73

 1. Who May Object to Confirmation of the Plan ................................. 73

 2. Who May Vote to Accept/Reject the Plan ...................................... 73

  a. What Is an Allowed Claim/Interest....................................... 74

  b. What Is an Impaired Claim/Interest ..................................... 74

 3. Who Is Not Entitled to Vote............................................................. 75

 4. Votes Necessary to Confirm the Plan ............................................ 76

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# TABLE OF CONTENTS (cont.)

| | | | Page |
|---|---|---|---|
| | 5. | Votes Necessary for a Class to Accept the Plan | 76 |
| | 6. | Treatment of Non-accepting Classes | 76 |
| B. | | Liquidation Analysis | 77 |
| C. | | Feasibility | 79 |
| X. | | EFFECT OF CONFIRMATION OF PLAN | 81 |
| A. | | Discharge | 81 |
| B. | | Vesting of Property of the Estate | 83 |
| C. | | Modification of Plan | 83 |
| D. | | Post-Confirmation Status Report | 83 |
| E. | | Post-Confirmation United States Trustee Fees | 83 |
| F. | | Post-Confirmation Conversion/Dismissal | 84 |
| G. | | Final Decree | 84 |

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

347881.2

TABLE OF CONTENTS

# I. INTRODUCTION

The Official Committee of Equity Holders (the "Equity Committee") of Fremont General Corporation (the "Debtor") submits this Third Amended Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of acceptances and rejections of the Equity Committee's third amended plan of reorganization (the "Plan"), a copy of which was sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

This is a reorganizing plan. In other words, the Equity Committee seeks to accomplish payments under the Plan with Cash on hand and other Assets presently available to the Debtor, as well as assets to be generated by the Reorganized Debtor.

**ANY AND ALL STATEMENTS, REPRESENTATIONS, ESTIMATES, ANALYSES, AND FINANCIAL PROJECTIONS CONTAINED IN THE DISCLOSURE STATEMENT AND PLAN ARE SOLELY THOSE OF THE EQUITY COMMITTEE, AND SHOULD NOT BE RELIED UPON AS STATEMENTS OF THE DEBTOR OR ITS MANAGEMENT TEAM. WHILE CERTAIN FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND PLAN RELATING TO THE DEBTOR AND ITS WHOLLY-OWNED INDIRECT SUBSIDIARY FREMONT REORGANIZING CORPORATION ("FRC") MAY BE BASED UPON INFORMATION PROVIDED BY THE DEBTOR TO THE EQUITY COMMITTEE, SUCH INFORMATION WAS PROVIDED PURSUANT TO A CONFIDENTIALITY AGREEMENT EXPRESSLY CONTEMPLATING THAT SUCH MATERIALS WERE NOT GENERALLY AVAILABLE FOR PUBLIC CIRCULATION AND WERE CONSTRUCTED UNDER CIRCUMSTANCES THAT HAVE NOW BEEN MATERIALLY ALTERED. MOREOVER, THE INFORMATION INCLUDES FINANCIAL STATEMENTS THAT HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT REGISTERED ACCOUNTANTS, HAVE NOT BEEN PRESENTED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, AND WERE PREPARED FOR INTERNAL PURPOSES RATHER THAN FOR THE PURPOSES PRESENTED IN THE DISCLOSURE STATEMENT AND PLAN.**

## A. Purpose of This Document

The purpose of this Disclosure Statement is to set forth information (1) about the history of the Debtor, its business, and the chapter 11 case, (2) concerning the Plan and alternatives to the Plan, (3) advising the Holders of Claims and Equity Interests of their

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   rights under the Plan, (4) assisting any Creditors and Equity Interest Holders in making an

2   informed judgment regarding whether they should vote to accept and indicate their

3   preference for this Plan and vote to reject any plan proposed by the Debtor or the Official

4   Committee of Unsecured Creditors, and (5) assisting the Bankruptcy Court in determining

5   whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and

6   should be confirmed.  This Disclosure Statement cannot tell you everything about your

7   rights.  You should consider consulting your own lawyer to obtain more specific advice on

8   how the Plan will affect you and what is the best course of action for you.

9         Be sure to read the Plan as well as the Disclosure Statement.  If there are any

10  inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will

11  govern.

12        By order dated _____, the Bankruptcy Court approved this Disclosure

13  Statement as containing "adequate information" concerning the Plan, meaning that it

14  contains sufficient information to enable any Creditors and Equity Interest Holders entitled

15  to vote to make an informed judgment in exercising their rights to vote to accept or reject

16  the Plan.  Any party may now solicit votes or preferences for or against the Plan and for or

17  against the plan proposed by the Creditors Committee.

18        The only Creditors or Equity Interest Holders who may vote for or against the Plan

19  are those who have a Claim that is both (1) allowed or allowed for voting purposes and

20  (2) classified in an impaired class.  A Class is impaired if the legal, equitable, or

21  contractual rights of the Claims or Equity Interests in the Class are altered.  Classes of

22  Claims or Equity Interests that are not impaired are conclusively presumed to have voted

23  to accept the Plan and therefore are not entitled to vote on the Plan.  No Classes of

24  Claims or Equity Interests are impaired under the Plan, so all Classes are deemed to have

25  voted to accept the Plan.  However, out of an abundance of caution, all Classes of Claims

26  and Equity Interests are receiving ballots so that they can vote on the Plan and their vote

27  can be counted in the event that the Court disagrees with the Equity Committee and finds

28  that any Class of Claims or Equity Interests is actually impaired.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1       **B.**     **Deadlines for Objecting; Date of Plan Confirmation Hearing**

2       The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure

3 Statement. In other words, the terms of the Plan are not yet binding on anyone.

4 However, if the Court later confirms the Plan, then the Plan will be binding on the Debtor

5 and on all Creditors and Equity Interest Holders in this case. The Equity Committee, as

6 proponent of the Plan, recommends that the Holders of Claims in Classes 1, 2, 3A, 3B,

7 3C, 4, and 5 indicate on the ballot their preference for the Plan and reject any plan

8 proposed by the Debtor or the Creditors Committee. In addition, although the Equity

9 Committee believes that all Classes are unimpaired under the Plan so that all Classes are

10 deemed to vote in favor of the Plan, all Creditors and Equity Holders are being requested

11 to vote on the Plan in the event that the Court finds that any Class is actually impaired.

12 The vote of any Class will only be counted if the Court finds that the Class is impaired.

13 The Equity Committee, as proponent of the Plan, recommends that Holders of Claims in

14 Classes 1, 2, 3A, 3B, 3C, 4, and 5 vote in favor of the Plan.

15       **1.**     **Time and Place of the Confirmation Hearing**

16       The hearing where the Court will determine whether or not to confirm the Plan will

17 take place on _____, 2009, at __:__ __.m. in Courtroom 5A of the Ronald Reagan

18 Federal Building and United States Courthouse located at 411 West Fourth Street, Santa

19 Ana, California 92701.

20       **2.**     **Deadline for Objecting to the Confirmation of the Plan**

21       Objections to the confirmation of the Plan must be Filed with the Court and served

22 upon counsel for the Equity Committee no later than _____.

23       **3.**     **Identity of Person to Contact for Further Information Regarding**

24                         **the Plan**

25       Any interested party desiring further information about the Plan should contact

26 Philip E. Strok of Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP, by phone at

27 (714) 966-1000 or by e-mail at pstrok@wgllp.com.

28

347881.2                    3                       THIRD AMENDED

## C.    Disclaimer

The Disclosure Statement contains information that will inform your decision of whether to vote to accept or reject the Plan.  The purpose of the Disclosure Statement is to provide "adequate information" of a kind and in sufficient detail as far as is reasonably practicable given the nature and history of the Debtor and the condition of its books and records that would enable a reasonable hypothetical investor to make an informed judgment about the Plan.  The Equity Committee makes no representations concerning the Debtor, its financial condition, or any aspect of the Plan other than those contained in this Disclosure Statement.

The financial data relied upon in formulating the Plan is based on historical financial information obtained by the Equity Committee from the Debtor and on financial projections prepared by the Equity Committee's financial advisors, CRG Partners Group LLC ("CRG").  Unless otherwise indicated, the financial information is unaudited.  The Equity Committee cannot warrant or represent that the information contained in this Disclosure Statement is without inaccuracies, although great effort has been taken to ensure that the information is presented fairly.

In July 2008, Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP ("Weiland Golden") commenced representing the Equity Committee as its counsel and CRG commenced representing the Equity Committee as its financial advisors.  Weiland Golden and CRG have relied upon information provided by the Debtor and its management in connection with the preparation of this Disclosure Statement.  Although Weiland Golden and CRG have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified all of the information contained herein.  The Equity Committee incorporates by reference the boldface capitalized text set forth above on page 1 of this Disclosure Statement.

Although a copy of this Disclosure Statement is being served on the Securities and Exchange Commission (the "SEC") and the SEC has been given an opportunity to object to the adequacy of the Disclosure Statement, the Disclosure Statement has not been and

1  will not be registered under the Securities Act of 1933, as amended (the "Securities Act"),

2  or applicable state securities laws.  Neither the SEC nor any state regulatory authority has

3  passed upon the accuracy or adequacy of the Disclosure Statement, its exhibits, or the

4  statements contained therein.

5       The contents of this Disclosure Statement should not be construed as legal,

6  business, or tax advice.  Any tax advice that may be contained in the Disclosure

7  Statement is not intended to be used and cannot be used for the purpose of avoiding any

8  tax penalties that may be imposed on any person.  All Creditors and Equity Interest

9  Holders should consult their own legal counsel and accountants as to legal, tax, and other

10  matters concerning their Claims or Equity Interests.

11

12  **II.    OVERVIEW OF THE EQUITY COMMITTEE'S PLAN AND NOTICE TO**

13  **CREDITORS OF FREMONT GENERAL CREDIT CORPORATION AND**

14  **FREMONT REORGANIZING CORPORATION**

15       The following is a brief summary of the material provisions of the Plan and is

16  provided for convenience only.  A more detailed description of the Plan appears below in

17  Section VII of the Disclosure Statement.

18       **A.    The Merger of Fremont General Credit Corporation and Fremont**

19            **Reorganizing Corporation Into the Debtor**

20       The Plan's objective is to simplify the corporate structure of the Debtor and its

21  wholly-owned subsidiary, Fremont General Credit Corporation ("FGCC"), and FGCC's

22  wholly-owned subsidiary, Fremont Reorganizing Corporation, formerly known as Fremont

23  Investment & Loan ("FRC") by effecting a merger of these three entities and vesting title to

24  all Assets of the Debtor, FGCC, and FRC in the Reorganized Debtor which will then make

25  Distributions to Holders of Allowed Claims and Equity Interests in accordance with the

26  Plan and after making appropriate reserves for creditors of FGCC and FRC.  The Plan

27  designates a series of Classes of Claims and one Class of Equity Interests and includes

28  all Claims against and Equity Interests in the Debtor.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

<u>NOTICE TO FGCC AND FRC CREDITORS</u>

2     AS A RESULT OF THE MERGER, CLAIMS AGAINST FGCC AND FRC WILL BE

3 ASSUMED AND SATISFIED BY THE REORGANIZED DEBTOR AND FGCC AND FRC

4 WILL CEASE TO EXIST AS SEPARATE LEGAL ENTITIES. CLAIMS AGAINST FGCC

5 AND FRC ARE NOT CLASSIFIED AND TREATED AS CLAIMS UNDER THE PLAN

6 AND WILL INSTEAD BE PAID IN THE ORDINARY COURSE OF THE REORGANIZED

7 DEBTOR'S BUSINESS AS REQUIRED BY APPLICABLE NON-BANKRUPTCY LAW.

8 AS PART OF THE PLAN, FUNDS ARE BEING RESERVED AND SET ASIDE

9 SPECIFICALLY FOR CREDITORS OF FRC AND ANY CREDITORS OF FGCC,

10 ALTHOUGH THE ASSETS OF THE REORGANIZED DEBTOR WILL ALSO BE

11 AVAILABLE TO PAY ANY SUCH CLAIMS.

12     B.     <u>Treatment of Claims Against the Debtor and Equity Interests in the</u>

13          <u>Debtor</u>

14     The following table summarizes the treatment of Claims and Equity Interests under

15 the Plan with: (1) estimates of the amount of Claims in each category or Class that will be

16 finally determined to be Allowed Claims; and (2) a description of the treatment provided

17 for in the Plan for each Class of Claims and Equity Interests. The dollar amounts are

18 based on the records of the Debtor as of the Petition Date or the date of the Disclosure

19 Statement proposed by the Debtor and do not constitute an admission by the Equity

20 Committee or the Debtor as to the validity or amount of any particular Claim or Equity

21 Interest. All rights of any party in interest to dispute the validity or amount of any Claim or

22 Equity Interest that have not already been Allowed by the Bankruptcy Court or by

23 agreement of the parties are hereby reserved.

24

25

26

27

28

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| N/A | Administrative Claims[1] | Unless any entity entitled to payment of an Allowed Administrative Claim agrees to a less favorable treatment or unless otherwise ordered by the Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Claim, Cash in an amount equal to the amount of the Allowed Administrative Claim on the later of: (1) the Effective Date, or (2) the fifteenth Business Day after such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable. However, Ordinary Course Administrative Claims will be paid in full in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim or as otherwise authorized by the Court. | The Equity Committee estimates that the projected range of unpaid Administrative Claims will be from $2,000,000 to $2,500,000. | 100% | No |
| N/A | Priority taxes | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each | The Debtor has estimated the range from $100,271 to $102,676,574.[2] The Equity Committee has | 100% | No |

[1]    The Administrative Claims described in this table do not include Administrative Claims that have already been paid or any intercompany Administrative Claims that may be due to FRC.

[2]    The $102,676,574 figure includes the IRS's proof of claim in the amount of $89,384,470 and the California Franchise Tax Board's proof of claim in the amount of $13,292,104 and does not represent the Debtor's view of the amount that ultimately is likely to be Allowed. The Debtor disputes the proofs of claim filed by the IRS and the California Franchise Tax Board.

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable. | estimated that the Allowed Priority Taxes will be significantly below the high-end of the range. | | |
| 1 | Secured Claims | In full satisfaction of any Allowed Secured Claim, the Holder of the Allowed Secured Claim will receive either the full amount of the Allowed Secured Claim in Cash on the later of the Effective Date or fifteen days after the Claim becomes an Allowed Secured Claim or the Collateral securing the Allowed Secured Claim. Any Allowed deficiency balance will be treated in Class 3A. | Neither the Debtor nor the Equity Committee are aware of any valid Secured Claims. | 100% | No |
| 2 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim on the later of (1) the Effective Date or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim, or in either case, as soon thereafter as is practicable | The Debtor has estimated the range from $0 to $68,253 | 100% | No |
| 3A | General | Except as provided below | Approximately | 100% | No |

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | Unsecured Claims (excluding the TOPrS Claims (Class 3B) and the $176,402,107 of Claims represented by the 7.875% Senior Notes due 2009 (Class 3C)) | with respect to the Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BONY Stipulation or any other settlement, compromise, stipulation or order which provides for treatment that is more or less favorable than the treatment provided for herein, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, the Holder of an Allowed Class 3A General Unsecured Claim shall retain their legal, equitable, and contractual rights and be paid in full on the later of the Effective Date of the Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim. with prepetition interest and postpetition interest (with postpetition interest to be calculated at the federal judgment rate in effect on the Petition Date of 2.51%).<br><br>The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BONY Stipulation or any other settlement, compromise, stipulation or order which provides for treatment that is more or less favorable | $56.5 million<br><br>Class 3A includes the proof of claim filed by the Debtor's indirect wholly-owned subsidiary, FRC, in an unspecified amount. | | |

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | than the treatment provided for herein, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of (1) the fifteenth Business Day after the Effective Date or (2) the fifteenth Business Day after the Claim becomes an Allowed Claim, or in either case, as soon thereafter as is practicable. | | | |
| 3B | TOPrS Claims | The Holders of Allowed TOPrS Claims shall retain their legal, equitable, and contractual rights provided by the Indenture dated as of March 6, 1996. However, if the Court finds at the Confirmation Hearing that the Holders of the Class 3B Claims have demonstrated that a contractual provision or applicable non-bankruptcy law entitles the Holders of TOPrS Claims to demand or receive accelerated payment of their Claims, the Reorganized Debtor will: (1) cure any such default that occurred prepetition, other than a default of a kind specified in 11 U.S.C. § 365(b)(2) or of a kind that § 365(b)(2) does not require to be | $107,422,681 | 100% | No |

347881.2

10

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | cured; (2) reinstate the maturity of the Class 3B Claim as such maturity existed prior to the default; (3) compensate the Holders of such Class 3B Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (4) if such Class 3B Claim arises from any failure to perform a nonmonetary obligation, compensate the Holder of such Class 3B Claim (other than the Debtor or an insider) for the actual pecuniary loss that it suffered as a result of such failure. | | | |
| 3C | General Unsecured Claims of the Holders of the 7.875% Senior Notes | The Holders of the Senior Notes shall retain their legal, equitable, and contractual rights and, on the Effective Date, will be paid their principal, prepetition interest at the rate set forth in the Senior Notes, and postpetition interest at the federal judgment rate in effect as of the Petition Date, which was 2.51%. | $176,402,107, plus accrued interest | 100% | No |
| 4 | Equity Interests | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor in full and final satisfaction of their Equity Interests. | As of the Petition Date, approximately 82,116,176 shares of the Debtor's common stock had been issued | 100% | No |
| 5 | Section 510(b) Claims | The Holders of Allowed Section 510(b) Claims will retain their legal, equitable, and contractual rights and, pursuant to | Unknown | 100% | No |

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | Section 510(b), will receive newly-issued interests in the Reorganized Debtor in full and final satisfaction of their Allowed Section 510(b) Claims. The percentage interest of common stock to which such Holders will be entitled shall be based upon the average trading value of the common stock of the shares of the Reorganized Debtor for the thirty days preceding the date on which any Section 510(b) Claims become Allowed Section 510(b) Claims if such allowance occurs after the Effective Date.<br><br>If the Court determines in a Final Order that the Allowed Class 5 Claim is not subject to subordination under 11 U.S.C. § 510(b), then the Holder of the Allowed Class 5 Claim will receive the same treatment as Allowed Class 3A General Unsecured Claims. | | | |

## III.   HISTORY OF THE DEBTOR

The Debtor is a publicly-held Nevada corporation that has functioned as a financial services holding company. Its prepetition business operations were conducted through two intermediate holding companies--one for banking operations and one for insurance operations. Prepetition, the Debtor's common stock was traded on the New York Stock Exchange under the symbol "FMT."

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

## A.     The Banking Operations

The Debtor engaged in both commercial and residential real estate lending nationwide through FRC, the Debtor's industrial bank subsidiary. FRC focused on the origination of commercial real estate loans and held these loans primarily for investment. Its consumer lending operations focused on the origination of non-prime and sub-prime residential real estate loans, most of which were sold to third party investors or securitized. FRC was one of the nation's largest originators of sub-prime loans. Prepetition, FRC offered certificates of deposit and savings and money market deposit accounts through its 22 retail banking branches in California.

FRC's business grew rapidly in the years before the Debtor's bankruptcy filing. FRC's total amount of residential loan originations increased from approximately $14 billion in 2003 to approximately $36 billion in 2006. Its commercial real estate loan originations also increased from approximately $1.1 billion in annual mortgage originations in 2003 to approximately $8.3 billion in 2005. However, the sub-prime lending market deteriorated significantly in 2007. A periodic review by the Federal Deposit Insurance Corporation ("FDIC") of FRC's sub-prime lending operations led to the issuance of a cease-and-desist order with respect to some of FRC's past sub-prime lending practices. The cease and desist order required much higher capital levels, making it more difficult for FRC to operate in the sub-prime business. As a result, FRC decided to discontinue its sub-prime lending activities. As of March 7, 2007, FRC ceased entering into new funding commitments for sub-prime mortgage loans, although it continued to honor remaining outstanding commitments. FRC also sold substantially all of its commercial real estate loan portfolio to another entity during 2007, terminating FRC's interest in its commercial real estate lending business.

The vast majority of FRC's originated residential loans were transferred to third parties via a whole loan sale or securitizations. Most of FRC's loans transferred were transferred via a whole loan sale. In a whole loan sale, FRC entered into an agreement to sell loans for cash, generally on a servicing released basis, but occasionally on a servicing

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    retained basis. As part of the sale process, FRC gave customary representations and
2    warranties regarding the characteristics and origination process of the loans. FRC also
3    generally committed to repurchase loans if a payment default occurred within a certain
4    period after the loan was sold.

5            In a securitization, FRC transferred residential loans to a qualifying special-purpose
6    entity, established for the limited purpose of purchasing the loans and issuing interest
7    bearing securities that represented interests in the loans. The transfer of the loans in a
8    securitization was treated as a sale, with the loans being removed from FRC's balance
9    sheet, although FRC continued to perform loan servicing functions for the securitizations.

10           For various reasons, some of the loans that FRC originated were not sold to other
11   parties. In March and April of 2007, FRC entered into whole loan sale agreements that
12   transferred the majority of FRC's unsold sub-prime residential real estate loans, valued at
13   approximately $6.9 billion.

14   **B.      The Insurance and Indemnity Operations**

15           On the insurance side, the Debtor owns all of the common stock of Fremont
16   Compensation Insurance Group, Inc. ("FCIG"). FCIG in turn owns 100% of bare legal title
17   to the common stock of Fremont Indemnity Company in Liquidation ("Indemnity") and
18   100% of bare legal title to the common stock of Fremont Life Insurance Company ("Life").
19   Indemnity operated in the property and casualty insurance industry and engaged in the
20   underwriting of workers' compensation insurance policies. In June 2003, Indemnity was
21   placed into a state "conservation" proceeding under section 1101 of the California
22   Insurance Code, and the following month, that proceeding was subsequently converted
23   into a liquidation proceeding under section 1016 of the California Insurance Code. In
24   connection with those proceedings, the California Insurance Commissioner obtained all of
25   the powers of the directors, officers, and manager of Indemnity, as well as sole control
26   over Indemnity's property.

27           Life operated as a licensed life, annuity, and accident, and health insurance
28   company, although it had discontinued writing new policies in 1995 and in 1996 entered

Smiley, Weiland, Golden,
Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   into a coinsurance agreement to reinsure all existing annuity, life, and credit in-force

2   business.  By 2004, Life had terminated its life, disability, workers' compensation and

3   common carrier liability lines.  Life was placed into a state "conservation" proceeding by

4   the CIC in June 2008.

5        **C.**    **The Debtor's Management**

6          Until November 2007, the Debtor was managed by a management team that

7   included Chairman of the Board James A. McIntyre, President and Chief Executive Officer

8   Louis J. Rampino.  Mr. McIntyre and Mr. Rampino were each employed by the Debtor for

9   more than thirty years.  Mr. McIntyre served as the Debtor's Chief Executive Officer from

10  1976 until 2004, when Mr. Rampino was appointed as Chief Executive Officer.

11         In November 2007, Mr. McIntyre, Mr. Rampino, and several of the Debtor's other

12  officers and directors resigned after the Debtor continued to experience significant

13  financial difficulties.  The Debtor's previous management team was replaced with a new

14  management team, including Chairman of the Board of Directors and Chief Executive

15  Officer Stephen H. Gordon and Vice-Chairman and President David S. DePillo.  This

16  management team managed the Debtor from November 2007 through October 2008.

17  Gordon and DePillo resigned from day-to-day management on September 30, 2008, but

18  remained on the board as chairman and vice-chairman, respectively.  On October 1,

19  2008, Richard A. Sanchez replaced Mr. DePillo and Mr. Gordon and became the Debtor's

20  Interim President and Interim Chief Executive Officer.  Mr. Sanchez has served as Interim

21  President and Interim CEO through the present date. Other members of the new

22  management team, namely Thea K. Stuedli as the chief financial officer and Donald E.

23  Royer as the general counsel, have remained in their positions since November 2007.

24         In November 2007, in connection with the hiring of the new management team, the

25  Debtor and FRC entered into employment agreements (together, the "Employment

26  Agreement") with Gordon, DePillo, Sanchez, Royer, and Stuedli (together, the

27  "Executives") for a term of three years.  Notices of non-renewal of the Employment

28  Agreement are expected to be sent in November 2009.  Among other things, the

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1 Employment Agreements provide that the Debtor and FRC are jointly and severally

2 obligated to pay the Executives' salaries. In addition, if an Executive is terminated for

3 other than "cause" of a voluntary resignation for "good reason," then the Debtor and FRC

4 may be obligated to pay them severance compensation equal to 300% of their average

5 annual bonus and provide continued health benefits for three years. Moreover, if there is

6 a "change in control event," which includes situations where any person becomes the

7 beneficial owner of 20% of the voting securities of the Debtor or FRC or a reorganization

8 or merger where the resulting entity is not the Debtor or FRC, then any outstanding and

9 unvested equity awards the Executive is eligible to receive automatically fully vest.

10 The Employment Agreements with Sanchez, Royer, and Stuedli (the "Executive

11 Employment Agreements") will be assumed under the Plan and they will continue to retain

12 their executive positions and perform their existing job descriptions with the Reorganized

13 Debtor following the Effective Date, should they decide to continue to serve. As of the

14 date of this Disclosure Statement, they have not made a decision about whether to

15 continue to serve. In addition, the Debtor has advised the Equity Committee that

16 Sanchez, Royer, or Stuedli may take the position that "good reason" exists for one or

17 more of them to resign under the terms of the Executive Employment Agreements and

18 that they are entitled to certain payments by the Debtor as a result of their resignation.

19 The Equity Committee does not agree with that contention. In the event that they elect to

20 continue to serve, their biographical information follows.

21         1.     **Richard A. Sanchez, Interim President and Interim Chief**

22                **Executive Officer**

23 Mr. Sanchez has served as both a bank executive and a banking regulator. From

24 2002 through 2006, he was a director of Commercial Capital Bancorp, Inc. ("CCBI") and

25 served as the Executive Vice President, Chief Administrative Officer, and Corporate

26 Secretary for CCBI and Commercial Capital Bank ("CCB"). Prior to that, he was Deputy

27 Regional Director for the Office of Thrift Supervision, where he supervised examiners

28 responsible for 85 insured financial institutions with total assets of over $300 billion.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Smiley, Weiland, Golden,
Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1          **2.**     <u>**Thea Stuedli, Executive Vice President and Chief Financial**</u>

2                 <u>**Officer**</u>

3        Ms. Stuedli is a certified public accountant with more than eleven years of financial

4 services experience. From 2004 to 2006, Ms. Stuedli served as Senior Vice President

5 and Chief Accounting Officer at CCB, where she was primarily responsible for all internal

6 and external financial reporting requirements, including all SEC filings, board of directors'

7 reports, and regulatory reports. From 2002 through 2004, she served as the Corporate

8 Controller at Jackson Federal Bank and, before that, served as a manager in the financial

9 services practice at KPMG, LLP.

10          **3.**     <u>**Donald E. Royer, Executive Vice President and General Counsel**</u>

11        Mr. Royer has served in various capacities in the California financial services

12 industries. In 2007, he acted as a consultant in representing various mortgage lenders.

13 In 2006, Mr. Royer joined CCBI and CCB as Executive Vice President and General

14 Counsel. From 2002 to 2006, Mr. Royer was in private practice as an attorney. From

15 1991 to 2002, Mr. Royer was employed by Downey Savings as Executive President,

16 General Counsel, and Corporate Secretary. From 1988 to 1991, Mr. Royer served as

17 Executive Vice President and General Counsel of American Savings Bank, and from 1984

18 to 1988 was the Executive Vice President and General Counsel of Financial Corporation

19 of America and American Savings and Loan Association. Before that, Mr. Royer held

20 positions as general counsel for American Savings and Loan Association. He began his

21 legal career at First Federal Savings.

22        **D.**     <u>**Selected Financial Information**</u>

23        Attached as Exhibit "1," for general informational purposes, is the Debtor's

24 operating report filed with the Office of the United States Trustee for the month ended

25 August 31, 2009. For additional general information, please see the Debtor's Bankruptcy

26 Schedules, which are available online at http://www.kccllc.net/fremontgeneral if you click

27 on the "Court Documents" tab on the left hand side. The schedules appear as docket

28 number 66.

347881.2                       17                      THIRD AMENDED

# IV.  THE CHAPTER 11 CASE

## A.  Events Leading to the Bankruptcy Filing

FRC was one of the nation's largest sub-prime lenders.  Although FRC resold the vast majority of all loans that it originated via "whole loan" sales, FRC remained obligated to repurchase loans that it had sold if they experienced a payment default within a certain period of time after being sold.  FRC's loan repurchase obligations increased significantly in 2006.

A combination of loan repurchase losses and deterioration in the sub-prime loan market caused FRC to experience significant erosion in its statutorily mandated capital ratios.  Consequently, on February 27, 2007, the FDIC provided Debtor and FRC with a Cease and Desist Order, which required the Debtor to take steps to improve FRC's Tier 1 capital ratio and significantly adjust and improve its sub-prime lending practices.  As a result of the Cease and Desist Order, FRC decided to completely terminate all new sub-prime funding commitments on March 7, 2007, although it continued to honor existing funding commitments made before March 7, 2007.  FRC reached agreements to sell its remaining residential and commercial real estate loan portfolios to third parties during the first half of 2007.

Even after ceasing residential lending, disposing of residential and commercial loan portfolios, completing the sale of significant portions of FRC's assets, and taking other steps to comply with the Cease and Desist Order, the Debtor was not able to sufficiently repair the damage to FRC's capital position caused by the sub-prime lending crisis.  The FDIC issued a Supervisory Prompt Corrective Action Directive (the "Directive") on March 26, 2008, which that gave the Debtor sixty days to either recapitalize FRC or accept an offer for FRC to be acquired by another depository institution.  In order to comply with the Directive, the Debtor reached an agreement with CapitalSource, Inc. ("CapitalSource"), where CapitalSource would agree to purchase substantially all of FRC's principal assets and assume its deposits.  Because the Debtor was a publicly traded entity, it would have to comply with SEC proxy rules in order to complete the sale to CapitalSource.  However,

347881.2

18

THIRD AMENDED
DISCLOSURE STATEMENT

# IV.  THE CHAPTER 11 CASE

## A.  Events Leading to the Bankruptcy Filing

FRC was one of the nation's largest sub-prime lenders.  Although FRC resold the vast majority of all loans that it originated via "whole loan" sales, FRC remained obligated to repurchase loans that it had sold if they experienced a payment default within a certain period of time after being sold.  FRC's loan repurchase obligations increased significantly in 2006.

A combination of loan repurchase losses and deterioration in the sub-prime loan market caused FRC to experience significant erosion in its statutorily mandated capital ratios.  Consequently, on February 27, 2007, the FDIC provided Debtor and FRC with a Cease and Desist Order, which required the Debtor to take steps to improve FRC's Tier 1 capital ratio and significantly adjust and improve its sub-prime lending practices.  As a result of the Cease and Desist Order, FRC decided to completely terminate all new sub-prime funding commitments on March 7, 2007, although it continued to honor existing funding commitments made before March 7, 2007.  FRC reached agreements to sell its remaining residential and commercial real estate loan portfolios to third parties during the first half of 2007.

Even after ceasing residential lending, disposing of residential and commercial loan portfolios, completing the sale of significant portions of FRC's assets, and taking other steps to comply with the Cease and Desist Order, the Debtor was not able to sufficiently repair the damage to FRC's capital position caused by the sub-prime lending crisis.  The FDIC issued a Supervisory Prompt Corrective Action Directive (the "Directive") on March 26, 2008, which that gave the Debtor sixty days to either recapitalize FRC or accept an offer for FRC to be acquired by another depository institution.  In order to comply with the Directive, the Debtor reached an agreement with CapitalSource, Inc. ("CapitalSource"), where CapitalSource would agree to purchase substantially all of FRC's principal assets and assume its deposits.  Because the Debtor was a publicly traded entity, it would have to comply with SEC proxy rules in order to complete the sale to CapitalSource.  However,

347881.2

18

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

THIRD AMENDED
DISCLOSURE STATEMENT

1  given its dire financial condition, the Debtor determined that it would be unable to
2  complete an audit of its 2007 consolidated financial statements and required subsequent
3  quarterly financial statement reviews.  Under SEC proxy rules, both of these items would
4  have to be completed before the Debtor could solicit shareholder approval of the
5  CapitalSource Transaction.  Given the difficulties associated with completing a sale
6  outside of bankruptcy, the Debtor determined that its best option for completing the sale
7  would be to seek protection under Chapter 11 of the Bankruptcy Code and complete the
8  sale.  Accordingly, on June 18, 2008 (the "Petition Date"), the Debtor filed a voluntary
9  petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued to
10  manage its Assets and properties as a debtor-in-possession pursuant to Bankruptcy Code
11  sections 1107 and 1108.

12          As of the Petition Date, the Debtor's books and records reflected that the Debtor's
13  common stock was held by approximately 120 holders of record, with no person or entity
14  holding more than 20% of the Debtor's common stock.  The Debtor's common stock was
15  listed on the New York Stock Exchange ("NYSE") under the "FMT" symbol, although the
16  NYSE suspended trading of the Debtor's stock prior to the opening of trading on April 17,
17  2008.  Also as of the Petition Date, the Debtor had two issues of debt securities
18  outstanding.  On March 1, 1999, the Debtor issued its "Senior Notes," of which
19  approximately $166 million in principal remained outstanding on the Petition Date.
20  Tennenbaum Capital Partners, LLC, appears to hold over 95% of the Senior Notes.  On
21  March 6, 1996, the Debtor issued its 9% Junior Subordinated Debentures to the Debtor's
22  wholly-owned subsidiary, Fremont General Financing I, a Delaware business trust.
23  Fremont General Financing I in turn issued preferred securities that had been traded on
24  the NYSE under the symbol "FMTPR."  As of the Petition Date, the Debtor's books and
25  records reflected that the Trust Preferred Securities stock was held by approximately
26  1,750 holders of record and that approximately $103 million in principal remained
27  outstanding.

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    **B.    Significant Events During the Chapter 11 Case**

2         **1.    Retention of Debtor's Professionals and Agents**

3         After filing its petition for reorganization, the Debtor retained the law firm of Patton

4    Boggs LLP, as reorganization counsel, effective as of June 18, 2008.  The Debtor also

5    retained the law firm of Stutman, Treister & Glatt, PC, to assist Patton Boggs in rendering

6    bankruptcy-related services to the Debtor.  The Bankruptcy Court approved the Debtor's

7    employment of these professionals, effective as of the Petition Date, pursuant to orders

8    entered on September 29, 2008.

9         The Debtor has also retained (i) FTI Consulting, Inc. ("FTI") to provide interim

10   management and management assistance to the Debtor, (ii) the law firms of Willenken,

11   Wilson, Loh & Lieb, LLP, Epstein Becker & Green, PC and The Caldwell Law Firm as

12   special litigation counsel, and (iii) KPMG Corporate Finance LLC ("KPMGCF") as the

13   Debtor's exclusive financial advisor in conjunction with a contemplated transaction that

14   could form the basis for a plan of reorganization.

15        The Debtor has also retained Squar, Milner, Peterson, Miranda & Williamson, LLP

16   and Ernst & Young, LLP as the Debtor's independent accountant and auditor.

17        **2.    Appointment of the Creditors' Committee and Equity Committee**

18        On July 1, 2008, the U.S. Trustee appointed an official committee of creditors

19   holding unsecured claims against the Debtor (the "Creditors' Committee") to represent the

20   interests of the general unsecured creditors of the Estate.  The members of the Creditors'

21   Committee are:  (1) Tennenbaum Multi-Strategy Master Fund, which serves as the chair;

22   (2) HSBC Bank USA, N.A., the Indenture Trustee for holders of the Debtor's 7.875%

23   Senior Notes; (3) Wells Fargo Bank, N.A., as successor trustee to the Bank of New York

24   Trust Company, N.A., the Indenture Trustee for holders of the Debtor's 9% Junior

25   Subordinated Debentures; (4) Dennis & Loretta Danko Family Trust; and (5) Rita Angel.

26   In addition, Howard Amster and Roark, Rearden & Hamot Capital Management serve as

27   "ex officio" members of the Creditors Committee.

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    The Creditors Committee has employed Klee, Tuchin, Bogdanoff & Stern LLP

2    ("Klee Tuchin") as its counsel, the Solon Group, Inc. ("Solon") as its financial advisor on a

3    limited basis in the Case, and Bocarsly Emden Cowan Esmail & Arndt LLP ("Bocarsly") as

4    its tax advisor.

5    On July 8, 2008, the U.S. Trustee appointed the Equity Committee to represent the

6    interests of the equity Holders.  The initial members of the Equity Committee were:

7    (1) John M. Koral; (2) William M. Stern; (3) Paul Dagostino; (4) William Holmes; (5) Frank

8    E. Williams, Jr.; (6) Jeffrey M. Pies; (7) Lynn Ehlers; (8) John M. Mlynick; and (9) Jonathan

9    Siegal.  The latter two later resigned from the Equity Committee.  The Equity Committee

10   has employed, with the Bankruptcy Court's approval, Weiland Golden as its counsel and

11   CRG as its financial advisor.

12              **3.      Consummation of the CapitalSource Transaction**

13   Within a week of the Petition Date, the Debtor filed its Motion for Order Authorizing

14   the Debtor to Use the Shares of Non-Debtor Subsidiary to Consummate the

15   CapitalSource Transaction (the "CapitalSource Motion"), which sought entry of an order

16   authorizing the Debtor, as sole shareholder, to use its shares of a non-debtor subsidiary to

17   consummate the CapitalSource Transaction.  Following a hearing on July 17, 2008, the

18   Court entered an order approving the CapitalSource Motion, which order was supported

19   by accompanying Findings of Fact and Conclusions of Law.

20   The CapitalSource Transaction closed on or about July 25, 2008, and FRC

21   subsequently surrendered its banking charter to the state of California and changed its

22   name from Fremont Investment & Loan to Fremont Reorganizing Corporation.  As a result

23   of the CapitalSource Transaction – which both the Creditors' Committee and the Equity

24   Committee supported – seizure of FRC by the FDIC was avoided and significant value

25   was preserved for all stakeholders.

26              **4.      The Order Limiting Transfers of Equity**

27   On the Petition Date, the Debtor filed an emergency motion for an order limiting

28   certain transfers of Equity Interests in the Debtor.  The motion was filed because the

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1 Debtor's consolidated federal corporate income tax return for 2007 reflect NOLs of
2 $695,469,659 that, if preserved, could yield a tax benefit of more than $200 million.
3 However, the Debtor was concerned that unregulated postpetition trading of the Debtor's
4 equity interests could reduce or eliminate the value of the NOLs that it thought might be
5 critical to its reorganization. Accordingly, the Debtor sought an order limiting and tailoring
6 restrictions on trading and requiring the Debtor to receive advance notice of any transfers
7 that could have the effect of jeopardizing the NOLs. The Court granted the requested
8 relief with an order that was entered on June 19, 2008.

9 **5.** **Insider Compensation**

10 During the Case, the Debtor sought Court approval of the post-petition
11 compensation of its current and past officers and directors, including Stephen H. Gordon,
12 David S. DePillo, Donald E. Royer, Richard A. Sanchez, and Thea K. Stuedli. The Court
13 approved a stipulation on September 15, 2008, that set the post-petition compensation for
14 each of these officers or directors and established a mechanism for apportioning the
15 executive compensation cost among the Debtor and FRC.

16 **6.** **Establishment of General Bar Date and Filing of Claims**

17 On September 4, 2008, pursuant to a Stipulated Order Regarding the Claims Bar
18 Date, the Court established November 10, 2008, as the general claims bar date for all
19 Persons other than governmental units to file proofs of Claim or Equity Interests arising
20 prior to the Petition Date, pursuant to section 501 of the Bankruptcy Code, and
21 (2) December 15, 2008, as the claims bar date for governmental units to file pre-petition
22 Claims.

23 Over 900 Proofs of Claim have been filed against the Debtor, including a limited
24 number after the Claims Bar Date. Based on its preliminary review, it appears that many
25 of these asserted Claims are invalid and/or inflated and, ultimately after Claims objection
26 litigation, the aggregate Claims amounts should be significantly reduced.

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

347881.2

22

1       **7.**     **Relief from Stay Motions – McIntyre, Faigin, and The Bank of**

2                 **New York Mellon**

3       During the Case, two of the Debtor's former Officers, James A. McIntyre and Alan

4 C. Faigin have filed motions seeking relief from the automatic stay under Bankruptcy

5 Code section 362. Former CEO McIntyre sought relief from the automatic stay to allow

6 him to pursue litigation requiring the Debtor to hold a shareholder's meeting. After

7 conducting a hearing on the matter, the Bankruptcy Court entered an order on October

8 24, 2008, denying, without prejudice, McIntyre's motion to lift the stay.

9       Former General Counsel Faigin filed a motion to lift the automatic stay in order to

10 pursue state court litigation against the Debtor and FRC under a theory that both entities

11 were jointly liable for amounts that were still allegedly owed to Faigin under his pre-

12 petition employment contract with the Debtor. Although the Debtor, but not FRC, was a

13 party to Faigin's employment contract, Faigin had attempted to pursue arbitration against

14 FRC, which is not a debtor in bankruptcy, under a theory that both Debtor and FRC were

15 joint employers of Faigin. The Bankruptcy Court entered an order on December 24, 2008

16 allowing Faigin's litigation against FRC to proceed on the condition that Faigin amend his

17 complaint to remove all allegations against the Debtor and refrain from seeking discovery

18 from the Debtor in connection with the state court litigation.

19       More recently, The Bank of New York Mellon ("BONY") filed a motion to lift the

20 automatic stay so that prepetition litigation that BONY commenced against the Debtor for

21 alleged interference with a contractual relationship between BONY, the New York

22 Insurance Department, and FIC, which was pending in the United States District Court,

23 Central District of California, on the Petition Date, could resume. The hearing on the

24 motion has been continued several times. BONY's prepetition litigation claims have been

25 asserted in the Case through a proof of claim BONY filed in excess of $20,000,000. The

26 Debtor disputes any liability to BONY and whether the Debtor had the requisite intent.

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626-1925
Tel 714-966-1000 Fax 714-966-1002

**8.    Engagement of KPMG Corporate Finance and the Attempts to Negotiate a Consensual Plan**

On January 6, 2009, the Bankruptcy Court approved the engagement of KPMG Corporate Finance LLC ("KPMGCF"), a subsidiary of KPMG LLP (UK), as the Debtor's financial advisor to locate potential acquirers of the Debtor who might act as a sponsor in a potential plan of reorganization. In connection with this engagement, the Equity Committee is informed that KPMGCF distributed marketing materials informing potential investors of the opportunity to act as the sponsor of the Debtor's plan of reorganization.

As a result of KPMGCF's marketing efforts, 26 parties entered into non-disclosure agreements and were provided access to information about the Debtor and its management. Ultimately, the Debtor received six non-binding letters of intent from interested third parties.

In Spring 2009, the Debtor evaluated each of these proposals to determine whether the implementation of any of such proposals through a plan of reorganization was viable and consulted with the committees to determine their positions. Although the Equity Committee was supportive of the Debtor's efforts and even contemplated being a co-sponsor of a plan with the Debtor, the Creditor's Committee was not supportive. Ultimately, the Debtor proposed its own plan.

**9.    Exclusivity**

Pursuant to the United States Bankruptcy Code, a debtor-in-possession, such as the Debtor, has 120 days from the date of the filing of its Chapter 11 petition with the Bankruptcy Court in which to file a plan of reorganization, subject to Bankruptcy Court's discretion to grant extensions of this exclusive period. During this exclusive period no other person or entity is permitted to file a plan of reorganization. The Debtor obtained an extension of time to June 1, 2009, to propose its plan and September 1, 2009, to solicit votes on the plan. The Debtor filed its plan and the Creditors' Committee filed a motion to terminate exclusivity that was set for a hearing on July 14, 2009. The Equity Committee

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  joined in that motion and the Court granted it and terminated exclusivity effective July 17,

2  2009.

3       **10.    Settlement of Claims and Litigation**

4       During the course of the bankruptcy case, the Debtor has achieved settlements of

5  various matters. In some instances, the Debtor has negotiated final terms of settlement,

6  subject only to obtaining Bankruptcy Court approval. The following narrative describes

7  the more significant settlements.

8            a.   California Insurance Commissioner

9       In June 2004, the California Insurance Commissioner (the "CIC"), as Indemnity's

10  statutory liquidator, sued the Debtor and FCIG in state court, alleging that they improperly

11  utilized net operating loss deductions ("NOLs") allegedly belonging to Indemnity (the "NOL

12  Case"). In 2005, the CIC filed another complaint against the Debtor and others on behalf

13  of Indemnity as successor in interest to Comstock Insurance Company ("Comstock"), a

14  former affiliate of Indemnity that was subsequently merged into Indemnity. That case

15  alleged similar causes of action regarding the utilization of NOLs as well as assertions of

16  improper transactions with other insurance subsidiaries and affiliates of Indemnity (the

17  "Comstock Action"). In 2008, FRC was added as a defendant in both the NOL Case and

18  the Comstock Action.

19       As a result of disputes as to whether Indemnity, which is in liquidation, and its

20  subsidiaries could be considered part of the Debtor's consolidated taxpayer group for

21  federal income tax purposes, the CIC requested that the IRS issue a private letter ruling to

22  resolve the dispute. The IRS issued it on July 26, 2006, and based on that ruling, the CIC

23  has taken the position that Indemnity and its subsidiaries should be included in the

24  Debtor's consolidated taxpayer group, and the Debtor has maintained its objection to such

25  tax treatment (the "Tax Deconsolidation Dispute").

26       The CIC also filed a lawsuit in California state court asserting on behalf of

27  Indemnity claims of ownership to substantial portions of artwork, including any related

28  proceeds from the sale of that artwork, that were at any time in the possession or control

347881.2                              25                          THIRD AMENDED
                                                            DISCLOSURE STATEMENT

1  of the Debtor or its affiliates.  The Debtor removed that action to the Bankruptcy Court on
2  July 11, 2008, and it remains pending as case number 08:08-ap-01258-ES (the "Art
3  Adversary Dispute").  The claims are being asserted against the Debtor, FRC, and four
4  current or former employees of the Debtor.

5  In connection with these various adversary proceedings, the CIC filed four claims
6  with the Bankruptcy Court, asserting the claims set forth in the NOL Case, the Comstock
7  Action, the Art Adversary Dispute, and the Tax Consolidation Dispute.  Collectively, the
8  liquidated amounts of these asserted claims exceed $489 million, and also included
9  unliquidated amounts.

10  In April 2009, the Debtor, FRC, and FCIG (together, the "Fremont Entities") and the
11  CIC, in its capacity as the statutory liquidator or Indemnity and the statutory conservator of
12  Life, entered into a stipulation agreement that settled their disputes (the "CIC Stipulation").
13  In the CIC Stipulation, the Fremont Entities and the CIC agreed to the following:

14  (1)  Tax Issues:  Within 20 days of the CIC Stipulation's effective date, the
15  Fremont Entities will take the appropriate action to document that Indemnity has been
16  deconsolidated from the group of affiliates of the Debtor that elect to participate in a
17  consolidated federal taxpayer group so that Indemnity can use any NOLs generated by
18  Indemnity on or after January 1, 2003, on its own tax returns.  In addition, the Debtor has
19  agreed to cooperate with the CIC in the preparation, filing, approval, and consummation of
20  the statutory liquidation case involving Indemnity.

21  (2)  Life Stock.  On the effective date of the CIC Stipulation, FCIG, as the holder
22  of all of Life's issued and outstanding stock, will transfer all of its right, title, and interest in
23  the stock of Life to the Commissioner.

24  (3)  Proofs of Claim.  On the effective date of the CIC Stipulation, each of the
25  proof of claim filed by the CIC in the Debtor's case will be withdrawn, disallowed, and
26  expunged with prejudice.  The CIC will be allowed a $5 million general unsecured claim in
27  the Debtor's Case, and this claim will be the sole and exclusive right to payment by CIC,
28

Smiley, Weiland, Golden, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Tel 714-966-1000   Fax 714-966-1002

1 Indemnity, and Life from the Debtor's bankruptcy estate, except with respect to the D&O

2 Case described below.

3     (4)   <u>Art Adversary Dispute</u>. On the effective date of the CIC Stipulation, the CIC

4 will receive $4.1 million of the funds presently held in escrow that are attributable to the

5 sale of certain of the Debtor's artwork. The Debtor will receive the remaining proceeds

6 held in the escrow account (approximately $300,000) and ownership rights to all of the

7 remaining artwork, including any future proceeds from the sale or disposition of such

8 artwork.

9     (5)   <u>Cash Payment</u>. On the effective date of the CIC Stipulation, FRC will pay to

10 Indemnity $5.0 million.

11     (6)   <u>Dismissal of Pending Litigation</u>. As soon as possible after the effective date

12 of the CIC Stipulation, the CIC will dismiss with prejudice all of the actions mentioned

13 above, including any counterclaim or cross complaint filed therein, and the Fremont

14 Entities will dismiss with prejudice any claims filed in connection with Indemnity's statutory

15 liquidation case.

16     (7)   <u>Releases</u>. Except for the agreements and obligations set forth in the CIC

17 Stipulation, CIC, Indemnity, Life, and the Fremont Entities will give each other mutual

18 releases of the claims set forth in the actions described above.

19     The Debtor filed a motion to approve the CIC Stipulation pursuant to FRBP 9019

20 (a) in April 2009, and the motion was approved at a hearing held on May 14, 2009. The

21 CIC Stipulation has also been approved by the two necessary state court and the

22 settlement is essentially final.

23           b.   <u>Massachusetts Attorney General</u>

24     The Debtor and FRC were also subject to ongoing litigation in the Massachusetts

25 Superior Court in Suffolk County ("MA Superior Court") brought by the Attorney General

26 for the Commonwealth of Massachusetts (the "Commonwealth") based upon alleged

27 consumer protection violations stemming from FRC's lending practices in connection with

28 the origination and servicing of residential mortgage loans made to Massachusetts

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

347881.2

27

1  residents. The complaint sought injunctive and equitable relief and civil penalties. Since

2  February 2009, the Debtor and FRC have been operating under a preliminary injunction

3  issued by the MA Superior Court, as modified in March 2008, that enjoined the Debtor and

4  FRC from foreclosing on certain of the loans made to Massachusetts residents absent the

5  approval of the MA Superior Court. The preliminary injunction also prevented the Debtor

6  and FRC from selling, transferring, or assigning any of these Massachusetts residential

7  loans unless certain conditions were met. This litigation appeared to be outside the scope

8  of the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

9       In April 2009, after comprehensive settlement discussions, the Commonwealth, the

10  Debtor, and FRC entered into a Final Judgment by Consent (the "Final Judgment").

11  Pursuant to the Final Judgment, FRC will pay $10 million to the Commonwealth on the

12  effective date of the Final Judgment. If neither FRC nor FGCC is the subject of a

13  bankruptcy proceeding as of a date that is about 95 days after the effective date of the

14  Final Judgment and no court has determined that either the Debtor or FRC has violated

15  any of the terms of the Final Judgment, then the Commonwealth will withdraw with

16  prejudice the $20 million proof of claim that it filed in the Debtor's Case. If either FRC or

17  FGCC is in a bankruptcy proceeding on such date, then the Commonwealth may void the

18  Final Judgment and refund the $10 million.

19       If the Final Judgment becomes effective, then the preliminary injunction will be

20  modified and will become a permanent injunction that will apply to loans to Massachusetts

21  residents or to loans secured by property in Massachusetts. The permanent injunction

22  requires the Debtor or FRC to provide the Massachusetts Attorney General with prior

23  notice before initiating or advancing a foreclosure on any such mortgage loan originated

24  by FRC. If the Attorney General does not provide a written objection, then the Debtor or

25  FRC may proceed with the foreclosure. If there is a written objection, then the parties will

26  follow the resolution procedures set forth in the Final Judgment. In addition, before the

27  Debtor or the FRC can sell, transfer, or assign any mortgage loan originated by FRC that

28  is secured by any residential property in Massachusetts, they must (1) provide the

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
6501 Irvine Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  Attorney General with prior notice; (2) a purchaser or assignee from the FRC must agree

2  to be bound by the foreclosure and sale restrictions in the permanent injunction, and (3) a

3  copy of the written assignment must be provided to the Attorney General.  In exchange for

4  this agreement, upon entry of the Final Judgment by the MA Superior Court, the

5  Commonwealth will release the Debtor and FRC from the claims set forth in the

6  Massachusetts Action.

7         The Debtor sought Court approval of the Final Judgment pursuant to FRBP

8  9019(a) in April 2009, and that was approved at a hearing on May 14, 2009.  The Equity

9  Committee believes that all conditions to the effectiveness of the Final Judgment have

10  occurred and the settlement has been consummated.

11                          c.     Enron

12         In April 2009, the Debtor entered into a stipulation and agreement (the "Enron

13  Stipulation') with Enron Creditors Recovery Corporation ("Enron") to settle the litigation

14  described below and to resolve a proof of claim in the approximate amount of $25.5

15  million that Enron filed against the Debtor in the Case.

16         On December 2, 2001, Enron and certain affiliates filed voluntary petitions for relief

17  under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern

18  District of New York (the "Enron Court").  Before that date, Enron issued unsecured

19  commercial paper to various entities, including the Debtor.  The commercial paper had

20  maturities of up to 270 days.  In a series of transfers, Enron allegedly paid over $1 billion

21  to various entities, including $25,426,521.66 to the Debtor, on account of the commercial

22  paper prior to their stated maturity.  In November 2003, representatives of Enron's

23  bankruptcy estate filed avoidance actions in the Enron Court against the Debtor and

24  various defendants, contending that the payments were avoidable and recoverable under

25  the Bankruptcy Code.  In settlement of that dispute, Enron and the Debtor agreed to the

26  following:

27         (1)     Allowed General Unsecured Claim.  Enron will be allowed for purposes of

28  voting on any plan proposed in the Case and receiving Distributions a general unsecured

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 | Fax 714-966-1002

1   claim against the Debtor in the amount of $4.0 million (the "Allowed Enron Claim").

2   However, upon Enron's actual receipt of Distributions from the Debtor's bankruptcy estate

3   of $2.0 million, the Allowed Enron Claim will be deemed satisfied in full and Enron will

4   have no further right to any Distributions from the Debtor's bankruptcy estate.  The

5   Allowed Enron Claim is the only right to payment that Enron will have against the Debtor's

6   bankruptcy estate.

7       (2)     Dismissal of the Avoidance Action.  After the effective date of the

8   agreement, Enron has agreed to dismiss the avoidance action with prejudice as to the

9   Debtor, with each party bearing its own attorney's fees and costs.

10      (3)     Releases.  On the effective date and except for the agreements and

11  obligations arising from the settlement, Enron and the Debtor will exchange mutual

12  general releases of all claims they may hold against one another.

13          Both this Court and the Enron Court have approved the settlement agreement.

14              d.      The Rampino Litigation and Associated Defendants' Wage,

15                      SERP, and Indemnification Claims

16          In October 2006, the CIC, as the statutory liquidator of Indemnity, filed a first

17  amended complaint in Los Angeles Superior Court against seven former officers and

18  directors of the Debtor or Indemnity (together, the "Rampino Defendants"), alleging that

19  they breached their fiduciary duties by allowing Indemnity to engage in an inappropriate

20  underwriting scheme that caused injury to Indemnity's reinsurers, which in turn injured

21  Indemnity by settlements it made with those reinsurers (the "D&O Case").  Although

22  neither the Debtor nor any affiliates are defendants in the D&O Case, it is possible that the

23  Debtor could have indemnification obligations to some or all of the Rampino Defendants.

24  After the Debtor filed its bankruptcy petition, each of the Rampino Defendants filed at least

25  one claim based on, among other things, the contention that the Debtor is obligated to

26  indemnify each of them for any settlement amounts or judgment that might be entered

27  against them in the D&O Case.'

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

In May 2009, the Debtor entered into a stipulation (the "Rampino Stipulation") with the Rampino Defendants and the CIC to settle the outstanding litigation and to resolve fifteen proof of claims that together asserted liquidated amounts in excess of $27 million and that also contained substantial contingent and unliquidated components. A summary of the Rampino Stipulation is as follows:

(1)    Allowed General Unsecured Claim of CIC.  The CIC will be allowed, for voting and Distribution purposes, a general unsecured claim in the amount of $35 million. However, after the CIC's actual receipt of Distributions from the Debtor's bankruptcy estate totaling $22 million, the claim will be deemed to be satisfied in full and the CIC will have no further right to any Distributions from the Debtor's bankruptcy estate on account of the D&O Case.  This claim is in addition to the $5 million general unsecured claim allowed the CIC for the unrelated settlement discussed above.

(2)    Final Disallowance of Proof of Claims.  Each of the Rampino Defendants' proofs of claim will be deemed to have been withdrawn or disallowed with prejudice.

(3)    Allowed General Unsecured SERP Claims.  Four of the seven defendants will each be allowed for purposes of voting and Distribution purposes a general unsecured claim against the Debtor in amounts ranging from $2.3 million to $5.6 million.  However, once they actually receive Distributions in specific, lesser amounts ranging from $1.42 million to $3.47 million, their claims will be deemed to have been satisfied in full and they will have no further rights to Distributions or payments from the Debtor's bankruptcy estate.  They will also have no right to Distributions or payments from the Fremont General Corporation Supplemental Executive Retirement Plan or the Fremont General Corporation Supplemental Executive Retirement Plan II.

(4)    Dismissal of Litigation. After the effective date of the Rampino Stipulation, CIC and Indemnity will dismiss the D&O Case with prejudice, and Mr. Bailey, Mr. Rampino, and Mr. McIntyre will dismiss their respective adversary proceedings that are pending in the Bankruptcy Court to be dismissed with prejudice against all defendants

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    other than the Debtor.  With respect to the Debtor, the dismissal is conditioned upon their

2    receiving payment on account of their allowed general unsecured claims.

3         (5)    Releases.  Except for the agreements and obligation arising under the

4    Rampino Stipulation, the parties will execute mutual general releases, except that the

5    Rampino Defendants are not releasing any claims that they may have against the Debtor

6    as a result of ownership of the Debtor's common stock or other securities of the Debtor or

7    its affiliates.  In addition, no one is releasing any claims that they may hold against any

8    insurance policy issued by any insurer of any of the parties.

9         The hearing on approval of the Rampino Stipulation was held on June 11, 2009,

10   and the order approving the Rampino Stipulation was entered on June 18, 2009.

11                    e.    Other Settled and Resolved Claims

12        The Debtor and FRC entered into an agreement with Credit Suisse to provide for

13   the payment and resolution of a proof of claim in excess of $2 million filed by Credit

14   Suisse, which agreement was approved by the Court pursuant to Federal Rule of

15   Bankruptcy Procedure 9019(a).

16        The Debtor entered into a stipulation providing for the withdrawal with prejudice of

17   86 separate proofs of claim filed by the plaintiffs in the so-called Scheid action, which

18   stipulation was approved by the Court.

19        The Debtor and FRC agreed to settle their affirmative claims against BlackRock,

20   Inc., Private National Mortgage Acceptance Company, LLC, and John Lawrence, which

21   agreement was also approved by the Court pursuant to Federal Rule of Bankruptcy

22   Procedure 9019(a).

23        The Debtor has entered into a stipulation with BONY (the "BONY Stipulation") to

24   settle the litigation described above and to resolve a proof of claim in the approximate

25   amount of $20 million that BONY filed against the Debtor in the Case.  The Debtor has

26   agreed, subject to Court approval, to afford BONY a general unsecured non-priority claim

27   in the amount of $10,000,000; provided, however, that (i) the Allowed Claim shall be

28   deemed to have been satisfied in full upon the actual receipt of Distributions on or before

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

347881.2                              32                        THIRD AMENDED
                                                              DISCLOSURE STATEMENT

1 October 31, 2009 that total $6,500,000; or (ii) in the event that the aggregate payment

2 described in (i) of this paragraph is not made on or before October 31, 2009, then the

3 Allowed Claim shall be deemed to have been satisfied in full upon the actual receipt of

4 Distributions on or before June 30, 2010 that total $7,000,000. BONY has agreed to

5 dismiss the district court action with prejudice and there will be a mutual release of claims.

6 A hearing to consider approval of the BONY Stipulation took place on September 10,

7 2009, at which the BONY Stipulation was approved.

8 **11.** **Allowance of Fees and Costs of Professionals Employed by the**

9 **Debtor, the Creditors' Committee, and the Equity Committee**

10 In connection with the retention of the professionals employed by the Debtor, the

11 Creditors' Committee, and the Equity Committee, the Court approved interim fee

12 procedures. With the exception of certain professionals whose compensation is subject to

13 different procedures, professionals are eligible to receive payment of 80% of their monthly

14 fees and 100% of their monthly costs, provided that no objection is timely filed and served

15 in connection with their monthly fee statements. Such professionals may request and

16 receive payment of the "hold back" amounts at interim or final fee hearings.

17 Kurtzman Carson Consultants is paid in full on a monthly basis by the Debtor under

18 a separate procedure. KPMGCF has also been compensated differently, receiving a

19 monthly retainer of $25,000 until its retention is terminated by the Debtor, and it is entitled

20 to receive an additional transaction fee if a plan sponsored by a third-party plan proponent

21 becomes effective.

22 Below is a chart that summarizes the fees and costs incurred and requested by the

23 professionals through March 31, 2009. The first interim period ran from June 18, 2008,

24 through November 30, 2008 (the "First Interim Period"). The second interim period ran

25 from December 1, 2008, through March 31, 2009.

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

347881.2

33

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

| Professional | Retainer | Fees Requested in First Interim Period | Costs Requested in First Interim Period | Unpaid Portion from First Interim Period | Fees Requested in Second Interim Period | Costs Requested in Second Interim Period | Unpaid Portion from Second Interim Period |
|---|---|---|---|---|---|---|---|
| Klee Tuchin | N/A | $652,229 | $32,129 | $0 | $571,868 | $11,265 | $113,829 |
| Stutman Treister | $116,314 | $978,456 | $46,882 | $0 | $746,501 | $20,267 | $149,300 |
| Patton Boggs | $250,000 | $1,459,565 | $37,427 | $0 | $608,329 | $29,686 | $121,665 |
| FTI | $500,000 | $909,964 | $132,132 | $0 | $429,651 | $39,4611 | $85,930 |
| Weiland Golden | N/A | $391,820 | $10,046 | $0 | $213,573 | $467 | $43,118 |
| Solon Group | N/A | $25,285 | $0 | $0 | $10,452 | $0 | $0 |
| CRG Partners | N/A | $87,100 | $105 | $0 | $20,362 | $0 | $0 |
| Epstein Becker | N/A | $238,524 | $12,720 | $0 | $619,720 | $18,070 | $0 |
| Willenken Wilson | N/A | N/A | N/A | N/A | $5,351 | $8 | $0 |
| Caldwell Law Firm | N/A | N/A | N/A | N/A | $17,508 | $0 | $0 |

Since the end of the Second Interim Period, the professionals have continued to incur fees and expenses. From April 1, 2009, through July 31, 2009, the interim fee applications submitted by the professionals seek payment of the following fees and expenses, with the unpaid portion for this time period as indicated below:

| Professional | Retainer | Fees | Expenses | Unpaid Portion |
|---|---|---|---|---|
| Klee Tuchin | N/A | $795,297 | $14,392 | $159,059 |
| Stutman Treister | N/A | $848,468 | $41,878 | $169,727 |
| Patton Boggs | N/A | $663,712 | $18,274 | $137,742 |
| FTI | N/A | $428,263 | $25,780 | $156,710 |
| Weiland Golden | N/A | $328,808 | $1,217 | $65,762 |
| Solon Group | N/A | $36,465 | $0 | $29,947 |
| CRG Partners | N/A | $108,361 | $1,086 | $50,225 |
| Epstein Becker | N/A | $57,787 | $4,519 | $11,557 |
| Willenken Wilson | N/A | $11,963 | $91 | $12,054 |
| Caldwell Law Firm | N/A | $104,227 | $6,291 | $20,855 |
| Squar Milner | $100,000 | $57,546 | $0 | $57,546 |

| Professional | Retainer | Fees | Expenses | Unpaid Portion |
|---|---|---|---|---|
| Bocarsly Emden | N/A | $28,375 | $158 | $5,675 |
| Ernst & Young | N/A | $48,600 | $0 | $9,270 |

The above professionals will continue to incur fees and expenses through Plan confirmation.

## V. LITIGATION AND CAUSES OF ACTION

### A. Litigation Commenced Pre-Petition

As of the Petition Date, the Debtor was involved in certain litigation and other actions set forth in the Bankruptcy Schedules, the most material of which are discussed above.

### B. Post-Petition and Other Potential Causes of Action

#### 1. In General

Since the Petition Date, the Debtor has prosecuted or defended adversary proceedings that are connected with this Chapter 11 case. In some instances, the Debtor removed civil actions that were pending in other courts on the Petition Date to the Bankruptcy Court. The discussion in this Section is for general informational purposes only. Nothing herein is intended nor should be construed to be an admission or acknowledgement of any matter and all parties reserve all of their respective rights with respect to any potential and/or actual claims against any Persons.

#### 2. Adv. Pro. No. 8:08-ap-01256-ES and Adv. Pro No. 8:09-ap-01103-ES: the SERP Actions

This adversary proceeding involves certain claims asserted against the Debtor arising from two supplemental executive retirement plans, or "SERPs." The Debtor removed this proceeding from California state court to this Court on July 7, 2008. The Debtor filed a motion to dismiss the plaintiff's complaint. The plaintiffs have filed a second amended complaint,

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    A different set of plaintiffs filed the separate adversary proceeding No. 8:09-ap-
2    01103-ES, *Bailey v. Fremont General Corporation, et al.* This proceeding was brought by
3    two former executive employees of the Debtor, Wayne Bailey and Louis Rampino, and
4    involves certain ERISA claims asserted against the Debtor related to two supplemental
5    executive retirement plans.

6        The Rampino Stipulation described above and that has been approved by the
7    Court resolves these adversary proceedings with respect to all plaintiffs other than Alan
8    Faigin. The Equity Committee is informed by the Debtor that it is in discussions with Alan
9    Faigin to settle and resolve these adversary proceedings in their entirety.

### 3.    Adv. Pro. No. 8:08-ap-01258-ES:  The Art Action

11       This proceeding involves the California Insurance Commissioner's asserted
12   ownership interests in certain artwork and related proceeds (the "Art Action"). This
13   proceeding was removed from California state court to this Court by the Debtor on July
14   11, 2008. The Art Action was settled and, as described above, the settlement was
15   approved by the Court.

### 4.    Adv. Pro. No. 8:08-ap-01418-ES:  The Insurance Action

17       This proceeding involves the Debtor and FRC's rights to coverage under certain
18   insurance policies issued by the Federal Insurance Company (the "Insurance Action").
19   This proceeding was commenced by the Debtor and FRC on October 20, 2008 and
20   remains pending before the Court.

### 5.    Adv. Pro. No. 8:08-ap-01470-ES:  The Mover Action

22       This proceeding involves the Debtor's claims against National Relocation Services,
23   Inc., Mike Garrett, and other parties in connection with the misappropriation of certain
24   furniture, fixtures, and equipment from the Debtor's Water Garden location (the "Mover
25   Action"). This proceeding was commenced by the Debtor on November 20, 2008, and a
26   motion to amend the complaint is currently pending.

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

1     6.     **ERISA Class Action**

2          In 2007, six complaints seeking class certification were filed in the United States

3     District Court, Central District of California, against the Debtor and various officers,

4     directors, and employees by participants in the Debtor's Investment Incentive Plan 401(k)

5     and Employee Stock Ownership Plan, alleging violations of the Employee Retirement

6     Income Security Act of 1974 ("ERISA") in connection with stock in the Debtor held by the

7     Plans (the "ERISA Action").  The six complaints have been consolidated in a single

8     proceeding.

9          The plaintiffs in the ERISA Action contend that their claims are not subject to

10    subordination and contend that to the extent that their claims exceed available insurance

11    coverage, they should be classified and treated as Class 3A general unsecured claims.

12    The Equity Committee disagrees and believes that to the extent that the ERISA Action

13    claims become Allowed Claims, they should be classified and treated as Class 5 Section

14    510(b) Claims.  In addition, the Plaintiffs in the ERISA Action contend that their claims are

15    covered under available insurance policies up to $100 million.  Plaintiffs in the ERISA

16    Action have stated their intention to file a motion to lift the automatic stay and a motion to

17    withdraw the reference so that their claims may continue to be prosecuted against the

18    Debtor in the District Court in the ERISA Action.  Neither the Debtor, the Creditors'

19    Committee, nor the Equity Committee agree with the contentions or position of the ERISA

20    Action plaintiffs.

21    7.     **The Securities Class Action (Al-Beitawi v. Fremont General**

22         **Corp., Consolidated Securities Complaint, Case No. CV07-05756)**

23         In September 2007, three separate complaints seeking class certification were filed

24    in the United States District Court, Central District of California, against the Debtor and

25    various officers and directors alleging violations of federal securities laws in connection

26    with published statements by the Debtor regarding its loan portfolio and loans held for

27    resale during the period from May 2006 through February 2007.  The three class action

28    lawsuits were consolidated into a single proceeding with a consolidated class action

347881.2

37

complaint filed on March 3, 2008 (the "Securities Class Action"). In January 2009, a second amended class action securities complaint was filed alleging violations from October 2005 through March 2007; the defendants include the Debtor and several former and current officers of the Debtor and FRC. The litigation against the Debtor has been stayed by the bankruptcy filing. It is not stayed as to any of the non-Debtor defendants. The plaintiffs have asserted that the Debtor's liability insurance policies in favor of their officers and directors provide coverage for the claims asserted in the Securities Class Action as well as for claims against the Debtor directly for alleged violations of federal securities laws. The Plan will provide for the right of the plaintiffs to pursue claims against the Debtor, which will be treated in accordance with the Plan, and to recover from available insurance coverage. It also preserves their right to conduct discovery. The Equity Committee believes that any Allowed Claims of the Securities Class Action plaintiffs will be classified and treated as Allowed Section 510(b) Claims.

### 8. Other Actions

The Debtor has addressed a series of motions for relief from stay, motions for conversion, motions for Rule 2004 exams, and various other contested matters that have arisen during this case.

### 9. Other Significant Litigation Claims

Certain Claims against the Debtor and FRC are not at present pending before the Bankruptcy Court, but may present material risks to Holders of Claims and Interests under the Plan if not resolved in a satisfactory manner.

### 10. Causes of Action Are to Be Retained Under Plan; No Waiver Should Be Implied

Attached to the Disclosure Statement as Exhibit "2" is a non-exhaustive list of potential Causes of Action; provided, however, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Cause of Action, or potential Cause of

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002