Christopher E. Prince (State Bar No. 183553)
cprince@lesnickprince.com
LESNICK PRINCE LLP
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Telephone: (213) 291-8984
Facsimile: (310) 396-0963

Carole Neville (*Pro Hac Vice* Pending)
cneville@sonnenschein.com
Peter D. Wolfson (*Pro Hac Vice* Pending)
pwolfson@sonnenschein.com
SONNENSCHEIN, NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Attorneys for New World Acquisition, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-13421-ES |
| FREMONT GENERAL CORPORATION, a Nevada corporation, | CHAPTER 11 CASE |
| Debtor. | **NEW WORLD ACQUISITION, LLC'S DISCLOSURE STATEMENT WITH RESPECT TO CHAPTER 11 PLAN OF REORGANIZATION FOR FREMONT GENERAL CORPORATION (DATED NOVEMBER 6, 2009)** |
| Taxpayer ID No. 95-2815260 | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 2

    A.    Purpose of This Document ........................................................................ 3

    B.    Solicitation Package .................................................................................. 5

    C.    Voting Procedures, Ballots, and Voting Deadline ..................................... 5

    D.    Individual Ballots ...................................................................................... 7

II.   OVERVIEW OF NEW WORLD'S PLAN ............................................................... 9

    A.    The Merger of Fremont General Credit Corporation and
        Fremont Reorganizing Corporation Into the Debtor ............................... 9

    B.    Treatment of Claims Against the Debtor and Equity Interests in the Debtor ...... 10

III.  HISTORY OF THE DEBTOR ................................................................................ 16

    A.    The Banking Operations .......................................................................... 17

    B.    The Insurance and Indemnity Operations ............................................... 18

    C.    The Debtor's Management ....................................................................... 19

        1.    Richard A. Sanchez, Interim President and
            Interim Chief Executive Officer ..................................................... 20

        2.    Thea Stuedli, Executive Vice President and Chief Financial Officer ....... 21

        3.    Donald E. Royer, Executive Vice President and General Counsel .......... 21

IV.   THE CHAPTER 11 CASE ...................................................................................... 22

    A.    Events Leading to the Bankruptcy Filing ............................................... 22

    B.    Significant Events During the Chapter 11 Case ...................................... 24

        1.    Retention of Debtor's Professionals and Agents ........................... 24

        2.    Appointment of the Creditors' Committee and Equity Committee .......... 24

        3.    Consummation of the CapitalSource Transaction ......................... 25

        4.    The Order Limiting Transfers of Equity ........................................ 25

5.     Insider Compensation ....................................................26

6.     Establishment of General Bar Date and Filing of Claims ........26

7.     Relief from Stay Motions — McIntyre, Faigin, and
The Bank of New York Mellon ...................................................27

8.     Engagement of KPMG Corporate Finance and
the Attempts to Negotiate a Consensual Plan ............................27

9.     Exclusivity .................................................................................28

10.    Settlement of Claims and Litigation ..........................................29

       a)     California Insurance Commissioner ....................................29

       b)     Massachusetts Attorney General .......................................31

       c)     Enron...................................................................................33

       d)     The Rampino Litigation and Associated Defendants'
Wages SERP, and Indemnification Claims ......................34

       e)     Other Settled and Resolved Claims ...................................36

       f)     Settlement With Bank of New York Mellon ....................36

11.    Allowance of Fees and Costs of Professionals Employed by
the Debtor, the Creditors' Committee, and the Equity Committee ..........37

V.    LITIGATION AND CAUSES OF ACTION ........................................................39

   A.    Litigation Commenced Pre-Petition ................................................39

   B.    Post-Petition and Other Potential Causes of Action .............................39

     1.     In General .....................................................................................39

     2.     Adv. Pro. No. 8:08-ap-01256-ES and
Adv. Pro No. 8:09-ap-01103-ES: the SERP Actions ................39

     3.     Adv. Pro. No. 8:08-ap-01258-ES:  The Art Action....................40

     4.     Adv. Pro. No. 8:08-ap-01418-ES:  The Insurance Action.........40

     5.     Adv. Pro. No. 8:08-ap-01470-ES:  The Mover Action...............40

     6.     ERISA Class Action ....................................................................40

     7.     The Securities Class Action (Al-Beitawi V. Fremont General Corp.,
Consolidated Securities Complaint, Case No. CV07-05756)....41

8.      Causes of Action Are to Be Retained Under Plan;
        No Waiver Should Be Implied ...................................................42

9.      Objections To Claims ...............................................................43

10.     Insurance Policies with Westchester Surplus Lines
        Insurance Company and Pacific Employers Insurance Company ...........43

VI.     GENERAL DISCUSSION OF ASSETS AND LIABILITIES ...................................44

        A.      Assets ...........................................................................44

        B.      Liabilities ......................................................................45

                1.      Liabilities Identified in the Schedules ....................................45

                2.      Proofs of Claim ..........................................................45

                3.      Senior and Junior Notes ..................................................46

                4.      Intercompany Claims .....................................................47

VII.    SUMMARY OF THE PLAN OF REORGANIZATION ...................................48

        A.      Allowance and Treatment of Unclassified Claims .............................49

                1.      Administrative Claims ....................................................49

                        a)      Administrative Claim Reserve..................................50

                        b)      Administrative Claims Bar Date................................50

                        c)      Deadline for Objections to Administrative Claims .................50

                        d)      U.S. Trustee Fees...............................................51

                        e)      Professional Fee Claims ........................................51

                        f)      Indenture Trustee Fees and Expenses...........................51

                2.      Priority Tax Claims.......................................................52

        B.      Allowance and Treatment of Classified Claims and Interests.....................53

                1.      Secured Claims (Class 1)..................................................53

                2.      Priority Non-Tax Claims (Class 2)..........................................53

                3.      General Unsecured Claims (Class 3)........................................54

                4.      Class of Equity Interests (Class 4)..........................................56

5.      Class or Claims Subordinated Under 11 U.S.C. § 51 0(b) (Class 5).........57

C.    Executory Contracts and Unexpired Leases ..................................................58

D.    Means of Effectuating the Plan........................................................................60

1.    Merger.........................................................................................................60

a)    The Assets and Liabilities of FGCC...............................................61

b)    The Assets and Liabilities of FRC.................................................61

2.    Postconfirmation Business Operations of the Reorganized Debtor ..........65

3.    The Reorganized Debtor's Management Team.......................................66

4.    Reporting Requirements ..........................................................................72

E.    Risk Factors .......................................................................................................73

1.    Additional Risks .......................................................................................74

a)    General Risks .................................................................................74

b)    Specific Risks ................................................................................74

F.    Tax Consequences of Plan................................................................................77

1.    Certain Federal Income Tax  Consequences of the Plan ...........................77

a)    General............................................................................................78

b)    Consequences to Debtor Group .....................................................79

c)    Overview of Section 382 ................................................................81

d)    Application of Section 382 to the Debtor Group............................84

2.    Consequences to Holders of Claims. .......................................................86

a)    Contingent Liability Claims ..........................................................87

b)    Debt Claims ...................................................................................87

c)    Distributions in Discharge of Accrued but Unpaid Interest. .........88

d)    Character of Gain or Loss...............................................................89

e)    Market Discount. ............................................................................90

3.    Consequences to Holders of Equity Interests. .........................................90

4.        Withholding. ...................................................................90

G.    Trading Restrictions...........................................................................91

H.    Retention of Jurisdiction ...................................................................93

I.    Claims ................................................................................................94

1.    Maintenance of Post-Confirmation Claims Register ...............94

2.    Claim Objections ...................................................................94

J.    The Committees .................................................................................95

VIII.    SECURITIES CONSIDERATIONS ...............................................................95

A.    Section 1145 of the Bankruptcy Code ...............................................96

B.    Section 4(2) of the Securities Act/Regulation D ...............................97

C.    Rule 144 and Rule 144A....................................................................98

D.    Investment Company Act Status ......................................................101

IX.    MISCELLANEOUS PROVISIONS GOVERNING DISBURSEMENTS....................102

A.    Dates of Distributions ......................................................................102

B.    Manner of Distribution ....................................................................102

C.    Undeliverable Distributions .............................................................102

D.    Rounding of Payments......................................................................102

E.    Compliance with Tax Requirements .................................................103

F.    Distribution of Unclaimed Property .................................................103

G.    No De Minimis Distributions ...........................................................104

H.    Setoff................................................................................................104

I.    Distribution Record Date .................................................................104

X.    CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN ...................................................105

A.    Conditions to Confirmation .............................................................105

B.    Conditions to Effective Date ...........................................................105

C.    Waiver of Conditions.......................................................................106

NEW WORLD DISCLOSURE STATEMENT

XI.      CONFIRMATION REQUIREMENTS AND PROCEDURES ......................................106

            1.      Votes Necessary for a Class to Accept the Plan ......................................107

            2.      Treatment of Non-Accepting Classes ......................................................107

XII.     BEST INTERESTS TEST AND FEASIBILITY ............................................................107

     A.      The "Best Interests Test" ..........................................................................107

     B.      Feasibility .................................................................................................112

XIII.    EFFECT OF CONFIRMATION OF PLAN....................................................................113

     A.      Discharge ..................................................................................................113

     B.      Vesting of Property of the Estate .............................................................115

     C.      Modification of Plan .................................................................................115

     D.      Post-Confirmation Status Report..............................................................115

     E.      Post-Confirmation United States Trustee Fees.........................................115

     F.      Exculpation ..............................................................................................116

     G.      Final Decree .............................................................................................116

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER BANKRUPTCY CODE SECTION 1125(B) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND THE DISTRIBUTION OF THE DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS SOLICITATION OF ACCEPTANCES AND REJECTIONS OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A BANKRUPTCY JUDGE DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(B) OF THE BANKRUPTCY CODE.**

## I.    __INTRODUCTION__

New World Acquisition, LLC ("New World"), Holders of significant Equity Interests in Fremont General Corporation (the "Debtor"), submits this Disclosure Statement in connection with the solicitation of acceptances and rejections of New World's proposed plan of reorganization for the Debtor (the "Plan").

**THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ACCOMPANYING PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS TO THESE DOCUMENTS IN THEIR ENTIRETY**.

**EXCEPT TO THE EXTENT THAT THIS DISCLOSURE STATEMENT EXPRESSLY STATES THAT ANY STATEMENT, REPRESENTATION, ESTIMATE OF ANALYSIS OR FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE  STATEMENT WAS FURNISHED BY THE DEBTOR TO NEW WORLD, THE CREDITORS COMMITTEE OR THE EQUITY COMMITTEE (AS SO REPRESENTED IN A PUBLIC FILING BY THE DEBTOR, THE CREDITORS COMMITTEE OR THE EQUITY COMMITTEE), ALL STATEMENTS, REPRESENTATIONS, ESTIMATES AND ANALYSIS OF FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE SOLELY THOSE OF NEW WORLD AND SHOULD NOT BE RELIED UPON AS STATEMENT OF THE DEBTOR OR ITS MANAGEMENT.**

**SOME STATEMENTS IN THIS DISCLOSURE STATEMENT MAY CONSTITUTE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.  SUCH STATEMENTS ARE BASED UPON INFORMATION AVAILABLE WHEN THE STATEMENT WERE MADE ARE SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL**

**RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN THE STATEMENT. NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR HAS ANY STATE SECURITIES COMMISSION APPROVED OR DISAPPROVED THE DISCLOSURE STATEMENT, PLAN OR ANY EXHIBITS.**

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**A.      Purpose of This Document**

The purpose of this Disclosure Statement is to set forth information (1) about the history of the Debtor, its business, and the chapter 11 case, (2) concerning the Plan and alternatives to the Plan, (3) advising the Holders of Claims and Equity Interests of their rights under the Plan, (4) assisting any Creditors and Equity Interest Holders in making an informed judgment regarding whether they should vote to accept and indicate their preference for this Plan and vote to reject any plan proposed by the Debtor or the Official Committee of Unsecured Creditors or the Official Committee of Equity Holders, and (5) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By Order dated _____, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" concerning the Plan, meaning that it contains sufficient information to enable any Holder of Claims and Equity Interest entitled to vote to make an informed judgment in exercising their rights to vote to accept or reject the Plan.  The Bankruptcy Court's approval of this Disclosure Statement or any other disclosure statement for a plan for the Debtor does not mean that the Court recommends either acceptance or rejection of a plan.  No solicitation of votes may be made except pursuant to an approved Disclosure Statement.

The only Creditors or Equity Interest Holders who may vote for or against the Plan are those who have a Claim or Equity Interest that is both (1) Allowed or Allowed for voting purposes and (2) classified in an impaired Class.  A Class is impaired if (a) the legal, equitable, or contractual rights of

the Claims or Equity Interests in the Class are altered, (b) the plan cures any default, reinstates the

maturity of the Claim, and compensates the Holder for certain losses or (c) as New World believes,

Creditors holding General Unsecured Claims are paid in full in Cash with interest on the Effective

Date.  Classes of Claims or Equity Interests that are not impaired are conclusively presumed to have

accepted the Plan and therefore, are not entitled to vote on the Plan.  Class 4 is the only impaired

Class under the New World Plan; all other Classes are deemed to have voted to accept the Plan.

However, out of an abundance of caution, Holders of Claims in Classes 3A, 3B, 3C and 5 are

receiving Ballots so that they can vote on the Plan and their vote can be counted in the event that the

Court disagrees with New World's characterization of the Class treatment and finds that any Class of

Claims is actually impaired.  New World reserves its rights to have the matter of Class impairment

determined prior to the Confirmation Date.

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement.

In other words, the terms of the Plan are not yet binding on any Creditor or Holder of an Equity

Interest.  However, if the Court later confirms the Plan, then the Plan will be binding on the Debtor

and on all Creditors and Equity Interest Holders in this case, whether or not the Holder of a Claim or

Equity Interest actually votes for the Plan.

New World, as proponent of the Plan, recommends that the Holders of Equity Interests in

Class 4 indicate on the ballot their preference for the New World Plan and reject any other plan.  In

addition, because the New World Plan provides the greatest certainty of full recovery for Creditors in

all Classes, New World recommends that Holders of Claims in Classes 3A, 3B, 3C and 5 vote to

accept the New World Plan.

THE FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT INCLUDES

INFORMATION THAT HAS NOT BEEN AUDITED OR REVIEWED BY AN INDEPENDENT

REGISTERED ACCOUNTANT.  NONE OF THE FINANCIAL INFORMATION INCLUDED

HEREIN HAS BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED

ACCOUNTING PRINCIPALS.

NEVERTHELESS, TO THE BEST OF NEW WORLD'S KNOWLEDGE AND BELIEF, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE.  AS INDICATED SUCH INFORMATION HAS BEEN STATED BY THE DEBTOR, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE IN THEIR FILINGS WITH THE BANKRUPTCY COURT.

**B.**    **Solicitation Package**

Accompanying this Disclosure Statement (which is provided on CD-ROM) is a package of hard copy materials called the "Solicitation Package."  The Solicitation Package contains copies of, among other things:

- The Bankruptcy Court order approving the Disclosure Statement and procedures for soliciting and tabulating votes in the Plan (the "Solicitation Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing sets, the voting deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against and Equity Interests in the Debtor, establishes the procedures for tabulating ballots used in voting on the Plan, and sets the deadline for objection to confirmation of the Plan;

- The Notice of the Hearing to Consider Confirmation of New Worlds' Plan of Reorganization for Fremont General Corporation; and

- One or more ballots and a postage-paid return envelope (ballots are provided only to Holders of Claims and Equity Interest that are entitled to vote on the Plan), which will be used by Creditors and Equity Interest Holders who are entitled to or who have been conditionally solicited to vote on the Plan.

**C.**    **Voting Procedures, Ballots, and Voting Deadline**

After carefully reviewing the materials in the Solicitation Package and the detailed

instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. Each ballot has been coded to reflect the Class of Claims or Equity Interests it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original ballot and return it in the envelope provided (only original signatures will be accepted). Please return your completed ballot to the Voting Agent, unless you are a beneficial holder of a Senior Note or Junior Note or Equity Interest (each as defined below) who receives a ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Nominee"), in which case you must return the ballot to such Nominee. Ballots should not be sent to the Debtor or to the Indenture Trustees for the Senior Notes or the Junior Notes.

If you are a beneficial holder of a Note who receives a ballot from a Nominee, in order for your vote to be counted, your ballot must be completed in accordance with the voting instructions on the ballot and received by the Nominee in enough time for the Institutional Nominee to transmit a Master Ballot to the Voting Agent so that it is received to later than November 25, 2009 at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline"). If you are the Holder of any other type of Claim, in order for your vote to be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and received by (the "Voting Agent") no later than the Voting Deadline. Any ballot received after the Voting Deadline shall be counted at the sole discretion of New World. Do not return any debt instruments or equity securities with your ballot.

**Any executed ballot that does not indicate either an acceptance or rejection of the Plan or indicates both and acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you have any questions about the procedure for voting your Claim or Equity Interest, materials that you have receive, or if you wish to obtain, at your own expenses, an additional copy of

this Disclosure Statement and its appendices and exhibits, please contact the Voting Agent. You may

obtain a copy of the Disclosure statement and Plan from (i) the Office of the Clerk, United States

Bankruptcy Court for the Central District of California, Santa Ana Division, 411 West forth St. Santa

Ana, California 92701; (ii) through the Court's website using PACER service

(www.cacb.uscourts.gov); and (iii) by making a written request to counsel for New World:

Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, New York 10020,

Attn: Daniel Pina, Paralegal, Facsimile: (212) 768-6800.

Before voting on the Plan, each Holder of Claims and Equity Interests in Classes that are

entitled to vote on the Plan should read, it its entirety, the Disclosure Statement, the Plan, the

Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the

ballots.  These documents contain important information concerning how Claims are classified for

voting purposes and how votes will be tabulated.

**D.    <u>Individual Ballots</u>**

If you are a Holder of an Allowed Claim in Classes 3A, 3B, 3C or 5 or a Holder of an

Allowed Equity Interest in Class 4, accompanying this Disclosure Statement is a Ballot for casting

your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.  BALLOTS FOR

ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS

OF CLAIMS AND EQUITY INTERESTS IN CLASSES 3A, 3B, 3C , 4 and 5 WHICH ARE

ENTITLED TO OR REQUESTED TO OR ARE BEING CONDITIONALLY SOLICITED TO

VOTE TO ACCEPT OR REJECT THE PLAN.  If you are the holder of a Claim and/or Equity

Interest in said Class(es), and (a) did not receive a Ballot, (b) received a damaged or illegible Ballot,

or (c) lost your Ballot, or if you are a party in interest and have any questions concerning the

Disclosure Statement, any of the Exhibits hereto, the Plan, or the voting procedures in respect thereof,

please contact Kurtzman Carson Consultants LLC ("KCC"), 2335 Alaska Avenue, Los Angeles,

California 310.823.9000, the balloting tabulator.

NEW WORLD DISCLOSURE STATEMENT

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY _____, 2010, AT 5 P.M. (THE "VOTING DEADLINE") AT THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE ENCLOSED WITH YOUR BALLOT.  BALLOTS MUST BE RECEIVED BY THE VOTING AGENT AT THE FOLLOWING ADDRESS BY THE VOTING DEADLINE: KURTZMAN CARSON CONSULTANTS LLC, 2335 ALASKA AVENUE, EL SEGUNDO, CA 90245.  BALLOTS NOT TIMELY RECEIVED BY THE BALLOT TABULATOR WILL NOT BE COUNTED.**

Votes cannot be transmitted orally or by e-mail.  Accordingly, you are urged to return your signed and completed Ballot promptly.  Ballots not received by the Voting Deadline and unsigned Ballots will not be counted.  Any executed Ballots that are timely received, but which do not indicate either an acceptance or rejection of the Plan, will be deemed to constitute an acceptance of the Plan.

The Bankruptcy Court has scheduled a hearing on Confirmation of the Plan for January 8, 2010 at 9:30 a.m. and to continue on January 15, 2010 at 9:30 a.m. (Pacific Time) at the United States Bankruptcy Court for the Central District of California, Santa Ana Division, Courtroom 5A, 411 W. 4th Street, Santa Ana, California.  Any objections to confirmation of the Plan must be in writing and filed with the Bankruptcy Court, and served so as to be received by 5 p.m. (Pacific Time) on December  , 2009, upon the following:  (1) counsel to New World, Lesnick & Prince LLP, 185 Pier Avenue, Suite 103, Santa Monica, CA 90405, Attn:  Christopher E. Prince; and Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, 25th Floor, New York, New York 10020, Attn: Carole Neville and Peter D. Wolfson; Telephone: (212) 768-6700;  (2) counsel to the Debtor, Patton Boggs LLP, 2001 Ross Avenue, Suite 3000, Dallas, Texas 75201, Attn:  Robert W. Jones, J. Maxwell Tucker, and Brent McIlwain and Stutman, Treister & Glatt, P.C., 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attn:  Theodore B. Stolman and Whitman L. Holt; (3) Office of the Untied States Trustee, 411 W. 4th Street, Suite 9041, Santa Ana, California 92701, Attn: Frank Cadigan; (4) counsel to the Official Committee of Unsecured Creditors, Klee, Tuchin,

NEW WORLD DISCLOSURE STATEMENT

Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, Attn:

Lee Bogdanoff & Jonathon Shenson; and (5) counsel to the Official Committee of Equity Holders,

Weiland Golden, Smiley, Wang Ekvall & Strok LLP, 650 Center Drive, Suite 950, Costa Mesa,

California 92626.

Both the Official Committee of Unsecured Creditors and the Official Committee of Equity

Holders have proposed plans which provide different treatment for Claims against and Equity

Interests in the Debtor and different corporate governance procedures.  Only the New World Plan

provides for an investment of new capital in the Debtor.  Only one of the Plans can be confirmed by

the Bankruptcy Court.  If more than one plan meets the requirements for confirmation, the

Bankruptcy court will consider the preferences of Creditors and Holders of Equity Interests in

determining which Plan to confirm.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  ANY TAX ADVICE THAT MAY BE

CONTAINED IN THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE USED AND

CANNOT BE USED FOR THE PURPOSE OF AVOIDING ANY TAX PENALTIES THAT MAY

BE IMPOSED ON ANY PERSON.  ALL CREDITORS AND EQUITY INTEREST HOLDERS

SHOULD CONSULT THEIR OWN LEGAL COUNSEL AND ACCOUNTANTS AS TO LEGAL,

TAX, AND OTHER MATTERS CONCERNING THEIR CLAIMS OR EQUITY INTERESTS.

## II.    OVERVIEW OF NEW WORLD'S PLAN

The following is a brief summary of the material provisions of the Plan and is provided for

convenience only.  A more detailed description of the Plan appears below.  .

### A.    The Merger of Fremont General Credit Corporation and Fremont Reorganizing Corporation Into the Debtor

New World's Plan is designed to meet the two primary goals of Chapter 11—the

reorganization of the business operation and the satisfaction of Claims and Equity Interests.

The Plan's business objective is to simplify the corporate structure of the Debtor and its wholly-owned subsidiary, Fremont General Credit Corporation ("FGCC"), and FGCC's wholly-owned subsidiary, Fremont Reorganizing Corporation, formerly known as Fremont Investment & Loan ("FRC") by effecting a merger of these three entities and vesting title to all Assets of the Debtor, FGCC, and FRC in the Reorganized Debtor, which will then make distributions to Holders of Allowed Claims and Equity Interests in accordance with the Plan and after making appropriate reserves for creditors of FGCC and FRC.

The New World Plan provides the Reorganized Debtor with additional liquidity by way of (i) a $6.8 million equity investment (with the shares priced at the 90 day average prior to the disclosure statement hearing on the New World Plan) and (ii) Exit Financing of $20 million for operations, general corporate purposes and reserves for making the Distributions required by the Plan and to the holders of Post-Effective Date Merger Claims.  The shares of the Debtor's common stock have been trading from a low of $.30 to a high of $.41 during the period of August through October 2009.  New World will receive Warrants to acquire shares of the Reorganized Debtor at an average price of $.67 and may allocate certain of those Warrants to the lender in connection with the Exit Financing.  In addition, under the New World Plan, the operations of the Reorganized Debtor will be under the supervision of a representative and experienced Board that will maximize the value of the operations for the benefit of the Creditors, holders of Post-Effective Date Merger Claims and Equity Interests and observe all good corporate governance practices.

**B.**    **Treatment of Claims Against the Debtor and Equity Interests in the Debtor**

The New World Plan proposes to make a substantial payment of Cash on account of Unsecured Claims, other than on account of the TOPrS and Junior Notes, which will be Reinstated exactly in accordance with the terms of the Indenture.  Accordingly, the Plan contains an efficient Distribution mechanism that will allow the Distributions to Holders of Allowed Claims through the Reorganized Debtor or a designee or in the case of the Senior Note, through the Indenture Trustee

- 10 -

rather than through an elaborate system of trusts and plan administrators..

The Plan designates a series of Classes of Claims against the Debtor and one Class of Equity Interests in the Debtor.  The following table summarizes the treatment of Claims and Equity Interests under the Plan with:  (1) estimates of the amount of Claims in each category or Class that will be finally determined to be Allowed Claims; and (2) a description of the treatment provided for in the Plan for each Class of Claims and Equity Interests.  The dollar amounts are based on the records of the Debtor as of the Petition Date or the date of the disclosure statement proposed by the Creditors Committee and the Equity Committee and do not constitute an admission by New World or the Debtor, the Creditors Committee or the Equity Committee as to the validity or amount of any particular Claim or Equity Interest.  All rights of any party in interest to dispute the validity or amount of any Claim or Equity Interest that have not already been Allowed by the Bankruptcy Court or by agreement of the parties have been reserved.

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| N/A | Administrative Claims[1] | Unless any entity entitled to payment of an Allowed Administrative Claim agrees to a less favorable treatment or unless otherwise ordered by the Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Claim, Cash in an amount equal to the amount of the Allowed Administrative Claim on the later of:  (1) the Effective Date, or (2) the fifteenth Business Day after | New World estimates that the projected range of unpaid Administrative Claims will be from $2,000,000 to $2,500,000. | 100% | No |

_____

[1] Administrative Claims described in this table do not include Administrative Claims that have already been paid or any intercompany Administrative Claims that may be due to FRC.  Other Claims that are treated in this category include, U.S. Trustee Fee, Professional Fees and Indenture Trustee Fees.

NEW WORLD DISCLOSURE STATEMENT

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable. However, Ordinary Course Administrative Claims will be paid in full in accordance with the terms and conditions of the particular transaction or agreement that gave rise to the Ordinary Course Administrative Claim or as otherwise authorized by the Court. | | | |
| N/A | Priority taxes | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date, agrees to different treatment or is subject to the Final Order of the Bankruptcy Court, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable, provided that the Reorganized Debtor may, at its sole option, pay an | The Debtor has estimated the range from $100,271 to $102,676,574.[2] New World has estimated that the Allowed Priority Taxes will be significantly below the high end of the range. | 100% | No |

2 The $102,676,574 figure includes the IRS's proof of claim in the amount of $89,384,470 and the California Franchise Tax Board's proof of claim in the amount of $13,292,104 and does not represent the Debtor's view of the amount that ultimately is likely to be Allowed. The Debtor disputes the proofs of claim filed by the IRS and the California Franchise Tax Board.

NEW WORLD DISCLOSURE STATEMENT

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | | Allowed Priority Tax Claim in equal quarterly payments over a period not exceeding five years after the Petition Date with simple interest at the rate of applicable non bankruptcy law. | | | |
| 1 | Secured Claims | In full satisfaction of any Allowed Secured Claim, the Holder of the Allowed Secured Claim will receive either the full amount of the Allowed Secured Claim in Cash on the later of the Effective Date or fifteen days after the Claim becomes an Allowed Secured Claim or the Collateral securing the Allowed Secured Claim. Any Allowed deficiency balance will be treated in Class 3A. | Neither the Debtor nor New World are aware of any valid Secured Claims. | 100% | No |
| 2 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim on the later of (1) the Effective Date or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim, or in either case, as soon thereafter as is practicable | The Debtor has estimated the range from $0 to $68,253 | 100% | No |
| 3A | General Unsecured Claims (excluding the of Claims represented by | Except as provided below with respect to the Holder of an Allowed General Unsecured Claim that is party to a settlement, compromise, stipulation or | Approximately $56.5 million Class 3A includes the proof of claim filed by the | 100% | No |

- 13 -

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | the Senior Notes (3B) and the TOPrS Claims and Junior Note Claims(Class 3C)) | order, or the Holder of an Allowed Class 3A agrees to different treatment, the Holder of an Allowed Class 3A General Unsecured Claim shall retain their legal, equitable, and contractual rights and on the later of the Effective Date of the Plan or within fifteen business days from the date such Claim becomes an Allowed Claim or as soon thereafter as is practicable such Holder shall be paid in full in Cash with prepetition interest and Post Petition Interest (at the federal judgment rate of 2.51%) calculated from the Petition Date until the Distribution.<br><br>The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BNY Stipulation or any other settlement, compromise, stipulation or order which provides for different treatment shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of (1) the fifteenth Business Day after the Effective Date or (2) the fifteenth Business Day after the Claim becomes an Allowed Claim, or in either case, s soon thereafter as is practicable. | Debtor's indirect wholly-owned subsidiary, FRC, in an unspecified amount. | | |

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| 3B | General Unsecured Claims of the Holders of the 7.875% Senior Notes | The Holders of the Senior Notes will be paid their principal, plus prepetition interest at the rate set forth in the Senior Notes, and Post Petition interest at the federal judgment rate in effect as of the Petition Date, which was 2.51% on the Effective Date.  The Plan provides for the payment of the reasonable fees of the Indenture Trustee without reduction to the distribution to the Noteholders. | $176,402,107, (on the Petition Date) | 100% | No |
| 3C | TOPrS Claims | The Holders of Allowed TOPrS Claims shall retain their legal, equitable, and contractual rights provided by the Indenture dated as of March 6, 1996.  The TOPrS and Junior Notes shall be Reinstated.

The Plan provides for the reasonable fees of the Indenture Trustee and the payment of Indenture Trustee fees after the Effective Date. | $107,422,681 (as of Petition Date) | 100% | No |
| 4 | Equity Interests | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor in full and final satisfaction of their Equity Interests, subject to dilution as a result of the issuance of stock for a reserve for Warrants to be issued, New World Equity Investment , and to the extent necessary to satisfy Class 5 Claims. | As of the Petition Date, approximately 82,116,176 shares of the Debtor's common stock had been issued | | Yes |
| 5 | Section 510(b) | The Holders of Allowed Section 510(b) Claims will | Unknown | 100% | No |

- 15 -

| Class | Description of Claim or Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims or Interests | Impaired and Entitled to Vote |
|---|---|---|---|---|---|
| | Claims | receive newly-issued interests in the Reorganized Debtor in full and final satisfaction of their Allowed Section 510(b) Claims. The percentage interest of common stock to which such Holders will be entitled shall be based upon the average trading value of the common stock of the shares of the Reorganized Debtor for the thirty days preceding the date on which any Section 510(b) Claims become Allowed Section 510(b) Claims if such allowance occurs after the Effective Date. | | | |
| | | If the Court determines in a Final Order that the Allowed Class 5 Claim is not subject to subordination under 11 U.S.C. § 510(b), then the Holder of the Allowed Class 5 Claim will receive the same treatment as holders of Claims in the appropriate Class of Unsecured Claims or Equity Interests. | | | |
| | | Certain of the Section 510(b) Claims shall be reduced or satisfied by proceeds from insurance policies. | | | |

## III. __HISTORY OF THE DEBTOR__

The Debtor is a publicly-held Nevada corporation that has functioned as a financial services holding company. Its prepetition business operations were conducted through two intermediate holding companies--one for banking operations and one for insurance operations. Prepetition, the

- 16 -

Debtor's common stock was traded on the New York Stock Exchange under the symbol "FMT."

## A.    The Banking Operations

The Debtor engaged in both commercial and residential real estate lending nationwide through FRC, the Debtor's industrial bank subsidiary.  FRC focused on the origination of commercial real estate loans and held these loans primarily for investment.  Its consumer lending operations focused on the origination of non-prime and sub-prime residential real estate loans, most of which were sold to third party investors or securitized.  FRC was one of the nation's largest originators of sub-prime loans.  Prepetition, FRC offered certificates of deposit and savings and money market deposit accounts through its 22 retail banking branches in California.

FRC's business grew rapidly in the years before the Debtor's bankruptcy filing.  FRC's total amount of residential loan originations increased from approximately $14 billion in 2003 to approximately $36 billion in 2006.  Its commercial real estate loan originations also increased from approximately $1.1 billion in annual mortgage originations in 2003 to approximately $8.3 billion in 2005.  However, the sub-prime lending market deteriorated significantly in 2007.  A periodic review by the Federal Deposit Insurance Corporation ("FDIC") of FRC's sub-prime lending operations led to the issuance of a cease-and-desist order with respect to some of FRC's past sub-prime lending practices.  The cease and desist order required much higher capital levels, making it more difficult for FRC to operate in the sub-prime business.  As a result, FRC decided to discontinue its sub-prime lending activities.  As of March 7, 2007, FRC ceased entering into new funding commitments for sub-prime mortgage loans, although it continued to honor remaining outstanding commitments.  FRC also sold substantially all of its commercial real estate loan portfolio during 2007, terminating FRC's interest in its commercial real estate lending business.

The vast majority of FRC's originated residential loans were transferred to third parties via a whole loan sale or securitizations.  Most of FRC's loans were transferred via a whole loan sale.  In a whole loan sale, FRC entered into an agreement to sell loans for cash, generally on a servicing

released basis, but occasionally on a servicing retained basis.  As part of the sale process, FRC gave

customary representations and warranties regarding the characteristics and origination process of the

loans.  FRC also generally committed to repurchase loans if a payment default occurred within a

certain period after the loan was sold.

In a securitization, FRC transferred residential loans to a qualifying special-purpose entity,

established for the limited purpose of purchasing the loans and issuing interest bearing securities that

represented interests in the loans.  The transfer of the loans in a securitization was treated as a sale,

with the loans being removed from FRC's balance sheet, although FRC continued to perform loan

servicing functions for the securitizations.

For various reasons, some of the loans that FRC originated were not sold to other parties.  In

March and April of 2007, FRC entered into whole loan sale agreements that transferred the majority

of FRC's unsold sub-prime residential real estate loans, valued at approximately $6.9 billion.

New World is advised that the existing cash and assets of FRC greatly exceed FRC's own

liabilities, even in a liquidation.

### B.     The Insurance and Indemnity Operations

On the insurance side, the Debtor owns all of the common stock of Fremont Compensation

Insurance Group, Inc. ("FCIG").  FCIG in turn owns 100% of bare legal title to the common stock of

Fremont Indemnity Company in Liquidation ("Indemnity") and 100% of bare legal title to the

common stock of Fremont Life Insurance Company ("Life").

Indemnity operated in the property and casualty insurance industry and engaged in the

underwriting of workers' compensation insurance policies.  In June 2003, Indemnity was placed into

a state "conservation" proceeding under section 1101 of the California Insurance Code, and the

following month, that proceeding was subsequently converted into a liquidation proceeding under

section 1016 of the California Insurance Code.  In connection with those proceedings, the California

Insurance Commissioner obtained all of the powers of the directors, officers, and manager of

1  Indemnity, as well as sole control over Indemnity's property.

2      Life operated as a licensed life, annuity, and accident, and health insurance company,

3  although it had discontinued writing new policies in 1995 and in 1996 entered into a coinsurance

4  agreement to reinsure all existing annuity, life, and credit in-force business.  By 2004, Life had

5  terminated its life, disability, workers' compensation and common carrier liability lines.  Life was

6  placed into a state "conservation" proceeding by the CIC in June 2008.

7      **C.      The Debtor's Management**

8      Until November 2007, the Debtor was managed by a management team that included

9  Chairman of the Board James A. McIntyre, President and Chief Executive Officer Louis J. Rampino.

10 Mr. McIntyre and Mr. Rampino were each employed by the Debtor for approximately thirty years.

11 Mr. McIntyre served as the Debtor's Chief Executive Officer from 1976 until 2004, when Mr.

12 Rampino was appointed as Chief Executive Officer.

13     In November 2007, Mr. McIntyre, Mr. Rampino, and several of the Debtor's other officers

14 and directors resigned after the Debtor continued to experience significant financial difficulties.  The

15 Debtor's previous management team was replaced with a new management team, including

16 Chairman of the Board of Directors and Chief Executive Officer Stephen H. Gordon and Vice-

17 Chairman and President David S. DePillo.  This management team managed the Debtor from

18 November 2007 through October 2008.  Gordon and DePillo resigned from day-to-day management

19 on September 30, 2008, but remained on the board as chairman and vice-chairman, respectively.  On

20 October 1, 2008, Richard A. Sanchez replaced Mr. DePillo and Mr. Gordon and became the Debtor's

21 Interim President and Interim Chief Executive Officer.  Mr. Sanchez has served as Interim President

22 and Interim CEO through the present date.  Other members of the new management team, namely

23 Thea K. Stuedli as the chief financial officer and Donald E. Royer as the general counsel, have

24 remained in their positions since November 2007.

25     In November 2007, in connection with the hiring of the new management team, the Debtor

26

27

28

- 19 -                NEW WORLD DISCLOSURE STATEMENT

and FRC entered into employment agreements (together, the "Employment Agreement") with Gordon, DePillo, Sanchez, Royer, and Stuedli (together, the "Executives") for a term of three years. Notices of non-renewal of the Employment Agreement are expected to be sent in November 2009. Among other things, the Employment Agreements provide that the Debtor and FRC are jointly and severally obligated to pay the Executives' salaries. In addition, if an Executive is terminated for other than "cause" of a voluntary resignation for "good reason," then the Debtor and FRC may be obligated to pay them severance compensation equal to 300% of their average annual bonus and provide continued health benefits for three years. Moreover, if there is a "change in control event," which includes situations where any person becomes the beneficial owner of 20% of the voting securities of the Debtor or FRC or a reorganization or merger where the resulting entity is not the Debtor or FRC, then any outstanding and unvested equity awards the Executive is eligible to receive automatically fully vest.

The Employment Agreements with Sanchez, Royer, and Stuedli (the "Executive Employment Agreements") will be assumed under the Plan and they will continue to retain their executive positions and perform their existing job descriptions with the Reorganized Debtor following the Effective Date, should they decide to continue to serve. As of the date of this Disclosure Statement, they have not made a decision about whether to continue to serve. In addition, the Debtor has advised New World that Sanchez, Royer, or Stuedli may take the position that "good reason" exists for one or more of them to resign under the terms of the Executive Employment Agreements and that they are entitled to certain payments by the Debtor as a result of their resignation. New World does not agree with that contention. In the event that they elect to continue to serve, their biographical information follows.

1. **Richard A. Sanchez, Interim President and Interim Chief Executive Officer**

Mr. Sanchez has served as both a bank executive and a banking regulator. From 2002

NEW WORLD DISCLOSURE STATEMENT

through 2006, he was a director of Commercial Capital Bancorp, Inc. ("CCBI") and served as the Executive Vice President, Chief Administrative Officer, and Corporate Secretary for CCBI and Commercial Capital Bank ("CCB").  Prior to that, he was Deputy Regional Director for the Office of Thrift Supervision, where he supervised examiners responsible for 85 insured financial institutions with total assets of over $300 billion.

### 2.    Thea Stuedli, Executive Vice President and Chief Financial Officer

Ms. Stuedli is a certified public accountant with more than eleven years of financial services experience.  From 2004 to 2006, Ms. Stuedli served as Senior Vice President and Chief Accounting Officer at CCB, where she was primarily responsible for all internal and external financial reporting requirements, including all SEC filings, board of directors' reports, and regulatory reports.  From 2002 through 2004, she served as the Corporate Controller at Jackson Federal Bank and, before that, served as a manager in the financial services practice at KPMG, LLP.

### 3.    Donald E. Royer, Executive Vice President and General Counsel

Mr. Royer has served in various capacities in the California financial services industries.  In 2007, he acted as a consultant in representing various mortgage lenders.  In 2006, Mr. Royer joined CCBI and CCB as Executive Vice President and General Counsel.  From 2002 to 2006, Mr. Royer was in private practice as an attorney.  From 1991 to 2002, Mr. Royer was employed by Downey Savings as Executive President, General Counsel, and Corporate Secretary.  From 1988 to 1991, Mr. Royer served as Executive Vice President and General Counsel of American Savings Bank, and from 1984 to 1988 was the Executive Vice President and General Counsel of Financial Corporation of America and American Savings and Loan Association.  Before that, Mr. Royer held positions as general counsel for American Savings and Loan Association.  He began his legal career at First Federal Savings.

NEW WORLD DISCLOSURE STATEMENT

## IV.    THE CHAPTER 11 CASE

### A.    Events Leading to the Bankruptcy Filing

FRC was one of the nation's largest sub-prime lenders.  Although FRC resold the vast majority of all loans that it originated via "whole loan" sales, FRC remained obligated to repurchase loans that it had sold if they experienced a payment default within a certain period of time after being sold.  FRC's loan repurchase obligations increased significantly in 2006.

A combination of loan repurchase losses and deterioration in the sub-prime loan market caused FRC to experience significant erosion in its statutorily mandated capital ratios.  Consequently, on February 27, 2007, the FDIC provided the Debtor and FRC with a Cease and Desist Order, which required the Debtor to take steps to improve FRC's Tier 1 capital ratio and significantly adjust and improve its sub-prime lending practices.  As a result of the Cease and Desist Order, FRC decided to completely terminate all new sub-prime funding commitments on March 7, 2007, although it continued to honor existing funding commitments made before March 7, 2007.  FRC reached agreements to sell its remaining residential and commercial real estate loan portfolios to third parties during the first half of 2007.

Even after ceasing residential lending, disposing of residential and commercial loan portfolios, completing the sale of significant portions of FRC's assets, and taking other steps to comply with the Cease and Desist Order, the Debtor was not able to sufficiently repair the damage to FRC's capital position caused by the sub-prime lending crisis.  The FDIC issued a Supervisory Prompt Corrective Action Directive (the "Directive") on March 26, 2008, which that gave the Debtor sixty days to either recapitalize FRC or accept an offer for FRC to be acquired by another depository institution.  In order to comply with the Directive, the Debtor reached an agreement with CapitalSource, Inc. ("CapitalSource"), where CapitalSource would agree to purchase substantially all of FRC's principal assets and assume its deposits.  Because the Debtor was a publicly traded entity, it would have to comply with SEC proxy rules in order to complete the sale to CapitalSource.

NEW WORLD DISCLOSURE STATEMENT

However, given its dire financial condition, the Debtor determined that it would be unable to complete an audit of its 2007 consolidated financial statements and required subsequent quarterly financial statement reviews.  Under SEC proxy rules, both of these items would have to be completed before the Debtor could solicit shareholder approval of the CapitalSource Transaction.  Given the difficulties associated with completing a sale outside of bankruptcy, the Debtor determined that its best option for completing the sale would be to seek protection under Chapter 11 of the Bankruptcy Code and complete the sale.  Accordingly, on June 18, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued to manage its Assets and properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

As of the Petition Date, the Debtor's books and records reflected that the Debtor's common stock was held by approximately 120 holders of record, with no person or entity holding more than 20% of the Debtor's common stock.  The Debtor's common stock had been listed on the New York Stock Exchange ("NYSE") under the "FMT" symbol.  On or about April 14, 2008, the NYSE announced that the Debtor's stock should be suspended prior to the opening of trading on April 17, 2008.

Also as of the Petition Date, the Debtor had two issues of debt securities outstanding.  On March 1, 1999, the Debtor issued its "Senior Notes," in principal face amount of $200,000,000.  As of the Petition Date, approximately $176,400,000 in principal plus accrued interest was outstanding.

On March 6, 1996, the Debtor issued the Junior Notes to the Debtor's wholly-owned subsidiary, Fremont General Financing I, a Delaware business trust.  Fremont General Financing I in turn issued preferred securities that had been traded on the NYSE under the symbol "FMTPR."  Generally, the Debtor would make payments on account of the Junior Notes to Fremont General Financing and Fremont General Financing would make distributions to the holders of the TOPrS.  As of the Petition Date, the Debtor's books and records reflected that approximately $103 million in

- 23 -                     NEW WORLD DISCLOSURE STATEMENT

principal amount plus interest of Trust Preferred Securities ("TOPrs") remained outstanding.

### B.    Significant Events During the Chapter 11 Case

#### 1.    Retention of Debtor's Professionals and Agents

After filing its petition for reorganization, the Debtor retained the law firm of Patton Boggs

LLP, as reorganization counsel, effective as of June 18, 2008.  The Debtor also retained the law firm

of Stutman, Treister & Glatt, PC, to assist Patton Boggs in rendering bankruptcy-related services to

the Debtor.  The Bankruptcy Court approved the Debtor's employment of these professionals,

effective as of the Petition Date, pursuant to orders entered on September 29, 2008.

The Debtor has also retained (i) FTI Consulting, Inc. ("FTI") to provide interim management

and management assistance to the Debtor, (ii) the law firms of Willenken, Wilson, Loh & Lieb, LLP,

Epstein Becker & Green, PC and The Caldwell Law Firm as special litigation counsel, and (iii)

KPMG Corporate Finance LLC ("KPMGCF") as the Debtor's exclusive financial advisor in

conjunction with a contemplated transaction that could form the basis for a plan of reorganization.

The Debtor has also retained Squar, Milner, Peterson, Miranda & Williamson, LLP and Ernst

& Young, LLP as the Debtor's independent accountant and auditor.

#### 2.    Appointment of the Creditors' Committee and Equity Committee

On July 1, 2008, the U.S. Trustee appointed an official committee of creditors holding

unsecured claims against the Debtor (the "Creditors' Committee") to represent the interests of the

general unsecured creditors of the Estate.  The members of the Creditors' Committee are:  (1)

Tennenbaum Multi-Strategy Master Fund, which serves as the chair; (2) HSBC Bank USA, N.A., the

Indenture Trustee for holders of the Debtor's 7.875% Senior Notes; (3) Wells Fargo Bank, N.A., as

successor trustee to the Bank of New York Trust Company, N.A., the Indenture Trustee for holders

of the Debtor's 9% Junior Subordinated Debentures; (4) Dennis & Loretta Danko Family Trust; and

(5) Rita Angel.  In addition, Howard Amster and Roark, Rearden & Hamot Capital Management

serve as "ex officio" members of the Creditors Committee.

NEW WORLD DISCLOSURE STATEMENT

The Creditors Committee has employed Klee, Tuchin, Bogdanoff & Stern LLP ("Klee Tuchin") as its counsel, the Solon Group, Inc. ("Solon") as its financial advisor on a limited basis in the Case, and Bocarsly Emden Cowan Esmail & Arndt LLP ("Bocarsly") as its tax advisor.

On July 8, 2008, the U.S. Trustee appointed the Equity Committee to represent the interests of the equity Holders.  The initial members of the Equity Committee were:  (1) John M. Koral; (2) William M. Stern; (3) Paul Dagostino; (4) William Holmes; (5) Frank E. Williams, Jr.; (6) Jeffrey M. Pies; (7) Lynn Ehlers; (8) John M. Mlynick; and (9) Jonathan Siegal. The latter two later resigned from the Equity Committee. The Equity Committee has employed, with the Bankruptcy Court's approval, Weiland Golden as its counsel and CRG as its financial advisor.

### 3.    Consummation of the CapitalSource Transaction

Within a week of the Petition Date, the Debtor filed its Motion for Order Authorizing the Debtor to Use the Shares of Non-Debtor Subsidiary to Consummate the CapitalSource Transaction (the "CapitalSource Motion"), which sought entry of an order authorizing the Debtor, as sole shareholder, to use its shares of a non-debtor subsidiary to consummate the CapitalSource Transaction.  Following a hearing on July 17, 2008, the Court entered an order approving the CapitalSource Motion, which order was supported by accompanying Findings of Fact and Conclusions of Law.

The CapitalSource Transaction closed on or about July 25, 2008, and FRC subsequently surrendered its banking charter to the state of California and changed its name from Fremont Investment & Loan to Fremont Reorganizing Corporation.  As a result of the CapitalSource Transaction — which both the Creditors' Committee and the Equity Committee supported — seizure of FRC by the FDIC was avoided and significant value was preserved for all stakeholders.

### 4.    The Order Limiting Transfers of Equity

On the Petition Date, the Debtor filed an emergency motion for an order limiting certain transfers of Equity Interests in the Debtor.  The motion was filed because the Debtor's consolidated

- 25 -

federal corporate income tax return for 2007 reflect NOLs of $695,469,659 that, if preserved, could

yield a tax benefit of more than $200 million.  However, the Debtor was concerned that unregulated

postpetition trading of the Debtor's equity interests could reduce or eliminate the value of the NOLs

that it thought might be critical to its reorganization.  Accordingly, the Debtor sought an order

limiting and tailoring restrictions on trading and requiring the Debtor to receive advance notice of any

transfers that could have the effect of jeopardizing the NOLs.  The Court granted the requested relief

with an order that was entered on June 19, 2008.

### 5.    Insider Compensation

During the Case, the Debtor sought Court approval of the post-petition compensation of its

current and past officers and directors, including Stephen H. Gordon, David S. DePillo, Donald E.

Royer, Richard A. Sanchez, and Thea K. Stuedli.  The Court approved a stipulation on September 15,

2008, that set the post-petition compensation for each of these officers or directors and established a

mechanism for apportioning the executive compensation cost among the Debtor and FRC.

### 6.    Establishment of General Bar Date and Filing of Claims

On September 4, 2008, pursuant to a Stipulated Order Regarding the Claims Bar Date, the

Court established November 10, 2008, as the general claims bar date for all Persons other than

governmental units to file proofs of Claim or Equity Interests arising prior to the Petition Date,

pursuant to section 501 of the Bankruptcy Code, and (2) December 15, 2008, as the claims bar date

for governmental units to file pre-petition Claims.

Over 900 Proofs of Claim have been filed against the Debtor, including a limited number after

the Claims Bar Date.  Based on its preliminary review, it appears that many of these asserted Claims

are invalid and/or inflated and, ultimately after Claims objection litigation, the aggregate Claims

amounts should be significantly reduced.

NEW WORLD DISCLOSURE STATEMENT

### 7.    Relief from Stay Motions — McIntyre, Faigin, and The Bank of New York Mellon

During the Case, two of the Debtor's former Officers, James A. McIntyre and Alan C. Faigin filed motions seeking relief from the automatic stay under Bankruptcy Code section 362.  Former CEO McIntyre sought relief from the automatic stay to allow him to pursue litigation requiring the Debtor to hold a shareholder's meeting.  After conducting a hearing on the matter, the Bankruptcy Court entered an order on October 24, 2008, denying, without prejudice, McIntyre's motion to lift the stay.

Former General Counsel Faigin filed a motion to lift the automatic stay in order to pursue state court litigation against the Debtor and FRC under a theory that both entities were jointly liable for amounts that were still allegedly owed to Faigin under his pre-petition employment contract with the Debtor.  Although the Debtor, but not FRC, was a party to Faigin's employment contract, Faigin had attempted to pursue arbitration against FRC, which is not a debtor in bankruptcy, under a theory that both Debtor and FRC were joint employers of Faigin.  The Bankruptcy Court entered an order on December 24, 2008 allowing Faigin's litigation against FRC to proceed on the condition that Faigin amend his complaint to remove all allegations against the Debtor and refrain from seeking discovery from the Debtor in connection with the state court litigation.  The Debtor has entered into stipulation whereby Faigin dismissed hi claims in Adversary Proceeding No. 08-1256 with prejudice as to all defendants other than the Debtor and without prejudice as to the Debtor.

### 8.    Engagement of KPMG Corporate Finance and the Attempts to Negotiate a Consensual Plan

On January 6, 2009, the Bankruptcy Court approved the engagement of KPMG Corporate Finance LLC ("KPMGCF"), a subsidiary of KPMG LLP (UK), as the Debtor's financial advisor to locate potential acquirers of the Debtor who might act as a sponsor in a potential plan of reorganization.  In connection with this engagement, KPMGCF distributed marketing materials informing potential investors of the opportunity to act as the sponsor of the Debtor's plan of

reorganization.

As a result of KPMGCF's marketing efforts, 26 parties entered into non-disclosure agreements and were provided access to information about the Debtor and its management. Ultimately, the Debtor received six non-binding letters of intent from interested third parties.

In Spring 2009, the Debtor evaluated each of these proposals to determine whether the implementation of any of such proposals through a plan of reorganization was viable and consulted with the committees to determine their positions. Neither of the Committees adopted any of the proposals. Ultimately, the Debtor proposed its own plan.

New World has been advised that KPMGCF may claim a transaction fee in excess of $1 million in connection with the New World Plan based on the Exit Financing, the tax and the New World equity purchase in addition to an $850,000 transaction fee. New World reserves all rights with respect to such claims. Notwithstanding the reservation of rights with respect to any additional fees claimed by KPMGCF, New World has included the claim for $850,000 in its Projections in its estimate of Professional Fees.

### 9.    **Exclusivity**

Pursuant to the Bankruptcy Code, a debtor-in-possession, has 120 days from the date of the filing of its Chapter 11 petition with the Bankruptcy Court in which to file a plan of reorganization, subject to Bankruptcy Court's authority to grant extensions of this exclusive period for cause. During this exclusive period no other person or entity is permitted to file a plan of reorganization. The Debtor obtained an extension of its exclusive periods to June 1, 2009, to propose its plan and September 1, 2009, to solicit votes on the plan. Although the Debtor filed its plan, the Creditors' Committee filed a motion to terminate exclusivity that was set for a hearing on July 14, 2009. The Equity Committee joined in that motion and the Court granted the motion and terminated exclusivity effective July 17, 2009. Both the Creditors' Committee and the Equity Committee have filed plans.

10.    **Settlement of Claims and Litigation**

During the course of the Case, the Debtor has achieved settlements of various matters.  In some instances, the Debtor has negotiated final terms of settlement, subject only to obtaining Bankruptcy Court approval.  The following narrative describes the more significant settlements.

a)    California Insurance Commissioner

In June 2004, the California Insurance Commissioner (the "CIC"), as Indemnity's statutory liquidator, sued the Debtor and FCIG in state court, alleging that they improperly utilized net operating loss deductions ("NOLs") allegedly belonging to Indemnity (the "NOL Case").  In 2005, the CIC filed another complaint against the Debtor and others on behalf of Indemnity as successor in interest to Comstock Insurance Company ("Comstock"), a former affiliate of Indemnity that was subsequently merged into Indemnity.  That case alleged similar causes of action regarding the utilization of NOLs as well as assertions of improper transactions with other insurance subsidiaries and affiliates of Indemnity (the "Comstock Action").  In 2008, FRC was added as a defendant in both the NOL Case and the Comstock Action.

As a result of disputes as to whether Indemnity, which is in liquidation, and its subsidiaries could be considered part of the Debtor's consolidated taxpayer group for federal income tax purposes, the CIC requested that the IRS issue a private letter ruling to resolve the dispute.  The IRS issued it on July 26, 2006, and based on that ruling, the CIC has taken the position that Indemnity and its subsidiaries should be included in the Debtor's consolidated taxpayer group, and the Debtor has maintained its objection to such tax treatment (the "Tax Deconsolidation Dispute").

The CIC also filed a lawsuit in California state court asserting on behalf of Indemnity claims of ownership to substantial portions of artwork, including any related proceeds from the sale of that artwork, that were at any time in the possession or control of the Debtor or its affiliates.  The Debtor removed that action to the Bankruptcy Court on July 11, 2008, and it remains pending as case number 08:08-ap-01258-ES (the "Art Adversary Dispute").  The claims are being asserted against the Debtor,

NEW WORLD DISCLOSURE STATEMENT

FRC, and four current or former employees of the Debtor.

In connection with these various adversary proceedings, the CIC filed four claims with the Bankruptcy Court, asserting the claims set forth in the NOL Case, the Comstock Action, the Art Adversary Dispute, and the Tax Consolidation Dispute.  Collectively, the liquidated amounts of these asserted claims exceed $489 million, and also included unliquidated amounts.

In April 2009, the Debtor, FRC, and FCIG (together, the "Fremont Entities") and the CIC, in its capacity as the statutory liquidator or Indemnity and the statutory conservator of Life, entered into a stipulation agreement that settled their disputes (the "CIC Stipulation").  In the CIC Stipulation, the Fremont Entities and the CIC agreed to the following:

(1)     Tax Issues:  Within 20 days of the CIC Stipulation's effective date, the Fremont Entities will take the appropriate action to document that Indemnity has been deconsolidated from the group of affiliates of the Debtor that elect to participate in a consolidated federal taxpayer group so that Indemnity can use any NOLs generated by Indemnity on or after January 1, 2003, on its own tax returns.  In addition, the Debtor has agreed to cooperate with the CIC in the preparation, filing, approval, and consummation of the statutory liquidation case involving Indemnity.

(2)     Life Stock.  On the effective date of the CIC Stipulation, FCIG, as the holder of all of Life's issued and outstanding stock, will transfer all of its right, title, and interest in the stock of Life to the Commissioner.

(4)     Proofs of Claim.  On the effective date of the CIC Stipulation, each of the proof of claim filed by the CIC in the Debtor's case will be withdrawn, disallowed, and expunged with prejudice.  The CIC will be allowed a $5 million general unsecured claim in the Debtor's Case, and this claim will be the sole and exclusive right to payment by CIC, Indemnity, and Life from the Debtor's bankruptcy estate, except with respect to the D&O Case described below.

(5)     Art Adversary Dispute.  On the effective date of the CIC Stipulation, the CIC will receive $4.1 million of the funds presently held in escrow that are attributable to the sale of certain of

the Debtor's artwork.  The Debtor will receive the remaining proceeds held in the escrow account

(approximately $300,000) and ownership rights to all of the remaining artwork, including any future

proceeds from the sale or disposition of such artwork.

(6)    <u>Cash Payment</u>.  On the effective date of the CIC Stipulation, FRC will pay to

Indemnity $5.0 million.

(7)    <u>Dismissal of Pending Litigation</u>.  As soon as possible after the effective date of the

CIC Stipulation, the CIC will dismiss with prejudice all of the actions mentioned above, including

any counterclaim or cross complaint filed therein, and the Fremont Entities will dismiss with

prejudice any claims filed in connection with Indemnity's statutory liquidation case.

(8)    <u>Releases</u>.  Except for the agreements and obligations set forth in the CIC Stipulation,

CIC, Indemnity, Life, and the Fremont Entities will give each other mutual releases of the claims set

forth in the actions described above.

The Debtor filed a motion to approve the CIC Stipulation pursuant to FRBP 9019 (a) in April

2009, and the motion was approved at a hearing held on May 14, 2009.  The CIC Stipulation has also

been approved by the two necessary state court and the settlement is essentially final.

b)    <u>Massachusetts Attorney General</u>

The Debtor and FRC were also subject to ongoing litigation in the Massachusetts Superior

Court in Suffolk County ("MA Superior Court") brought by the Attorney General for the

Commonwealth of Massachusetts (the "Commonwealth") based upon alleged consumer protection

violations stemming from FRC's lending practices in connection with the origination and servicing of

residential mortgage loans made to Massachusetts residents.  The complaint sought injunctive and

equitable relief and civil penalties.  Since February 2009, the Debtor and FRC have been operating

under a preliminary injunction issued by the MA Superior Court, as modified in March 2008, that

enjoined the Debtor and FRC from foreclosing on certain of the loans made to Massachusetts

residents absent the approval of the MA Superior Court.  The preliminary injunction also prevented

NEW WORLD DISCLOSURE STATEMENT

the Debtor and FRC from selling, transferring, or assigning any of these Massachusetts residential loans unless certain conditions were met.  This litigation appeared to be outside the scope of the exemptions to the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

In April 2009, after comprehensive settlement discussions, the Commonwealth, the Debtor, and FRC entered into a Final Judgment by Consent (the "Final Judgment").  Pursuant to the Final Judgment, FRC will pay $10 million to the Commonwealth on the effective date of the Final Judgment.  If neither FRC nor FGCC is the subject of a bankruptcy proceeding as of a date that is about 95 days after the effective date of the Final Judgment and no court has determined that either the Debtor or FRC has violated any of the terms of the Final Judgment, then the Commonwealth will withdraw with prejudice the $20 million proof of claim that it filed in the Debtor's Case.  If either FRC or FGCC is in a bankruptcy proceeding on such date, then the Commonwealth may void the Final Judgment and refund the $10 million.

If the Final Judgment becomes effective, then the preliminary injunction will be modified and will become a permanent injunction that will apply to loans to Massachusetts residents or to loans secured by property in Massachusetts.  The permanent injunction; requires the Debtor or FRC to provide the Massachusetts Attorney General with prior notice before initiating or advancing a foreclosure on any such mortgage loan originated by FRC.  If the Attorney General does not provide a written objection, then the Debtor or FRC may proceed with the foreclosure.  If there is a written objection, then the parties will follow the resolution procedures set forth in the Final Judgment.  In addition, before the Debtor or the FRC can sell, transfer, or assign any mortgage loan originated by FRC that is secured by any residential property in Massachusetts, they must (1) provide the Attorney General with prior notice; (2) a purchaser or assignee from the FRC must agree to be bound by the foreclosure and sale restrictions in the permanent injunction, and (3) a copy of the written assignment must be provided to the Attorney General.  In exchange for this agreement, upon entry of the Final Judgment by the MA Superior Court, the Commonwealth will release the Debtor and FRC from the

claims set forth in the Massachusetts Action.

The Debtor sought Court approval of the Final Judgment pursuant to FRBP 9019(a) in April 2009, and that was approved at a hearing on May 14, 2009. The Equity Committee believes that all conditions to the effectiveness of the Final Judgment have occurred and the settlement has been consummated.

c)    <u>Enron</u>

In April 2009, the Debtor entered into a stipulation and agreement (the "Enron Stipulation") with Enron Creditors Recovery Corporation ("Enron") to settle the litigation described below and to resolve a proof of claim in the approximate amount of $25.5 million that Enron filed against the Debtor in the Case.

On December 2, 2001, Enron and certain affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of New York (the "Enron Court"). Before that date, Enron issued unsecured commercial paper to various entities, including the Debtor. The commercial paper had maturities of up to 270 days. In a series of transfers, Enron allegedly paid over $1 billion to various entities, including $25,426,521.66 to the Debtor, on account of the commercial paper prior to their stated maturity. In November 2003, representatives of Enron's bankruptcy estate filed avoidance actions in the Enron Court against the Debtor and various defendants, contending that the payments were avoidable and recoverable under the Bankruptcy Code. In settlement of that dispute, Enron and the Debtor agreed to the following:

(1)    <u>Allowed General Unsecured Claim</u>. Enron will be allowed for purposes of voting on any plan proposed in the Case and receiving Distributions a general unsecured claim against the Debtor in the amount of $4.0 million (the "Allowed Enron Claim"). However, upon Enron's actual receipt of Distributions from the Debtor's bankruptcy estate of $2.0 million, the Allowed Enron Claim will be deemed satisfied in full and Enron will have no further right to any Distributions from the Debtor's bankruptcy estate. The Allowed Enron Claim is the only right to payment that Enron

will have against the Debtor's bankruptcy estate.

       (2)    Dismissal of the Avoidance Action.  After the effective date of the agreement, Enron has agreed to dismiss the avoidance action with prejudice as to the Debtor, with each party bearing its own attorney's fees and costs.

       (3)    Releases.  On the effective date and except for the agreements and obligations arising from the settlement, Enron and the Debtor will exchange mutual general releases of all claims they may hold against one another.

       Both the Bankruptcy Court and the Enron Court have approved the settlement agreement.

       d)    The Rampino Litigation and Associated
               Defendants' Wages SERP, and Indemnification Claims

       In October 2006, the CIC, as the statutory liquidator of Indemnity, filed a first amended complaint in Los Angeles Superior Court against seven former officers and directors of the Debtor or Indemnity (together, the "Rampino Defendants"), alleging that they breached their fiduciary duties by allowing Indemnity to engage in an inappropriate underwriting scheme that caused injury to Indemnity's reinsurers, which in turn injured Indemnity by settlements it made with those reinsurers (the "D&O Case").  Although neither the Debtor nor any affiliates are defendants in the D&O Case, it is possible that the Debtor could have indemnification obligations to some or all of the Rampino Defendants.  After the Debtor filed its bankruptcy petition, each of the Rampino Defendants filed at least one claim based on, among other things, the contention that the Debtor is obligated to indemnify each of them for any settlement amounts or judgment that might be entered against them in the D&O Case.'

       In May 2009, the Debtor entered into a stipulation (the "Rampino Stipulation") with the Rampino Defendants and the CIC to settle the outstanding litigation and to resolve fifteen proof of claims that together asserted liquidated amounts in excess of $27 million and that also contained substantial contingent and unliquidated components.  A summary of the Rampino Stipulation is as

follows:

(1)    <u>Allowed General Unsecured Claim of CIC</u>.  The CIC will be allowed, for voting and Distribution purposes, a general unsecured claim in the amount of $35 million.  However, after the CIC's actual receipt of Distributions from the Debtor's bankruptcy estate totaling $22 million, the claim will be deemed to be satisfied in full and the CIC will have no further right to any distributions from the Debtor's bankruptcy estate on account of the D&O Case.  This claim is in addition to the $5 million General Unsecured Claim allowed the CIC for the unrelated settlement discussed above.

(2)    <u>Final Disallowance of Proof of Claims</u>.  Each of the Rampino Defendants' proofs of claim will be deemed to have been withdrawn or disallowed with prejudice.

(3)    <u>Allowed General Unsecured SERP Claims</u>.  Four of the seven defendants will each be allowed for purposes of voting and distribution purposes a general unsecured claim against the Debtor in amounts ranging from $2.3 million to $5.6 million.  However, once they actually receive distributions in specific, lesser amounts ranging from $1.42 million to $3.47 million, their Claims will be deemed to have been satisfied in full and they will have no further rights to Distributions or payments from the Debtor's bankruptcy estate.  They will also have no right to Distributions or payments from the Fremont General Corporation Supplemental Executive Retirement Plan or the Fremont General Corporation Supplemental Executive Retirement Plan II.

(4)    <u>Dismissal of Litigation</u>.  After the effective date of the Rampino Stipulation, CIC and Indemnity will dismiss the D&O Case with prejudice, and Mr. Bailey, Mr. Rampino, and Mr. McIntyre will dismiss their respective adversary proceedings that are pending in the Bankruptcy Court to be dismissed with prejudice against all defendants other than the Debtor.  With respect to the Debtor, the dismissal is conditioned upon their receiving payment on account of their allowed general unsecured claims.

(5)    <u>Releases</u>.  Except for the agreements and obligation arising under the Rampino Stipulation, the parties will execute mutual general releases, except that the Rampino Defendants are

not releasing any claims that they may have against the Debtor as a result of ownership of the

Debtor's common stock or other securities of the Debtor or its affiliates.  In addition, no one is

releasing any claims that they may hold against any insurance policy issued by any insurer of any of

the parties.

The hearing on approval of the Rampino Stipulation was held on June 11, 2009, and the order

approving the Rampino Stipulation was entered on June 18, 2009.  With the settlement of the Faigin

adversary proceeding described above, the SERP litigation is closed as of this date.

e)      Other Settled and Resolved Claims

The Debtor and FRC entered into an agreement with Credit Suisse to provide for the payment

and resolution of a proof of claim in excess of $2 million filed by Credit Suisse, which agreement

was approved by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019(a).

The Debtor entered into a stipulation providing for the withdrawal with prejudice of 86

separate proofs of claim filed by the plaintiffs in the so-called Scheid action, which stipulation was

approved by the Court.

The Debtor and FRC agreed to settle their affirmative claims against BlackRock, Inc., Private

National Mortgage Acceptance Company, LLC, and John Lawrence, which agreement was also

approved by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019(a).

f)      Settlement With Bank of New York Mellon

The Debtor has also resolved a proof of claim The Bank of New York Mellon ( "BNY") filed

against the Estate which asserts a Claim of approximately $20.1 million arising out of a prepetition

lawsuit against the Debtor styled as Bank of New York v. Fremont General Corporation, Case No.

CV-03-09238-CAS, United States District Court for the Central District of California.  The litigation

generally involved a dispute over a custodial account of Fremont Indemnity established for the

benefit of workers compensation claimants from which BNY alleged the Debtor wrongfully

withdrew funds.  The Debtor and BNY executed a settlement stipulation pursuant to which BNY was

granted an Allowed Claim of $10 million that may be deemed satisfied by receipt of payments (i)

totaling $6.5 million if such amount is received by BNY by October 31, 2009 or (ii) totaling $7

million if such amount is received by BNY by June 30, 2010, BNY's pending action against the

Debtor will be dismissed and the parties exchanged general mutual releases, subject to certain

exceptions.  On August 4, 2009, the Debtor filed its *Motion for Order Approving Stipulation Between*

*the Debtor and The Bank of New York* [Docket No. 853] seeking approval of settlement with Bank of

New York Mellon.  On September 28, 2009, the Bankruptcy Court entered an order approving the

settlement.  The Allowed Claim of BNY will be treated as an Allowed General Unsecured Claim in

Class 3A, subject to the terms of the settlement governing the satisfaction of such Claim.

**11.    Allowance of Fees and Costs of Professionals Employed
by the Debtor, the Creditors' Committee, and the Equity Committee**

In connection with the retention of the professionals employed by the Debtor, the Creditors'

Committee, and the Equity Committee, the Court approved interim fee procedures.  With the

exception of certain professionals whose compensation is subject to different procedures,

professionals are eligible to receive payment of 80% of their monthly fees and 100% of their monthly

costs, provided that no objection is timely filed and served in connection with their monthly fee

statements.  Such professionals may request and receive payment of the "hold back" amounts at

interim or final fee hearings.

Kurtzman Carson Consultants, retained by the Debtor, is paid in full on a monthly basis by

the Debtor under a separate procedure.  KPMG has also been compensated differently, receiving a

monthly retainer of $25,000 until its retention is terminated by the Debtor, and it is entitled to receive

an additional transaction fee if a plan sponsored by a third-party plan proponent becomes effective.

Below is a chart that summarizes the fees and costs incurred and requested by the

professionals through March 31, 2009.  The first interim period ran from June 18, 2008, through

November 30, 2008 (the "First Interim Period").  The second interim period ran from December 1,

2008, through March 31, 2009.

| Professional | Retainer | Fees Requested in First Interim Period | Costs Requested in First Interim Period | Unpaid Portion from First Interim Period | Fees Requested in Second Interim Period | Costs Requested in Second Interim Period | Unpaid Portion from Second Interim Period |
|---|---|---|---|---|---|---|---|
| Klee Tuchin | N/A | $652,229 | $32,129 | $0 | $571,868 | $11,265 | $113,829 |
| Stutman Treister | $116,314 | $978,456 | $46,882 | $0 | $746,501 | $20,267 | $149,300 |
| Patton Boggs | $250,000 | $1,459,565 | $37,427 | $0 | $608,329 | $29,686 | $121,665 |
| FTI | $500,000 | $909,964 | $132,132 | $0 | $429,651 | $39,4611 | $85,930 |
| Weiland Golden | N/A | $391,820 | $10,046 | $0 | $213,573 | $467 | $43,118 |
| Solon Group | N/A | $25,285 | $0 | $0 | $10,452 | $0 | $0 |
| CRG Partners | N/A | $87,100 | $105 | $0 | $20,362 | $0 | $0 |
| Epstein Becker | N/A | $238,524 | $12,720 | $0 | $619,720 | $18,070 | $0 |
| Willenken Wilson | N/A | N/A | N/A | N/A | $5,351 | $8 | $0 |
| Caldwell Law Firm | N/A | N/A | N/A | N/A | $17,508 | $0 | $0 |

Since the end of the Second Interim Period, the professionals have continued to incur fees and expenses. From April 1, 2009, through July 31, 2009, the interim fee applications submitted by the professionals seek payment of the following fees and expenses, with the unpaid portion for this time period as indicated below:

| Professional | Retainer | Fees | Expenses | Unpaid Portion |
|---|---|---|---|---|
| Klee Tuchin | N/A | $795,297 | $14,392 | $159,059 |
| Stutman Treister | N/A | $848,468 | $41,878 | $169,727 |
| Patton Boggs | N/A | $663,712 | $18,274 | $137,742 |
| FTI | N/A | $428,263 | $25,780 | $156,710 |
| Weiland Golden | N/A | $328,808 | $1,217 | $65,762 |
| Solon Group | N/A | $36,465 | $0 | $29,947 |
| CRG Partners | N/A | $108,361 | $1,086 | $50,225 |
| Epstein Becker | N/A | $57,787 | $4,519 | $11,557 |

- 38 -

| Professional | Retainer | Fees | Expenses | Unpaid Portion |
|---|---|---|---|---|
| Willenken Wilson | N/A | $11,963 | $91 | $12,054 |
| Caldwell Law Firm | N/A | $104,227 | $6,291 | $20,855 |
| Squar Milner | $100,000 | $57,546 | $0 | $57,546 |
| Bocarsly Emden | N/A | $28,375 | $158 | $5,675 |
| Ernst & Young | N/A | $48,600 | $0 | $9,270 |

The above professionals will continue to incur fees and expenses through Confirmation of the Plan.

## V.    LITIGATION AND CAUSES OF ACTION

### A.    Litigation Commenced Pre-Petition

As of the Petition Date, the Debtor was involved in certain litigation and other actions set forth in the Bankruptcy Schedules, the most material of which are discussed above.

### B.    Post-Petition and Other Potential Causes of Action

#### 1.    In General

Since the Petition Date, the Debtor has prosecuted or defended adversary proceedings that are connected with this Chapter 11 case.  In some instances, the Debtor removed civil actions that were pending in other courts on the Petition Date to the Bankruptcy Court.  The discussion in this Section is for general informational purposes only.  Nothing herein is intended nor should be construed to be an admission or acknowledgement of any matter and all parties reserve all of their respective rights with respect to any potential and/or actual claims against any Persons.

#### 2.    Adv. Pro. No. 8:08-ap-01256-ES and
#### Adv. Pro. No. 8:09-ap-01103-ES: the SERP Actions

This adversary proceeding involves certain claims asserted against the Debtor arising from two supplemental executive retirement plans, or "SERPs."  The Debtor removed this proceeding from California state court to this Court on July 7, 2008.  The Debtor filed a motion to dismiss the plaintiffs complaint.  The plaintiffs have filed a second amended complaint,

NEW WORLD DISCLOSURE STATEMENT

A second set of plaintiffs filed the separate adversary proceeding No. 8:09-ap-01103-ES, *Bailey v. Fremont General Corporation, et al.*  This proceeding was brought by two former executive employees of the Debtor, Wayne Bailey and Louis Rampino, and involves certain ERISA claims asserted against the Debtor related to two supplemental executive retirement plans.

The Rampino Stipulation described above and the Faigin stipulation described above resolves these adversary proceedings with respect to all plaintiffs at this time.

### 3.    Adv. Pro. No. 8:08-ap-01258-ES:  The Art Action

This proceeding involves the California Insurance Commissioner's asserted ownership interests in certain artwork and related proceeds (the "Art Action").  This proceeding was removed from California state court to this Court by the Debtor on July 11, 2008.  The Art Action was settled and, as described above, the settlement was approved by the Court.

### 4.    Adv. Pro. No. 8:08-ap-01418-ES:  The Insurance Action

This proceeding involves the Debtor and FRC's rights to coverage under certain insurance policies issued by the Federal Insurance Company (the "Insurance Action").  This proceeding was commenced by the Debtor and FRC on October 20, 2008 and remains pending before the Court.

### 5.    Adv. Pro. No. 8:08-ap-01470-ES:  The Mover Action

This proceeding involves the Debtor's claims against National Relocation Services, Inc., Mike Garrett, and other parties in connection with the misappropriation of certain furniture, fixtures, and equipment from the Debtors Water Garden location (the "Mover Action").  This proceeding was commenced by the Debtor on November 20, 2008, and a motion to amend the complaint is currently pending.

### 6.    ERISA Class Action

In 2007, six complaints seeking class certification were filed in the United States District Court, Central District of California, against the Debtor and various officers, directors, and employees by participants in the Debtor's Investment Incentive Plan 401(k) and Employee Stock

NEW WORLD DISCLOSURE STATEMENT

Ownership Plan, alleging violations of the Employee Retirement Income Security Act of 1974

("ERISA") in connection with stock in the Debtor held by the Plans (the "ERISA Action").  The six

complaints have been consolidated in a single proceeding.

        The plaintiffs in the ERISA Action contend that their claims are not subject to subordination

and contend that to the extent that their claims exceed available insurance coverage, they should be

classified and treated as Class 3A General Unsecured Claims.  New World disagrees and believes

that to the extent that the ERISA Action claims become Allowed Claims, they should be classified

and treated as Class 5 Section 510(b) Claims.  In addition, the Plaintiffs in the ERISA Action contend

that their claims are covered under available insurance policies up to $100 million.  Plaintiffs in the

ERISA Action have stated their intention to file a motion to lift the automatic stay and a motion to

withdraw the reference so that their claims may continue to be prosecuted against the Debtor in the

District Court in the ERISA Action.  The Debtor recently reached an agreement with the plaintiffs

that modified the automatic stay to allow their claims to go forward in the United States District

Court and realize any judgment from available insurance.  Any Claim in excess of insurance would

be satisfied, if Allowed, as a Section 510(b) Claim.

### 7.    The Securities Class Action (Al-Beitawi V. Fremont General Corp., Consolidated Securities Complaint, Case No. CV07-05756)

        In September 2007, three separate complaints seeking class certification were filed in the

United States District Court, Central District of California, against the Debtor and various officers

and directors alleging violations of federal securities laws in connection with published statements by

the Debtor regarding its loan portfolio and loans held for resale during the period from May 2006

through February 2007.  The three class action lawsuits were consolidated into a single proceeding

with a consolidated class action complaint filed on March 3, 2008 (the "Securities Class Action").  In

January 2009, a second amended class action securities complaint was filed alleging violations from

October 2005 through March 2007; the defendants include the Debtor and several former and current

officers of the Debtor and FRC.  The litigation against the Debtor has been stayed by the bankruptcy filing.  It is not stayed as to any of the non-Debtor defendants.  The plaintiffs have asserted that the Debtor's liability insurance policies in favor of their officers and directors provide coverage for the claims asserted in the Securities Class Action as well as for claims against the Debtor directly for alleged violations of federal securities laws.  The Plan will provide for the right of the plaintiffs to pursue claims against the Debtor, which will be treated in accordance with the Plan, and to recover from available insurance coverage.  It also preserves their right to conduct discovery.  Any Allowed Claims of the Securities Class Action plaintiffs will be classified and treated as Allowed Section 510(b) Claims.

### 8. Causes of Action Are to Be Retained Under Plan; No Waiver Should Be Implied

Attached hereto as Exhibit 1 is a non-exhaustive list of potential Causes of Action Schedule; provided, however, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Cause of Action, or potential Cause of Action, in the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court will in no manner waive, eliminate, modify, release, or alter the rights of the Debtor, New World, or the Reorganized Debtor's right to commence, prosecute, defend against, settle, and realize upon any Cause of Action that the Debtor or the Estate has or may have as of the Confirmation Date.  Unless otherwise provided in the Plan or Confirmation Order, to the extent any filed or to-be-filed actions are not resolved, after the Effective Date, the Reorganized Debtor will continue to prosecute, settle, or otherwise resolve or dispose of those actions.  Notwithstanding the foregoing, nothing stated in the Plan, the schedule of Litigation or this Disclosure Statement requires New World or the Reorganized Debtor to pursue any Cause of Action.

9.    **Objections To Claims**

New World is informed that the Debtor has commenced its review, analysis and investigation of the filed Claims and the Claim objection process.  Over 900 proofs of claim in an aggregate amount in excess of $1.14 billion have been filed in the case.  After Confirmation, the Reorganized Debtor will continue the Claim objection process and file additional objections to various scheduled and filed Claims.  The Debtor has commenced the Claim objection process, although it is not expected to be completed prior to the hearing on confirmation of the Plan.  Thus far, the objections by the Debtor and the various settlements have reduced the total Claims against the Estate by approximately $541 million.  New World is informed that the Debtor has preliminarily identified more than 600 invalid, duplicate, late-filed, or improperly classified Claims, and the Court established a procedure for handling bulk Claim objections for omnibus objections related to proofs of Claim that were filed on account of Interests, duplicate claims, and proofs of Claim that relate only to FRC.  The Court has ruled on nine omnibus Claim objections.  These objections and additional objections are expected to substantially reduce the amount of Claims asserted against the Estate.

10.    **Insurance Policies with Westchester Surplus Lines
Insurance Company and Pacific Employers Insurance Company**

Prepetition, Westchester Surplus Lines Insurance Company ("WSLIC") issued to the Debtor a claims made directors and officers excess liability insurance policy and a six year run off endorsement thereto for claims made against the insured for wrongful acts occurring between January 1, 2008 and December 31, 2014 (the "WSLIC Policy").  According to WSLIC, under certain circumstances, the Debtor would be required to reimburse the insurer for advanced defense costs.  Pacific Employers Insurance Company ("PEIC") issued prepetition to the Debtor high-deductible workers compensation occurrence policies for the calendar years 2000, 2001, 2002, and possibly additional years (the "PEIC Policies").  WSLIC and PEIC have filed contingent and unliquidated proofs of claim.  Matters relating to the WSLIC Policy and PEIC Policies will be addressed in the

NEW WORLD DISCLOSURE STATEMENT

Plan.  WSLIC and PEIC each reserve their right to object to the Plan.

## VI.    GENERAL DISCUSSION OF ASSETS AND LIABILITIES

### A.    Assets

According to the Debtor's unaudited balance sheet as of August 31, 2009, the Debtor has Cash on hand of approximately $27.3 million.  An additional $11.5 million in Cash is currently held in accounts at Merrill Lynch Trust Company that were established in connection with the SERPs that are currently the subject of a pending ownership dispute.  Cash on hand as of the Effective Date will be used to satisfy Allowed Claims under the Plan.  In addition to these Cash deposits, the Debtor also has several insurance policies, including 2007 and 2008 Directors' and Officers' Liability Policies that were issued by XL Specialty Insurance Company with coverage totals of up to $100 million and $225 million, respectively.  There are also policies issued by Federal Insurance Company; the Debtor and FRC are in the process of attempting to recover more than $10 million in defense and settlement costs that were incurred in connection with the action brought by the Massachusetts Attorney General that was discussed above.

Other than the Cash and its interests in various insurance policies, the primary assets of the Debtor are comprised of its direct and indirect ownership interest in FGCC, FRC, and FCIG.  New World does not believe that any value will be realized from FCIG, which has no employees and no contracts.  The Debtor also holds ownership interests in Fremont Aviation Services Corp. and Fremont General Financing I.  Fremont Aviation Services Corp. used to own a corporate jet that was sold in 2008; the company is in the process of being wound down.  The interest in Fremont Aviation Services Corp. will vest in the Reorganized Debtor and it will continue to be wound down; the treatment of Fremont General Financing I is discussed in the next section and elsewhere in the Disclosure Statement.

On the Petition Date, the consolidated federal income taxpayer group of which the Debtor is the common parent had reported NOLs for the 2007 tax year amounting to over $1 billion.  Based

- 44 -

upon information provided by the Debtor, approximately $418 million of those NOLs were carried

back to earlier tax years to obtain a tax refund, leaving, as of the Petition Date, estimated NOLs for

application to 2007 and future tax years of approximately $695 million.  In connection with the relief

sought during the early stages of the Case, the Debtor obtained an order from the Bankruptcy Court

that established certain procedures regarding trading in the Debtor's common stock that were

designed to avoid a "change of control" and preserve these NOLs.  Although the trading order will

not be in effect after the Effective Date of the Plan, the Reorganized Debtor will continue to protect

and preserve the Fremont NOLs, to the extent necessary, with an amendment to the Articles of

Incorporation restricting certain trading.

### B.    Liabilities

#### 1.    Liabilities Identified in the Schedules

According to the Schedules, as of the Petition Date, the Debtor listed more than $326.5

million in Unsecured Claims, the majority of which were listed as undisputed.  The majority of the

Debtor's undisputed and liquidated liabilities are attributable to two prepetition debt issuances that

together total approximately $282.5 million and to an intercompany debt owed by the Debtor to FRC

of approximately $32.2 million.  The remainder of the Debtor's undisputed and liquidated liabilities

that were listed in the Schedules is related to a small amount of prepetition trade debt and employee

benefit obligations.  In addition to these undisputed and liquidated liabilities, the Schedules list

disputed, contingent, and unliquidated priority Claims that consist mostly of potential tax liabilities

and other disputed, contingent, and unliquidated general unsecured Claims related to litigation

against the Debtor and to the SERP plans.

#### 2.    Proofs of Claim

November 10, 2008, was set as the claims bar date for creditors of the Debtor other than

governmental units, which had until December 15, 2008.  Notice of the claims bar dates and the

procedures for filing claims were mailed to all creditors and parties in interest on September 11,

2008, and it was also published in the Wall Street Journal on September 12, 2008.  Over 900 proofs of Claim were filed in the Case, in the aggregate amount of $1.14 billion.  A summary of the Claims, which does not take into account any objections to the Claims, is as follows:

| Secured Claims | $8,466,301 |
| Priority Unsecured Claims | 107,056,301 |
| General Unsecured Claims | 1,023,180,072 |
| **Total** | $1,143,702,725 |

Although this sum is substantially greater than the amount identified by the Debtor in the Schedules, the Debtor has indicated that it has performed an initial review of the Claims Filed in this Case and has concluded, based on that review, that a substantial number of the proofs of Claim Filed in the Case are without merit, duplicative, inflated, or improperly classified.  As an example, there is no known reason for any valid secured Claims to exist against the Debtor.  In addition, a number of Claims have been resolved by the Debtor for amounts that are substantially less than what is contained in the proof of Claim and some Claims have already been withdrawn or disallowed.  For these reasons, New World does not believe that the proofs of Claim Filed in this Case accurately reflect the Debtor's liabilities and expects that the Allowed Claims against the Estate will be substantially less once the claim objection process is completed.

### 3. <u>Senior and Junior Notes</u>

Most of the Debtor's undisputed liabilities arise from prepetition debt issuances of $7.875% Senior Notes due in 2009 in the original aggregate principal amount of $200 million (the "Senior Notes") and 9% Junior Subordinated Debentures due March 31, 2026 in the original aggregate principal amount of $103,092,784 (the "Junior Notes").  As of the Petition Date, approximately $176.4 million in principal and accrued interest was outstanding under the Senior Notes, and

approximately $107.4 million in principal and accrued interest was outstanding under the Junior

Notes. The Plan allows the Claims in those amounts. As discussed below, the Plan proposes to

reinstate the Junior Notes and to preserve their legal, contractual, and equitable rights intact.

The Junior Notes are currently held by Fremont General Financing I ("Fremont General Financing"),

a statutory business trust that was formed under Delaware law pursuant to an Amended and Restated

Declaration of Trust of Fremont General Financing I dated March 6, 1996 (the "Fremont General

Financing Declaration of Trust"). Fremont General Financing is a wholly-owned subsidiary of the

Debtor that was formed as a special purpose financing entity to hold the Junior Notes as its sole asset.

In 1996, Fremont General Financing issued and sold approximately $100 million of 9% Trust

Originated Preferred Securities ("TOPrS") in a public offering, which represented preferred

undivided beneficial interests in the assets of Fremont General Financing (i.e., the Junior Notes). The

Debtor made payments on account of the Junior Notes to Fremont General Financing, and then

Fremont General Financing would in turn distribute those payments to holders of TOPrS. Pursuant to

the terms of the Fremont General Financing Declaration of Trust, Fremont General Financing I was

to terminate in the event that the Debtor filed for bankruptcy. New World does not believe that a

provision for termination on the filing of a bankruptcy may be enforced by the Trustee. For that and

other reasons, the New World Plan reinstates the TOPrS and with such treatment, leaves the

contractual rights of the Holders thereof and of Junior Notes unimpaired.

As discussed more fully in section VII.B.3 below, the Indenture Trustee for the Senior Notes

believes that Holders of Claims in Class 3C (Junior Note Claims) are also impaired and entitled to

vote on the Plan. New World disagrees with the Indenture Trustee's analysis.

### 4.    **Intercompany Claims**

According to the Schedules and a proof of Claim that was filed by FRC, there is an

intercompany payable owed by the Debtor to FRC of approximately $32.2 million, the bulk of which

is owed in connection with a Tax Allocation Agreement dated May 1, 2006, between the Debtor,

FGCC, and FRC (the "Tax Allocation Agreement").  The merger that will be consummated pursuant to the Plan will result in the elimination of all intercompany Claims between the Debtor, FRCC, and FRC, including any intercompany Claims owed by the Debtor to FRC pursuant to the Tax Allocation Agreement.

## VII.    SUMMARY OF THE PLAN OF REORGANIZATION

The following is a summary of the material provisions of the Plan.

The Plan is intended to achieve the two primary goals of Chapter 11 of the Bankruptcy Code: to satisfy Claims against and Equity Interests in the Debtor and to reorganize the business of the Debtor.  Accordingly, the Plan proposes to use the assets of the Debtor and Reorganized Debtor to satisfy the Claims of Creditors and to leave the holders of Equity Interests with their Equity Interests in a revitalized, ongoing  business.  To meet the liquidity needs of the Reorganized Debtor for operations, administration expenses, and Claims reserves, the New World Plan provides for a $6.8 million equity investment in the Reorganized Debtor and a $20 million secured Exit Facility.  New World will also receive Warrants to acquire shares of the Reorganized Debtor for $30 million at an average price of $.67 and may allocate certain of the Warrants in connection with the Exit Facility. The holder of the Warrants will have the option for a cashless exercise of the Warrants by reducing the number of shares issued.  The Warrants will be exercisable for a period of ten years as follows:

| Warrant Amount | Exercise Price | Shares |
|---|---|---|
| 5,000,000 | .40 | 12,500,000 |
| 5,000,000 | .60 | 8,333,333 |
| 5,000,000 | .70 | 7,142,857 |
| 5,000,000 | .80 | 6,250,000 |
| 5,000,000 | .90 | 5,555,556 |
| 5,000,000 | 1.00 | 5,000,000 |
| $30,000,000 | .67 | 44,781,746 |

The terms of the Warrant will be incorporated in full in the Warrant Agreement, the form of which, subject to modification, is attached to the Plan as Exhibit 2.

The treatment of Allowed Claims and Allowed Equity Interests under the Plan supersedes any agreements or rights the Holders of those Claims or Equity Interests may have in or against the Debtor or its Assets and is in full satisfaction of the legal, equitable, and contractual rights of the Holders of the Claims or Equity Interests.  Unless the Plan provides otherwise, no Distributions will be made and no rights retained on account of any Claim or Equity Interest that has not become an Allowed Claim or Allowed Equity Interest.

As required by the Bankruptcy Code, the Plan classifies Claims and Equity Interests in various classes according to their right to priority.  The Plan states whether each Class of Claims or Equity Interests is impaired and provides for the treatment that each Class will receive.

### A.    Allowance and Treatment of Unclassified Claims

Certain types of Claims are not placed into voting classes but are instead unclassified.  They are considered unimpaired and they are given treatment in accordance with the Bankruptcy Code:

### 1.    Administrative Claims

Administrative Claims are for costs and expenses of administering the Debtor's Case that are allowable under Bankruptcy Code section 503(b) or 28 U.S.C. § 1930, and include Claims incurred postpetition in the ordinary course of the Debtor's business, fees and expenses of professionals, and fees due to the U.S. Trustee's Office.

The following chart lists the Debtor's unpaid Administrative Claims and their treatment under the Plan:

| Description | Treatment |
| --- | --- |
| Ordinary Course Administrative Claims | Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be allowed in accordance with the terms and conditions that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its claim. |

NEW WORLD DISCLOSURE STATEMENT

| Description | Treatment |
|---|---|
| Clerk's Office Fees | Paid in full before the Effective Date. |
| Office of the U.S. Trustee | Paid in full pursuant to 28 U.S.C. § 1930. |
| Allowed Non-Ordinary Course Administrative Claims, Professional Fee Claims and Indenture Fee Claims[3] | Paid in full on the later of: (1) the Effective Date; or (2) the fifteenth Business Day after such Non-Ordinary Course Administrative Claim or Professional Fee Claim becomes an Allowed Administrative Claim or Allowed Professional Fee Claim, or in either case, as soon thereafter as is practicable.  The Indenture Trustee Fee Claims will be paid in accordance with the terms of the Plan. |

a)     Administrative Claim Reserve

On the Effective Date, the Reorganized Debtor will fund the Administrative Claims Reserve with sufficient funds to pay all Administrative Claims outstanding as of the Effective Date in full. Ordinary Course Administrative Claims will be paid in the ordinary course of the Reorganized Debtor's operations.  Distributions will be made to the Holders of Allowed Administrative Claims from the Administrative Claims Reserve.  Any amounts remaining in the Administrative Claims Reserve after payment in full of all Allowed Administrative Claims will revert to the Reorganized Debtor.

b)     Administrative Claims Bar Date

All requests for payment of an Administrative Claim that accrued from the Petition Date, except for (1) Ordinary Course Administrative Claims, (2) Clerk's Office and U.S. Trustee fees, (3) Professional Fee Claims, and (4) Indenture Trustee Fees must be filed with the Court no later than thirty days after the Effective Date (the "Administrative Claims Bar Date") or be forever barred.

c)     Deadline for Objections to Administrative Claims

All objections to allowance of Administrative Claims, excluding Professional Fee Claims, must be filed by any parties in interest no later than sixty (60) days after the Administrative Claims Bar Date (the "Administrative Claims Objection Deadline.") The Administrative Claims Objection

---

[3] The Indenture Trustee Fees have been classified as Administrative Claims solely for convenience.   Nothing herein constitutes an admission that the fees are entitled to Administrative Claim priority.

Deadline may be extended for a one-time sixty (60) day period by the Reorganized Debtor by filing a

notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court.

Thereafter, it may only be extended by an order of the Bankruptcy Court.  If no objection to an

Administrative Claim is filed on or before the Administrative Claim Objection Deadline, then the

Administrative Claim will be deemed Allowed as of that date.

d)       U.S. Trustee Fees

Quarterly fees owed to the Office of the U.S. Trustee will be paid prior to the Effective Date

by the Debtor, and after the Effective Date by the Reorganized Debtor when due in accordance with

applicable law.  The Reorganized Debtor will continue to file reports showing the calculation of such

fees until the Case is closed under Bankruptcy Code section 350.

e)       Professional Fee Claims

Any professional seeking allowance of a Professional Fee Claim for services rendered prior to

the Effective Date must (1) fife their application for allowance of compensation and reimbursement

of expenses on or before 45 days after the Effective Date or such other date as may be set by the

Bankruptcy Court, and (2) have the fees and expenses allowed by a Final Order.  Any party in

interest may file an objection to such an application within the time provided by the Local

Bankruptcy Rules or within any other period that the Court sets.  Professionals holding Professional

Fee Claims who do not timely file and serve their applications for payment will be forever barred

from asserting these Claims against the Reorganized Debtor or its property.

f)       Indenture Trustee Fees and Expenses

The Reorganized Debtor will pay or cause to be paid in full and in Cash, without reduction to

the recovery of applicable holders of allowed claims, any and all Indenture Trustee Fees and other

amounts that are due to each of the Indenture Trustees and its counsel as of the Effective Date on or

before the later of:  (i) the Effective Date; or (ii) five (5) days after the date on which the Reorganized

Debtor receives from such Indenture Trustee a reasonably and customary detailed itemized statement

of such amounts so long as the Reorganized Debtor does not, within such five (5) day period, give written notice to such Indenture Trustee that it disputes the amount requested or any part thereof and all such amounts shall be deemed Allowed without further application to or order from the Court. The Reorganized Debtor's objection shall be limited to a "reasonableness standard" and whether the amounts sought are actually due and payable under the particular Indenture.  If the Reorganized Debtor gives such Indenture Trustee timely written notice that it disputes the amount requested or any part thereof, the Reorganized Debtor will promptly pay or cause to be paid any undisputed amounts and any pending disputed items shall be promptly presented to and determined by the Court, the sole questions being whether the amounts in dispute are due and payable under the particular Indenture and satisfy the "reasonableness standard"; any unpaid amounts shall be promptly paid upon determination by the Court that such amounts are due and owing under the respective Indenture Trustee Fees.  The Reorganized Debtor shall also promptly pay or cause to be paid in full any and all fees and expenses that will be incurred in connection with the distributions to be made by the Indenture Trustees under the Plan to the extent such fees and costs are provided for by the Indentures.

Any claim for Indenture Trustee fees and expenses arising after the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtor.  Nothing in the Plan shall be deemed to impair, waive, extinguish or negatively impact any charging lien of an Indenture Trustee.

### 2.     Priority Tax Claims

Priority Tax Claims include certain unsecured income, employment, and other taxes described by Bankruptcy Code section 507(a)(8).

The following chart lists the treatment under the Plan for Debtor's § 507(a)(8) Priority Tax Claims:

| Description | Treatment |
|---|---|
| Priority Tax Claims Arising Under 11 | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date, agrees to different treatment or its Claim is the subject of Final Order of the Bankruptcy Court, each Holder of an |

| U.S.C. § 507(a)(8) | Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable. The Debtor or Reorganized Debtor, as the case may be, reserves the right to pay any Allowed Priority Tax Claim in equal quarterly payments over a period of five years from the date of the entry of the Order for relief in the simple interest at applicable non bankruptcy rate. |

**B.      Allowance and Treatment of Classified Claims and Interests**

**1.      Secured Claims (Class 1)**

Secured Claims are Claims secured by liens on Estate property to the extent that the lien is valid and unavoidable and against property in which the Estate has an interest or that is subject to setoff under 11 U.S.C. § 553.  A Claim is secured only to the extent of the value of the Holder's interest in the collateral that secures the Claim.  If there are any Allowed Secured Claims, New World does not believe that they are impaired and, therefore, the Holders are deemed to accept the Plan not entitled to vote on the Plan.  The following chart summarizes the treatment of any Allowed Secured Claims, if any, against the Debtor:

| Class | Description | Impaired | Treatment |
| --- | --- | --- | --- |
| 1 | Allowed Secured Claims | No | Unless the Holders agrees to different terms, in full satisfaction of any Allowed Secured Claims, the Holder of the Allowed Secured Claim will receive either (1) the full amount of the Allowed Secured Claim in Cash on the later of the Effective Date or fifteen business days after the Claim becomes an Allowed Secured Claim or (2) the Collateral securing the Allowed Secured Claim, Any Allowed deficiency balance will be treated in Class 3A. |

**2.      Priority Non-Tax Claims (Class 2)**

Priority Non-Tax Claims are those unsecured claims entitled to priority under 11 U.S.C. § 507(a) other than Tax Claims arising under 11 U.S.C. § 507(a)(8).  The Bankruptcy Code requires that each Holder of a Priority Non-Tax Claim receive Cash on the Effective Date equal to the

Allowed amount of such Claim.  However, a Class of Priority Non-Tax Claims may elect to accept

deferred Cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount

of such Claim.  Class 2 is not impaired and, therefore, the Holders of Class 2 Claims are deemed to

accept the Plan and are not entitled to vote on the Plan.

The following chart summarizes the treatment of these Claims:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 2 | Priority Non-Tax | No | Except to the extent that a Holder of an Allowed Claims Priority Non-Tax Claim agrees to other treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim from funds available to the Reorganized Debtor on the later of (1) the Effective Date or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim or, in either case, as soon thereafter as is practicable. |

### 3.    General Unsecured Claims (Class 3)

Class 3 is comprised of all General Unsecured Claims, which are Claims not entitled to

priority under Bankruptcy Code section 507(a).  New World believes that Classes 3A, 3B, and 3C are

unimpaired; therefore, the Creditors in Classes 3A, 3B, and 3C will not be entitled to cast votes.

Classes 3A (General Unsecured Claims) and 3B (Senior Notes) are paid in full in cash with Post

Petition Interest at the federal judgment rate which, under the case law interpreting Section 1124 of

the Bankruptcy Code, as amended, leaves intact their legal, equitable and contractual rights.

The TOPrS and the Junior Notes are Reinstated and unimpaired under Section 1124.  The

Indenture Trustee for the Junior Notes disputes the right of New World, as the Plan proponent, to

Reinstate the Junior Notes or the TOPrS based upon defaults triggered by the filing of the Case.  New

World believes that sections 365 and 1124 of the Bankruptcy Code and case law interpreting those

provisions support New World's position with respect to the Reinstatement of the TOPrS and the

Junior Notes.  By way of clarification, in the event that the Bankruptcy Court finds that Class 3C is

impaired under a definition of impairment, the Holders of Allowed TOPrS Claims shall retain all legal, equitable and contractual rights provided by the Indenture dates as of March 6, 1996 and the Notes and expect that all existing, continuing or future non-monetary defaults that might otherwise prevent cure or reinstatement under 11 U.S.C.§1124 are hereby deemed waived.  In such event and to the extent that the parties do not agree to different terms, the Indenture and Notes shall be reaffirmed by the Reorganized Debtor and shall remain in full force and effect and the Confirmation Order shall provide for such reaffirmation.

The Indenture Trustee for the Senior Notes believes that the Holders of Junior Notes Claims are impaired, contrary to their stated treatment herein, because, to the extent that the Court determines that the Holders of Senior Notes Claims are only entitled to receive Post-Petition Interest in satisfaction of the requirements of section 1124 of the Bankruptcy Code, the subordination provisions of the Junior Notes indenture require Holders of Junior Notes Claims to pay from any distribution such Holders receive on account of such Claims to Holders of Senior Notes Claims the value of the difference between Post-Petition Interest and the amount the Senior Notes Holders would receive if paid interest from the Petition Date at the rate borne by the Senior Notes.  New World disagrees with the Indenture Trustee's analysis.

In an abundance of caution, the Holders Claims in Classes 3A, 3B and 3C are being sent Ballots to vote on the Plan.  If the Court disagrees with New World's characterization and finds that one or more of Classes 3A, 3B, or 3C are in fact impaired, then the votes will be counted.  New World reserves the right to have the Court determine prior to the Confirmation Date whether the holders in Class 3A, 3B and 3C are impaired.

The following chart summarizes the Plan's treatment of all Classes containing the Debtor's General Unsecured Claims:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 3A | General Unsecured Claims (excluding the TOPrS Claims, and the $176,402,107 of Claims represented by the 7.875% Senior Notes due 2009) | No | Except as provided below with respect to the Holder of an Allowed General Unsecured Claim pursuant to any settlement, compromise, stipulation or order which provides for different treatment, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, the Holder of an Allowed Class 3A General Unsecured Claim shall retain their legal, equitable, and contractual rights and shall be paid in full on the later of the Effective Date of the Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim, with prepetition interest and Post Petition interest from the Petition Date.<br><br>The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BNY Stipulation or any other settlement, compromise, stipulation or order which provides for treatment that is different from the treatment provided for herein, shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of (1) the Effective Date or (2) the fifteenth Business Day after the Claim becomes an Allowed Claim, or in either case, as soon thereafter as is practicable. |
| 3B | General Unsecured Claims of the Holders and of the 7.875% Senior Notes<br><br>$176,402,10.56 (prepetition) | No | The Holders of Allowed Class 3B General Unsecured Claims shall retain their legal, equitable, contractual rights and, on the Effective Date, will be paid their principal, plus prepetition interest at the rate set forth in the Senior Notes, and PostPetition interest at the federal judgment rate in effect as of the Petition Date, which was 2.51%. |
| 3C | TOPrS Claims<br><br>$107,422,680.37 (prepetition) | No | The Holders of Allowed TOPrS Claims shall be Reinstated.  The TOPrS shall retain all legal, equitable and contractual rights provided by the Indenture. |

### 4.      Class of Equity Interests (Class 4)

Equity Interest Holders are the parties who hold ownership interests (i.e., Equity Interests) in the Debtor.  As of the Petition Date, the Debtor had issued approximately 82,116,179 shares of

common stock.  The New World Plan provides for the Holders of allowed Equity Interests to retain

their Equity Interests in the Reorganized Debtor.  Nevertheless, Class 4 is impaired because the

Equity Interests are subject to dilution for the issuance of additional shares of common stock for

reserves for the Warrants issued in connection with the purchase of $6.8 million (20.6 million) of

shares by New World on the Effective Date, the equity purchase, and additional shares issued for the

Holders of Section 510(b) Claims .  Therefore, the Holders of Equity Interests are entitled to vote to

accept or reject the Plan:

| Class | Description | Impaired | Treatment |
|-------|-------------|----------|-----------|
| 4 | Equity Interests | Yes | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor in full and final satisfaction of their Equity Interests, subject to dilution for the issuance of shares in reserve for the Warrants, the shares issued to New World on account of the equity contribution and the common stock issued to the Holders of Allowed Class 5 Claims, if any. |

### 5.    Class or Claims Subordinated Under 11 U.S.C. § 51 0(b) (Class 5)

Class 5 is comprised of Claims subject to subordination under 11 U.S.C. § 510(b) because

they arise from the rescission of a purchase or sale of a security of the Debtor or an affiliate of the

Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or

contribution on account of such a claim.  The Claims of the plaintiffs in the ERISA Action and the

Securities Class Action are presently classified in this Class.  If the Court enters a Final Order finding

that the Allowed Claims should be subordinated pursuant to 11 U.S.C. § 510(b), then the Creditors

shall receive the treatment proposed below.  If the Court enters a Final Order finding that the

Allowed Claims should not be subordinated pursuant to 11 U.S.C. § 510(b), then the Creditors shall

receive the same treatment provided for in the appropriate class of Unsecured Creditors.  Class 5 is

unimpaired because the Holders retain their legal, equitable and contractual rights as determined by

the Final Order of the Bankruptcy Court.  The amount of any such Allowed Claim shall be reduced in

whole or part to the extent the Holder of such Allowed Claim receives proceeds of insurance policies

in satisfaction thereof.  The Holders of Claims in Class 5 are not entitled to Vote.  The following

chart describes the treatment provided for Holders of Class 5 Claims under the Plan:

| Class | Description | Impaired | Treatment |
|-------|-------------|----------|-----------|
| 5 | Section 510(b) Claims | No | It must be determined by a final Order that  that the Claims in this Class are (a) Allowed Class 5 Claims and (b) subject to subordination under 11 U.S.C. § 510(b), then the Holder of the Allowed Class 5 Section 510(b) Claim will receive newly-issued common stock in the Reorganized Debtor in full and final satisfaction of its Allowed Section 510(b) Claim.  The percentage interest of common stock to which such Holders will be entitled shall be based upon the average trading value of the common stock of the shares of the Reorganized Debtor for the thirty days preceding the date on which any Section 510(b) Claims become Allowed Section 510(b) Claims if such allowance occurs after the Effective Date. |
| | | | If the Court determines in a Final Order that the Allowed Class 5 Claim is not subject to subordination under 11 U.S.C. § 510(b), then the Holder of the Allowed Class 5 Claim will receive the same treatment as Allowed Class 3A General Unsecured Claims. |
| | | | Certain Allowed Class 5 Claims may be reduced or satisfied by proceeds of insurance policies. |

New World believes that the issuance of interests in the Reorganized Debtor to the Holders of

Allowed Class 5 Claims, if any, pursuant to the Plan will satisfy the applicable requirements of

section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from

registration under the Securities Act and any applicable Blue Sky Law.  The issuance of interests will

be entirely in exchange for or on account  of Claims or Equity Interests.

## C.    Executory Contracts and Unexpired Leases

Effective upon Confirmation of the Plan, the Debtor will reject all executory contracts and

unexpired leases between the Debtor and any other party that have not previously been rejected, other

than the Executive Employment Agreements, certain insurance contracts and those executory

contracts and unexpired leases which are listed on the Schedule of Assumed Agreements to be filed

twenty-one (21) days before the Confirmation Hearing Date with the Bankruptcy Court of executory

contracts and unexpired leases to be assumed under the Plan on the Effective Date.  That schedule

will list the amount of the proposed cure payment required by 11 U.S.C. § 365(b)(1).  A copy of the

schedule and notice of the objection deadline will be served on the contract parties.

Any party that objects to the assumption of its executory contract or unexpired lease by the

Debtor or to the proposed cure payment must file with the Court and serve on interested parties a

written objection with supporting evidence that states the basis for the objection.  This objection must

be filed with the Court and served no later than ten (10) days before the Confirmation Hearing.  Any

entity that fails to timely file and serve an opposition will be deemed to have waived any and all

objections to the proposed assumption or the amount of the proposed cure payment.  In the absence

of a timely objection by such a party, the Confirmation Order shall constitute a final determination of

the amount of the cure payment and that the Reorganized Debtor has shown adequate assurances of

its future performance.

In the event of a dispute regarding the cure payment, adequate assurances, or some other

matter related to assumption, the cure payment required by 11 U.S.C. § 365(b)(1) shall not be made

until after entry of a Final Order resolving the dispute and approving the assumption.  Pending the

entry of a Final Order, the executory contract or unexpired lease at issue will be deemed assumed by

the Reorganized Debtor unless otherwise ordered by the Court.  Upon payment of the cure amount

required by 11 U.S.C. § 365(b)(1), any prepetition or postpetition arrearage or other Claim asserted in

a Filed proof of Claim or listed in the Schedules shall be deemed satisfied in full and the Claim shall

be deemed disallowed, without further order of the Court or action by any party.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases will

be treated as Class 3A General Unsecured Claims, and a proof of claim must be filed with the

Bankruptcy Court and served on the Reorganized Debtor within thirty days of the Effective Date of the Plan or be forever barred and unenforceable against the Debtor, the Reorganized Debtor, or their property.

### D.     Means of Effectuating the Plan

#### 1.     Merger

Section 1123(a)(5)(C) of the Bankruptcy Code contemplates that one means for implementation of a plan of reorganization is through the merger of a debtor with one or more entities.  Both Nevada Revised Statute Section 92A.180 and California Corporations Code § 1110 enable parent corporations to effectuate "short-form" mergers with subsidiaries.  The Plan contemplates a two-step merger that will occur on the Effective Date of the Plan:  first, FGCC will merge into the Reorganized Debtor or the Debtor, as the case may be, and then FRC will merge into the Reorganized Debtor or the Debtor, again as the case may be.  The resulting entity will be the Reorganized Debtor.  The Reorganized Debtor will then continue to operate its business in the ordinary course with the assets of the subsidiaries and will perform its obligations under the Plan.

On the asset side, the effect of the merger will be that the assets of the Debtor, FGCC, and FRC will become assets of the Reorganized Debtor.  On the liability side, any existing liabilities of FGCC and FRC that are outstanding as of the date of the merger will become obligations of the Reorganized Debtor.  The liabilities of FGCC and FRC will be assumed and satisfied by the Reorganized Debtor in the ordinary course of business in accordance with applicable non-bankruptcy law and are not classified or treated as Claims under the Plan.  The stock of FGCC and FRC will be cancelled and all intercompany claims between the Debtor, FGCC, and FRC will be eliminated.  After payment of the sums required to be paid on the Effective Date under the Plan, it is estimated that the Reorganized Debtor will have $84.8 million in cash on hand.

New World is advised that while FRC operated as a bank and engaged in the business of loan origination, it may have entered into mortgage loan purchase and securitization agreements that

contained provisions that addressed FRC's possible merger or consolidation. Some of these agreements are believed to contain provisions specifying that the successor corporation have a minimum net worth of at least $25 million or be an institution whose deposits are insured by the FDIC, or that the merger not adversely affect the then current rating on the certificates originally generated. Because FRC ceased operating as a bank and returned its banking charter some time ago, it is unlikely that these provisions are relevant or could give rise to valid claims.

New World believes that the merger is an appropriate and proper means of implementing the Plan. The corporate structure of the Debtor, FGCC, and FRC was established while FRC was operating as an industrial bank subject to federal and state regulations and the Debtor, as the holding company, was similarly subject to laws and regulations that governed its ownership of FRC. Because FRC is no longer a bank, the same laws and regulations do not apply. The merger will streamline operations and eliminate redundant costs and will facilitate the decision-making process because the Reorganized Debtor will have only one board instead of three and that board can more easily monitor the performance of the business and the status of all outstanding liabilities.

### a) The Assets and Liabilities of FGCC

Because FGCC is the holding company for FRC, its wholly-owned subsidiary, its assets consist of its ownership interest in FRC and approximately $986,000 in cash. Because it is a holding company, its balance sheet does not reflect any material outstanding liabilities.

### b) The Assets and Liabilities of FRC

FRC's assets include real estate loan portfolios, real estate holdings and other investments, and the cash flow and income generated from these assets, primarily from the collection of mortgage principal and interest payments. FRC has recently outsourced the servicing of its loans to a third party sub-servicer, Specialized Loan Servicing LLC ("SLS").

According to FRC's unaudited balance sheet, FRC's primary assets consist of (i) approximately $336.7 million in cash and cash equivalents; (2) residential real property held for sale

with a book value of approximately $6.8 million; (3) its corporate headquarters and related personal property, furniture, and equipment with an aggregate book value, after depreciation, of about $4.3 million; (4) real estate loan portfolios with an aggregate book value of approximately $159.7 million; (5) common stock investments with a book value of approximately $2.1 million; and (6) Community Reinvestment Act loans and investments with a book value of approximately $18.1 million.  The fair market value of these assets is not necessarily reflected in the book values.  In addition, FRC may be entitled to recoveries against fidelity bonds and insurance policies.

FRC's main liabilities consist of the remaining contingent, unliquidated, and disputed claims associated with its lending operations.  Many of these liabilities have been resolved, but many remain.  Those that remain are mostly related to residential loans originated by FRC that were then sold to third parties in either whole loan sales or securitized transactions.  When done as a whole loan sale, FRC sold the loans for cash and gave the buyer customary representations and warranties regarding the loan that required FRC to repurchase those loans if certain defaults occurred within a designated period after the sale (the "Repurchase Claims").

FRC established a reserve for Repurchase Claims that has been adjusted on occasion as claims have been resolved and new Repurchase Claims asserted.  FRC has contested and settled many Repurchase Claims, but there are Repurchase Claims that remain outstanding and that could be asserted in the future, although the likelihood of that occurring decreases over time.  FRC has reserved approximately $10.5 million on account of known Repurchase Claims and has indicated that it is likely that this sum will be used to satisfy known Repurchase Claims.  It has been assumed by parties in the Case that there are additional Repurchase Claims estimated to be in the range of $14.4 million and $29.4 million that will require payment and resolution.  Because FRC's records reflect that FRC has historically been able to resolve Repurchase Claims for a fraction of their asserted face amounts and because of the progress that has been made to date, New World believes that the Reorganized Debtor will have sufficient cash to satisfy any remaining Repurchase Claims.  The Plan

- 62 -

provides for the creation of a cash reserve for Repurchase Claims and an additional reserve for

contingent claims in the aggregate amount of $30 million.  In the event that the claims do exceed the

sums being reserved, the Reorganized Debtor will be liable for such claims.  After the Effective Date,

the Reorganized Debtor may increase the amount of the reserves as deemed appropriate by the

Reorganized Debtor and any Final Order of the Bankruptcy Court requiring a different or greater

reserve.  In the event that the claims do not exceed the sums being reserved after resolution and

payment of all claims, the remaining funds held in the reserve shall be remitted to the Reorganized

Debtor.

U.S. Bank National Association, as Trustee ("U.S. Bank") has alleged that the various

securitization trusts that own more than 700 residential loans originated by FRC and as to which U.S.

Bank acts as trustee, have an aggregate amount of at least $98 million of claims ($64 million of

liquidated claims and in excess of $34 million in face amount of unliquidated claims).  U.S. Bank has

reserved its right to contest confirmation of the Plan and the provisions of the Plan regarding the

Merger and the provisions governing post Effective Date Distributions.  Wells Fargo Bank, National

Association, as Trustee ("Wells Fargo") has joined in the objection.  Together, U.S. Bank and Wells

Fargo contend that the Repurchase Claims are approximately $200 million.  New World will seek

additional information regarding U.S. Bank's alleged Repurchase Claims.  New World does not

believe that U.S. Bank's or Wells Fargo's claims have merit.

In order to meet the potential need for additional reserve funds, New World is seeking

financing in a competitive process that will provide the Reorganized Debtor with a $20 million Exit

Facility in the form of a secured credit facility with interest payable at a commercially advantageous

rate of interest per annum for a term of seven years.  The Exit Facility will be initially secured by the

Reorganized Debtor's existing loan portfolio.  The reserves for Repurchase Claims and other claims

will not serve as collateral for the Exit Facility.  Among other things, the Exit Facility contemplates

the ability to substitute collateral.  As a result, sales or repayments from within the existing loan

portfolio will not necessarily result in the need to amortize the Exit Facility, provided that mutually

satisfactory substitute collateral is pledged.  The new assets which are targeted for

acquisition/origination by New World are expected to be suitable substitute collateral for the Exit

Facility.  Moreover, there may be provisions to expand the capacity of the Exit Facility to meet the

anticipated growth of the asset base.  Alternatively, the Reorganized Debtor will have the right to

prepay the Exit Facility, subject to customary prepayment provisions, to the extent that a refinancing

alternative would better meet its anticipated financing needs.  In connection with the Exit Financing

Facility, the Reorganized Debtor may issue to the Lenders Warrants of ten years duration to purchase

some part of 44,781,746 shares of common stock at an average price of $.67 pursuant to the terms of

the New Fremont Warrants.  New World is engaged in a competitive process to secure the best

possible financing terms for the Reorganized Debtor.  Accordingly, although New World has

attached hereto as Exhibit 2 a form of Term Sheet for the Exit Facility, certain terms and the identity

of the Lenders will not be disclosed until ten (10) days prior to the Confirmation Hearing.

         In addition, New World will invest approximately $6.8 million on the Effective Date of the

Plan to purchase approximately 20.6 million common stock (with the shares priced at the 90 day

average prior to the disclosure statement hearing on the New World Plan).  Changes in the

projections and other information with respect to stock ownership provided by the Debtor may result

in an increase or decrease in the number of shares purchased subject to a maximum adjustment of

shares with a purchase price of $1 million.  Without giving effect to the Warrants and including New

World's current Equity Interests, New World estimates that the purchase of the Equity Interest will

result in an ownership interest of approximately 24% of the stock of the Reorganized Debtor based

on 78,380,000 shares currently outstanding.

         Additionally, FRC is a party to more than 150 various pending litigation actions at various

stages of litigation, and additional lawsuits continue to be filed and commenced against it.  These

lawsuits relate to FRC's lending operations and essentially involve title actions, foreclosure

proceedings, or claims asserted by individual borrowers against FRC.  The title actions are usually covered by applicable title insurance and defended by the insurer and the others are sometimes covered by insurance.  Historically, FRC has been successful in resolving the matters not covered by insurance for small sums.

New World has provided a notice to creditors and equity holders that the Plan may affect their rights.  A copy of this notice is attached hereto as Exhibit 3.

### 2.    Postconfirmation Business Operations of the Reorganized Debtor

Although the immediate goal of the Plan is obviously to provide a source for full repayment of Claims against the Debtor after appropriate reserves for contingent and Post Effective Date Merger Claims of FGCC and FRC, the long-term strategy is to utilize the assets of the Reorganized Debtor to invest in business opportunities.  Under the business plan, the Reorganized Debtor, in addition to the existing business, will structure, originate and manage a diversified portfolio of commercial and residential mortgages, mortgage securities, corporate debt and asset-backed securities which may be sourced as new transactions or purchased in the secondary marketplace.  All such investments shall be made pursuant to the direction of the New Board and an Investment Management Committee appointed by the Board.

The activities will target after-tax returns of 20-25%, although the Plan assumes only a 15% return on invested capital.  The Plan also proposes to utilize the Debtor's substantial NOL carry forwards to generate significant after-tax returns to the Reorganized Debtor's shareholders.  A description of the business and projections related thereto are set forth in greater detail in the Projections for the Reorganized Debtor (the "Projections") attached as Exhibit 4.

As of August 31, 2009, the Debtor had Cash on hand of $27,348,966.  The balance of the funds that will be necessary to satisfy the payments required to be made on the Effective Date will be obtained from the Debtor's investment in its non-bankruptcy subsidiary, FRC, which will be merged into the Reorganized Debtor on the Effective Date, and after appropriate payments or reserves are

made for claims of creditors of FGCC and FRC, the New World Equity Investment and the Exit Financing Facility.

After payments required to be made on the Effective Date are made, the cash balance available to the Reorganized Debtor, together with the Exit Facility and the New World Equity purchase, will  provide sufficient liquidity to meet its operating expenses, obligations under the Plan, strategic investments, and interest expense.

### 3.    The Reorganized Debtor's Management Team

On the Effective Date of the Plan, the existing board of directors for the Debtor will be replaced by a nine member New Board of Directors comprised of the following members:  Four members from or in consultation with the ten largest shareholders and the Equity Committee excluding New World and five members designated by New World.  The members of the New Board will be designated twenty (20) days prior to the Confirmation Hearing.  Biographies of four of the individuals to be designated by New World are as follows:

**Seth B. Lipsay**

Mr. Lipsay is an Executive Managing Director of New World Realty Advisors, LLC.  Mr. Lipsay's professional career has included senior leadership roles in a variety of public and private organizations in the real estate, mortgage, and CMBS arenas, including Kenneth Leventhal & Company, Kidder Peabody, Paine Webber, and UBS.

Mr. Lipsay has recognized expertise in originating, underwriting, structuring, negotiating and harvesting complex debt, mezzanine and equity investments in the commercial real estate and specialty finance arenas.  His experience includes originations in excess of $2 billion of commercial and multifamily mortgage loans and more than $1 billion of corporate leveraged lease financings for leading private and institutional owners and acquirers of real estate portfolios.  As a Trader on a leading CMBS desk.  Mr. Lipsay was intimately involved in the securitization and trading of billions of dollars worth of public and private CMBS, including the bond structuring, credit rating and

institutional sales processes.

Mr. Lipsay also has considerable principal and advisory experience in portfolio sales, contentious workouts and complex restructurings of commercial real estate and mortgage assets. He has played a leadership role representing mortgage borrowers and lenders in many large corporate and portfolio restructurings. In addition, he has successfully represented major banks and insurance companies in orchestrating large-scale portfolio sale processes, coordinating the simultaneous marketing, documentation and closings of multiple pools of performing and non-performing loans and properties among multiple bidders and back-up bidders.

As a 25-year veteran of the real estate and mortgage finance industries, Mr. Lipsay has developed a strong reputation for his unique ability to assess complex situations, develop creative, but practical solutions, and provide valuable counsel throughout the process of implementing the selected strategic solutions. Over the years, Mr. Lipsay has advised the chief executives and boards of leading insurance companies, money center banks, and investment banks as well as public and private property owners in real estate matters of great significance and value. Mr. Lipsay won the Institutional Investor Real Estate Deal of the Year Award for his pivotal role in a large, complex portfolio transaction with a major insurance company and a leading opportunity fund. Clients rely upon his sharp mind, strong interpersonal skills, and broad base of knowledge and experience in the real estate realm when confronting complexity, adversity or uncertainty.

Mr. Lipsay holds an MBA in real estate and finance from the Wharton School of the University of Pennsylvania, a Juris Doctor in tax and business planning from the Hofstra University School of Law, and a BA from New College in public policy.

### **Steven H. Shepsman**

Mr. Shepsman is an Executive Managing Director New World Realty Advisors, LLC. Mr. Shepsman was a Managing Partner of Kenneth Leventhal and Company and of Ernst & Young's Real Estate Practice, who worked directly with and was responsible for the activities of several hundred

real estate consultants and accountants working on diverse engagements including complex valuation assignments of large performing and nonperforming real estate and real estate long portfolios, litigation assignments, large judicial and nonjudicial restructurings (including the chapter 11 proceeding of Bay Financial Corp. and Peter S. Kalikow), M&A support, capital markets activities including entity, portfolio and property debt and equity (Private and public) financings and integrating tax, accounting and regulatory issues into these various assignments.

His clients included numerous leading banks, investment banks, insurance companies, funds, developers, homebuilders, investors, law firms and a variety of real estate service firms.  Mr. Shepsman was integrally involved in the planning and execution of the first privately funded good bank/ bad bank:  Mellon/ Grant Street Banks.

As a principal in a real estate fund, he was responsible for the initial due diligence and closing of significant investments in a variety of platforms, including student housing, assisted living, medical office, hospitality/gaming, parking/ land banking and various privatization programs.  He directed the subsequent acquisition and financing by those platform entities of in excess of $1 billion of real estate investments.  Mr. Shepsman also participated in the disposition of these investments through sales, initial public offerings, restructurings and recapitalizations.

Mr. Shepsman has served on the boards of a number of privately held companies as well as Grubb & Ellis, a publicly traded real estate services company.  He currently serves as the chair of the Official Equity Committee of General Growth Properties, Inc.

Mr. Shepsman received his BS in business administration from the University at Buffalo and is presently the Vice Chairman of the Dean's Advisory Council for its School of Management.

**Daniel K. Pfeffer**

Mr. Pfeffer is an Executive Managing Director of New World Realty Advisors, LLC.  With over 20 years of direct real estate experience, including as a founder and Chief Executive Officer of a private real estate development firm, Mr. Pfeffer is well respected in the real estate community.  He

- 68 -

has a deep background in real estate finance, restructuring and development.  Mr. Pfeffer has

received accolades for many of his projects; include his work with Brownfield sites, projects

involving highly complex financial structuring, including, hybrid tax increment financing structures,

historic tax credit utilization and others.  Mr. Pfeffer has a vast amount of experience in land use

analysis, zoning work and project level development/construction.

Mr. Pfeffer previously served for twelve years as President, and Co-Founder of Midtown

Equities of New York where he oversaw a large, diverse multi-disciplined portfolio of investment

and development projects.  He concluded many highly complex projects, including the development

of a 56 acre Brownfield Site in South Florida that has become a model for many other cities in

America.  Mr. Pfeffer also has extensive experience in taking over failed projects, both at the

construction level stage, as well as fully developed properties.  A large element of what he

accomplishes involves repositioning troubled or broken assets based on market needs.

Prior to that time, Mr. Pfeffer was a Vice President at GE Capital in Stamford, CT, where he

was directly responsible for acquiring government held properties from the Department of Housing

and Urban Development (HUD) and the Resolution Trust Corp (RTC) and was charged with the

responsibility of overseeing and restructuring the $2.5 billion acquisitions portfolio. Smith Barney

recruited Mr. Pfeffer in 1992 to join its Real Estate Investment Banking Group, where he managed

secondary offerings and IPO's for large real estate developers.

Mr. Pfeffer has an extensive background in both financial and project level restructurings. He

spent a number of years at Manufacturers Hanover Trust, as one of the original members of the real

estate work out team. During his tenure, among others, he successfully completed restructuring and

workout assignments involving one of the worlds' premier hotel companies, a large multi-national

apartment developer, and a major owner of shopping malls. Mr. Pfeffer was directly responsible for

restructuring a large number of luxury hotel properties including Ritz-Carltons and other luxury

brands.

NEW WORLD DISCLOSURE STATEMENT

Mr. Pfeffer holds a B.A. in Economics with a concentration in Accounting from the University of Rochester. In addition, Mr. Pfeffer holds an M.B.A. in Finance from New York University, Stern School of Business.

### Kenneth S. Grossman

Kenneth S. Grossman is a highly experienced investor and executive specializing in troubled and distressed credit products, Mr. Grossman has a demonstrated track record of selecting profitable investments and actively participating in the financial and operational restructuring of target companies.

From 2000 until 2007 funds managed by him have generated annual internal rates of return in excess of 30% on average.

Mr. Grossman has served on numerous official corporate bodies, including Boards of Directors and official and unofficial groups involved in restructuring and bankruptcies.

**Bondholder/Bank/Creditor/Equity Committees**

| | | |
|---|---|---|
| American Homepatient, Inc. | Kara Homes, Inc. | Oneida, Inc. |
| Circle K. Corp | Kasper/Anne Klein, Inc. | Rickel, Inc. |
| Claridge Casino, Corp. | Lenox, Inc. | Resorts International, Inc. |
| Evercom Systems, Inc. | Leslie Fay Companies | Revco, Inc. |
| Fair Lanes, Inc. | Loehmann's Inc | Securus Technologies |
| Glasstech, Inc. | Morris Publishing | Western Union Corp. |
| Hill Stores, Inc. | Navigator Gas, Ltd. | Worldcorp, Inc. |

**Board Memberships**

| Chairman | Director | Shareholder Representative |
|---|---|---|

NEW WORLD DISCLOSURE STATEMENT

| e-Lottery, Inc. (2006 – 2008) | e-Lottery, Inc. (2003 – 2008) | Jennifer Convertibles, Inc. (2005 – Present) |
|---|---|---|

Roberts Consolidated Industries (1994 – 1998)     Evercom Systems (2003 – 2005)

Texas-New Mexico Power, Inc. (2003 – 2005)

Mr. Grossman was an attorney with Shea & Gould specializing in Bankruptcy, Creditor's Rights and Commercial Litigation from 1981 – 1989.

Mr. Grossman was affiliated with Balfour Investors Inc. and the Recovery Group, LP from 1989 – 1998, where he began investing in distressed situations.

Q2/1999 – Q4/1999 Mr. Grossman was a consultant to Avalon Total Return Fund, LP (distressed debt and value equity fund) and to Riverside Capital, Inc. (High Yield Fund).

Q4/1999 – Q3/2006 Mr. Grossman was a Managing Director of Alpine Associates, LP.

Q4/2006 – Q2/2008 Mr. Grossman was a Managing Member of Del Mar Asset Management, L.P.

Q3/2008 – Q2/2009 Mr. Grossman was a Managing Director of Ramius, LLC

The members of New World are four seasoned professionals with vast experience in work-outs, distressed investing and corporate restructuring and revitalizations.  Together they have well over a century of experience in these disciplines.  They have the expert financial, legal and organizational skills necessary to reposition Fremont after 18 months in bankruptcy.  At various times each of them has served as the lead advisor or principal (with capital at risk) in many of the largest corporate and real estate restructurings of the past 20 years.  While in these roles they have each raised substantial amounts of new capital, and structured or restructured hundreds of millions of dollars of mortgage debt.

In addition, several of the New World members have experience at both the board and senior management levels with real estate and lending operating companies.  They have served as the

NEW WORLD DISCLOSURE STATEMENT

managing partners of several real estate funds with hundreds of millions of dollars in equity capital and as owners and senior management of several specialty finance companies.  The New World members currently hold approximately 4.5% of the common stock of the Debtor based upon approximately 78,380,000 shares outstanding.  As a result of its equity investment of approximately $6.8 million for approximately 20.6 million shares, New World will hold approximately 23.5% of the stock of the Reorganized Debtor and after giving effect to the Warrant, New World will hold approximately 48% of the stock of the Reorganized Debtor.  New World estimates that its fees and expenses in connection with its Plan proposal through the Effective Date will not exceed $600,000, provided that none of the constituents launches deliberately costly confirmation litigation.

The boards of the subsidiaries will also be reconstituted in advance of the merger to the extent necessary to manage the affairs of the subsidiaries pre merger.

Richard Sanchez, Don Royer and Thea Stuedli (the "Remaining Executives") have not agreed, at this point, to continued employment by the Reorganized Debtor under the terms of the Executive Employment Agreements or otherwise, although New World intends to seek assumption of the Executive Employment Agreements.  The terms of the Executive Employment Agreements expire in November 2010.

### 4.    Reporting Requirements

At present the Debtor is classified as a "reporting company" for purposes of the 1934 Securities and Exchange Act.  The Debtor previously determined that the Debtor was unable to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 by the May 15, 2009 due date and the Debtor was not able to make that filing within the fifteen-day extension permitted by the rules of the SEC.  A similar disclosure has been made regarding the Annual Report on Form 10-K for the fiscal year ended December 31, 2007 and 2008 in addition to the Quarterly Report on form 10-Q for the quarters ended March 31, 2008, June 30, 2008 and September 30, 2008.

While it implements its initial investment strategy, the Reorganized Debtor will remain a

public company with Equity Interests trading on the pink sheets.  The Reorganized Debtor will seek

an accommodation from the SEC of filing and past due reporting requirements, if feasible,

commencing with a Form 10-K in the first quarter in which the Plan goes effective, which is

anticipated to be the first quarter of 2010.  This accommodation may be available to a registrant, like

the Debtor, that has filed on Form 8-K all monthly reports required by the Bankruptcy Code while in

bankruptcy.  If granted, the accommodation would permit all the filing of a detailed, comprehensive

Form 10-K to include all audited financial statements and unaudited statements that would have been

available had the registrant filed timely and complete reports.  In the event that the Reorganized

Debtor is unable to obtain the requested accommodation or if there are other impediments, the

Reorganized Debtor will become current in its SEC reporting requirements post emergence. The cost

of certifying the Debtor's historical financial statements is estimated to be between $1.5 million and

$2.5 million and is included in New World's projections.  At the same time, New World intends to

prepare and file a registration statement, the financial component of which and the response to SEC

commentary is included in the above estimate.  New World estimates that these processes may take

six (6) months to complete, based on a average two and half (2 1/2) months audit period, plus the

back audit required.  Although New World believes that it has estimated sufficient time, there can be

no assurance that the process can be completed within that time frame.

### E.    **Risk Factors**

The Reorganized Debtor's ability to perform its obligations under the Plan is subject to

various factors and contingencies, some of which are described in this section.  The following

discussion summarizes some of the material risks associated with the Plan, but is not exhaustive.

Moreover, it should be read in connection with other disclosures contained in the Plan and the

Disclosure Statement.  Each Creditor and Equity Holder, in conjunction with its advisors, should

supplement the following discussion by analyzing and evaluating the Plan and the Disclosure

Statement as a whole.  The risks associated with the Plan must be carefully considered in determining

whether to accept the Plan.

1. **Additional Risks**

    a)    General Risks

There are certain downsides and risks associated with the business plan that must be considered, including the following:

    (1)    Investment returns could be less than projected and the Reorganized Debtor might be forced to liquidate investments to raise Cash;

    (2)    Operating cost and litigation settlement could exceed projection;

    (3)    Resolution of bankruptcy claims might take longer than expected and require the Reorganized Debtor to pay or reserve more Cash than anticipated in the projections, although a contingency is included in the projections; and

    (4)    The Reorganized Debtor may be unable to implement its long-term plan if its capital reserves are found to be insufficient by any applicable law or regulations.

    b)    Specific Risks

In addition to the general risks described above, there are a number of specific risks that must be taken into account, as set forth below.

    (i)    Repurchase Claims

As explained above, FRC sold most of its residential loans to third parties in either whole loan sales or securitization transactions.  As part of the sale process, FRC was often required to give representations and warranties regarding the origination process of the loans and committed to repurchase loans if a payment default occurred within a specified period of time, giving rise to potential Repurchase Claims.

In 2006, the total amount of Repurchase Claims significantly increased and comprised about 2.4% of the loans FRC sold and securitized in 2006. In 2005, the percentage had only been 0.9% and in 2004 it had been 0.7%.  Demands based on Repurchase Claims have continued.

NEW WORLD DISCLOSURE STATEMENT

As of April 30 2009, FRC had reserved approximately $51.7 million on account of known Repurchase Obligations and estimated that $10.6 million would be paid out of the reserve in June 2009.  Under the Plan proposed by New World, $30 million will continue to be reserved for Repurchase Claims.  Although New World believes that this reserve should be more than sufficient to satisfy any such Repurchase Claims, it is possible that the final amount of Repurchase Claims may exceed this reserve.  However, New World believes that even if the Repurchase Claims exceed the reserve, the assets of the Reorganized Debtor should be sufficient to cover all Repurchase Claims.

(ii)    Risks Regarding Unresolved Litigation

FRC is further a defendant in excess of 150 litigation matters in various for a related to its lending operations.  While resolution of the lawsuits is on-going, new lawsuits often replace the resolved ones and there is no assurance that the lawsuits will be resolved for the sums projected by New World.  The ability of the Reorganized Debtor to fully realize upon FRC's assets may be constrained by FRC's need to retain funds to defend against and settle these litigation matters.

(iii)    Risks Regarding Unresolved Claims

As of the date of this Disclosure Statement, the process of reviewing and objecting to Claims is not complete.  To the extent not resolved and the settlements approved prior to the Effective Date of the Plan, final resolution of certain Claims will require approval of the New Board of the Reorganized Debtor.

One such Claim is the Claim filed by the IRS (the "IRS Claim") that asserts a priority unsecured Claim against the Debtor in excess of $89 million.

According to the Debtor, the Debtor has administratively appealed adjustments proposed during the IRS examination of tax years 2004 and 2005.  The adjustments proposed by the IRS pertain to the valuation of retired interests in securitizations and non-accrual interest income on commercial real estate loans, and will increase the Debtor's taxable income.  The assessments associated with these adjustments were included in the IRS Claim.

NEW WORLD DISCLOSURE STATEMENT

In addition, the Debtor's 2006 tax return is currently being examined by the IRS. The Debtor received notice of an IRS audit in December 2008. In 2006, the Debtor recorded a NOL of approximately $459 million which was fully carried back to the 2004 tax return to recapture a majority of the taxes that the Debtor paid in 2004. The Debtor then received a "carryback refund" in 2008 of approximately $160 million. If the IRS proposes adjustments that reduce the NOL that was recorded on the 2006 return, it could impact the carryback refund and result in the Debtor having to repay some or all of the tax return that the Debtor received.

The Debtor's 2007 tax return is also under examination after the Debtor received the audit notice in January 2009. In 2007, the Debtor recorded a NOL in excess of $1 billion and that loss was partially carried back to 2005 to recapture taxes paid in 2005, resulting in the Debtor receiving a "carryback refund" of approximately $105 million in June 2008. This refund was transferred to FRC in accordance with an existing tax allocation agreement.

There is a similar issue with the Claim filed by the Franchise Tax Board in the amount of $13,292,104. if these Claims are not resolved favorably to the Debtor, then they may adversely affect the ability of the Reorganized Debtor to consummate the Plan.

In addition to those tax issues, there is another issue that may adversely impact the ability to fund the Plan. In November 2008, FRC entered into a Consent Agreement with the IRS in which the IRS allowed FRC to change its method of accounting for loan repurchase obligations. Under that Consent Agreement, FRC must recognize an increase in computing taxable income of $100,358,879 (the "Adjustment"). FRC is required to recognize a quarter of the Adjustment in computing taxable income beginning with the tax year ended December 31, 2008, and is required to recognize a quarter of the Adjustment in each of the next three years. If FRC ceases engaging in the trade or business associated with the loan repurchase obligations or ceases to exist, then FRC may be required to take the remaining balance of the Adjustment into account in computing taxable income in the year it ceases that business or ceases to exist. As a result, if FRC does not generate a sufficient offset

NEW WORLD DISCLOSURE STATEMENT

against the taxable income recognized under the Consent Agreement (such as by using NOL carry

forwards to offset its taxable income), then the Reorganized Debtor may incur a federal and state tax

liability beyond that disputed liability included within the IRS Claim.  The Consent Agreement-based

liability would likely be required to be paid from Cash on hand.

(iv)    Regulatory Issues

There is a risk that the SEC could institute a proceeding under Section 12(j) of the Securities

Exchange Act of 1934 to revoke the Debtor's registration of the securities registered under Section

12(g) of the Act. While the Debtor and/or the Reorganized Debtor may use its best efforts to become

current in its reporting obligations, there is no assurance that it will be able to do so in sufficient time

to avoid a Section 12(j) revocation.

In addition, the Reorganized Debtor intends to conduct its business and operations so that it is

not required to register under the Investment Company Act, as amended.  If it is not able to do so, it

may have to register in order to comply with the Investment Company Act, as amended, and if so,

could become subject to substantial regulation with respect to its management, operations,

transactions with affiliates (as defined in the Investment Company Act, as amended), asset

composition (including diversification and industry concentration), governance, capital structure and

use of leverage.

**F.    Tax Consequences of Plan**

    **1.    Certain Federal Income Tax
            Consequences of the Plan**

**TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR**

**230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:**

**(A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO**

**IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED**

**UPON, AND CANNOT BE RELIED UPON, BY SUCH HOLDERS FOR THE PURPOSE OF**

**AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("TAX CODE"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTION OR MATTERS ADDRESSED HEREIN; AND (C) SUCH HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN INDEPENDENT TAX ADVISOR.**

          a)     <u>General</u>

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated and proposed thereunder (the "Treasury regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent for many of the federal tax consequences of the Plan, the possibility of changes in the law, the potential for disputes as to legal and factual matters with the IRS, the federal tax consequences described in the Plan are subject to significant uncertainties and may or may not reflect the position taken by the Debtor on any tax return. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, that could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to

special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities who elect to apply a mark-to-market method of accounting, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, and persons who hold Claims as part of a "straddle," a "hedge against currency risk or a "conversion transaction"). Except as expressly set forth below, no aspect of foreign, state, local or estate and gift taxation is addressed.

No assurance can be given as to the positions that the Debtor and its subsidiaries may take in any tax returns, or as to the amount of the Debtor's net operating losses ("NOLs") or other tax attributes. This discussion includes certain financial projections and estimates based on preliminary information that is subject to further review.  No assurance can be given that actual results will not differ materially.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.

b)      Consequences to Debtor Group

(i)      Mergers of FGCC and FRC into the Debtor

Pursuant to the Plan, each of FGCC and FRC would be merged into the Debtor in connection with effectiveness of the Plan, but prior to, and as a condition to, the infusion of equity capital by New World and the issuance of the Warrants.  Each merger should be treated for U.S. federal income

tax purposes as a liquidation of FGCC or FRC, as the case may be, into the Debtor.  It is expected

that each of FGCC and FRC will be solvent at the time of the merger and that each merger should be

treated as a liquidation pursuant to Section 332.

(ii)    Cancellation of Indebtedness

Under the Plan, holders of Claims in the following classes will be paid the full amount of their

Allowed Claims: Administrative Claims, Priority Taxes, Secured Claims, Priority Non-Tax Claims,

General Unsecured Claims of the Holders of the 7.875% Senior Notes. Since those Claims will be

paid in full, satisfaction of such Claims should not give rise to COD Income to the Debtor (except to

the extent that interest previously accrued and deducted by the Debtor is not required to be paid).

Similarly, the holders of General Unsecured Claims in Class 3A, Senior Notes in Class 3B, the

TOPrS Claims, the Junior Notes, the Equity Interests and the Section 510(b) Claims will not be

impaired and, in certain cases, such Claims do not relate to debt instruments, and therefore no COD

Income should result from these Claims.

As noted above, the Debtor is the common parent of an affiliated group of corporations that

join in the filing of a consolidated U.S. federal income tax return (the "Debtor Group").  The

principal intercompany claim between the Debtor and its affiliates is an intercompany payable owed

by the Debtor to FRC, the bulk of which is owed in connection with the Tax Allocation Agreement.

The merger of FRC into the Debtor that will be consummated pursuant to the Plan will result in the

elimination of this intercompany claim.  If, as expected, the liquidation of FRC into the Debtor is tax-

free pursuant to Section 332, no discharge of indebtedness income should be recognized upon

elimination of the intercompany claim.

As a result of the foregoing, the Debtor believes that it will not realize a material amount of

COD Income for U.S. federal income tax purposes as a result of the implementation of the Plan.  The

holders of Claims and Equity Interests should be advised that no ruling has been requested from the

IRS regarding this issue and no assurances can be given that the positions intended to be taken by the

- 80 -

Debtor will be accepted by the IRS.

(iii)    Net Operating Losses

Based on information made available by the Debtor, as of December 31, 2008, the Debtor Group estimates that it had U.S. consolidated net operating losses of approximately $819 million. The Debtor has indicated that the amount of such NOLs remains subject to adjustment by the IRS, as well as to carrybacks to prior years to cover additional tax assessments in prior years depending upon the outcome of ongoing IRS examinations.  In general, NOLs may be carried back two years and forward twenty years.  The Reorganized Debtor's ability to utilize such NOLs may be limited by Section 382 of the Code, as described below.

(iv)    Possible Limitations on Net Operating<br>Losses, "Built-In" Losses and Deductions

c)    <u>Overview of Section 382</u>

(1)    <u>Net Operating Losses</u>.  Under Section 382 of the Code, if a corporation with NOLs (a "loss corporation") undergoes an "ownership change," the amount of its pre-change NOLs that may be utilized to offset post-change taxable income is subject to an annual limitation (the "Section 382 Limitation").  In general terms, an "ownership change" will occur if one or more of the corporation's 5% shareholders increase their ownership, in the aggregate, by more than 50 percentage points over a three-year period.  The Section 382 Limitation is an amount equal to the product of the applicable long-term tax-exempt rate in effect on the date of the ownership change (for example, 4.48% for ownership changes occurring in October 2009) and the value of the loss corporation immediately prior to the ownership change.  The value of the loss corporation generally is equal to the value of the stock of the loss corporation immediately before the ownership change, provided that such value is subject to (i) reduction if the corporation will hold substantial nonbusiness assets after the ownership change and (ii) certain other adjustments specified in Section 382 and applicable Treasury regulations.  If a loss corporation does not continue its historic business or use a significant

- 81 -        NEW WORLD DISCLOSURE STATEMENT

portion of its business assets in a new business for two years after the ownership change, the Section 382 Limitation would be zero.  Generally, Section 382 and the Section 382 Limitation are applied to a consolidated group as though the group were a single corporation, subject to certain exceptions noted below.

(2)    Built-in Losses.  In addition to limiting a corporation's ability to utilize NOLs, the Section 382 Limitation may limit the use of certain losses or deductions which are "built-in" as of the date of an ownership change and which are subsequently recognized.  If a loss corporation has a net unrealized built-in loss at the time of an ownership change in excess of a specified threshold (taking into account most assets and all items of "built-in" income and deduction), then any built-in loss or deduction recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and will be subject to the Section 382 Limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, in excess of a specified threshold, then any built-in gain recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the Section 382 Limitation in the year recognized, such that the loss corporation would be permitted to use pre-change losses against such built-in gain income in addition to its regular annual allowance.

(3)    Section 382(1)(5) Bankruptcy Exception.  Section 382(1)(5) provides an exception to the application of the Section 382 Limitation for certain loss corporations under the jurisdiction of a court in a bankruptcy case (the "Section 382(1)(5) Bankruptcy Exception"). The Section 382(1)(5) Bankruptcy Exception applies if historic shareholders and certain creditors prior to an ownership change own at least 50 percent of the total voting power and total value of the loss corporation's stock after the ownership change (the "50 percent historic shareholder test").  The historic shareholders and creditors must own at least 50 percent of the corporation's stock as a result of being shareholders and creditors immediately before the ownership change.  Thus, if a party that is an historic shareholder acquires additional shares for new consideration pursuant to the Plan, those

- 82 -                    NEW WORLD DISCLOSURE STATEMENT

additional shares would be considered 'new' shares and would not be considered historic for purposes of the 50 percent historic shareholder test.  Solely for purposes of the 50 percent historic shareholder test, options or warrants of the loss corporation generally are deemed exercised if such treatment would result in the 50 percent historic shareholder test being failed.  The continuity of business enterprise requirement does not apply to an ownership change that qualifies for the Section 382(1)(5) Bankruptcy Exception.  The loss corporation must, however, carry on more than an insignificant amount of an active trade or business, or an acquisition may be considered to have been made for a prohibited purpose under Section 269.

If the Section 382(1)(5) Bankruptcy Exception applies to a loss corporation, the loss corporation's pre-change NOLs and built-in losses would not be subject to a Section 382 Limitation.  Rather, the loss corporation's pre-change NOLs would be subject to certain reductions relating to the amount of loss corporation debt in respect of which stock is issued.  Because the Plan does not provide for the issuance of stock for debt, these reductions should not apply.  The Section 382(1)(5) Bankruptcy Exception provides that a second ownership change occurring during the two-year period immediately following the first ownership change would reduce the Section 382 Limitation to zero.  There is no clear interpretation as to whether and how the Section 382(1)(5) Bankruptcy Exception applies to a consolidated group; e.g., whether historic shareholders of a parent corporation who satisfy the 50 percent historic shareholder test prevent the other members of the consolidated group from experiencing an ownership change.

(4)    Alternative: Section 382(l)(6).  If a loss corporation does not qualify for the Section 382(1)(5) Bankruptcy Exception or elects not to apply the Section 382(1)(5) Bankruptcy Exception, a special rule under Code Section 382(1)(6) applicable to corporations under the jurisdiction of a bankruptcy court will apply in calculating the loss corporation's value for purposes of determining the Section 382 Limitation. Under this special rule, the loss corporation's value would be the lesser of (a) the value of the loss corporation's stock immediately after the ownership change (as opposed to

immediately before the ownership change, as discussed above) and (b) the value of the loss

corporation's assets determined without regard to liabilities immediately before the ownership

change, subject to certain adjustments specified in Section 382 and the applicable Treasury

regulations.  One such adjustment is a reduction in the value of a loss corporation that holds

substantial nonbusiness assets immediately after an ownership change.

d)    Application of Section 382 to the Debtor Group

(1)    Ownership change.  To facilitate the Section 382 analysis, the Debtor has made

available information regarding owner shifts in Debtor stock over the past three years.  This

information indicates that an approximately 34.7% owner shift has occurred over the three year

period ending January 31, 2010 (an assumed Plan effective date used solely for purposes of this

analysis).  No assurance can be given that the information furnished by the Debtor would be accepted

by the IRS.  Shares to be issued to New World pursuant to the Plan would add to this owner shift, as

would certain shares acquired by New World prior to the Petition Date.  Any shares issued in respect

of Section 510(b) Claims would not add to this owner shift if, as expected, such shares in the

aggregate represent less than ten percent of the then outstanding shares.  Based on the foregoing,

New World expects that the owner shifts over the three years preceding the expected Effective Date,

together with the issuance of shares to New World pursuant to the Plan, would trigger an "ownership

change" of the Debtor Group.  If an "ownership change" occurs, the Debtor Group's NOLs would

become subject to a Section 382 Limitation unless the Section 382(1)(5) Bankruptcy Exception

applies.

(2)    Section 382(1)(5) Bankruptcy Exception.  In order for the Section 382(1)(5)

Bankruptcy Exception to apply, historic shareholders and certain creditors of the Debtor must own at

least 50 percent of the Debtor's stock after the ownership change, as a result of their historic

ownership.  This 50 percent historic shareholder test compares stock ownership immediately before

and immediately after an ownership change, and is distinct from the rolling three-year test used to

- 84 -    NEW WORLD DISCLOSURE STATEMENT

determine if an ownership change has occurred.  Solely for purposes of the 50 percent historic

shareholder test, shares issued to New World pursuant to the Plan would be considered new shares

and would not be counted as historic share ownership.  Similarly, solely for purposes of the 50

percent historic shareholder test, Warrants issued pursuant to the Plan would be deemed exercised,

and the shares deemed issued upon exercise would be considered new shares and not historic shares.

Shares issued in respect of Section 510(b) Claims likely would be considered historic shares, because

these shares would be issued in respect of ordinary course claims which arose prior to the ownership

change.  New World estimates that the shares issued to New World pursuant to the plan, together

with the shares that would be deemed issued upon deemed exercise of the Warrants, would be less

than 50 percent of the shares outstanding after the ownership change.  The remaining shares of

Debtor stock, which would represent more than 50 percent of the shares outstanding after the

ownership change, would continue to be owned by historic shareholders of the Debtor.  Accordingly,

New World anticipates that the 50 percent historic shareholder ownership test will be satisfied and

that the Section 382(1)(5) Bankruptcy Exception will apply to the Debtor.  If the Section 382(1)(5)

Bankruptcy Exception applies to the Debtor, the Debtor's NOLs and built-in losses arising prior to

the ownership change will not be subject to a Section 382 Limitation.

        (3)     <u>Debtor's Subsidiaries</u>.  A portion of the Debtor Group's NOLs is attributable to

subsidiaries of the Debtor, including FRC and FGCC.  FRC and FGCC are loss corporations that are

not under the jurisdiction of a court in a bankruptcy case.  As noted above, the Section 382(1)(5)

Bankruptcy Exception is applicable only to loss corporations that are under the jurisdiction of a court

in a  bankruptcy case.  Pursuant to the Plan, however, FRC and FGCC will be merged into the Debtor

on the Effective Date.  If, as expected, these mergers are treated for Federal income tax purposes as

tax-free liquidations pursuant to Section 332, then the Debtor, which is under the jurisdiction of a

court in a bankruptcy case, would succeed to the NOLs and certain other tax attributes of FGCC and

FRC on the Effective Date.  New World intends to request the Debtor to file its tax returns for the

period which includes the Effective Date in a manner which applies the Section 382(1)(5)

Bankruptcy Exception not only to NOLs which were originally attributable to the Debtor, but also to

NOLs to which the Debtor succeeds as a result of the mergers of FGCC and FRC into the Debtor.  No

assurance can be given that the Debtor will file its tax returns on this basis.   Because no definitive

guidance exists on the application of the Section 382(1)(5) Bankruptcy Exception to a group of

corporations, and/or to the contemplated mergers/liquidations, it is unclear whether the Section

382(1)(5) Bankruptcy Exception would apply to the NOLs of FGCC and FRC.

       (4)    Alternative Treatment.  If the Section 382(1)(5) Bankruptcy Exception does not

apply to NOLs of the Debtor, the transactions contemplated by the Plan may subject the Debtor's

NOLs  to a Section 382 Limitation calculated under the special rules of Section 382(1)(6), as

described above.   If the Section 382(1)(5) Bankruptcy Exception does not apply to NOLs of FRC or

the other subsidiaries of the Debtor, the transactions contemplated by the Plan may subject those

NOLs to a Section 382 Limitation determined under the regular rules of Section 382, as described

above.

## 2.    Consequences to Holders of Claims.

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon

several factors, including but not limited to: (i) the origin and nature of the Holder's Claim, (ii)

whether the Holder is a resident of the United States for tax purposes (or falls into any of the special

classes of taxpayers excluded from this discussion as noted above), (iii) whether the Holder reports

income on the accrual or cash basis method, (iv) whether the Holder has taken a bad debt deduction

or worthless security deduction with respect to the Claim and (v) whether the Holder receives

distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED

TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER

THE PLAN OF THEIR PARTICULAR CLAIMS.

NEW WORLD DISCLOSURE STATEMENT

a)      Contingent Liability Claims

In general, the Claims can be divided into two broad categories for federal income tax purposes. The first category consists of Claims that are not treated as debt for federal income tax purposes.  Most of the Administrative Claims, Priority Taxes, Priority Non-Tax Claims, General Unsecured, and Section 510(b) Claims, for example, are included in this category.

The Holder of such a Claim generally should not recognize any income, gain or loss, if at all, until actual receipt of consideration under the Plan (in the case of a cash basis taxpayer) or at such time as the Holder's right to consideration under the Plan becomes fixed and determinable (in the case of an accrual basis taxpayer). In either case, the Holder generally should be treated no differently for federal income tax purposes than had the consideration been received with respect to the Holder's original Claim, except to the extent that a payment from the Debtor represents interest, which a Holder shall report in accordance with such Holder's method of accounting as described in the preceding sentence.

Holders of Administrative Claims, Priority Taxes, Priority Non-Tax Claims, certain General Unsecured Claims, and Section 510(b) Claims, will recognize gain or loss equal to the amount realized under the Plan in respect of their Claims, less their respective tax bases in their Claims. The amount realized for this purpose will generally be equal to the amount of cash and the fair market value of common stock received under the Plan in respect of their Claims.

The character of any gain or loss recognized will depend on a number of factors, as described below. The holder's aggregate tax basis for any non-cash consideration received under the Plan will generally equal the amount realized. The holding period for any non-cash consideration received under the Plan will generally begin on the day following the receipt of such consideration.

b)      Debt Claims

The second category of Claims consists of Claims that are treated as debt obligations for federal income tax purposes ("Debt Claims"). This category would include, among other Claims,

Senior Notes Claims, Junior Note Claims, and the TOPrS Claims. The payment or reinstatement of a

Debt Claim under the Plan will be treated as one of two possible transactions for federal income tax

purposes: a continuation of the Debt Claim or payment of the Debt Claim in a fully taxable

transaction.

      (1)     Continuation of Debt Claims.

A Holder of a TOPrS Claim or Junior Note Claim who receives (or maintains) an obligation

of the Debtor under the Plan that does not differ significantly from the original Claim generally

should not have a taxable event for federal income tax purposes.   The Holders of Allowed TOPrS

Claims and Junior Note claims shall retain their legal, equitable, and contractual rights provided by

the Indenture dated as of March 6, 1996, and the TOPrS and Junior Notes shall be Reinstated.

Holders of such Claims generally should not have a taxable event for federal income tax purposes.

      (2)     Fully Taxable Transactions.

If a Debt Claim, including a Claim relating to the Senior Notes, is discharged under the Plan

other than through a continuation of the Debt Claim as described above, the discharge will generally

constitute a fully taxable transaction to the Holder and any gain or loss realized as a result of the

exchange or discharge will be recognized.  A Holder whose discharge of a Debt Claim constitutes a

fully taxable transaction will realize gain or loss equal to the difference between (i) the "amount

realized" in respect of the Claim and (ii) the Holder's tax basis therein. The amount realized generally

will be equal to the sum of the cash received, less any amounts allocable to interest.

      c)     <u>Distributions in Discharge of Accrued but Unpaid Interest.</u>

Distributions received in respect of Allowed Claims will be allocated first to the principal

amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However,

there is no assurance that the IRS will respect such allocation for federal income tax purposes.

Holders of Allowed Claims not previously required to include in their taxable income any accrued

but unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent

any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. Holders should consult their own tax advisors concerning the allocation of consideration received in satisfaction of their Allowed Claims and the federal income tax treatment of accrued but unpaid interest.

d)      Character of Gain or Loss.

The character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss recognized by a holder of Allowed Claims under the Plan will be determined by a number of factors, including, but not limited to, the status of the holder, the nature of the Allowed Claim in such holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Allowed Claim, and the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the Allowed Claim. In this regard, section 582(c) of the IRC provides that the sale or exchange of a bond, debenture, note or certificate, or other evidence of indebtedness by a bank or certain other financial institutions, will not be considered the sale or exchange of a capital asset. Accordingly, any gain recognized by such creditors as a result of the implementation of the Plan will be ordinary income.

In general, if a creditor holds a Debt Claim as a capital asset, any gain recognized will be classified as capital gain, except to the extent of interest (including accrued market discount, if any, as described below), and any loss required to be recognized will be classified as capital loss. Such gain or loss will be long-term with respect to Debt Claims for which the creditor's holding period is more than one year. There is a favorable tax rate applied to long-term capital gains for non-corporate holders. Any capital losses realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of other income.

e)    <u>Market Discount.</u>

Generally, a "market discount" bond is one acquired after its original issuance for less than the issue price of such bond plus the aggregate amount, if any, of original issue discount includible in the income of all holders of such bond before such acquisition. Generally, gain realized on the disposition of a market discount bond (or on the disposition of property exchanged for such bond in certain non-taxable exchanges) will be ordinary income to the extent of "accrued market discount" at the time of such disposition (determined using either constant interest or ratable daily accrual).

### 3.    <u>Consequences to Holders of Equity Interests.</u>

Pursuant to the Plan, all Equity Interests are being reinstated. A holder of an Equity Interest should not have a taxable event for federal income tax purposes.

### 4.    <u>Withholding.</u>

All Distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Debtor and/or the Post-Confirmation Estate will withhold appropriate employment taxes with respect to payments made to a holder of an Allowed Claim which constitutes a payment for compensation. Payors of interest, dividends, and certain other reportable payments are generally required to withhold from such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number), to the payor. This rate is currently 30% but is scheduled to be reduced in future years. The Debtor and/or the Post-Confirmation Estate may be required to withhold a portion of any payments made to a holder of an Allowed Claim if the holder (i) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such holder, (ii) furnishes an incorrect TIN, (iii) has failed to properly report interest or dividends to the IRS in the past or (iv) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such holder is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may

NEW WORLD DISCLOSURE STATEMENT

be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### G.    Trading Restrictions

In order to preserve the tax benefits from a second change in control, New World  intends to provide an amendment to the Articles of Incorporation.  The proposed amendment to the Articles of Incorporation to prevent a post Effective Date second change of control generally would restrict any person or entity from attempting to transfer (which includes any direct or indirect acquisition, sale, transfer, assignment, conveyance, pledge or other disposition) any of the Reorganized Debtor's stock (or options, warrants or other rights to acquire such stock, or securities convertible or exchangeable into such stock), to the extent that the transfer would (i) create or result in an individual or entity becoming a 5-percent stockholder of the Reorganized Debtor's stock for purposes of Section 382 of the Internal Revenue Code (which the amendment refers to as a "Five Percent Shareholder") or (ii) increase the stock ownership percentage of any existing Five Percent Shareholder. The amendment would not prevent transfers that are sales by a Five Percent Shareholder, although it would restrict any purchasers that seek to acquire shares from a Five Percent Shareholder to the extent that the purchaser is or would become a Five Percent Shareholder.

In order to provide for effective policing of the provision, the amendment will require a Restricted Holder (defined as a Person or group of Persons that is a Five Percent Shareholder and

acquires or proposes to acquire securities) prior to the date of the proposed acquisition, to request in writing that the Board of Directors (or a committee thereof that has been appointed by the Board of Directors) review the proposed acquisition and authorize or not authorize the proposed acquisition in accordance with the amendment.  The Board of Directors may authorize an acquisition by a Restricted Holder, if it determines, in its sole discretion, that, after taking into account the preservation of the tax benefits, such acquisition would be in the best interests of the Reorganized Debtor and its stockholders.

The amendment provides that any transfer that violates the provisions of the amendment would be null and void *ab initio* and shall not be effective to transfer any record, legal, beneficial or any other ownership of the number of shares which result in the violation of the amendment (which are referred to as "**Excess Securities**"). The purported transferee would  not be entitled to any rights as a stockholder of the Reorganized Debtor with respect to the Excess Securities.  Instead, the purported transferee would be required, upon demand by the Reorganized Debtor to transfer the Excess Securities to an agent designated by the Reorganized Debtor for the limited purpose of consummating an orderly arm's-length sale of such shares. The net proceeds of the sale will be distributed first to reimburse the agent for any costs associated with the sale, second to the purported transferee to the extent of the price it paid, and finally any additional amount will go to the purported transferor, or, if the purported transferor cannot be readily identified, to a charity designated by the Board of Directors.. The amendment would also provide the Reorganized Debtor with various remedies to prevent or respond to a purported transfer which violates its provisions.

Although New World believes that this should preserve the Fremont NOLs, it cannot guarantee that they will remain available for the Reorganized Debtor because in order to realize value from the NOLs, the Reorganized Debtor must also acquire income-producing assets or otherwise conduct a business that generates positive income that can be setoff by the NOLs.

**H.**    **Retention of Jurisdiction**

The Bankruptcy Court will retain jurisdiction of all matters arising in or related to the Plan to the fullest extent provided by law until the Plan is fully consummated, including, without limitations:

1.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

2.    The estimation of any Claim;

3.    The allowance or disallowance of Professional Fee Claims, compensation, or other Administrative Claims;

4.    To hear and determine Claims concerning taxes pursuant to Bankruptcy Code sections 346, 505, 525, and 1146;

5.    To hear and determine any action or proceeding brought under Bankruptcy Code sections 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553;

6.    To hear and determine all actions and proceedings relating to pre-confirmation matters;

7.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

8.    To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

9.    To enforce and interpret terms of the Plan;

10.    To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

11.    To hear and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or related to any order entered by the Court in this Case; and

12.    The entry of an order concluding and terminating this Case.

NEW WORLD DISCLOSURE STATEMENT

## I.    Claims

### 1.    Maintenance of Post-Confirmation Claims Register

In order to reduce the administrative burdens on the Bankruptcy Court and to improve the efficiency of the remaining claims allowance process, the Plan provides that the Reorganized Debtor shall be entitled to retain a third party, including, without limitation, Kurtzman Carson Consultants LLC, to maintain the official claims register for this Case (the "Post-Confirmation Claims Register"). The Post-Confirmation Claims Register shall be based, in the first instance, upon an updated claims database (the "Register Update") that shall be filed by the Debtor at least twenty-one (21) days prior to the Confirmation Hearing.  Objections by any party in interest to the form or substance of the Register Update may be considered as part of the Confirmation Hearing.  The Plan further provides that on the Effective Date, the Register Update shall be deemed to amend and supersede the Bankruptcy Court's official register, and may thereafter be relied upon by the Reorganized Debtor and any retained third party as the official Post-Confirmation Claims Register.  Finally, the Plan provides that following the Effective Date, copies of the current Post-Confirmation Claims Register may be obtained by any party in interest upon written request to the Reorganized Debtor.

### 2.    Claim Objections

The Reorganized Debtor or any other party in interest shall file objections to Claims or Equity Interests within 180 days of the Effective Date.  The Reorganized Debtor may obtain an extension of this date by filing a motion in the Bankruptcy Court, based upon a showing of "cause."  If, at the time of any Distribution, a Claim or Equity Interest under the Plan is a Disputed Claim or Disputed Equity Interest, the Reorganized Debtor shall have the right to hold in trust any funds that would be distributed to that Claim Holder or Equity Interest Holder if the Claim or Equity Interest were Allowed and until the Claim or Equity Interest is Allowed, if at all (the "Reserve Account").  Any unused funds in the Reserve Account, not otherwise designated for payout under the Plan, shall be returned to the Reorganized Debtor for use under the Plan, if required, and then to the Reorganized

NEW WORLD DISCLOSURE STATEMENT

Debtor.  Once a Claim or Equity Interest becomes an Allowed Claim or Equity Interest, it will receive the treatment afforded by the Plan.

### J.    The Committees

Until the Effective Date, the Equity Committee and the Creditors Committee shall continue in existence.  As of the Effective Date, the Equity Committee and the Creditors Committee shall terminate and disband and the members of the Equity Committee and the Creditors Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Committee members.  Except as otherwise provided in the Plan or Court order, the prohibition on members of the Equity Committee from trading their respective Equity Interests shall cease as of the Confirmation Date.

## VIII.   SECURITIES CONSIDERATIONS

Except as set forth below, common stock to be issued to Holders of Allowed Claims in Class 5, if any, will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

Common stock to be issued in connection with the $6.8 million equity investment, Warrants to be issued and common stock to be issued in connection with the exercise of such Warrants will be issued without registration under the Securities Act or any similar federal, state or local law and in reliance upon the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.  In that regard, New World will have made customary representations to the Reorganized Debtor, including that it is an "accredited investor" as defined under Rule 501 of Regulation D.  The lenders who may be granted Warrants in connection with the Exit Financing will be required to make the same representation.

On or about the Effective Date, the Reorganized Debtor shall execute and deliver the Registration Rights Agreement in substantially the form attached as Exhibit 1 to the Plan. The Registration Rights Agreement shall obligate the Reorganized Debtor to use commercially reasonable

efforts to effect, within six (6) months following the Effective Date, the registration under the Securities Act of common stock held by persons who acquired such common stock under the Plan in reliance upon the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder. The Registration Rights Agreement shall include customary terms and conditions, including customary demand and "piggyback" registration provisions. The Reorganized Debtor shall be responsible for all registration expenses, excluding selling expenses. bring the Debtor into compliance with its reporting obligations under the Exchange Act.

As stated herein, to the extent that it is currently delinquent in its reporting obligations under the Securities Exchange Act of 1934, the Reorganized Debtor shall use its reasonable efforts to obtain an accommodation and/or become compliant with such reporting obligations.

### A.    Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim against the debtor with

a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

**B.    Section 4(2) of the Securities Act/Regulation D**

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.

NEW WORLD DISCLOSURE STATEMENT

Regulation D is a nonexclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, Section 4(2) of the Securities Act.

The term "issuer," as used in Section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by Section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities would not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

On or after the Effective Date, the Reorganized Debtor shall execute and deliver the Registration Rights Agreement.

**C.**    **Rule 144 and Rule 144A**

Under certain circumstances, affiliates and holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale and (ii) an affiliate may sell restricted

securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Securities Exchange Act of 1934, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

Pursuant to the Plan, certificates evidencing shares of common stock received by (i) holders of securities issued in reliance upon the exemption set forth in section 4(2) of the Securities Act, (ii) holders of five percent or more of the outstanding common stock or (iii) by holders that request legended certificates and who certify that they may be deemed to be underwriters within the meaning of section 1145 of the Bankruptcy Code, will bear a legend substantially in the form below:

**THE SHARES OF COMMON STOCK EVIDENCED BY THIS CERTIFICATE
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933,**

NEW WORLD DISCLOSURE STATEMENT

**AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Any person that would receive legended securities as provided above may instead receive certificates evidencing common stock without such legend if, prior to the Effective Date, such person or entity delivers to the Debtor (a) an opinion of counsel reasonably satisfactory to the Debtor to the effect that the shares of common stock to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (b) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing shares of common stock of the Reorganized Debtor bearing such legend may present such certificate to the transfer agent for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act or (b) such holder delivers to the Reorganized Debtor an opinion of counsel reasonably satisfactory to the Reorganized Debtor to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (c) such holder delivers to the Reorganized Debtor an opinion of counsel reasonably satisfactory to the Reorganized Debtor to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

NEW WORLD DISCLOSURE STATEMENT

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF COMMON STOCK MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTOR, THE NEW WORLD MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE THE COMMON STOCK OR WARRANTS TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, NEW WORLD RECOMMENDS THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**D.    Investment Company Act Status**

The Reorganized Debtor intends to structure and operate its business in such a way that it will not be deemed an "investment company" under the Investment Company Act of 1940 (the "Company Act").  The Reorganized Debtor intends to operate as a financial company engaged in various financing activities as discussed herein, and will not be primarily in the business of investing, reinvesting or trading in securities.  However as of the Effective Date of the Plan, the Reorganized Debtor is projected to own:  i) assets that could be deemed "investment securities" as defined in Section 3(a)(1)(C) of the Company Act, that might exceed 40 percent of its total assets, less government securities, investments in majority-owned subsidiaries, cash and cash items, and consequently could be considered an investment company under that section.  In such instance, the Reorganized Company would need to register with the SEC as an investment company unless it can rely on an exception or exemption from the Company Act, or obtain an order from the SEC allowing it to operate under the terms of the order without registering.  For up to a year from the Effective Date of the Plan, the Reorganized Debtor intends to rely upon the provisions of Rule 3a-2 of the Company Act, which provides a one-year period in which it may operate without being subject to registration and regulation as an investment company.  The Board of the Reorganized Debtor will adopt a resolution evidencing the intent to rely on and observe the requirements of Rule 3a-2.

## IX.    MISCELLANEOUS PROVISIONS GOVERNING DISBURSEMENTS

### A.    Dates of Distributions

The Reorganized Debtor shall make each required distribution by the date stated in the Plan with respect to such distribution.  Any Distribution required to be made on the Effective Date shall be deemed to be made on such date if made as soon as practicable after such date.  Any Distribution required to be made on the date on which a Claim becomes an Allowed Claim shall be deemed to be made on such date if made on the nearest Distribution Date occurring after such date.

### B.    Manner of Distribution

At the option of the Reorganized Debtor, monetary distributions may be made in Cash, by wire transfer, or by a check drawn on a domestic bank.  Distributions to the Holders of Senior Notes will be made through the Indenture Trustee.

### C.    Undeliverable Distributions

If a Distribution is returned to the Reorganized Debtor as undeliverable, then such Distribution amount shall be deemed to be "Unclaimed Property."  Nothing contained in the Plan shall require the Reorganized Debtor, or anyone else, to attempt to locate such Person.  The Unclaimed Property shall be set aside and (in the case of Cash) held in a segregated interest-bearing account to be maintained by the Reorganized Debtor.  If such Person presents itself within one (1) year following the Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person.  If such Person does not present itself within one (1) year following the Effective Date, any such Unclaimed Property and accrued interest or dividends earned thereon shall become the property of the Reorganized Debtor for use under the Plan, if required, then to the Reorganized Debtor.

### D.    Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains

undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" and shall be dealt with in as described above.

### E.    Compliance with Tax Requirements

The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making Distributions pursuant to the Plan.

In connection with each Distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganized Debtor shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such Distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Reorganized Debtor, then the Reorganized Debtor may, at its sole option, withhold the amount required and distribute the balance to such Person or decline to make such Distribution until the information is received.

### F.    Distribution of Unclaimed Property

If a distribution is returned to the Reorganized Debtor as undeliverable, then such distribution amount shall be deemed to be "Unclaimed Property."  Nothing contained in the Plan shall require the Reorganized Debtor, or anyone else, to attempt to locate such Person.  The Unclaimed Property shall be set aside and (in the case of Cash) held in a segregated interest-bearing account to be maintained by the Reorganized Debtor.  If such Person presents itself within one (1) year following the Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person.  If such Person does not present itself within one (1) year following the Effective Date, any such Unclaimed Property and accrued interest or dividends earned thereon shall become the property of the Reorganized Debtor for use under the

Plan, if required, then to the Reorganized Debtor.

### G.    No De Minimis Distributions

If any single distribution required by the Plan would be for an amount of $25.00 or less, then the Reorganized Debtor shall not be required to process the distribution and may, at its option, either add the distribution to the next distribution if the collective amount would be greater than $25.00 or may treat the distribution as Unclaimed Property..

### H.    Setoff

Any Claims of any nature which the Debtor or the Estate may have against the Holder of a Claim may be, but are not required to be, set off against any Claim and the Distribution to be made pursuant to the Plan in respect of such Claim.  Neither the failure by the Reorganized Debtor or any other Person to effect such a setoff nor the allowance of any Claim shall constitute a waiver or a release of any claim which any or all of the foregoing may have against the Holder of a Claim.

### I.    Distribution Record Date

At the close of business on the Distribution Record Date, the claims registers for all Claims (other than the TOPrS and the Junior Notes), and the transfer ledgers for the Senior Notes shall be closed, and there shall be no further changes in the record holders of such Claims or such Senior Notes.  Except as provided herein, the Reorganized Debtor, the Disbursing Agent, the Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims or any transfer of Senior Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers or transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

NEW WORLD DISCLOSURE STATEMENT

## X.    CONDITIONS PRECEDENT TO
## CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with the Plan.

(a)    an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered; and

(b)    the proposed Confirmation Order shall be in form and substance reasonably satisfactory to New World and wholly consistent with the New World Plan.

### B.    Conditions to Effective Date

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section IX of the Plan:

(a)    the Confirmation Order shall have been entered in form and substance reasonably satisfactory to New world and the lender or the agent for the lenders under the Exit Facility, and shall, among other things:

(i)    Provide that the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)    approve the Exit Facility;

(iii)    authorize the issuance of the Common Stock and the Warrants; and

(iv)    provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

(b)    the Confirmation Order shall not then be stayed, vacated, or reversed;

(c)    the documents evidencing the Exit Facility shall be in form and substance reasonably acceptable to New World, and the lender or the agent for the lenders under the Exit Facility; and, to

the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived;

(d)     the By-laws, in form and substance reasonably acceptable to New World  shall have been adopted;

(f)     all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained; and

(g)     all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

### C.     **Waiver of Conditions**

Each of the conditions set forth in this Section, with the express exception of the conditions contained in Section (b), may be waived in whole or in part by New World with notice to parties-in-interest without a hearing.

### XI.     **CONFIRMATION REQUIREMENTS AND PROCEDURES**

The following discussion is intended solely for the purpose of alerting parties in interest about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  New World CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

The Bankruptcy Code sets forth a number of requirements that must be met before a plan may be confirmed.  Among others, a plan must be proposed in good faith, must treat claim in certain Classes in a specific manner, the plan must provide a holder of claim or interest in an impaired class with not less than the holder would receive or retain if the debtor were liquidated under chapter 7 and a plan must be feasible.  New World believes the Plan meets these requirements and all the other requirements of the Bankruptcy Code for confirmation of the Plan.

### 1.    Votes Necessary for a Class to Accept the Plan

When a Class of Claims is entitled to vote, it is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan.  A Class of Equity Interests is considered to have "accepted" the Plan when at least two-thirds (2/3) in amount of the interest-holders of such Class which actually voted, voted to accept the Plan.

### 2.    Treatment of Non-Accepting Classes

Even if any impaired Classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the non-accepting impaired Classes are treated in the manner required by the Code.  The process by which non-accepting impaired Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Equity Interests if it meets all consensual requirements except the voting requirements of 11 U.S.C. § 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.  In the event that the Court determines that any Class of Claims or Equity Interests is impaired and therefore improperly designated by the Plan, New World will tabulate the votes of the impaired Class(es), and will seek to "cram down" the Plan on any non-accepting Classes as may be permitted by the Bankruptcy Code.

## XII.    BEST INTERESTS TEST AND FEASIBILITY

### A.    The "Best Interests Test"

In addition to the other requirements described in this Disclosure Statement, Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an Impaired Class either (i) vote to accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of the effective date of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This is referred to as the "Best

NEW WORLD DISCLOSURE STATEMENT

Interests Test."

In a chapter 7 case, a trustee would be elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Under the priority scheme set forth in the Bankruptcy Code, secured creditors are generally paid from the proceeds of sale of the properties securing their liens. If any assets are remaining after the satisfaction of secured claims, the holders of administrative claims are generally next to receive payments. Unsecured claims are thereafter paid from any remaining sales proceeds, according to their legal rights of priority. Unsecured claims with the same priority share in proportion to the amount of their allowed claim in relation to the amount of total allowed unsecured claims with the same priority, subject to any inter-creditor agreement.  Finally, holders of Equity Interest receive the balance that remains, if any, after all creditors are paid.  Thus, for the Court to confirm the Plan, the Court must find that all Creditors and Holders of Equity Interests who do not accept the Plan will receive at least as much under the Plan as such Holders would receive under a hypothetical chapter 7 liquidation taking into account the Debtor's assets at liquidation value.

The estimated the liquidation value of the Debtor's assets based upon the most accurate information that is currently available is set forth on a liquidation analysis (the "Liquidation Analysis") which is the following chart. The Liquidation Analysis is not a guarantee as to the amounts and sources of recovery that could be realized in a hypothetical liquidation. Rather, the Liquidation Analysis is only an estimate. The Liquidation Analysis was prepared based on a number of sources, including unaudited financial statements prepared by the Debtor and the Committees and information furnished by the Debtor and certain of its advisors and professionals concerning the assets, liabilities and operations of the Debtor and its affiliates. As demonstrated by the Liquidation Analysis, the prospects for recovery that may be realized by Creditors on account of their Claims and Holders of Equity Interest on account of their Equity Interests in the Debtor would be at least as great for most Creditors if not better, under the Plan as in a chapter 7 liquidation of the Debtor.

NEW WORLD DISCLOSURE STATEMENT

It is not certain that in a chapter 7 liquidation the Merger contemplated by the Plan could be accomplished, that the inter-company claim would be cancelled, or that the assets of the Debtor's direct and indirect subsidiaries would be made available for the payment of Claims and Equity Interests to the extent contemplated by the Plan. Moreover, in a chapter 7 liquidation, payment of claims to Creditors could be delayed while the chapter 7 trustee liquidates assets. In addition, the administration of the wind down would be costly. Creditors (other than possibly the Holders of the Senior Notes depending upon the interpretation of the subordination provisions in the Senior Notes and the Junior Notes and the amount of reserved for FRC claims) would most likely not be paid in full or receive Post Petition interest on their allowed claims. It is not certain that a chapter 7 trustee would be successful in challenging certain of the claims against FRC and it is likely that the reserve for Repurchase Claims would be substantially greater in a chapter 7 liquidation than under the Plan where the Reorganized Debtor will be engaged in a continuing income generating business. Finally, the Debtor's tax liability might be increased by recapture in a liquidation and the value of the Fremont NOLs would be lost.

In contrast, under the Plan, General Unsecured Creditors will immediately receive Cash on the Effective Date plus Post Petition Interest, and holders of Equity Interest will retain their Equity Interests in substantial part. In light of the foregoing, New World believes that Holders of Claims and Equity Interests would receive under the Plan at least as much, if not more than in a liquidation under chapter 7.

The Liquidation Analysis set forth below assumes, among other things, that the assets of the Debtor's direct and indirect subsidiaries are available for distribution to Creditors in the chapter 7 liquidation after a reserve for the FRC claims on terms substantially greater than would be required under the Plan where the Reorganized Debtor is engaged as an income producing ongoing business.

### ASSETS VALUED AT LIQUIDATION VALUES

| | |
|---|---|
| Estimated Cash on Hand as of 1/10 | $ 350,221,723 |
| Income & Other Recoveries During Liquidation | $   40,218,000 |
| Less Operating Costs During Liquidation | $  (30,367,000) |
| Estimated Cash Available for Distribution | $ 360,072,723 |
| Plus Assets at Estimated Liquidation Value: | |
| Loans Held for Sale | $   60,000,000 |
| FHLB Stock | $     2,000,000 |
| Loans Held for Investment | $     3,500,000 |
| Real Estate Owned | $     2,300,000 |
| Premises & Equipment | $     6,000,000 |
| Miscellaneous Assets | $    15,000,000 |
| | $ 448,872,723 |
| | |
| Less:  Chapter 7 Trustee Fees and Expenses | $    (3,721,000) |
| Less: Professional Fees for Litigation | $    (8,500,000) |
| Less:  Priority Tax Claims, incl. accrued interest | $  (12,000,000) |
| Less Additional Tax | $ (17,000,000) |
| Less Accrued Administrative Claims | $(2,500,000) |
| Less:  FRC Claims (known and unknown) as estimated by U.S. Bank and Wells Fargo (estimated)[4] | $(200,000,000) |
| Net Cash Available for Distribution to Unsecured Creditors | $  205,151,723 |

**Claims:**

---

[4] This is the estimate of Repurchase Claims as asserted by U.S. Bank and Wells Fargo.  Nothing herein constitutes an admission by New World that New World adopts or agrees with the estimate except for the purposes of a hypothetical liquidation.

Senior Notes, incl. accrued interest                                    $ 185,438,000

($176.4 million without Post-Petition Interest)

TOPrS Claims, incl. accrued interest                                    $ 111,699,000

($107.4 million without Post-Petition Interest)

General Unsecured Claims, incl. accrued interest              $   55,505,000

($47 million without Post-Petition Interest)

($78 million per settlements if not paid in full)

Total Unsecured Claims, incl. accrued interest                    $ 352,642,000

((Total Claims without Post-Petition Interest: $330.8
million or approximately $378,100,000 at full amount)

Below is a demonstration in tabular format that all Creditors and Equity Interest Holders are projected to receive at least as much under the Plan as they would receive in a Chapter 7 liquidation giving effect to the subordination provision in the Indentures and accounting in full for Claims that have been settled in compromised amounts provided that such compromised amounts were paid in full.

| CLASS | ESTIMATED PAYOUT PERCENTAGE OR RETAINED INTEREST UNDER PLAN | ESTIMATED PAYOUT PERCENTAGE OR RETAINED INTEREST IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| 1 | 100% | 100% |
| 2 | 100% | 100% |
| 3A | 100% plus interest | approximately 54%[5] |
| 3B | 100% Plus Interest | Approximately $161,100,000 [6] |
| 3C | 100% | 0 |
| 4 | 100% subject to dilution | 0 |
| 5 | 100% | 0 |

---

[5] Based upon approximately $78 million of Claims.
[6] This recovery reflects the turnover from the Junior Notes in accordance with the subordination agreement.

**B.**    <u>Feasibility</u>

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy

Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the

liquidation or the need for further financial reorganization of the Debtor or any successor to the

Debtor under the Plan (i.e., the Reorganized Debtor), unless such liquidation or reorganization is

proposed in the Plan. See 11 U.S.C. § 1129(a)(11). The Projections (attached as Exhibit 4) show

estimated receipts from the income generating assets that will be retained by the Reorganized Debtor

and associated expenses. Additional assets of the Reorganized Debtor will include Cash as well as

the other assets described herein as set forth in the Liquidation Analysis set forth on the following

chart to this Disclosure Statement. The Projections are not a guarantee as to how the Reorganized

Debtor will perform or how quickly, or how much, creditors may be paid. Rather, the Projections are

only an estimate. The timetable for satisfaction of remaining Allowed Claims reflected in the

Projections may or may not turn out to be correct. The Projections were prepared from information

contained in a number of sources, including information furnished by the Debtor and certain of its

advisors and professionals concerning the assets, liabilities and operations of the Debtor and its

affiliates.

There are at least two important aspects of a feasibility analysis. The first aspect considers

whether the Plan proponent will have enough Cash on hand on the Effective Date of the Plan to pay

all the Claims and expenses which are entitled to be paid on such date. The second aspect considers

whether the proponent will have enough Cash over the life of the Plan to make the required Plan

payments.

With respect to the first component, there is sufficient Cash on hand and available to the

Debtor to pay all Claims that must be paid on the Effective Date so that even after the Administrative

Claims and the Claims in Classes 1, 2, 3A, 3B, and 5 are paid in full, there will be sufficient Cash

remaining in addition to the equity infusion and exit financing provided by the New World Plan to

fund the Reorganized Debtor's business plan and meet Plan obligations.  Subsequent strategic investments would occur in January and July 2011.  Initially, the Reorganized Debtor will increase the yield on its Cash investments through the purchase or mortgage-backed securities and other related financial products with a target after-tax return of 6%.  The Reorganized Debtor will continue to generate loan income.  The Plan assumes an average of $500,000 a month on loan income from January 2010 through July 2010, when the loans would be sold or securitized.  These numbers are consistent with the present rate of returns, which were $550,000 in March 2009 and $606,000 in April 2009.

The second component of the feasibility analysis requires an examination of whether the Reorganized Debtor will have sufficient Cash over the life of the Plan to make the required Plan payments.  The investment strategy and targets are set forth in Business Plan.  The activities will target after-tax returns of 20-25%, although the Plan assumes only a 15% return on invested capital. With the Cash that will be available to the Reorganized Debtor, including the Equity Investment, the Exit Facility and the Warrant Exercise Price, as well as the generation of additional funds through the early repayment of mortgages, real estate sales, and sales or securitization of loans, there is sufficient liquidity to fund the Reorganized Debtor's long term strategy which will result in all Creditors being paid in full and in a significant return to the Class 4 Equity Interests.

## XIII.   EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge

Because the Plan does not contemplate the liquidation of substantially all of the property of the estate and the Reorganized Debtor will engage in business after consummation of the Plan, the rights under the Plan and the treatment of Claims and Equity Interests under the Plan will be in exchange for, and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor, the Reorganized Debtor, or their property, except as otherwise provided in the Plan or the Confirmation Order,

NEW WORLD DISCLOSURE STATEMENT

(1)    On the Effective Date, except as otherwise provided for in the Plan the Debtor, the

Debtor's Estate, Reorganized Debtor, and their property will be deemed discharged and released

from any and all Claim, including without limitation, all demands, liabilities, Claims, that arose

before the Confirmation Date or that are based upon or otherwise relate to acts, events, omissions,

transactions or other activities of any kind that occurred before the Confirmation Date, and all debts

of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i) regardless of whether:  (a) a

proof of Claim based on such debt is filed or deemed filed; (b) a Claim based on such debt is

allowable under Bankruptcy Code § 502; or (c) the Person holding the Claim based on such a debt

has accepted the Plan;

(2)    All Persons will be precluded from asserting against the Debtor, the Estate, or the

Reorganized Debtor, or their property, any other or further Claims based on, arising from, or in

connection with any act, event, omission, transaction, or other activity of any kind that occurred

before the Confirmation Date;

(3)    Any debt of the Debtor, whether secured or unsecured, which was in default up to

the Confirmation, will no longer be deemed in default.  Moreover, to the extent that the Debtor and

Reorganized Debtor comply with the terms and conditions of the Plan, these obligations will be

deemed in good standing;

(4)    As set forth in sections 524 and 1141 of the Bankruptcy Code, except as otherwise

provided in the Plan or the Confirmation Order, the Confirmation Order constitutes a discharge or

any and all Claims against, and all debts and liabilities of, the Debtor.  The Reorganized Debtor and

its property will be deemed discharged and released from any and all Claims and Equity Interests,

including, without limitation, all demands, liabilities, Claims and Equity Interests that arose before

the Confirmation Date or that are based on or otherwise relate to acts, events, transactions, or other

activities of any kind that occurred before the Confirmation Date.  This discharge will void any

judgment that was obtained against the Debtor at any time only to the extent that the judgment

relates to a discharged Claim.

(5)     Subject to the limitations and conditions imposed under section 1125(e) of the Bankruptcy Code, Persons who, in good faith and in compliance with applicable provisions of the Bankruptcy Code, either solicit Plan acceptances or rejections or participate in the offer, issuance, sale, or purchase of securities under the Plan will not be liable on account of their solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of Plan acceptances or rejections or the offer, issuance, sale, or purchase of such securities.

**B.     Vesting of Property of the Estate**

On the Effective Date, all Assets that are property of the Estate as of the Effective Date, including all Causes of Action, Rights of Action and Avoidance Actions, will vest in the Reorganized Debtor free and clear of the Claims of any Creditors.

**C.     Modification of Plan**

New World may modify the Plan at any time before confirmation provided that the modifications meet the requirements of the Bankruptcy Code.  New World may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.     Post-Confirmation Status Report**

Within 120 days of the Confirmation Date, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee and the members of the Committees. Further status reports shall be filed every 180 days and served on the same entities.

**E.     Post-Confirmation United States Trustee Fees**

Pursuant to 28 U.S.C. § 1930(a)(6), quarterly fees to the United States Trustee will continue to be due until the bankruptcy case is closed,. at the rate in effect at the time such fees are due.  Such fees shall be paid by the Reorganized Debtor.

NEW WORLD DISCLOSURE STATEMENT

**F.**    **Exculpation**

The Plan provides that as of the Effective Date, neither the Debtor, FGCC or FRC (including, without limitation, their successors or assigns, including, without limitation, the Reorganized Debtor, the Disbursing Agent, the Board of Directors and Board of Directors' Agents) or the Creditors' Committee or the Equity Committee or the Indenture Trustees or New World and, in each case, none of their respective present or former officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and professionals and agents for the foregoing shall have or incur any liability for, and are expressly exculpated and released from, any Claims (including, without limitation, any Claims whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise) for any past or present or future actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the Case including, without limitation, the formulation, negotiation, documentation, preparation, dissemination, implementation, administration, confirmation, or consummation of the Plan and the Disclosure Statement; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. It being expressly understood that any act or omission with the approval of the Bankruptcy Court will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation.

**G.**    **Final Decree**

Upon substantial consummation of the Plan and the occurrence of the Effective Date, the Estate shall be deemed fully administered as referred to in Bankruptcy Rule 3022, and the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close the Reorganization Case.

    NEW WORLD DISCLOSURE STATEMENT

Dated:  November 6, 2009

NEW WORLD ACQUISITION, LLC

By: _____
Kenneth S. Grossman
Authorized Signatory

LESNICK PRINCE LLP

By: _/s/ Christopher E. Prince_____
Christopher E. Prince (State Bar No. 183553)
cprince@lesnickprince.com
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Telephone: (213) 291-8984
Facsimile:  (310) 396-0963

- and -

SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville (*Pro Hac Vice* Pending)
Peter D. Wolfson (*Pro Hac Vice* Pending)
1221 Avenue of the Americas
25th Floor
New York, New York 10020
Telephone:    (212) 768-6700
Facsimile:    (212) 768-6800
Email:        cneville@sonnenschein.com
              pwolfson@sonnenschein.com

Attorneys for New World Acquisition, LLC

NEW WORLD DISCLOSURE STATEMENT