John P. Schafer (State Bar No. 205638)
jps@mandersonllp.com
William C. Manderson (State Bar No. 211648)
wcm@mandersonllp.com
Lance A. McKinlay (State Bar No. 213717)
lam@mandersonllp.com
MANDERSON, SCHAFER & McKINLAY LLP
4695 MacArthur Court, Suite 1270
Newport Beach, CA  92660
Telephone:     (949) 788-1038
Facsimile:     (949) 743-8310

Attorneys for SIGNATURE GROUP HOLDINGS, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>FREMONT GENERAL CORPORATION,<br>a Nevada corporation,<br><br>                       Debtor.<br><br><br><br>Taxpayer ID No. 95-2815260 | Case No.:  8:08-bk-13421-ES<br><br>Chapter 11 Case<br><br>**SIGNATURE GROUP HOLDINGS, LLC'S CHAPTER 11 SECOND AMENDED PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010** |

This document sets forth the Chapter 11 Plan of Reorganization for Fremont General Corporation, a Nevada corporation (defined below as the "Plan"), by Plan proponent and sponsor Signature Group Holdings, LLC ("Signature"), which is joined by the TOPrS Group and James McIntyre as co-proponents.

For a discussion of the Debtor's history, business, operations, assets and liabilities and for a summary and analysis of this Plan, Signature refers all parties in interest to the Disclosure Statement for Signature Group Holdings, LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation Dated January 20, 2010.

1

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES
MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

# TABLE OF CONTENTS

**Page(s)**

I. DEFINITIONS AND RULES OF CONTRUCTION ...................................................... 2

    A.    Definitions ................................................................................ 2

    B.    Rules of Construction ......................................................... 14

II. CLASSIFICATION AND TREATMENT ....................................................... 15

    A.    Allowance and Treatment of Unclassified Claims ................. 15

        1.    Administrative Claims ......................................... 15

            (a)    Administrative Claim Reserve ....................... 16

            (b)    Administrative Claims Bar Date ..................... 16

            (c)    Deadline for Objections to Administrative Claims ................ 16

            (d)    U.S. Trustee Fees ........................................ 17

            (e)    Professional Fee Claims ............................... 17

            (f)    Indenture Trustee Fees and Expenses .............. 17

        2.    Priority Tax Claims .......................................... 18

    B.    Allowance and Treatment of Classified Claims and Interests ................. 19

        1.    Secured Claims (Class 1) ................................. 19

        2.    Priority Non-Tax Claims (Class 2) ..................... 19

        3.    General Unsecured Claims (Classes 3A, 3B, 3C, 3D) ..................... 20

        4.    Class of Equity Interests (Class 4) ..................... 22

        5.    Class or Claims Subordinated Under 11 U.S.C. § 510(b) (Class 5) ................ 22

III. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................. 23

IV. MEANS OF EFFECTUATING THE SIGNATURE PLAN ................................ 24

    A.    Merger .............................................................................. 24

    B.    Postconfirmation Business Operations of the Reorganized Debtor .............. 25

        1.    Post-Confirmation Business Plan for the Reorganized Debtor .............. 25

    C.    Management Agreement with Credit Partners Management, Inc. ............. 28

    D.    The CP Management Team and the Reorganized Debtor's Management Team .......... 31

    E.    The Reorganized Debtor's Board of Directors ......................... 31

    F.    Reporting Requirements ..................................................... 32

    G.    Amendment of Corporate Governance Documents to Authorize Certain Transactions 32

    H.    Transfer Restrictions: the "Leucadia Provision" ................. 33

    I.    Certain Insurance Policy Matters ................................... 34

    J.    Repurchase Claims Reserves ......................................... 34

    K.    Retention of Jurisdiction .............................................. 35

i

L.    Cancellation and Treatment of Senior Notes and Junior Notes ..................................36

V. CLAIMS ..................................37
A.    Maintenance of Post-Confirmation Claims Register.......................37
B.    Claim Objections .................................38

VI. SECURITIES RELATED MATTERS .................................38
A.    Issuance of Securities .................................38
B.    Registration Rights .................................39
C.    Security Certificates .................................39
D.    Investment Company Act Status .................................40

VII. disbursements.................................41
A.    Manner of Distribution .................................41
B.    Undeliverable Distributions .................................42
C.    Rounding of Payments .................................43
D.    Compliance with Tax Requirements .................................43
E.    Distribution of Unclaimed Property .................................43
F.    No De Minimis Distributions .................................44
G.    Setoff .................................44
H.    Distribution Record Date .................................45
I.    Delivery and Surrender of Senior Notes .................................45
J.    Delivery and Surrender of Junior Notes .................................46
K.    Outside Effective Date Distributions Date .................................46

VIII. conditions precedent to confirmation  and consummation of the plan.................................46
A.    Conditions to Confirmation.................................46
B.    Conditions to Effective Date .................................47
C.    Waiver of Conditions .................................48
D.    Outside Effective Date .................................48

IX. EFFECT OF CONFIRMATION OF PLAN .................................48
A.    Discharge .................................48
B.    Vesting of Property of the Estate.................................50

X. MISCELLANEOUS PROVISIONS .................................50
A.    Modification of Plan .................................50
B.    The Committees.................................50
C.    Post-Confirmation Status Report.................................50
D.    Post-Confirmation United States Trustee Fees.................................51
E.    Exemption From Securities Laws .................................51

F.    Exculpation ................................................................................................................. 51
G.    Governing Law ........................................................................................................... 52
H.    Notices ....................................................................................................................... 52
I.    Payment of the Signature Plan Proponents' Expenses ............................................. 53
J.    ERISA Claims ............................................................................................................ 53
K.    New York State Teachers' Retirement System Class Action ...................................... 53
L.    Final Decree ............................................................................................................... 54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SIGNATURE GROUP HOLDINGS, LLC'S CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010**

# I.

## DEFINITIONS AND RULES OF CONTRUCTION

### A.    **Definitions**

The following defined terms shall have the corresponding meaning anytime they appear as capitalized terms in this Plan.

**"1940 Act"** means the Investment Company Act of 1940.

**"Administrative Claim"** means a claim for administrative costs or expenses that are allowable under section 503(b) of the Bankruptcy Code or 28 U.S.C. § 1930. These costs or expenses may include: (a) Non-Ordinary Course Administrative Claims; (b) Ordinary Course Administrative Claims; (c) Professional Fee Claims; (d) Administrative Tax Claims; (e) U.S. Trustee Fees; and (f) the Indenture Trustee Fees.

**"Administrative Claims Bar Date"** means thirty days after the Effective Date.

**"Administrative Claims Objection Deadline"** means sixty (60) days after the Administrative Claims Bar Date.

**"Adviser's Act"** means the Investment Advisers Act of 1940.

An **"Affiliate"** of any particular Person means any other Person controlling, controlled by or under common control with such particular person or entity.

**"Allowed Administrative Claim"** means an Administrative Claim that is allowed by a Final Order.

**"Allowed," "Allowed Claim"** or **"Allowed Equity Interest"** means a Claim or Equity Interest, other than an Administrative Claim, to the extent that:

1.  Either: (1) a proof of claim or proof of interest was timely filed prior to the Claims Bar Date; or (2) a proof of claim or proof of interest is deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a Final Order; and

2.  Either: (1) the Claim or Equity Interest is not a Disputed Claim or a Disputed Equity Interest; or (2) the Claim or Equity Interest is allowed either by a Final Order or under the Plan.

Any portion of a Claim that is satisfied or released during the Case is not an Allowed Claim.

2

**"Allowed Class '__' Claim"** means an Allowed Claim classified in the specified Class.

**"Allowed Amount"** means the amount at which Claim is allowed.

**"Anticipated Tax Refund"** means a refund or refunds that may be paid to the Debtor and its subsidiaries, or to the Reorganized Debtor, as a result of an election the Debtor intends to make with the Internal Revenue Service regarding a carryback of NOLs and alternative minimum tax NOLs incurred in recent years, the amount of which may approximate $20 million, although the amount and timing of any such refund(s) remain uncertain as of the date hereof.

**"Assets"** means all assets of the Debtor's Estate including "property of the estate" as described in section 541 of the Bankruptcy Code.

**"Avoidance Action"** means an adversary proceeding, lawsuit or other proceeding with respect to Causes of Action arising under, relating to, or similar to sections 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, or any fraudulent conveyance, fraudulent transfer or preference laws, or any Cause of Action arising under, or relating to, any similar state law or federal law that constitutes property of the Estate under section 541 of the Bankruptcy Code, whether or not an action is initiated on or before the Effective Date.

**"Ballot"** means the ballot to vote to accept or reject the Plan.

**"Bankruptcy Code"** or **"Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

**"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the Central District of California, Santa Ana Division, or any other court that exercises competent jurisdiction over the Case.

**"Bankruptcy Rules"** means, collectively, (a) the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075, as amended from time to time; and (b) the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect or hereafter amended.

**"Board of Directors"** means the board of directors of the Reorganized Debtor, the composition of which is described in Section IV.E hereof.

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES
MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

**"Business Day"** means any day other than a Saturday, Sunday or a legal holiday (as the later is defined in Bankruptcy Rule 9006(a)).

**"Case"** means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor and bearing Case Number 8:08-bk-13421-ES.

**"Cash"** means cash or cash equivalents including, but not limited to, bank deposits, checks or other similar items.

**"Causes of Action"** means any and all claims, demands, rights, actions, rights of action, causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, that the Debtor or the Debtor's Estate has or asserts or may have or assert against third parties, whether or not brought as of the Effective Date, and which have not been settled or otherwise resolved by Final Order as of the Effective Date, including but not limited to (1) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (2) the right to object to claims or interests, (3) such claims and defenses as fraud, mistake, duress and usury, (4) Avoidance Actions, (5) claims for tax refunds (6) claims to recover outstanding accounts receivable, (7) such claims and defenses as alter ego and substantive consolidation, and (8) any other claims which may be asserted against third parties.

**"Charging Lien"** means any Lien or other priority in payment arising prior to the Effective Date to which the Indenture Trustees are entitled under the Senior Notes Indenture and Junior Notes Indenture, as applicable, against distributions to be made to the holders of Senior Notes Claims and Junior Notes Claims, as applicable.

**"Claim"** means a claim, as the term "claim" is defined in section 101(5) of the Bankruptcy Code, against the Debtor.

**"Claims Bar Date"** means (a) with respect to Claims other than those held by governmental units, November 10, 2008, which was the last date for filing Claims against the Estate pursuant to the Court's Order entered on September 4, 2008; and (b) with respect to Claims held by governmental units, December 15, 2008.

4

"**Claims Objection Deadline**" means the deadline for the Reorganized Debtor and parties in interest to file objections to Claims as set forth in the Confirmation Order.

"**Class**" means a group of Claims or Equity Interests as classified in Section II(B).

"**Collateral**" means property, or an interest in property, of the Estate that is encumbered by a Lien to secure payment or performance of a Claim.

"**Common Stock**" means the common stock of the Reorganized Debtor.

"**Confirmation**" means the entry of the Order by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

"**Confirmation Hearing**" means the hearing before the Court to consider the confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

"**Confirmation Hearing Date**" means the first date on which the Bankruptcy Court holds the Confirmation Hearing.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

"**CP Management**" means Credit Partners Management, Inc.

"**Creditor**" means the Holder of a Claim against the Debtor.

"**Creditors Committee**" means the Official Committee of Unsecured Creditors appointed in the Case by the Office of the U.S. Trustee for the Central District of California.

"**Debtor**" means Fremont General Corporation, a Nevada corporation.

"**DIP**" means a debtor-in-possession loan.

"**Disbursing Agent**" means the Reorganized Debtor or its designee retained to make Distributions pursuant to Section VII of the Plan.

"**Disclosure Statement**" means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

5

**"Disclosure Statement Order"** means the Order entered by the Bankruptcy Court approving the Disclosure Statement.

**"Disputed Claim"** means any Claim: (a) as to which a proof of claim has been filed and the dollar amount of such Claim, respectively, is not specified in a fixed amount; (b) prior to the deadline to object to such Claim, as to which a proof of claim has been filed and the dollar amount of such Claim is specified in a fixed liquidated amount, the extent to which the stated amount of such Claim exceeds the amount of such Claim listed in the Schedules; (c) prior to the deadline to object to such Claim, as to which a proof of claim has been filed and such Claim is not included in the Schedules; (d) with respect to a proof of claim that is filed or is deemed filed under Bankruptcy Rule 3003(b)(1) and is listed as contingent, disputed or unliquidated; (e) as to which an objection has been filed or is deemed to have been filed pursuant to any order approving procedures for objecting to Claims and such objection has neither been overruled nor been denied by a Final Order and has not been withdrawn; or (f) with respect to an Administrative Claim, as to which an objection: (1) has been timely filed (or the deadline for objection to such Administrative Claim has not expired) and (2) has neither been overruled nor been denied by a Final Order and has not been withdrawn; provided, however, that in each case, a Claim or Administrative Claim shall not be deemed to be a Disputed Claim to the extent that the Reorganized Debtor otherwise agrees with any such Claim or Administrative Claim, and such Claim or Administrative Claim is Allowed under the Bankruptcy Code or by Final Order, as applicable.

**"Disputed Equity Interest"** means any Equity Interest, as to which (a) an objection has been timely filed, which has neither been overruled nor been denied by a Final Order and has not been withdrawn or (b) is the subject of a filed Cause of Action that is related to such Equity Interest which has not been settled or otherwise resolved by Final Order.

**"Distribution(s)"** means any transfer under the Plan of Cash or other property or instruments to a Holder of an Administrative Claim, a Holder of an Allowed Claim, or to the Holder of an Equity Interest.

**"Distribution Record Date"** means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be for all Holders of

6

Claims, excluding the Claims in Class 3(C), the third Business Day following the Confirmation Date at 5 p.m. prevailing Pacific time.

**"DTC"** means The Depository Trust Company.

**"Effective Date"** shall mean, subject to Article VIII.D of this Plan, the first Business Day occurring ten (10) days after the conditions to effectiveness have been met.

**"Equity Committee"** means the Official Committee of Equity Security Holders appointed in the Case by the Office of the U.S. Trustee for the Central District of California.

**"Equity Interest"** means the interest—as the term "interest" is defined in section 101(17) of the Bankruptcy Code — of any entity who holds an equity security in the Debtor no matter how held, including issued and outstanding shares of common stock, preferred stock, stock options, warrants, membership interests, or other evidence of interests in securities of the Debtor; provided, however, that in no event shall the TOPrS Claims be considered "Equity Interests."

**"Equity Interest Holder(s)"** means the record Holder of an Equity Interest.

**"Estate"** means the estate created in the Case under section 541 of the Bankruptcy Code.

**"FGCC"** means Fremont General Credit Corporation, a California Corporation.

**"FGFI Trust"** means Fremont General Financing I, a statutory business trust, formed under Delaware law pursuant to that certain "Amended and Restated Declaration of Trust" dated as of March 6, 1996, for the sole purpose of issuing securities representing undivided beneficial interests in the FGFI Trust's assets.

**"Final Order"** means an order or judgment of the Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor prior to the Effective Date or to the Reorganized Debtor after the Effective Date, as applicable, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Court or other applicable court shall have been affirmed by the highest court to which such order or judgment

7

was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

**"FRC"** means Fremont Reorganizing Corporation f/k/a Fremont Investment & Loan, a corporation organized under the laws of the state of California.

**"Fremont NOLs"** means the federal consolidated net operating loss carryovers of the affiliated tax group of which the Debtor is the common parent.

**"General Unsecured Claim"** or "Unsecured Claim" means any Claim that is not entitled to a priority of repayment under the Bankruptcy Code and for which the Claim is not secured by any collateral and expressly does not include any Administrative Claim, Priority Tax Claim, a Priority Non-Tax Claim, Secured Claim, or a Section 510(b) Claim.

**"Holder"** means the Holder of a Claim against, or an Equity Interest in the Debtor.

**"Impaired"** means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code and the case law interpreting the statute.

**"Indenture Trustee"** means the Indenture Trustee for the Senior Notes or the Indenture Trustee for the Junior Notes or the Guaranty.

**"Indenture Trustee Fees"** means the reasonable compensation, fees and expenses, disbursements and indemnity claims, including, without limitation, attorneys' fees and agents' fees, expenses, costs and disbursements, incurred by the Indenture Trustee under the Senior Notes Indenture or Junior Notes Indenture, as applicable, whether prior to or after the Petition Date and whether prior to or after consummation of the Plan.

**"Intercompany Claim"** means any Claim (i) of FGCC against FRC or the Debtor, (ii) of FRC against FGCC or the Debtor, and (iii) of the Debtor against FRC or FGCC.

**"Junior Notes"** means the 9% Junior Subordinated Debentures due March 31, 2026.

**"Junior Notes Indenture"** means the Indenture with respect to the 9% Junior Subordinated Debentures among Fremont General Corporation, Fremont General Financing I and Bank of New

8

York (originated with First Interstate Bank of California), a New York Banking Corporation, as trustee.

"**Lien**" means a lien, as defined in 11 U.S.C. § 101(37), except a lien that has been avoided under Chapter 5 of the Bankruptcy Code or that is otherwise avoidable or invalid under the Bankruptcy Code or applicable law.

"**Loans**" means the residential mortgage loans owned by FRC.

"**Local Bankruptcy Rules**" means the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California, as now in effect or hereafter amended.

"**Non-Ordinary Course Administrative Claim**" means any Administrative Claim other than an Ordinary Course Administrative Claim, Professional Fee Claim, Indenture Trustee Fees or U.S. Trustee Fees.

"**Management Agreement**" means an investment advisory agreement pursuant to which CP Management will provide investment advisory services to the Reorganized Debtor.

"**Manager**" shall mean Credit Partners Management, Inc.

"**New World Disclosure Statement**" means the New World Acquisition, LLC Amended Disclosure Statement With Respect To Amended Chapter 11 Plan of Reorganization For Fremont General Corporation (Dated January 19, 2010), including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Ordinary Course Administrative Claim**" means a claim for administrative costs or expenses that are allowable under section 503(b) of the Bankruptcy Code that are incurred in the ordinary course of the Debtor's operations for goods and services and that are unpaid on the Effective Date or on account of an expense by a governmental unit under sections 503(b)(1)(B) or (C) of Bankruptcy Code.  Ordinary Course Administrative Claims do not include Professional Fee Claims, U.S. Trustee Fees or Non-Ordinary Course Administrative Claims.

"**Person**" means any natural person or entity.

"**Petition Date**" means June 18, 2008, the date on which the Debtor filed its voluntary petition commencing the Case.

9

"**Plan**" means this plan of reorganization under Chapter 11 of the Bankruptcy Code, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time, also referred to herein and in the Disclosure Statement as the "Signature Plan."

"**Post Petition Interest**" means interest that shall have accrued on account of the applicable Holder's Allowed Claim for the period from the Petition Date to and through the date in which such Allowed Claim is paid in full.

"**Post Petition Interest Rate**" **means** 2.51% (compounded annually), which reflects the federal judgment rate of interest set forth in 28 U.S.C. §1961(a) in effect on the Petition Date.

"**Post-Effective Date Merger Claims**" means any and all unpaid claims, liabilities for obligations which immediately, prior to the occurrence of the Effective Date, were claims, liabilities or obligations of FGCC and/or FRC.

"**Priority Non-Tax Claims**" means Claims, other than Administrative Claims or Priority Tax Claims, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means a Claim that a governmental unit asserts against the Debtor for taxes or related interest or penalties, which Claim is entitled to priority and allowable under section 507(a)(8) of the Bankruptcy Code.

"**Professionals**" means those Persons (i) retained pursuant to an order of the Bankruptcy Court in accordance with sections 327, 1103 and/or 1106 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code; or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to sections 330 and 503(b)(2) of the Bankruptcy Code.

"**Professional Fee Claim**" means:  (a)  A claim under sections 327, 328, 330, 331, 503(b), 1103 or 1106 of the Bankruptcy Code for compensation for professional services rendered or expenses incurred prior to the Effective Date on the Estate's behalf; or (b)  A  claim  either  under section 503(b)(4) of the Bankruptcy Code for compensation for professional services rendered or under section 503(b)(3)(D) of the Bankruptcy Code for expenses incurred prior to the Effective Date in making a substantial contribution to the Estate.

10

**"Registration Rights Agreement"** means a registration rights agreement substantially in the form set forth in <u>Exhibit 1</u> obligating the Reorganized Debtor to register for resale certain shares of common stock under the Securities Act of 1933 in accordance with the terms set forth in such registration rights agreement.

**"Reinstated or Reinstatement"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other that the debtor or an insider) for any pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim.

**"Remaining Executives"** means Don Royer, Richard Sanchez and Thea Stuedli.

**"Reorganized Debtor"** means the Debtor, from and after the Effective Date.

**"Repurchase Claims"** claims arising from loans FRC is required to repurchase if certain defaults under such loans occurred within a designated period after the sale of such loans.

**"Rights Of Action"** means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, and whether commenced or arising before or after the Effective Date.

**"Schedules"** means the schedules of Assets and Liabilities filed by the Debtor on July 3, 2008, as amended, and as may be further amended.

**"Schedule of Assumed Agreements"** means the schedule of executory contracts and unexpired leases that the Reorganized debtor will assume on the effective Date and the amounts, if any, necessary to cure any defaults under such executory contracts and unexpired leases.

**"Section 510(b) Claim"** means any Claim for rescission of or damages arising from the purchase or sale of a debt or equity security, including, without limitation, any Claims arising from equity forward agreements and other understandings to purchase Equity Interests, which Claim is subject to subordination in accordance with section 510(b) of the Bankruptcy Code.   For the avoidance of doubt, "Section 510(b) Claim" shall include any claim against the Estate for reimbursement or contribution on account of a Section 510(b) Claim.

**"Secured Claim"** means a Claim that was secured by a Lien on Collateral as of the Petition Date. A Claim is a Secured Claim only to the extent of the value of the claimholder's interest in the Collateral or to the extent of the amount subject to setoff, whichever is applicable, and as determined under 11 U.S.C. § 506(a).

**"Securities"** means the Common Stock, together with any other equity securities of the Reorganized Debtor.

**"Senior Notes"** means the 7.875% Senior Notes due 2009, which were issued pursuant to that certain indenture dated March 1, 1999, by and between The Bank of New York, as Trustee and the Fremont General Corporation.

**"Senior Notes Indenture"** means the Indenture dated as of March 1, 1999, by and between Fremont General Corporation and the First National Bank of Chicago, as Indenture Trustee.

"**SERP Claims**" means Claims arising from supplemental retirement plans, commonly referred to as "SERPS."

**"Signature Investors"** includes Signature Group Holdings, LLC, Craig Noell, Kyle Ross, Thomas Donatelli, Kenneth Grossman, and their respective Affiliates.

**SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES
MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010**

**"Subordinated Debenture"** means that certain 9% Junior Subordinated Debenture due March 31, 2026, which was issued pursuant to that certain indenture dated March 6, 1996, and which is the sole asset of the FGFI Trust.

**"Tax Code"** means the Internal Revenue Code of 1986, as amended.

**"TOPrS"** means the 9% Trust Originated Preferred Securities issued to the FGFI Trust pursuant to the Fremont General Financing Declaration of Trust.

**"TOPrS Group"** means, collectively, Seth Hamot, RRH Capital, LLC, Costa Brava Partners III, L.P. and Howard Amster, who individually or with their affiliates are Holders of significant TOPrS Claims.

**"Unclassified Claim"** means any Claim which is not part of any Class.

**"Unimpaired"** means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is not Impaired within the meaning of section 1124 of the Bankruptcy Code and the case law interpreting the statute.

**"Unrestricted Cash"** means Cash in excess of (i) Cash needed to make all of the required payments with respect to Allowed Claims which the Reorganized Debtor is obligated to make pursuant to the Plan and (ii) Cash sufficient to fund the reserves that are required to be established by the Reorganized Debtor pursuant to the Plan or under any Indenture as of the Effective Date.

**"U.S. Bank"** means U.S. Bank National Association.

**"U.S. Trustee"** means the Office of the United States Trustee for the Central District of California.

**"U.S. Trustee Fees"** means all fees and charges assessed against the Estate by the U.S. Trustee and due pursuant to section 1930 of Title 28 of the United States Code.

**"Warrants"** means the warrants to purchase shares of the Reorganized Debtor's Common Stock issued to the Signature Investors on the Effective Date.

**"Warrant Agreement"** means the agreement, substantially in the form annexed hereto as Exhibit 2, governing the terms and conditions of the Warrant.

**"Wells Fargo"** means Wells Fargo Bank, National Association.

**B.**    **Rules of Construction**

(a)    The rules of interpretation set forth in section 102 of the Bankruptcy Code apply to this Plan.

(b)    Except as otherwise provided in this Plan, in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006 shall apply.

(c)    The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

(d)    Any term used in the Plan that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules (as defined below), shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(e)    Whenever the context requires, such terms shall include the plural as well as the singular number.

(f)    Any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented

(g)    Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

(h)    Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to this Plan in its entirety rather than to only a portion of the Plan.

(i)    Unless otherwise specified, all references in this Plan to Articles, Sections, Schedules and Exhibits are references to Articles, Sections, Schedules and Exhibits of or to this Plan.

14

(j)     Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan.

## II.

### CLASSIFICATION AND TREATMENT

The treatment of Allowed Claims and Allowed Equity Interests under this Plan supersedes any agreements or rights the Holders of those Claims or Equity Interests may have in or against the Debtor or its Assets and is in full satisfaction of the legal, equitable, and contractual rights of the Holders of the Claims or Equity Interests.  Unless provided otherwise herein, no Distributions will be made and no rights retained on account of any Claim or Equity Interest that has not become an Allowed Claim or Allowed Equity Interest.

As required by the Bankruptcy Code, this Plan classifies Claims and Equity Interests in various classes according to their right to priority.  This Plan sets forth whether each Class of Claims or Equity Interests is Impaired and provides for the treatment that each Class will receive.

### A.     <u>Allowance and Treatment of Unclassified Claims</u>

The following Unclassified Claims are considered unimpaired, not placed into voting classes and shall receive treatment in accordance with the Bankruptcy Code:

### 1.     Administrative Claims

Administrative Claims consist of costs and expenses of administering the Case that are Allowed under section 503(b) of the Bankruptcy Code or 28 U.S.C. § 1930, and include Claims incurred post-petition in the ordinary course of the Debtor's business, fees and expenses of professionals, and fees due to the U.S. Trustee's Office.

Unpaid Administrative Claims shall receive the following treatment:

| Description | Treatment |
| --- | --- |
| Ordinary Course Administrative Claims | Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be allowed in accordance with the terms and conditions that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course |

15

| Description | Treatment |
|---|---|
| | Administrative Claim need not file any request for payment of its claim. |
| Clerk's Office Fees | Paid in full before the Effective Date. |
| Office of U.S. Trustee | Paid in full pursuant to 28 U.S.C. § 1930. |
| Allowed Non-Ordinary Course Administrative Claims, Professional Fee Claims and Indenture Fee Claims | Paid in full on the later of: (1) the Effective Date; or (2) the fifteenth Business Day after such Non-Ordinary Course Administrative Claim or Professional Fee Claim becomes an Allowed Administrative Claim or Allowed Professional Fee Claim, or in either case, as soon thereafter as is practicable. The Indenture Trustee Fee Claims will be paid in accordance with the terms of this Plan. |

### (a)    Administrative Claim Reserve

On the Effective Date, the Reorganized Debtor shall fund the Administrative Claims Reserve with sufficient funds to pay all Administrative Claims outstanding as of the Effective Date in full.

Ordinary Course Administrative Claims will be paid in the ordinary course of the Reorganized Debtor's operations. Distributions will be made to the Holders of Allowed Administrative Claims from the Administrative Claims Reserve.  Any amounts remaining in the Administrative Claims Reserve after payment in full of all Allowed Administrative Claims will revert to the Reorganized Debtor.

### (b)    Administrative Claims Bar Date

All requests for payment of an Administrative Claim that accrued from the Petition Date, except for (1) Ordinary Course Administrative Claims, (2) Clerk's Office and U.S. Trustee fees, (3) Professional Fee Claims, and (4) Indenture Trustee Fees must be filed with the Court no later than the Administrative Claims Bar Date or be forever barred.

### (c)    Deadline for Objections to Administrative Claims

All objections to allowance of Administrative Claims, excluding Professional Fee Claims, must be filed by any parties in interest no later than the Administrative Claims Objection Deadline. The Administrative Claims Objection Deadline may be extended for a one-time sixty (60) day period by the Reorganized Debtor by filing a notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court.

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

Thereafter, it may only be extended by an order of the Bankruptcy Court. If no objection to an Administrative Claim is filed on or before the Administrative Claim Objection Deadline, then the Administrative Claim will be deemed Allowed as of that date.

### (d)     U.S. Trustee Fees

Quarterly fees owed to the Office of the U.S. Trustee will be paid prior to the Effective Date by the Debtor, and after the Effective Date by the Reorganized Debtor, when due in accordance with applicable law. The Reorganized Debtor will continue to file reports showing the calculation of such fees until the Case is closed under section 350 of the Bankruptcy Code.

### (e)     Professional Fee Claims

Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be Allowed only if: (i) on or before thirty (30) days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting Allowance of the fees and serves the application or motion on the Reorganized Debtor and the U.S. Trustee; and (ii) the Court allows the Claim by an order of the Bankruptcy Court (as to which fourteen (14) days have passed without a stay of the enforcement of such order or, if a stay has been granted, such stay has lapsed or been dissolved).

Any party in interest may file an objection to such an application within the time provided by the Local Bankruptcy Rules or within any other period that the Court sets.  Professionals holding Professional Fee Claims who do not timely file and serve their applications for payment will be forever barred from asserting these Claims against the Reorganized Debtor or its property.

The Disbursing Agent will pay or cause to be paid an Allowed Professional Fee Claim, in Cash, within five (5) days after the date on which the condition specified in the preceding subparagraph (ii) of this Section II.A.1.e is satisfied.

### (f)     Indenture Trustee Fees and Expenses

The Reorganized Debtor will pay or cause to be paid in full and in Cash as an Administrative Claim, without the need for application to, or approval of, any court, without reduction to the recovery of applicable holders of allowed claims, any and all Indenture Trustee Fees and other amounts that are due to each of the Indenture Trustees and its counsel as of the Effective Date on or before the

17

Effective Date.  The Reorganized Debtor shall also promptly pay or cause to be paid in full any and all fees and expenses that will be incurred in connection with the distributions to be made by the Indenture Trustees under this Plan without further court approval.

2.    **Priority Tax Claims**

Section 507(a)(8) of the Bankruptcy Code Priority Tax Claims shall receive the following treatment:

/ / /

/ / / /

| Description | Treatment |
|---|---|
| Priority Tax Claims Arising Under 11 U.S.C. § 507 (a)(8). | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date, agrees to different treatment or its Claim is the subject of Final Order of the Bankruptcy Court, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable. The Debtor or Reorganized Debtor, as the case may be, reserves the right to pay any Allowed Priority Tax Claim in equal quarterly payments over a period of five years from the date of the entry of the Order for relief with interest at the applicable rate under non-bankruptcy law.<br><br>For the avoidance of any doubt, in the event the Allowed Priority Tax Claim of the California Franchise Tax Board (the "FTB") has not been paid in full on the Effective Date, the FTB shall be entitled to interest on its Allowed Priority Tax Claim at a rate determined under applicable nonbankruptcy law as provided for in section 511 of the Bankruptcy Code for the period of time from the Effective Date to and through the date its Allowed Priority Tax Claim is paid in full. |

### B.   Allowance and Treatment of Classified Claims and Interests

#### 1.   Secured Claims (Class 1)

Allowed Secured Claims, if any, shall receive the following treatment:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 1 | Allowed Secured Claims | No | Except to the extent that a Holder of an Allowed Claims Priority Non-Tax Claim agrees to other treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim from funds available to the Reorganized Debtor on the later of (1) the Effective Date or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim or, in either case, as soon thereafter as is practicable. |

#### 2.   Priority Non-Tax Claims (Class 2)

Section 507(a) of the Bankruptcy Code Priority Non-Tax Claims shall receive the following treatment:

/ / /

/ / / /

19

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 2 | Priority Non-Tax Claims Arising Under 11 U.S.C. § 507 (a) Other Than Tax Claims Arising Under U.S.C. § 507(a)(8). | No | Except to the extent that a Holder of an Allowed Claims Priority Non-Tax Claim agrees to other treatment, each Allowed Priority Non-Tax Claim will be paid in full satisfaction of the Priority Non-Tax Claim from funds available to the Reorganized Debtor on the later of (1) the Effective Date, or (2) the fifteenth Business Day after such date that the Claim becomes an Allowed Priority Non-Tax Claim or, in either case, as soon thereafter as practicable. |

### 3.       General Unsecured Claims (Classes 3A, 3B, 3C, 3D)

General Unsecured Claims shall receive the following treatment by sub-Class:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 3A | General Unsecured Claims (excluding the TOPrS Claims, and the $176,402,106.56 of Claims represented by the 7.875% Senior Notes due 2009) | No | Except as provided below with respect to the Holder of an Allowed General Unsecured Claim pursuant to any settlement, compromise, stipulation or order which provides for different treatment, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, the Holder of an Allowed Class 3A General Unsecured Claim shall retain their legal, equitable, and contractual rights and shall be paid in full on the later of the Effective Date of the Signature Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim or, in either case, as soon thereafter as is practicable, with Post Petition Interest at the Post Petition Interest Rate (2.51%).

The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BNY Stipulation or any other settlement, compromise, stipulation or order which provides for different treatment shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of the Effective Date of the Signature Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim or, in either case, as soon thereafter as is practicable, with Post Petition Interest, unless the Allowed Class 3A General Unsecured Claims has been otherwise capped, at the Post Petition Interest Rate (2.51%). |
| 3B | General Unsecured Claims of the Holders and of the 7.875% Senior Notes $176,402,106.56 (prepetition) | Yes | Class 3B shall have Allowed General Unsecured Claims in the aggregate amount of $176,402,106.56, which amount includes $166,530,000 in principal and $9,872,106.56 in accrued but unpaid interest as of the Petition Date at the applicable rates specified in the Senior Notes Indenture and related documents, as well as other fees and costs |

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

| | | | |
|---|---|---|---|
| | | | associated therewith, and shall not be subject to objection, challenge, deduction, offset, avoidance, setoff, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or disallowance under applicable law.

The Holders of Allowed Class 3B General Unsecured Claims will be paid their principal in full on the Effective Date.

If Class 3B votes as a class to accept the Signature Plan, which shall operate as binding settlement of the dispute regarding the amount of post petition interest Holders of Allowed Class 3B Claims are entitled to receive, interest claims shall be paid on the Effective Date as follows:
  • Pre-petition accrued interest shall be paid in cash at the full contract rate of 7.875%.
  • On account of accrued post petition interest, the sum of (i) the Post Petition Interest at the Post Petition Interest Rate and (ii) an additional $1.5 million shared by Class 3B on a pro-rata basis.

In the event Class 3B votes to accept the Plan but the Court makes a determination that the payment of post petition interest on account of Class 3B Claims in excess of the Post Petition Interest Rate renders the Plan un-confirmable, Class 3B shall be deemed to have rejected the Plan and the Plan can only be confirmed as to Class 3B if the treatment of Class 3B satisfies the cram-down confirmation standards under section 1129(b) of the Bankruptcy Code.

If Class 3B votes as a class to reject the Signature Plan, interest claims shall be paid on the Effective Date as follows:
  • Pre-petition accrued interest will be paid in cash at the full contract rate of 7.875%.
  • Accrued Post Petition Interest at the Post Petition Interest Rate. |
| 3C | TOPrS Claims $107,422,680.93 (prepetition) | Yes | Class 3C shall have Allowed General Unsecured Claims in the aggregate amount of $107,422,680.93, consisting of: (a) $103,092,784 in the principal amount issued pursuant to the Junior Notes Indenture and related documents and (b) $4,329,896.93 in accrued but unpaid interest as of the Petition Date at the applicable rates specified in the Junior Notes Indenture and related documents, as well as other fees and costs associated therewith, and shall not be subject to objection, challenge, deduction, offset, avoidance, setoff, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or disallowance under applicable law.  The TOPrS would receive the following in settlement of their existing Claims:
  • $45 million in cash to be paid upon the earlier of (i) the Effective Date if, after giving effect to the payment to the TOPrS the Unrestricted Cash of the Reorganized Debtor would equal or exceed $20 |

21

| | | | |
|---|---|---|---|
| | | | million; (ii) within 45 days following the receipt of the Anticipated Tax Refund; or (iii) one hundred and twenty days (120) after the Effective Date. |
| | | | • $39 million in new note(s) bearing 9% annual interest, payable quarterly commencing one quarter after the Effective Date and continuing quarterly thereafter, with a final maturity on December 31, 2016, in substantially the form attached as Exhibit 4 to this Plan. |
| | | | • 21 million shares of Common Stock. |

Nothing contained in this Plan shall be deemed to modify, impair, terminate, or otherwise disturb in any way the provisions of section 510(a) of the Bankruptcy Code or the subordination provisions in any applicable agreement, and all such rights are expressly preserved under this Plan.

### 4. Class of Equity Interests (Class 4)

Equity Interest Holders shall receive the following Treatment:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 4 | Equity Interests | Yes | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor in full and final satisfaction of their Equity Interests, subject to dilution for the issuance of securities to the TOPrS Group and the Signature Investors on the Effective Date in connection with the Plan, and the Common Stock which may be issued to the Holders of Allowed Class 5 Claims, if any. |

### 5. Class or Claims Subordinated Under 11 U.S.C. § 510(b) (Class 5)

Section 510(b) Claims, if any, shall receive the following treatment:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 5 | Section 510(b) Claims | No | The Holders of Allowed Section 510(b) Claims will receive newly-issued interests in the Reorganized Debtor in full and final satisfaction of their Allowed Section 510(b) Claims. The percentage interest of common stock to which such Holders will be entitled shall be based upon the average trading value of the common stock of the shares of the Reorganized Debtor for the thirty days preceding the date on which any Section 510(b) Claims become Allowed Section 510(b) Claims if such allowance occurs after the Effective Date.  If the Court determines in a Final Order that the Allowed Class 5 Claim is not subject to subordination under 11 U.S.C. § 510(b), then the Holder of the Allowed Class 5 Claim will receive the same treatment as Holders of Claims in the appropriate Class of Unsecured Claims or Equity Interests. Certain of the Section 510(b) Claims may be satisfied by insurance coverage. |

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES
MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

## III.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Effective upon Confirmation of this Plan, the Debtor will reject all executory contracts and unexpired leases between the Debtor and any other party that have not previously been rejected, other than the Executive Employment Agreements, certain insurance contracts and those executory contracts and unexpired leases which are listed on the final Schedule of Assumed Agreements to be filed twenty-one (21) days before the Confirmation Hearing Date with the Bankruptcy Court of executory contracts and unexpired leases to be assumed under this Plan on the Effective Date. That schedule will list the amount of the proposed cure payment required by 11 U.S.C. § 365(b)(1).  A copy of the schedule and notice of the objection deadline will be served on the contract parties.

Any party that objects to the assumption of its executory contract or unexpired lease by the Debtor or to the proposed cure payment must file with the Court and serve on interested parties a written objection with supporting evidence that states the basis for the objection. This objection must be filed with the Court and served no later than ten (10) days before the Confirmation Hearing. Any entity that fails to timely file and serve an opposition will be deemed to have waived any and all objections to the proposed assumption or the amount of the proposed cure payment. In the absence of a timely objection by such a party, the Confirmation Order shall constitute a final determination of the amount of the cure payment and that the Reorganized Debtor has shown adequate assurances of its future performance.

In the event of a dispute regarding the cure payment, adequate assurances, or some other matter related to assumption, the cure payment required by 11 U.S.C. § 365(b)(1) shall not be made until after entry of a Final Order resolving the dispute and approving the assumption. Pending the entry of a Final Order, the executory contract or unexpired lease at issue will be deemed assumed by the Reorganized Debtor unless otherwise ordered by the Court. Upon payment of the cure amount required by 11 U.S.C. § 365(b)(1), any prepetition or postpetition arrearage or other Claim asserted in a Filed proof of Claim or listed in the Schedules shall be deemed satisfied in full and the Claim shall be deemed disallowed, without further order of the Court or action by any party.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases will be treated as Class 3A General Unsecured Claims, and a proof of claim must be filed with the Bankruptcy Court and served on the Reorganized Debtor within thirty days of the Effective Date of this Plan or be forever barred and unenforceable against the Debtor, the Reorganized Debtor, or their property.

## IV.

## MEANS OF EFFECTUATING THE SIGNATURE PLAN

### A.    Merger

On the Effective Date, and effective contemporaneously with the occurrence of the Effective Date, FGCC will first be merged into the Debtor or the Reorganized Debtor (as applicable), and then FRC will be merged into the Debtor or the Reorganized Debtor (as applicable), with the resulting merged entity surviving as the Reorganized Debtor (the "Merger"). The Reorganized Debtor will thereafter continue to operate its business in the ordinary course without the supervision or oversight of the Bankruptcy Court.

As a result of the Merger, the assets of the Debtor, FGCC and FRC will become assets of the Reorganized Debtor and any existing liabilities of FGCC and FRC that are unsatisfied as of the date of the Merger, any guarantees by FGCC or FRC of any obligations of the Debtor and any joint and several liabilities of the Debtor, FGCC and/or FRC will become obligations of the Reorganized Debtor. The liabilities of FGCC and FRC constitute Post-Effective Date Merger Claims that will satisfied by the Reorganized Debtor in the ordinary course of business in accordance with applicable non-bankruptcy law; those liabilities are not classified or treated as Claims under this Plan. The equity securities of FGCC and FRC will also be cancelled and all Intercompany Claims between the Debtor, FGCC and FRC will be eliminated.

The decisions of the Reorganized Debtor, including the timing and amounts of distributions to creditors, will be made by an external manager and a single Board of Directors.

The Signature Investors will invest $10 million on the Effective Date, consisting of (i) at least $5 million in cash and (ii) an in-kind contribution of loan and lease net assets consistent with the

24

future business plan of the Reorganized Debtor of up to $5 million, and receive for this investment 12,500,000 shares of Common Stock at $.80 per share.

All in-kind assets would be subject to a third party valuation as of December 31, 2009 and a management representation from Signature regarding any subsequent material changes in value. In addition, to the extent that the effective date extends over 120 days from the original valuation, the third party valuation provider will produce an updated analysis for the period subsequent to yearend. All existing in-kind asset contributions made prior to the Effective Date would be reviewed and approved by a committee representing the interests of existing shareholders and creditors (the "Steering Committee") comprised of Seth Hamot and James McIntyre no later than January 31, 2010. Any future additions would be reviewed and approved by the Steering Committee prior to acquisition by Signature Affiliates.

In addition, the Signature Investors will pay up to an aggregate of $300,000 to acquire Warrants to purchase 15 million shares of Common Stock at an exercise price of $1.03 per share. The Warrants will vest as to 20% on the Effective Date, and 20% in annual installments thereafter until the Warrants are fully vested on the fourth anniversary of the Effective Date. Assuming the Warrants are exercised for cash, the Warrants represent an additional potential future equity infusion to the Reorganized Debtor of $15.75 million, including an aggregate purchase price of $300,000 and an aggregate exercise price of $15,450,000 paid for the Warrants. The purchase price shall be payable by the Signature Investors as the Warrant shares vest, with $60,000 payable on the Effective Date and $60,000 payable on each subsequent vesting installment.

**B.      Postconfirmation Business Operations of the Reorganized Debtor**

**1.      Post-Confirmation Business Plan for the Reorganized Debtor**

The Reorganized Debtor shall utilize the asset base of the current Fremont estate in all commercially reasonable ways for the creation of a broad based, high growth, and solidly profitable licensed commercial finance platform oriented toward originating special situations financing in what is commonly referred to as the "middle market." For purposes of this Plan, the term "middle market" refers to corporate entities which generate annual gross sales in the range of $10 million to $500 million.

25

The Reorganized Debtor's proposed management team (including its board Chairman) shall be made up of a highly experienced and seasoned group of financial professionals who have operated very successfully within this market segment for decades.  The assets underlying the portfolio in this Plan are not securities; they are loans sourced through the Signature team's proprietary network, individually structured based on the unique circumstances of the individual situation, subjected to appropriate due diligence and documented through the collective efforts of the Signature team, drawing on the significant breadth of experience of Signature and its team.

The Reorganized Debtor's proposed management team shall use commercially reasonable efforts to leverage its expertise in this market by reformulating Fremont General into a well-capitalized and profitable finance company serving this large and attractive market in the following areas:

- o **Commercial Finance** – Financings collateralized by assets typically for businesses in transition.  The loans are expected to cover a broad cross section of industries, including without limitation, industrial, retail, franchise food, leasing and transportation, media and entertainment

- o **Portfolio Acquisitions** – Opportunistic purchases of senior secured bank loans either as a whole portfolio or as "carved out" from large bank owned portfolios at meaningful discounts to face value.  Frequently, acquired portfolios may be focused on  specialized industries such as technology, retail, media, restaurants, casino, hospitality, healthcare, agriculture and lead to further opportunities over the long term, particularly when they come with talented management.

- o **Individual Loan Purchases** – The Reorganized Debtor shall continue to be actively involved in purchasing sub performing and distressed loans from financial institutions. As an example, Signature recently acquired the debt of the largest domestic operator of auto racing schools from a top 5 financial institution.  Although the business is very sensitive to, and, therefore, reeling from the current economic environment, management has aggressively reduced its cost base and shareholders have supported it through additional capital injections.    Signature is currently negotiating with

26

management regarding the terms for extending one of the facilities which would otherwise mature in December.

o **Equity Investments** - In the right circumstances, the Reorganized Debtor may acquire controlling interests in operating companies, including through purchasing senior debt of companies to be later converted into equity, or through outright purchases of controlling equity interests.

o **Distressed Situations** – The Company will also pursue opportunistic corporate financings for asset-rich companies requiring near-term liquidity including, without limitation, bridge loans, transition financing, debtor-in-possession loans ("DIPs"), senior secured bank debt, bonds in liquidation and trade claims in anticipation of a recapitalization or other clearly defined event.  By way of example, Signature recently provided a structured lending solution for the Fatburger franchisor that included both DIP financing to subsidiaries reorganizing in Chapter 11 and traditional financing to the parent franchisor who does not anticipate a bankruptcy filing.

o **Specialty Lending Niches** – The Reorganized Debtor may identify specific market niches (technology, retail, media, restaurants, casino, hospitality, healthcare, agriculture) that are underserved and present excellent risk/reward business opportunities.  These may be identified as a result of portfolio acquisitions (see above) or through other activities the Reorganized Debtor.   The Reorganized Debtor anticipates that it will be contacted by management teams seeking a new platform to put their expertise to work.

o **Good Bank/Bad Bank Transactions** – As widely reported, many community banks face significant capital constraints, high ratios of criticized assets, and doubts regarding their future viability.   Signature believes there are opportunities for structured transactions where Signature buys their criticized assets enabling them to raise new capital or complete a merger that would not otherwise be feasible due to regulatory and other issues.  This line has similar metrics as its other lines that acquire sub-performing and distressed loans with the added incentive that the purchaser may be able to

27

augment its return with a significant equity kicker. Although the Reorganized Debtor may acquire a significant ownership position or even 100% ownership as a result of such a transaction, there may be significant regulatory impediments and such transactions are not central to the Reorganized Debtor's plan.

o **Senior Stretch and Tranche B** – The Reorganized Debtor may pursue opportunities to acquire or originate senior secured "stretch" loans and Tranche B loans that are junior secured loans subject to an intercreditor agreement. These loans go beyond normal senior lending guidelines but present significant risk/reward opportunities.

The Reorganized Debtor's business plan will build upon the existing platform established by Signature. In conjunction with assuming managerial responsibility for the Reorganized Debtor, the Reorganized Debtor shall seek to wind down all of its existing activities or fold them into the Reorganized Debtor as appropriate while pursuing the long-term strategy to utilize the assets of the Reorganized Debtor to expand Signature's existing special situation lending platform and expand the business to grow a significant portfolio of income generating assets.

The Reorganized Debtor may utilize the Fremont NOL carry forwards to the fullest extent allowed under applicable law to generate significant after-tax returns to the Reorganized Debtor's shareholders.

C.      **Management Agreement with Credit Partners Management, Inc.**

The Reorganized Debtor's activities will be managed by CP Management acting as an external investment advisor. On the Effective Date, the Reorganized Debtor's Board of Directors will enter into a temporary management contract with the senior management team of Signature to provide day to day interim management services to the Company consistent with the post-confirmation business plan for the Reorganized Debtor, as outlined herein, and to oversee the wind-down of the business affairs of the Debtor, FRCC, and FRC while a more complete management agreement is negotiated between the Board and the newly formed entity, CP Management. Such temporary management contract will terminate upon execution of the Management Agreement, which is expected to occur within 45 days of the Effective Date.

The "Management Agreement" for the Reorganized Debtor for the calendar year 2010 will be

28

based upon a commercially standard business plan, consistent with the Signature Plan. It will be prepared and submitted by CP Management, to the Board of Directors for approval within twenty (20) days of the Effective Date. The form of the proposed Management Agreement, which CP Management anticipates will be submitted to the Board of Directors for approval, is attached as Exhibit 3 to the Signature Plan and has been the subject of arms length negotiations between Signature and a steering committee.

Following the entry into the Management Agreement, CP Management shall register with the U.S. Securities and Exchange Commission as an investment adviser pursuant to the Investment Advisers Act of 1940 (the "Advisers Act"). Subject to the supervision of the Reorganized Debtor's Board of Directors, CP Management shall then manage the company's day-to-day operations (other than the wind-down of legacy assets) and provide investment advisory services pursuant to the Management Agreement. If any of the Remaining Executives elect to continue with the Reorganized Debtor, they will continue to manage the legacy assets of the Debtor through the end of their contract.

Under the terms of the proposed Management Agreement, CP Management shall:

- identify, evaluate and negotiate the structure of the investments made by the Reorganized Debtor;

- determine the investments and other assets that the Reorganized Debtor will purchase, retain, or sell;

- determine the composition of the portfolio of the Reorganized Debtor, the nature and timing of the changes therein and the manner of implementing such changes;

- close and monitor the Reorganized Debtor's investments;

- manage, service, administer, and collect payments related to the Reorganized Debtor's investments;

- negotiate, restructure, settle and/or compromise any loan or other debt obligations related to the investment portfolio;

- supervise a limited staff of FRC employees who will be employed directly by the Reorganized Debtor to continue with the orderly wind-down of the Debtor and FRC's legacy business activities;

29

- engage, interact and supervise any financial advisors, legal counsel, accountants, or other outside consultants engaged by the Reorganized Debtor to continue with the orderly wind-down of the Debtor and FRC's legacy business activities;

- engage, interact and supervise any financial advisors, legal counsel, accountants, or other outside consultants engaged by the Reorganized Debtor to facilitate the Reorganized Debtor's return to compliance with the SEC and any other governmental agencies;

- file, continue, amend and modify any financing statements, Uniform Commercial Code filings, mortgages, deeds, title policies, etc. related to any liens or collateral associated with any loan or other debt obligations related to the investment portfolio; and

- provide the Reorganized Debtor with such other investment advisory, research and related services as the Reorganized Debtor may, from time to time, reasonably require for the investment of its funds.

The compensation arrangements set forth in the Management Agreement shall be renewable annually based on such terms as the Manager and the independent members of the Board of Directors shall agree. Under the Management Agreement, the Reorganized Debtor will pay CP Management a fee for its services pursuant to the Management Agreement. The Management Agreement and its fee structure were established by arm's-length negotiation between Signature and a Steering Committee consisting of James McIntyre and Seth Hamot, neither of whom holds any direct or indirect economic interest in Signature or CP Management. The management fee during the initial term shall be based upon an expense budget setting forth projected, commercially reasonable operating expenses to be incurred by CP Management in its management of the Reorganized Debtor. The framework established by the Steering Committee also provides that annual salaries for each of Messrs. Noell, Grossman, Donatelli and Ross shall be limited to $150,000 per year for services provided to the Reorganized Debtor under the Management Agreement. The Management Agreement and the proposed budget shall be subject to review and approval by the entire Board of Directors within 120 days after the Effective Date.

Under the Management Agreement and pursuant to the established budget, CP Management is

30

solely responsible for: (i) compensating CP Management's investment professionals and their respective staffs (and pursuant to agreed upon limits on the compensation of Messrs. Noell, Grossman, Donatelli and Ross), when and to the extent engaged in providing investment advisory and management services to the Reorganized Debtor, and (ii) the compensation and routine overhead expenses of such personnel allocable to such services. Notwithstanding the above, the Reorganized Debtor's Board of Directors in its sole discretion may award an annual bonus to CP Management above and beyond the budget based upon performance.

The Management Agreement will have an initial term through December 31, 2010 and will renew automatically thereafter for annual periods subject to the vote of the Reorganized Debtor's board of directors or shareholders.

### D.    The CP Management Team and the Reorganized Debtor's Management Team

The CP Management team will be led by Craig Noell, Kyle Ross, Thomas Donatelli and Kenneth Grossman.

In addition to the CP Management team, the Reorganized Debtor shall seek out accomplished commercial finance industry executives based in Atlanta, Los Angeles, and New York to participate in the management of the Reorganized Debtor in accordance with the terms and structure of this Plan.

Signature has requested that the Remaining Executives enter into new arrangements with the Reorganized Debtor providing for their continued employment through the expiration of their contracts in November 2010 or under other mutually agreeable arrangements while a transition plan is implemented. No agreement has been reached with these executives, nor can there be any assurance that any such an agreement will be reached.

### E.    The Reorganized Debtor's Board of Directors

The Reorganized Debtor would have a Board of Directors consisting of nine directors including Craig Noell and Kenneth Grossman of CP Management, and the following directors expected to satisfy the independence requirements of the New York Stock Exchange: John Nickoll, Robert Schwab, two directors identified from the New World Disclosure Statement and/or New World Plan, two directors nominated by the TOPrS Group (which shall be mutually acceptable to Signature, the TOPrS Group and James McIntyre), and a ninth director selected from the existing

31

Equity Interest Holders. The TOPrS Group has informed Signature that it expects to recommend Howard Amster and Seth W. Hamot as independent directors.

### F.    Reporting Requirements

While it implements its initial investment strategy, the Reorganized Debtor will remain a public company with Equity Interests trading on national securities exchange. The Reorganized Debtor will seek an accommodation from the SEC of filing and past due reporting requirements, if feasible, commencing with a comprehensive Form 10K in the first quarter in which this Plan goes effective, which is anticipated to be the first or second quarter of 2010. In the event that the Reorganized Debtor is unable to obtain the requested accommodation or if there are other impediments, the Reorganized Debtor will become current in its SEC reporting requirements post emergence.

### G.    Amendment of Corporate Governance Documents to Authorize Certain Transactions

Under the Signature Plan, the Reorganized Debtor and its affiliates shall amend and restate certain of their corporate governance documents, including its articles of incorporation and bylaws in substantially the form attached as Exhibit 5 and Exhibit 6, respectively, to this Plan, to the extent necessary to, among other things authorize: (1) the restructuring transactions contemplated by the Signature Plan, including but not limited to the issuance of Common Stock and Warrants to be issued under the Signature Plan, (2) implementation of a "Leucadia Provision" (as discussed in detail below), and (3) the following actions to be taken in the discretion of the Reorganized Debtor's board of directors within eighteen months of the Effective Date: a corporate name change, a new Committee on Uniform Securities Identification Procedures (CUSIP) number, an exchange of certificates representing common stock of the Debtor par value $1.00 per share for certificates (for the same number of shares) representing Common Stock of the Reorganized Debtor par value $0.01 per share (to the extent shares are certificated), a reincorporation to Delaware or another state (provided that the Reorganized Debtor's Board of Directors, after receiving advice from legal and financial advisors, believes that the advantages of such a reincorporation outweigh the disadvantages).

### H.    Transfer Restrictions: the "Leucadia Provision"

The Reorganized Debtor, at the option of its Board of Directors, may implement a "Leucadia Provision" to restrict certain transfers of the common stock or other equity of the Reorganized Debtor in order to avoid adverse federal income tax consequences caused by certain subsequent ownership changes (as defined in section 382 of the Internal Revenue Code of the Tax Code, as described in more detail below).

The Leucadia Provision shall restrict transfers on certain shares of the common stock with the following material terms:

- no Person may acquire or accumulate five percent or more (as determined under tax law principles governing the application of Section 382 of the Tax Code) of the common stock or other equity of the Reorganized Debtor (together, "the Securities"); and

- no Person owning directly or indirectly (as determined under such tax law principles) on the Effective Date, after giving effect to this Plan, or after any subsequent issuances of securities pursuant to transactions contemplated by this Plan, five percent or more (as determined under such tax law principles) of the Securities, may acquire additional shares of that common stock or other equity of the Reorganized Debtor, subject to certain exceptions, and

- no person holding 5% or more of the total fair market value of the Securities may transfer, or agree to transfer, Securities.

The restrictions on transfer will not apply to certain transactions approved by the board of directors of the Reorganized Debtor.

The express intent of the Leucadia Provision is to reduce the risk that any change in the ownership of the Reorganized Debtor's common stock may jeopardize the preservation of federal income tax attributes of the Reorganized Debtor for purposes of sections 382 and 383 of the Tax Code.

Each certificate representing shares of the Reorganized Debtor's common stock shall bear a legend in substantially the following form:

"The shares of Reorganized Debtor's common stock represented by this certificate are issued

33

pursuant to this Plan of Reorganization for the Reorganized Debtor, as confirmed by the United States

Bankruptcy Court for the Central District of California. The transfer of securities represented hereby

is subject to restriction pursuant to the Bylaws of the Reorganized Debtor. The Reorganized Debtor

will furnish a copy of its Bylaws to the holder of record of this certificate without charge upon written

request addressed to the Reorganized Debtor at its principal place of business."

## I.    Certain Insurance Policy Matters

Westchester Surplus Lines Insurance Company ("WSLIC") and Pacific Employers Insurance

Company ("PEIC") are members of the ACE Group of companies. WSLIC issued pre-petition to the

Debtor a claims made directors and officers excess liability insurance policy for claims made against

the insured for wrongful acts occurring between January 1, 2008 and December 31, 2014 (the

"WSLIC Policy"). PEIC issued pre-petition to the Debtor high deductible workers compensation

occurrence policies for the calendar years 2000, 2001 and 2002 (the "PEIC Policies"). The WSLIC

Policy and the PEIC Policies are collectively referred to hereinafter as the "ACE Policies." Unless

rejected pursuant to the Plan, in which case Claims will be treated solely as set forth in the Plan,

nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to this Plan or any

other Plan document (together the "Plan Documents") (including any provision that purports to be

preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any

respect the legal, equitable or contractual rights and defenses, if any, of the insured or insurer with

respect to the ACE Policies or any prepetition agreement with the Debtor related to any of the ACE

Policies (the "ACE Policies and Related Agreements"). Unless rejected pursuant to the Plan, in which

case the terms of the Plan shall govern, the rights and obligations of the insured and insurer shall be

determined under the ACE Policies and Related Agreements and under applicable non-bankruptcy

law. Any assumption of the Plan Documents of the ACE Policies and Related Agreements will not

enlarge the prepetition rights of the insured or insurers thereunder.

## J.    Repurchase Claims Reserves

On the Effective Date of the Signature Plan, Signature will establish a balance sheet cash

reserve of $15,000,000 reflecting its best estimate of the likely liability for Repurchase Claims

payable over time. (This reserve is in addition to Signature's assumption that the Debtor will utilize

34

$20 million in cash to pay known Repurchase Claims on or before the Effective Date and reduce corresponding liabilities in the same amount.)  After the Effective Date of the Signature Plan, the Reorganized Debtor's Board of Directors may determine to increase or decrease the amount reserved for the satisfaction of Repurchase Claims (the Signature Plan proposes periodic adjustments after the Effective Date that maintain a reserve equal to or greater than anticipated claims payments for the following 12 months), subject to any applicable Court order governing the reserves.  Upon obtaining a line of credit after the Effective Date of the Signature Plan, the Reorganized Debtor's Board of Directors may determine that a cash reserve may not be in the best interest of the company and may, alternatively, elect to establish a reserve under the line of credit to satisfy the potential liability for Repurchase Claims.

**K.**    **Retention of Jurisdiction**

The Bankruptcy Court will retain jurisdiction of all matters arising in or related to this Plan to the fullest extent provided by law until this Plan is fully consummated, including, without limitations:

1.    The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim;

2.    The estimation of any Claim;

3.    The allowance or disallowance of Professional Fee Claims, compensation, or other Administrative Claims;

4.    To hear and determine Claims concerning taxes pursuant to sections 346, 505, 525, and 1146 of the Bankruptcy Code;

5.    To hear and determine any action or proceeding brought under section 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code;

6.    To hear and determine all actions and proceedings relating to pre-confirmation matters;

7.    To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

8.    To hear and determine any modification to this Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

9.    To enforce and interpret terms of this Plan;

35

10.    To correct any defects, cure any omissions, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of this Plan;

11.    To hear and determine such matters and make such orders as are consistent with this Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or related to any order entered by the Court in this Case; and

12.    The entry of an order concluding and terminating this Case.

**L.    Cancellation and Treatment of Senior Notes and Junior Notes**

On the Effective Date, all Senior Notes and the Senior Notes Indenture shall be deemed automatically canceled and discharged on the Effective Date, and (ii) the obligations of the Debtor (and Reorganized Debtor) under any agreements, indentures, or certificates of designation governing the Senior Notes, shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Court or any Person; *provided, however*, that the Senior Notes and the Senior Notes Indenture shall continue in effect solely for the purposes of (i) allowing the Holders of the Senior Notes to receive their Distributions hereunder, (ii) allowing the Indenture Trustee for the Senior Notes to make the Distributions, if any, to be made on account of the Senior Notes, (iii) permitting the Indenture Trustee for the Senior Notes to assert its Indenture Trustee Charging Lien against such Distributions for payment of its Indenture Trustee Fees, and (iv) allowing the Indenture trustee for the Senior Notes to enforce the subordination provisions contained in the Subordinated Debenture.

On the Effective Date, except as otherwise provided for herein, (i) the Junior Notes and TOPrS shall be deemed extinguished, cancelled and of no further force or effect, and (ii) the obligations of the Debtor (and Reorganized Debtor) under any agreements, indentures, or certificates of designation governing the Junior Notes and TOPrS, shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; *provided, however*, that the Junior Notes, TOPrS and Junior Notes Indenture shall continue in effect to the extent necessary to permit the Indenture Trustee for the Junior Notes to (i) maintain or assert any rights or Charging Lien it may have on distributions

36

pursuant to the Plan, (ii) permit the Indenture Trustee for the Junior Notes to exercise its rights and obligations relating to the interests of the applicable Holders pursuant to the Junior Notes Indenture, (iii) allow the Indenture Trustee for the Junior Notes to make distributions pursuant to the Plan, (iv) permit the Indenture Trustee for the Junior Notes to assert any rights to indemnity pursuant to the indenture, which indemnification obligations of the Reorganized Debtor shall survive; (v) permit the Indenture Trustee for the Junior Notes to perform such other functions as provided under the Junior Notes Indenture, and (vi) appear in the Case.

Subsequent to the performance by the Indenture Trustee for the Junior Notes, the FGFI Trust trustees or their agents of any duties that are required under the Plan, the Confirmation Order and/or under the terms of the Indenture, the Indenture Trustee, the trustees and its agents shall be relieved of, and released from, all obligations associated with the TOPrS, the Junior Notes or under other applicable trust agreements or law and the Indenture shall be deemed to be discharged.

Upon receipt and distribution of the cash and equity to the Holders of the TOPrS and issuance and receipt of the new note as provided under the Plan and after payment of the Indenture Trustee Fees, the Fremont General Financing Declaration of Trust shall be deemed terminated and dissolved and, if necessary or desirable, the Reorganized Debtor or Junior Note Indenture Trustee may file a certificate of cancellation with the Secretary of State of Delaware, and upon such termination and dissolution, the Preferred Securities Guarantee shall be deemed terminated.

## V.

## CLAIMS

A.    **Maintenance of Post-Confirmation Claims Register**

In order to reduce the administrative burdens on the Bankruptcy Court and to improve the efficiency of the remaining claims allowance process, the Reorganized Debtor shall be entitled to retain a third party, including, without limitation, Kurtzman Carson Consultants LLC, to maintain the official claims register for this Case (the "Post-Confirmation Claims Register").

The Post-Confirmation Claims Register shall be based, in the first instance, upon an updated claims database (the "Register Update") that shall be filed by the Debtor at least twenty-one (21) days

37

prior to the Confirmation Hearing.  Objections by any party in interest to the form or substance of the Register Update may be considered as part of the Confirmation Hearing.  On the Effective Date, the Register Update shall be deemed to amend and supersede the Bankruptcy Court's official register, and may thereafter be relied upon by the Reorganized Debtor and any retained third party as the official Post-Confirmation Claims Register.  Following the Effective Date, copies of the current Post-Confirmation Claims Register may be obtained by any party in interest upon written request to the Reorganized Debtor.

**B.      Claim Objections**

The Reorganized Debtor or any other party in interest shall file objections to Claims or Equity Interests within 180 days of the Effective Date.  The Reorganized Debtor may obtain an extension of this date by filing a motion in the Bankruptcy Court, based upon a showing of "cause." Once a Claim or Equity Interest becomes an Allowed Claim or Equity Interest, it will receive the treatment afforded by this Plan.

# VI.

## SECURITIES RELATED MATTERS

**A.      Issuance of Securities**

Except as set forth below, common stock to be issued to Holders of Allowed Claims, if any, will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

Common Stock and Warrants to be issued in connection with the equity investment by the Signature Investors, as well the common stock to be issued upon the exercise of such Warrants, will be issued without registration under the Securities Act or any similar state or local law in reliance upon the exemption set forth in section 4(2) of the Securities Act and the rules set forth in Regulation D promulgated thereunder.   In that regard, the Signature Investors intend to make customary representations to the Reorganized Debtor, including that it is an "accredited investor" as defined under Rule 501 of Regulation D.

## B.  Registration Rights

The Reorganized Debtor shall be responsible for providing mandatory registration rights to the Signature Investors in order to accommodate the resale of common stock and Warrants sold in reliance upon the section 4(2) exemption of the Securities Act.  Accordingly, on or about the Effective Date, the Reorganized Debtor shall execute and deliver a Registration Rights Agreement in substantially the form attached as Exhibit 1 to this Plan.

The Reorganized Debtor shall have twelve (12) months to affect resale registration.  The Registration Rights Agreement shall include customary terms and conditions associated with mandatory registration provisions.  The Reorganized Debtor shall be responsible for all registration expenses, excluding selling expenses.  To the extent that it is currently delinquent in its reporting obligations under the Securities Exchange Act of 1934, the Reorganized Debtor shall use its reasonable efforts to obtain a waiver and/or become compliant with such reporting obligations.

Consistent with the closing conditions for this Plan to go effective, the Reorganized Debtor shall execute and deliver the Registration Rights Agreement.

## C.  Security Certificates

Certificates evidencing shares of preferred stock and warrants received by (i) Holders of securities issued in reliance upon the exemption set forth in section 4(2) of the Securities Act, (ii) holders of five percent or more of the outstanding common stock or (iii) by holders that request legended certificates and who certify that they may be deemed to be underwriters within the meaning of section 1145 of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE AND, IF APPLICABLE, THE COMMON STOCK UNDERLYING SUCH SECURITIES, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT

39

THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any person that would receive legended securities as provided above may instead receive certificates evidencing securities without such legend if, prior to the Effective Date, such person or entity delivers to the Debtor (a) an opinion of counsel reasonably satisfactory to the Debtor to the effect that the shares to be received by such person or entity (or the common stock underlying such shares) may be sold without registration under the Securities Act and (b) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing shares of the Reorganized Debtor bearing such legend may present such certificate to the transfer agent for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act or (b) such holder delivers to the Reorganized Debtor an opinion of counsel reasonably satisfactory to the Reorganized Debtor to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

### D.    **Investment Company Act Status**

The Reorganized Debtor expects that CP Management will register as an investment adviser under the Advisers Act, but that the Reorganized Debtor will not be required to register under the 1940 Act.

The Reorganized Debtor intends to structure and operate its business and its investments in such a way that it will not be deemed an "investment company" under the 1940 Act. The Reorganized Debtor intends to operate as a commercial lender engaged in various financing activities as discussed herein, and will not be primarily in the business of investing, reinvesting or trading in securities. However as of the Effective Date of this Plan, the Reorganized Debtor is projected to own: i) assets that could be deemed "investment securities" as defined in Section 3(a)(1)(C) of the Company Act, that might exceed 40 percent of its total assets, less government securities, investments in majority-owned subsidiaries, cash and cash items, and consequently could be considered an investment company under that section. In such instance, the Reorganized Debtor will seek to register

40

with the SEC as an investment company unless it can rely on an exception or exemption from the 1940 Act, or obtain an order from the SEC allowing it to operate under the terms of the order without registering.  For up to a year from the Effective Date of this Plan, the Reorganized Debtor intends to rely upon the provisions of Rule 3a-2 of the 1940 Act, which provides a one-year period in which it may operate without being subject to registration and regulation as an investment company.

## VII.

## DISBURSEMENTS

### A.    <u>Manner of Distribution</u>

At the option of the Reorganized Debtor, monetary distributions may be made in Cash, by wire transfer, or by a check drawn on a domestic bank.  Distributions on account of holders of Allowed Class 3B Claims and Allowed Class 3C Claims shall be made to (a) the applicable Indenture Trustee or (b) with the prior written consent of the applicable Indenture Trustee, through the facilities of DTC.  If a distribution is made to the applicable Indenture Trustee, the applicable Indenture Trustee, in its capacity as disbursing agent, shall administer the distributions in accordance with the Plan and the Senior Notes Indenture or Junior Notes Indenture, as applicable, and be compensated as described below; provided, however, that nothing herein shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to the Charging Lien.

The applicable Indenture Trustee acting as disbursing agent shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (A) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtor as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

Each Indenture Trustee acting as disbursing agent by providing services related to distributions under the Plan will receive from the Reorganized Debtor, without further approval of the Court, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.    These payments will be made by the

41

Reorganized Debtor and will not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Class 3B Claims and Allowed Class 3C Claims receiving distributions from the Indenture Trustee as disbursing agent. All payments to Holders of Allowed Class 3B Claims and Allowed Class 3C Claims shall only be made to such Holders after the surrender by each such Holder of the Senior Notes or Junior Notes certificates representing such Class 3B or Class 3C Claim, or in the event that such certificates are lost, stolen, mutilated or destroyed, upon the Holder's compliance with the requirements set forth in Section IV.L hereof, or if such Senior Notes or Junior Notes are held electronically, ownership of such Claims is surrendered in a manner acceptable to the applicable Indenture Trustee. As soon as practicable after surrender of certificates evidencing Allowed Class 3B and Allowed Class 3C Claims, the applicable Indenture Trustee shall distribute to each Holder thereof such Holder's pro rata share of the Distribution, subject to the rights of the Indenture Trustee to assert a Charging Lien against such distribution.

Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Senior Notes Indenture and the Junior Notes Indenture shall continue in effect to the extent necessary to authorize the applicable Indenture Trustee to receive and distribute to the Holders of Allowed Class 3B Claims and Allowed Class 3C Claims Distributions pursuant to this Plan and shall terminate upon completion of all such Distributions.

Any Distribution required to be made to satisfy Priority Tax Claims or Administrative Tax Claims shall include interest at the applicable rate pursuant to Section 511 of the Bankruptcy Code calculated as of the actual date of Distribution.

**B.    Undeliverable Distributions**

If a Distribution is returned to the Disbursing Agent as undeliverable, then such Distribution amount shall be deemed to be "Unclaimed Property." Nothing contained in this Plan shall require the Disbursing Agent, or anyone else, to attempt to locate such Person. The Unclaimed Property shall be set aside and (in the case of Cash) held in a segregated interest-bearing account to be maintained by the Disbursing Agent. If such Person presents itself within one (1) year following the Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person. If such Person does not present itself within one

42

(1) year following the Effective Date, any such Unclaimed Property and accrued interest or dividends earned thereon shall become the property of the Reorganized Debtor for use under this Plan, if required, then to the Reorganized Debtor.

### C.   **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" and shall be dealt with in as described above.

### D.   **Compliance with Tax Requirements**

The Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making Distributions pursuant to this Plan.

In connection with each Distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Disbursing Agent shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such Distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Disbursing Agent, then the Disbursing Agent may, at its sole option, withhold the amount required and distribute the balance to such Person or decline to make such Distribution until the information is received.

### E.   **Distribution of Unclaimed Property**

If a distribution is returned to the Disbursing Agent as undeliverable, then such distribution amount shall be deemed to be "Unclaimed Property." Nothing contained in this Plan shall require the Disbursing Agent, or anyone else, to attempt to locate such Person.  The Unclaimed Property shall be set aside and (in the case of Cash) held in a segregated interest-bearing account to be maintained by the Disbursing Agent.  If such Person presents itself within one (1) year following the Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned

43

thereon, shall be paid or distributed to such Person. If such Person does not present itself within one (1) year following the Effective Date, any such Unclaimed Property and accrued interest or dividends earned thereon shall become the property of the Reorganized Debtor for use under this Plan, if required, then to the Reorganized Debtor.

### F.    No De Minimis Distributions

If any single distribution required by this Plan would be for an amount of $25.00 or less, then the Disbursing Agent shall not be required to process the distribution and may, at its option, either add the distribution to the next distribution if the collective amount would be greater than $25.00 or may treat the distribution as Unclaimed Property.

### G.    Setoff

Any Claims of any nature which the Debtor or the Estate may have against the Holder of a Claim may be, but are not required to be, set off against any Claim and the Distribution to be made pursuant to this Plan in respect of such Claim. Neither the failure by the Disbursing Agent or any other Person to affect such a setoff nor the allowance of any Claim shall constitute a waiver or a release of any claim which any or all of the foregoing may have against the Holder of a Claim.

Except as otherwise provided in this Plan, all Causes of Action are retained and preserved pursuant to section 1123(b) of the Bankruptcy Code including, without limitation, the pending or contemplated Causes of Action identified on Exhibit 1 to the Disclosure Statement, a revised, amended and modified version of which may be submitted prior to the ten (10) days prior to the Confirmation Hearing. From and after the Effective Date, all Causes of Action will be prosecuted or settled by the Disbursing Agent. To the extent any Cause of Action is already pending on the Effective Date, the Disbursing Agent as successor to the Debtor will continue the prosecution of such Cause of Action In addition, and without limiting the generality of Section of this Plan, from and after the Effective Date ( as a result of the Merger), the Disbursing Agent is the successor-in-interest to any and all interests of FGCC or FRC in any and all claims rights, and causes of action which have been or could have been commenced by FGCC or FRC immediately prior to the Effective Date. Notwithstanding the foregoing, nothing herein shall be deemed to require the Disbursing Agent to prosecute any Cause of Action.

44

### H.    Distribution Record Date

At the close of business on the Distribution Record Date, the claims registers for all Claims and the transfer ledgers for the Senior Notes shall be closed, and there shall be no further changes in the record holders of such Claims or such Senior Notes.  Except as provided herein, the Disbursing Agent, the Disbursing Agent, the Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims or any transfer of Senior Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers or transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### I.    Delivery and Surrender of Senior Notes

Each Holder of any Senior Note shall surrender such Senior Note to the Indenture Trustee for the Senior Notes.  No Distribution hereunder shall be made to or on behalf of any such Holder unless and until such Senior Note is received by the Indenture Trustee for the Senior Notes, or the loss, theft or destruction of such Senior Note is established to the satisfaction of the Indenture Trustee for the Senior Notes, including requiring such Holder (i) to submit a lost instrument affidavit and an indemnity bond, and (ii) to hold the Debtor and the Indenture Trustee for the Senior Notes harmless in respect of such Senior Note and any Distributions made in respect thereof.  Upon compliance with this Section by a Holder of any Senior Note, such Holder shall, for all purposes under this Plan, be deemed to have surrendered such Senior Note.  Any such Holder that fails to surrender such Senior Note or satisfactorily explain its non-availability to the Indenture Trustee for the Senior Notes within eighteen months of the Effective Date shall be deemed to have no further Claim against the Debtor or its property, or the Indenture Trustee for the Senior Notes in respect of such Claim, and shall not participate in any Distribution hereunder, and the Distribution that would otherwise have been made to such Holder shall be distributed by the Indenture Trustee for the Senior Notes to all Holders who have surrendered their Senior Notes or satisfactorily explained their non-availability to the Indenture Trustee for the Senior Notes within eighteen months of the Effective Date.

SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010

### J.    Delivery and Surrender of Junior Notes

Except as provided in the Plan for lost, stolen, mutilated or destroyed notes, each Holder of any Junior Note not held through book entry must tender such note to the Reorganized Debtor or the Indenture Trustee for the Junior Notes acting as distribution agent in accordance with a letter of transmittal to be provided to such Holders by the Reorganized Debtor or Indenture Trustee as promptly as practicable on the Effective Date.  The letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the Holder of such note to act and the authenticity of any signatures required thereon.  All surrendered notes will be marked as cancelled and delivered to the Reorganized Debtor.  If the record Holder of a note is DTC or its nominee or such other securities depository or custodian thereof or is held in book entry or electronic form pursuant to a global security held by DTC, then the beneficial Holder of such a note shall be deemed to have surrendered such Holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

### K.    Outside Effective Date Distributions Date

Distributions payable as of the Effective Date or "as soon thereafter as is practicable" (such Distributions, "Effective Date Distributions") must occur by the following outside dates: (i) with respect to Effective Date Distributions to be made to the respective Indenture Trustee for distribution to Holders of Senior Notes and, if applicable, the Holders of Junior Notes, such Distributions shall be made no later than by the third (3rd) Business Day after the Effective Date; and (ii) with respect to all other Effective Date Distributions, such Distributions shall be made no later than by the fifth (5th) Business Day after the Effective Date.

### VIII.

### CONDITIONS PRECEDENT TO CONFIRMATION

### AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with this Plan:

46

1.      An order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered; and

2.      The proposed Confirmation Order shall be in form and substance reasonably satisfactory to Signature and wholly consistent with this Plan.

**B.      Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with the provisions of this Plan:

1.      The Confirmation Order shall have been entered in form and substance reasonably satisfactory to Signature, and shall, among other things:

    a.      Provide that the Debtor and the Disbursing Agent are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the obligations under the Plan,

    b.      Authorize the issuance of the Common Stock and the Warrants; and

    c.      Provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of this Plan;

2.      All conditions precedent to the financing commitments required to consummate the Reorganized Debtor's obligations on the Effective Date shall have been waived or satisfied.

3.      The Confirmation Order shall not then be stayed, vacated, or reversed;

4.      All documents, instruments and agreements provided for under this Plan or necessary to implement this Plan (including the Management Agreement and the Registration Rights Agreement, but not necessarily the Warrant) shall have been executed and delivered by all parties thereto, unless such execution or delivery has been waived by the parties benefited;

5.      All corporate governance documents in a commercially reasonable form shall have been adopted;

6.      All material authorizations, consents, and regulatory approvals required, if any, in

47

connection with consummation of this Plan shall have been obtained; and

       7.     All material actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

## C.    <u>Waiver of Conditions</u>

Each of the conditions set forth in this Section, with the express exception of the conditions contained in Section VIII.B.1(a), VIII.B.1(b), VIII.B.1(c) and VIII.B.2, may be waived in whole or in part by Signature with notice to parties-in-interest without a hearing.

## D.    <u>Outside Effective Date</u>

Notwithstanding anything contained to the contrary in this Plan, the Effective Date shall occur no later than 25 days after entry of the Confirmation Order, unless (a) the Confirmation Order is stayed on appeal by a court of competent jurisdiction, in which case then the Effective Date shall by the first Business Day occurring ten (10) days after such stay is dissolved by Final Order, or (b) the Effective Date is extended with the written consent of the Creditor's Committee, which consent shall not be unreasonably withheld.

## IX.

### EFFECT OF CONFIRMATION OF PLAN

## A.    <u>Discharge</u>

Because this Plan does not contemplate the liquidation of substantially all of the property of the estate and the Disbursing Agent will engage in business after consummation of this Plan, the rights under this Plan and the treatment of Claims and Equity Interests under this Plan will be in exchange for, and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor, the Disbursing Agent, or their property, except as otherwise provided in this Plan or the Confirmation Order,

       1.     On the Effective Date, except as otherwise provided for in this Plan the Debtor, the Debtor's Estate, Disbursing Agent, and their property will be deemed discharged and released from any and all Claims, including without limitation, all demands, liabilities, and Claims, that arose before the Confirmation Date or that are based upon or

48

otherwise relate to acts, events, omissions, transactions or other activities of any kind that occurred before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i) regardless of whether: (a) a proof of Claim based on such debt is filed or deemed filed; (b) a Claim based on such debt is allowable under Bankruptcy Code § 502; or (c) the Person holding the Claim based on such a debt has accepted this Plan;

2.    All Persons will be precluded from asserting against the Debtor, the Estate, or the Disbursing Agent, or their property, any other or further Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Confirmation Date;

3.    Any debt of the Debtor, whether secured or unsecured, which was in default up to the Confirmation, will no longer be deemed in default.  Moreover, to the extent that the Debtor and Disbursing Agent comply with the terms and conditions of this Plan, these obligations will be deemed in good standing;

4.    As set forth in sections 524 and 1141 of the Bankruptcy Code, except as otherwise provided in this Plan or the Confirmation Order, the Confirmation Order constitutes a discharge or any and all Claims against, and all debts and liabilities of, the Debtor. The Disbursing Agent and its property will be deemed discharged and released from any and all Claims and Equity Interests, including, without limitation, all demands, liabilities, Claims and Equity Interests that arose before the Confirmation Date or that are based on or otherwise relate to acts, events, transactions, or other activities of any kind that occurred before the Confirmation Date.  This discharge will void any judgment that was obtained against the Debtor at any time only to the extent that the judgment relates to a discharged Claim.

5.    Subject to the limitations and conditions imposed under section 1125(e) of the Bankruptcy Code, Persons who, in good faith and in compliance with applicable provisions of the Bankruptcy Code, either solicit Plan acceptances or rejections or participate in the offer, issuance, sale, or purchase of securities under this Plan will not

49

**SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010**

be liable on account of their solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of Plan acceptances or rejections or the offer, issuance, sale, or purchase of such securities.

**B.**    **Vesting of Property of the Estate**

On the Effective Date, all Assets that are property of the Estate as of the Effective Date, including all Causes of Action, Rights of Action and Avoidance Actions, will vest in the Disbursing Agent free and clear of the Claims of any Creditors.

## X.

## MISCELLANEOUS PROVISIONS

**A.**    **Modification of Plan**

Signature may modify this Plan at any time before confirmation provided that the modifications meet the requirements of the Bankruptcy Code.  Signature may also seek to modify this Plan at any time after confirmation only if (1) this Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**B.**    **The Committees**

Until the Effective Date, the Equity Committee and the Creditors Committee shall continue in existence.  As of the Effective Date, the Equity Committee and the Creditors Committee shall terminate and disband and the members of the Equity Committee and the Creditors Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Committee members.  Except as otherwise provided in this Plan or Court order, the prohibition on members of the Equity Committee from trading their respective Equity Interests shall cease as of the Confirmation Date.

**C.**    **Post-Confirmation Status Report**

Within 120 days of the Confirmation Date, the Disbursing Agent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.

The status report shall be served on the United States Trustee and the members of the Committees.  Further status reports shall be filed every 180 days and served on the same entities.

50

### D.      Post-Confirmation United States Trustee Fees

Pursuant to 28 U.S.C. § 1930(a)(6), quarterly fees to the United States Trustee will continue to be due until the bankruptcy case is closed, at the rate in effect at the time such fees are due. Such fees shall be paid by the Disbursing Agent.

### E.      Exemption From Securities Laws

The issuance of the stock pursuant to the Plan shall be exempt from any securities laws regulation requirements to the fullest extent permitted by Section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and any other applicable exemptions.

### F.      Exculpation

As of the Effective Date, neither the Debtor, FGCC or FRC (including, without limitation, their successors or assigns, including, without limitation, the Disbursing Agent, the Disbursing Agent, the Board of Directors and Board of Directors' Agents) or the Creditors' Committee or the Equity Committee or the Indenture Trustees or Signature and, in each case, none of their respective present or former officers, directors, employees, members, agents, representatives, shareholders, attorneys, accountants, financial advisors, investment bankers, lenders, consultants, experts, and professionals and agents for the foregoing shall have or incur any liability for, and are expressly exculpated and released from, any and all claims, causes of action and other assertions of liability (including, without limitation, any Claims whether known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise) for any past or present or future actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the Case, including those claims arising out of the discharge of the powers and duties conferred upon the Indenture Trustee for the Senior Notes and the Indenture Trustee for the Junior Notes by the Senior Notes Indenture or Junior Notes Indenture, respectively, or the Plan or any order of the Court entered pursuant to or in furtherance of the Plan, or applicable law, including, without limitation, the formulation, negotiation, documentation, preparation, dissemination, implementation, administration, confirmation, or consummation of this Plan and the Disclosure Statement; except only for actions or omissions to act to the extent determined by a court of competent jurisdiction (in a Final Order) to be by reason of such party's gross negligence, willful misconduct, or fraud, and in all respects, such party shall be entitled

51

to rely upon the advice of counsel with respect to its duties and responsibilities under this Plan.  It, being expressly understood that any act or omission with the approval of the Bankruptcy Court, will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation.  No Holder of a Senior Note Claim or a Junior Note Claim or other party in interest shall have or pursue any claim or cause of action against the Indenture Trustee for the Senior Notes or the Junior Notes, as applicable, for making Distributions in accordance with this Plan or for implementing the provisions of this Plan.

### G.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of California shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of the Debtor shall govern corporate governance matters; in each case without giving effect to the principles of conflicts of law thereof.

### H.    Notices

Any notice, request, or demand required or permitted to be or provided under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Counsel for Signature Group Holdings LLC
> Manderson, Schafer & McKinlay
> John P. Schafer, Esq.
> Chris Manderson, Esq.
> 4695 MacArthur Court, Suite 1270
> Newport Beach, CA  92660
> Facsimile:  (949) 743-8310
>
> Counsel for the Creditors' Committee
> Klee, Tuchin, Bogdanoff & Stern LLP
> Jonathan S. Shenson, Esq.
> 1999 Avenue of the Stars, 39th Floor
> Los Angeles, California 90067
> Facsimile: (310) 407-9090

Debtor's Co-Reorganization Counsel
Stutman, Treister & Glatt
Theodore Stolman, Esq.
1901 Avenue of the Stars, Suite 1200
Los Angeles, California 90067
Facsimile: (310) 228-5788

Counsel for the Official Committee of Equity Holders
Weiland, Golden, Smiley, Wang, Ekvall & Strok, LLP
Evan D. Smiley, Esq.
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Facsimile (714) 966-1002

### I.   Payment of the Signature Plan Proponents' Expenses

On the Effective Date, the Disbursing Agent shall pay the expenses of Signature, New World, the TOPrS Group and James McIntyre, including reasonable fees of their attorneys and advisors. The Signature Plan Proponents shall submit application(s) pursuant to Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code no later than ten (10) Business Days following entry of the Confirmation Order seeking allowance of such fees and expenses incurred on the basis that confirmation of the Plan constitutes a "substantial contribution" that directly benefits the estate, its creditors, and other interested parties.

### J.   ERISA Claims

Nothing in the Plan or in any Order confirming the Plan shall enjoin or otherwise prevent the prosecution of the ERISA Action or the collection from available insurance proceeds by plaintiffs in the ERISA Action on the basis provided for by the Court's Order dated October 29, 2009 [Docket No. 1163] (the "ERISA Order") and the terms and conditions of the ERISA Order shall not be modified in any manner by the Plan and shall remain in full force and effect.

### K.   New York State Teachers' Retirement System Class Action

The Reorganized Debtor shall continue to comply with any obligations of the Debtor under applicable law regarding the preservation and retention of books, records and other documents.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall preclude the New York State Teachers' Retirement System, for itself and on behalf of the putative class in the consolidated securities class action styled as New York State Teachers' Retirement System v. Fremont General Corporation et al., Case No. 2:07-cv-05756-

53

FMC-FFM, United States District Court for the Central District of California (the "Securities Class Action"), from (a) satisfying any of its alleged claims against the Debtor from available insurance coverage and proceeds, or (b) from seeking discovery in connection with the Securities Class Action from the Debtor or the Reorganized Debtor, in each instance as may be permitted under applicable law in order to prosecute any of its alleged claims against non-Debtor third parties.

**L.     Final Decree**

Upon substantial consummation of this Plan and the occurrence of the Effective Date, the Estate shall be deemed fully administered as referred to in Bankruptcy Rule 3022, and the Disbursing Agent shall file a motion with the Court to obtain a final decree to close the Reorganization Case.

Dated:  March 18, 2010                          SIGNATURE GROUP HOLDINGS, LLC


By: _____

     Craig F. Noell
     Managing Director


By: _____

     JOHN P. SCHAFER, an attorney with
     MANDERSON, SCHAFER & McKINLAY
     LLP, attorneys for SIGNATURE GROUP
     HOLDINGS, LLP


JAMES MCINTYRE, an Individual


By: _____

     James McIntyre

ROARK, REARDEN & HAMOT CAPITAL
MANAGEMENT, LLC

By: _____

Its: Managing Member


COSTA BRAVA PARTNERSHIP III L.P.

By: _____

Its: Managing Member of General Partner


SETH W. HAMOT, an Individual

By: _____

    Seth W. Hamot


HOWARD AMSTER, an Individual

By: _____

    Howard Amster

Attorneys for SIGNATURE GROUP
HOLDINGS, LLP

**SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
OF FREMONT GENERAL CORPORATION, JOINED BY CERTAIN TOPRS HOLDERS AND JAMES
MCINTYRE AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010**