1 | JOHN P. SCHAFER, SBN 205638
jps@mandersonllp.com
2 | WILLIAM C. MANDERSON, SBN 211648
wcm@mandersonllp.com
3 | MANDERSON, SCHAFER & McKINLAY LLP
4695 MacArthur Court, Suite 1270
4 | Newport Beach, CA 92660
Telephone: (949) 788-1038
5 | Facsimile: (949) 743-8310

6 | Attorneys for Signature Group Holdings, LLC

7 | RUTAN & TUCKER, LLP
Mark B. Frazier (SBN 107221)
8 | mfrazier@rutan.com
Brendt C. Butler (SBN 211273)
9 | bbutler@rutan.com
611 Anton Boulevard, Fourteenth Floor
10 | Costa Mesa, California 92626-1931
Telephone:    714-641-5100
11 | Facsimile:    714-546-9035

12 | Attorneys for James A. McIntyre, Sr.

13 |
UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
14 | SANTA ANA DIVISION

15 | In re

Case No. 8:08-bk-13421-ES
Chapter 11 Case

16 | FREMONT GENERAL CORPORATION,
a Nevada corporation.

**JOINT NOTICE OF MOTION AND MOTION OF**
17 | **SIGNATURE GROUP HOLDINGS, LLC AND JAMES A**
**MCINTYRE, SR. FOR ORDER APPROVING: (1)**

Debtor.

18 | **SETTLEMENT AGREEMENT WITH KENNETH S.**
**GROSSMAN AND NEW WORLD ACQUISITION, LLC,**
19 | **PURSUANT TO FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE 3018 AND 9019; AND (2) NON-**
20 | Taxpayer ID No. 95-2815260
**MATERIAL MODIFICATIONS TO "SIGNATURE**
**GROUP HOLDINGS, LLC'S SECOND AMENDED**
21 | **CHAPTER 11 PLAN OF REORGANIZATION OF**
**FREMONT GENERAL CORPORATION, JOINED BY**
22 | **CERTAIN TOPRS HOLDERS AND JAMES MCINTYRE**
**AS CO-PLAN PROPONENTS, DATED APRIL 9, 2010",**
23 | **PURSUANT TO 11 U.S.C. § 1127 AND FEDERAL RULE**
**OF BANKRUPTCY PROCEDURE 3019**

24 |

**[Declarations of Craig Noell and Kenneth S. Grossman**
25 | **are filed Concurrently Herewith Under Separate**
**Caption Pages]**

26 |

| | |
|---|---|
| **Date:** | April 23, 2010 |
| **Time:** | 9:30 a.m. |
| **Courtroom:** | 5A |
| **Judge:** | Hon. Erithe A. Smith |

# TABLE OF CONTENTS

**Page**

MOTION ........................................................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 5

I.  Factual Background ............................................................................................................. 5

  A.  Settlement Discussions Among Signature, New World and the OEC ......................... 5

  B.  The Settlement Agreement. ......................................................................................... 7

  C.  The Signature Plan Modifications. .............................................................................. 8

  D.  Effect on Voting of the Signature Plan. ...................................................................... 9

  E.  The Settlement Agreement Combines the Resources of Signature and New
      World. ........................................................................................................................ 12

II.  LEGAL ARGUMENT ..................................................................................................... 15

  A.  The Settlement Agreement is Fair and Reasonable and Should be
      Approved by the Court. ............................................................................................. 15

      1.  The Probability of Success in Litigation. ......................................................... 17

      2.  Difficulty to be Encountered in Collection. ..................................................... 17

      3.  The Complexity of Litigation. .......................................................................... 17

      4.  The Paramount Interests of Creditors. .............................................................. 18

  B.  The Modifications to the Signature Plan are Non-Material and Do Not
      Require Re-Solicitation. ............................................................................................. 19

      1.  Legal Standard. ................................................................................................. 19

      2.  Modifications to the Signature Plan. ................................................................. 20

          a.  Modifications to Section I: Definitions and Rules of
              Construction. ......................................................................................... 20

          b.  Modifications to Section II: Classification and Treatment. ................. 21

          c.  Modifications to the Section IV: Means of Effectuating the
              Signature Plan. ...................................................................................... 23

          d.  Modifications to Section VI: Securities Related Matters. .................. 33

## TABLE OF CONTENTS

|  | | **Page** |
|---|---|---|
| e. | Modifications to Section VIII: Conditions Precedent to Confirmation and Consummation of the Plan. | 35 |
| f. | Modifications to Section IX: Effect of Confirmation of the Plan. | 35 |
| g. | Modifications to Section X: Miscellaneous Provisions. | 36 |
| III. | CONCLUSION | 39 |

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

In re Am. Solar King Corp.,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)....................................................................................20

Andrew v. Coopersmith (In re Downtown Inv. Club III),
    89 B.R. 59 (Bankr. 9th Cir. 1988) ......................................................................................20

Enron Corp. v. New Power Co. (In re New Power Co.),
    438 F.3d 1113 (11th Cir. 2006) ...............................................................................19, 20

In re Cellular Info. Sys., Inc.,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994)..................................................................................19

In re Concrete Designers, Inc.,
    173 B.R. 354 (Bankr. S.D. Ohio 1994)................................................................................20

In re Guy F. Atkinson Company of California
    242 B.R. 497 (Bankr. 9th Cir. 1999) ..................................................................................15

In re Lee Way Holding Co.,
    120 B.R. 881 (Bankr. S.D. Ohio 1990).......................................................................... 15-16

Martin v. Kane (In re A & C Properties),
    784 F.2d 1377 (9th Cir. 1986) ............................................................................................16

Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.),
    177 B.R. 791 (S.D.N.Y. 1995)............................................................................................20

In re Simplot,
    2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007) ............................................................20

United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.),
    669 F.2d 1325 (9th Cir. 1982) ............................................................................................16

Woodson v. Fireman's Fund Ins. Co. (In re Woodson),
    839 F.2d 610, 620 (9th Cir. 1988) ......................................................................................16

Ziegenhagen v. Dorsey (In re Kara),
    258 Fed. Appx. 154 (9th Cir. 2007).....................................................................................16

**FEDERAL STATUTES**

11 U.S.C. §§ 101 through 1330 ...............................................................................................2

# TABLE OF AUTHORITIES

**Page(s)**

11 U.S.C. § 507 (a)(8)..................................................................................21

11 U.S.C. § 511.........................................................................................22

11 U.S.C. § 1122.......................................................................................19

11 U.S.C. § 1123.......................................................................................19

11 U.S.C. § 1125...................................................................................19, 20

11 U.S.C. § 1126(d)..............................................................................10, 11

11 U.S.C. § 1127......................................................................................3, 4

11 U.S.C. § 1127(a)...................................................................................19

11 U.S.C. § 1127(c)..............................................................................19, 20

11 U.S.C. § 1129.........................................................................3, 7, 8, 17

**Federal Rules**

Federal Rules of Bankruptcy Procedure 101 through 9036 ............................2

Federal Rule of Bankruptcy Procedure 3018 .........................................4, 9

Federal Rule of Bankruptcy Procedure 3019 .........................................3, 4

Federal Rule of Bankruptcy Procedure 3019(a).................................... 19-20

Federal Rule of Bankruptcy Procedure 9019 ....................................3, 4, 15

Federal Rule of Bankruptcy Procedure 9019(a)........................................38

**OTHER AUTHORITIES**

http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/pdfmain.aspx?env=1 ............37

Local Bankruptcy Rules of the United States Bankruptcy Court for the
    Central District of California, Rules 1001-1 through 9075-1 ..................2

## TABLE OF AUTHORITIES

**Page(s)**

Local Bankruptcy Rule of the United States Bankruptcy Court for the
    Central District of California 9013-1(a)(11)..............................................................................3

## MOTION

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,
COUNSEL TO THE OFFICIAL COMMITTEE OF EQUITY HOLDERS, THE DEBTOR
AND ITS COUNSEL, COUNSEL TO THE OFFICIAL COMMITTEE OF CREDITORS
HOLDING UNSECURED CLAIMS, THE OFFICE OF THE UNITED STATES TRUSTEE,
AND ALL OTHER PARTIES ENTITLED TO NOTICE:**

**PLEASE TAKE NOTICE** that a hearing will be held on April 23, 2010, at 9:30 a.m., before the Honorable Erithe A. Smith, United States Bankruptcy Judge, in courtroom 5A located at 411 W. Fourth Street, Santa Ana, CA 92701 on the *Joint Motion of Signature Group Holdings, LLC and James A. McIntyre, Sr. for Order Approving: (1) Settlement Agreement With Kenneth S. Grossman and New World Acquisition, LLC, Pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019; and (2) Non-Material Modifications to "Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010" Pursuant to 11 U.S.C. § 1127 and Federal Rule of Bankruptcy Procedure 3019* ("Motion"), filed jointly by Signature Group Holdings, LLC ("Signature") and James A. McIntyre, Sr. ("McIntyre", and with Signature, together, "Movants").

**PLEASE TAKE FURTHER NOTICE** that the Motion is supported by: (1) these moving papers; (2) the concurrently filed Declarations of Craig Noell, Managing Director of Signature ("Noell Declaration"), and Kenneth S. Grossman of Credit Partners Management, Inc. ("Grossman Declaration"), and all exhibits appended thereto; (3) the concurrently filed *Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010* ("Signature Plan"), and blacklined version of the Signature Plan; (4) the concurrently filed *New World Acquisition, LLC's Amended Chapter 11 Plan of Reorganization for Fremont General Corporation (Dated April 9, 2010)* ("New World Plan"); (5) the concurrently filed *Motion for Order Pursuant to Rule 3018 Approving Change of Votes of Shareholders to Acceptances of the New World Acquisition, LLC's Second Amended Chapter 11 Plan of Reorganization for Fremont General Corporation and*

1

*Signature Group Holdings, LLC's Second Amended Chapter 11 Plan of Reorganization of Fremont General Corporation* ("Vote Modification Motion"); (6) the record in this case; and (7) any other oral or documentary evidence that may be submitted at or prior to the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that, by the Motion, the Movants seek entry of an order approving the *Reciprocal Plan Support and Settlement Agreement* ("Settlement Agreement") by and among Signature, Mr. Grossman, and New World Acquisition, LLC ("New World"),[1] pursuant to Federal Rules of Bankruptcy Procedure 3018 and 9019.[2]  A true and correct copy of the Settlement Agreement is attached to the Noell Declaration as <u>Exhibit 1</u>.  As detailed in the Noell and Grossman Declarations, the Settlement Agreement is the product of good faith, arms'-length negotiations by and among Signature, New World, and Mr. Grossman, each represented by counsel.  The key terms of the Settlement Agreement are as follows:

1.      The Signature Plan, concurrently filed herewith, is non-materially modified to incorporate the terms of the Settlement Agreement, as discussed more fully in the appended Memorandum of Points and Authorities;

2.      The New World Plan, concurrently filed herewith, is non-materially modified to incorporate the terms of the Settlement Agreement, as discussed more fully in the appended Memorandum of Points and Authorities;

3.      New World agrees to support confirmation of the Signature Plan and the Movants agree to support confirmation of the New World Plan, in each case as each plan is modified by the Settlement Agreement and filed concurrently herewith;

4.      Signature and New World agree to withdraw all of their objections to the other party's plan unless otherwise mutually agreed to in writing;

---

[1]  McIntyre is a party to the Settlement Agreement to the limited extent that he agrees to be bound by one provision of that agreement.

[2]  Unless otherwise indicated, all chapter, section, and rule references are to 11 U.S.C. §§ 101 through 1330 ("Bankruptcy Code"), to the Federal Rules of Bankruptcy Procedure, Rules 101 through 9036 ("Bankruptcy Rules"), and to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1 through 9075-1 ("Local Bankruptcy Rules").

1     5.     New World agrees to prefer the Signature Plan over the New World Plan ("New

2   World Preference") and to support confirmation of the Signature Plan first at the earliest possible

3   date.  The New World Preference will remain in effect until such time, if ever, that the Court rules

4   that the Signature Plan, as modified by the Settlement Agreement, is not confirmable;

5     6.     In the event the Signature Plan is found to be confirmable under the Bankruptcy Code,

6   the Movants and New World will jointly request that the Court enter an order confirming the

7   Signature Plan under Bankruptcy Code section 1129; and

8     7.     In the event that the Signature Plan is determined not to be confirmable or is not

9   confirmed, the New World Plan, as modified by the Settlement Agreement and as otherwise modified

10   in such a manner as may be possible to reflect the Signature Plan and the Settlement Agreement

11   without having any such modification(s) determined to be a material modification(s), will proceed to

12   a determination of its confirmation under Bankruptcy Code section 1129.  Noell Decl. at ¶ 11 & Exh.

13   1 at § 1.

14     The Movants believe the Settlement Agreement is fair and equitable, meets the standards for

15   approval of settlements under Bankruptcy Rule 9019, and should, accordingly, be approved as in the

16   best interests of the Debtor's estate and its creditors and equity holders.

17     By the Motion, the Movants also seek entry of an order approving certain non-material

18   modifications to the Signature Plan, incorporating the terms of the Settlement Agreement, pursuant to

19   Bankruptcy Code section 1127 and Bankruptcy Rule 3019.  The non-material modifications to the

20   Signature Plan are set forth in detail in the appended Memorandum of Points and Authorities.

21     **PLEASE TAKE FURTHER NOTICE** that, if you wish to oppose the Motion, per the

22   Court's oral order you must file a written response with the Court and serve a copy of it on the

23   undersigned counsel for the Movants by no later than **April 16, 2010**.  Pursuant to Local Rule 9013-

24   1(a)(11), the failure to file and serve a timely written opposition to the Motion may be deemed to

25   constitute consent to the relief requested in the Motion.

26

27

28

1    **WHEREFORE**, the Movants respectfully request that the Court enter an order approving the

2    Settlement Agreement, pursuant to Bankruptcy Rules 3018 and 9019, and the non-material

3    modifications to the Signature Plan, pursuant to Bankruptcy Code section 1127 and Bankruptcy Rule

4    3019.

5                                        RESPECTFULLY SUBMITTED,

6

7    Dated: April 9, 2010                  By: */s/ John P. Schafer*
                                            John P. Schafer, an Attorney with MANDERSON,
8                                           SCHAFER & MCKINLAY, LLP, counsel for
9                                           SIGNATURE GROUP HOLDINGS LLC

10

11   Dated: April 9, 2010                  RUTAN & TUCKER, LLP

12

13                                         By: */s/ Brendt C. Butler*
                                            Mark B. Frazier
14                                          Brendt C. Butler
                                            RUTAN & TUCKER, LLP
15                                          Attorneys for James A. McIntyre, Sr.

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL BACKGROUND

**A.    Settlement Discussions Among Signature, New World and the OEC.**

At the end of the hearing on Friday, March 19, 2010, the Court took the issue of reinstatement of the Trust-Originated Preferred Securities ("TOPrS") under submission. One of the reasons the Court gave for doing so was to permit the parties in interest additional time to determine whether they could negotiate a consensual compromise to this case and avoid the very real prospect of four competing chapter 11 plans of reorganization proceeding to confirmation by Signature, New World, the Official Equity Committee ("OEC"), and the Official Committee of Creditors Holding Unsecured Claims ("Creditors' Committee"). Noell Decl. at ¶ 6; Grossman Decl. at ¶ 5. Except for the Creditors' Committee, which expressed some reservation for another delay and skepticism regarding settlement, the parties in interest, including Signature, McIntyre, New World, the Debtor, and the OEC, universally expressed support before the Court for additional time to try and bridge the gap toward settlement. Noell Decl. at ¶ 7; Grossman Decl. at ¶ 5.

From after that hearing on Friday evening through Monday, the respective parties and their counsel discussed the logistics for settlement discussions. Signature proposed a number of measures to try and breach the impasse, including, among other things, the use of a mediator or other professional facilitator, potentially Kenneth N. Klee, the Honorable John E. Ryan, the Honorable Mitchel R. Goldberg, or some other well-respected and knowledgeable party. Noell Decl. at ¶ 8. The parties also discussed who should participate in the discussions other than the OEC, Signature and New World to help facilitate the process. The other parties discussed were Don Royer, general counsel for the Debtor, Theodore Stolman for the Debtor, Steven Wilson of Tennenbaum Capital Partners, LLC, and Jonathan Shenson for the Creditors' Committee. All of the foregoing indicated they would participate in efforts to achieve a settlement. The parties ultimately settled on Wednesday, March 24, in Dallas, Texas, as the date and location for the settlement discussions. Noell Decl. at ¶ 8; Grossman Decl. at ¶ 6.

1    In advance of the Dallas meeting, Signature coordinated a conference call with the OEC for

2    the afternoon of Monday, March 22. Prior to the conference call with the OEC members, Signature

3    first discussed the substance of its proposal with both the Debtor and Mr. Wilson of Tennenbaum to

4    gauge their reaction and solicit their opinion with regard to whether such a settlement could be

5    accomplished without occasioning a "material modification" requiring re-solicitation. The feedback

6    from both parties was encouraging. The conference call took place that afternoon with all but one of

7    the OEC's members, the OEC's financial advisor, and at least one of the OEC's lawyers. The agenda

8    for the call was for Signature to share its business plan with the OEC and to discuss potential basis

9    for settlement. The conference call lasted approximately 100 minutes during which time Signature

10   proceeded to lay out what it thought was a productive proposal for remedying the issues that had been

11   identified by the OEC. At the end of the conference call, the remaining OEC members on the call

12   requested that Signature put its settlement proposal in writing. The OEC's counsel reiterated this

13   request for a written proposal on the afternoon of Tuesday, March 23. Signature complied with that

14   request. Noell Decl. at ¶ 9.

15   On the afternoon of March 23, the OEC filed its motion to approve a settlement agreement

16   with certain TOPrS holders that provided for, among other things, the TOPrS holders changing their

17   votes rejecting the OEC's plan to acceptance of the OEC's plan, which, if approved, would give the

18   OEC a consenting impaired class and a potentially confirmable plan without reliance on reinstatement

19   of the TOPrS.[3]

20   On the morning of Wednesday, March 24, the parties met for settlement discussions.

21   Unfortunately, it quickly became apparent to Signature and New World that the OEC arrived at the

22   meeting with zero intention of reaching a workable settlement with either Signature or New World

23   unless New World and/or Signature became sub-employees under a future unknown permanent

24

25   [3]  See *Motion for Order Approving (1) Settlement With Certain TOPrS and (2) Further Non-Material
     Modification to Official Committee of Equity Holders' Fourth Amended Chapter 11 Plan of
26   Reorganization (Dated January 20, 2010) Pursuant to 11 U.S.C. § 1127(a)* ("OEC Settlement Motion")
     [Docket No. 1799]. The Court approved the OEC Settlement Motion at the hearing on March 31. New
27   World, however, has filed a motion for reconsideration based on new facts that certain of the TOPrS
     holders sold their notes in which they sought to change votes prior to entering into the settlement with the
28   OEC. The Movants have joined New World's motion for reconsideration.

manager, most likely believing that the pending approval of its settlement with the TOPrS made

settlement with either Signature or New World unnecessary.  Nevertheless, abiding by the spirit of the

Court's ruling, Signature, New World, the Debtor, and Bob Jones of Patton Boggs LLP, co-counsel to

the Debtor, engaged in productive settlement discussions.  Those discussions in Dallas resulted in

Signature and New World tentatively agreeing to the general terms upon which they could settle

subject to definitive documentation.  Noell Decl. at ¶ 10; Grossman Decl. at ¶ 7.

From the meeting in Dallas until the filing of this Motion, the Movants and their counsel and

Signature and its counsel have worked tirelessly in good faith, arms'-length negotiations to document

the settlement.  Those endeavors have resulted in the Settlement Agreement, the Signature Plan, and

the New World Plan, among other pleadings.  Noell Decl. at ¶ 11; Grossman Decl. at ¶ 8.

**B.    The Settlement Agreement.**

The key terms of the Settlement Agreement are as follows:

1.    The Signature Plan, concurrently filed herewith, is non-materially modified to

incorporate the terms of the Settlement Agreement, as discussed more fully below;

2.    The New World Plan, concurrently filed herewith, is non-materially modified to

incorporate the terms of the Settlement Agreement, as discussed more fully below;

3.    New World agrees to support confirmation of the Signature Plan and the Movants

agree to support confirmation of the New World Plan, in each case as each plan is modified by the

Settlement Agreement and filed concurrently herewith;

4.    Signature and New World agree to withdraw all of their objections to the other party's

plan unless otherwise mutually agreed to in writing;

5.    New World agrees to prefer the Signature Plan over the New World Plan ("New

World Preference") and to support confirmation of the Signature Plan first at the earliest possible

date.  The New World Preference will remain in effect until such time, if ever, that the Court rules

that the Signature Plan, as modified by the Settlement Agreement, is not confirmable;

6.    In the event the Signature Plan is found to be confirmable under the Bankruptcy Code,

the Movants and New World will jointly request that the Court enter an order confirming the

Signature Plan under Bankruptcy Code section 1129; and

7.      In the event that the Signature Plan is determined not to be confirmable or is not confirmed, the New World Plan, as modified by the Settlement Agreement and as otherwise modified in such a manner as may be possible to reflect the Signature Plan and the Settlement Agreement without having any such modification(s) determined to be a material modification(s), will proceed to a determination of its confirmation under Bankruptcy Code section 1129. Noell Decl. at ¶ 11 & Exh. 1 at § 1.

## C.      The Signature Plan Modifications.

The Settlement Agreement provides for the following, some of which require minimal, non-material modifications to the Signature Plan:[4]

- **Business Plan.** Signature and New World each acknowledge that their underlying business plans are mutually compatible focusing on structuring, originating, and managing a diversified portfolio of loan and special situation investments;

- **Capital Infusion.** The investment on the effective date of the Signature Plan will be a minimum of $10 million for 12.5 million shares at $.80 per share and otherwise on terms identical to what is set forth in the Disclosure Statement for the Signature Plan;

- **Warrants.** No change to the number of warrants issued under the Signature Plan;

- **Board of Directors.** The Board of Directors shall consist of the following nine (9) directors: Craig Noell; Kenneth S. Grossman of Credit Partners Management, Inc. ("CPM"); and seven directors that satisfy the independence requirements of the New York Stock Exchange as outlined in the Signature Plan;

- **Management.** The reorganized Debtor will be managed by CPM, which is owned 62% by Signature and 38% by Mr. Grossman;

- **Investment Committee.** A Senior Investment Committee of Craig Noell, Kenneth S. Grossman, and John Nickoll will require approval of all investments in excess of $5

---

[4] This is intended only as a summary of the Settlement Agreement and the Signature Plan. The Settlement Agreement and the Signature Plan control to the extent there is any confusion or conflict with the Motion.

1    million by a majority vote.  Investments of less than $5 million are subject to approval

2    by the mutual concurrence of Messrs. Noell and Grossman; and

3    •    **"Leucadia Provision".**  The "Transfer Restrictions referred to as the 'Leucadia

4    Provision'" in the Signature Plan are modified so that no party, including Signature,

5    New World, and McIntyre are exempt from the Transfer Restrictions of the "Leucadia

6    Provision".

7    Noell Decl. at ¶ 11 & Exh. 1 at § 2.

8        Subject to Section 1 of the Settlement Agreement, including the New World Preference, in the

9    event the New World Plan is presented for confirmation, Signature agrees to support the New World

10   Plan on the condition that the New World Plan incorporates the terms of Section 2 of the Settlement

11   Agreement under the headings "Board of Directors" and "Management."  Under those circumstances,

12   Signature also agrees and will have the right to invest 50% of the capital investment under the New

13   World Plan if it is confirmed, as well as a right to an allocation of warrants under a similar structure

14   as described under Exhibit 1 of the Settlement Agreement.  Id. at § 3.

15       Finally, the Settlement Agreement provides for a vote modification.  The equity holders in the

16   Debtor who are signatories to the Settlement Agreement agree to seek to change pursuant to

17   Bankruptcy Rule 3018, as applicable, their votes appurtenant to their shares of the Debtor, whether

18   held directly or indirectly (i.e., 401k accounts, family trusts, business entities under common

19   ownership, etc.), to (a) vote for the Signature Plan and withdraw their rejection of the New World

20   Plan, and (b) vote for the New World Plan and withdraw their rejection of the Signature Plan ("Vote

21   Modification").  The Vote Modification is being effectuated by the concurrently filed Vote

22   Modification Motion.

23   **D.    Effect on Voting of the Signature Plan.**

24       It is important to note that even before Signature's settlement with New World brought the

25   overwhelming majority of equity votes to favor the Signature Plan, Signature was by far the most

26

27

28

successful plan proponent in the Court-approved voting process.[5]  By the voting deadline of March 5,

2010, the Signature Plan was the only plan to garner the support of over two-thirds (2/3) in amount

and fifty-percent (50%) in number of both the Senior Notes and the TOPrS.  With respect to the

Senior Notes class, 53.85% in number, and a resounding 98.84% in amount, voted to accept the

Signature Plan.  With respect to the TOPrS class, 88.58% of the amount of TOPrS voting and 55.3%

of the holders voting voted to accept the Signature Plan.  In comparison, the OEC failed to attain the

support of a single consenting impaired class.  The OEC Plan was rejected by 56% in number of the

Senior Notes, and a resounding 83% in amount of the TOPrS.

In sharp contrast to the statements the OEC has made about its support among the equity

class, the OEC's plan actually fared poorly among the very class it represents.  Not only did the OEC's

plan fail to win the support of the equity as a consenting impaired class, barely 35% of the shares

voting identified the OEC as their first preference while over 55% of the equity class actually

affirmatively voted to reject the OEC's plan.  Thus, over 29 million shares voted to reject the OEC's

plan, while 23 million voted to accept it and only 35% identified it as its first preference.  In

comparison, the Signature Plan and New World Plan each received over 21 million votes for

acceptance in the initial voting.  This does not constitute "2-1 support" for the OEC Plan, as the OEC

has incorrectly represented to the Court on multiple occasions.[6]

Ignoring blackletter law, that is, Bankruptcy Code section 1126(d) counts only the number of

shares actually voted, consistent with standard corporate voting procedures outside of bankruptcy, the

OEC has indicated that the purported "2-1 support" is actually a vague reference to plan preference

---

[5]  See *Affidavit of Robert G. Klamser Regarding Votes Accepting or Rejecting the (1) Chapter 11 Plan of Fremont General Corporation Presented by the Official Committee of Unsecured Creditors, (2) Official Committee of Equity Holders Fourth Amended Chapter 11 Plan of Reorganization for Fremont General Corporation, (3) Ranch Capital, LLCs Second Amended Plan of Reorganization for Fremont General Corporation, (4) Signature Group Holding LLCs Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by Certain TOPrS Holders and James McIntyre as Co-Proponents, and (5) New World Acquisition LLCs Amended Chapter 11 Plan of Reorganization for Fremont General Corporation* [Docket No. 1746]

[6]  See OEC Settlement Motion at 2:26-28 ("Moreover, the existing equity holders have expressed a preference through the solicitation process to favor the OEC Plan by a count of more than 2-1 over any other competing plan.")

1    elections by voting shareholders. Even then, the statistics don't support the OEC's assertion. Instead,

2    872 voting shareholders indicated a first preference for one of the five plans. Of these, 396

3    shareholders, representing just 45% of the 872 voters and only 18.4 million shares, indicated the

4    OEC's plan as their first preference. The Signature Plan, in comparison, was the first choice of 195

5    voting shareholders holding almost 16.9 million shares. In terms of shares voted, which is the proper

6    analysis under section 1126(d), the OEC's plan has a preference of only 1.08 to 1 to the Signature

7    Plan based on the initial voting. It should also be noted that the Debtor has over 6,300 beneficial

8    holders who were entitled to vote; 396 shareholders thus represents only 6% of the total shareholders

9    eligible to vote. By contrast, the 29 million shares that voted to reject the OEC's plan represented

10   55% of all shares voted, and approximately 37% of all issued and outstanding shares of the Debtor.

11   Moreover, it cannot be overemphasized that in the initial voting, no plan attained a consenting

12   impaired class with respect to the equity, however the Signature Plan did attain two (2) other

13   consenting impaired classes, while the OEC's plan was resoundingly rejected by these classes.

14   Finally, it should be noted that following the settlement between Signature and New World

15   that will result in New World changing its votes to accept the Signature Plan, Signature will have

16   attained the acceptance of over 24,702,442 million shares, or 45.5% of the equity vote, compared to

17   23,554,985 million shares, or 44.5% of the equity vote, accepting the OEC's plan.[7] This will make

18   the Signature Plan indisputably the leading plan among the equity, and will possibly give Signature its

19   third consenting impaired class. In addition to all of its other favorable attributes in comparison to

20   the OEC's plan, this definitively proves that the Signature Plan is the overwhelming choice across all

21   classes of stakeholders, especially when combined with the strong support among the Senior Notes

22   and the TOPrS, who even when seeking to change their rejection to acceptance of the OEC's plan in

23   response to its death trap/reinstatement treatment, reiterated that the Signature Plan remains their first

24   choice and their preference.[8]

25   _____

26   [7]   Mr. Grossman holds 2,796,573 shares, or 3.57%, of the common stock of the Debtor. New World holds
          725,965, or 0.93%, of the common stock of the Debtor.

27

28   [8]   See *Declaration of Seth Hamot in Support of the OEC Settlement Motion* [Docket No. 1800] at ¶ 11 ("The
          Costa Brava Parties' first preference for a plan of reorganization of the Debtor is the Signature Plan, which
          [Footnote continued on next page]

**E.     The Settlement Agreement Combines the Resources of Signature and New World.**

One of the advantages of the Settlement Agreement is that is combines the considerable financial and experience resources of the parties.  For example, the capital infusion under the Signature Plan will be contributed by both Signature and Mr. Grossman, as follows:  As set forth in the existing Signature Plan, the capital infusion will take the form of a minimum injection of $10 million for the purchase of 12.5 million shares at $0.80 cents per share.  Any and all in kind assets to be contributed by Signature will be subject to the review and approval of New World.  Signature will contribute a $6.2 million investment for 7.75 million shares.  Mr. Grossman will contribute $3.8 million in cash for 4.75 million shares.  Noell Decl. at ¶ 12; Grossman Decl. at ¶ 10.

Moreover, Mr. Noell of Signature and Mr. Grossman of New World will take the lead in managing the reorganized Debtor.  Mr. Noell has 25 years experience in corporate finance, investing banking, and special situation investing.  Previously, as a member of the distressed investing area at Goldman Sachs, he founded and ran the Specialty Lending Group, investing Goldman's proprietary capital in special situations opportunities.  He also has been involved in numerous recapitalizations/restructurings, DIP loans, and POR financings.  He has been involved in establishing multiple joint venture relationships.  Noell Decl. at ¶ 4.

In addition to Mr. Noell's experience, Signature also benefits from the expertise of Robert Weingarten, an independent financial consultant with an extensive background and experience in public company accounting and compliance, as well as accounting issues related to bankruptcy reorganizations.  Mr. Weingarten is a California CPA (inactive) with an MBA in Finance from the University of Southern California and a BA in Business (Accounting) from the University of Washington.  Mr. Weingarten has 30+ years of professional experience in matters relating to accounting, finance and operations of public companies.  Mr. Weingarten has a particular expertise in

---

[Footnote continued from previous page]
they believe to be the best choice for creditors, equity holders, the Debtors, and its estate"); *Declaration of Steven Tannenbaum in Support of the OEC Settlement Motion* [Docket No. 1800] at ¶ 11 ("The Greenwood Parties' first preference for a plan of reorganization of the Debtor is the Signature Plan, which they believe to be the best choice for creditors, equity holders, the Debtors, and its estate") ; *Declaration of Howard Amster in Support of the OEC Settlement Motion* [Docket No. 1800] at ¶ 11 ("The Amster Parties' first preference for a plan of reorganization of the Debtor is the Signature Plan, which they believe to be the best choice for creditors, equity holders, the Debtors, and its estate").

1  SEC compliance, U.S. GAAP, complex SEC accounting and reporting issues, Sarbanes-Oxley

2  compliance, exchange listing requirements, internal controls and disclosure controls, and public

3  company governance.  In this regard, he has assisted companies in addressing a broad cross section of

4  their financial and operational needs, from laying the groundwork for an IPO to reverse mergers,

5  PIPEs, mergers/acquisitions and divestitures, restructurings and recapitalizations, and cleaning up

6  situations with delinquent, deficient or inaccurate financial reporting.  Mr. Weingarten has served as

7  an executive officer (typically, Chief Financial Officer) and/or Director of over 20 publicly reporting

8  companies over the course of his career (and has served as an advisor to several times that number),

9  including several companies that restructured either in or out of bankruptcy (among them,

10  Youbet.com, Inc. "UBET", Casmyn Corp. "ARVT", and ARTISTdirect, Inc. "ARTD").  In several

11  cases, NOL tax carryforwards were a significant intangible asset that were documented and

12  proactively managed.  Mr. Weingarten has worked with major law firms, accounting firms, and

13  investing banking firms in Los Angeles, New York and elsewhere.  Noell Decl. at ¶ 14.

14       Lance McKinlay of Manderson, Schafer & McKinlay LLP, Signature's counsel, also has

15  experience advising publicly-traded and private companies on transactional corporate matters,

16  including mergers and acquisitions, public and private securities offerings, equity and debt finance

17  transactions and proxy contests.  One of the important issues for the reorganized Debtor is

18  compliance with the SEC.  Mr. McKinlay has experience counseling public companies on compliance

19  with disclosure and reporting obligations under the Securities Exchange Act of 1934, as well as stock

20  exchange listing requirements and the Sarbanes-Oxley Act of 2002.  Mr. McKinlay has counseled

21  three companies with respect to re-attaining SEC compliance after losing compliance for lack of

22  reporting, including Brocade Communications Systems, Hines Horticulture, Inc., and Alliance

23  Semiconductor Corporation.  Following Mr. McKinaly's counsel all three of these companies traded

24  on Nasdaq.  A true and correct summary of Mr. McKinlay's professional experience is attached to the

25  Noell Declaration as Exhibit 2.  Noell Decl. at ¶ 15.

26       Mr. Grossman likewise has significant experience in identifying and investing in distressed

27  and other special situation investment opportunities.  He began his career as an attorney with Shea &

28  Gould specializing in bankruptcy, creditor's rights and commercial litigation from 1981 – 1989.

1    Thereafter, he was affiliated with Balfour Investors Inc. and the Recovery Group, LP from 1989 –

2    1998, where he began investing in distressed situations.  In 1999, he was a consultant to Avalon Total

3    Return Fund, LP (distressed debt and value equity fund) and to Riverside Capital, Inc. (High Yield

4    Fund).  From 1999 through 2006, he was a Managing Director of Alpine Associates, LP.  Thereafter,

5    he became a Managing Member of Del Mar Asset Management and then, a Managing Director with

6    Ramius, LLC.  Grossman Decl. at ¶ 3.  As illustrated in his Declaration in support of the *Initial*

7    *Memorandum of Points and Authorities in Support of Confirmation of the Amended Plan of*

8    *Reorganization for Fremont General Corporation Proposed by New World Acquisition, LLC (Dated*

9    *January 19, 2010)* [Docket No. 1533], Mr. Grossman and his team have a sophisticated

10    understanding of the company and a vision for its future.

11        In addition to Mr. Grossman's personal experience, Mr. Grossman also has the resource of the

12    expertise of the legal team of Sonnenschien Nath & Rosenthal LLP.  In particular for purposes of the

13    reorganized Debtor and re-attaining compliance with the SEC, is the experience of Walter G. Van

14    Dorn, Jr. and Ira I. Roxland.  Mr. Van Dorn advises issuers, underwriters and financial institutions on

15    domestic and international capital market transactions such as SEC-registered public offerings of both

16    equity and debt securities (including sovereign debt), securities offerings under Rule 144A and

17    Regulation S and mergers and acquisitions.  In addition, Mr. Van Dorn advises clients on all aspects

18    of the U.S. securities laws, including the Securities Act and the Exchange Act, as well as investment

19    company and investment advisory matters and broker-dealer regulation.  His clients include financial

20    services, industrial and technology companies around the world.  Prior to entering private practice,

21    Mr. Van Dorn was Special Counsel in the Division of Corporation Finance at the SEC in

22    Washington, D.C.  His areas of responsibility included offerings of equity securities and ADRs,

23    offerings of debt securities by both corporate and government issuers, and mergers and acquisitions

24    involving non-U.S. companies.  He also participated in rule-making initiatives such as those

25    amending Regulation S as well as those exempting certain cross-border tender and exchange offers

26    and rights offerings from Securities Act registration requirements and from Exchange Act tender offer

27    rules.  A true and correct summary of Mr. Van Dorn's professional experience is attached to the

28    Grossman Declaration as Exhibit 1.  Grossman Decl. at ¶ 11.

1   Mr. Roxland similarly concentrates in the transactional practice areas of domestic and cross-

2   border mergers and acquisitions and corporate finance.  He has represented issuers and underwriters

3   in connection with public and private offerings of debt and equity securities.  Mr. Roxland has acted

4   as special counsel for boards of directors and board committees on corporate governance issues, in

5   conducting internal investigations, SEC compliance issues, and in responding to business

6   combination proposals.  A true and correct summary of Mr. Roxland's professional experience is

7   attached to the Grossman Declaration as <u>Exhibit 2</u>.  Grossman Decl. at ¶ 12.

8                                              **II.**

9                                    **LEGAL ARGUMENT**

10  **A.      The Settlement Agreement is Fair and Reasonable and Should be Approved by the**

11  **Court.**

12  Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a

13  hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Rule

14  9019(a) is applicable to settlements where, as here, neither party is the trustee or debtor in possession.

15  The Bankruptcy Appellate Panel for the Ninth Circuit ruled in <u>In re Guy F. Atkinson Company of</u>

16  <u>California</u>:

17               We conclude that interpreting *Rule 9019* as restricting negotiation of

18               compromises and settlements to the trustee and debtor in possession

19               is contrary to the reading the Ninth Circuit and other panels of this

20               BAP have given to similar language in other parts of the Bankruptcy

21               Code.  Under those precedents, the court may, under appropriate

22               circumstances discussed below, authorize an entity other than the

23               trustee or debtor in possession to pursue settlement of claims of the

24               estate.

25  242 B.R. 497, 502 (Bankr. 9th Cir. 1999) (emphasis in original).

26  As the Court's ruling at the end of the hearing on March 19 holding its order on reinstatement

27  to permit the parties to engage in settlement discussions reflects, it is well-established that bankruptcy

28  courts favor compromises.  <u>See</u> <u>In re Lee Way Holding Co.</u>, 120 B.R. 881, 891 (Bankr. S.D. Ohio

1   1990) (citation omitted). "The purpose of a compromise agreement is to allow the trustee and the

2   creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious

3   claims." Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986) (citation

4   omitted), cert. denied, Martin v. Robinson, 489 U.S. 854 (1986). Nor does the Court need to conduct

5   an exhaustive investigation into the validity of the merits of the disputes sought to be compromised.

6   See United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.), 669 F.2d 1325, 1328 (9th Cir.

7   1982). Rather, the Court need only determine that the outcome of the potential dispute/litigation is

8   open to reasonable doubt. See Walsh Const., Inc., 669 F.2d 1328-29 (citations omitted). Even if

9   faced with objections, the Court may still approve the Settlement Agreement if it is in the best

10  interests of the bankruptcy estate and creditors. See A & C Properties, 784 F.2d at 1382 (citation

11  omitted).

12       The Ninth Circuit Court of Appeals has recognized that the Court has wide discretion in

13  approving compromise agreements. Id. at 1380-81. However, in determining whether to approve the

14  Settlement Agreement, the Court must find that the compromise between Signature and New World

15  is fair and equitable. Id. at 1381. See also Ziegenhagen v. Dorsey (In re Kara), 258 Fed. Appx. 154,

16  155 (9th Cir. 2007). The Ninth Circuit, along with other federal circuits, has identified four factors

17  that the Court should consider in determining whether the Settlement Agreement is fair and equitable.

18              '(i) the probability of success in the litigation; (ii) the difficulties, if any,

19              to be encountered in the matter of collection; (iii) the complexity of the

20              litigation involved, and the expense, inconvenience and delay

21              necessarily attending it; [and] (iv) the paramount interest of the

22              creditors and a proper deference to their reasonable views in the

23              premises.'

24  A & C Properties, 784 F.2d at 1381 (quoting Lambert v. Flight Transp. Corp. (In re Flight Transp.

25  Corp. Sec. Litigs.), 730 F.2d 1128, 1135 (8th Cir. 1984), cert. denied, 469 U.S. 1207 (1985));

26  Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988).

27

28

1    In light of the following analysis of the four factors identified by the Ninth Circuit in

2    determining whether the Settlement Agreement is fair and equitable, it is clear that the Settlement

3    Agreement should be approved.

4        **1.    The Probability of Success in Litigation.**

5    Here, the litigation is the contested confirmation of the four competing plans.  Suffice it to

6    say, probability of success of each of Signature, New World, the OEC, and the Creditors' Committee

7    in succeeding at confirmation and confirming its plan over the others, pursuant to Bankruptcy Code

8    section 1129(c), is fraught with uncertainty and obstacles for each of the plan proponents, some more

9    than others.  The creditors and equity holders of the company, the undisputed real parties in interest in

10    this chapter 11 case, are also subject to this uncertainty.  There is no dispute that both Signature and

11    New World have expended tremendous resources in developing highly competitive competing plans

12    designed to exit the company from chapter 11 in the strongest possible position to succeed.  A

13    settlement between these two plan proponents and a combining of their considerable resources by the

14    Settlement Agreement and the modification to the plans, while reducing additional attorney's fees and

15    costs associated with moving forward with competing plans and a concomitant drain on the estate, is

16    in the best interests of the Debtor's estate and its creditors and equity holders.  The Settlement

17    Agreement should streamline the confirmation process and enable the company to exit chapter 11

18    prior to June 30, 2010.  As the Court is aware, it is important that a chapter 11 plan be confirmed and

19    go effective prior to the June 30, 2010 increase in the amount of Bank of New York Mellon's allowed

20    general unsecured claim from $7 million to $10 million.  The Settlement Agreement helps

21    accomplish that objective.

22        **2.    Difficulty to be Encountered in Collection.**

23    This factor is not applicable for purposes of the current settlement.

24        **3.    The Complexity of Litigation.**

25    The factual and legal issues with respect to the competing chapter 11 plans of Signature and

26    New World (not to mention the OEC) are highly complex, as evidenced by the briefing to date.  The

27    analysis required under Bankruptcy Code section 1129 for purposes of confirmation will require

28    extensive evidentiary showings and legal arguments at the confirmation hearings at the end of April.

17

1   Moreover, if the Court determined that both plans are confirmable, the Court would then have to

2   proceed to section 1129(c) and make the difficult determination as to which plan is preferred by

3   creditors and equity security holders. See 11 U.S.C. § 1129(c) ("If the requirements of subsections (a)

4   and (b) of this section are met with respect to more than one plan, the court shall consider the

5   preferences of creditors and equity security holders in determining which plan to confirm.")

6       The Settlement Agreement resolves that complexity, at least as between the Signature Plan

7   and the New World Plan. Moreover, as the voting analysis above shows, the Settlement Agreement

8   will result in New World changing its votes to accept the Signature Plan. The Signature Plan will

9   then have attained the acceptance of over 24,702,442 million shares, or 45.5% of the equity vote.

10  This will make the Signature Plan indisputably the leading plan among the equity holders, and will

11  likely give Signature its third consenting impaired class. In addition to all of its other favorable

12  attributes in comparison to the OEC's plan, and considering "the preferences of creditors and equity

13  security holders in determining which plan to confirm", this definitively establishes that the Signature

14  Plan is the overwhelming choice across all classes of stakeholders, especially when combined with

15  the strong support among the Senior Notes and the TOPrS, making the Court's analysis under section

16  1129(c) much easier.

17          **4.      The Paramount Interests of Creditors.**

18      The Movants and New World believe that resolving the issues regarding their competing

19  plans and combining their resources as provided under the terms of the Settlement Agreement, rather

20  than through a contested confirmation, is in the best interests of the estate's creditors and equity

21  holders. McIntyre, the largest individual equity holder, supports the settlement. The settlement

22  results in the strongest plan in terms of experience, expertise, and financial resources, and also a plan

23  overwhelmingly preferred by the company's stakeholders. As mentioned previously, the Debtor's

24  estate would continue to incur significant costs in proceeding to confirmation with multiple

25  competing plans. However, with the Settlement Agreement, the confirmation under section 1129 in

26  reality dwindles to just two plans, the Signature Plan and the OEC Plan. Thus, it is in the paramount

27  interest of stakeholders for Signature and New World to settle under the terms of the Settlement

28  Agreement.

**B.** **The Modifications to the Signature Plan are Non-Material and Do Not Require Re-Solicitation.**

Signature has made a number of non-material modifications to its plan in accordance with the Settlement Agreement. These modifications are contained in the modified Signature Plan, which is filed concurrently herewith along with a blackline highlighting those modifications. For the reasons discussed below, Signature submits that the non-material modifications in the Signature Plan benefit all creditors and shareholders and are in the best interest of both.

**1.** **Legal Standard.**

Section 1127 of the Bankruptcy Code provides for the modification of a chapter 11 plan by its proponent "at any time before confirmation," as long as the plan as modified satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code. See 11 U.S.C. § 1127(a). See Enron Corp. v. New Power Co. (In re New Power Co.), 438 F.3d 1113, 1117 (11th Cir. 2006); In re Cellular Info. Sys., Inc., 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994). In addition, the modification must comply with the disclosure requirements as set forth in section 1125 of the Bankruptcy Code. 11 U.S.C. § 1127(c). However, such disclosure requirements do not necessarily mandate re-solicitation of the plan. See Cellular Info. Sys., 171 B.R. at 929 n.6 ("I find that such changes are nonmaterial modification which do not require resolicitation of the respective impaired classes of creditors and equity security holders"). Rather, Bankruptcy Rule 3019(a) provides that:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the ***proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder*** who has not accepted in writing the modification, ***it shall be deemed accepted*** by all creditors and equity security holders who have previously accepted the plan.

19

1   Fed. R. Bankr. P. 3019(a) (emphasis added). Thus, further disclosure is only necessary when the

2   modification materially and adversely impacts a claimant's treatment. See Resolution Trust Corp. v.

3   Best Prods. Co., Inc. (In re Best Prods. Co., Inc.), 177 B.R. 791, 802 (S.D.N.Y. 1995), aff'd, 68 F.3d

4   26 (2d Cir. 1995) (noting that the key inquiry was whether the modification materially altered the

5   plan so that a claimant's treatment was adversely affected). See also New Power, 438 F.3d at 1118

6   ("[A]s an initial matter, we consider whether there was any material and adverse modifications from

7   the First Amended Plan."); Andrew v. Coopersmith (In re Downtown Inv. Club III), 89 B.R. 59, 65

8   (Bankr. 9th Cir. 1988).

9        A plan modification will be considered material "if it so affects a creditor or interest holder

10  who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its

11  acceptance." In re Am. Solar King Corp., 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (citing 8 Collier

12  on Bankruptcy, ¶ 3019.03 (15th ed. 1987)); In re Simplot, 2007 WL 2479664, at *11 (Bankr. D.

13  Idaho Aug. 28, 2007). Thus, a "clear and obvious improvement to the position of the creditors

14  affected by the modification" will not require re-solicitation of the modified plan. In re Concrete

15  Designers, Inc., 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994). This reading of section 1127(c) is

16  entirely consistent with the disclosure requirements in section 1125 because "[a] modification which

17  is not 'material' is by definition one which will not affect an investor's voting decision," and thus,

18  "[a]dditional disclosure would serve no purpose." Solar King, 90 B.R. at 824 n.28.

19       Seen against these standards, Signature's modifications to the Signature Plan are not material

20  and in no way materially or adversely affect the way any claim or equity interest is treated.

21  Accordingly, Signature requests that the modifications in the Signature Plan be approved without

22  need for further solicitation.

23       **2.    Modifications to the Signature Plan.**

24       Signature seeks approval of the following non-material modifications to the Signature Plan.

25            **a.    Modifications to Section I: Definitions and Rules of Construction.**

26       Section I.A of the Signature Plan is modified to include the following modified or additional

27  definitions:

28            **"1940 Act"** means the Investment Company Act of 1940.

An **"Affiliate"** of any particular Person means any other Person controlling, controlled by or under common control with such particular person or entity.

**"New World Disclosure Statement"** means the New World Acquisition, LLC Amended Disclosure Statement With Respect to Amended Chapter 11 Plan of Reorganization For Fremont General Corporation (Dated January 19, 2010), including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

The **"Signature Investors"** includes Signature Group Holdings, LLC, Craig Noell, Kyle Ross, Thomas Donatelli, Kenneth Grossman, and their respective Affiliates.

**"Warrants"** means the warrants to purchase shares of the Reorganized Debtor's Common Stock issued to the Signature Investors~~Group~~ on Effective Date.

**b.**    **Modifications to Section II: Classification and Treatment.**

Section II.A.1.(f) of the Signature Plan is modified with respect to the Indenture Trustee's fees and expenses, as follows:

**(f)**      **Indenture Trustee Fees and Expenses**

The Reorganized Debtor will pay or cause to be paid in full and in Cash as an Administrative Claim, without the need for application to, or approval of, any court, without reduction to the recovery of applicable holders of allowed claims, any and all Indenture Trustee Fees and other amounts that are due to each of the Indenture Trustees and its counsel~~Professionals~~ as of the Effective Date on or before the Effective Date.  The Reorganized Debtor shall also promptly pay or cause to be paid in full any and all fees and expenses that will be incurred in

connection with the distributions to be made by the Indenture Trustees under this Plan without further court approval.

Section II.A.2 of the Signature Plan is modified with respect to Priority Tax Claims, as follows:

| Description | Treatment |
|---|---|
| Priority Tax Claims Arising Under 11 U.S.C. § 507 (a)(8). | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date, agrees to different treatment or its Claim is the subject of Final Order of the Bankruptcy Court, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (1) the Effective Date, or (2) the fifteenth Business Day after the Priority Tax Claim becomes an Allowed Priority Tax Claim, or in either case, as soon thereafter as is practicable. The Debtor or Reorganized Debtor, as the case may be, reserves the right to pay any Allowed Priority Tax Claim in equal quarterly payments over a period of five years from the date of the entry of the Order for relief ~~within the~~ interest at the applicable rate under non-bankruptcy law~~rate~~. |
| | For the avoidance of any doubt, in the event the Allowed Priority Tax Claim of the California Franchise Tax Board (the "FTB") has not been paid in full on the Effective Date, the FTB shall be entitled to interest on its Allowed Priority Tax Claim at a rate determined under applicable nonbankruptcy law as provided for in section 511 of the Bankruptcy Code for the period of time from the Effective Date to and through the date its Allowed Priority Tax Claim is paid in full. |

Section II.B.3 of the Signature Plan is modified with respect to General Unsecured Claims, as follows:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 3A | General Unsecured Claims (excluding the TOPrS Claims, and the $176,402,106.56 of Claims represented by the 7.875% Senior Notes due 2009) | No | Except as provided below with respect to the Holder of an Allowed General Unsecured Claim pursuant to any settlement, compromise, stipulation or order which provides for different treatment, whether in terms of maturity, amortization, interest rate and/or entitlement to interest (prepetition or postpetition) or otherwise, the Holder of an Allowed Class 3A General Unsecured Claim shall retain their legal, equitable, |

and contractual rights and shall be paid in full on the later of the Effective Date of the Signature Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim or, in either case, as soon thereafter as is practicable, with Post Petition Interest at the Post Petition Interest Rate (2.51%).

The Holder of an Allowed General Unsecured Claim pursuant to the Rampino Stipulation, the Enron Stipulation, the BNY Stipulation or any other settlement, compromise, stipulation or order which provides for different treatment shall be paid in accordance with the underlying compromise, settlement, stipulation or order giving rising to the Allowed Claim, and if no payment date is specified on the later of the Effective Date of the Signature Plan or within fifteen business days of becoming an Allowed Class 3A General Unsecured Claim or, in either case, as soon thereafter as is practicable, with Post Petition Interest, unless the Allowed Class 3A General Unsecured Claims has been otherwise capped, at the Post Petition Interest Rate (2.51%).

Section II.A.4 of the Signature Plan is modified with respect to Equity Interests, as follows:

| Class | Description | Impaired | Treatment |
|---|---|---|---|
| 4 | Equity Interests | Yes | Holders of existing Equity Interests in the Debtor will retain their Equity Interests in the Reorganized Debtor in full and final satisfaction of their Equity Interests, subject to dilution for the issuance of securities to the TOPrS Group and the Signature InvestorsGroup on the Effective Date in connection with the Plan, and the Common Stock which may be issued to the Holders of Allowed Class 5 Claims, if any. |

    **c.**    **Modifications to the Section IV: Means of Effectuating the Signature Plan.**

Section IV.A of the Signature Plan is modified with respect to the merger, as follows:

1   On the Effective Date, and effective contemporaneously with

2   the occurrence of the Effective Date, FGCC will first be merged into

3   the Debtor or the Reorganized Debtor (as applicable), and then FRC

4   will be merged into the Debtor or the Reorganized Debtor (as

5   applicable), with the resulting merged entity surviving as the

6   Reorganized Debtor (the "Merger"). The Reorganized Debtor will

7   thereafter continue to operate its business in the ordinary course without

8   the supervision or oversight of the Bankruptcy Court.

9                               *   *   *

10   The Signature InvestorsGroup will invest $10 million on the

11   Effective Date, consisting of (i) at least $5 million in cash and (ii) an in-

12   kind contribution of loan and lease net assets consistent with the future

13   business plan of the Reorganized Debtor of up to $5 million, and

14   receive for this investment 12,500,000 shares of Common Stock at $.80

15   per share.

16   All in-kind assets would be subject to a third party valuation as

17   of December 31, 2009 and a management representation from Signature

18   regarding any subsequent material changes in value.  In addition, to the

19   extent that the effective date extends over 120 days from the original

20   valuation, the third party valuation provider will produce an updated

21   analysis for the period subsequent to yearend.  All existing in-kind asset

22   contributions made prior to the Effective Date would be reviewed and

23   approved by a committee representing the interests of existing

24   shareholders and creditors (the "Steering Committee") comprised of

25   Seth Hamot and Jamesim McIntyre no later than January 31, 2010.  Any

26   future additions would be reviewed and approved by the Steering

27   Committee prior to acquisition by Signature Affiliates.

28

1    In addition, the Signature Investors~~Group~~ will pay up to an

2    aggregate of $300,000 to acquire Warrants to purchase 15 million

3    shares of Common Stock at an exercise price of $1.03 per share.  The

4    Warrants will vest as to 20% on the Effective Date, and 20% in annual

5    installments thereafter until the Warrants are fully vested on the fourth

6    anniversary of the Effective Date.  Assuming the Warrants are exercised

7    for cash, the Warrants represent an additional potential future equity

8    infusion to the Reorganized Debtor of $15.75 million, including an

9    aggregate purchase price of $300,000 and an aggregate exercise price of

10    $15,450,000 paid for the Warrants.  The purchase price shall be payable

11    by the Signature Investors~~Group~~ as the Warrant shares vest, with

12    $60,000 payable on the Effective Date and $60,000 payable on each

13    subsequent vesting installment.

14    Section IV.B.1 of the Signature Plan is modified with respect to the post-confirmation

15    business plan for the reorganized Debtor, as follows:

16    The Reorganized Debtor's proposed management team

17    (including its board Chairman) shall be made up of a highly

18    experienced and seasoned group of financial professionals who have

19    operated very successfully within this market segment for decades.  The

20    assets underlying the portfolio in this Plan are not securities; they are

21    loans sourced through the Signature team's proprietary network,

22    individually structured based on the unique circumstances of the

23    individual situation, subjected to appropriate due diligence~~d~~ and

24    documented through the collective efforts of the Signature team,

25    drawing on the significant breadth of experience of Signature and its

26    team.

27    The Reorganized Debtor's proposed management team shall use

28    commercially reasonable efforts to leverage its expertise in this market

by reformulating Fremont General into a well-capitalized and profitable finance company serving this large and attractive market in the following areas:

\*   \*   \*

- o **Portfolio Acquisitions** – Opportunistic purchases of senior secured bank loans either as a whole portfolio or as "carved out" from large bank owned portfolios at meaningful discounts to face value. Frequently, acquired portfolios may be <u>focused on</u>to specialized industries such as technology, retail, media, restaurants, casino, hospitality, healthcare, agriculture and lead to further opportunities over the long term, particularly when they come with talented management talent.

- o **Distressed Situations** – The Company will also pursue opportunistic corporate financings for asset-rich companies requiring near-term liquidity including, without limitation, bridge loans, transition financing, <u>debtor in possession loans ("DIPs"),</u> senior secured bank debt, bonds in liquidation and trade claims in anticipation of a recapitalization or other clearly defined event.  By way of example, Signature recently provided a structured lending solution for the Fatburger franchisor that included both DIP financing to subsidiaries reorganizing in Chapter 11 and traditional financing to the parent franchisor who does not anticipate a bankruptcy filing.

Section IV.C of the Signature Plan is modified with respect to the management agreement with Credit Partners Management, Inc., as follows:

The Reorganized Debtor's activities will be managed by CP Management acting as an external investment advisor.  On the Effective Date, the Reorganized Debtor's Board of Directors will enter into a

1    temporary management contract with the senior management team of

2    Signature to provide day to day interim management services to the

3    Company consistent with the post-confirmation business plan for the

4    Reorganized Debtor, as outlined herein, and to oversee the wind-down

5    of the business affairs of the Debtor, FRCC, and FRC while a more

6    complete management agreement is negotiated between the Board and

7    the newly formed entity, CP Management.  Such temporary

8    management contract will terminate upon execution of the Management

9    Agreement, which is expected to occur within 45 days of the Effective

10   Date.

                                  *    *    *

12   Following the entry into the Management Agreement, CP

13   Management shall register <u>with the U.S. Securities and Exchange</u>

14   <u>Commission as an investment adviser</u> pursuant to the Investment

15   Advisers Act of 1940 (the "Advisers Act").  Subject to the supervision

16   of the Reorganized Debtor's Board of Directors, CP Management shall

17   then manage the company's day-to-day operations (other than the wind-

18   down of legacy assets) and provide investment advisory services

19   pursuant to the Management Agreement.  If any of the Remaining

20   Executives elect to continue with the Reorganized Debtor, they will

21   continue to manage the legacy assets of the Debtor through the end of

22   their contract.

                                  *    *    *

24   The compensation arrangements set forth in the Management

25   Agreement shall be renewable annually based on such terms as the

26   Manager and the independent members of the Board of Directors shall

27   agree. Under the Management Agreement, the Reorganized Debtor will

28   pay CP Management a fee for its services pursuant to the Management

                                  27

Agreement. The Management Agreement and its fee structure were established by arm's-length negotiation between Signature and a Steering Committee consisting of James McIntyre and Seth Hamot, neither of whom holds any direct or indirect economic interest in Signature or CP Management. The management fee during the initial term shall be based upon an expense budget setting forth projected, commercially reasonable operating expenses to be incurred by CP Management in its management of the Reorganized Debtor. The framework established by the Steering Committee also provides that annual salaries for each of Messrs. Noell, Grossman, Donatelli and Ross shall be limited to $150,000 per year for services provided to the Reorganized Debtor under the Management Agreement. The Management Agreement and the proposed budget shall be subject to review and approval by the entire Board of Directors within 120 days after the Effective Date.

Under the Management Agreement and pursuant to the established budget, CP Management is solely responsible for: (i) compensating CP Management's investment professionals and their respective staffs (and pursuant to agreed upon limits on the compensation of Messrs. Noell, Grossman, Donatelli and Ross), when and to the extent engaged in providing investment advisory and management services to the Reorganized Debtor, and (ii) the compensation and routine overhead expenses of such personnel allocable to such services. Notwithstanding the above, the Reorganized Debtor's Board of Directors in its sole discretion may award an annual bonus to CP Management above and beyond the budget based upon performance.

1    The Management Agreement will havehas an initial term

2    through December 31, 2010 and will renews automatically thereafter

3    for annual periods subject to the vote of the Reorganized Debtor's

4    board of directors or shareholders.

5    Section IV.D of the Signature Plan is modified with respect to the CP Management team and

6    the reorganized Debtor's management team, as follows:

7    The CP Management team will be led by Craig Noell, Kyle

8    Ross, Thomas Donatelli and Kenneth Grossman.

9    Section IV.E of the Signature Plan is modified with respect to the reorganized Debtor's board

10    of directors, as follows:

11    The Reorganized Debtor would have a Board of Directors

12    consisting of seven nine directors including four independent directors

13    identified by Signature Craig Noell and two directors nominated by the

14    TOPrS Group, all Kenneth Grossman of CP Management, and the

15    following directors expected to satisfy the independence requirements

16    of the New York Stock Exchange: John Nickoll, Robert Schwab, two

17    directors identified from the New World Disclosure Statement and/or

18    New World Plan, two directors nominated by the TOPrS Group (which

19    shall be mutually acceptable to Signature, the TOPrS Group and James

20    McIntyre), and a ninth director will be selected from the Existing

21    Equity Interest Holders. Signature expects to recommend John Nickoll,

22    Robert Peiser, Larry Hochberg and Robert Schwab as independent

23    directors. Mssrs. Hochberg, Schwab, and Peiser are existing

24    shareholders of the Debtor. The TOPrS Group has informed Signature

25    that it expects to recommend Howard Amster and Seth W. Hamot as

26    independent directors.

27    Section IV.G of the Signature Plan is modified with respect to the amendments of corporate

28    governance documents to authorize certain transactions, as follows:

29

1           Under the Signature Plan, the Reorganized Debtor and its

2      affiliates shall amend and restate certain of their corporate governance

3      documents, including its~~such as~~ articles of incorporation and bylaws in

4      substantially the form attached as Exhibit 5 and Exhibit 6, respectively,

5      to this Plan, to the extent necessary to, among other things authorize:

6      (1) the restructuring transactions contemplated by the Signature Plan,

7      including but not limited to the issuance of Common Stock and

8      Warrants to be issued under the Signature Plan, (2) implementation of a

9      "Leucadia Provision" (as discussed in detail below), and (3) the

10      following actions to be taken in the discretion of the Reorganized

11      Debtor's board of directors within eighteen months of the Effective

12      Date: a corporate name change, a new ~~e~~Committee on ~~u~~Uniform

13      ~~s~~Securities ~~i~~Identification ~~p~~Procedures (CUSIP) number, an exchange

14      of certificates representing common stock of the Debtor par value $1.00

15      per share for certificates (for the same number of shares) representing

16      Common Stock of the Reorganized Debtor~~, a change in the~~ par value ~~of~~

17      ~~the Common Stock from $1.00 to~~ $0.01 per share (to the extent shares

18      are certificated), a reincorporation to Delaware or another state

19      (provided that the Reorganized Debtor's Board of Directors, after

20      receiving advice from legal and financial advisors, believes that the

21      advantages of such a reincorporation outweigh the disadvantages).

22    Section IV.H of the Signature Plan is modified with respect to the "Leucadia Provision", as

23  follows:

24           The Reorganized Debtor, at the option of its Board of Directors,

25      may implement a "Leucadia Provision" to restrict certain transfers of

26      the common stock or other equity of the Reorganized Debtor in order to

27      avoid adverse federal income tax consequences caused by certain

28

subsequent ownership changes (as defined in section 382 of the Internal
Revenue Code of the Tax Code, as described in more detail below).

The Leucadia Provision shall restrict transfers on certain shares
of the common stock with the following material terms:

- no Person (other than Signature and its affiliates) may
  acquire or accumulate five percent or more (as determined
  under tax law principles governing the application of
  Section 382 of the Tax Code) of the common stock or other
  equity of the Reorganized Debtor (together, "the
  Securities"); and

- no Person (other than Signature and its affiliates) owning
  directly or indirectly (as determined under such tax law
  principles) on the Effective Date, after giving effect to this
  Plan, or after any subsequent issuances of securities pursuant
  to transactions contemplated by this Plan, five percent or
  more (as determined under such tax law principles) of the
  Securities, may acquire additional shares of that common
  stock or other equity of the Reorganized Debtor, subject to
  certain exceptions, and

- no person (other than Signature and its affiliates) holding
  5% or more of the total fair market value of the Securities
  may transfer, or agree to transfer, Securities.

The restrictions on transfer will not apply to:

- certain transactions approved by the board of directors of the
  Reorganized Debtor.

- an acquisition by Signature of Securities which, as a
  percentage of the total shares outstanding, is not greater than
  the difference between 49% and the percentage of the total

1    shares outstanding acquired by Signature or any of its

2    subsidiaries in this Plan plus any additional Securities

3    acquired by Signature and its affiliates;

4    • a transfer of Securities by Signature on or prior to the second

5    anniversary of Effective Date which, together with any

6    transfers of Securities by Signature since the Effective Date,

7    represent less than 15% of the issued and outstanding

8    Securities at the time of the transfer;

9    • a transfer or acquisition of Securities by Signature after the

10    second anniversary of the Effective Date that would

11    otherwise be disallowed under the transfer restriction, so

12    long as such transaction and any other similar transactions

13    consummated by Signature during the three years prior to

14    the consummation of such transaction (and after the

15    Effective Date), as a whole constitute less than 15% of the

16    issued and outstanding Securities at the time of the

17    transaction; and

18    • a transfer or acquisition of Securities by any Holder of

19    Securities other than Signature that would otherwise be

20    disallowed under the transfer restriction, so long as such

21    transaction and any other similar transactions consummated

22    by Holders of Securities (other than Signature) during the

23    three years prior to the consummation of such transaction

24    (and after the Effective Date), as a whole constitute less than

25    15% of the issued and outstanding Securities at the time of

26    the transaction.

27    The restrictions on transfer will not apply to Mr. McIntyre, who

28    served as the Debtor's CEO from its pubic offering in 1970 until

1    ~~retirement in 2004 and as of the Petition Date beneficially owned (as~~

2    ~~that term is defined in the rules of the SEC) in excess of 10% of the~~

3    ~~Debtor's issued and outstanding Common Stock.~~

4            The express intent of the Leucadia Provision is to reduce the

5    risk that any change in the ownership of the Reorganized Debtor's

6    common stock may jeopardize the preservation of federal income tax

7    attributes of the Reorganized Debtor for purposes of sections 382 and

8    383 of the Tax Code.

9            Each certificate representing shares of the Reorganized Debtor's

10    common stock shall bear a legend in substantially the following form:

11            "The shares of Reorganized Debtor's common stock represented

12    by this certificate are issued pursuant to this Plan of Reorganization for

13    the Reorganized Debtor, as confirmed by the United States Bankruptcy

14    Court for the Central District of California.  The transfer of securities

15    represented hereby is subject to restriction pursuant to the

16    Bylaws~~Articles of Incorporation~~ of the Reorganized Debtor.  The

17    Reorganized Debtor will furnish a copy of its Bylaws~~Articles of~~

18    ~~Incorporation~~ to the holder of record of this certificate without charge

19    upon written request addressed to the Reorganized Debtor at its

20    principal place of business."

21            **d.        Modifications to Section VI: Securities Related Matters.**

22    Section VI.A of the Signature Plan is modified with respect to the issuance of securities, as

23    follows:

24            Common Stock and Warrants to be issued in connection with

25    the equity investment by the Signature Investors, as well the common

26    stock to be issued upon the exercise of such Warrants, will be issued

27    without registration under the Securities Act or any similar state or local

28    law in reliance upon the exemption set forth in section 4(2) of the

33

1   Securities Act and the rules set forth in Regulation D promulgated

2   thereunder.  In that regard, the Signature Investors intends to make

3   customary representations to the Reorganized Debtor, including that it

4   is an "accredited investor" as defined under Rule 501 of Regulation D.

5   Section VI.B of the Signature Plan is modified with respect to registration rights, as follows:

6   The Reorganized Debtor shall be responsible for providing

7   mandatory registration rights to the Signature InvestorsGroup in order

8   to accommodate the resale of common stock and Warrants sold in

9   reliance upon the section 4(2) exemption of the Securities Act.

10   Accordingly, on or about the Effective Date, the Reorganized Debtor

11   shall execute and deliver a Registration Rights Agreement in

12   substantially the form attached as Exhibit 1 to this Plan.

13   Section VI.D of the Signature Plan is modified with respect to Investment Company Act

14   status, as follows:

15   The Reorganized Debtor expects that CP Management will

16   register as an investment adviser under the Investment Advisers Act of

17   1940, but that the Reorganized Debtor will not be required to register

18   under the Investment Company Act of 1940 (the "1940 Act").

19   The Reorganized Debtor intends to structure and operate its

20   business and its investments in such a way that it will not be deemed an

21   "investment company" under the 1940 Act.  The Reorganized Debtor

22   intends to operate as a commercial lender engaged in various financing

23   activities as discussed herein, and will not be primarily in the business

24   of investing, reinvesting or trading in securities.  However as of the

25   Effective Date of this Plan, the Reorganized Debtor is projected to own:

26   i) assets that could be deemed "investment securities" as defined in

27   Section 3(a)(1)(C) of the Company Act, that might exceed 40 percent of

28   its total assets, less government securities, investments in majority-

1    owned subsidiaries, cash and cash items, and consequently could be

2    considered an investment company under that section.  In such instance,

3    the Reorganized Debtor will seek to register with the SEC as an

4    investment company unless it can rely on an exception or exemption

5    from the 1940 Company Act, or obtain an order from the SEC allowing

6    it to operate under the terms of the order without registering.  For up to

7    a year from the Effective Date of this Plan, the Reorganized Debtor

8    intends to rely upon the provisions of Rule 3a-2 of the 1940 Act, which

9    provides a one-year period in which it may operate without being

10    subject to registration and regulation as an investment company.

11    **e.    Modifications to Section VIII: Conditions Precedent to Confirmation and**

12    **Consummation of the Plan.**

13    Section VIII.B of the Signature Plan is modified with respect to conditions to Effective Date,

14    as follows:

15    4.    All documents, instruments and agreements provided for

16    under this Plan or necessary to implement this Plan (including the

17    Management Agreement and the Registration Rights Agreement, but

18    not necessarily the Warrant) shall have been executed and delivered by

19    all parties thereto, unless such execution or delivery has been waived by

20    the parties benefited;

21    **f.    Modifications to Section IX: Effect of Confirmation of the Plan.**

22    Section IX.A of the Signature Plan is modified with respect to discharge, as follows:

23    1.    On the Effective Date, except as otherwise provided for

24    in this Plan the Debtor, the Debtor's Estate, Disbursing Agent, and their

25    property will be deemed discharged and released from any and all

26    Claims, including without limitation, all demands, liabilities, and

27    Claims, that arose before the Confirmation Date or that are based upon

28    or otherwise relate to acts, events, omissions, transactions or other

1    activities of any kind that occurred before the Confirmation Date, and

2    all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or

3    502(i) regardless of whether: (a) a proof of Claim based on such debt is

4    filed or deemed filed; (b) a Claim based on such debt is allowable under

5    Bankruptcy Code § 502; or (c) the Person holding the Claim based on

6    such a debt has accepted this Plan;

7          **g.**     **Modifications to Section X: Miscellaneous Provisions.**

8    Section X.I of the Signature Plan is modified with respect to payment of Signature

9    Proponent's expenses, as follows:

10    On the Effective Date, the Disbursing Agent shall pay the

11    expenses of Signature, <u>New World</u> the TOPrS Group and Jame~~sin~~

12    McIntyre, including reasonable fees of their attorneys and advisors.

13    The Signature Plan Proponents shall submit application(s) pursuant to

14    Sections 503(b)(3)(D) and (b)(4) of the Bankruptcy Code no later than

15    ten (10) Business Days following entry of the Confirmation Order

16    seeking allowance of such fees and expenses incurred on the basis that

17    confirmation of the Plan constitutes a "substantial contribution" that

18    directly benefits the estate, its creditors, and other interested parties.

19    Section X.K of the Signature Plan is modified with respect to the New York State Teachers'

20    Retirement System Class Action, as follows:

21    Notwithstanding anything to the contrary in the Plan or the

22    Confirmation Order, nothing in the Plan or the Confirmation Order

23    shall preclude ~~shall preclude shall preclude~~ the New York State

24    Teachers' Retirement System, for itself and on behalf of the putative

25    class in the consolidated securities class action styled as New York

26    State Teachers' Retirement System v. Fremont General Corporation et

27    al., Case No. 2:07-cv-05756-FMC-FFM, United States District Court

28    for the Central District of California (the "Securities Class Action"),

1    from (a) satisfying any of its alleged claims against the Debtor from

2    available insurance coverage and proceeds, or (b) from seeking

3    discovery in connection with the Securities Class Action from the

4    Debtor or the Reorganized Debtor, in each instance as may be permitted

5    under applicable law in order to prosecute any of its alleged claims

6    against non-Debtor third parties.

7    The Movants submit that the aforementioned modifications to the Signature Plan are not

8    material and do not adversely affect the rights of creditors and shareholders under the Signature Plan.

9    To the extent that any modification alters any rights of creditors and shareholders under the Signature

10   Plan, the proposed modifications are beneficial to creditors and shareholders and are in the best

11   interest of both. The Court agreed with these general principles previously in its April 2, 2010

12   tentative ruling regarding plan modifications to the New World Plan:

13   A plan proponent may modify a plan any time before

14   confirmation so long as the plan as modified meets the requirements of

15   Sections 1122 and 1123. 11 U.S.C. § 1127(a).

16   If the proposed pre-confirmation modification does not

17   adversely affect the treatment of a claim of any creditor or interest of an

18   equity security holder it shall be deemed accepted by all creditors and

19   equity security holders who have previously accepted the plan, even if

20   such parties have not accepted the modification in writing. Rule 3019.

21   *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr.E.D.Mich.1999).

22   Stated otherwise, resolicitation and reballoting is not required.

23   Material modifications to a plan require a formal disclosure statement

24   and resolicitation.

25   A modification is considered "material" if it "so affects a

26   creditor or interest holder who accepted the plan that such entity, if it

27   knew of the modifications, would be likely to reconsider its

28

1    acceptance." *In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.

2    D. Tex.1988).

3         Unaffected creditors do not have the substantive right to [] insist

4    upon non-modification of the Plan. *In re Rhead*, 179 B.R. 169, 176

5    (Bankr.D.Ariz.1995).

6         The intent of the Bankruptcy Code is to encourage consensual

7    resolution of claims through the plan negotiation process. *Id.* The

8    Bankruptcy Court is a court of equity with a primary focus upon

9    facilitating the reorganization process. *Id* Applying the foregoing to the

10    modifications proposed by New World, the court finds that none of

11    modifications adversely impact creditors and equity holders who

12    previously voted to accept the plan.

13    See http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/pdfmain.aspx?env=1&pdf=ES_040210.pdf.

14    Accordingly, the Movants respectfully request that the Court approve the proposed

15    modifications to the Signature Plan and determine that further solicitation of votes is not required.

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## CONCLUSION

**WHEREFORE**, the Movants respectfully request that the Court enter an order approving the

Settlement Agreement, pursuant to Bankruptcy Rules 3018 and 9019, and the non-material

modifications to the Signature Plan, pursuant to Bankruptcy Code section 1127 and Bankruptcy

Rule 3019.

Dated: April 9, 2010                          RESPECTFULLY SUBMITTED,


                                              By: */s/ John P. Schafer*
                                              John P. Schafer, an Attorney with
                                              MANDERSON, SCHAFER & MCKINLAY,
                                              LLP, counsel for SIGNATURE GROUP
                                              HOLDINGS LLC


Dated: April 9, 2010                          RUTAN & TUCKER, LLP


                                              By: */s/ Brendt C. Butler*
                                                  Mark B. Frazier
                                                  Brendt C. Butler
                                                  RUTAN & TUCKER, LLP
                                                  Attorneys for James A. McIntyre, Sr.