1  **WEILAND, GOLDEN**
**SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
esmiley@wgllp.com
3  Philip E. Strok, State Bar No. 169296
pstrok@wgllp.com
4  Kyra E. Andrassy, State Bar No. 207959
kandrassy@wgllp.com
5  650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
6  Telephone:   (714) 966-1000
Facsimile:   (714) 966-1002
7
8  Attorneys for the Official Committee of Equity Holders

9  **UNITED STATES BANKRUPTCY COURT**

10  **CENTRAL DISTRICT OF CALIFORNIA**

11  **SANTA ANA DIVISION**

| 12 In re | Case No. 8:08-bk-13421-ES |
|---|---|
| 13 FREMONT GENERAL CORPORATION, a Nevada corporation, | Chapter 11 Case |

**REPLY TO THE OPPOSITION OF NEW WORLD ACQUISITION, LLC AND SIGNATURE GROUP HOLDINGS, LLC TO PLAN SUPPLEMENT FOR THE OFFICIAL COMMITTEE OF EQUITY HOLDERS FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION (DATED MARCH 24, 2010) AND SUPPLEMENT TO OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY HOLDERS TO:**

**(A) MOTION OF SIGNATURE GROUP HOLDINGS, LLC AND JAMES MCINTYRE, SR. FOR ORDER APPROVING (1) SETTLEMENT AGREEMENT WITH KENNETH S. GROSSMAN AND NEW WORLD ACQUISITION, LLC, PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 3018 AND 9019; AND (2) NON-MATERIAL MODIFICATIONS TO "SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED PLAN OF REORGANIZATION;**

**(B) MOTION FOR APPROVAL OF NON MATERIAL MODIFICATIONS OF NEW WORLD ACQUISITION, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR FREMONT**

414030.2                                                           REPLY



1

Debtor.

2

Tax I.D. 95-2815260

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GENERAL CORPORATION (DATED APRIL 9, 2010); AND

(C) MOTION FOR ORDER PURSUANT TO RULE 3018 FOR ORDER APPROVING CHANGE OF VOTES OF SHAREHOLDERS TO ACCEPTANCES;

MEMORANDUM OF POINTS AND AUTHORITIES;

[DECLARATIONS OF EVAN D. SMILEY, JEFF PIES, AND LAWRENCE HERSHFIELD FILED CONCURRENTLY IN SUPPORT THEREOF]

Hearing Information:
DATE:   April 23, 2010
TIME:   9:30 a.m.
CTRM:  5A

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

414030.2

REPLY

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE,**

**THE DEBTOR AND ITS COUNSEL, NEW WORLD ACQUISITION, LLC, AND ITS**

**COUNSEL OF RECORD, SIGNATURE GROUP HOLDINGS, LLC, AND ITS COUNSEL**

**OF RECORD, JAMES A. MCINTYRE, SR., AND HIS COUNSEL OF RECORD, AND**

**ANY OTHER PARTIES IN INTEREST:**

The Official Committee of Equity Holders (the "OEC") hereby responds to the

opposition of New World Acquisition, LLC ("New World"), and Signature Group Holdings,

LLC ("Signature"), to the plan supplement filed by the OEC on April 9, 2010 and

supplements the omnibus objection that the OEC filed on April 16, 2010, to the proposed

"settlement" between New World and Signature with additional information obtained since

April 16, 2010.  In support of this reply, the OEC submits the concurrently filed

declarations of Evan D. Smiley, Jeff Pies, and Lawrence Hershfield, such other and

further evidence as may be obtained and presented at or in connection with the hearing,

and respectfully represents as follows:

## I.      INTRODUCTION

With the hearings to consider confirmation of the three equity plans fast

approaching, the tone and approach taken by New World and Signature have become

increasingly personal, and zealous representation has crossed into disingenuousness.

After striking a deal to support each other's plans, Signature and New World have

launched a full-scale, win-at-all-costs offensive to confirm their respective plans at the

expense of both the integrity of the process and the interests of equity holders.  As set

forth in detail below, both Signature and New World have completely flouted the rules and

guidelines established in these cases in an effort to secure an unfair advantage in this

highly competitive process.

- First, unhappy with the OEC Plan receiving the first preference and most
   votes of the equity class during the Court approved solicitation process,
   Signature and New World have engaged in an improper re-solicitation

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

413835.1                              1                                      REPLY

1    campaign designed to garner sweeping vote changes from equity holders.

2    This solicitation was based upon false, misleading and inconsistent

3    information and cannot be endorsed by this Court.

4    • Second, the proposed settlement is not a settlement at all and because it

5    would not result in withdrawal of either plan, the Court is still faced with the

6    same number of plans and issues, but of course the fees and expenses of

7    both plan proponents would be paid without limit.  To further underscore the

8    absence of a true settlement and their "take no prisoners" approach, this

9    "house of mirrors" arrangement is a deal that has cast off certain of their

10    existing proponents as orphan children, simply ignoring the fact that they did

11    not approve it.

12    • Third, even assuming the solicitation practices were proper, the OEC

13    harbors serious doubts that New World's filing of numerous joinders

14    accurately accounts for the vote changes based upon proper information.

15    Putting aside the improper solicitation tactics employed by Signature and New

16    World, the ongoing discovery in this case has revealed a troubling gap between what

17    Signature professes in terms of experience and the reality of Signature's track record.

18    Despite a seemingly unshakeable confidence, the disclosure of documents related to

19    their deal history simply do not demonstrate that Signature has the requisite platform to

20    successfully manage the Reorganized Debtor and fully take advantage of its favorable

21    tax attributes for the benefit of equity holders; certainly, the actual experience and scale

22    of the existing Signature business is nothing like what was advertised in their Disclosure

23    Statement or used to garner equity holder support.

24    Finally, the latest round of objections from Signature and New World have

25    endeavored to cast Ranch Capital's management agreement as inconsistent with the

26    OEC Plan.  This is simply untrue.  As described in more detail below, the management

27    agreement was carefully negotiated and executed to fit squarely within parameters of the

28    OEC Plan.  Despite the efforts to mischaracterize the agreement as unduly dilutive to

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   existing equity holders, the incentive-based warrants provided to Ranch Capital

2   appropriately links their compensation to the performance of the Reorganized Debtor in a

3   manner that is entirely consistent with the OEC Plan.

4

5   II.   **SIGNATURE AND NEW WORLD HAVE ENGAGED IN A UNILATERAL,**

6          **UNAUTHORIZED AND IMPROPER RE-SOLICITATION OF EQUITY HOLDERS**

7          **THAT THREATENS TO UNDERMINE THIS COURT'S APPROVED**

8          **SOLICITATION PROCEDURES**

9          Obviously unhappy with the outcome of the Court approved voting process where

10  the equity class selected the OEC Plan as the first choice of the competing plans by total

11  shares voted and by preference,[1] New World and Signature have now engaged in their

12  *own unilateral, unauthorized and improper re-solicitation of votes* of third-party equity

13  holders for the Signature Plan.  Worse yet, New World and Signature's mass re-

14  solicitation of votes is based upon material misrepresentations which totally ignore the

15  months of work that resulted in Court-approved solicitation materials.

16         In their opposition, Signature and New World stoop to a new low by accusing the

17  OEC of withholding important information during the solicitation process, disseminating

18  false information, acting in the self-interest of the chairperson of the OEC, and sacrificing

19  the interests of the equity holders that the OEC represents.  Those are extremely reckless

20  allegations based on distortions of truth and hyperbole and appear to be a part of a

21  pattern of misstatements and exaggerations by Signature and New World that is

22  continuing unabated.  This undoubtedly exposes the tone of their new solicitation efforts.

23         As set forth in the Omnibus Objection filed by the OEC on April 16, 2010, the OEC

24  has learned that Signature and New World have been actively contacting equity holders in

25  an attempt to convince them to file motions to modify their ballots to support the New

26  World and Signature plans, based on a "settlement" that has not yet been approved by the

27  ───────────────────

28  [1] *See* Exhibit "6" to the concurrently filed Declaration of Evan D. Smiley (the 'Smiley Declaration').

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

1  Court.  Although the OEC continues to actively conduct discovery regarding the tactics, it

2  has serious concerns that principals from Signature and New World are misleading equity

3  holders about the intended management roles of Craig Noell and Kenneth Grossman in

4  the Reorganized Debtor.  Perhaps more troublesome, despite working with the other plan

5  proponents to design the guidelines that govern the solicitation, New World's counsel has

6  been directly participating in this re-solicitation effort without any apparent concern for the

7  misinformation being spread to equity holders in the process, having prepared and filed

8  the *Joinders to Motion for Order Approving Change of Votes of Shareholders to*

9  *Acceptances* [Docket No. 1939] that was filed on April 16, 2010.

10      As the Court is now aware, on April 16, 2010, the TOPrS Group that was formerly a

11  co-plan proponent with Signature filed a *Notice of Motion and Motion of Certain TOPrS*

12  *Holders to Change Preference to Official Committee of Equity Holders' Fourth Amended*

13  *Chapter 11 Plan of Reorganization (Dated January 20, 2010)* [Docket No. 1933], in which

14  they verify that they were **not** parties to the agreement between New World and

15  Signature, did **not** consent to *Signature Group Holdings, LLC's Chapter 11 Second*

16  *Amended Plan of Reorganization of Fremont General Corporation Joined by Certain*

17  *TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated April 9, 2010* (the

18  "Signature Second Amended Plan"), and in fact, were **not** even advised of the content of

19  the agreement or the Signature Second Amended Plan prior to their filing.  Thus, the

20  representation that the TOPrS Group remains a co-plan proponent is patently false.  Even

21  worse, Signature has perpetuated this falsehood with interviews with *The Deal* and a

22  posting as recent as April 19, 2010, on the Yahoo! Message Board that falsely claims that

23  the Signature Second Amended Plan is supported by Roark, Rearden & Hamot, LLC, the

24  Debtor's largest junior noteholder, and that Costa Brava Partners is a co-plan proponent.[2]

25  Neither is true, and with the filing of the TOPrS Group's motion on April 16, 2010,

26  Signature must know it.

27  _____

28  [2] A printout of the posted message is attached as Exhibit "1" to the Smiley Declaration.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

413835.1                    4                    REPLY

1    As the OEC noted in its Omnibus Objection, these efforts to change votes are the

2  best evidence that the agreement is a material modification.  However, what is most

3  troubling to the OEC id not the modifications of rejections of the plans proposed by New

4  World or Signature to acceptances, but what the Court will not see: namely, how many

5  votes would be modified from acceptances of the plans proposed by New World and

6  Signature to rejections of them based on the material changes made to both plans as a

7  result of the settlement.  Perhaps not surprisingly, Signature and New World are not

8  actively soliciting those votes.

9    The conduct being engaged in by New World and Signature, both with respect to

10  their re-solicitation campaign and in various pleadings before the Court, is part of a pattern

11  that has emerged in recent weeks in which New World and Signature have attempted to

12  discredit the OEC by distorting and exaggerating the truth, both with respect to their own

13  plans and with respect to the OEC Plan.

14    The following are a few examples of the inappropriate statements being made to

15  equity holders to secure the change of votes:

16

17  • **Statements that Kenneth Grossman and Craig Noell will be co-CEOs under a
       confirmed Signature Second Amended Plan.**  In his deposition testimony, Mr.

18     Noell explicitly rejected the concept of Mr. Grossman being a co-CEO -- "Q:
       "Going back to the management company of Fremont, will Ken Grossman be co-

19     CEO of Credit Partners Management?  A:  No".  Noell Deposition at page 65: lines
       7-10.  In fact, Mr. Noell testified that he has had no discussions with Mr. Grossman

20     regarding any officer role under a Signature Plan and that he never contemplated
       whether Mr. Grossman would be an officer of the Reorganized Debtor. Noell

21     Deposition page 59::12-60:13-19.  See Noell Deposition Excerpts at Exhibit "2".
       Certain equity holders have advised that they have been solicited to change their

22     votes based upon representations that the two will in fact be co-CEOs.  The identity
       of the CEO is a critical component of the Signature Plan; the fact that Messrs.

23     Grossman and Noell are telling different stories regarding this key fact *by itself*
       should cause the Court to disallow any vote changes, and is evidence of the "we'll-

24     do-whatever-it-takes-to-win" mode under which they are operating.

25  • **By changing ballots to support and prefer the Signature Second Amended
       Plan, New World and Signature told equity holders that the change of votes**

26     **will result in a speedy confirmation because it will result in all impaired
       classes clearly in support of Signature Second Amended Plan.**  *See* E-mail

27     from Craig Noell to equity holder Jeff Pies dated April 17, 2010, attached as Exhibit
       "7".  This is clearly not true because the TOPrS Group is not a co-proponent nor a

28     party to the Signature Second Amended Plan, which was filed without obtaining the

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

TOPrS Group's consent and with blank signature lines. "The TOPrS Group did not consent to the Modified SGH Plan; nor was it advised of the content in advance of filing. Under these circumstances, it is clear that SGH has breached the Term Sheet and that it is no longer binding on the TOPrS Group. The TOPrS Group members are not co-proponents of the Modified Signature Plan and should not be identified as such." *See* Declarations of Seth Hamot (paragraph 15) and Howard Amster (paragraph 13), all filed April 16, 2010 [Docket No. 1933]. Moreover, the confirmation hearings already set for the last week in April will not be fast-tracked on account of the settlement. Both the Signature and New World Plans will still be presented for confirmation, so it is misleading to state that this will result in a "speedy confirmation."

- **Craig Noell states, the OEC spent over $500,000 in professional fees last month on the Fremont General case.** *See* Email from Craig Noell to Jeff Pies dated April 17, 2010, attached as Exhibit "7." The OEC's professional fees were substantially less than $500,000 during any month of this case, including March, 2010. Noell's vindictive and inaccurate email to this equity holder goes on to state, "[i]t's time to put your foot down and insist Frank Williams stop squandering the estate's money so that Evan Smiley can build a new mansion" and then asks the equity holder to consider changing their vote.

- **Signature and New World tell equity holders that under the OEC Plan Ranch Capital will receive 20 percent of the fully diluted shares of Fremont as of the Effective Date, taking into consideration all shares, warrants, or options issued under the OEC plan and the management agreement is 27.7 million shares. "10-year warrants equal to 20% of the fully diluted shares of Fremont."** *See* Declaration of Robert Weingarten (the alleged expert of Signature) filed on April 16, 2010, at paragraphs 21 and 22. [Docket No. 1952]. *See also* pages 4-5 of New World and Signature's Opposition to Plan Supplement filed on April 16, 2010 [Docket No. 1937]. Kenneth Grossman of New World also perpetuated this falsehood in conversations with shareholders in which he alleged that the OEC was basically "gifting" Ranch Capital 20% of the Reorganized Debtor. *See* New World and/or Ken Grossman document production at Exhibit "9." Actually, under the Ranch Capital Management Agreement negotiated with the OEC and the TOPrS Group, Ranch will receive warrants for 5% of the shares of stock in the Reorganized Debtor at a strike price of $1.04 per share, which represents 106% of the closing stock price of $0.98 per share on April 9, 2010 (and 110.6% of the most recent closing price of $0.94), and which are exercisable only if the volume weighted average price of the Reorganized Debtor's common stock equals or exceeds $1.25 per share over a period of twenty consecutive trading days during the six-year warrant[3].

The OEC is mindful of the need to bring this confirmation process to a close as quickly as possible to avoid unnecessary delay and to limit the drain on estate resources. That said, the OEC believes that the integrity of the process is of paramount importance and remains concerned that the material misstatements and misrepresentations made to

---

[33] The "knock-in" requirement that the stock trade at $1.25 is eliminated if Ranch Capital is terminated with no long term agreement.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  equity holders have done irreparable harm to that process.  The OEC has not engaged in

2  a re-solicitation process.  If the Court approves the "settlement" between New World and

3  Signature, it will only serve to vindicate these tactics and potentially set a dangerous

4  precedent for future companies trying to reorganize their affairs through the Chapter 11

5  process.  Therefore, the OEC respectfully requests that the Court deny the settlement and

6  the associated vote changes.

7

8  III.    **SIGNATURE HAS GROSSLY OVERSTATED ITS FINANCIAL TRACK RECORD**

9         **AND EXPERIENCE IN A MANNER THAT VIOLATES SECTIONS 1125 AND 1129**

10        **(A)(1)**

11        In addition to distorting the truth and painting inaccurate pictures about the OEC

12  and Ranch Capital, Signature has misled creditors and equity holders in this case about

13  the extent of its own experience and track record.

14    A.    **Based on the deposition testimony of Mr. Noell and documents**

15          **recently produced by Signature, it has become very clear that the**

16          **Signature has exaggerated the scale of its business in its Disclosure**

17          **Statement.**

18        In its Disclosure Statement, Signature failed to include any substantive evidence of

19  its track record.  Signature has promised creditors and equity holders that its business

20  plan will build upon the existing platform built by Signature and assures them that it will

21  "bring[ ] an established business, business plan, enviable track record, distinguished

22  team, and fresh capital" to the Reorganized Debtor and that its capabilities are "well

23  demonstrated."  *Fourth Amended Disclosure Statement for Signature Group Holdings,*

24  *LLC's Chapter 11 Plan of Reorganization of Fremont General Corporation, Joined by*

25  *Certain TOPrS Holders and James McIntyre as Co-Plan Proponents, Dated January 20,*

26  *2010* (the "Signature Disclosure Statement") at 81 and 82 [Docket No. 1450].  However, it

27  curiously omitted any discussion in the Signature Disclosure Statement of specific dollar

28  amounts of its investments.  Most notably, Signature provided no information on amounts

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  invested, amounts under management, profits, and amounts borrowed.  On April 19,

2  2010, after repeated requests by the OEC to furnish additional information, Signature

3  finally produced a report from McGladrey & Pullen LLP (the "McGladrey Report")[4] that

4  included some analysis of their track record.[5]  A copy of the McGladrey Report is attached

5  to the Smiley Declaration as Exhibit "4."  It is not surprising that it took Signature so long

6  to produce the McGladrey Report because the details contained therein expose the

7  relatively small-scale nature of Signature's historical operations.

8       In the Signature Disclosure Statement, Signature projects new lending and

9  investing volume as follows:  (1) an annualized rate of $75 million in 2010, based on a

10  May 1, 2010 projected emergence date; (2) $80 million in 2011; and (3) $100 million per

11  year thereafter.  Based on a review of the McGladrey Report, a copy of which is attached

12  as Exhibit "4," it is apparent that these projections represent an *enormous* increase over

13  Signature's historic volume:  (1) in 2004, Signature loaned or invested $11.35 million; (2)

14  in 2005, it loaned or invested $8.8 million; (3) in 2006, it loaned or invested $7.4 million;

15  and (4) in 2007, it did not loan or invest anything.  In other words, the *annualized* rate in

16  2004 through 2006 is approximately equal to the *monthly* rate Signature is projecting

17  post-emergence.

18       Signature has not yet produced an updated report to show loans or investments

19  after 2007, although it has promised it would do so.  Based on the deposition testimony of

20  Craig Noell, however, some approximations can be made.  Mr. Noell testified during his

21  deposition that Signature has done a total of 27 deals since its inception.  The McGladrey

22  Report contains information in 23 deals.  Therefore, there must have been only four deals

---

[4] The McGladrey Report was referenced in the following statement from a footnote to a chart on page 90 of the Signature Disclosure Statement: "*Results from inception through 12/31/07 have been examined by McGladrey & Pullen, LLP, the Fund's auditor. An updated examination is expected to be completed by 1/31/2010.*"  It is misleading to refer to McGladrey & Pullen as "the Fund's auditor" if the company provided nothing more than an examination, which relies on management assertions without obligation of independent verification. An audit performed in accordance with Generally Accepted Auditing Standards is much more thorough process. Signature should provide evidence of any audits produced by McGladrey & Pullen if, in fact, the company served in this capacity, as well.

[5] Because Signature has not yet provided an update through January 31, 2010, no analysis can be done post-2007.

413835.1              8              REPLY

1  funded since 2007.  Two of them were described by Mr. Noell during his deposition:  one

2  was a $33 million investment and the other was for $14 or $15 million.  *See* Noell

3  Deposition at 114, attached as Exhibit "2" to the Smiley Declaration.  He also testified that

4  the total amount deployed by Signature was "north of 75 million."  *Id.*  at 84.  No

5  information is available as to the sorts of returns Signature will obtain on these two much-

6  larger deals because the ultimate return on virtually all of Signature's deals (and the return

7  on virtually all loans) depends on the ultimate repayment of the loans.  Consistent with its

8  propensity to provide selective information, Signature has repeatedly disclosed in

9  solicitation that it has realized returns of approximately 29%, but the level of returns

10  including projected realizations may be significantly lower.  Moreover, because the two

11  largest deals total $47 or $48 million and the 23 transactions included in the McGladrey

12  Report total $27.5 million— with the total of those two figures approximating $75 million—

13  one could conclude the two remaining deals must be relatively small.

14      It is also worth noting that total realized profits since Signature's inception

15  (assuming none of the four new deals since 2007 have been realized, which seems likely

16  given such investments were made in 2008 or 2009) is $8.5 million *before* deducting

17  overhead and perhaps before some direct expenses as it is impossible to tell.  This rate of

18  profit generation does not seem well suited to take advantage of the $750-plus million

19  worth of net operating losses ("NOLs").  Of course, Signature is forecasting a ***much***

20  higher level of profit generation, but the problem is that there is very little evidence from

21  their track record or history to justify such lofty projections. Given its historic operations, or

22  lack thereof, how can Signature possibly expect to deploy so much capital in a manner

23  that effectively manages risk?

24      The Signature Disclosure Statement also dramatically overstates the true size of

25  the existing and historic Signature platform, and this distortion was a key "selling point" of

26  Signature's pitch to equity holders throughout the solicitation process.  It implies

27  throughout the Signature Disclosure Statement that it is a large and active lender, when

28  there are only three principals and two back office people, plus an "arrangement" with

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

413835.1                               9                                    REPLY

1   Tom Donatelli, who is not employed or compensated.  Notwithstanding the fact that

2   Signature has not done a single deal this year, it claims to be "in business" and made

3   several statements in its Disclosure Statement to emphasize as much:

4          •    *"Signature brings an established business..."* and *"[t]he business plan will*

5                 *build upon the existing platform established by Signature.*"  Shouldn't the

6                 Signature Disclosure Statement disclose the enormous increase the

7                 projected business represents relative to the "existing business" and the

8                 enormous risk to the Reorganized Debtor's capital resulting from that

9                 increase, given the current "platform" and Signature's apparent

10                inexperience with the projected volume of business?  Or the risk to equity

11                holders and creditors if Signature is unable to scale up the business as

12                projected?

13          •    *"Signature was founded in 2004 and since that time has been actively*

14                *lending and investing in special situation opportunities".*  The implication is

15                that Signature is already "actively" conducting the business on a scale

16                consistent with its Business Plan.

17          •    *"The assets underlying the portfolio in the Signature Plan are ... sourced*

18                *through the Signature team's proprietary network".*  The "proprietary

19                network" is three people in Sherman Oaks plus perhaps Mr. Donatelli.  This

20                network has done no deals this year.

21          •    *"... Signature has and remains an active source of liquidity for banks*

22                *seeking to monetize underperforming commercial assets...".*  This

23                statement seems to imply a much larger presence that in fact exists.

24       Moreover, although Signature made representations in its Disclosure Statement

25   about the scope of its existing business and the types loans and transactions it has

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  engaged in,[6] Mr. Noell has testified in his deposition that Signature has not actually

2  completed transactions in many of these categories.

3        The nature of Signature's proposed contribution of "in-kind" assets (instead of an

4  all-cash infusion) further underscores its inability to provide an adequate platform for the

5  Reorganized Debtor.  Under its original Disclosure Statement, Signature proposed that

6  the in-kind contributed assets be reviewed by plan co-proponents Seth Hamot and James

7  McIntyre.  Now that Mr. Hamot no longer supports Signature Plan as his first preference,

8  and has been cast-off as a proponent, Signature has suggested the approval of their new

9  plan supporter, Kenneth Grossman of New World, is sufficient.  It is clear that Signature

10  would like to keep the review and approval of their in-kind assets to people who have a

11  stated and vested interest in their plan moving ahead, and there is no mention of a third-

12  party valuation by a disinterested party.  The schedules produced by Signature supporting

13  the valuation of the assets in conjunction with Mr. Noell's deposition contained very little

14  (and in certain cases inconsistent) information about the ultimate value of the assets, all of

15  which is based on Signature's seemingly optimistic opinion, in some cases, of a future

16  outcome.  These schedules also contained no information regarding how much it costs to

17  originate, service, monitor, and restructure loans like these, 85% of which by Signature's

18  proposed dollar value and 60% by number are listed under Status "Current but

19  extending/restructuring."  It would be impossible for a competent professional to draw any

20  reasonable inference or conclusion about the value of the assets based on the information

21  provided.  If the loans provided are indicative of future loan production or purchases, it

22  further demonstrates what a significant volume increase (in dollars and numbers of loans)

23  is contemplated by the Signature Plan going forward based on the average size of the

24  loans.  Again, Signature has not been forthcoming about the scale of its business and

25  what it is offering to the Reorganized Debtor.

26

27

28

_____

[6] See Signature Disclosure Statement at Appendix 1, page 31 [Docket no. 1450].

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   Overall, the misleading implication that results from overstating the breadth of its

2   experience is that Signature claims to operate on a much greater scale than it actually

3   does. This leads to the obvious question: how will Signature effectively lead the

4   emergence of the Reorganized Debtor from bankruptcy, when its asset base is many

5   times greater than anything Signature has ever done? Based on the OEC's review of the

6   evidence to date, Signature has not sufficiently answered this critical question.

7        **B.**   **Signature's Discussion of its Management Fees in its Disclosure**

8             **Statement and During the Solicitation Process Has Been Misleading**

9        The Signature Disclosure Statement is misleading about management fees, and

10   the confusion has been compounded during the solicitation (and re-solicitation) process.

11   At page 99 of the Signature Disclosure Statement, it states that "the annual salaries of

12   Messrs. Noell, Donatelli and Ross shall not exceed $150,000 per year for their services to

13   the Reorganized Debtor." Signature has repeatedly emphasized this point during the

14   solicitation process. A close review of the projections, however, reveals that this

15   arrangement is expected to last only through 2011. Thereafter, the projections show the

16   2% of assets plus 20% of profits (after a 7% return on assets) structure that was so

17   heavily criticized in earlier versions of Signature's disclosure statement. Moreover,

18   Signature has retained the right for the New Board to award the management company or

19   its professionals an annual bonus "above and beyond the budget based upon

20   performance." It is not the desire to be compensated that is problematic—it is the

21   misleading solicitation efforts that accompanied it by assuring creditors and equity holders

22   that the principals of Signature would only receive $150,000 per year.

23        **C.**   **The Statements in the Recently-Filed Weingarten Declaration Are**

24             **Inaccurate in Several Material Respects**

25        Signature's most recent factual misstatements have come in the form of the

26   Weingarten Declaration that was filed on April 16, 2010. In paragraphs 14 through 16, Mr.

27   Weingarten, a witness for Signature, testifies that Signature's right to purchase shares in

28   the Reorganized Debtor at below the current share price is not dilutive and is in fact

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    appropriate.  Notwithstanding this statement, Signature inconsistently contends that

2    Ranch Capital's warrants, with a strike price well above Signature's purchase price and

3    the current market price of the stock (and with much higher "knock-in" requirements) are

4    dilutive.

5            Other parts of the Weingarten Declaration are simply factually inaccurate.

6    Notwithstanding statements made in Paragraphs 21 and 25 through 27, Ranch Capital

7    stands to receive only 5% of the fully diluted shares of the Reorganized Debtor through

8    the warrants granted to it per the terms of the Amended Management Agreement.  The

9    remaining warrants are strictly subject to the approval of the New Board.  As such, it is

10   simply improper to consider these warrants to be dilutive because the New Board will be

11   free to agree or not to these issuances in the future based on Ranch Capital's

12   performance.  Similar to Signature's representations during solicitation that its 2% of

13   assets and 20% of profits management fee structure, future warrant grants to Ranch

14   Capital are left to the sole discretion of the New Board.  It is simply hypocrisy and

15   falsehood to characterize ungranted, unapproved warrants as dilutive.

16           Similarly, in paragraphs 23 and 24, Mr. Weingarten attempts to show the

17   superiority to equity holders of Signature's treatment of TOPrS (as compared to treatment

18   under the OEC Plan).  Again, this statement misses the mark.  While it is true the

19   Signature Plan distributes fewer shares to the TOPrS, it distributes $5 million more cash,

20   and also distributes a note that matures in 2016 (versus the note that matures in 2021

21   under the OEC Plan).  The correct way to compare the treatment under the Signature and

22   OEC Plans is to value the **total** package of consideration being distributed under each.

23   By this method, Signature and the OEC offer packages of consideration to the TOPrS that

24   are very close in total value, especially if one adopts Mr. Weingarten's view that the

25   shares are only worth $0.80 per share.  Moreover, the OEC Plan has the advantages of

26   leaving $5 million more investable cash in the Reorganized Debtor and deferring for five

27   additional years the date by when the new TOPrS Note must be repaid.  Finally, and

28   perhaps most importantly, the OEC Plan does not provide for the issuance of 12.5 million

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

1  new shares (unrelated to the TOPrS consideration) at a price below current trading

2  values.

3          What has become apparent is that Signature and New World will do and say what

4  they think they need to say to get one of their plans confirmed and to minimize their

5  downsides.  But that is not what chapter 11 was intended for and their conduct should not

6  be condoned.

7

8  IV.     **THE PROPOSED MANAGEMENT AGREEMENT SIMPLY DOES NOT**

9          **MATERIALLY MODIFY THE OEC PLAN**

10         In their opposition, Signature and New World accuse the OEC and Ranch Capital

11 of willfully delaying disclosure of the terms of the management agreement until the last

12 minute, accusing the OEC of failing to propose the Plan in good faith as required by 11

13 U.S.C. § 1129(a)(3).  The accusations in the Opposition are unfounded and incorrect and,

14 as set forth below, form part of a pattern of Signature distorting the truth, making

15 misrepresentations, and engaging in hyperbole, consistent with their win-at-all-costs

16 approach.

17         Also in their opposition, New World and Signature contend that the Amended

18 Management Agreement constitutes a material modification to the Plan, contending that

19 (1) the board composition has changed; (2) the management team and its compensation

20 are materially changed; (3) the business plan is a different business plan; and (4) the

21 contemplated issuance of warrants to Ranch will be highly dilutive.  Signature and New

22 World are wrong on all accounts.

23     A.     **The OEC and Ranch Capital negotiated the terms of the Management**

24            **Agreement in good faith and have not concealed any relevant facts**

25            **from interested parties.**

26         The OEC did not conceal any of the terms of its retention of Ranch Capital as the

27 interim management team.  In fact, the OEC and Ranch Capital have disclosed the terms

28 to the public as they became known.  As set forth in the attached declaration of Lawrence

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   Hershfield, when Ranch Capital agreed to serve as the interim management team under

2   the OEC Plan, Ranch Capital wanted a comprehensive agreement that included financial

3   terms to be agreed and executed, and Mr. Hershfield requested such an agreement from

4   Mr. Williams.  However, although Mr. Williams indicated he would be receptive to a

5   package that included warrants, he told Mr. Hershfield that any long-term agreement

6   should ultimately be decided upon and approved by the New Board.

7          During these conversations, Mr. Williams did indicate to Mr. Hershfield that he

8   thought that warrants for a 5% ownership interest in the Reorganized Debtor would be

9   acceptable as part of the terms of an interim management agreement and agreed to raise

10  the issue with the OEC.  At that time, however, the OEC was not prepared to enter into

11  any formal arrangement to grant Ranch Capital warrants as part of the interim

12  management agreement.  As a result, the only terms that were agreed upon when the

13  OEC filed its *Notice of Designation of Management Team and Certain Members of the*

14  *Board of Directors for the Reorganized Debtor Pursuant to Agreement with Ranch Capital,*

15  *LLC, in the Event that the Court Confirms the Official Committee of Equity Holders' Fourth*

16  *Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010)* (the "Designation

17  Notice") were those set forth in that notice and no others.

18         A few weeks later, the various plan proponents attended a global settlement

19  meeting in Dallas, Texas.  Ranch Capital was also in attendance at that meeting.  During

20  the course of the day, it became apparent to the OEC and Ranch Capital that the absence

21  of an agreement regarding the terms of Ranch Capital's interim management of the

22  Reorganized Debtor could be problematic and cause unnecessary concern among

23  creditors and equity holders who wanted assurances that Ranch Capital would indeed be

24  the interim manager of the Reorganized Debtor post-confirmation.  Accordingly, the OEC

25  and Ranch Capital agreed to resolve that open issue by agreeing on an outline of interim

26  and long-term financial terms that would be acceptable to the OEC, although it was

27  always the understanding of the parties that the terms for long-term management would

28  need to be acceptable to and approved by the New Board.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    Accordingly, Ranch Capital and the OEC continued their discussions, and the

2  negotiations ultimately resulted in the management agreement that was attached to the

3  plan supplement filed with the Court on April 9, 2010 (the "Original Management

4  Agreement").  Pursuant to the Original Management Agreement, the provisions regarding

5  interim management would be binding on the Reorganized Debtor on the Effective Date of

6  the OEC Plan, and the long-term management provisions would be binding upon the

7  Reorganized Debtor only if they were ratified by the New Board at a meeting of the New

8  Board to be held within thirty days after the Effective Date.  Initially, Frank Williams, Jr.,

9  and William Stern, who are expected to be members of the New Board if the OEC Plan is

10  confirmed, agreed to vote in favor of the provisions and agreed to recommend to the other

11  members of the New Board that they do the same.  If the provisions of the long-term

12  management agreement were not approved, then the Original Management Agreement

13  provided that the interim management provisions would only be binding for a period of

14  twelve months.

15    The material provisions for interim management contained in the Original

16  Management Agreement were the following:  (1) in exchange for providing management

17  services, Ranch Capital was to receive $125,000 per month; (2) although Ranch Capital

18  would receive warrants equal to 5% of the fully diluted shares of the Reorganized Debtor

19  on the Effective Date at a strike price of $1.04 per share, which would vest on the

20  Effective Date, such warrants would be exercisable only if the Volume Weighted Average

21  Price of the Reorganized Debtor's common stock equaled or exceeded $1.25 per share

22  over a period of twenty consecutive trading days during the warrant term of ten years; (3)

23  if the OEC Plan was confirmed, then the Reorganized Debtor would reimburse Ranch

24  Capital's actual out of pocket expenses incurred in connection with this case in an amount

25  not to exceed $550,000; and (4) if the long-term provisions of the Original Management

26  Agreement were not ratified by the Board, and Ranch Capital was terminated as manager

27  after the Interim Term, and the share price performance of the Reorganized Debtor

28  exceeded the performance of the S&P 500 Index, Ranch Capital would receive additional

1  warrants with the same terms as its initial warrant grant to bring Ranch Capital's total

2  ownership upon exercise to 10% of the fully diluted shares.

3      After the Original Management Agreement was filed, representatives of the TOPrS

4  Group requested certain changes to the agreement, including elimination of the

5  requirement that Mr. Williams and Mr. Stern agree to vote in favor of the provisions

6  regarding long-term management, reducing the term of the first tranche of warrants from

7  ten years to six years, and eliminating the potential that Ranch Capital would get the

8  second tranche of warrants even if a long-term agreement was not entered into.  Ranch

9  Capital and the OEC were amenable to these changes and filed a revised management

10 agreement (the "Amended Management Agreement") on April 16, 2010 as an attachment

11 to the *Amended Plan Supplement for the Official Committee of Equity Holders' Fourth*

12 *Amended Chapter 11 Plan of Reorganization (Dated March 24, 2010); Declaration of*

13 *Lawrence S. Hershfield in Support* [Docket No. 1932].  Thus, contrary to Signature and

14 New World's oppositions, the only existing agreement with respect to warrants is for 5% of

15 the shares of the Reorganized Debtor, not 20%.  The remainder of the warrants are

16 subject to approval by the New Board of the Reorganized Debtor and, if granted, will

17 presumably be linked to the performance of Ranch Capital during the first year after

18 emergence.  At their core, the reckless allegations of Signature and New World are a

19 deliberate effort to incorrectly mischaracterize the compensation of Ranch Capital under

20 the Amended Management Agreement as being inconsistent with the OEC Disclosure

21 Statement.

22      Moreover, this agreement was not finalized until shortly before the filing of the

23 Original Management Agreement on April 9, 2010.  There was no plot to withhold

24 information from creditors and equity holders and nothing deceptive has occurred.  To

25 twist the truth to argue that the OEC has somehow proposed the OEC Plan in bad faith is

26 ridiculous.

27

28

413835.1                         17                              REPLY

**B.**     <u>The Identification of the Members of the New Board Is Not a Material Modification</u>[7]

First, the finalization of the members of the New Board is not a material modification. With respect to the composition of the New Board, the *Official Committee of Equity Holders' Fourth Amended Disclosure Statement Describing Fourth Amended Chapter 11 Plan of Reorganization (Dated January 20, 2010)* (the "OEC Disclosure Statement") contemplated that there would be seven members and provided as follows:

(1)     In the event that Class 3B voted to accept the OEC Plan and the OEC Plan was otherwise confirmable, that once the TOPrS Payment was made, three of the members of the New Board would be selected by certain holders of Allowed TOPrS Claims, three of the members would be selected by the OEC, and the last seat would be held by someone mutually agreed upon by those two groups. Until the TOPrS Payment is made, the holders of Allowed TOPrS Claims would have one of the seats otherwise available to a designee of the OEC so that four of the members of the New Board would be selected by the TOPrS, two would be selected by the OEC, and one would be mutually agreed upon. The OEC designees were not identified. *See* OEC Disclosure Statement excerpts at page 68, attached to the Smiley Declaration as Exhibit "3."

(2)     In the event that Class 3B voted to reject the OEC Plan, the Disclosure Statement indicated that the New Board would be comprised of: (a) Mr. Williams; (b) Mr. Stern; (c) Steven J. Schwartz or another OEC designee; (d) Jacques Rebibo or another

---

[7] See Fed. R. Bankr. P. 3019 (stating that if "the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity holder who has not accepted in writing the modification, it shall be deemed accepted by creditors and equity security holders who have previously accepted the Plan."). See Fed. R. Bankr. P. 3019(a); see also In re Enron Corp., 2004 Bankr. LEXIS 2549, *259 (Bankr. S.D.N.Y. July 15, 2004) ("The best test [for whether written consent under Federal Rule of Bankruptcy Procedure 3019 is required] is whether the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.") (emphasis added) (citing 9 Collier on Bankruptcy ¶ 113019.01 (15th ed. Rev. 2004)). As shown herein, the modifications to the OEC Plan do not adversely affect the treatment provided to creditors that have previously accepted the OEC Plan. Because the Modification does not adversely affect the treatment provided to any Classes that have accepted the Plan, the Modification complies in all respects with Bankruptcy Code section 1127 and the Bankruptcy Rules and should be deemed accepted by all Classes previously voting in favor of the OEC Plan.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   OEC designee; (e) two additional designees of the OEC; and (f) Don Royer, the present

2   general counsel of the Debtor, if he elected to accept, or by another OEC Designee. *Id.* at

3   67.  The OEC reserved the right to appoint more directors or fewer directors through the

4   Effective Date of the OEC Plan. *Id.*

5          Consistent with these provisions, the Designation Notice informed creditors that if

6   Class 3B voted in favor of the Plan, then (1) until the TOPrS Payment was made, one of

7   the two seats to be held by designees of the OEC would be held by Lawrence Hershfield,

8   and (2) after the TOPrS Payment was made, one of the three seats to be held by a

9   designee of the OEC would be held by Lawrence Hershfield.  If Class 3B voted to reject

10  the Plan, then the Designation Notice informed creditors that two of the seats to be held

11  by designees of the OEC would be filled with Lawrence Hershfield and Randall Jenson,

12  both of Ranch Capital.  A copy of the Designation Notice is attached to the Smiley

13  Declaration as Exhibit "5."

14         The identification of these members of the New Board was done in a manner

15  entirely consistent with the OEC Plan.  No new seats were added to the Board and the

16  balance of power was not altered.  The identification did little more than ensure that the

17  OEC complied with 11 U.S.C. § 1129(a)(5) by disclosing the composition of the New

18  Board.  As a result, there was no modification, much less a material one.

19  **C.**     **The Designation of Ranch Capital as the Management Team and the**

20         **Proposed Compensation Were Contemplated by and Consistent with**

21         **the Disclosure Statement.**

22         The Disclosure Statement informed creditors that the new chief executive officer

23  and management team of the Reorganized Debtor would be designated at or prior to the

24  hearing on confirmation of the OEC Plan. *See OEC Disclosure Statement* at 69, excerpts

25  attached to the Smiley Declaration as Exhibit "3" hereto.  The Disclosure Statement

26  further informed creditors that the cash flow projections in support of the OEC Plan

27  allocated $1.5 million per year for salaries and benefits for senior management of the

28  Reorganized Debtor.  *Id.*  In the business plan attached to the Disclosure Statement as

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  Exhibit "3," creditors were informed that the OEC had engaged in discussions with various

2  management personnel and that it was the OEC's intention "to compensate these

3  individuals on a performance-based incentive program which is heavily stock-laden, but

4  not dilutive to equity holders relative to the financial projections." *Id.* at page 214, excerpts

5  attached as "3."

6        Consistent with these disclosures, prior to the closing of the solicitation process

7  and in advance of its deadline for doing so, the OEC filed the Designation Notice,

8  identifying Ranch Capital as its interim management team.  Consistent with the Disclosure

9  Statement, the Amended Management Agreement indicates that Ranch Capital will

10  receive $125,000 per month, or $1.5 million per year, as a management fee.  In addition,

11  as compensation for the interim management services and as discussed in greater detail

12  above, it will receive warrants for 5% of the shares of stock in the Reorganized Debtor at a

13  strike price of $1.04 per share, which represents 106% of the closing stock price of $0.98

14  per share on April 9, 2010, and which are exercisable only if the Volume Weighted

15  Average Price of the Reorganized Debtor's common stock equals or exceeds $1.25 per

16  share over a period of twenty consecutive trading days during the six-year warrant term.

17  Thus, as specifically contemplated in the Disclosure Statement, the warrants that Ranch

18  Capital receives under the Amended Management Agreement are directly tied to the

19  performance of the stock of the Reorganized Debtor, which is consistent with the business

20  plan incorporated into and attached to the Disclosure Statement.  The remaining warrants

21  set forth in the Amended Management Agreement remain subject to approval of the New

22  Board and, as contemplated by the Disclosure Statement, are also tied to performance.

23  The designation of Ranch Capital and its proposed compensation over the short-term and

24  the long-term, if the long-term provisions are approved by the New Board, are not

25  modifications to the OEC Plan but are instead entirely consistent with it.

26        The warrants being issued to Ranch Capital are consistent with the compensation

27  structure described in the Disclosure Statement; specifically, they are performance based

28  and not "dilutive" ,as such term is most often used, because they are well "out-of-the-

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  money." Virtually all publicly-traded companies use options (which are economically

2  identical to warrants) to compensate senior management.   It is particularly peculiar that

3  Signature has argued that the Ranch Capital Warrants are dilutive, inasmuch as in his

4  declaration Mr. Weingarten, Signature's expert on these matters, goes to great length to

5  show that a per-share purchase price of $0.80 per share (which is 23% below Ranch

6  Capital's warrant exercise price and 36% below the Ranch Capital "knock-in price" of

7  $1.25) is an appropriate and fair price for Signature purchase of shares.

8       With respect to the concern Signature raises about how Ranch will determine

9  which investments it would make on behalf of the Reorganized Debtor and which it might

10 make for its own business, the Amended Management Agreement proposes to address

11 that issue by indicating that during the term of the management agreement, Ranch will

12 offer to the Reorganized Debtor all "newly sourced" investment opportunities that it

13 believes are appropriate for the Reorganized Debtor based on the amount of capital

14 required and the Reorganized Debtor's projected capital.  If the investment is too large for

15 the Reorganized Debtor to fund by itself or if there are other reasons that Ranch Capital

16 believes it would be prudent or necessary to include others as partners, the Reorganized

17 Debtor may be offered the opportunity to co-invest, subject to approval of the other

18 investors.  This issue is one that will present itself to any of the equity plan proponents as

19 long as their management company is not required to work solely for the Reorganized

20 Debtor.  In other words, this is not an issue unique to the OEC Plan and, in any event,

21 does not result in or constitute a modification to the Plan.  In his deposition, Mr.

22 Hershfield, Chief Executive Officer of Ranch Capital, reiterated his belief that he had a

23 good faith obligation to present *all* Ranch Capital newly sourced opportunities to the

24 Reorganized Debtor, and only identified one very unlikely scenario of a potential new deal

25 that might not be offered.[8]

26

27 _____

[88] The one situation that Mr. Hershfield identified that might not be presented to the Reorganized Debtor

28 would be if Ranch Capital came upon a very large transaction (likely over $1 billion) that might be of interest
(Continued...)

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1

### D.    The OEC's business plan has not changed.

2    With respect to the proposed business plan for the Reorganized Debtor, the OEC

3    explained in the Disclosure Statement provided that "[t]he composition and nature of the

4    investments will be determined with the goal of providing the Reorganized Debtor an

5    adequate return on investment while maintaining liquidity to service short-term obligations

6    and to capitalize on continuing business opportunities." *OEC Disclosure Statement* at

7    page 74, excerpts attached as Exhibit "3." With respect to the long-term strategy, the

8    Disclosure Statement informed creditors that it was intended that the Reorganized Debtor

9    would utilize its assets to invest in business opportunity areas and suggested that such

10    opportunities included, but were by no means limited to, a roll-up of community bank

11    acquisitions, the purchase, work-out, and sale of distressed loans, the funding and

12    servicing of hard money mortgages, and the development of a middle-market asset-based

13    lending platform.  As set forth in Mr. Hershfield's previously filed declaration, Ranch

14    Capital's experience and Business Plan fit squarely within the strategies and plans set

15    forth in the OEC Plan.

16    In sum, the retention of Ranch Capital pursuant to the Designation Notice and the

17    Amended Management Agreement are consistent with and were contemplated by the

18    Plan and the Disclosure Statement.  There have been no modifications to the Plan, much

19    less material ones, and there has therefore been no violation of 11 U.S.C. § 1129(a)(5).

20                                              Respectfully submitted,

21    Dated:  April 21, 2010                    WEILAND, GOLDEN
                                               SMILEY, WANG EKVALL & STROK, LLP
22                                             By:  /s/ Philip E. Strok
23                                                  PHILIP E. STROK
                                                  Attorneys for the Official Committee
24                                                  of Equity Holders

25

26    _____

      (...Continued)
27    to Berkshire Hathaway.  Under such circumstance, Berkshire **might** be unwilling to have a very small
      partner, but Mr. Hershfield stated he would certainly strive to include the Reorganized Debtor.
28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

| In re:                                        | CHAPTER: 11                    |
|-----------------------------------------------|--------------------------------|
| **FREMONT GENERAL CORPORATION**               |                                |
|                                  Debtor(s).   | CASE NUMBER: **08-13421 ES**   |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 TOWN CENTER DRIVE, SUITE 950, COSTA MESA, CA  92626**

A true and correct copy of the foregoing document described <u>REPLY TO THE OPPOSITION OF NEW WORLD ACQUISITION, LLC AND SIGNATURE GROUP HOLDINGS, LLC TO PLAN SUPPLEMENT FOR THE OFFICIAL COMMITTEE OF EQUITY HOLDERS FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION (DATED MARCH 24, 2010) AND SUPPLEMENT TO OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY HOLDERS TO:(A) MOTION OF SIGNATURE GROUP HOLDINGS, LLC AND JAMES McINTYRE, SR. FOR ORDER APPROVING (1) SETTLEMENT AGREEMENT WITH KENNETH S. GROSSMAN AND NEW WORLD ACQUISITION, LLC, PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 3018 AND 9019; AND (2) NON-MATERIAL MODIFICATIONS TO "SIGNATURE GROUP HOLDINGS, LLC'S SECOND AMENDED PLAN OF REORGANIZATION;(B) MOTION FOR APPROVAL OF NON MATERIAL MODIFICATIONS OF NEW WORLD ACQUISITION, LLC'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR FREMONT GENERAL CORPORATION (DATED APRIL 9, 2010); AND (C) MOTION FOR ORDER PURSUANT TO RULE 3018 FOR ORDER APPROVING CHANGE OF VOTES OF SHAREHOLDERS TO ACCEPTANCES;MEMORANDUM OF POINTS AND AUTHORITIES; [DECLARATIONS OF EVAN D. SMILEY, JEFF PIES, AND LAWRENCE HERSHFIELD FILED CONCURRENTLY IN SUPPORT THEREOF</u>will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>April 21, 2010</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☑ Service information continued on attached page

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):**
On <u>April 21, 2010</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.*

☑ Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on <u>April 21, 2010</u> I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

 The Honorable Erithe Smith, 411 W. 4th Street, Suite 2030, Santa Ana, CA  92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 21, 2010 | Kelly M. Rivera | *Kelly M. Rivera* (signature) |
|----------------|-----------------|-------------------------------|
| Date           | Type Name       | Signature                     |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

In re FREMONT GENERAL CORPORATION
Case No.: 8:08-bk-13421-ES

## SERVICE LIST

Office of the U.S. Trustee
Attn: Frank Cadigan
411 West Fourth Street, Suite 9041
Santa Ana, CA 92701-8000
**Email: Frank.Cadigan.usdoj.gov**

Fremont General Corporations
175 N. Riverview Drive
Anaheim, CA  92808
Email: invrel@ftinv.com
**Debtor**

Theodor Stolman, Esq.
Scott H. Yun, Esq.
Stutman Treister & Glatt
1901 Avenue of the Stars, Suite 1200
Los Angeles, CA 90067-6013
Email: tstolman@stutman.com
**Debtor 's Counsel**

Robert W. Jones
J. Maxwell Tucker
Brent R. McIlwain, Esq.
Patton Boggs, LLP
2000 McKinney Avenue, Ste 1700
Dallas, TX 75201-1954
**Email: rwjones@pattonboggs.com**
**Debtor's Counsel**

Lee R. Bogdanoff, Esq.
Klee, Tuchin, Bogdanoff & Stern, LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067-6049
Email: lbogdanoff@ktbslaw.com
Email: jshenson@ktbslaw.com
**Counsel for the Official Committee of
Unsecured Creditors**

Frank E. Williams, Jr.
P.O. Box 4004
Merrifiled, VA 22116
Email: fewr2789@aol.com
**Chairman of the Equity Committee**

Paul Dagostino
5642 Scripps Street
San Diego, CA 92122
Email: paul_dogostino@hotmail.com
**Equity Committee Member**

Lynn Ehlers
4725-27th Avenue So.
Minneapolis, MN 55406-3721
Email: lynn@upyourassets.com
**Equity Committee Member**

William Holmes
2467 Cheyenne Drive
Gambrills, MD 21054
Email: wmikeh26@gmail.com
**Equity Committee Member**

Jeffrey Michael Pies
1818 Stoner Avenue, #104
Los Angeles, CA 90025
Email: jeff.pies@gmail.com
**Equity Committee Member**

William M. Stern
8000 Maryland Avenue
Suite 800
St. Louis, MO 63105-3911
Email: bstern2@bloomberg.net
**Equity Committee Member**

Wells Fargo Bank, N.A. as successor
trustee to The Bank of New York Trust
Company, N.A.
c/o James R. Lewis, V.P. or
Thomas M. Korsman, VP
45 Broadway, 14th Floor
New York, NY 10006
Email: James.r.lewis@wellsfargo.com
**Creditors Committee**

HSBC Bank USA, National Association,
as indenture trustee
Indenture dated March 1, 1999
c/o Robert Conrad, V.P.
10 East 40th Street, 14th Floor
New York, NY 10018
Email: Robert.conrad@us.hsbc.com
**Creditors Committee**

Tennebaum Multi-Strategy Master Fund
c/o David Hollander, Managing Director
2951 28th Street, Suite 1000
Santa Monica, CA 90405
Email: david@tennenbaumcapital.com
**Creditors Committee**

Rita Angel
c/o Joshua T. Angel
Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016
Email: jangel@herrick.com
**Creditors Committee**

Dennis & Loretta Danko Family Trust
Dennis Danko, Trustee
10941 E. Buckskin Trail
Scottsdale, AZ 85255
Email: onedgd@yahoo.com
**Creditors Committee**

~~Larry H. Spector~~
~~Bazelon Less & Feldman, P.c.~~
~~1515 Market Street, Suite 700~~
~~Philadelphia, PA 19102~~
Email: lspector@bazless.com
**Attorneys for ACE Group of Companies**

Jesse S. Finlayson. Esq.
Michael R. Williams, Esq.
Finlayson Augustini & Williams LLP
15615 Alton Pkwy Ste 250
Irvine, CA 92618
Email: jfinlayson@faw-law.com
**Attorneys for Lead Plaintiff New York
State Teacher's Retirement System**

Michael S. Etkin, Esq.
S. Jason Teele, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, NJ 07068
Email: metkin@lowenstein.com
**Attorneys for Lead Plaintiff New
York State Teacher's Retirement System**

Salvatore Graziano, Esq.
Bernstein Litowitz Beger & Grossmann LLP
1285 Avenue fo the Americas
New York, NY 10019
Email: sgraziano@blbglaw.com
**Attorneys for Lead Plaintiff New York
State Teacher's Retirement System**

Andrew I. Silfen, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019
Email: silfen.andrew@arentfox.com
**Attorneys for Wells Fargo Bank, N.A.,
And Wells Fargo Delaware Trust
Company**

Aram Ordubegian, Esq.
Michael S. Cryan
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Email: Ordubegian.aram@arentfox.com
**Attorneys for Wells Fargo Bank, N.A.,
& Wells Fargo Delaware Trust
Company**

William H. Kiekhofer, Esq.
Jodie Grotins, Esq.
McGuire Woods LLP
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
Email: wkiekhofer@mcguirewoods.com
**Attorneys for U.S. National Bank**
**Association,**
**as Trustee**

Ira H. Goldman, Esq.
Kathleen M. LaManna, Esq.
Corrine L. Burnick, Esq.
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Email: igoldman@goodwin.com
**Attorneys for U.S. National Bank**
**Association,**
**as Trustee**

Sarah D. Moyed
U.S. Securities & Exchange Commission
5670 Wilshire Boulevard, Suite 1100
Los Angeles, CA 90036
Email: moyeds@sec.gov

T. David Copley
Keller Rohrback
Suite 3200
1201 Third Avenue
Seattle, WA 98101
Email: Dcopley@kellerrohrback.com

Johnny Ong
Ong Trust Dated 5/17/1986
1922 Westwind
Santa Ana, CA 92704

Ronald Wilborn
P.O. Box 170259
Atlanta, GA 30317
Email: ronwilborn@yahoo.com

~~Ronald Wilborn~~
~~1949 Bonner Street~~
~~Decatur, GA 30032~~
MAIL RETURNED
Email: ronwilborn@yahoo.com

McCurdy & Candler LLC
Attn: Bankrutpcy Department
250 East Ponce De Leon Ave, Suite 200
Decatur, GA 30030
Email: sgelernter@mccurdycandler.com

~~Kenneth S. Grossman~~
~~599 Lexington Avenue, 21st Floor~~
~~New York, NY 10022~~
MAIL RETURNED
Email: jgrossbal@aol.com

Barry Freeman, Esq.
Jeffer, Mangels, Butler & Marmaro, LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Email: bfreeman@jmbm.com

Gary O. Caris, Esq.
McKenna Long & Aldridge, LLP
444 South Flower Street, 8th Floor
Los Angeles, CA 90071
Email: gcaris@mckennalong.com

Franklin H. Top, Esq.
Chapman & Cutler LLP
111 West Monroe Street
Chicago, IL 60603-4080
Email: Top@chapman.com

Adelaide Maudsley, Esq.
Chapman & Cutler LLP
201 South Main Street, Suite 2000
Salt Lake City, UT 84111
Email:maudsley@chapman.com

Christopher E. Prince
Lesnick Prince
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Email: cprince@lesnickprince.com
**Attorneys for New World Acquisition**

Carole Neville
Peter D. Wolfson
Sonnenschein, Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020
Email:cneville@sonnenschein.com

pwolfson@sonnenschein.com
**Attorneys for New World Acquisition**

John Schafer
Chris Manderson
Lance A. McKinlay
Manderson, Schafer & McKinlay LLP
4695 MacArthur Court, Suite 1270
Newport Beach, CA 92660
Email: jps@mandersonllp.com
wcm@mandersonllp.com
lam@mandersonllp.com
**Attorneys for Signature Group Holdings
LLC**

Thomas B. Walper
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Email: thomas.walper@mto.com
**Attorneys for Ranch Capital, LLC**

Mr. John Mlynick
23 Mechanic Street
Shelburne Falls, MA  01370
Email: jmlynick@earthlink.net

Mr. Andre Mutchnik
17 de la Poudriere, #105
Montreal, Quebec, Canada H4G 3J5
Email: andre.mutchnik@hotmail.com

Denise H. Feleihan
209 Royal Aberdeen Way
Las Vegas, NV 89144
**Pro Se**
(702) 400-0910- Phone

Daniels, Fine, Israel, Schonbuch &
Lebovits, LLP
1801 Century Park East, 9th Floor
Los Angeles, CA 90067
Phone: (310) 556-7900
**Attorneys for Plaintiff, Gwyneth E.
Colburn**

Richard Marshack, Esq.
Sean A. Kading
Marshack Hays LLP
5410 Trabuco Road, Suite 130
Irvine, CA 92620
Email: rmarshack@marshackhays.com
Skading@marshackhays.com
**Attorneys for Thea Stuedli , Donald Royer,
Richard Sanchez**

Edmund G. Brown, Jr.
Felix E. Leatherwood
W. Dean Freeman
Elisa B. Wolfe-Donato
California Department of Justice
300 South Spring Street, #1702
Los Angeles, CA 90013
Email: Elisa.Wolfe@doj.ca.gov
**Attorneys for California Franchise Tax
Board**

Lewis R. Landau
Attorney at Law
23564 Calabasas Road, Suite 104
Calabasas, CA 91302
Email: Lew@landaunet.com
**Attorneys for Alan W. Faigin**

Lynn Lincoln Sarko
T. David Copley
Sarah H. Kimberly
Gary Gotto
Keller Rohrback, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101
**Interim Lead Counsel for Erisa Plaintiffs**

Michael D. Braun
Braun Law Group, PC
10680 W. Pico Boulevard, Suite 280
Los Angeles, CA 90064
Email: mdb@braunlawgroup.com
**Interim Liason Counsel for ERISA
Plaintiffs**

Ron Bender, Esq.
Philip Gasteier, Esq.
Levene Neale Bender Rankin & Brill LLP
10250 Constellation Bl #1700
Los Angeles, CA 90067
Email: rb@lnbrb.com
Email: PAG@lnbrb.com

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

United States Department of Justice Tax
Division - Civil Trial Section, Wtrn Region
P.O. Box 683
Ben Franklin Station
Washington, DC 20044

United States Attorney's Office Tax Division
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles, CA 90012

Tennenbaum Capital Partners, LLC
Attn: Steve Wilson
2951 28th Street, Suite 1000
Santa Monica, CA 90405

Bank of New York
Attn: Bridget Schessler
301 Grant Street, Suite 1100
Pittsburgh, PA 15219

HSBC Bank USA, N.A.
Attn: Robert A. Conrad
452 Fifth Avenue
New York, NY 10016

Federal Deposit Insurance Company
Division of Supervision and Consumer
Protection
San Francisco Regional Office
25 Jessie Street at Ecker Square
San Francisco, CA 94105

State of California
Department of Financial Institutions
45 Fremont Street, Suite 1700
San Francisco, CA 94105-2219

Andrew Glenn
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019
Email: Aglenn@kasowitz.com

Michael Fox
Olshan Grundman Frome Rozenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, NY 10022

Costa Brava Partnership III LP
420 Boylston Street, 5th Floor
Boston, MA 02116-4002

Seth Hamot
Gideon Bear Hamot
222 Berkeley Street, 17th Floor
Boston, MA 02116
Email: Seth@rrhcap.com

Michael Blitzer
Kingstown Capital Management
1270 Broadway, Ste 1009
New York, NY 10001

Howard Amster
23811 Chagrin Blvd., #200
Beachwood, OH 44122-5525
Email: howarda@roadrunner.com

Raymond Meyers
275 Ashland Avenue
Staten Island, NY 10309

Email only

Michael Schwerin
Email: mfs@me.com

James McIntyre
Email: jamcintyresr@yahoo.com

Ricardo Chance
Email: rchance@KPMG.com

wilson@tennenbaumcapital.com

jeevan.gore@tennenbaumcapital.com

**Electronic Mail Notice List**

Kyra E Andrassy    kandrassy@wgllp.com
Kristen N Beall    kbeall@pattonboggs.com, bmcilwain@pattonboggs.com
Reem J Bello    rbello@wgllp.com
Ron Bender    rb@lnbrb.com
Dustin P Branch    dustin.branch@kattenlaw.com
Brendt C Butler    BButler@rutan.com
Frank Cadigan    frank.cadigan@usdoj.gov
Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
Lisa W Chao    lisa.chao@doj.ca.gov
Shawn M Christianson    cmcintire@buchalter.com
Eric A Cook    ecook@ebglaw.com
Kristopher Davis    ksdavis@ebglaw.com
Ted A Dillman    Ted.dillman@lw.com
Willis B Douglass    Willis.B.Douglass@irscounsel.treas.gov
Jesse S Finlayson    jfinlayson@fwtrl.com, wmills@fwtrl.com
Philip A Gasteier    pag@lnbrb.com
Jodie M Grotins    jgrotins@mcguirewoods.com
Peter J Gurfein    pgurfein@akingump.com
Matthew Heyn    mheyn@ktbslaw.com
Whitman L Holt    wholt@stutman.com
Mark D Houle    mark.houle@pillsburylaw.com
Michelle Hribar    mhribar@rutan.com
Sean A Kading    skading@marshackhays.com
Derek J Kaufman    derek.kaufman@mto.com
William H. Kiekhofer    wkiekhofer@mcguirewoods.com
Lewis R Landau    lew@landaunet.com
Thomas A. Lee 2    notices@becket-lee.com
Kerri A Lyman    klyman@irell.com
Richard A Marshack    rmarshack@marshackhays.com, lbergini@marshackhays.com
Robert S Marticello    Rmarticello@wgllp.com
Neeta Menon    nmenon@stutman.com
Sarah D Moyed    moyeds@sec.gov
Mike D Neue    mneue@thelobelfirm.com, csolorzano@thelobelfirm.com
Aram Ordubegian    ordubegian.aram@arentfox.com
David L Osias    bcrfilings@allenmatkins.com, dosias@allenmatkins.com
Christina M Padien    cmoore@akingump.com
Jonathan Petrus    jpetrus@ktbslaw.com
David M Poitras    dpoitras@jmbm.com
Christopher E Prince    cprince@lesnickprince.com
Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
John P Schafer    jps@mandersonllp.com
Sarah Seewer    sarah.seewer@kirkland.com
Jonathon Shenson    jshenson@ktbslaw.com
Evan D Smiley    esmiley@wgllp.com
Philip E Strok    pstrok@wgllp.com
Samuel J Teele    steele@lowenstein.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
Thomas J Welsh    tomwelsh@orrick.com
Brian D Wesley    brian.wesley@doj.ca.gov
Alan Z Yudkowsky    ayudkowsky@stroock.com
Scott H Yun    syun@stutman.com