JOHN P. SCHAFER (SBN 205638)
jps@mandersonllo.com
WILLIAM C. MANDERSON (SBN 211648)
wcm@mandersonllp.com
MANDERSON, SCHAFER & McKINLAY LLP
4695 MacArthur Court, Suite 1270
Newport Beach, CA 92660
Tel: (949) 788-1038
Fax: (949) 743-8310

Attorneys for reorganized debtor Signature Group
Holdings, Inc. f/k/a Fremont General Corporation

Brendt C. Butler (SBN 211273)
bbutler@rutan.com
RUTAN & TUCKER, LLP
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Tel: (714) 641-5100
Fax: (714) 546-9035

Attorneys for reorganized debtor Signature Group
Holdings, lnc. f/k/a Fremont General Corporation

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-13421-ES |
| FREMONT GENERAL CORPORATION, a Nevada corporation, | Chapter 11 Case |
| Debtor. | DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF THE OBJECTION OF REORGANIZED DEBTOR SIGNATURE GROUP HOLDINGS, INC. TO THE FINAL FEE APPLICATION OF ARENT FOX, LLP |
| | **Hearing** |
| Taxpayer ID No. 95-2815260 | Date:        November 12, 2010<br>Time:        10:00 a.m.<br>Courtroom:    5A<br>Judge:        Hon. Erithe A. Smith |

I, JAMES P. SCHRATZ, hereby declare:

1.    I am an attorney at law licensed to practice in the State of California, and have been so licensed since 1976. I received my law degree from the University of San Francisco School of Law in June 1976, where I was the Editor-in-Chief of *The Law Review*. In September 1976, I joined the law firm of Heller, Ehrman, White & McAuliffe, where I worked as an associate in its litigation department.

2.    In March 1978 I left Heller, Ehrman, White & McAuliffe and joined a smaller firm until August 1980, when I joined Fireman's Fund Insurance Company in San Francisco, California, in its General Counsel's Office. My responsibilities included representing Fireman's Fund as attorney of record in various litigation matters throughout the country. In addition, I supervised outside counsel throughout the country on various types of cases, including many complex civil litigation cases.

3.    In 1984 I left the General Counsel's Office and transferred to the Claims Department where I established the Major Litigation Unit, which was responsible for managing complex litigation throughout the country, including the $65 million bankruptcy of The Woodson Company. In this role, I was responsible for approximately 1,000 cases and a staff of ten people, and became very familiar with the rates charged not only by Fireman's Fund "panel counsel," but also rates charged by solo practitioners and small, medium and large law firms throughout California.

4.    In July 1990 I was promoted to Vice President Major Claims, where my duties were expanded to include responsibility for any case throughout the world that had potential exposure of $3 million or more, and responsibility for supervising approximately 100 adjusters. Again, I continued my involvement in supervising cases throughout California and stayed abreast of what solo practitioners and small, medium and large law firms charged their respective clients.

5.    On January 1, 1994, I left Fireman's Fund to establish my own litigation management and consulting firm. I am the principal of Jim Schratz and Associates, a firm that conducts legal fee audits of various law firms throughout the country. Over the past sixteen years, while at Fireman's Fund and as an independent legal auditor, I have personally supervised or

DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF DEBTOR SIGNATURE GROUP'S OBJECTION TO THE
FINAL FEE APPLICATION OF ARENT FOX LLP

1   conducted approximately 900 legal fee audits throughout the country on behalf of both clients and

2   law firms, including governmental agencies, insurance companies, corporations, and private

3   individuals.

4   Many of these audits have involved plaintiffs' fee requests in fee-shifting cases. In

5   that role, I have performed legal fee audits of various law firms on behalf of the California

6   Department of Justice, the City and County of San Francisco, the City of Huntington Beach, the

7   Sonoma County Sheriff's Office, the State of Wisconsin, United Airlines, and Avis Rent-A-Car,

8   among others. The amount of the fee requests audited ranges from a low of a few hundred

9   thousand dollars to over $60 million.

10   In 1999, I was appointed by the District Court for the Northern Mariana Islands to

11   audit approximately $22 million in legal fees *In re the Estate of Larry Lee Hillblom*, one of the

12   founders of DHL Express, whose estate was valued at approximately $1 billion. I was also retained

13   by the United States Department of Justice to conduct an audit of a fee request in a nationwide

14   class action lawsuit against the Immigration and Naturalization Service. I have served as an

15   arbitrator for the Sonoma County Bar Association and the State Bar of California in their

16   mandatory fee arbitration programs.

17   In January 2010, I was retained by investor Carl Icahn to serve as special litigation

18   counsel to review approximately $60 million in legal fees in the *In re Tropicana Entertainment,*

19   *LLC, et al*, Case No. 08-10856 (KJC) ("*Tropicana*") in the United States Bankruptcy Court for the

20   District of Delaware.

21   In February 2010, in *Department of Fair Employment and Housing v. United*

22   *Dominion Realty* (Case Nos. 07CC12067, 02CC12069) the court accepted our audit findings

23   stating,

24   "In awarding fees in these amounts, the court has fully accepted the declaration of James P.
     Schratz in opposition to the motion, including all of his recommended reductions. The

25   court finds his qualifications to be impressive. Likewise his reasoning as to why the fees
     sought are excessive is persuasive."

26

27   In May 2010, I was again retained by Mr. Icahn to serve as special litigation counsel

28   to review an additional $6 million in legal fees in the related *In re Adamar of New Jersey, Inc. and*

-3-

1    *Manchester Mall, Inc.*, Case No. 09-20711 and 09-20716 in the United States Bankruptcy Court

2    for the District of New Jersey.

3          6.      I have qualified as an expert witness in numerous state courts, including San

4    Francisco Superior Court and Los Angeles Superior Court, and in federal district court in

5    Philadelphia and Pittsburgh, Pennsylvania; Detroit, Michigan; and Tulsa, Oklahoma.

6          In the case of *Madrid v. Gomez*, No. C-90-3094, United States District Court for the

7    Northern District of California, I was retained by the California Department of Justice to audit a

8    fee request of $8.3 million in connection with a prisoners' civil rights case at Pelican Bay State

9    Prison. The audit disclosed a number of billing concerns and the audit report was submitted to

10    Judge King, the settlement judge. The case resulted in a negotiated settlement of $4.25 million, or

11    a reduction of approximately 50 percent. A copy of an article from *The Recorder* dated September

12    26, 1995, describing the settlement is attached as Exhibit 1.

13          In *Rios v. Rowland*, No. 330211, Superior Court of California, County of

14    Sacramento, I was retained to audit a fee request of $1.5 million. The audit disallowed a significant

15    amount of the fees requested. The court upheld the audit results, and reduced the fee request to

16    approximately $227,000.

17          In *CVB Corporation v. John Cavallucci*, No. 156505, Superior Court of California,

18    County of Marin, I was retained to audit a fee request of approximately $2 million pursuant to a

19    contractual provision. The audit uncovered a number of billing abuses, and the court disallowed

20    approximately 50 percent of the fee request.

21          In *Aquilar v. Avis Rent-A-Car System*, No. 948597, Superior Court of California,

22    County of San Francisco, I was retained to audit a fee request of approximately $1.3 million. The

23    audit disclosed a number of problem areas and disallowed a significant amount. The court

24    followed the audit findings and reduced the request by approximately 50 percent, to $650,000.

25          In *McCauley v. BFC Direct Mailing*, No. 5711562, Superior Court of California,

26    County of Orange, the plaintiff alleged violations of campaign election laws and sought attorneys'

27    fees of $1.1 million. The defendant, Howard Jarvis Tax Reform Movement, hired this office to

28

1    conduct a legal fee audit, and we disallowed approximately 50 percent of the fees. The court

2    followed the audit findings and awarded approximately $525,000 of the $1 million requested.

3             In *Florida Asset Financing Corp. v. Borton, Petrini & Conron*, United States

4    District Court, Central District of California, Southern Division (Santa Ana), Case No. 8:96 cv

5    01144 AHS-MLG, we were retained by a private client to audit a fee request of $600,000. Based

6    on the audit report, the court awarded $80,000.

7             I conducted an audit of plaintiff's motion for attorneys' fees in *Adam v. Norton,*

8    Northern District of California, Case No. C-98-2094 CW, a case in which plaintiff sought total

9    fees in the sum of $1,726,312.92. The Special Master appointed by Judge Claudia Wilken to

10   adjudicate the fee petition cited my declaration and recommended a total award of only

11   $434,581.95 in attorneys' fees, less than 25 percent of the amount originally sought. The Special

12   Master stated, "I believe Mr. Schratz' expert testimony meets the standard. Schratz's testimony is

13   relevant, in that Schratz has provided a useful breakdown of the time spent by Plaintiff's attorneys,

14   and reliable, in that Schratz has accurately summarized the time and expenses claimed by

15   Plaintiffs' attorneys." It must be stated the Special Master did not follow all of the audit

16   recommendations. However, the Special Master did recommend reducing the fee request by

17   approximately 75 percent, from $1,726,312.92 to $434,581.95, a result that Judge Claudia Wilken

18   adopted in total in July 2005.

19            In January 2004, in *Frieders v. City of Glendale*, No. BC263271, Los Angeles

20   County Superior Court Judge David A. Workman adopted our findings with respect to an audit of

21   plaintiffs' fee request. As a result, plaintiffs' request of $4.1 million in fees was reduced to $1.1

22   million. The court specifically referred to our audit and reduced the fee request by approximately

23   75 percent. A copy of that order is attached as Exhibit 2.

24            In August 2005, in *Rose v. Lancaster School District,* No. BC 303843, Superior

25   Court of California, County of Los Angeles, the court adopted the methodology, analysis and

26   recommendations contained in our audit, and reduced plaintiff's request for fees by 58 percent

27   from $498,000 to $209,000.

28

1    In *North Pacifica, LLC v. City of Pacifica*, United States District Court, Northern

2    District of California, Case No. C-01-4823 EMC, plaintiff sought damages at trial of

3    approximately $16 million. I was retained by the defendant to audit plaintiff's request for

4    $2,046,759.16 in fees and costs. In awarding plaintiffs only $453,810.75 in fees, Magistrate Judge

5    Edward M. Chen cited my audit with approval with respect to various billing issues. A copy of the

6    order dated December 16, 2005 is attached as Exhibit 3, and states, in pertinent part:

7    
8    
9    
10   

> [B]ased on the information provided in the declaration, Mr. Schratz
> has demonstrated that he is qualified to opine about fee awards and
> that his methodology in evaluating the billing records of NP's attorneys
> in this case is reasonable and sufficiently reliable. For example, Mr.
> Schratz's approach to categorizing the nature of the work of the attorneys
> is reasonable and sufficiently reliable as is, overall, his approach to
> unblocking the block-billed time entries.

11    7.    Of course, not all courts have accepted the audit findings: see, for example,

12    *Oberfelder v. City of Petaluma,* United States Distinct Court, Northern District of California, Case

13    No. 3:98-cv-01470-MHP; *Estrada v. FedEx,* Superior Court of California, County of Los Angeles,

14    Case No. BC210130[1]; Millar *v. BART,* Superior Court of California, County of Alameda, Case No.

15    C830013-9; *Lopez v. San Francisco Unified School District,* United States District Court,

16    Northern District of California, Case No. CV-96-3585 SI; *Gober v. Ralph's Grocery Company,*

17    Superior Court of California, County of San Diego, North County Judicial District, Case No.

18    N72142; *Miller v. Vicorp,* United States District Court, Northern District of California, San Jose

19    Division, Case No. CV-03-00777-RMW.

20    However, even in the cases in which the Court has not accepted all of the audit

21    findings, the court has often reduced the fee application by a significant amount: see, e.g., *Lopez v.*

22    *San Francisco Unified School District,* United States District Court, Northern District of

23    California, Case No. CV-96-3585SI, or *Miller v. Vicorp,* United States District Court, Northern

24    District of California, San Jose Division, Case No. CV-03-00777-RMW.

25    

26    

27    
[1] Court of Appeal reversed trial court's award of attorneys' fees using a 2.0 multiplier as excessive, and remanded for
28    recalculation of an appropriate fee award.

-6-

8.      An audit does not always uncover overbilling. On numerous occasions, I have been retained by a client to audit a legal bill and have informed the client that there is little, if any, overbilling and that the client should pay most, if not all, of the invoice.

For example, previously I have been retained by the California Department of Insurance to audit a number of law firms in connection with numerous matters, including the insolvency of Golden Eagle Insurance Company, which was located in San Diego, California (and was declared insolvent by the California Insurance Commissioner). On a number of these audits, I found that most, if not all, of the fees involved were reasonable and necessary, and recommended to the client that it pay most, if not all, of the fees audited.

9.      As a standard practice, I make an offer to all of my clients to review the bills free of charge and arrive at a preliminary opinion as to whether an audit would uncover any overbilling, so as to make an audit cost efficient. I estimate that in approximately 10 to 15 percent of the possible requests I receive, I suggest to the client that an audit is not cost justified.

10.     On numerous occasions, I have been retained by a law firm engaged in litigation with a client to conduct an audit, and if the audit discloses no overbilling I testify as an expert witness on behalf of the law firm. The following is a partial list of the law firms that I have audited on behalf of a client seeking validation of the requested fees:

> Sidley & Austin
> Manatt, Phelps & Phillips
> Mower, Koeller, Nebeker, Carlson & Halluck
> Lanahan & Reilley
> Lurie & Zepeda
> Banning, Micklow, Bull & Lopez
> Robles & Castles
> Thelen Reid & Priest
> Stoel Rives
> Robinson & Cole
> LeBoeuf, Lamb, Greene & MacRae,
> Husch & Eppenberger
> Parson, Behle & Latimer
> Christiansen Miller Fink Jacobs Glaser Weil & Shapiro, LLP
> Berding & Weil
> Meredith Weinstein & Numbers
> Spector Law Offices

11.     I have published approximately 35 articles, many of which involve the control of legal fees and abuses in the billing practices of attorneys. Over the past several years, I have given

1   numerous presentations on legal auditing and controlling legal costs throughout the United States,

2   Canada and England. I have made a number of presentations to various Bar Associations,

3   insurance industry groups, and other organizations, including the American Bar Association, on

4   how to assist the court in analyzing fee requests. I wrote an article on employing legal fee auditors

5   in fee-shifting cases, which was published in *Trial Diplomacy Journal.* Most recently, I wrote an

6   article, "How to Win a Fee Petition," which was published in a number of publications including

7   *The Rhode Island Bar Journal*, *The Practical Litigator*, *The Federal Lawyer* and Business Laws,

8   Inc.'s *Law Department Management Adviser*. Among other points, this article listed various "red

9   flags" or questionable billing practices that should be avoided in submitting a fee application.

10          12.      Attached hereto as Exhibit 4 is a true and correct copy of my Curriculum Vitae,

11   which lists my work history, my publications, and my general experience.

12          13.      **Scope of Review:** I was retained on or about July 14, 2010 by attorney John P.

13   Schafer of Manderson, Schafer & McKinlay, LLP in Newport Beach, California, on behalf of

14   Signature Group Holdings, Inc. f/k/a Fremont General Corporation ("Signature") to review certain

15   invoices and other documents in connection with a claim for attorneys' fees submitted by the law

16   firm of Arent Fox LLP ("Arent Fox"). The firm has offices in Washington, D.C., New York, New

17   York, and Los Angeles, California. The invoice appears to have been issued from the Washington,

18   D.C. office although the timekeepers who billed to this matter appeared to be exclusively from the

19   other two offices. Arent Fox served as the attorneys for Wells Fargo Bank, N.A. ("Wells Fargo" or

20   the "Trustee"), solely in its capacity as: (a) Indenture Trustee; (b) Institutional Trustee;

21   (c) Guarantee Trustee; and (d) Delaware Trustee in this bankruptcy proceeding.

22          In the course of the audit, I was provided with background information about the

23   case and access to the pleadings through KCC's online electronic docket and I personally reviewed

24   all of the pleadings prepared by Arent Fox.

25          14.      **Scope of Audit:** The auditor initially reviewed all the billing records produced by

26   Arent Fox in support of the instant fee application covering the limited time period June 26, 2008

27   through April 30, 2010. The total billing is 1,863.80 hours and $1,110,873.00 in fees, based on

28   "computed" totals calculated by adding up all the individual entries to independently arrive at the

-8-

1  totals. For purposes of the audit, we use "computed" hours and fees in order to ensure both that all

2  entries are accurately counted and that all are accounted for. In this instance, the auditor found that

3  the computed fees and expenses matched the stated fees and expenses.

4          Arent Fox's billing records for the Fee Application consist of a single invoice,

5  invoice number 1251790, dated May 19, 2010, with 79 pages related to fees and 4 pages related to

6  expenses.

7          On September 20, 2010, attorney John P. Schafer of Manderson, Schafer &

8  McKinlay, LLP forwarded to the auditor a copy of correspondence dated September 20, 2010,

9  including attachments, from attorney Jeffrey N. Rothleder of Arent Fox to attorney Schafer. That

10  correspondence included three additional Arent Fox invoices for the time period from May 3, 2010

11  through July 28, 2010 for work performed in this case.

12          Invoice number 1255895 is dated June 8, 2010, and records 32.8 hours, $19,314.50

13  in fees and $699.12 in costs, for a total of $20,013.62.

14          Invoice number 1260448 is dated June 30, 2010. According to the Rothleder letter,

15  the invoice was originally in the amount of $37,269.95, was later reduced to $36,924.95, and then

16  further reduced to $34,221.45. The final invoice records 45.2 hours, $29,506.00 in fees and

17  $4,715.45 in costs.

18          Invoice number 1268378 is dated August 25, 2010, and records 37.2 hours,

19  $20,931.00 in fees and $2,273.78 in costs, for a total of $23,204.78.

20          These three additional invoices total $69,751.50 in fees and $7,688.35 in costs, for

21  a total of $77,439.85.

22          The complete audit therefore reviewed 1,979 hours and $1,180,624.50 in fees.

23          15.    **Audit Methodology:** As part of the audit process, all of the billing records were

24  input into a computer database to allow for comprehensive searching and analysis. The

25  computerized database permitted creation of summary reports of billing by categories of activities.

26  To the best of my information and belief, all of these reports accurately reflect the information

27  contained in Arent Fox's billing records. Having the records in the computer database also allowed

28

1  for accurate quantification of various other issues including, but not limited to, those discussed in

2  this declaration.

3          The purpose of the legal fee audit is to provide the court and client with information

4  that will enable them to better analyze the information contained in the time records. It is not

5  intended to be the determining "final answer" to any issues concerning the fees in question.

6          16.    **Standard of Review:** In conducting a legal fee audit, the auditor analyzes the

7  invoices and work product generated in light of one of two standards. The first standard is

8  contained in any retainer agreement between the law firm and client, or in billing guidelines or any

9  other instructions provided by the client to the law firm. Absent such agreement, guidelines, or

10  instructions, the auditor looks to established case law for what are acceptable billing practices. To

11  the extent there are instructions from the client, State Bar opinions and case law may supplement

12  the instructions.

13          It has been the auditor's experience that in bankruptcy cases such as the present

14  one, where the bankruptcy estate is being asked to pay the attorneys' fees, the second standard is

15  more relevant. First, the client is the estate and there is no retainer agreement as such. Second,

16  while the Bankruptcy Court is charged with maximizing the value of the estate, it must also

17  consider other factors such as limited judicial resources that often prevent more comprehensive

18  reviews of attorney fee applications. Third, a law firm may engage in billing practices in which the

19  law firm would not engage if a client were actively engaged in monitoring billing on an ongoing

20  basis. In this case, the estate itself is not monitoring the billing and the Court has limited resources

21  to monitor the same. Finally, the auditor is not aware of and has not reviewed any fee agreement or

22  billing guidelines other than the local rules and general U.S. Trustee guidelines.

23          The auditor approaches all legal fee audits with the assumption that most attorneys

24  do not intentionally inflate their bills, and that there must be a "preponderance of the evidence" to

25  support an audit finding that a certain amount of fees should be disallowed. In this regard, the

26  auditor also believes that attorneys should be given the benefit of the doubt where possible

27  overbilling may have occurred. On the other hand, in those cases where it is difficult to determine

28

-10-

1 the nature and extent of the possible overbilling due to the firm's questionable billing practices,

2 such as block billing or vague entries, it is incumbent upon the law firm to justify its fees.

3    17.    **Billing Format:** The auditor views a law firm's billing statement as a

4 representation by the law firm that a particular task was performed on a particular day, by a

5 particular timekeeper, and that the timekeeper spent the amount of time stated on the invoice.

6 Billing format or billing practice irregularities that bring into question the credibility, integrity or

7 reliability of a law firm's billing records are not only not acceptable, they are potentially grounds

8 for a significant disallowance of fees.

9    Arent Fox's billing statement includes the date a particular task was done, the name

10 of the timekeeper who performed the task, a description of the task, the number of hours billed for

11 that task, and the fees billed for that task. However, the billing statement does not specify the

12 hourly rates for the timekeepers for each of their billing entries. This is significant because over

13 the course of the twenty-two months during which Arent Fox billed to this bankruptcy, three of the

14 timekeepers' billing rates increased by 12%, 17%, and 25%, as discussed further below. Due to the

15 lack of hourly rates on the billing statement, these rate increases were not evident and would not

16 have been discovered if the auditor had not calculated the hourly rates for each billing entry. This

17 is a serious deficiency in Arent Fox's billing statement.

18    18.    **Excessive Increase In Attorney Hourly Billing Rates:** The court in *In re First*

19 *Software Corp.*, 79 B.R. 108, 119 (Bankr. D.Mass. 1987) aptly summarized the issue:

20    The hourly rate charged by an attorney is not a measure of his competency. The assumption that the passage of time alone warrants an automatic increase in counsel's hourly rate is

21    unacceptable in a bankruptcy context. The notion that on June 30th an attorney is reasonably worth a particular hourly rate, and the next day, on July 1, the attorney's hourly

22    value increases by 19% is without justification ….

23    The *First Software* Court determined that the hourly rate associated with each

24 attorney was reasonable and that no upward or downward adjustment was warranted so that fee

25 increases were not included in the final award of fees. The court pointed out that there had been

26 no unreasonable delay in payment of fees. (*Id.*, at p. 120.)

27

28

DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF DEBTOR SIGNATURE GROUP'S OBJECTION TO THE
FINAL FEE APPLICATION OF ARENT FOX LLP

1    Over the course of the 25-month period reviewed, June 26, 2008 through July 28,

2   2010, 31 Arent Fox timekeepers billed to this bankruptcy. Of these 31 timekeepers, 3 had rate

3   increases of greater than 10%. Exhibit 5 shows the hourly rate increases for these three individuals.

4    According to The National Law Journal's 2009 survey of billing rates, Law firms

5   increased their average annual firm-wide billing rate by 2.5 percent over the last year, one of the

6   lowest increases in recent memory. "Law firms this year increased rates very modestly, compared

7   to the standard rate increase of 6 to 8 percent," said James Jones, a consultant with Hildebrandt

8   International. "There really isn't anything comparable," said Joe Altonji, an analyst in the Chicago

9   office of Hildebrandt International who advises some local firms. "This may, in fact, be the first

10   time people haven't increased billing rates since the concept started in the 1960's". This article is

11   attached as Exhibit 6.

12    Despite the global economic meltdown and the major upheaval in the legal

13   industry, Arent Fox increased their timekeeper rates above this average firmwide billing rate, as

14   evidenced by the attached exhibit. The increased billing rates are excessive, and as such,

15   unreasonable and the auditor recommends that all billing rate increases over 10% be adjusted to

16   10% and the excess of $23,898.55 be disallowed.

17   **Requested Disallowance:    $ 23,898.55**

18

19    **19.    Travel Time:** Travel time can often be non-productive. As such, many courts have

20   allowed only half the normal billing rate or half the billed travel time as compensable unless the

21   travel time was somehow used productively. E.g., *Daggett v. Kimmelman* (1985 DCNJ) 617 F.

22   Supp. 1269, 1282; *Jennette v. City of New York* (1992 DC SDNY) 800 F. Supp. 1165, 1170;

23   *McDonald, et al. v. Armontrout, et al.* (1988 8th Cir.) 860 F.2d 1456, 1462-3.

24    In this case, Arent Fox is seeking full reimbursement for their travel time,

25   specifically the time for travel of the attorneys from the New York office:

26

27

28

| Date | Biller | Description | Hrs | Rate | Amount |
|------|--------|-------------|-----|------|--------|
| 3/11/10 | Rothleder, JN | Correspond with A. Silfen regarding hearing preparation; Prepare for initial confirmation hearing including multiple emails and telephone conferences with A. Silfen; travel to Santa Ana, CA for initial confirmation hearing; prepare response; prepare joinder; review discovery production. | 13.50 | $535 | $7,222.50 |
| 3/12/10 | Rothleder, JN | Return travel from Santa Ana, CA for initial confirmation hearing. | 8.30 | $535 | $4,440.50 |
| 4/22/10 | Rothleder, JN | Travel to California for confirmation hearing. | 10.00 | $535 | $5,350.00 |
| 4/24/10 | Rothleder, JN | Travel from California after confirmation hearing. | 7.10 | $535 | $3,798.50 |
| 9/15/09 | Silfen, AI | Travel to court regarding disclosure hearing. | 7.50 | $815 | $6,112.50 |
| 9/17/09 | Silfen, AI | Travel from hearing. | 6.00 | $815 | $4,890.00 |
| 3/18/10 | Silfen, AI | Prepare for reinstatement hearing, prepare for vote change hearing, travel, negotiate, conference, continue negotiations; review declarations. | 14.90 | $890 | $13,261.00 |
| 3/20/10 | Silfen, AI | Travel from court hearings. | 6.50 | $890 | $5,785.00 |
| 4/26/10 | Silfen, AI | Travel to court, prepare for confirmation hearings. | 11.20 | $890 | $9,968.00 |
| 4/29/10 | Silfen, AI | Travel back from Court, telephone conference with Wells Fargo, various e-mails with regard to confirmation. | 9.50 | $890 | $8,455.00 |
| | | **Grand Total** | **94.50** | | **$69,283.00** |

Three of these entries (Rothleder's 3/11/10 entry and Silfen's 3/18/10 and 4/29/10 entries) are block billed, as that is described below. To try to account for this, the auditor took the average of the six entries that strictly contained travel time (Rothleder's entries of 3/12/10, 4/22/10, and 4/24/10 and Silfen's entries of 9/15/09, 9/17/09, and 3/20/10) and came up with 7.57 hours as the average billed travel time between New York and the Court. Using 7.57 hours as the travel time for the three block-billed entries, the total fees billed for travel total $57,861.33.

-13-

The auditor recommends allowing travel time to be billed at only 50% of the time billed, or $28,930.67.

A chart listing the time entries containing time billed for travel is attached as Exhibit 7.

**Recommended Disallowance: $28,930.67**

**20.    Clerical Work:** Clerical work is generally not recoverable because it is considered overhead. Nor is clerical work recoverable because an attorney or paralegal actually does the work. If the services performed by a paraprofessional consist of typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying or mailing documents, organizing files, making copies, delivering or mailing papers, or making or receiving routine telephone calls, the task is clerical in nature and not compensable. Instead, it is taken into account when the law firm sets its attorneys' hourly rates, as they can and should be performed by competent legal secretaries or clerical assistants without additional charge to the client.

| Date | Biller | Description | Hrs | Rate | Amount |
|------|--------|-------------|-----|------|--------|
| 1/12/10 | Constantino, NA | Efile pro hac application of J. Rothleder, prepare proof of service, lodge proposed order and serve on Chambers | 1.10 | $265 | $291.50 |
| 1/19/10 | Constantino, NA | Schedule telephonic appearance for J. Rothleder for 01/22/09 hearing | 0.20 | $265 | $53.00 |
| 4/28/10 | Constantino, NA | Schedule courtcall appearance for 04/30 hearing for R. Arnold | 0.20 | $265 | $53.00 |
| 1/19/10 | Filip, SG | Prepare, file and serve pro hac vice order with proof of service and notice of entered order for Jeffrey N. Rothleder's application to appear. | 1.00 | $205 | $205.00 |
| 2/25/10 | Filip, SG | Prepare Proof of Services, file by ECF and serve the Stipulation to Extend Confirmation Objection Deadlines and the Order Approving | 4.00 | $205 | $820.00 |

| Date | | Description | | | |
|---|---|---|---|---|---|
| | | Stipulation. | | | |
| 3/2/10 | Filip, SG | Prepare for filing the exhibits for the omnibus objections and response to proposed competing plans of reorganization and reservation of rights. | 0.60 | $205 | $123.00 |
| 3/2/10 | Filip, SG | Prepare proof of service, serve and file initial omnibus objections and response to proposed competing plans of reorganization and reservation of rights. | 0.40 | $205 | $82.00 |
| 3/3/10 | Filip, SG | Prepare proof of service, serve and file omnibus response to proposed modifications to competing plan of reorganization. | 0.80 | $205 | $164.00 |
| 3/8/10 | Filip, SG | Prepare proof of service, file and serve clean copies of exhibit "C" and "B" to omnibus objection and response of Wells Fargo to proposed plan of reorganization. | 0.20 | $205 | $41.00 |
| 3/8/10 | Filip, SG | Prepare proof of service, serve and file first response to proposed competing pan of reorganization. | 0.20 | $205 | $41.00 |
| 3/10/10 | Filip, SG | Prepare proof of service, file and serve statement concerning discovery and confirmation trial procedures. | 0.20 | $205 | $41.00 |
| 3/17/10 | Filip, SG | Prepare for electronic filing the summary statement and related objection to confirmation of New World Acquisition and Equity Committee plan of reorganization. | 0.30 | $205 | $61.50 |
| 3/17/10 | Filip, SG | Prepare proof of service and file the summary statement and related objection to confirmation of New World Acquisition and Equity Committee plan of reorganization. | 0.20 | $205 | $41.00 |
| 3/23/10 | Filip, SG | Prepare proof of service, file and serve Ronni Arnold's pro hac vice application. | 0.60 | $205 | $123.00 |
| 3/24/10 | Filip, SG | Prepare letter to Judge's clerk re payment of pro hac vice fee for Ronni Arnold. | 0.20 | $205 | $41.00 |

| Date | Timekeeper | Description | | | |
|---|---|---|---|---|---|
| 3/24/10 | Filip, SG | Prepare proof of service, file and serve the order on Ronni Arnold's pro hac vice application. | 0.80 | $205 | $164.00 |
| 4/16/10 | Filip, SG | Prepare proof of service, serve and filed the opposition to New World Acquisition's motion for reconsideration of reinstatement ruling. | 1.20 | $205 | $246.00 |
| 4/21/10 | Filip, SG | Prepare proof of service and serve the reply to New World's supplemental memorandum of points and authorities in support of confirmation of New World plan. | 1.00 | $205 | $205.00 |
| 7/18/08 | Indelicato, LA | Prepare envelopes to send to court for clerk to use for service of signed orders granting pro hac applications; review local rules and procedures; call to court re same. | 0.30 | $270 | $81.00 |
| 11/9/09 | Indelicato, LA | Review docket; arrange Jeff Rothleder's telephonic appearance at hearing on disclosure statement; email Rothleder re same. | 0.30 | $285 | $85.50 |
| 11/16/09 | Indelicato, LA | Set up court call for tomorrow's emergency hearing for Jeff Rothleder. | 0.30 | $285 | $85.50 |
| 3/22/10 | Indelicato, LA | Arrange for copying of CD of Fremont documents for Andrew Silfen. | 0.20 | $270 | $54.00 |
| 9/14/09 | Linn, SL | Assemble duplicate set of exhibits; | 0.60 | $250 | $150.00 |
| 7/9/10 | Kong, AS | Discuss with A. Ordubegian re payment of fees and setting of hearing re same. | 0.10 | $465 | $46.50 |
| 7/9/10 | Kong, AS | Discuss with J. Rothleder re setting of motion for fees and telephone with law clerk re setting of motion for fees. | 0.40 | $465 | $186.00 |
| 7/12/10 | Kong, AS | Telephone to chambers to discuss hearing date for motion to enforce plan terms for fees and expenses. | 0.30 | $310 | $93.00 |
| 7/27/10 | Kong, AS | Revise motion to enforce plan terms and prepare same with exhibits and proposed order for filing. | 0.20 | $465 | $93.00 |
| | | **Grand Total** | **15.90** | | **$3,670.50** |

-16-

A table listing examples of clerical tasks billed by Arent Fox timekeepers is attached as Exhibit 8. The last four (4) entries above, by attorney Andy S. Kong, are his only entries to this entire matter. Attorney Kong is a 2006 admittee to the California Bar. The first three entries relate to setting a hearing date for the motion for fees, a task that could and should have been handled by a secretary. The final entry appears to be substantive in that it references revising the motion. However, it also refers to preparing the motion for filing. As this entry is attorney Kong's only work on the motion and totals just 0.2 hours, it is highly unlikely that he made any substantive or substantial changes to the motion and more likely just prepared the motion for filing. That is why I have classified this task as clerical. Total fees associated with clerical work are $3,670.50. None of this work required specialized legal expertise or knowledge and should have been performed by clerical personnel at no additional cost to the estate.

**Recommended Disallowance: $3,670.50**

21.    **Vague Billing:** The applicant bears the burden of describing the services performed in sufficient detail to enable the court to make a meaningful assessment as to whether those services were actual, necessary, and beneficial to the estate and whether they were performed within a reasonable amount of time. Vague entries provide little or no information about the nature or significance of the work performed, thereby severely hampering a realistic assessment of its utility, or the reasonableness of the associated fees. Specifically, billing records should provide: "…sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." *United Slate, Tile & Composition v. G&M Roofing* (Sixth Cir. 1984) 732 F.2d 495, 502 n.2. Generally, "sufficient detail" means that the timekeeper must include in each time entry, at a minimum, descriptions of the services performed and the subject matter involved. To enable the court to determine whether the services are compensable, the timekeeper is also expected to identify the other party to the conference, meeting, telephone call, or correspondence. Where the time entry omits some critical

1   element describing the services performed, it is not compensable. *In Re Bennett Funding Group*

2   (Bankr. N.D.N.Y. 1997) 213 BR. 234, 244.

3          Vague characterizations of the services performed, omitting the other party to a

4   conference, meeting, telephone call, or correspondence or omitting the subject of a communication

5   make review meaningless. Time entries containing such vague characterizations connote some

6   activity other than professional services, although it is not entirely clear what the timekeeper is

7   actually doing. They fail to identify a specific task that the timekeeper is performing.

8   Consequently, it is not possible to determine whether the task is necessary and whether the

9   compensation sought is reasonable.

10         As examples, the following billing entries all lack at least one piece of information

11  essential to an informed analysis such as the subject of a communication, the other parties to a

12  communication, what "attention to" means, or what documents were reviewed:

13

14
| Date | Biller | Description | Hrs | Rate | Amount |
|------|--------|-------------|-----|------|--------|
| 3/4/10 | Arnold, RN | Attention to issues regarding discovery of New World and Equity Committee | 1.60 | $475 | $760.00 |
| 3/22/10 | Arnold, RN | Attention to issues regarding pro hac admission for April 2 hearing | 0.30 | $475 | $142.50 |
| 4/5/10 | Brown, TF | Prepare draft email to New World counsel. | 0.40 | $690 | $276.00 |
| 7/20/09 | Eisenberg, LM | Emails with A. Silfen and J. Rothleder. | 0.20 | $615 | $123.00 |
| 9/16/08 | Indelicato, LA | Various calls and emails to set up telephonic hearing. | 0.40 | $285 | $114.00 |
| 11/4/08 | Indelicato, LA | Review and organize documents. | 0.20 | $285 | $57.00 |
| 2/7/10 | Ordubegian, AO | Review various plan related pleadings recently filed by parties. | 1.40 | $655 | $917.00 |
| 2/12/10 | Ordubegian, AO | Review various pleadings and emails re repurchase creditors and impacts on pending plans. | 0.70 | $655 | $458.50 |
| 2/24/10 | Ordubegian, AO | Various conferences and email exchanges re Wells Fargo's objection to plan confirmation. | 1.70 | $655 | $1,113.50 |

28

-18-

1    Even examining the context of these billing entries fails to provide sufficient

2   information as to what is being done in each of these vague billing entries.

3    Attorney Andrew I. Silfen billed 442.90 hours, or 23.8% of the total 1,863.40 hours

4   billed by all Arent Fox timekeepers. His hours resulted in fees totaling $378,979.50, or 34.1% of

5   the total $1,110,873.00 billed by all Arent Fox timekeepers. Reviewing all of his 285 billing

6   entries, the auditor found that most of them were vague as seen by the following examples:

7

8

| Date | Biller | Description | Hrs | Rate | Amount |
|---|---|---|---|---|---|
| 6/26/08 | Silfen, AI | Conference; negotiation; telephone conference. | 0.30 | $760 | $228.00 |
| 6/29/08 | Silfen, AI | Review documents, telephone call with client. | 0.40 | $760 | $304.00 |
| 6/30/08 | Silfen, AI | Conference with UST. | 0.40 | $725 | $290.00 |
| 6/30/08 | Silfen, AI | Various telephone calls and negotiations. | 0.80 | $725 | $580.00 |
| 6/30/08 | Silfen, AI | Conference with Wells and M. Cryan. | 0.30 | $725 | $217.50 |
| 7/1/08 | Silfen, AI | Various telephone calls, conference, review documents. | 2.10 | $760 | $1,596.00 |
| 7/3/08 | Silfen, AI | Review documents and make comments. | 0.60 | $725 | $435.00 |
| 7/3/08 | Silfen, AI | Telephone call with committee counsel. | 0.50 | $725 | $362.50 |
| 7/7/08 | Silfen, AI | Review documents and pleadings. | 0.60 | $725 | $435.00 |
| 7/8/08 | Silfen, AI | Various telephone calls, conference. | 1.20 | $725 | $870.00 |

21    In *In re Samuel R. Pierce, Jr.* (D.C.Cir. 1999) 190 F.3d 586, 593-594, the D.C.

22  Circuit confirmed that its general practice was to reduce vaguely entered hours of plaintiffs'

23  attorneys by ten percent (10%). Similarly, the Eighth Circuit, in *H.J.Inc. v. Flygt Corp.* (8th Cir.

24  1991) 925 F.2d 257, 260, upheld a district court's reduction of hours billed by the prevailing

25  plaintiff's attorney by twenty percent (20%) for vague billing entries. Finally, in *Gratz v. Bollinger*

26  (E.D. Mich. 2005) 353F.Supp.2d 929, 939, District Judge Duggan reduced requested fees ten

27  percent (10%) due to block billing and vague entries.

28

1    The auditor found 282 total entries that were vague. A table containing these entries

2  is attached as Exhibit 9. These entries total 343.8 hours and $269,576.50 in fees, or 18.5% of the

3  total hours and 24.3% of the total fees. In light of the magnitude of this billing problem, the

4  auditor recommends a 20% reduction of the fees remaining after the above-discussed

5  disallowances have been taken. Taking the reduction in this way avoids double-deducting.

6

7    **Recommended Disallowance: 20%**

8

9    **22.    Block Billing.** "Block billing" is the lumping together of daily time entries

10  consisting of two or more task descriptions, or the grouping of different tasks within one block of

11  time on a time record. Block billing obscures the amount of time actually spent on each task, and

12  opens the door to understatement or overstatement of the amount of time the law firm actually

13  spent on specific tasks.

14    The federal courts have long disapproved of block billing and disallowed fees

15  where this practice exists.  For example, the Tenth Circuit has ruled: "[t]he use of billing practices

16  that camouflage the work a lawyer does naturally and quite correctly raises suspicions about

17  whether all the work claimed was actually accomplished or whether it was necessary…" *Robinson,*

18  *et al. v. City of Redmond, et al.* (10th Cir. 1998) 160 F.3d 1275; see also *Leroy v. City of Houston*

19  (5th Cir, 1990) 906 F.2d 1068 (plaintiff has burden to show amount of time expended was

20  reasonable, and this showing could not be made without some breakdown as to the separate

21  functions performed and number of hours devoted to each.) The Ninth Circuit held (in an

22  unpublished opinion) that block billing and "overly generalized descriptions of tasks performed"

23  requires a reduction in a fee award.  *Gracie, et al. v. Semaphore Entertainment Group, et al.* (9th

24  Cir. 2002) 52 Fed Apex. 43; 2002 U.S. App. LEXIS 24556.

25    State Bar of California Mandatory Fee Arbitration Advisory No. 03-01, "Detecting

26  Attorney Bill Padding," January 29, 2003, at page 5, attached as Exhibit 10, likewise disapproves

27  block billing, stating in pertinent part:

28

-20-

"If one amount of time is shown for working on more than one discreet task, this is called "block billing" or "lumping" time. This is almost never allowed by federal courts. The practice hides accountability and may increase time by 10% to 30%. The larger the "block," the more care should be exercised."

In a December 2005 U.S. District Court decision in the Northern District of California, *North Pacifica LLC v. City of Pacifica, et al.,* Case No. C01-4823 EMC, Magistrate Chen cited my report and confirmed my disapproval of block billing in his opinion on the motion for attorneys' fees.  In doing so, Magistrate Chen referred to a California State Bar fee arbitration committee advisory report, "Detecting Attorney Bill Padding," January 29, 2003, No. 03-01, which was included in my audit report for the above-referenced case and is attached to this current declaration as Exhibit 6.  The report concludes that block billing "hides accountability and may increase time by 10 to 30 percent.  The larger the 'block,' the more care should be exercised," at page 5.  Magistrate Chen also disapproved of block billing in *Defenbaugh v. JBC & Associates, Inc.,* No. C-03-0651 JCS, 2004 WL 1874978*9 (N.D. Cal., August 10, 2004), and *Navarro v. General Nutrition Corp.,* Northern District Case No. C-03-0603.   The report does not distinguish or even mention the difference between fee shifting claims with unrelated non-fee shifting claims.

The California State Bar advisory report referenced above was also used to reduce hours billed in block format in *Welch v. Metropolitan Life Insurance Co.,* No. 04-56768, D.C. No. CV-04-00084-PA (9th Cir. 2007).  While disapproving the District Court's across-the-board reduction of hours by 20 percent (because only about half the entries were blocked), the Ninth Circuit Court acknowledged the lower court's right to "impose a reduction for block billing," at p. 7. The *Welch* Court further states, in pertinent part, at p. 6.:

We do not quarrel with the district court's authority to reduce hours that are billed in block format.  The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked.  See *Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir. 1992).  It was reasonable for the district court to conclude that Welch failed to carry her burden, because block billing makes it more difficult to determine how much time was spent on particular activities. *See, e.g., Role Models Am., Inc. v. Brownlee,* 353 F.3d 962, 971 (D.C. Cir.

-21-

2004) (reducing requested hours because counsel's practice of block billing "lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness"); see also *Hensley v. Eckerhart,* 461 U.S. [424,] at 437 (holding that applicant should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims"); *Fischer v. SJB-P.D. Inc.,* 214 F.3d 1115, 1121 (9th Cir. 2000) (holding that a district court may reduce hours to offset "poorly documented" billing); see also *Costanza Builders of N.J., Inc. v. Waterfront Homes, LLC,* 2005 N.J. Super. Unpub. LEXIS 344 (App.Div. Oct. 28, 2005); and *Downey v. Coalition Against Rape & Abuse, Inc.,* 2005 U.S. Dist. LEXIS 22986 (D.N.J. Sept. 30, 2005).

In the auditor's experience, timekeepers who block bill usually use either a semicolon (";") punctuation mark or a period (".") punctuation mark to separate discrete tasks contained within one billing entry. Since block entries tend to consist of strings of items connected with semicolons or periods, finding and counting the semicolons or periods can also identify block entries and their length and is usually done by conducting a word search through the billing records for these punctuation marks.

This approach is not exact, as the search may pick up semicolons and periods in normal use, thus overstating the likely count of block entries. On the other hand, some block entries do not contain semicolons, thus underestimating the count. On balance, the auditor believes that the opposite risks tend to neutralize each other. The semicolon or period count is a valuable indicator of prevalence and complexity of block entries in billing records.

Ideally, block-billed entries should play no role in billing records, and each activity should be separately stated and charged. To the extent there are any block entries, therefore, the records fail to clearly present how much time was spent on each task. Block billing introduces serious potential for error, and undermines the integrity of the billing data as a whole. Examples of blocked entries are set out below:

| Date | Biller | Description | Hrs | Rate | Amount |
|------|--------|-------------|-----|------|--------|
| 3/16/10 | Arnold, RN | Draft and revise reinstatement brief, including telephone conferences with J. Rothleder and legal research regarding same; prepare response to issues raised by other parties. | 5.10 | $475 | $2,422.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4/5/10 | Brown, TF | Review outstanding discovery requests from New World and Equity Committee and information received from client in response to same; review production; conference regarding discovery. | 3.20 | $690 | $2,208.00 |
| 9/17/08 | Henderson, DJ | Prepare memo regarding Trust Termination; conferences with A. Silfen and D. Dubrow; telephone conference with P. McLeod; conference with holders; respond to holders. | 4.50 | $685 | $3,082.50 |
| 9/1/09 | Rothleder, JN | Review and revise notices to holders regarding plan filings and forward same to J. Lewis for review and execution; analyze Equity Committee plan of reorganization and related disclosure statement and draft and revise objection to same; review Committee's response to Equity Committee disclosure statement and correspond with A. Silfen re same. | 6.10 | $515 | $3,141.50 |
| 9/2/09 | Rothleder, JN | Revise objection to Equity Committee Disclosure Statement and forward same to A. Silfen for review and telephone conference with A. Silfen re same; correspond and telephone conferences with J. Lewis regarding notices to holders on filing of competing plans and revise same; draft statement in support of Committee disclosure statement. | 3.80 | $515 | $1,957.00 |
| 10/22/09 | Rothleder, JN | Prepare for and participate in committee conference call regarding New World plan; review draft language regarding treatment and payment of indenture trustee fees for inclusion in equity committee plan and correspond with A. Silfen and J. Lewis re same; review memorandum from Committee on New World plan. | 3.40 | $515 | $1,751.00 |
| 2/17/10 | Rothleder, JN | Analyze proposed plans of reorganization for relevant provisions including treatment of senior creditors and SEC compliance in advance of drafting objections to confirmation; legal research regarding modification of indentures by plans and correspond with R. Arnold re same; correspond and telephone conferences with R. Arnold regarding draft confirmation objections | 7.10 | $535 | $3,798.50 |

DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF DEBTOR SIGNATURE GROUP'S OBJECTION TO THE
FINAL FEE APPLICATION OF ARENT FOX LLP

| | | | | | |
|---|---|---|---|---|---|
| | | | and related issues; conference call with A. Silfen and R. Arnold regarding strategy relating to confirmation; review correspondence to Committee counsel regarding Committee's plan comments and related authorization. | | | |
| | 2/22/10 | Rothleder, JN | Correspond with A. Ordubegian regarding Fremont hearing dates; analyze plans and disclosure statements in connection with objection to confirmation and legal research re same; correspond with R. Arnold regarding confirmation objections; review draft objection and telephone conference with A. Silfen and R. Arnold re same. | 5.40 | $535 | $2,889.00 |
| | 3/2/10 | Rothleder, JN | Revise, finalize and file confirmation objection; multiple e-mails and conferences with A. Silfen, R. Arnold and A. Ordubegian regarding confirmation objection; correspond and telephone conference with J. Lewis regarding comments and approval of confirmation objection; conferences with J. Jordan regarding securities law inserts for objection; review draft discovery prepared by G. Utlik and comment on same. | 12.10 | $535 | $6,473.50 |
| | 4/13/10 | Rothleder, JN | Review and analyze pleadings filed on April 9th including New World's motion to reconsider reinstatement ruling; conferences with R. Arnold regarding status of pleadings and responses; conference with T. Brown regarding opposition to New World's motion to reconsider; conference call with A. Silfen, T. Brown, R. Arnold and G. Utlik regarding opposition to motion to reconsider and response to New World supplement brief in support of confirmation; telephone call with holder regarding opposition to motion to reconsider; mark-up Equity Committee and Signature plan and conference with A. Silfen re same; forward plan supplements for review by D. Henderson and J. Jordan. | 5.90 | $535 | $3,156.50 |

DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF DEBTOR SIGNATURE GROUP'S OBJECTION TO THE
FINAL FEE APPLICATION OF ARENT FOX LLP

| 4/21/10 | Rothleder, JN | Review and comment on draft reply to New World's supplemental confirmation brief and correspondence with R. Arnold re same; prepare for hearing on motion for reconsideration of reinstatement ruling and conferences with A. Silfen and T. Brown re same; mark-up revised and amended documents. | 6.30 | $535 | $3,370.50 |
| 4/23/10 | Rothleder, JN | Prepare for hearing on, among other things, New World's motion for reconsideration of reinstatement ruling; participate and attending confirmation hearings and correspond with A. Silfen re same; confer with Signature and OEC regarding comments to proposed plans; review hearing notes and draft summary of same for A. Silfen; travel to airport for return flight from California | 10.10 | $535 | $5,403.50 |

There are 1,259 separate billing entries in Arent Fox's billing statement. Using the semicolon count the auditor found that 958 entries, containing 53.80% of the hours billed and 56.46% of the fees billed contained no semicolons, most likely indicating that these billing entries contained only a single discrete task. This also means that 301 billing entries, containing 46.20% of the hours billed and 43.54% of the fees billed, contained more than one task; in other words, were block-billed. A table itemizing the number of entries containing semicolons, and the number of semicolons in those entries, is attached as Exhibit 11. A table containing these entries is attached as Exhibit 12.

To the degree block billing was present in this case, in addition to the fact that it can overstate or inflate time spent by as much as 30 percent, it presented additional problems. For example, it was difficult, if not impossible, to allocate work with a high degree of precision that was associated with specific documents.

Based upon the fact that over 40% of the billing hours and fees were contained in block-billed entries, and relying upon the State Bar of California Mandatory Fee Arbitration Advisory No. 03-01, as quoted above, the auditor recommends a 20% further disallowance of the fees remaining after the above-discussed disallowances have been taken.

**Requested Disallowance:    20%**

23.    **Expenses:** In addition to the fees requested, Arent Fox is also requesting $28,408.29 in expenses. The auditor was not provided with any backup documentation related to these expenses for review and is not aware that any backup documentation has been provided to the Court or any other party to evidence these claimed expenses. However, the expenses as claimed raise serious questions and therefore the auditor makes the following recommendations as to the claimed expenses.

a.    **Disallowed.** Certain of the expenses, even if later documented, should not be reimbursed by a client or any third party. These expenses fall into three categories.

(1).    **Meals and Overtime.** Arent Fox is requesting reimbursement of $454.01 for meals apparently consumed by their staff in office (via SeamlessWeb, an online delivery and takeout meal web site), for overtime meals, expenses, and cabs. The following entries are contained within this category:

| | | |
|---|---|---|
| 4/30/10 | MEALS - SEAMLESS WEB PROFESSIONAL | $25.62 |
| 4/30/10 | MEALS - SEAMLESS WEB PROFESSIONAL | $15.39 |
| 4/30/10 | MEALS - SEAMLESS WEB PROFESSIONAL | $25.62 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - R. ARNOLD 2/22 | $26.90 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - Y. CRUZ 3/1-3 | $15.00 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH 2/19, 3/2 AND ¾ | $32.00 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - R. ARNOLD 3/8 | $28.94 |
| 4/30/10 | OVERTIME MEALS & CABS - RONNI ARNOLD LATE NIGHT WORKING CAB FARE | $10.30 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - Y. CRUZ 3/11 AND 3/16 | $35.50 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - R. ARNOLD 3/9 AND 3/16 | $19.00 |

-26-

|  | OVERTIME MEALS & CABS - RONNI ARNOLD LATE |  |
|---|---|---|
| 4/30/10 | NIGHT WORKING CAB FARE | $9.00 |
| 4/30/10 | OVERTIME MEALS & CABS PETTY CASH - Y. CRUZ 4/14 | $32.25 |
| 5/27/10 | OVERTIME EXPENSE (SECRETARY) YOLANDA CRUZ | $75.00 |
| 7/28/10 | OVERTIME MEALS - SEAMLESS WEB PROFESSIONAL | $13.49 |
| 7/28/10 | OVERTIME EXPENSE (SECRETARY) YOLANDA CRUZ | $45.00 |
| 7/28/10 | OVERTIME EXPENSE (SECRETARY) YOLANDA CRUZ | $45.00 |
|  | **Total Meals and Overtime** | **$454.01** |

These cost items are usually considered part of firm overhead, thus included in the hourly rates being charged by the professionals, and not separately charged to the client. If the firm's staffing and scheduling decisions require staff meals, overtime, or cab fare, the firm should absorb that cost and not pass it through to the client or ask another party to pay for those decisions.

(2).    **Faxes.** Arent Fox is requesting reimbursement of $474.00 for "TELECOPIER" billed on April 30, 2010, May 27, 2010, June 30, 2010, and July 28, 2010, as seen in the following table:

| 4/30/10 | TELECOPIER | $297.00 |
|---|---|---|
| 5/27/10 | TELECOPIER | $12.00 |
| 6/30/10 | TELECOPIER | $147.00 |
| 7/28/10 | TELECOPIER | $18.00 |
|  | **Total Faxing** | **$474.00** |

While the invoices do not indicate the basis for this charge for faxes, in the auditor's experience, firm's charge a flat rate of $1.00 per page, or more, for all outbound faxes. Flat rate billing does not accurately represent the cost of outbound faxes, which is better represented by the actual long distance telephone charge, if any, for sending the faxes. Because the basis for the charge is arbitrary, we disallowed the firm's fax charges on this basis.

(3).    **Movies.** Arent Fox is requesting reimbursement of $43.97 for "OUT OF TOWN LODGING - ANDREW SILFEN HOTEL:MOVIES:TRVEL DEST: FREMONT" billed on June 30, 2010. While attorneys should be able to view movies in the privacy of their hotel rooms, this type of cost should not be passed through to any other entity for payment.

-27-

1    **Total Disallowed:    $971.98**

2

3          b.    **Disallowed Pending Receipt Of Additional Information.**

4                None of the remaining expenses were documented or have been shown to be

5    relevant to this matter.  Therefore, payment on all remaining expenses, $27,436.21 should be

6    withheld pending receipt of additional information related to them. Items of particular note are

7    discussed here, but all of these remaining expenses should be fully documented before payment is

8    authorized.

9                (1).    **Duplicating.** Arent Fox is requesting $4,932.60 as duplication

10   expenses:

11

12   | 4/30/10 | DUPLICATING SUMMARY | $4,592.60 |
     | 5/27/10 | DUPLICATING SUMMARY | $70.70 |
13   | 6/30/10 | DUPLICATING SUMMARY | $45.10 |
     | 7/28/10 | DUPLICATING SUMMARY | $224.20 |
14   | | **Total Duplicating** | **$4,932.60** |

15   However, the firm has failed to indicate the number of copies or the per page rate that it is

16   charging for making these copies. Expenses for copying should reflect the actual cost, as closely as

17   possible, of the copying and not be used as a profit-making endeavor. All of the claimed expenses

18   for duplicating should be disallowed pending receipt of this additional information.

19                (2).    **Taxis.** Arent Fox is requesting $2,733.50 for taxicabs:

20

21   | 4/30/10 | TAXICABS | $2,273.00 |
     | 5/27/10 | TAXICABS | $221.50 |
22   | 6/30/10 | TAXICABS | $119.00 |
     | 7/28/10 | TAXICABS | $120.00 |
23   | | **Total Taxicabs** | **$2,733.50** |

24   However, there is no indication why the use of taxicabs was necessary. Costs for local travel

25   should be included in a firm's overhead. Costs for out-of-area travel are separately listed by the

26   firm. Therefore, it is unclear exactly where, why, and how these taxicab expenses were incurred.

27

28

-28-

1   All of the claimed expenses for taxicabs should be disallowed pending receipt of this additional

2   information.

3   (3).    **Meals.** Two of the claimed expenses for meals stood out:

4

| 4/30/10 | OUT-OF-TOWN MEALS - ARAM ORDUBEGIAN MEAL:TRAVEL DEST: LA TO ORANGE COUNTY | $222.01 |
|---------|---|---|
| 6/30/10 | MEALS - ANDREW SILFEN MEALS:VARIOUS: J LEWIS: WELLS FARGO, | $525.80 |
| | **Total Meals** | **$747.81** |

8   If each of these entries is for a single meal, further explanation is clearly required as these are large

9   amounts. If each of these entries is for multiple meals, further documentation is also required as to

10  the number of meals, where they were incurred, etc.

11

12  Although only a few expense items have been discussed here, as stated

13  above, none of the remaining expenses claimed by Arent Fox should be authorized pending receipt

14  of additional information related to the expenses.

15

16  **Total Disallowed Pending Receipt of Further Documentation:**

17  **$27,436.31**

18

19  **24.    Summary:** Taking into account the recommended billing rate adjustments, the 50%

20  deduction for travel time, the disallowances for billing for clerical tasks, Arent Fox's vague billing

21  and block billing, the total recommended disallowance of fees in this matter is $506,149.63, or

22  42.9 percent of the total fees ($1,180,624.50) being sought in Arent Fox's Final Fee Application

23  plus the three invoices submitted in Rothleder's September 20, 2010 letter. Conversely,

24  $674,474.87, or 57.1 percent of the total fees remain. All calculations are set out in the Summary,

25  attached as Exhibit 13.

26

27  Excessive Billing Rates          $23,898.55

28  Travel Time                      $28,930.67

| | | |
|---|---|---|
| Clerical | $3,670.50 | |
| | ============ | |
| Sub-total | $56,499.72 | |
| Fees | | $1,180,624.50 |
| Remaining Fees | | $1,124,124.78 |
| Vague Billing (20%) | $224,824.96 | |
| Block Billing (20%) | $224,824.96 | |
| | ============ | |
| Sub-total | $449,649.91 | |
| **TOTAL** | | **$674,474.87** |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 23rd day of September, 2010 at Sonoma, California.

Regards,

*[signature: James P. Schratz]*

JAMES P. SCHRATZ